Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Block]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

IN RE WELLS FARGO & COMPANY
HIRING PRACTICES DERIVATIVE
LITIGATION

This Document Relates to:

ALL ACTIONS

Lead Case No. 3:22-cv-05173-TLT

## VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Hugues Gervat and Charles Rogers ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Wells Fargo & Company ("Wells Fargo" or the "Company"), files this Verified Consolidated Amended Shareholder Derivative Complaint against defendants Charles W. Scharf ("Scharf"), Kleber R. Santos ("Santos"), Carly Sanchez ("Sanchez"), Steven D. Black ("Black"), Mark A. Chancy ("Chancy"), Celeste A. Clark ("Clark"), Theodore F. Craver, Jr. ("Craver"), Wayne M. Hewett ("Hewett"), Maria R. Morris ("Morris"), Richard B. Payne, Jr. ("Payne"), Juan A. Pujadas ("Pujadas"), and Ronald L. Sargent ("Sargent") (collectively, the "Individual Defendants," and together with Wells Fargo, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Wells Fargo, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wells Fargo, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants between February 24, 2021 and June 9, 2022 (the "Relevant Period").

2.     Wells Fargo is one of the largest banks in the United States. As a large commercial bank, Wells Fargo provides banking, investments, mortgages, personal loans, education loans, credit cards, and other consumer and commercial finance products and services, both domestically and internationally.

3.     Over the last several years, Wells Fargo has been embroiled in corporate scandals stemming from sprawling instances of misconduct. In recent years, the Company has violated the

Sarbanes-Oxley Act of 2002 ("SOX"), defrauded mortgage holders and mortgage bond investors, and overcharged consumers for auto insurance, among other things. One of the biggest scandals involved the Company creating 3.5 million unauthorized consumer accounts in an attempt to boost its profits. This was done by falsifying records and forging customer signatures.

4.    These instances of misconduct resulted in significant regulatory penalties for the Company. Notably, in December 2017, due to the "fake account" scandal, the Federal Reserve capped the Company's assets at roughly $1.9 trillion until the Company could show that it had resolved its risk and control failures (the "Asset Cap"). The Asset Cap has limited the Company's revenue and growth and hampered its ability to compete against other big banks.

5.    The Company has also earned a reputation for discrimination in recent years, particularly due to its problematic hiring practices. As a result, the Company has faced a wide range of regulatory actions and lawsuits. For example, in 2012, Wells Fargo reached a historic settlement with the United States Department of Justice ("DOJ") after the DOJ alleged that the Company's mortgage lending practices discriminated against African-American and Hispanic borrowers. Furthermore, in 2016, the Company reached a settlement with a class of its African-American financial advisors to resolve claims that Wells Fargo effectively "segregate[d] [its] workforce by race" and failed to provide African-American financial advisors with the same opportunities provided to white financial advisors. Additionally, in 2017, the Company settled claims that it overcharged military veterans for refinance loans. Similar discriminatory conduct was revealed in 2019 when the Company entered into a Conciliation Agreement[1] with the Department of Labor ("DOL") following the DOL's investigation and conclusion that, in 2014, the Company had discriminated against 2,066 female job applicants and 282 African-American job applicants.

6.    In late 2019, as scandals continued to plague the Company, Wells Fargo hired Defendant Scharf to serve as its Chief Executive Officer ("CEO"); he was the third CEO the Company had hired in three years. At this time, Defendants knew that to shed the Asset Cap, the Company would need to remedy

---

[1]According to the DOL's website, Conciliation Agreements "identify violations and require [the company] to implement specific remedies." https://www.dol.gov/agencies/ofccp/foia/library/conciliation-agreements (last visited Feb. 24, 2023).

the pervasive problems it was facing. As a result, Defendant Scharf began implementing organizational changes at the Company. Defendant Scharf assured the investing public that these organizational changes provided him, the Company's Operating Committee (comprised of the Company's highest-ranking executives), and the Company's Board of Directors (the "Board") with insight into all significant matters impacting the Company.

7.      Because of the Company's history of discrimination, these organizational changes were part of Defendants' strategy to convince the market that the Company prioritized diversity, equity, and inclusion ("DE&I") and was striving to increase diversity within the Company's senior management levels. In March 2020, the Company revealed that it was implementing a Diversity Search Requirement, stating that, "[u]nder the leadership of our CEO, Charlie Scharf . . . [w]e are requiring diverse candidate slates and interview teams for all roles at Wells Fargo with total direct compensation of more than $100,000." Wells Fargo's most senior officers purportedly implemented the Diversity Search Requirement and pledged to ensure that the Company followed the policy.

8.      Several of the Individual Defendants, including certain members of Wells Fargo's Board, were aware of and involved in these efforts before the Relevant Period began. For instance, the Company's Notice of Annual Meeting and Proxy Statement filed with the SEC on Schedule 14A on March 16, 2020 (the "2020 Proxy Statement"), solicited by Defendants Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Scharf (among others) announced that Wells Fargo was implementing new diversity initiatives, including a program that would increase diverse representation in the Company's senior-level roles. The 2020 Proxy Statement further stated that the Company was "dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions."

9.      In the following months, Defendants continued to represent to the investing public that the Company was focused on, and dedicated to, DE&I. For example, as social unrest swept across the country after George Floyd was killed in May 2020, Defendant Scharf stated that, "as the CEO of Wells Fargo, I can commit that our company will do all we can to support our diverse communities and foster a company culture that deeply values and respects diversity and inclusion." However, during a Zoom call with

Company employees less than a month later, Defendant Scharf walked back on these statements when he stated that the Company's lack of senior-level Black employees was a result of a "very limited pool of Black talent to recruit from."

10.     Defendant Scharf's statements outraged the public and Company shareholders. As a result, shareholders demanded that the Company provide further disclosures regarding its DE&I initiatives. Further, Defendant Scharf's comments were referenced by several institutional Company shareholders in connection with a proposal for a diverse hiring initiative that would require at least one woman and one ethnically or racially diverse person to be included in the initial candidate pool for all of the Company's United States-based job openings. That proposal was submitted to Wells Fargo by shareholders who asked that it be included in the Company's forthcoming proxy statement. The shareholders also requested that the proposal be presented for consideration and a vote during the Company's 2021 annual shareholder meeting. However, the Company, advised by its Board, adamantly opposed the proposal, because it was supposedly undertaking sufficient action to address diversity related concerns and instead agreed to disclose significantly more detail about the Diverse Search Requirement in exchange for the shareholders withdrawing the proposal.

11.     Throughout the Relevant Period, Defendants made a series of statements to the investing public touting the Company's Diverse Search Requirement. For example, Wells Fargo's annual report filed on February 23, 2021 for the year ended December 31, 2020 (the "2020 Annual Report") stated that, "[i]n the U.S., we are requiring a diverse slate of candidates . . . for most roles with total direct compensation of more than $100,000 per year." Defendant Scharf discussed the Diverse Search Requirement again on May 26, 2021, while testifying under oath before the United States Senate Committee on Banking, Housing, and Urban Affairs. That day, Defendant Scharf assured that "for the hiring of many senior roles, [Wells Fargo] [had] implemented guidelines that require a diverse slate of candidates (at least 50 percent)."

12.     Similarly, in April 2021, the Company published a report titled *2020 Social Impact and Sustainability Highlights* wherein Defendants assured the investing public that "[o]ur Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at

least 50% of interview candidates must be diverse with respect to at least one diversity dimension." Further, Defendants boasted that, as of December 31, 2020, "91% of applicable requisitions had a diverse interview slate."

13.     Additionally, on October 7, 2021, Defendant Sanchez attended a virtual interview with the Institute for Corporate Productivity ("i4cp") where she highlighted the Company's "candidate slate requirement for roles $100K and above" and explained that "50% of the slate – of the candidate slate that will be interviewed needs to be diverse in one dimension or another." These representations were critical to investors, particularly due to the Company's history of discriminatory conduct. Investors knew that the Federal Reserve would not lift the Asset Cap until the Company resolved its pervasive issues with compliance and risk management.

14.     However, Wells Fargo fell far short of the diversity interviewing and hiring goals set forth by the Company, instead conducting sham interviews with minority candidates to artificially meet Company interviewing requirements. In particular, to show superficial compliance with the Diverse Search Requirement, the Company would interview diverse candidates for positions that had already been filled. These sham interviews were a systemic problem at the Company and impacted various business lines both prior to and during the Relevant Period. As a result, the statements made by Defendants throughout the Relevant Period touting the Company's DE&I efforts were materially false and misleading.

15.     Making matters worse, on March 14, 2022, several of the Individual Defendants solicited shareholders to vote on various proposals in the Schedule 14A the Company filed with the SEC that day, which contained materially false and misleading statements and omissions (the "2022 Proxy Statement"). The 2022 Proxy Statement called for shareholders to: (1) elect as directors the 14 nominees named in the proxy statement; (2) approve, on an advisory basis, executive compensation (Say on Pay); (3) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for 2022; and (4) approve the Company's 2022 Long-Term Incentive Plan (the "Plan"). The purpose of the Plan was to "assist" the Company and its affiliates in "attracting, retaining and rewarding employees, officers and directors, and to motivate them to achieve [C]ompany goals and to drive sustained shareholder value." By shareholders approving the Plan, shares that remained available for grant for full value awards under

the Company's Long-Term Incentive Compensation Plan (the "LTICP"), less the full-value awards granted to non-employee directors under the LTICP on the date of the 2022 annual meeting, became available for grant under the Plan. In conjunction with the Plan, the Board also sought shareholder approval to add *80 million shares* for issuance under the Plan. As a result of the Individual Defendants' false and misleading statements, shareholders voted to approve the Plan, enabling the Individual Defendants and others at the Company to materially benefit, unjustly, therefrom. The matters omitted from the 2022 Proxy Statement and/or otherwise misrepresented were significant to investors, who were keenly monitoring the Company's compliance efforts and diversity related activities. Had shareholders been aware of the true state at the Company—they would not have voted to approve the Plan, as it sought to (and did) reward the Individual Defendants based on false pretenses.

16.     On May 19, 2022, the truth began to emerge when *The New York Times* reported that Wells Fargo did indeed conduct fake interviews with diverse candidates so the Company could satisfy the Diverse Search Requirement (the "May 19th Article").[2] The May 19th Article featured a former Wells Fargo executive in the wealth management division named Joe Bruno ("Bruno") who was allegedly fired in retaliation for blowing the whistle on the Company's practice of conducting sham interviews for diverse candidates. Wells Fargo attempted to discredit these claims, with one Company spokesperson telling *The Wall Street Journal* that "[t]here is absolutely no reason why anyone would conduct a fake interview." In a further attempt to diminish these claims, the Company characterized any "fake" interviews as isolated acts of rogue employees, stating that "[t]o the extent that individual employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it." The Company also stated several times after the May 19th Article's publication that it had researched all of the specific claims *The New York Times* shared with the Company before the article was published but could not determine if they were factual.

17.     On this news, the price of Wells Fargo's stock fell $0.33 per share, from $42.00 per share at close on May 19, 2022 to close at $41.67 per share on May 20, 2022.

---

[2] Emily Flitter, "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews," *N.Y. Times* (May 19, 2022) (last visited Feb. 24, 2023), https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html.

18.     Less than two weeks later, on June 1, 2022, the Company released a report titled *Diversity, Equity and Inclusion at Wells Fargo* (the "2022 DE&I Report") where Defendants again touted the Company's DE&I efforts, assuring the market that, "[f]or most posted roles in the U.S. with total director compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension." Two days later, Defendant Santos again touted the Diverse Search Requirement, telling *Business Insider* that, "[t]he rule is working."

19.     Shortly thereafter, on June 6, 2022, *Reuters* reported that Wells Fargo would pause use of its Diverse Search Requirement "after the New York Times reported such interviews were often fake and conducted even though the job had already been promised to someone else."[3] The Company paused the Diverse Search Requirement so Company leaders could "study its use and make changes," "gain confidence that 'the guidelines live[d] up to their promise,'" and ensure "hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should work."

20.     Just three days later, on June 9, 2022, the truth fully emerged when *The New York Times* published an article reporting that federal prosecutors in the United States Attorney's Office for the Southern District of New York had opened a criminal investigation into Wells Fargo's discriminatory hiring practices (the "June 9th Article").[4] The article further revealed that since the publication of the May 19th Article, ten current and former Company employees had come forward to corroborate the allegations that sham interviews were prevalent throughout the Company and the Company's other business lines.  In particular, the article revealed that federal prosecutors were investigating whether Wells Fargo violated federal law by holding sham interviews to meet the Company's Diverse Search Requirement and retaliated against employees by terminating them for speaking up against these unethical practices (the "Discrimination Misconduct").

---

[3] "Wells Fargo pauses diverse slate hiring policy after reports of fake job interviews" *Reuters* (June 6, 2022, 7:02PM EST) (last visited Feb. 24, 2023), https://www.reuters.com/business/wells-fargo-pauses-diverse-slate-hiring-policy-after-reports-of-fake-job-interviews-2022-06-06/.
[4] Emily Flitter, "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices," *N.Y. Times* (June 9, 2022) (last visited Feb. 24, 2023), https://www.nytimes.com/2022/06/09/business/wells-fargo-fake-interviews-investigation.html.

21.     On this news, the price of the Company's common stock fell more than 10% over two days, declining from a close of $44.63 per share on June 8, 2022 to close at $40.08 on June 10, 2022. This stock drop wiped out $17 billion in market capitalization.

22.     Several market commentators represented that the stock drop was caused by the disclosures made in the June 9th Article. They further represented that the revelations made in the June 9th Article and the accompanying stock drop stunted the Company's progress toward lifting the Asset Cap. For example, on June 9, 2022, the last day of the Relevant Period, *Fortune* wrote that the Company's "share decline accelerated after [*The New York Times*'s] report," and that "[t]he probe [wa]s the last potential blow to Wells Fargo's public image."

23.     The fallout from Defendants' misconduct continued well after the end of the Relevant Period. For example, members of both houses of Congress have cited Wells Fargo's fake interview scandal as another example of the Company's corporate malfeasance. On June 28, 2022, Maxine Waters, Chairwoman of the United States House of Representatives Financial Services Committee, released a letter regarding the Company's sham interviews. Chairwoman Waters stated that "commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that financial institutions hold" and noted that it was "unacceptable that Wells Fargo would mislead applicants and the public." Additionally, Chairwoman Waters emphasized that the "asset cap imposed by now-Treasury Secretary Janet Yellen ha[d] failed to force the bank to change its behavior" and that the Company "continue[d] to display a troubling pattern of bad behavior with an inability to competently redress such patterns."

24.     Members of the United States Senate's Banking, Housing, and Urban Affairs Committee also expressed concern regarding the revelations made in the June 9th Article. In September 2022, Senators Bob Menendez, Sherrod Brown, and Elizabeth Warren sent a letter to Defendant Scharf and the Company's Senior Vice President and Head of Human Resources, Bei Ling, highlighting their "deep concern regarding recent reports that Wells Fargo conducts 'fake interviews' with women and minority candidates for positions that ha[d] already been filled." The Senators further noted that the Company's

diversity hiring practices were "not only highly offensive and suggestive of systemic bias and discrimination at the bank, but also may represent a pattern of misleading shareholders."

25.     That same month, Defendant Scharf testified before the House Financial Services Committee and was asked by Chairwoman Waters, "[i]s it true that you interviewed an African-American employee for a position after you already hired a white employee? Is that true?" Defendant Scharf deflected the question, stating that the Company was "in the middle of continuing an investigation to make sure that [the Company] understand[s] every instance where people felt as if they were not treated fairly, and if we have findings, we will take appropriate action." However, Defendant Scharf never denied that the Company had conducted fake interviews.

26.     On August 1, 2022, Wells Fargo announced that it was "reinstating its diverse candidate slate guidelines," but with drastic changes. In this announcement, Defendants also effectively admitted that the Company had abused the Diverse Search Requirement throughout the Relevant Period. *The New York Times* reported that the Company made a series of disclosures regarding its diversity hiring practices in an internal memo announcing the reinstatement of the Diverse Search Requirement. The memo revealed that, after "talking to employees," Wells Fargo had "[o]verwhelmingly [] heard the need to improve the candidate and manager experience" and would be adding "new features" to the Diverse Search Requirement policy "***to prevent abuse***." (Emphasis added.) Some of these changes included "increased training for managers" and "an easier approval process for exemptions to the diverse slate requirement." The Company also changed the Diverse Search Requirement's hard rule which required a 50% diverse candidate slate for positions with compensation of over $100,000. Instead, the Diverse Search Requirement would now apply to roles that were "in-scope" based on unspecified job levels.

27.     On October 31, 2022, the Company filed a Form 10-Q with the SEC for the third quarter of 2022 (the "3Q 2022 10-Q") which revealed that, in addition to the DOJ's investigation, the Company was also facing an SEC investigation into the Company's diversity hiring practices. Analysts linked the fake hiring scandal to the Company's ability to finally shed the Asset Cap, with Deutsche Bank noting in a November 6, 2022 analyst report that "[i]t seems logical (to us, at least) that the above issues need to be resolved before the Fed lifts the asset cap."

28.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Wells Fargo's business, operations, and prospects, including in the 2022 Proxy Statement. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Wells Fargo did not abide by its own diverse hiring procedures and was actively deceiving the public about the Company's commitment to workplace diversity; (2) Wells Fargo was engaged in the Discrimination Misconduct; (3) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (4) as a result, the foregoing circumstances would tarnish Wells Fargo's reputation and stature as an institution; and (5) Wells Fargo failed to maintain adequate internal controls. As a result of the foregoing, Wells Fargo's public statements were materially false and misleading at all relevant times.

29.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing Wells Fargo to repurchase its own stock at artificially inflated rates. Indeed, between February 2021 and June 2022, approximately 400 million shares of Wells Fargo common stock were repurchased, costing the Company almost $19.9 billion. Since the repurchased stock was only worth $40.08 per share, which was the price at close of trading on June 10, 2022, Wells Fargo overpaid by over $3.8 billion.

30.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

31.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock while the price of stock was artificially inflated, obtaining proceeds of over $1 million while several of the Individual Defendants materially benefited from shareholder approval of the Plan, which provided an additional 80 million shares for awards made thereunder and established compensation ceilings for certain of the Individual Defendants, including members of the Board, that provided for potentially double or triple their prior year salaries.

32.     In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, its Senior Executive Vice President ("EVP"), CEO of Consumer Lending, and its Human Resources Senior Executive to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and has further subjected the Company to criminal investigations, the need to remedy the Discrimination Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

33.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants Scharf's, Santos's, and Sanchez's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

35.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

36.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

37.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

38.     The court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she has, directly or indirectly, used the means and instrumentalities of interstate commerce, some of which are, the mails, interstate telephone communications, and the facilities of the national securities markets.

39.     Venue is proper in this Judicial District because Wells Fargo is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

## PARTIES

### Plaintiff Gervat

40.     Plaintiff Gervat is a current Wells Fargo stockholder who has continuously held Wells Fargo stock since before the beginning of the Relevant Period.

41.     Plaintiff Gervat is a citizen of Florida.

### Plaintiff Rodgers

42.     Plaintiff Rogers is a current Wells Fargo stockholder who has continuously held Wells Fargo stock since before the beginning of the Relevant Period.

43.     Plaintiff Rogers is a citizen of North Carolina.

### Nominal Defendant Wells Fargo

44.     Wells Fargo is a San Francisco, California-based Delaware corporation. The Company's principal executive offices are located at 420 Montgomery Street, San Francisco, California. Wells Fargo's shares trade on the New York Stock Exchange ("NYSE") under the ticker "WFC."

### Defendant Scharf

45.     Defendant Scharf is Wells Fargo's CEO, President, and has served as a Company director

since October 2019. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Scharf beneficially owned 316,771 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 23, 2022 was $53.95, Defendant Scharf owned approximately $17.1 million worth of Wells Fargo stock.

46.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Scharf received $21,350,906 in total compensation from the Company. This included $2,500,000 in salary, $13,485,052 in stock awards, and $5,365,854 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Scharf received $20,392,046 in total compensation from the Company. This included $2,500,000 in salary, $13,542,046 in stock awards, and $4,350,000 in non-equity incentive plan compensation.

47.     The 2022 Proxy Statement stated the following about Defendant Scharf:

*Mr. Scharf* has served as our Company's President and CEO, and as a director since October 2019. He served as CEO of The Bank of New York Mellon Corporation (American investment banking services holding company), New York, New York, from July 2017, and as chairman from January 2018 to September 2019. Mr. Scharf was the CEO and a director of Visa Inc., San Francisco, California, from November 2012 to December 2016. Prior to joining Visa, he served in several senior positions at JPMorgan and Citigroup and their predecessors. Mr. Scharf was formerly a director of The Bank of New York Mellon Corporation and Visa.

48.     Upon information and belief, Defendant Scharf is a citizen of New York.

**Defendant Santos**

49.     Defendant Santos has served as the Company's Senior EVP and CEO of Consumer Lending since July 11, 2022. He served as the Company's Head of Diverse Segments, Representation, and Inclusion ("DSRI") throughout the Relevant Period.

50.     During the Relevant Period, Defendant Santos made the following sale of the Company stock at an artificially inflated price:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 3, 2022 | 22,700 | $44.44 | $1,008,788 |

51.     Defendant Santos's insider sale which was made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

52.     Upon information and belief, Defendant Santos is a citizen of Virginia.

**Defendant Sanchez**

53.     Defendant Sanchez is the Company's Human Resources Senior Executive. She served as Wells Fargo's EVP, Talent Acquisition, Affirmative Action/Equal Employment Opportunity, Diversity Recruiting throughout the Relevant Period.

54.     Upon information and belief, Defendant Sanchez is a citizen of California.

**Defendant Black**

55.     Defendant Black has served as a director of Wells Fargo's Board since April 2020 and was elected as Chair of the Board in August 2021. He was also elected as Finance Committee Chair during the 2022 Annual Meeting of Shareholders based on proposals made in the 2022 Proxy Statement. Additionally, Defendant Black is a member of the Company's Human Resources Committee ("HRC"). According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Black owned 19,037 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on February 23, 2022 was $53.95, Defendant Black owned approximately $1.1 million worth of Wells Fargo stock.

56.     For the 2021 Fiscal Year, Defendant Black received $428,900 in total compensation from the Company. This included $248,856 in fees earned or paid in cash and $180,044 in stock awards.

57.     The 2022 Proxy Statement stated the following about Defendant Black:

*Mr. Black* was Co-CEO of Bregal Investments, New York, New York (private equity firm) from September 2012 until his retirement in December 2021. He was Vice Chairman of JPMorgan from March 2010 until February 2011, where he was a member of the operating and executive committees. Prior to that position, Mr. Black was Executive Chairman of JPMorgan's investment bank from October 2009 until March 2010. He served as co-CEO of JPMorgan's investment bank from 2004 until 2009. Mr. Black was the deputy co-CEO of JPMorgan's Investment Bank from 2003 until 2004. He also served as head of JPMorgan investment bank's Global Equities business from 2000 until 2003following a career at Citigroup and its predecessor firms. Mr. Black was formerly a director of The Bank of New York Mellon Corporation.

58.     Upon information and belief, Defendant Black is a citizen of Michigan.

**Defendant Chancy**

59.     Defendant Chancy has served as a director of Wells Fargo's Board since August 2020. He also serves as a member of the Audit Committee, Finance Committee, and Risk Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Chancy owned 16,379 shares of Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 23, 2022 was $53.95, Defendant Chancy owned approximately $883,647 worth of Wells Fargo stock.

60.     For the 2021 Fiscal Year, Defendant Chancy received $357,044 in total compensation from the Company. This included $177,000 in fees earned or paid in cash and $180,044 in stock awards.

61.     The 2022 Proxy Statement stated the following about Defendant Chancy:

*Mr. Chancy* served as vice chairman and consumer segment executive of SunTrust from April 2017 and co-chief operating officer from February 2018 until his retirement in December 2019. As customer segment executive at SunTrust, he led consumer banking, mortgage and consumer lending, private wealth management, deposits and virtual channels, and consumer operations. He was corporate EVP and wholesale banking executive of SunTrust from April 2011 to April 2017, where he led SunTrust's wholesale segment, which included corporate and investment banking, commercial and business banking, treasury and payment solutions, and commercial real estate banking. Previously, Mr. Chancy served as CFO of SunTrust from August 2004 to April 2011 and was treasurer of SunTrust from July 2001 until August 2004. Prior to joining SunTrust, he was CFO of The Robinson-Humphrey Company, Inc., which was purchased by SunTrust in 2001.

62.     Upon information and belief, Defendant Chancy is a citizen of Georgia.

**Defendant Clark**

63.     Defendant Clark has served as a director of Wells Fargo's Board since January 2018. She is also the Chair of the Corporate Responsibility Committee ("CRC") and a member of the Governance and Nominating Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Clark owned 29,543 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on February 23, 2022 was $53.95, Defendant Clark approximately owned $1.6 million worth of Wells Fargo stock.

64.     For the 2021 Fiscal Year, Defendant Clark received $342,044 in total compensation from the Company. This included $162,000 in fees earned or paid in cash and $180,044 in stock awards.

65.     The 2022 Proxy Statement stated the following about Defendant Clark:

*Dr. Clark* has served as a principal of Abraham Clark Consulting, LLC, Battle Creek, Michigan (health and regulatory policy consulting firm) since 2011. She was SVP of Global Public Policy and External Relations from 2010 and Chief Sustainability Officer from 2008 of Kellogg Company, Battle Creek, Michigan (food manufacturing company) until 2011. Dr. Clark was formerly a director of Advance Pierre Foods Holdings, Inc., Mead Johnson Nutrition Company, and Omega Protein Corporation.

66.     Upon information and belief, Defendant Clark is a citizen of Michigan.

**Defendant Craver**

67.     Defendant Craver has served as a director of Wells Fargo's Board since January 2018. He is also the Chair of the Audit Committee and a member of the Finance Committee and the Governance and Nominating Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Craver owned 30,797 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading day on February 23, 2022 was $53.95, Defendant Craver owned approximately $1.7 million worth of Wells Fargo stock.

68.     For the 2021 Fiscal Year, Defendant Craver received $378,211 in total compensation from the Company. This included $198,167 in fees earned or paid in cash and $180,044 in stock awards.

69.     The 2022 Proxy Statement stated the following about Defendant Craver:

*Mr. Craver* served as President of Edison from April 2008 until May 2016 and Chairman and CEO of Edison from August 2008 until his retirement in September 2016. Prior to joining Edison in 1996, Mr. Craver served as EVP and corporate treasurer of First Interstate. He also served as chairman of both the electric utility trade group, Edison Electric Institute (June 2014 to June 2015), and the industry's technology research arm, the Electric Power Research Institute (April 2011 to April 2012). Mr. Craver was formerly a director of Edison and Health Net, Inc.

70.     Upon information and belief, Defendant Craver is a citizen of California.

**Defendant Hewett**

71.     Defendant Hewett has served as a director of Wells Fargo's Board since January 2019. He is also the Chair of Governance and Nominating Committee and a member of the CRC, HRC, and Risk Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Hewett owned 26,660 shares of Company common stock. Given that the price per share of the Company's common stock

at the close of trading day on February 23, 2022 was $53.95, Defendant Hewett owned approximately $1.4 million worth of Wells Fargo stock.

72.     For the 2021 Fiscal Year, Defendant Hewett received $354,923 in total compensation from the Company. This included $174,879 in fees earned or paid in cash and $180,044 in stock awards.

73.     The 2022 Proxy Statement said the following about Defendant Hewett:

*Mr. Hewett* served as CEO of Klöckner Pentaplast Group, founded in Montabaur, Germany (packaging) from August 2015 to November 2017. He was President from February 2015 and a director from March 2015 of Platform Specialty Products Corporation, West Palm Beach, Florida (Specialty chemicals) until August 2015. Mr. Hewett was President and CEO of Arysta Life Science Corporation, Tokyo, Japan (crop protection and life sciences) from January 2010until its acquisition by Platform Specialty Products Corporation in February 2015.Since March 2018, he has served as a senior advisor to Permira (private equity). From March 2018 until December 2020, he was Non-Executive Chairman of DiversiTech Corporation (HVAC manufacturer and distributor), formerly a portfolio company of the Permira Funds. Since December 2019, he has been Non-Executive Chairman of Cambrex Corporation (small molecule therapeutics), and since January 2021, a Director of Lytx (telematics), both portfolio companies of the Permira Funds.

74.     Upon information and belief, Defendant Hewett is a citizen of Illinois.

**Defendant Morris**

75.     Defendant Morris has served as a director of Wells Fargo's Board since January 2018. She is also the Chair of the Risk Committee and a member of the HRC. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Morris owned 19,581 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading day on February 23, 2022, was $53.95, Defendant Morris owned approximately $1.1 million worth of Wells Fargo stock.

76.     For the 2021 Fiscal Year, Defendant Morris received $440,044 in total compensation from the Company. This included $260,000 in fees earned or paid in cash and $180,044 in stock awards.

77.     The 2022 Proxy Statement stated the following about Defendant Morris:

*Ms. Morris* served as EVP and head of the Global Employee Benefits business from 2011 and interim head of the U.S. Business from 2016 until July 2017 of MetLife, New York, New York (global provider of life insurance, annuities, employee benefits, and asset management), when she retired. She was Chief Marketing Officer from April 2014 until January 2015 and EVP of Technology and Operations from January 2008 to September 2011.

78.     Upon information and belief, Defendant Morris is a citizen of New York.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendant Payne**

79.     Defendant Payne has served as a director of Wells Fargo's Board since October 2019. He is also a member of the Risk Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Payne owned 13,231 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading day on February 23, 2022 was $53.95, Defendant Payne owned approximately $713,812 worth of Wells Fargo stock.

80.     For the 2021 Fiscal Year, Defendant Payne received $349,211 in total compensation from the Company. This included $169,167 in fees earned or paid in cash and $180,044 in stock awards.

81.     The 2022 Proxy Statement said the following about Defendant Payne:

*Mr. Payne* served as vice chairman, Wholesale Banking, of U.S. Bancorp from November 2010 until he retired in April 2016, and as vice chairman, Corporate Banking, at U.S. Bancorp, Minneapolis, Minnesota from July 2006 to November 2010. Prior to joining U.S. Bancorp, he served as EVP for National City Corporation, Cleveland, Ohio, from 2001 to 2006. Prior to joining National City, Mr. Payne was a managing director at First Union Corporation and served in various roles of increasing responsibility in corporate banking at Bank of America predecessor banks. He also served in the corporate finance group of Morgan Stanley and in roles of increasing responsibility at a predecessor bank of JPMorgan.

82.     Upon information and belief, Defendant Payne is a citizen of Minnesota.

**Defendant Pujadas**

83.     Defendant Pujadas has served as a director of Wells Fargo's Board since September 2017. He is also a member of the Finance Committee and the Risk Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Pujadas owned 19,813 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading day on February 23, 2022 was $53.95, Defendant Pujadas owned approximately $1.1 million worth of Wells Fargo stock.

84.     For the 2021 Fiscal Year, Defendant Pujadas received $383,044 in total compensation from the Company. This included $203,000 in fees earned or paid in cash and $180,044 in stock awards.

85.     The 2022 Proxy Statement stated the following about Defendant Pujadas:

*Mr. Pujadas* served as vice chairman, Global Advisory Services of PricewaterhouseCoopers International Limited, London, United Kingdom (audit, financial advisory, risk management, tax, and consulting, the PwC global network), from 2008 until his retirement in June 2016. He served as the leader of the U.S. Advisory practice of PwC, the U.S. member firm of PWCIL, from 2003 to 2009.

18

Verified Consolidated Amended Shareholder Derivative Complaint

86.     Upon information and belief, Defendant Pujadas is a citizen of California.

**Defendant Sargent**

87.     Defendant Sargent has served as a director of Wells Fargo's Board since February 2017. He is also the Chair of the HRC and a member of the Audit Committee and the Governance and Nominating Committee. According to the 2022 Proxy Statement, as of February 23, 2022, Defendant Sargent owned 64,426 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading day on February 23, 2022 was $53.95, Defendant Sargent owned approximately $3.5 million worth of Wells Fargo stock.

88.     For the 2021 Fiscal Year, Defendant Sargent received $374,044 in total compensation from the Company. This included $194,000 in fees earned or paid in cash and $180,044 in stock awards.

89.     The 2022 Proxy Statement stated the following about Defendant Sargent: *"Mr. Sargent served as Chairman from March 2005 until January 2017 and Chief Executive Officer from February 2002 until June 2016 of Staples, Inc., Framingham, Massachusetts (business products retailer), when he retired. Mr. Sargent was formerly a director of Staples, Inc."*

90.     Upon information and belief, Defendant Sargent is a citizen of Ohio.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

91.     By reason of their positions as officers, directors, and/or fiduciaries of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, the Individual Defendants owed Wells Fargo and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Wells Fargo and its shareholders so as to benefit all shareholders equally.

92.     Each director and officer of the Company owes to Wells Fargo and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

93.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wells Fargo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

94.     To discharge their duties, the officers and directors of Wells Fargo were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

95.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Wells Fargo, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Wells Fargo's Board at all relevant times.

96.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

97.     To discharge their duties, the officers and directors of Wells Fargo were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Wells Fargo's own Code of Ethics and Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as misrepresenting the Company's compliance with its diversity hiring policies and subjecting underrepresented candidates to fake interviews, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Wells Fargo and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Wells Fargo's operations would comply with all applicable laws and Wells Fargo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

98.     Each of the Individual Defendants further owed to Wells Fargo and the shareholders the duty of loyalty requiring that each favor Wells Fargo's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

99.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Wells Fargo and were at all times acting within the course and scope of such agency.

100.     Because of their advisory, executive, managerial, and directorial positions with Wells Fargo, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

101.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Wells Fargo.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

102.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

103.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

104.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Wells Fargo was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

105.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

106.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Wells Fargo and was at all times acting within the course and scope of such agency.

## **WELLS FARGO'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

### *Code of Conduct*

107.    Wells Fargo's Code of Conduct states that it "applies to all employees, including officers, as well as directors of Wells Fargo & Company and its subsidiaries, regardless of location or employee classification."

108.    The Code of Conduct states the following regarding the Company's values:

We have a responsibility to always act with honesty and integrity. When we do so, we earn the trust of our customers. We have to earn that trust every day by behaving ethically, rewarding open, honest communication, and holding ourselves accountable for the decisions we make and the actions we take.

109.    Regarding values pertaining to Diversity and Inclusion at the Company, the Code of Conduct states the following, in relevant part:

- Collaboration and inclusiveness are central to how we work because the best solutions are often those that draw on our diverse ideas and perspectives. As employees we have a responsibility to: Do our part to help Wells Fargo to serve and earn business from a variety of communities and stakeholders.
- Integrate diversity into our sourcing processes.
- Help create an environment where all team members can contribute, develop, and fully use their talents.
- Keep an open mind to new ideas, and listen to different points of view.

110.    The Code of Conduct instructs Company employees on accountability by stating that:

We are all accountable for complying with the Code, as well as all corporate and business policies and applicable laws, rules, and regulations that apply to us. Likewise, we are all accountable for our decisions and actions, especially managing the risks inherent in our roles and appropriately escalating issues and violations of which we become aware. If mistakes are made, we acknowledge them and act to correct them.

Violation of the provisions of this Code or the referenced policies and guidelines is grounds for corrective action, which may include termination of your employment. Certain actions may also result in legal proceedings, including prosecution for criminal violations.

111.    The Code of Conduct expressly states that Wells Fargo does not "tolerate retaliation," stating that:

We do not engage in or tolerate retaliation of any kind against anyone for providing information in good faith (or otherwise in accordance with applicable country-specific laws) about suspected and unethical or illegal conduct, including fraud; securities law or regulatory violations; possible violations of any Wells Fargo policies (including this Code); other inappropriate workplace behavior; or concerns regarding accounting, internal accounting controls, or auditing matters.

112.    The Code of Conduct also states that "[e]each of us must help maintain a culture where everyone feels comfortable speaking up."

113.    The Code of Conduct instructs that Wells Fargo personnel must, "[a]void conflicts of interest" adding that:

A conflict of interest can be a situation that interferes with your duties or responsibilities to Wells Fargo, or that affects your ability to act in the best interests of Wells Fargo.
A situation when you receive an improper benefit as a result of your position with Wells Fargo.

114.    The Code of Conduct section on "Maintain accurate and complete records" states:

Each of us has an important role to play in recording financial and non-financial information. We must always be accurate and timely when reporting personnel and business transactions.

We are committed to full, fair, accurate, timely, and understandable disclosure in the public reports and documents that Wells Fargo files with, submits, or provides to the U.S. Securities and Exchange Commission, other regulatory authorities, our shareholders, and the public.

115.    The Code of Conduct further states that:

When we share information with the public, we must do so carefully and consistently. In all of our communications we should be as candid and transparent as possible while keeping in mind our responsibilities to protect confidentiality and privacy. This includes the use of social media as well as more traditional forms of oral and written communication.

116.    Under the section "Insider trading and other trading restrictions," the Code of Conduct states, in relevant part:

You must never buy or sell securities when you have material, nonpublic information, nor should you ever "tip" others by providing them with material, nonpublic information. Insider trading restrictions cover Wells Fargo securities of other companies, including customers and third-party service providers, and apply to you and your immediate family. These restrictions also apply to transactions or trades conducted in your personal accounts or any other account over which you have direct or indirect control.

If you commit an insider trading violation, the consequences can be severe, including immediate termination of your employment; civil and criminal penalties for you, anyone you tip, and Wells Fargo as a company; and damage to Wells Fargo's reputation.

117.    Finally, the Code of Conduct provides that employees must "[r]eport concerns regarding possible violations of the Code, laws, rules, regulations, or corporate and business policies and practices to the EthicsLine," adding that:

> We have a responsibility to protect the reputation and integrity of Wells Fargo. If you see or suspect illegal or unethical behavior involving Wells Fargo, including possible violations of this Code, or violations of laws, rules or regulations – whether it relates to you, your manager, a co-worker, a customer or a third-party service provider.

### Human Resources Committee Charter

118.    The Wells Fargo and Company Human Resources Committee Charter (the "HRC Charter") defines the responsibilities of the Company's HRC.

119.    Per the HRC Charter, among the HRC's responsibilities are to "oversee the Company's human capital risk and human capital management," which includes: performance management; talent management; diversity, equity, and inclusion; pay equity; and succession planning for the CEO and other senior executives as determined by the HRC.

120.    An additional responsibility of the HRC contained in the HRC Charter is to oversee the Company's "culture and ethics." The HRC Charter states that:

> The HRC shall oversee the Company's culture, including management's efforts to foster ethical behavior and decision-making throughout the Company and the Company's Code of Ethics and Business Conduct and any significant changes or exceptions thereto.

121.    With regard to the HRC's responsibility for executive compensation, the charter states:

> *Executive Compensation, Incentive Compensation, and Equity-Based Plans*. The HRC shall review and approve benefit, compensation, perquisite plans and arrangements, and any other compensation-related plans or arrangements applicable to the executive officers of the Company. The executive officers of the Company shall be those persons designated "officers" by the Board for purposes of Section 16 of the Exchange Act and the rules thereunder. The HRC shall make recommendations to the Board with respect to the Company's incentive compensation and equity-based plans that are subject to Board approval, discharge any responsibilities assigned to the HRC by any of these plans, and periodically review the Company's stock ownership retention guidelines for participants in the Company's Long-Term Incentive Compensation Plan.

### Audit Committee Charter

122.    The Wells Fargo & Company Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

123.    Per the Audit Committee Charter, among the Audit Committee's "purposes" are to "assist the Board in fulfilling its responsibilities to oversee the integrity of the Company's financial statements and the adequacy and reliability of disclosures to shareholders and bank regulatory agencies, including management activities related to accounting and financial reporting and internal controls . . . as well as the Company's compliance with legal and regulatory requirements[.]"

124.    An additional "purpose" is to "oversee risk related to the Committee's responsibility described in this Charter."

125.    The Audit Committee Charter lists the following Audit Committee responsibilities, among others:

1. Reviews and approves the Committee report included in the Company's annual proxy in accordance with Securities and Exchange Commission rules.
2. Review and discuss, prior to filing, the Company's annual audited financial statements (and Form 10-K) and quarterly unaudited financial statements (and Form 10-Q) with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.
3. Monitor the Company's progress in appropriately and promptly addressing, correcting, and resolving any matters reported to the Committee that in the Committee's judgment could materially jeopardize the Company's financial condition, results of operations and accuracy of the Company's financial statements.
4. Review the audit results prepared annually by the internal audit function, and reported to both the Risk Committee and the Audit Committee, assessing the effectiveness of the Company's risk management framework and capabilities.

126.    The Individual Defendants violated Wells Fargo's Code of Conduct by engaging in or permitting the Company to engage in the Discrimination Misconduct, issuing materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to uphold the diversity and inclusion policies, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure

the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law.

127.    Moreover, the Individual Defendants who served on the Company's HRC and Audit Committee during the Relevant Period violated the HRC Charter and the Audit Committee Charter by engaging in or permitting the Company to engage in the Discrimination Misconduct, issuing materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. In addition the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background of the Company's Business and Wells Fargo's History of Mismanagement and Scandal

128.    Wells Fargo is a Delaware corporation based in San Francisco, California that provides banking, investment, and mortgage products and services, and consumer and commercial finance services both domestically and internationally through physical banking locations, the internet, and other distribution channels.

129.    Wells Fargo is the fourth largest bank holding company in the United States, controlling approximately $1.9 trillion in balance sheet assets. The Company employed over 247,000 people as of December 31, 2021.

130.    Over the last decade, the Company has repeatedly implemented abusive practices that have significantly harmed its customers, employees, and shareholders and have subjected the Company to intense regulatory scrutiny. The Company has faced a myriad of negative consequences as a result.

131.     Issues with the Company's image began in 2013 when *The Los Angeles Times* published a piece accusing the Company of deceiving its customers by creating unauthorized customer accounts. Wells Fargo initially tried to downplay these allegations by blaming the unauthorized customer accounts on a few rogue employees. However, it was ultimately revealed that the Company, in an attempt to boost profits, had created over 3.5 million unauthorized customer accounts. This was largely accomplished by "falsif[ying] records and forg[ing] customer signatures." To make matters worse, the Company's top executives, including its then-CEO, "were aware of the 'unlawful and unethical' practices as early as 2002" yet continued to promote the behavior. In relation to this scandal, the Company ultimately paid over $4 billion in settlements, fines, and penalties, including a $3 billion settlement to the DOJ.

132.     In the following years, the Company's participation in widespread misconduct continued, resulting in costly consequences for the Company. For example, in 2016 and 2017, as a result of Wells Fargo improperly repossessing the cars of military members, the Company paid $30 million in fines to the DOJ and the Office of the Comptroller of Currency ("OCC"). Still, the Company, under the leadership and supposed oversight of Defendant Sargent, continued to engage in misconduct. On August 1, 2017, *The New Republic* published an article titled *Give Wells Fargo the Corporate Death Penalty*, which stated, in relevant part:

> In the past month, Wells has also been accused of secretly changing the loan terms of mortgage borrowers in bankruptcy, falsifying records to charge mortgage applicants for its own delays in application processing, and stealing from mortgage bond investors to pay legal fees in lawsuits filed by those very same investors.
>
> ***If Wells Fargo wanted to rehabilitate its image, it failed miserably.***

(Emphasis added.)

133.     In 2018, more of the Company's misconduct was revealed to the public. To boost its profits, Wells Fargo charged individuals who held car loans from the Company for auto insurance without their knowledge, even when these individuals already had insurance. As a result of this misconduct, the Company settled with the Consumer Financial Protection Bureau ("CFPB") and the OCC for $1 billion. Later in 2018, the Company paid the DOJ a $2.09 billion fine to settle allegations that, during the 2008 financial crisis, Wells Fargo had misrepresented the types of mortgages it had sold to investors.

134.    In addition to the egregious misconduct mentioned above, over the past several years, the Company has also violated SOX, anti-money laundering provisions, and governance and risk management obligations.

***Wells Fargo's Repeated Misconduct Has Resulted in Reputational and Monetary Harm***

135.    As a result of certain of Defendants' persistent mismanagement and oversight failures, reflected by Wells Fargo's repeated misconduct, the Company's business and reputation have been significantly harmed. In particular, analyst DA Davidson noted that, "[i]t has been a five-year nightmare for [Wells Fargo]" and its "stock has been a massive under performer."

136.    The reputational harm the Company has faced due to its sprawling misconduct and the accompanying regulatory scrutiny has been severe. Additionally, the Company's widespread misconduct has resulted in an unprecedented level of government scrutiny. Notably, Wells Fargo was subject to 12 separate consent orders with federal agencies by the end of 2021. These included three from the Federal Reserve, three from the CFPB, and six from the OCC. As a result of the consent orders, the Company faced both financial penalties and expensive and restrictive constraints which required the Company to remediate the internal failures that led to the misconduct. Analyst J.P. Morgan reported towards the end of 2020 that "remediation and legal costs continued to creep up and now total $13.6 [billion] since year end 2016 with continued additions in some matters."

The Asset Cap and Its Detrimental Impact on Wells Fargo's Growth

137.    Of the Company's numerous consent orders, the Asset Cap proved to be the most damaging and costly one. Through its implementation of the Asset Cap, the Federal Reserve took the unprecedented action of preventing the Company from growing its balance sheet until it corrected various issues with its internal controls and risk management practices. Under the Asset Cap, Wells Fargo was required to keep its total assets below $1.95 trillion, which was the amount of its total consolidated assets as of December 31, 2017. The Federal Reserve noted that it would not lift the Asset Cap until the Company: (i) "submit[ted] a written plan" to "improve its firmwide compliance and operational risk management" and "enhance" its Board's "effectiveness in carrying out its oversight and governance" responsibilities; (ii) secured the Federal Reserve Board's approval of the plan; (iii) administered the plan; (iv) had a "third

party . . . review [the plan's] implementation"; and (v) received the Federal Reserve Board's "vote to lift the asset cap."

138.    The Asset Cap has caused and continues to cause significant harm to the Company. For example, analyst RBC reported that the Asset Cap "limit[ed] the company's ability to grow by putting an asset cap on the size of its balance sheet," which, in turn, was "limiting [Wells Fargo's] revenue opportunities," according to Deutsche Bank. The Motley Fool further reported that, since the Asset Cap had been put in place in 2018, the Company had lost over $200 billion in market value.

139.    In addition to limiting its ability to grow, the Asset Cap has also affected the Company's ability to compete with other large banks. For example, Morningstar noted that "Wells has been on defense while its peers have been on offense, potentially damaging the positioning of Wells' franchises over the long term." Further, UBS emphasized that "[t]here are really three national banks: Chase, Wells, and Bank of America," yet while "Chase and Bank of America have been doing extremely well [,] Wells Fargo has struggled some because of the reputational and regulatory challenges they're faced with." CNN reported similar findings, stating that "[s]ince the scandals began in September 2016, Wells Fargo's stock is down 5%, while over the same period the S&P 500 has soared 55%" and "[b]anking rivals JPMorgan Chase (JPM) and Bank of America (BAC) have more than doubled in value."

### *Prior to the Relevant Period, the Board was Well Aware of Significant Issues Plaguing the Company*

140.    The Company's directors, including Defendants Clark, Craver, Morris, Pujadas, and Sargent, and management at the time, were well aware of the fragile position the December 2017 Asset Cap had left the Company in, with former-Chairwoman of the Board, Betsy Duke ("Duke") stating in a 2018 internal email that "I believe our credibility and perhaps even viability as a company is dependent on successfully exiting these consent orders." The Company expressed a similar view to the investing public by indicating that it was prioritizing getting the Asset Cap lifted and that it could be lifted by the end of 2018. However, in late 2018, the Company held an investor presentation in Charlotte, North Carolina where then-CEO Tim Sloan ("Sloan") told investors that "the cap w[ould] probably remain in place in early 2019."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

141.   In March 2019, the United States House of Representatives Financial Services Committee questioned Sloan about what progress the Company's management had made to fix the pervasive compliance and risk management issues it was facing. After the hearing, Chairwoman Waters released a statement that "[i]t was very clear from Mr. Sloan's testimony that Wells Fargo has failed to clean up its act"; her statement also called for Sloan to "be shown the door." In addition, the OCC took the rare action of issuing a statement on Sloan's testimony. The OCC's statement represented that it was "disappointed with [Wells Fargo's] performance under our consent orders and its inability to execute effective corporate governance and a successful risk management program." Sloan abruptly resigned in the weeks following the testimony.

142.   Soon after Sloan's resignation, the Board began searching for a new CEO. The Company announced that, for its next CEO, it was seeking an external candidate. Following the announcement that Sloan had resigned, Duke stated during a conference call that "seeking someone from outside is the most effective way to complete the transformation" and further admitted that the Company had "a lot more work to do." A month later, in April 2019, Wells Fargo again frustrated analysts when the Company revealed that it did not know how much longer the Asset Cap would remain in place. In relevant part, Wells Fargo stated that it "w[ould] no longer provide guidance on when the shackles affixed by the Federal Reserve are likely to be removed." In his report for CFRA regarding the Company's statements, Leon specifically attributed the Company's "underperform[ance]" compared to "peers" in the period since the Asset Cap was implemented to Wells Fargo's "entire management team [being] distracted by compliance and risk issues."

143.   On September 27, 2019, the Company announced that it had hired Defendant Scharf as its new CEO, effective October 21, 2019. Once he was appointed, Defendant Scharf continuously stressed that solving the Company's regulatory compliance and internal control issues was "clearly the first priority." On January 14, 2020, the Company filed a press release with the SEC on Form 8-K which quoted Defendant Scharf as saying, "[d]uring my first three months at Wells Fargo my primary focus has been on advancing our required regulatory work with a different sense of urgency and resolve." Defendant

Scharf also stated that the Company "has made some serious mistakes, and my mandate is to make the fundamental changes necessary to regain the full trust and respect of all stakeholders."

### The Discrimination Misconduct

#### *Wells Fargo's History of Discriminatory Conduct and the Resulting Regulatory Scrutiny*

144.    Wells Fargo has also earned a reputation for discrimination in recent years, particularly due to its problematic hiring practices. Over the past decade, the Company has repeatedly discriminated against people of color, people with disabilities, and women. As a result, the Company has faced a wide range of regulatory actions and lawsuits.

145.    The Company's discriminatory conduct spans back as far as 2008 when, following the financial crisis, the Company was sued by multiple major U.S. cities for its lending practices. These cities, including Los Angeles, Miami, Philadelphia, Baltimore, Oakland, and Sacramento, accused Wells Fargo of engaging in discriminatory lending practices by, among other things, leaving African-American and Hispanic homebuyers with unfavorable mortgage terms.

146.    Wells Fargo's discriminatory conduct continued in 2011, when approximately 1,200 female financial advisors accused the Company of paying them less than male employees and denying them promotions because of their gender. To settle these claims, the Company agreed to pay $32 million and make internal changes aimed at promoting female financial advisors.

147.    Later, in 2012, the Company reached a settlement with the DOJ to "resolve allegations that [it] . . . engaged in a pattern or practice of discrimination against qualified African-American and Hispanic borrowers in its mortgage lending [practices] from 2004 through 2009." This was the second largest fair lending claim in the DOJ's history. Further, the settlement's terms required the Company to pay over $184 million to affected borrowers that Wells Fargo had "steered into subprime mortgages or who paid higher fees and rates than white borrowers because of their race or national origin."

148.    Matters again worsened in 2013 when a class of the Company's African-American financial advisors sued the Company, claiming that they were denied opportunities that were given to their white counterparts (the "*Slaughter* Action"). In particular, the complaint alleged that the Company effectively "segregate[d] [its] workforce by race" by deliberately keeping African-American financial

advisors away from lucrative clients, "limiting their . . . advancement opportunities," internally separating them from white financial advisors, and placing them in neighborhoods that generated less revenue.

149.    In 2014, the Company's misconduct continued when it discriminated against 2,066 female job applicants and 282 African-American job applicants, as confirmed by a 2019 DOL investigation. As a result of the investigation, Wells Fargo reached a Conciliation Agreement with the DOL which required the Company to (1) reimburse affected applicants for their wages and (2) "review and revise its selection process and provide better training to its hiring managers to eliminate [the] practices that resulted in the violations."

150.    In 2015, more of the Company's discriminatory conduct was revealed when the DOL found that Wells Fargo had failed to provide adequate accommodations to its disabled employees during 2014. As a result of these findings, the Company entered into a Conciliation Agreement with the DOL.

151.    In December 2016, the Company settled the *Slaughter* Action for $36 million. In addition to the monetary payment, the settlement called for the Company to implement preventative measures to improve its treatment of African-American financial advisors moving forward by, among other things, "*encourag[ing] a diverse pool of applicants . . . and a diverse slate of evaluators" for job openings*. (Emphasis added.) Soon after, the Company implemented an informal, unwritten policy that required that at least one woman or person of color be interviewed for certain open senior positions.

152.    In 2019, Wells Fargo reached another Conciliation Agreement with the DOL after the DOL found that, in 2014, the Company had discriminated against 2,066 female job applicants and 282 African-American job applicants. The Conciliation Agreement required Wells Fargo to reimburse affected applicants for their wages and to "review and revise its selection process and provide better training to its hiring managers to eliminate [the] practices that resulted in the violations."

153.    Despite promises to prioritize diverse hiring practices, in 2020, the Company was accused of discriminating against 34,193 African-American job applicants and 308 female job applicants across the country, resulting in a DOL investigation. As a result of the investigation, the Company entered into another Conciliation Agreement with the DOL which required the Company to pay $7.8 million to the

DOL and agree to "proactively" "enhance future compliance" with federal anti-discrimination laws by "tak[ing] steps to ensure its personnel practices comply with federal requirements."

### *Scharf Attempts to Mitigate Backlash Over His Comments About a Lack of Black Talent as Investors Demand DE&I Disclosures*

154.    Despite Wells Fargo knowing it needed to avoid further scandal in order to get the Asset Cap lifted, the Company's discriminatory conduct continued. This was worsened by the fact that Defendants were well aware of the increased shareholder demand for DE&I initiatives, which followed a wave of social unrest that swept across the United States in May 2020 following the murder of George Floyd at the hands of police officers in Minneapolis, Minnesota. The social unrest brought with it increased awareness that systemic racism was a barrier to social progress in the United States. Many emphasized that diverse individuals in corporations throughout the country were facing barriers to advancement, which drew attention to large banking institutions like the Company. As a result, the Company highlighted its commitment to implementing DE&I initiatives. Indeed, on May 29, 2020, Defendant Scharf sent an email to Company employees that was later posted on the Company's website wherein he was quoted saying, "as the CEO of Wells Fargo*, I can commit that our company will do all we can to support our diverse communities and foster a company culture that deeply values and respects diversity and inclusion*." (Emphasis added.)

155.    However, Defendant Scharf's statements that the Company was "committed to diversity" garnered skepticism when, less than a month later, he blamed the Company's lack of Black employees on a supposedly limited talent pool. On June 18, 2020, Defendant Scharf stated in an internal Company-wide memo titled *Our commitment to change* that "[w]e need more diverse representation on our operating committee," referring to the Company's top senior-level roles. However, Defendant Scharf continued that "[w]hile it might sound like an excuse, the unfortunate reality is that there is a very limited pool of Black talent to recruit from." Moreover, in the summer of 2020 during an internal Zoom meeting, Defendant Scharf similarly blamed the Company's failure to meet its diversity and inclusion goals on a lack of qualified minority talent.

156.    On September 22, 2020, a *Reuters* report publicly revealed the comments Defendant Scharf made in the memo and during the conference call discussed above, which generated immediate and

significant backlash. For example, *The Huffington Post* wrote that, "[i]n June, at the height of a reckoning over race and police killings in the U.S., Wells Fargo CEO Charles Scharf tried to blame his bank's failure to hire and promote Black people on Black people themselves." The report further noted that "[t]he bank has been poorly run by white people for more than a decade, and it has repeatedly been accused of racial discrimination in hiring and lending, paying out millions in claims." Moreover, AdAge reported that "Wells Fargo is in hot water again. The bank, which is still managing brand damage caused by its 2016 fraudulent account scandal, is facing a growing public backlash following recently reported remarks by CEO Charles Scharf about a dearth of Black talent."

157.    Similarly, *American Banker* wrote that "Wells Fargo has taken a series of steps to increase workforce diversity, but blowback over CEO Charlie Scharf's comment that there is 'a very limited pool of Black talent' for key jobs has raised questions about whether those initiatives have been dealt a serious blow." In addition, *Business Insider* classified Defendant Scharf's attitude as "pervasive and harmful to workers" and "false and damaging to the Black community." It further reported that "[p]eople have begun to call for a boycott of Wells Fargo after it was revealed that the bank's CEO claimed multiple times that the bank's difficulty in hiring diverse employees was due to a lack of qualified Black talent."

158.    On September 23, 2020, the day after the *Reuters* article was published, Defendant Scharf sent a message to Company employees, which was also posted on the Company's website, apologizing for his comments. In the message, titled *CEO Charlie Scharf Reinforces Commitment to Diversity and Inclusion*, Defendant Scharf apologized for his "insensitive comment" and stated that "[t]here are many talented diverse individuals working at Wells Fargo and throughout the financial services industry and I never meant to imply otherwise." He further emphasized the importance of Wells Fargo's initiatives involving DE&I, noting that the Company needed to effect meaningful change. Additionally, Defendant Scharf highlighted the Diverse Search Requirement to support his comments that the Company was making progress with its diversity initiatives. In particular, Defendant Scharf noted that "we are requiring diverse candidate slates for key roles with compensation of more than $100,000."

159.    In particular, when the Company published its Environmental, Social, and Governance ("ESG") Report in August 2020 (the "2020 ESG Report"), it noted that "we interviewed internal and

external stakeholders, including more than 30 Wells Fargo leaders and subject matter experts from across the company, and members of our external Stakeholder Advisory Council." Among others, the Stakeholder Advisory Council included the Company's Director of Corporate Governance for the California State Teachers' Retirement System (CalSTRS), Anne Sheehan. The 2020 ESG Report further explained that it "also included content from stakeholders representing," among others, "ESG investors" and that, based on this feedback, the topics "most significant to our internal and external stakeholders" included "[d]iversity and inclusion."

160.    In the following months, Defendants continued to emphasize the Company's diversity and inclusion efforts. For example, in November 2020, the Company announced that it had hired Defendant Santos as "head of the newly created Diverse Segments, Representation and Inclusion group, elevating the company's internal and external diversity efforts." The Company further stated that Santos would report to Defendant Scharf, serve on the Company's Operating Committee, and "w[ould] be responsible for leading efforts to make the company a place where diversity is reflected at all levels and in every facet of the company's operations, processes, and programs."

### The Board Objects to Shareholder Proposals That Would Improve the Company's Diversity Policies and Procedures While Defendants Tout Superficial Commitment to Diversity Efforts

161.    During the Relevant Period, Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Scharf were well attuned to the fact that the Company's diverse hiring practices were a main focus for investors following the controversial comments Defendant Scharf made in summer 2020. Indeed, on November 12, 2020, three institutional Company shareholders, the Comptroller of the City of New York on behalf of the New York City Teachers' Retirement System and the Board of Education Retirement System, and AFL-CIO Reserve Fund, and the UAW Retiree Medical Benefits Trust (collectively, the "2021 Proxy Proposal Shareholders") submitted a shareholder proposal and supporting statements to Wells Fargo. In particular, the 2021 Proxy Proposal Shareholders informed the Company that they intended to present the following proposal involving diverse hiring (the "2021 Proxy Proposal") for a vote at the Company's 2021 Annual Meeting of Shareholders:

1
2
3

> RESOLVED: Shareholders request that the Board of Directors of Wells Fargo & Company (the "Company") adopt a policy for improving workforce diversity by requiring that the initial pool of candidates from which new employees are hired by the Company in the U.S. shall include at least one qualified woman and one ethnically or racially diverse candidate (a "Diverse Candidate Search Policy").

4
5
6
7

162.    The 2021 Proxy Proposal Shareholders specifically mentioned Defendant Scharf's controversial comments from summer 2020 in their statements in support of the 2021 Proxy Proposal. The 2021 Proxy Proposal Shareholders further emphasized that the Company implementing diverse hiring practices was highly important to shareholders, stating:

8
9
10

> As long-term shareholders, we are concerned that the lack of racial and ethnic diversity among the most senior ranks of the Company's executive management not only harms its financial performance, but also sets a poor tone at the top for diverse hiring processes throughout the Company.

11
12

> A diverse workforce at all levels of a company can enhance long-term company performance.

13
14
15
16
17
18
19

163.    On December 26, 2020, the Company objected to the 2021 Proxy Proposal when it filed a letter with the SEC pursuant to Rule 14a-8 of the Exchange Act requesting permission to omit the 2021 Proxy Proposal form the Company's 2021 Proxy Statement. In support of its objection to the 2021 Proxy Proposal, the Company noted that the proposal had already been "substantially implemented" by the Diverse Search Requirement. The Company further claimed that the Diverse Search Requirement was in fact stricter than the 2021 Proxy Proposal, arguing that "[t]he Diverse Search Requirement [i]s [c]omprehensive" and only had "limited exceptions."

20
21
22
23
24
25
26
27
28

164.    The Company's letter to the SEC also stated that "due to the importance of the Diverse Search Requirement, the Company has established governance processes relating to senior-level approval of any exception to the requirement for a specific role," which again underscored the critical importance of these policies. Upon filing the December 26, 2020 letter with the SEC, the Company met with the 2021 Proxy Proposal Shareholders and held discussions, which culminated in an agreement between the two groups. On January 19, 2021, the parties entered into an agreement that the 2021 Proxy Proposal Shareholders would withdraw the 2021 Proxy Proposal in exchange for the Company's agreement to increase its public disclosures pertaining to the Diverse Search Requirement (the "Agreement"). The terms of the Agreement required the Company to:

1.  Disclose that the Diverse Search Requirement requires at least 50% diverse candidates on the interview slate for covered roles in the United States.

2.  Clearly define the Company's definition of diverse candidates, which . . . includes race/ethnicity; gender; LGBTQ; veterans; and people with disabilities.

3.  Disclose (a) that the current Diverse Search Requirement applies to all operating committee executive positions (i.e., "level 2" positions) (b) the self-identified gender and race/ethnicity of the individual operating committee members.

4.  Disclose the governance processes relating to senior-level approval of any exception to the Diverse Search Requirement for a specific role.

5.  Disclose the applicability of the Diverse Search Requirements to internal hiring and promotions.

6.  Disclose the percentage of total positions of the entire workforce that are covered by the Diverse Search Requirement.

7.  Disclose that compliance with the Diverse Search Requirement is a performance criterion for senior executives.

8.  Provide more detailed disclosure on the link between progress against diversity initiatives, including with respect to the diverse search requirement, and executive compensation.

165.   The Company sent a letter to the SEC on January 21, 2021 informing it of the withdrawal of the 2021 Proxy Proposal and the Agreement. The letter formally withdrew Wells Fargo's request to exclude the 2021 Proxy Proposal from the 2021 Proxy Statement.

166.   As a result of this investor demand, the Company continued to emphasize its purported commitment to diversity in the 2021 Proxy Statement. The 2021 Proxy Statement stated that "[s]ince 2010, we have had an investor engagement program with independent director participation to help us better understand the views of our investors on key corporate governance and other topics." It continued on that, "[s]ince our 2020 annual meeting, we contacted institutional investors representing approximately 35% of our outstanding shares and engaged with a significant number of our investors and other stakeholders to provide updates on the Company, discuss governance and other matters, and hear their perspectives." Based on investor feedback, the 2021 Proxy Statement noted that topics of key shareholder engagement included "Board [c]omposition [and] diversity," "Board oversight of risk and diversity & inclusion initiatives," and "ESG disclosures and practices."

167.     Analysts continued to comment on investor demand for DE&I initiatives. Indeed, on July 9, 2021, *Pensions and Investments* published an article titled *Investors press companies on DEI*, which reported that "[i]nvestor demand for companies to commit to diversity, equity and inclusion was a highlight of the latest proxy season" and that "[o]ne new category this season was proposals asking companies to undergo independent racial equity audits." The report similarly quoted John Wilson, vice president and director of corporate engagement for Calvert Research and Management in New York, as saying that "'[s]ome of the biggest votes that we have seen' were for shareholder proposals on DEI." Additionally, the report stated that:

> According to proxy firm Institutional Shareholder Services Inc., activism for DEI in the form of shareholder proposals nearly doubled in just one year, with 143 proposals in 2021 compared with 74 in 2020. It also found record levels of support for those proposals, averaging 61.6% for ones addressing diversity and inclusion at the workforce level, and ones targeting board diversity averaging 62.6% shareholder support.

168.     In July 2021, Wells Fargo published its ESG Report for 2021 (the "2021 ESG Report") where the Company stated that "we interviewed internal and external stakeholders, including more than 30 Wells Fargo leaders and subject matter experts from across the company, and members of our external Stakeholder Advisory Counsel." Moreover, the Company stated that it "also included input from stakeholders representing," among others, "ESG investors." Wells Fargo emphasized that, based on that feedback, the topics "most significant to our internal and external stakeholders" included "[d]iversity, equity, and inclusion."

169.     The Company reported in the 2022 Proxy Statement, discussed and described in further detail below, that "[s]ince our 2021 annual meeting, we contacted institutional investors representing approximately 47%, and engaged with 44% of our outstanding shares." The 2022 Proxy Statement noted that, based on those meetings, the "Key Shareholder Topics" for 2021 included "Board composition, including Board diversity," "[d]iversity, equity and inclusion (DE&I) goals and metrics," and "Environmental, Social, and Governance (ESG) disclosures and practices." Critically, the 2022 Proxy Statement contained materially false and misleading statements and omissions that induced shareholders to approve a lucrative incentive plan that several of the Individual Defendants (including members of the Company's Board for purposes of demand futility) materially benefitted from.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

170.    Indeed, unbeknownst to investors, throughout the Relevant Period, Defendants participated in the Discrimination Misconduct which consisted of: (1) Wells Fargo holding sham interviews to meet the Company's Diverse Search Requirement; and (2) Wells Fargo, often under the recommendation of its Board, continuously failing to include shareholder diversity proposals on the Company's yearly proxy statements which would improve the Company's DE&I efforts.

171.    In 2021 and 2022, another institutional shareholder introduced proposals requesting that Wells Fargo conduct a racial equity audit to analyze its "adverse impacts on nonwhite stakeholders and communities of color." Similar to the 2021 Proxy Proposal, the Board pushed back on the new racial equity audit proposals (the "Racial Equity Audit Proxy Proposals" and, together with the 2021 Proxy Proposals, the "Proxy Proposals"), recommending during both years that the Company reject them. In support of its rejection of the Racial Equity Audit Proxy Proposals, the Board highlighted the purported work the Company had achieved on its DE&I efforts. For example, in 2021, Wells Fargo specifically pointed to its purported diversity hiring initiatives as a basis for rejecting the proposals, stating:

> Wells Fargo has taken a number of actions to promote and enhance diversity, equity, and inclusion goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership) [and], accountability of senior management for progress in improving diverse representation and inclusion . . . .

172.    In rejecting a separate institutional shareholder's proposal for a racial equity audit in 2022, the Company again highlighted its diverse hiring practices, stating that "[i]n 2021, Wells Fargo added a new DE&I executive performance objective for senior leaders that is directly connected to increasing gender, racial/ethnic representation in our executive ranks." At the Company's recommendation, its shareholders voted against the racial equity audit proposals during both years.

***Wells Fargo Adheres to its Flaunted Diverse Search Requirement by Conducting "Fake" Interviews for Diverse Candidates***

173.    In February 2022, the Company published a report titled *Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response* which contained representations by Defendants again assuring the market that the Company had "instituted diverse candidate slates . . . on most jobs of over $100,000 in total compensation." Similarly, the Company stated in the 2022 Proxy

Statement that it had "Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates . . . for designated posted positions."

174.    Although Defendants touted the progress Wells Fargo was making with its Diverse Search Requirement throughout the Relevant Period, in reality, the Company was conducting widespread "fake" interviews of diverse candidates to claim adherence to the Diverse Search Requirement. These "fake" interviews consisted of the Company "interviewing" diverse candidates for positions that had already been filled, clearly indicating that the Company had no intention of hiring the diverse candidates.

175.    More information about the Company's "fake" interview scandal came to light when *The New York Times* published a report which provided further support for the allegations. In particular, *The New York Times* report included statements from Bruno, a former Company Senior Vice-President-Market Leader who had overseen 14 branches in the Company's Wealth Management division, that "[f]or many open positions, employees would interview a 'diverse' candidate" but that "often, the so-called diverse candidate would be interviewed for a job that had already been promised to someone else." The report further noted that Bruno "said that he was often told to conduct interviews with Black candidates" and that in "most such cases," the Company "had no intention of hiring those people because either he or his superiors had already picked someone for the job." Additionally, *The New York Times* reported that Bruno "eventually refused to conduct the interviews" and "told his bosses" that "I got a Black person on the other side of the table who has no shot at getting the job."

176.    Bruno further explained in an online post that the Company was conducting "fake interviews" with diverse candidates when "a determination ha[d] already been made by the hiring manager for the candidate that will receive the job" and that "HR recruiters [] tell the managers that you have to conduct these interviews, even though you have clearly explained that a candidate has already been sourced and selected."

177.    Additionally, Bruno included countless examples of the "fake" interviews in his online post. While discussing a job opening for a market leader position in South Florida, Bruno noted that the Company had decided to combine "two large markets" consisting of "the Fort Lauderdale Market and the Miami Market" in an effort to create "a mega market, the biggest in the industry." However, Bruno stated

that there was "[a] predetermined candidate from home office with no branch manager experience, no complex manager experience, no market experience, and no recruiting experience [who] interviews for the job." Bruno continued that the candidate was "[a] white male from corporate who would like to move to Florida with his family who is well connected to the leadership chain at Wells Fargo" and that "he gets the job." Nevertheless, even upon the position being filled, Bruno noted that the job was still "posted for anyone to apply." In his post, Bruno further commented that "the current market leaders in Fort Lauderdale and Miami" both applied and interviewed for the already-filled position and that both were "premier managers [who] have successfully driven recruiting, driven revenue and driven retention for the last ten plus years." In stating that "[o]ne of these two candidates is Hispanic," Bruno indicated that "[f]ake interviews [were] conducted for this role." Bruno also revealed that "the white male that received the market leader job in this fake interview" was "over his head" and "quit after two weeks on the job and went back to his old corporate job." As a result, "[a] text was sent to the hiring manager of the fake interview, calling him out in this inappropriate hire."

178.    Bruno also reported two additional instances of "fake" interviews conducted by the Company. He first reported that "in 2021, two top WFA million-dollar teams at Wells Fargo needed to add a financial consultant to their respective teams." One team had "[s]omeone that they ha[d] already prescreened and chosen," meaning that "[a]n informal interview ha[d] been conducted and a decision to hire ha[d] been determined." The second team, on the other hand, was "not adding a new member but just restructuring the team to change one member from a financial advisor status to a financial consultant status for purposes of compensation." However, according to Bruno, "[i]n both instances, HR at Wells Fargo, backed up by senior leadership, requires that interviews be conducted." He continued that "as a best practice, one candidate needs to be diverse, preferably black or a woman." Bruno noted that "[i]f these interviews are not conducted, the hiring manager cannot move forward with the hiring restructuring. No exceptions." Further, Bruno reiterated this point by stating that "[e]ven though clearly an exception to not interview should have been granted, Wells Fargo requires the fake interviews to go forward."

179.    Similarly, Bruno recalled a "fake" interview that occurred in 2021 when a lesbian woman was interviewed by the Company for a job that had already been given to a white male. Indeed, Bruno

stated that "[w]hen he got the role, everyone knew a fake interview had taken place." Bruno expanded on this point by stating that "a predetermined candidate [was] chosen" but that "[a] diversity candidate – in this case, a woman – is used in the pool so Wells Fargo can show activity towards their diversity goals." In other words, according to Bruno's post, the Company would simply "throw in some black and brown people and women into the pool so Wells Fargo can show activity towards their diversity goals" which amounted to "wrong activity that inflates DEI metrics for affirmative action reports, regulatory briefings, and annual reports."

180.    Bruno's accounts of these widespread "fake" interview practices have been corroborated by numerous current and former Company employees. For example, *The New York Times* reported that 22 former and current Company employees had confirmed that they had conducted, arranged, become aware of, and/or been subjected to, the "fake" interviews. The former and current employees also indicated that the Company conducted the "fake" interviews across several business lines, including its mortgage servicing, home lending, Wealth Management, and retail banking operations.

### Current and Former Employees Confirm the Company Conducted "Fake" Interviews

181.    *The New York Times* published a similar report on May 19, 2022, revealing that 12 current and former Company employees had confirmed that the Company conducted "fake interviews" of diverse candidates in the Wealth Management Division. The report also noted that, in addition to Bruno, six other "current and former Wells Fargo employees . . . said that they were instructed by their direct bosses or human resources managers in the bank's wealth management unit to interview 'diverse' candidates – even though the decision had already been made to give the job to another candidate." Similarly, "[f]ive others said they were aware of the practice, or helped to arrange it."

182.    Conducting "fake" interviews was a common hiring practice at the Company throughout the Relevant Period. Indeed, *The New York Times* reported that "[t]hree current employees said they conducted fake job interviews or knew of them as recently as [2022]" and that "[t]he interviews . . . seemed to be more about helping Wells Fargo record its diversity efforts on paper — partly in anticipation of possible regulatory audits — rather than hiring more women or people of color."

183.     Likewise, on June 6, 2022, financial advisor-focused news outlet AdvisorHub reported that a current Company manager and a former Company manager had confirmed to the outlet that they had either heard about or been asked to participate in the "fake" interview practices.

184.     On June 9, 2022, *The New York Times* published another report which revealed that "another 10 current and former employees have shared stories about how they were subject to fake interviews, or conducted them, or saw paperwork documenting the practice." Additionally, it reported that the "fake" interviews "occurred across multiple [Company] business lines, including its mortgage servicing, home lending and retail banking operations," thus indicating that the practice was not limited to the Company's Wealth Management division.

185.     Moreover, *The New York Times* revealed that "[i]n some instances, there were written records of the practice of conducting fake interviews." It explained that, "[i]n late 2020, just days after Wells Fargo offered a job to a person who counted as 'diverse' by the bank's standards, a human resources employee asked that person to apply for a different job at the bank, according to an email reviewed by The Times." *The New York Times* continued that "[t]he first offer was still on the table, the Wells Fargo employee explained, but the bank also wanted to show that it had 'qualified candidates' for both roles. 'Simply book keeping for us,' the employee wrote in the email."

186.     The "fake" interview practices employed by the Company were also confirmed by comments made in response to Bruno's June 14, 2022 online post. For example, in his reply to Bruno's post, a YouTube user commented, "[t]hank you for speaking on this I was with Wells Fargo Advisors for 18 years, I can attest to these practices and am available for comments if needed." Similarly, a separate YouTube user stated, "I worked at Wells Fargo and Joe is correct about what's happening with interviews."

187.     Additionally, a former Company employee who had worked as a Corporate Recruiter contractor in the Wealth Management division from early 2019 until early 2020 was interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "FE-2." FE-2 represented that hiring managers frequently had a candidate in mind for a job opening. For example, FE-2 stated that, if he hired for 20 roles, hiring managers would often have a candidate in mind before the job was posted for at

least 13 of them. FE-2 further noted that he could always tell when candidates knew the hiring manager and indicated that some hiring managers complained about the process but were told to "pick your battles." According to FE-2, by the end of this process, the referral candidate was typically hired.

188.    In addition to former employees, the Company's senior management was also aware of the "fake" interview practices. For example, in Bruno's online post, he noted that fake interviews were "an open secret at Wells Fargo" and that they "ha[d] gone on for years." Bruno further stated that "[t]he problem is systemic at Wells Fargo. It can easily be identified and proven." Additionally, Bruno represented that "[o]thers and I have complained for years to HR, to our immediate managers, and to senior leaderships" but that "[n]othing has been done."

**False and Misleading Statements**

***February 23, 2021 Annual Report***

189.    On February 23, 2021, the Company released its 2020 Annual Report. Contained in the 2020 Annual Report was a "[l]etter from CEO," which included a section titled "Diversity, Equity, and Inclusion." Defendant Scharf stated in that section that, "[t]hroughout 2020, we also announced our expanded commitments to diversity, equity, and inclusion." Defendant Scharf noted that "[i]n the U.S., we are requiring a diverse slate of candidates — and a diverse interview team — for most roles with total direct compensation of more than $100,000 per year."

190.    The statements made in paragraph ¶ 189 above were materially false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v)

1
2
the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

3
***March 16, 2021 Proxy Statement***

4
5
191.    On March 16, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and non-party

6
7
Suzanne M. Vautrinot ("Vautrinot") solicited the 2021 Proxy Statement which contained material misstatements and omissions.

8
9
192.    The 2021 Proxy Statement contained a section titled *We Are Advancing Diversity, Equity, and Inclusion*. Under a subheading titled *Improving Diverse Representation and Inclusion within the*

10
11
*Company*, Defendants stated, "[w]e are expanding our diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all of those areas and are taking

12
specific actions in support of these commitments."

13
14
193.    The 2021 Proxy Statement stated, *inter alia*, that "***[i]n the U.S., we are requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of***

15
***more than $100,000 per year***." (Emphasis added.)

16
17
194.     Furthermore, the 2021 Proxy Statement mentioned the following regarding Wells Fargo's diverse candidate sourcing and interview guidelines under its Diverse Search Requirement:

18
19
20
21
22
23
Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, ***Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement)***. Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

24
25
***The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000:***

26
• ***At least 50% of interview candidates must be diverse with respect to at least one diversity dimension***; and

27
28
• At least one interviewer on the hiring panel must represent at least one diversity dimension.

(Emphasis added.)

195.    Additionally, the 2021 Proxy Statement stated the following regarding Wells Fargo's

Diverse Search Requirement, in relevant part:

**Based on our evaluation of our workforce composition, the Company determined that roles with total direct compensation above $100,000 presented the greatest opportunity for improving diverse representation at the Company.** For roles with total direct compensation less than $100,000, we have observed a historically higher level of diversity. As of December 31, 2020, the scope of the Diverse Search Requirement would have covered:
- Approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and
- Approximately 48% of all active U.S. employees irrespective of their total direct compensation.

These roles include senior management roles reporting to our CEO as well as job postings for covered U.S. roles, regardless of whether the candidates are internal or external . . .

(Emphasis added.)

196.    The 2021 Proxy Statement also noted how Wells Fargo enforced its Diverse Search

Requirement, stating, in relevant part:

**Any exceptions to the Diverse Search Requirement must be approved by an Operating Committee member or one of their direct reports (or their assigned delegate).** In order to obtain approval for an exception, hiring managers must show that sufficient outreach efforts were made (including the use of a variety of sourcing activities to identify diverse candidates) and that despite those efforts, they were unable to meet the Diverse Search Requirement.

(Emphasis added.)

197.    The 2021 Proxy Statement stated the following regarding its New Operating Committee

Role and Clear Accountability of Operating Committee Members for Diversity & Inclusion efforts:

Wells Fargo created a new Operating Committee role, the Head of Diverse Segments, Representation & Inclusion, that reports to the CEO. Kleber Santos joined Wells Fargo in November 2020 in this role and is responsible for advancing the Company's DE&I efforts in the marketplace and workplace. In this role, he will drive a Company-wide diverse segments strategy and partner with our line of business CEOs and diverse segment teams to deliver products and services designed to meet the needs of our diverse customer base.

Together with our CEO and other Operating Committee members, including our Head of Human Resources, Mr. Santos and his team are promoting and enhancing DE&I priorities and goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership), accountability of senior management for progress in improving diverse representation and inclusion, unconscious bias education and training, and new business initiatives focused on support

for diverse communities. As part of the Company's DE&I efforts, senior management meets with our most senior racially diverse executives to obtain their guidance on priorities and initiatives to enhance our career advancement opportunities and our overall racial equity efforts.

As part of the year-end performance evaluation and compensation decision process, Operating Committee members were evaluated based upon their progress in improving diverse representation and inclusion in their area of responsibility.

198.    With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated that: "[o]ur Code of Ethics and Business Conduct [is] applicable to our employees, including our executive officers, and directors." It further stated that:

At Wells Fargo, we expect all employees to Do What's Right by customers, stakeholders, and each other. Our Code of Ethics and Business Conduct provides additional clarity and focus on the ethical behavior we expect of all employees and members of our Board. The Code is supported by underlying policies as well as by interactive online training that all employees complete annually. Members of the Board also acknowledge annually that they have read and understand their obligations under the Code of Ethics and Business Conduct. It is critical for employees to understand our expectations and always do what is right. Employees also need to be comfortable speaking up with no fear of retaliation if they have a concern or see something that does not seem quite right.

199.    Regarding the Company's Non-Retaliation Policy, the 2021 Proxy Statement stated that:

Wells Fargo does not tolerate retaliation of any kind. Our employees' dedication and integrity are key to building a Wells Fargo we can all be proud of, and our leadership believes that it is critical everyone feels safe raising concerns and cooperating with investigations without fear of retaliation or other negative actions, such as harassment or unprofessionalism. By speaking up when they have a concern, our employees offer a courageous and vital contribution to Wells Fargo's ethical working environment. Every employee's voice matters, regardless of his/her/their role, position in the Company, or location. Our Speak Up and Non-Retaliation Policy requires all employees to adhere to the Code of Ethics and Business Conduct and supporting policies, recognize unethical behavior, and report suspected unethical or illegal conduct. The policy also sets additional expectations for managers to guard against retaliatory conduct, watch for signs of retaliation, and report any conduct that may violate policies. To report a concern, employees may talk to a manager, contact Employee Relations, or contact our confidential EthicsLine.

200.    Regarding the "Board of Directors' Oversight Role in Diversity & Inclusion initiatives," the 2021 Proxy Statement stated:

The Board and its Human Resources Committee oversee the Company's Diversity, Equity, and Inclusion (DE&I) efforts and progress. The Human Resources Committee receives updates relating to the Company's DE&I initiatives and, *beginning in the Fall of 2020, the full Board has received DE&I updates at each of its regularly scheduled Board meetings*. These reports provide updates on the Company's progress and accomplishments

across our DE&I commitments and the development and launch of new programs, including information relating to:

- Talent acquisition and development
- Sponsorship events
- Operating Committee leader engagement, including with our Team Member Networks and DE&I councils
- Supplier diversity
- Diversity reporting, including information on diverse representation

(Emphasis added.)

201.   Regarding the "Board of Directors' Role in Risk Oversight," the 2021 Proxy Statement stated:

**Role of the Board**
The Board oversees the Company's business, including its risk management. The Board assesses management's performance, provides credible challenge, and holds management accountable for maintaining an effective risk management program and for adhering to risk management expectations.

**Board Committee Structure**
The Board carries out its risk oversight responsibilities directly and through its committees. All of these committees report to the full Board about committee activities, including risk oversight matters and are comprised solely of independent directors. Each Board committee has defined authorities and responsibilities for primary oversight of specific risks, as outlined in its charter, and works closely with management to understand and oversee our Company's key risk exposures.

202.   The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Discrimination Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendant's failures to report the violations of the Code of Conduct.

203.   The 2021 Proxy Statement also called for shareholder approval of, among other things: (1) the election of 12 director nominees named in the proxy statement; (2) voting on an advisory resolution to approve executive compensation; and (3) voting on shareholder proposals.

204.   The Individual Defendants caused the 2021 Proxy Statement to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to

believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

205.    As a result of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to elect Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Scharf to the Board, thus allowing them to continue to breach their fiduciary duties to the Company.

### May 26, 2021 Senate Hearing

206.    On May 26, 2021, Defendant Scharf testified during a hearing before the United States Senate Committee on Banking, Housing, and Urban Affairs. Defendant Scharf's testimony contained a portion titled *Our Commitment to Diversity, Equity, and Inclusion*, wherein he stated, among other things, that "for the hiring of many senior roles, ***we have implemented guidelines that require a diverse slate of candidates (at least 50 percent)*** and a diverse interview panel." (Emphasis added.)

207.    The statements made in paragraph ¶ 206 above were materially false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v)

the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

### July 15, 2021 ESG Report

208.    On July 15, 2021, the Company published the 2021 ESG Report, which included a letter signed by Defendant Scharf. The 2021 ESG Report provided shareholders with an "[u]pdate on Wells Fargo's DE&I commitments," noting that Wells Fargo "*[r]equire[s] diverse candidate slates* and interview teams *for key roles with total direct compensation of more than $100,000*." (Emphasis added.) The Company further stated:

> *In the U.S., we now require that at least 50% of interview candidates identify with at least one diversity dimension* — and we require a diverse team of interviewers — *for most roles with total direct compensation of more than $100,000*. Outside the U.S., we have country-specific strategies in place to ensure that we're considering diverse candidate slates for executive-level roles.

(Emphasis added.)

209.    The statements made in paragraph ¶ 208 above were materially false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

### October 7, 2021 i4cp Interview

210.    On October 7, 2021, i4cp held a virtual interview with Defendant Sanchez during a segment of its *Talent Acquisition Next Practices Monthly* series. i4cp is an organization dedicated to "discover[ing] and advanc[ing] next practices in human capital, and *Talent Acquisition Next Practices*

*Monthly* "provides a forum for the [talent acquisition] leadership community to come together to discover and advance next practices" in the industry. Host Lorrie Lykins, while interviewing Defendant Sanchez, asked her to "talk a little bit about building diverse candidate slates and increasing opportunities" for diverse job candidates at the Company. In response, Defendant Sanchez stated the following, in relevant part:

> [W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates. . . .
>
> *[W]e formalized the candidate slate requirement for roles $100K and above. It's probably about a year and a half or two years ago to say that you have to have 50% of the slate -- of the candidate slate that will be interviewed needs to be diverse in one dimension or another.* Also, the interview team has to diverse, and so that's very important as well.
>
> But *I think the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates.* And we'll identify with the recruiters who work hand-in-hand with our diversity sourcing group.

(Emphasis added.)

211.    Additionally, Defendant Sanchez noted that, in attempting to build a pool of diverse candidates, the Company's "recruiters can say look, I have a really tough role to fill. I'm having a hard time pipelining that, and so *the diversity sourcing group can step in and also do a targeted effort to make sure that they've filled that pipeline adequately and found where they can find diverse groups.*" (Emphasis added.)

212.    The statements made in paragraphs ¶¶ 210-211 above were materially false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v)

the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

### February 15, 2022 Report

213.    On February 15, 2022, the Company published a report titled *Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response.* The report contained a section titled "Diversity, equity, and inclusion," and its subsection titled "Sourcing of diverse talent" stated the following, in relevant part:

> In 2021, we increased our partnerships with colleges, universities, and other organizations spotlighting diverse talent recruitment. For example, by expanding our engagement we increased our hiring of candidates from Historically Black Colleges and Universities and Hispanic- Serving Institutions. **We also instituted diverse candidate slates** and interview teams **on most jobs of over $100,000 in total compensation**. We are in the process of eliminating education requirements in certain job categories to increase equity in hiring. Programs such as Glide-Relaunch (an in-house returnship program) and our Career Development Cohort program (an in-house diversity focused program that supports our partnership with the OneTen Coalition) further support our DE&I recruiting efforts.

(Emphasis added.)

214.    The statements made in paragraph ¶ 213 above were materially false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

*March 14, 2022 Proxy Statement*

215.    On March 14, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and non-party Vautrinot solicited the 2022 Proxy Statement which contained material misstatements and omissions.

216.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Scharf to the Board; (2) approve, on an advisory basis, executive compensation (Say on Pay); (3) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for 2022; and (4) approve the Plan, which, among other things, would provide for an additional 80 million shares in connection with eligible awards to be received by the Company's directors and officers (the "2022 Proposals"). The purpose of the Plan was "to assist [the Company] and its Affiliates [] in attracting, retaining and rewarding employees, officers and directors, and to motivate them to achieve company goals and to drive sustained shareholder value."

217.    Pursuant to the Plan, awards may be granted until the tenth anniversary of the Plan's effective date, which is April 26, 2032. Further, by shareholders approving the Plan, shares that remained available for grant for full value awards under the Company's LTICP, less the full-value awards granted to non-employee directors under the LTICP on the date of the 2022 Annual Meeting, became available for grant under the Plan. The Plan is administered by the HRC with respect to awards to employees and by the Governance and Nominating Committee with respect to non-employee directors, or by such other committee of one or more individuals appointed by the HRC or the Board from time to time (the "Committee"). Further, the Plan includes an annual limit for each non-employee director's total compensation. Under the Plan, the total annual compensation paid to any non-employee director, inclusive of cash compensation and amounts awarded under the Plan, shall not exceed $750,000, except that in the case of the Chairman of the Board or any Independent Lead Director, such limit is instead $1,500,000.

218.    The 2022 Proxy Statement made various representations regarding the Company's Diverse Search Requirement. The 2022 Proxy Statement stated *inter alia*, that "[o]ur DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across

those areas," including "***Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions***"; that "[w]e define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities"; that "[w]e conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups"; that "[w]e seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles" and that "[w]e pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants." (Emphasis added.)

219.    The 2022 Proxy Statement stated the following regarding the New Operating Committee Role and Clear Accountability of Operating Committee Members for Diversity & Inclusion efforts:

> In November 2020, a new Operating Committee-level role reporting directly to our CEO was created to lead DE&I efforts. In this role, our Head of Diverse Segments, Representation and Inclusion (DSRI) is responsible for driving a Company-wide DE&I strategy to increase diverse representation at all levels of the Company, create a more inclusive workplace environment, and better serve and grow our diverse customer segments and diverse suppliers across all lines of business. In partnership with our CEO and other members of the Operating Committee, including our Head of Human Resources, our line of business CEOs and diverse segment teams, our Head of DSRI and his organization lead the DE&I priorities within our Company and the communities in which we operate.
>
> As part of the year-end performance evaluation and compensation decision process, our CEO is evaluated on progress to advance DE&I Company-wide. Operating Committee members are evaluated based on their progress in improving diverse representation and inclusion in their areas of responsibility.

220.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated that "[o]ur Code of Ethics and Business Conduct [is] applicable to our employees, including our executive officers, and directors."

221.    It further stated that:

> Our Code of Ethics and Business Conduct provides the principles and additional guidance to support ethical actions and decisions expected of all employees and members of our Board. The Code is supported by underlying policies, the Employee Handbook, and an annual interactive online training that employees are required to complete. Members of the Board must also acknowledge, on an annual basis, their obligations under the Code of Ethics and Business Conduct.

222.     Regarding the Company's Non-Retaliation Policy, the 2022 Proxy Statement stated that:

Under our Speak Up and Non-Retaliation Policy, Wells Fargo does not tolerate retaliation of any kind. Our employees' commitment and integrity are important to the success of Wells Fargo. Our leadership believes it is critical that everyone feels safe to raise a concern and cooperate with investigations without fear of retaliation. By speaking up when they have a concern, our employees demonstrate their responsibility to act with honesty and integrity and contribute to Wells Fargo's ethical working environment. In this culture, every employee's voice matters, regardless of role, position in the Company, or location.

Employees are expected to adhere to the Code of Ethics and Business Conduct and supporting policies, speak up when they have questions, and report suspected unethical behavior. To report a concern, employees may talk to a manager, contact Employee Relations, or contact our confidential EthicsLine.

223.     Regarding the "Board of Directors' Oversight Role in Diversity & Inclusion initiatives," the 2022 Proxy Statement stated the following, in relevant part:

The Board and its Human Resources Committee oversee the Company's DE&I strategy and monitor its activities and progress.

*          *          *

Each line of business has a Diverse Segment Leader, a senior role that dually reports to the Head of DSRI and the Operating Committee member for the respective line of business. Diverse Segment Leaders are principally responsible for executing the Company's effort to better serve and grow our diverse customer segments in each line of business.

224.     Regarding the Company's Diverse Hiring Practices, the 2022 Proxy Statement stated:

Our recruitment and career development practices are designed to support our employees and promote DE&I in our workforce, including leadership positions. In order to help identify and attract diverse talent, we employ selection processes intended to maintain a fair and equitable hiring process. Our talent strategy focuses on attracting, hiring, and supporting diverse talent. In addition, we have dedicated teams to enhance our efforts across multiple dimensions of diversity.

225.     The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants' allowance of and/or engagement in the Discrimination Misconduct and failures to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

226.     The Individual Defendants caused the 2022 Proxy Statement to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and

misleading. Specifically, the Director-Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result, the Company's public statements were materially false and misleading at all relevant times.

227.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2022 Proposals who would not have approved the 2022 Proposals had they been informed about the Discrimination Misconduct.

228.    As a result of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) approve the Plan, thus allowing the Individual Defendants to materially benefit from the false and misleading statements contained in the 2022 Proxy Statement.

### The Truth Begins to Emerge as the False and Misleading Statements Continue

229.    On May 19, 2022, *The New York Times* reported that, to give the appearance of complying with its DE&I commitments, the Company's Wealth Management division frequently conducted fake interviews of diverse candidates for positions that had already been filled. In an article titled *At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews*, *The New York Times* reported that, according to Bruno, for "many open positions" in his unit, "employees would interview a 'diverse' candidate – the bank's term for a woman or person of color – in keeping with the bank's yearslong informal policy" but that "often, the so-called diverse candidate would be interviewed for a job that had already been promised to someone else." Further, the article stated that, when Bruno "complained to his bosses,"

"[t]hey dismissed his claims" and that later, in August 2021, Bruno "was fired." Moreover, *The New York Times* reported that "[i]n an interview, [Bruno] said Wells Fargo retaliated against him for telling his superiors that the 'fake interviews' were 'inappropriate, morally wrong, ethically wrong.'"

230.    Additionally, the article reported that Bruno was "one of seven current and former Wells Fargo employees who said that they were instructed by their direct bosses or human resources managers in the bank's wealth management unit to interview 'diverse' candidates – even though the decision had already been made to give the job to another candidate." Further, "six current and former Wells Fargo employees, including Mr. Bruno, said that fake interviews were conducted for many types of positions. Three current employees said they conducted fake job interviews or knew of them as recently as this year." Moreover, "[f]ive others said they were aware of the practice, or helped to arrange it" and said that "***[t]he interviews . . . seemed to be more about helping Wells Fargo record its diversity efforts on paper*** – partly in anticipation of possible regulatory audits – ***rather than hiring more women or people of color***." (Emphasis added.)

231.    The article also included several quotes from Company spokespeople refuting or downplaying the misconduct. Indeed, *The New York Times* reported that "Barry Sommers, the chief executive of Wells Fargo's wealth and investment management business, said that fake interviews wouldn't even have been necessary for the financial consultant positions that Mr. Bruno was hiring for." Sommers noted that this was because "[t]heir salaries . . . fell below the $100,000 threshold that required a diverse slate of candidates to be interviewed per Wells Fargo's 2020 policy." Additionally, Sommers was quoted in the article as saying, "[t]here is absolutely no reason why anyone would conduct a fake interview," and that "[r]ather than tracking the identities of interviewees, the bank focused on the results . . . ."

232.    Moreover, the article quoted a Company spokesperson who attributed any such conduct to "individual employees," stating:

> In an emailed statement, Raschelle Burton, a Wells Fargo spokeswoman, said the bank expected all employees to follow its hiring policies and guidelines, which are communicated across the firm. "To the extent that individual employees are engaging in the behavior as described by The New York Times, we do not tolerate it," Ms. Burton said.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

233.    Further, the following day, on May 20, 2022, the Company issued a statement wherein it claimed that it could not corroborate any of the story's claims, stating:

> Yesterday, The New York Times published a story alleging that a handful of Wells Fargo managers decided to hire a job candidate and then — after making this decision — interviewed diverse candidates knowing that the seat had already been filled. ***We researched all specific claims the reporter shared with us in advance of the story's publication and could not corroborate the claims as factual***.

(Emphasis added.)

234.    On May 27, 2022, *Business Insider* published a similar article titled *Wells Fargo exec responds to reports that it denied mortgages to Black applicants and held sham job interviews* which reported that "Insider spoke with Kleber Santos, Wells Fargo's head of diverse segments, representation, and inclusion, about the recent news reports . . . ." Additionally, the article stated that "Wells Fargo is also dealing with the fallout from a New York Times report in which several current and former employees said that the bank conducted sham interviews to meet requirements for interviewing diverse job applicants." It further quoted Defendant Santos as responding:

> We researched all the specific hiring-practice allegations the reporter shared prior to the story's publication and we could not corroborate these allegations as factual.
>
> ***
>
> If we believe that any manager has conducted an interview with a predetermined outcome in mind, we believe we should investigate and punish if we find wrongdoing.

235.    At the same time, Defendants continued to misleadingly tout the Company's Diverse Search Requirement. For example, on June 1, 2022, when the Company published its 2022 DE&I Report, it again stated that "***[f]or most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension***." (Emphasis added.)

236.    Two days later, on June 3, 2022, *Business Insider* released an article titled *Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street*, which reported on the 2022 DE&I Report. In particular, the article stated:

> Wells Fargo's Santos said the bank was focused on improving diversity among leaders. In 2020, the banking giant instituted a rule that for all posted roles in the US with annual compensation greater than $100,000, at least half of interview candidates must be from a historically underrepresented group.

*The rule is working*, Santos said.

(Emphasis added.)

237.    Despite these assertions, a mere three days later, on June 6, 2022, Defendant Scharf issued a letter to Company employees revealing that Wells Fargo had temporarily suspected its "diverse slate" hiring policy. In addition, the Company announced it would be reviewing its diverse slate hiring guidelines to make adjustments and relaunch the program in July 2022.

238.    The same day, *The New York Times* published an article titled *Wells Fargo Announces 'Pause' of Policy That Led to Fake Job Interviews*. The article publicly revealed that "[o]n Monday, Mr. Scharf told employees that the policy would be put on hold for several weeks to give the bank's leaders time to study its use and make changes." It further reported that "[t]he pause would allow the bank to gain confidence that 'the guidelines live up to their promise,' and that 'hiring managers, senior leaders and recruiters fully understand how the guidelines should work,' Mr. Scharf said in the letter."

## The Truth Emerges

239.    On June 9, 2022, *The New York Times* published the June 9th Article, which was titled *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*. The article revealed that *The New York Times* had confirmed the fake interviews with 10 additional Company employees, stating that "another 10 current and former employees have shared stories about how they were subject to fake interviews, or conducted them, or saw paperwork documenting the practice." The article further revealed that the fake interviews had not been limited to "a few rogue employees" in the Company's Wealth Management Division. In reality, "sham interviews occurred across multiple business lines, including its mortgage servicing, home lending and retail banking operations." Additionally, the article noted that *The New York Times* had seen written evidence of the practice, stating that "there were written records of the practice of conducting fake interviews." Moreover, the article disclosed that the United States Attorney's Office for the Southern District of New York had opened a criminal investigation into "whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates."

240.    In response to the June 9th Article, the Company issued a press release the same day noting that "[n]o one should be put through an interview without a real chance of receiving an offer, period." The

Company further stated that, while the Company had paused the Diverse Search Requirement, it was conducting a review "so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented – and so [Wells Fargo] can have confidence that [its] guidelines live up to their promise."

241.     On this news, the price per share of the Company's common stock fell $4.55, or 10.2%, over the following two days, from a close of $44.63 per share on June 8, 2022 to a close of $40.08 on June 10, 2022.

## The Individual Defendants' Knowledge of the Discrimination Misconduct

242.     The Individual Defendants knew, or were reckless in not knowing, that the Company was conducting fake interviews of diverse candidates so that it could report that it was adhering to its Diverse Search Requirement. For example, the Company saved all of the data on its diversity initiatives and interview processes, with a former Company spokesperson confirming to *The New York Times* that "the bank kept records of every job interview." The former spokesperson noted that the record-keeping was "necessary because the Office of the Comptroller of the Currency, the nation's top banking regulator, conducts periodic audits."

243.     In addition, the Company's senior management and Board frequently reviewed, monitored, and discussed the Company's diversity initiatives. For example, the Company admitted in the 2020, 2021, and 2022 Proxy Statements that it used numerous internal and external metrics to monitor its progress on enhancing diversity at all levels of the Company. Similarly, in order to gauge whether Wells Fargo was meeting its DE&I goals, DE&I metrics and activities were included in all regular business reviews. Further, the Board and the HRC regularly received reports on Wells Fargo's DE&I initiatives. This included updates on Wells Fargo's progress pertaining to its DE&I initiatives and information related to talent acquisition and development and diversity reporting. Likewise, in the fall of 2020, the Board began receiving DE&I updates at each regularly scheduled Board meeting, which included updates on the Company's progress pertaining to its DE&I initiatives, as revealed by the Company's 2021 Proxy Statement. These Board updates on the Company's DE&I initiatives were further confirmed by former-Chairman of the Board, Charles H. Noski ("Noski"), when he represented in a signed letter contained in the 2021 Proxy Statement that "[t]he Board and its Human Resources Committee are fully engaged in

overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital management to support management in its efforts to drive meaningful change."

244.    Likewise, in April 2021, during the Company's annual proxy meeting, investors were informed by then-Chair Noski that DE&I was a "key focus" for the Board and the Company's management team. Noski further explained that "DEI is a topic that is regularly on our Board agenda. We discuss it with management and the responsible leaders, including Charlie at every one of our regularly scheduled meetings." Additionally, Noski stated that DE&I "is frankly, right near the top of [the Company's] agenda." At that time, the Board consisted of, among others, Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Scharf.

245.    The Company's Operating Committee, which was made up of, among others, Defendants Scharf and Santos, was also closely involved in Wells Fargo's diverse hiring initiatives throughout the Relevant Period. In particular, the Operating Committee was focused on diverse representation in the workforce, largely increasing the number of Black individuals in leadership roles and keeping the Company's senior management accountable for progress made with the Company's DE&I efforts.

246.    Additionally, every two weeks throughout the Relevant Period, Defendant Sanchez participated in "open positions meetings" where she and her direct reports, delivery leaders, and recruiting leaders, among others, looked into the data on the Company's DE&I efforts to determine which efforts were effective and which were not. Likewise, beginning in 2020, the annual performance reviews and compensation of the Company's senior executives were impacted by performance against the Diverse Search Requirement. For example, Defendant Scharf's and the Operating Committee's performance goals, which were approved by the Board in June and July 2020, respectively, both included the Diverse Search Requirement. Further, various senior executives' compensations were affected by progress against the Company's DE&I initiatives, including the Diverse Search Requirement. In particular, the Company's HR Committee would use progress on DE&I efforts to modify variable compensation. For example, regarding the Company's diversity initiatives: failure to meet expectations resulted in a reduction in compensation; meeting expectations had no impact on compensation; and exceeding expectations resulted in an increase in compensation. All of these facts taken together support that Defendants knew or were

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reckless in not knowing that the Company was conducting fake interviews of diverse candidates to allow it to report that it was adhering to its Diverse Search Requirement.

**Subsequent Developments Following the Relevant Period**

247.    The Company faced significant backlash following the publication of the June 9th Article. Fortune published an article on June 9, 2022 titled *Wells Fargo is under federal investigation for conducting fake job interviews of minority candidates, report say*, where it reported that the Company "is being investigated by the civil-rights unit of the Manhattan U.S. attorney's office, the New York Times reported . . . ." Additionally, the article stated that, on June 9, 2022, "[t]he stock fell 4.4% to $42.67." Fortune further represented that "[t]he probe is the latest potential blow to Wells Fargo's public image. The bank has been dealing with a series of scandals and regulatory issues for years, and is operating under a growth cap imposed by the Federal Reserve."

248.    The following day, on June 10, 2022, Barron's reported that "Wells Fargo is under criminal investigation over a scandal involving accusations the company conducted bogus job interviews with diverse candidates after positions had already been filled, according to a report in the New York Times." In addition, Barron's noted that "Wells Fargo shares fell 6% Friday [June 10, 2022] to $40.08 and reached a 52-week low of $40.02 in intraday trading."

249.    In addition, members of Congress criticized Wells Fargo and recommended additional investigations and penalties. On June 29, 2022, the House of Representatives Financial Services Committee issued a press release titled *Chairwoman Waters Calls on Regulators to Hold Wells Fargo Accountable for Continued Troubling Patterns and Practices of Anti-Consumer Behavior*. The press release revealed that, on June 28, 2022, Congresswoman Waters issued a letter to the United States Department of Housing & Urban Development, the Federal Reserve, the Federal Deposit Insurance Corporation, the CFPB, and the OCC, urging the regulators to investigate the claims that the Company denied Black refinancing applicants when interest rates were at their lowest and held "mock" interviews with diversity candidates to illustrate compliance with the Company's DE&I initiatives.

250.    In her letter, Congresswoman Waters wrote, "I write today to share my profound disappointment and significant concerns regarding the ongoing actions by one of America's largest

megabanks, Wells Fargo." Congresswoman Waters noted the Company's history of misconduct and stated, "[a]s I have made clear in the past, Congress has given regulators like yourselves significant tools to properly penalize Wells Fargo for its continuous wrongdoing, and ***based on Wells Fargo's recent behavior, I am writing to urge you to escalate penalties in a way that is reflective of its history of repeat offenses***." (Emphasis added.)

251. Further, in emphasizing the Company's history of intense regulatory scrutiny, Congresswoman Waters stated:

> Wells Fargo previously reached a settlement with the Consumer Financial Protection Bureau (CFPB), Office of the Comptroller of the Currency (OCC), and the City and County of Los Angeles in 2016 regarding some of its practices, but these penalties proved to be insufficient to deter future offenses. In September 2017, I released a Democratic Committee staff report detailing further abusive practices by Wells Fargo and outlining where regulators could use the full suite of their authorities to curb a pattern of repeated unlawful behavior. In 2018, the Federal Reserve, under then Chair Janet Yellen's leadership, ordered that Wells Fargo keep its total assets below $1.95 trillion until the bank improved its governance and risk controls. . . .

252. Additionally, Congresswoman Waters explained that the Company was far from achieving the progress with its DE&I initiatives that it repeatedly touted, stating:

> Yet, we continue to learn that the megabank is far from achieving the vision that CEO Scharf put forward at his first townhall in 2020, when he stated: "Our work has tremendous impact upon people. We need to recognize that and make sure that we're doing everything we can to operate the company to the highest standards of operational excellence." While Wells Fargo has continued to rake in billions of dollars in profit – more than $21 billion in 2021 alone – and their CEO received a 20% increase in compensation to total more than $24 million in 2021-- ***the megabank's misdeeds continue***. . . .

(Emphasis added.)

253. Congresswoman Waters also mentioned the revelations from the June 9th Article and expressed disdain for the Company's practices, stating:

> The New York Times reports that Wells Fargo staff have inflated their diversity, equity, and inclusion data by conducting 'fake' interviews with women and candidates of color. According to the article, the interviews 'seemed to be more about helping Wells Fargo records its diversity efforts on paper – partly in anticipation of possible regulatory audits – rather than hiring more women or people of color.' Recently, The New York Times also reported that federal prosecutors are investigating these "sham" interviews and if federal laws were violated. ***To be clear, commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks***; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that financial institutions hold. ***It is unacceptable that Wells Fargo would mislead applicants and the public.***

(Emphasis added.)

254.    In discussing the Company's accountability, Congresswoman Waters stated, "Wells Fargo and other mega-financial institutions must face real consequences to curb their recidivism." She continued that, "*I am also calling on the CFPB, OCC, FDIC, Federal Reserve, and HUD to take immediate action to end this pattern and practice of egregious consumer abuses at Wells Fargo and finally hold this repeat offender accountable*." (Emphasis added.)

255.    On August 1, 2022, Wells Fargo filed a Form 10-Q with the SEC for the second quarterly period ended June 30, 2022 (the "2Q 2022 10-Q") in which it confirmed that the DOJ was investigating the Company's diverse slate hiring practices. In particular, the 2Q 2022 10-Q stated that "[g]overnment agencies, including the United States Department of Justice, have undertaken formal or informal inquiries or investigations regarding the Company's hiring practices related to diversity." Analyst reaction to this news was almost immediate. On August 2, 2022, Barclays published a report titled *Wells Fargo 2Q22 10-Q Review: Discloses Hiring Practices Investigations, RPL Increases*, where it stated that "WFC believes regulators may impose additional penalties or take other enforcement actions, as it has not yet satisfied certain aspects of its consent orders. It disclosed that Government agencies, including U.S. Department of Justice, have undertaken formal or informal inquiries or investigations regarding WFC's hiring practices related to diversity." Similarly, the following day, Credit Suisse represented that "[g]overnment agencies, including the United States Department of Justice, have undertaken formal or informal inquiries or investigations regarding [Wells Fargo's] hiring practices related to diversity."

### Wells Fargo Walks Back on Its "Commitment to Diversity"

256.    That same day, the Company issued a press release titled *Wells Fargo Completes Comprehensive Review of Diverse Candidate Slate Guidelines*, which stated that the Company "is reinstating its diverse candidate slate guidelines following a pause that started in June." Additionally, it represented that "[o]ver the past six weeks, the company completed a review of diverse candidate slate hiring approaches and interviewed Wells Fargo recruiters and hiring managers to determine what's working and what's not." The Company further noted that "[w]e are recommitting to our diverse candidate

slate guidelines with changes that will help clarify and simplify the process and lead to a better experience for all candidates, internal and external."

257.    These changes dramatically undermined the initiatives that Defendants had touted to investors throughout the Relevant Period. For example, the modifications to the guidelines made it much easier for Wells Fargo's managers and executives to obtain exemptions from the Diverse Search Requirement. Similarly, in contrast to the previously-implemented hard rule which required a 50% diverse candidate slate for open positions at the Company with total direct compensation of more than $100,000, the Company announced that the Diverse Search Requirement would now apply to roles that were "in-scope" based on unspecified job levels, not compensation.

258.    In announcing the initiative's modifications and reinstatement, the Company essentially admitted that the Diverse Search Requirement had been subject to abuse throughout the Relevant Period. That same day, *The New York Times* published an article titled *Wells Fargo Revives Policy That Led to Fake Job Interviews, With Tweaks*, which reported on an internal Company memo which discussed the reinstatement of the policy. In particular, the article stated:

> Wells Fargo is reactivating a hiring practice that it paused this year after a former employee revealed that it was leading managers to interview nonwhite candidates for jobs that had already been filled, according to a memo seen by The New York Times.
>
> Beginning Aug. 19, the practice will again be put in place for certain jobs, **with new features added to prevent abuse**, according to the memo, which was sent to managers at the bank on Monday.
>
> **The bank acknowledged in the memo that its guidelines could be improved**. One problem executives found, according to the memo: "Our guidelines and processes can be overly prescriptive."
>
> The biggest changes will be increased training for managers and an easier approval process for exemptions to the diverse slate requirement.
>
> There will also be a change in which open jobs must meet the requirement. The earlier version of the policy required that every job with a salary of $100,000 or more be filled only after interviews were conducted with a diverse slate of candidates.
>
> "Instead of the previous compensation-based criteria, roles that are in-scope will now be based on job level, not compensation," the memo said. It did not specify which job levels would fall within the requirement.

(Emphasis added.)

259.    Additionally, the article stated that:

When they suspended the policy, the bank's leaders vowed to spend the following weeks talking to employees to find out how to improve the program.

"Overwhelmingly, we heard the need to improve the candidate and manager experience and the need for a stronger and longer-term commitment and investment to help employees develop their skills and grow their careers," the memo said.

260.    On September 13, 2022, following years of the Company urging shareholders to vote against racial equity audits, Wells Fargo issued a press release where it announced that it would "commission an external, third-party racial equity audit" by law firm Covington & Burling LLP. It stated that "[t]he assessment will include input from both internal and external stakeholders and focus on elements of Wells Fargo's efforts to serve diverse communities and promote a diverse workforce."

261.    This announcement was made shortly before Defendant Scharf was to testify before congressional committees. For example, Barron's reported in a September 14, 2022 article titled *Wells Fargo Hires Law Firm to Conduct Diversity Audit* that "Scharf is reportedly scheduled to testify next week before a pair of congressional committees where he would likely face intense questioning about the firm's hiring and diversity practices."

262.    Analysts soon commented on Wells Fargo's sudden turnaround with respect to the racial equity audits. Indeed, on September 13, 2022, Bloomberg published an article titled *Wells Fargo Commits to Racial-Equity Audit Ahead of Hearings*, wherein it reported that the Company "urged shareholders to vote against a shareholder-proposed racial-equity audit earlier this year and last year, arguing that it was already committed to advancing diversity, equity and inclusion. On both occasions, shareholders rejected the proposals."

263.    Additionally, the Company continued to face backlash regarding its fake interview practices. For example, on September 21, 2022, a hearing was held before the United States House of Representatives Committee on Financial Services titled *Holding Megabanks Accountable: Oversight of America's Largest Consumer Facing Banks*. During the hearing, Congresswoman Waters asked Defendant Scharf, "[i]s it true that you interviewed an African-American employee for a position after you had already hired a White employee? Is that true?" Defendant Scharf effectively dodged the question, responding that "[w]e are in the middle of continuing an investigation to make sure that we understand

1
2
every instance where people felt as if they were not treated fairly, and if we have findings, we will take

appropriate action."

3
4
5
6
7
8
9
10
264.    The following day, United States Senator Bob Menendez, a senior member of the Senate

Banking, Housing, and Urban Affairs Committee, Chairman Sherrod Brown, and Senator Elizabeth

Warren issued a press release titled *Menendez, Brown, Warren Hold Wells Fargo Accountable for*

*Conducting Misleading Interviews with Women and Minority Candidates*. The press release noted that,

the same day, Senators Menendez, Brown, and Warren had sent a "letter to Wells Fargo CEO and

President Charles Scharf and Senior Vice President Bei Ling to express their deep concerns about the

bank's reported practice of conducting 'fake interviews' with women and minority candidates after

already filling vacancies." In relevant part, the Senators wrote:

11
12
13
14
15
16
17
We write with deep concern regarding recent reports that Wells Fargo conducts "fake interviews" with women and minority candidates for positions that have already been filled. According to the New York Times, Wells Fargo undertakes these fake interviews to artificially boost diversity statistics in an attempt to satisfy an internal goal to interview at least one woman and one person of color for each open position—a goal that was meant to increase diversity among Wells Fargo's workforce. The information uncovered by The New York Times is ***not only highly offensive and suggestive of systemic bias and discrimination at the bank, but also may represent a pattern of misleading shareholders*** and federal and state regulators in oversight of Wells Fargo's execution of nondiscrimination laws and broader, public commitment to diversity, equity, and inclusion.

18
                                        \*\*\*
19
20
21
22
In response to The New York Times article, Wells Fargo said it will attempt to end fake interviews by allowing hiring managers to seek exemptions from the bank's diverse interviewing goals altogether. However, if hiring managers can more easily opt out of its goals, diverse candidates may be considered less often for open positions. Additionally, Wells Fargo recently announced that it agreed to a third-party racial-equity audit after years of urging shareholders to vote against such audits. While these are potentially good first steps, ***Wells Fargo should take more immediate action to rebuild confidence in its recruitment, application, interview, and hiring processes***.

23
(Emphasis added.)

24
25
26
265.    On October 31, 2022, the Company filed the 3Q 2022 10-Q which revealed that, in addition

to the DOJ, the SEC was also investing the Company's hiring practices. In relevant part, the 3Q 2022 10-

Q stated that "[g]overnment agencies, including the United States Department of Justice and the United

27
28

States Securities and Exchange Commission, have undertaken formal or informal inquiries or investigations regarding the Company's hiring practices related to diversity."

### Repurchases During the Relevant Period

266.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $19.8 billion to repurchase approximately 400 million shares of its own common stock at artificially inflated prices from February 2021 through June 2022.

267.     According to the Form 10-Q the Company filed with the SEC on July 28, 2021 for the quarterly period ended June 30, 2021 (the "2Q 2021 10-Q"), between April 1, 2021 and April 30, 2021, the Company purchased 20,075,596 shares of its common stock for approximately $875.3 million at an average price of $43.60 per share.

268.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $70.7 million for repurchases of its own stock between April 1, 2021 and April 30, 2021.

269.     According to the 2Q 2021 10-Q, between May 1, 2021 and May 31, 2021, the Company purchased 10,893,389 shares of its common stock for approximately $502.3 million at an average price of $46.11 per share.

270.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $65.7 million for repurchases of its own stock between May 1, 2021 and May 31, 2021.

271.     According to the 2Q 2021 10-Q, between June 1, 2021 and June 30, 2021, the Company purchased 4,354,796 shares of its common stock for approximately $187.6 million at an average price of $43.08 per share.

272.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $13.1 million for repurchases of its own stock between June 1, 2021 and June 30, 2021.

273.     According to the Form 10-Q the Company filed with the SEC on November 1, 2021 for the quarterly period ended September 30, 2021 (the "3Q 2021 10-Q"), between July 1, 2021 and July 31, 2021, the Company purchased 36,810,627 shares of its common stock for approximately $1.6 billion at an average price of $44.76 per share.

274.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $172.3 million for repurchases of its own stock between July 1, 2021 and July 31, 2021.

275.     According to the 3Q 2021 10-Q, between August 1, 2021 and August 31, 2021, the Company purchased 41,340,615 shares of its common stock for approximately $1.9 billion at an average price of $47.85 per share.

276.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $321.2 million for repurchases of its own stock between August 1, 2021 and August 31, 2021.

277.     According to the 3Q 2021 10-Q, between September 1, 2021 and September 30, 2021, the Company purchased 36,057,193 shares of its common stock for approximately $1.7 billion at an average price of $46.18 per share.

278.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $219.9 million for repurchases of its own stock between September 1, 2021 and September 30, 2021.

279.     According to the Form 10-K the Company filed with the SEC on February 22, 2022 for the fiscal year ended December 31, 2021 (the "2021 10-K"), between October 1, 2021 and October 31, 2021, the Company purchased 36,092,310 shares of its common stock for approximately $1.8 billion at an average price of $50.07 per share.

280.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $360.6 million for repurchases of its own stock between October 1, 2021 and October 31, 2021.

Verified Consolidated Amended Shareholder Derivative Complaint

281.     According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company purchased 80,585,475 shares of its common stock for approximately $4.1 billion at an average price of $50.66 per share.

282.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $852.6 million for repurchases of its own stock between November 1, 2021 and November 30, 2021.

283.     According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company purchased 23,001,846 shares of its common stock for approximately $1.1 billion at an average price of $48.79 per share.

284.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $200.3 million for repurchases of its own stock between December 1, 2021 and December 31, 2021.

285.     According to the Form 10-Q the Company filed with the SEC on May 3, 2022 for the quarterly period ended March 31, 2022 (the "1Q 2022 10-Q"), between January 1, 2022 and January 31, 2022, the Company purchased 33,687,433 shares of its common stock for approximately $1.8 billion at an average price of $54.55 per share.

286.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $487.5 million for repurchases of its own stock between January 1, 2022 and January 31, 2022.

287.     According to the 1Q 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company purchased 55,819,880 shares of its common stock for approximately $3.2 billion at an average price of $56.79 per share.

288.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $932.8 million for repurchases of its own stock between February 1, 2022 and February 28, 2022.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

289.     According to the 1Q 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company purchased 20,586,039 shares of its common stock for approximately $1 billion at an average price of $49.07 per share.

290.     As the Company's stock was actually worth only $40.08 per share, the price at closing on June 10, 2022, the Company overpaid by approximately $185.1 million for repurchases of its own stock between March 1, 2022 and March 31, 2022.

291.     According to the 2Q 2022 10-Q, between April 1, 2022 and April 30, 2022, the Company purchased 24,862 shares of its common stock for approximately $1.2 million at an average price of $47.54 per share.

292.     As the Company's stock was actually worth only $40.08, the price at closing on June 10, 2022, the Company overpaid by approximately $185,471 for repurchases of its own stock between April 1, 2022 and April 30, 2022.

293.     According to the 2Q 2022 10-Q, between May 1, 2022 and May 31, 2022, the Company purchased 25,465 shares of its common stock for approximately $1.1 million at an average price of $43.63 per share.

294.     As the Company's stock was actually worth only $40.08, the price at closing on June 10, 2022, the Company overpaid by approximately $90,401 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

295.     According to the 2Q 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company purchased 38,459 shares of its common stock for approximately $1.6 million at an average price of $42.45 per share.[5]

296.     As the Company's stock was actually worth only $40.08, the price at closing on June 10, 2022, the Company overpaid by approximately $91,148 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

297.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $3.8 billion.

---

[5] Upon information and belief, these shares were repurchased during the Relevant Period.

## DAMAGES TO WELLS FARGO

298.    As a direct and proximate result of the Individual Defendants' misconduct, Wells Fargo has lost and expended, and will continue to lose and expend, many millions of dollars.

299.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and three of the Individual Defendants, criminal investigations from the DOJ, SEC, and other governmental agencies, settlements reached with various former customers and employees, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

300.    Such losses include the Company's overpayment by over $3.8 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

301.    Such expenditures also include, but are not limited to, the cost of implementing measures to get the Asset Cap lifted and Wells Fargo's losses in connection therewith.

302.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Discrimination Misconduct.

303.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

304.    As a direct and proximate result of the Individual Defendants' conduct, Wells Fargo has also suffered and will continue to suffer a loss of reputation and goodwill and will be identified as a promoting discrimination that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

305.    Plaintiffs bring this action derivatively for the benefit of Wells Fargo to redress injuries Wells Fargo suffered and suffer as a direct result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Wells Fargo.

306.     Wells Fargo is named as a nominal defendant in this action. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

307.     Plaintiffs have continuously been stockholders of Wells Fargo at all relevant times. Plaintiffs will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

<u>**DEMAND FUTILITY**</u>

308.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

309.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Wells Fargo's Board consisted of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent (the "Director-Defendants") along with nonparties Richard K. Davis, Cecelia G. Morken, Felicia F. Norwood, and Suzanne M. Vautrinot (collectively with the Director-Defendants, the "Directors"). Plaintiffs did not make a demand on the Board to institute this action because such a demand would be futile. Plaintiffs need only to allege demand futility as to seven of fourteen Directors that were on the Board at the time this action was filed.

310.     Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause or permit Wells Fargo to engage in the Discrimination Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts while causing Wells Fargo to spend almost $3.8 billion to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to investigate the charges impartially and decide whether to pursue action against themselves and the other perpetrators of the scheme.

311.     Moreover, each of the Director-Defendants, that is, Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent, solicited the 2021 Proxy Statement to call for a shareholder vote to, *inter alia*, elect all of them to the Board, thus allowing them to continue breaching their fiduciary duties to Wells Fargo. Additionally, Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent objected to the inclusion of the 2021 Shareholder Proposals on the 2021

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Proxy Statement despite knowing that the Company was not following its own DE&I policies by participating in the Discrimination Misconduct.

312.    Moreover, Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent solicited the 2022 Proxy Statement which, *inter alia*, called for shareholders to approve the Plan. The 2022 Proxy Statement also solicited shareholder approval for an additional 80 million shares to be issued in connection with approving the Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan who would not have approved the Plan had they been informed about the Discrimination Misconduct and the other wrongdoing alleged herein. Under the Plan, the total annual compensation paid to any non-employee director, inclusive of cash compensation and amounts awarded under the Plan, shall not exceed $750,000, except that in the case of the Chairman of the Board or any Independent Lead Director, such limit is instead $1,500,000. However, as mentioned above, for the 2022 Fiscal Year, Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent received $428,900, $357,044, $342,044, $378,211, $354,923, $440,044, $349,211, $383,044, and $374,044, respectively, in total compensation. Because Defendants Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent solicited approval for the Plan which, *inter alia*, could have nearly doubled their total annual compensation, demand is futile as to them and, thus, excused. Because Defendant Black solicited approval for the Plan which, *inter alia*, could have nearly tripled his total annual compensation, demand is futile as to him and, thus, excused. Moreover, as set forth below, Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent were beholden to those among them who served on the Governance and Nominating Committee, that is, Defendants Clark, Craver, Hewett, and Sargent, who, as alleged below, had complete discretion over determining whether and to what extent awards under the Plan would be made to Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent.

313.    Defendants Clark, Craver, Hewett, and Sargent (the "Governance and Nominating Committee Directors") served as members of the Governance and Nominating Committee during the Relevant Period. The Governance and Nominating Committee Directors solicited shareholder approval of the Plan, which granted them the right to determine how many shares of Company common stock to

administer under the Plan to non-employee directors, including themselves. They all stood to benefit from, and did benefit from, shareholder approval of the Plan, which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements pertaining to the Discrimination Misconduct. Thus, non-employee Director-Defendants Black, Chancy, Morris, Payne, and Pujadas were beholden to the Governance and Nominating Committee Directors, and Governance and Nominating Committee Directors were beholden to each other, because they would not take action against the very directors who held the authority to award them nearly double, and, for Defendant Black, nearly triple, their total annual compensation pursuant to the Plan. These conflicts of interest precluded the Governance and Nominating Committee Directors and the rest of the Director-Defendants from calling into question the Director-Defendants and other Individual Defendants' conduct. Thus, demand upon the Governance and Nominating Committee Directors would be futile.

314. Each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by nearly $3.8 billion for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

315. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Wells Fargo to engage in the Discrimination Misconduct and caused or permitted Wells Fargo to issue materially false and misleading statements. Specifically, the Director-Defendants caused Wells Fargo to issue false and misleading statements which were intended to make Wells Fargo appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

316. Additional reasons that demand on Defendant Scharf is futile follow. Defendant Scharf is currently the Company's CEO, President, and a director and has been since October 2019. As such, the

Company provides Defendant Scharf with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO, President and a director throughout the Relevant Period, Defendant Scharf was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed*, inter alia*, to shareholders approving, on an advisory basis, his unjust compensation and approving the Plan. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the schemes to engage in the Discrimination Misconduct, and to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to oversee the implementation and progress of the DE&I efforts. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. Further, Defendant Scharf was in charge of working with the Operating Committee to ensure that all the DE&I policies were being followed properly. The Operating Committee reported to him about the implementation and progress of the Company's DE&I policies. Defendant Scharf's year-end performance review was based on efforts he made to advance DE&I at the Company. Moreover, Defendant Scharf is a defendant in the Securities Class Action. For these reasons, too, Defendant Scharf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

317.     Additional reasons that demand on Defendant Black is futile follow. Defendant Black has served as Chair of the Board since August 2021 and as a Company director since April 2020. He is also the Chair of the Finance Committee and a member of the HRC, roles for which he receives substantial compensation. In addition, Defendant Black solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the

Board and approving the Plan. As Chair of the Board and a member of the HRC, he failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Black breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

318.    Additional reasons that demand on Defendant Chancy is futile follow. Defendant Chancy has served as a Company director since August 2020 and serves as a member of the Audit Committee, Risk Committee, and Finance Committee, roles for which he receives substantial compensation. In addition, Defendant Chancy solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As the Company's trusted Audit Committee member, he failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Chancy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

319.    Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since January 2018, thus indicating she knew about the Company's

sprawling instances of misconduct and fragile position resulting from the Asset Cap, yet failed to take action. She also serves as the Chair of the CRC and as a member of the Governance and Nominating Committee, roles for which she receives substantial compensation. In addition, Defendant Clark solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that benefitted the other Individual Defendants and resulted in shareholder approval of the Plan. As a trusted Company director, she failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes. She also voted against the Proxy Proposals even though she had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to her failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Clark breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

320.    Additional reasons that demand on Defendant Craver is futile follow. Defendant Craver has served as a Company director since January 2018, thus indicating he knew about the Company's sprawling instances of misconduct and fragile position resulting from the Asset Cap, yet failed to take action. He is the Chair of the Audit Committee and a member of the Finance Committee and the Governance and Nominating Committee, roles for which he receives substantial compensation. In addition, Defendant Craver solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As the Company's trusted Audit Committee Chair, he failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the

Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Craver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

321.    Additional reasons that demand on Defendant Hewett is futile follow. Defendant Hewett has served as a Company director since January 2019. He is also Chair of the Governance and Nominating Committee and a member of the HRC, Corporate Responsibility Committee, and Risk Committee, roles for which he receives substantial compensation. The main responsibility of the HRC is to oversee the Company's DE&I initiatives and make sure that the Company was compliant with its DE&I policies. He had an oversight duty to make sure all the DE&I initiatives and policies were being implemented and followed properly. He was also in charge of reviewing year-end performances of the CEO and the Operating Committee. The review was based on the CEO and Operating Committee's efforts in advancing the Company's DE&I efforts. He failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Hewett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

322.    Additional reasons that demand on Defendant Morris is futile follow. Defendant Morris has served as a Company director since January 2018, thus indicating she knew about the Company's sprawling instances of misconduct and fragile position resulting from the Asset Cap, yet failed to take action. She is also Chair of the Risk Committee and a member of the HRC, roles for which she receives

substantial compensation. The main responsibility of the HRC is to oversee the Company's DE&I initiatives and make sure that the Company was compliant with its DE&I policies. She had an oversight duty to make sure all the DE&I initiatives and policies were being implemented and followed properly. She was also in charge of reviewing year-end performances for the CEO and the Operating Committee. The review was based on the CEO and Operating Committee's efforts in advancing the Company's DE&I efforts. However, Defendant Morris failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes. She also voted against the Proxy Proposals even though she had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to her failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Morris breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

323.    Additional reasons that demand on Defendant Payne is futile follow. Defendant Payne has served as a Company director since October 2019 and is a member of Risk Committee, roles for which he receives substantial compensation. In addition, Defendant Payne solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As a trusted Company director, he failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons,

too, Defendant Payne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

324.    Additional reasons that demand on Defendant Pujadas is futile follow. Defendant Pujadas has served as a Company director since September 2017, thus indicating he knew about the Company's sprawling instances of misconduct and fragile position resulting from the Asset Cap, yet failed to take action. He also serves as a member of the Finance Committee and the Risk Committee, roles for which he receives substantial compensation. In addition, Defendant Pujadas solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan. As a trusted Company director, he failed to conduct any oversight over the implementation and practices surrounding the DE&I policies and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Pujadas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

325.    Additional reasons that demand on Defendant Sargent is futile follow. Defendant Sargent has served as a Company director since February 2017, thus indicating she knew about the Company's sprawling instances of misconduct and fragile position resulting from the Asset Cap, yet failed to take action. He is also the Chair of the HRC and receives substantial compensation from the Company for his roles. The main responsibility of the HRC is to oversee the Company's DE&I initiatives and make sure that the Company remains compliant with its DE&I policies. Defendant Sargent had an oversight duty to make sure all the DE&I initiatives and policies were being implemented and followed properly. He was also tasked with reviewing year-end performance for the CEO and the Operating Committee. The review was based on the CEO and Operating Committee's efforts in advancing the Company's DE&I efforts.

Further, Defendant Sargent was also a member of the Audit and Governance and Nominating Committees. He conducted little, if any, oversight of the Company's engagement in the Discrimination Misconduct and the scheme to make false and misleading statements and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes. In addition, Defendant Black solicited the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board and approving the Plan.   He also voted against the Proxy Proposals even though he had knowledge of Wells Fargo's prior discriminatory lawsuits and settlements and knew that those proposals would help improve the Company's compliance with its diversity initiatives. Due to his failure of adequate oversight regarding the Diverse Search Requirement, the Company has been subjected to criminal and civil investigations by the DOJ, SEC, and other governmental agencies. For these reasons, too, Defendant Sargent breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

326.    Additional reasons that demand on the Board is futile follow.

327.    Defendants Craver, Chancy, and Sargent (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the Discrimination Misconduct, to disseminate materially false and misleading statements to the public, and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act.

328.    In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to: oversee the integrity of the Company's financial disclosures adequately; oversee the Company's compliance with legal and regulatory requirements adequately; oversee the Company's risk assessments and risk management adequately;  discuss with management the Company's financial information prior to public distribution adequately;  and oversee the Company' disclosure controls and procedures

adequately. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

329.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to engage in the Discrimination Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

330.    In addition, the Director-Defendants knew that the Company's progress with DE&I initiatives would be critical to the Federal Reserve lifting the Asset Cap and thus allowing for Company growth. As a result, the Director-Defendants made false and misleading statements throughout the Relevant Period which touted the Company's DE&I efforts.

331.    Wells Fargo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Wells Fargo any part of the damages Wells Fargo suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

332.    The acts complained of herein constitute violations of fiduciary duties owed by Wells Fargo's officers and directors, and these acts are incapable of ratification.

333.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies

belonging to the stockholders of Wells Fargo. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Wells Fargo, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

334.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

335.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Wells Fargo to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

336.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

337.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

338.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

339.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

340.    Under the direction and watch of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent, the 2021 and 2022 Proxy Statements failed to disclose that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

341.    Moreover, the 2021 and 2022 Proxy Statements failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Conduct was not complied with.

342.    Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for

shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

343.    Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors and approval of the Plan, which provided (and provides) material benefits to them and certain of the other Individual Defendants.

344.    The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and to the Board, allowing them to continue or being breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent, who were breaching their fiduciary duties to the Company.

345.    The false and misleading elements of the 2022 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Scharf to the Board; (2) approve, on an advisory basis, executive compensation (Say on Pay); and (3) approve the Plan, which, among other things, would provide for an additional 80 million shares in connection with eligible awards to be received by the Company's directors and officers.

346.    The Company was damaged as a result of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, and Sargent's material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

347.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

348.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above,

as though fully set forth herein.

349.     The Individual Defendants participated in the schemes to defraud with the purpose and effect of defrauding Wells Fargo. Not only is Wells Fargo now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Wells Fargo by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Wells Fargo.

350.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

351.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Wells Fargo not misleading.

352.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Wells Fargo.

353.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated

to the public through filings with the SEC.

354.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

355.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

## THIRD CLAIM
### Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

356.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

357.    The Individual Defendants, by virtue of their positions with Wells Fargo and their specific acts were, at the time of the wrongs alleged herein, controlling persons of Wells Fargo and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Wells Fargo to engage in the illegal conduct and practices complained of herein.

358.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

## FOURTH CLAIM
### Against Individual Defendants for Breach of Fiduciary Duties

359.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

360.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wells Fargo's business and affairs.

361.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

362.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wells Fargo.

363.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Discrimination Misconduct.

364.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Wells Fargo's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

365.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

366.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

367.    In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in a lucrative insider sale, netting proceeds of approximately $1 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

368.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts

set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

369.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Discrimination Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in Discrimination Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Discrimination Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in an insider sale. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

370.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

371.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wells Fargo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

372.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

### FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

373.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

374.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Wells Fargo.

375.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sale, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Wells Fargo that was tied to

the performance or artificially inflated valuation of Wells Fargo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

376.    Plaintiffs, as shareholders and representatives of Wells Fargo, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

377.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

378.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

379.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Wells Fargo, for which they are legally responsible.

380.    As a direct and proximate result of the Individual Defendants' abuse of control, Wells Fargo has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

381.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

382.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

383.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Wells Fargo in a manner consistent with the operations of a publicly held corporation.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

384.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Wells Fargo has sustained and will continue to sustain significant damages.

385.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

386.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

<u>**EIGHTH CLAIM**</u>
**Against Individual Defendants for Waste of Corporate Assets**

387.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

388.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, is subject to a criminal investigation, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

389.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

390.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

391.    Plaintiffs on behalf of Wells Fargo have no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Wells Fargo, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wells Fargo;

(c)    Determining and awarding to Wells Fargo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together

with pre-judgment and post-judgment interest thereon;

(d)     Directing Wells Fargo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wells Fargo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Wells Fargo to nominate at least seven candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Wells Fargo restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: February 24, 2023                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

Email: lrosen@rosenlegal.com

Erica L. Stone (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile (212) 202-3827
Email: estone@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

Verified Consolidated Amended Shareholder Derivative Complaint

## **VERIFICATION**

I, Hugues Gervat am a plaintiff in the within action.

I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2023.

2/22/2023

Hugues Gervat

Hugues Gervat

## **VERIFICATION**

I,     Charles Rogers        am     a      plaintiff     in     the  within        action.

I  have   reviewed   the   allegations   made    in    this    shareholder    derivative  complaint,  know  the  contents  thereof,  and   authorize   its   filing.  To   those allegations   of which  I  have  personal   knowledge,   I  believe  those   allegations   to  be   true.   As  to   those  allegations   of  which   I  do  not   have  personal  knowledge,  I  rely  upon  my  counsel  and  their  investigation  and  believe  them  to  be  true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th  day of _____, 2023.

2/22/2023

CHARLES ROGERS

Charles Rogers