1    Brendan P. Cullen (SBN 194057)
     (cullenb@sullcrom.com)
2    Sverker K. Hogberg (SBN 244640)
     (hogbergs@sullcrom.com)
3    SULLIVAN & CROMWELL LLP
     1870 Embarcadero Road
4    Palo Alto, California 94303
     Telephone:  (650) 461-5600
5

6    *Counsel for Nominal Defendant*
     *Wells Fargo & Company*
7
     [*Additional counsel listed on signature page*]
8

9

10                   **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12

13

14   |                                          | Lead Case No. 3:22-cv-05173-TLT |

15                                                (Consolidated with Case No. 3:22-cv-05473-TLT)

16
     IN RE WELLS FARGO & COMPANY
17   HIRING PRACTICES DERIVATIVE              **NOMINAL DEFENDANT'S NOTICE OF
     LITIGATION                               MOTION AND MOTION TO DISMISS THE
18                                            COMPLAINT FOR FAILURE
     This Document Relates To:               ADEQUATELY TO PLEAD DEMAND
19                                           FUTILITY; MEMORANDUM OF LAW IN
         ALL ACTIONS                         SUPPORT THEREOF**
20
                                             Hearing:  August 15, 2023
21                                           Time:  2:00 p.m.
                                             Courtroom 9, 19th Floor
22                                           The Honorable Trina L. Thompson

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on August 15, 2023 at 2:00 p.m., or as soon thereafter as counsel

4

may be heard in Courtroom 9 of the United States District Court for the Northern District of California,

5

located at 450 Golden Gate Avenue, San Francisco, California 94102, Nominal Defendant Wells Fargo &

6

Company ("Wells Fargo" or the "Company"), will and hereby does move this Court to dismiss the

7

Amended Complaint (ECF No. 37) under Federal Rule of Civil Procedure 23.1 for failure to make a

8

pre-suit demand on Wells Fargo's Board of Directors or adequately to plead that the demand requirement

9

is excused.  This Motion is based on this Notice, the supporting Memorandum of Law, the Declaration of

10

Brendan P. Cullen and exhibits thereto, and the accompanying Request for Judicial Notice filed

11

concurrently herewith, the complete files and records in this action, and any additional material and

12

arguments as may be considered in connection with the hearing or thereafter.

13

DATED:  April 3, 2023

Respectfully submitted,

14

*/s/ Brendan P. Cullen*

15

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 461-5600

16

17

18

19

20

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500

21

22

23

24

Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000

25

26

27

*Counsel for Nominal Defendant*
*Wells Fargo & Company*

28

1

## <u>TABLE OF CONTENTS</u>

2
Page

PRELIMINARY STATEMENT ...............................................................................................1

ISSUE TO BE DECIDED ......................................................................................................2

BACKGROUND ....................................................................................................................2

STANDARD FOR THIS DEMAND FUTILITY MOTION...................................................6

ARGUMENT .........................................................................................................................7

I.      Plaintiffs Fail To Plead that a Majority of the Board Faces a Substantial Likelihood of
        Personal Liability. ......................................................................................................8

        A.      Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board
                Breached Their Fiduciary Duties. ...................................................................8

                1.      The Complaint Lacks Particularized Facts Alleging that a Majority of the Board
                        Knowingly Failed To Oversee the Company's Implementation of the Diverse
                        Slates Guidelines. .............................................................................. 9

                2.      The Complaint Lacks Particularized Facts Alleging that a Majority of the Board
                        Deliberately Misinformed Shareholders about the Diverse Slates Guidelines and
                        Wells Fargo's Commitment to Diversity Hiring Practices........................ 13

        B.      Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board Faces
                a Substantial Likelihood of Liability Under Section 14(a)...................................17

                1.      Plaintiffs Fail To Allege a Material Misstatement or Omission................. 17

                2.      Plaintiffs Fail To Allege that the Director Defendants Acted in Bad Faith. ............ 19

                3.      Plaintiffs Fail To Allege that the Proxies Were an "Essential Link" to the
                        Purportedly Loss-Generating Corporate Action..................................... 20

        C.      Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board Faces
                a Substantial Likelihood of Liability Under Section 10(b)...................................21

II.     Plaintiffs Fail To Plead that a Majority of the Board Received a Material Personal Benefit
        from the Alleged Misconduct. ....................................................................................22

III.    Plaintiffs Fail To Plead that a Majority of the Board Is Not Independent. ..................24

CONCLUSION......................................................................................................................25

SULLIVAN &
CROMWELL LLP

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Advanced Advisors G. P.* v. *Berman*,
2014 WL 12772264 (C.D. Cal. Sept. 16, 2014) ................................................................20

*Africa* v. *Jianpu Tech. Inc.*,
2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) ................................................................15

*In re Allergan, Inc.*,
2011 WL 1429626 (C.D. Cal. Apr. 12, 2011) ................................................................12

*Aronson* v. *Lewis*,
473 A.2d 805 (Del. 1984) ................................................................6-7, 24

*Behrmann* v. *Brandt*,
2020 WL 4432536 (D. Del. July 31, 2020) ................................................................10

*Brody* v. *Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................17

*In re Citigroup Inc. S'holder Deriv. Litig.*,
964 A.2d 106 (Del. Ch. 2009)................................................................7, 8, 14

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ................................................................16

*City of Birmingham Relief & Ret. Sys.* v. *Hastings*,
2019 WL 3815722 (N.D. Cal. Feb. 13, 2019) ................................................................17

*Constr. Indus. Laborers Pension Fund* v. *Bingle*,
2022 WL 4102492 (Del. Ch. Sept. 6, 2022) ................................................................10

*In re Cornerstone Propane Partners, L.P.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ................................................................18

*Davis* v. *Baier*,
2023 WL 1073188 (M.D. Tenn. Jan. 27, 2023)................................................................24

*Desaigoudar* v. *Meyercord*,
223 F.3d 1020 (9th Cir. 2000) ................................................................17

*Desimone* v. *Barrows*,
924 A.2d 908 (Del. Ch. 2007)................................................................7, 10

*In re Diamond Foods, Inc. Deriv. Litig.*,
2012 WL 1945814 (N.D. Cal. May 29, 2012) ................................................................20

-iii-

SULLIVAN &
CROMWELL LLP

*In re Dow Chem. Co. Deriv. Litig.,*
2010 WL 66769 (Del. Ch. Jan. 11, 2010) ........................................................................13

*Durgin* v. *Sharer,*
2017 WL 2214618 (C.D. Cal. Jan. 10, 2017) ...................................................................25

*In re E.F. Hutton Banking Pracs. Litig.,*
634 F. Supp. 265 (S.D.N.Y. 1986) ...................................................................................24

*In re Facebook, Inc. S'holder Deriv. Privacy Litig.,*
367 F. Supp. 3d 1108 (N.D. Cal. 2019) ................................................ 12, 14, 17-18, 24, 25

*Forestal* v. *Caldwell,*
739 F. App'x. 895 (9th Cir. 2018) ...................................................................................25

*Freedman* v. *Adams,*
2012 WL 1345638 (Del. Ch. Mar. 30, 2012) ..................................................................23

*Gamco Asset Mgmt., Inc.* v. *iHeartMedia, Inc.,*
2016 WL 6892802 (Del. Ch. Nov. 23, 2016) ....................................................................8

*In re Gen. Motors Co. Deriv. Litig.,*
2015 WL 3958724 (Del. Ch. June 26, 2015) ...................................................................10

*Hastey* v. *Welch,*
449 F. Supp. 3d 1053 (D. Kan. 2020) ..............................................................................20

*Jackson* v. *Fischer,*
2013 WL 6732872 (N.D. Cal. Dec. 20, 2013) .................................................................22

*Kahnert* v. *Kotick,*
2022 WL 2167792 (C.D. Cal. May 20, 2022) ............................................................16, 22

*Laborers' Loc.* v. *Intersil,*
868 F. Supp. 2d 838 (N.D. Cal. 2012) ..............................................................................1

*In re Marvell Tech. Grp. Ltd. Sec. Litig.,*
2008 WL 4544439 (N.D. Cal. Sept. 29, 2008) ................................................................20

*In re Maxim Integrated Prod., Inc., Deriv. Lit.,*
574 F. Supp. 2d 1046 (N.D. Cal. 2008) ...........................................................................22

*Merckel* v. *Sacks,*
2010 WL 11586832 (C.D. Cal. July 12, 2010) ................................................................14

*Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.,*
540 F.3d 1049 (9th Cir. 2008) .........................................................................................22

*Nathanson* v. *Polycom, Inc.,*
87 F. Supp. 3d 966 (N.D. Cal. 2015) ...............................................................................19

-iv-

*NuVasive, Inc.* v. *Miles*,
  2020 WL 5106554 (Del. Ch. Aug. 31, 2020) ............................................................. 16

*Ocegueda* v. *Zuckerberg*,
  526 F. Supp. 3d 637 (N.D. Cal. 2021) ..................................................................... 21

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ................................................................................. 18

*In re Oracle Corp. Deriv. Litig.*,
  2011 WL 5444262 (N.D. Cal. Nov. 9, 2011) ........................................................... 24

*Oswald* v. *Identiv, Inc.*,
  2018 WL 1783838 (N.D. Cal. Apr. 13, 2018) ............................................................ 7

*In re PayPal Holdings, Inc. S'holder Deriv. Litig.*,
  2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ................................................... 7, 17, 20

*Police Ret. Sys. of St. Louis* v. *Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. May 22, 2012) .......................................................... 19

*Rattner* v. *Bidzos*,
  2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ....................................................... 13

*Ret. Sys.* v. *Bush*,
  2022 WL 1467773 (N.D. Cal. Mar. 1, 2022) ...................................................... 19, 22

*Ret. Sys.* v. *Jobs*,
  593 F.3d 1018 (9th Cir. 2010) ............................................................................... 17

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) .......................................................................... 16, 19

*In re Rocket Fuel Inc.*,
  2016 WL 4492582 (N.D. Cal. Aug. 26, 2016) ......................................................... 11

*Rosenbloom* v. *Pyott*,
  765 F.3d 1137 (9th Cir. 2014) .............................................................................. 6, 7

*Ryan* v. *Gursahaney*,
  2015 WL 1915911 (Del. Ch. Apr. 28, 2015) ........................................................... 23

*South* v. *Baker*,
  62 A.3d 1 (Del. Ch. 2010) ................................................................................ 11, 12

*Stone* v. *Ritter*,
  911 A.2d 362 (Del. 2006) ................................................................................... 9, 10

-v-

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund* v. *Zuckerberg*,
262 A.3d 1034 (Del. 2021) ..............................................................................7, 23

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
2022 WL 345066 (N.D. Cal. Feb. 4, 2022) ...............................................17, 19

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................20

*Weston Family P'ship LLP* v. *Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) .............................................................................21

*Wood* v. *Baum*,
953 A.2d 136 (Del. 2008) .........................................................................12, 13

**Statutes, Rules, and Regulations**

Delaware General Corporation Law Section 102(b)(7).........................................7

Delaware General Corporation Law Section 220 ...............................................13

Federal Rule of Civil Procedure 23.1 ..................................................... *passim*

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4.............................22

Securities and Exchange Act Section 10(b), 15 U.S.C. § 78j(b),
and SEC Rule 10-b5 promulgated thereunder ........................................5, 21-22

Securities and Exchange Act Section 14(a), 15 U.S.C. § 78n(a),
and SEC Rule 14a-9 promulgated thereunder ........................................5, 17-21

Securities and Exchange Act Section 20(a), 15 U.S.C. § 78t(a)......................5, 22

-vi-

**PRELIMINARY STATEMENT**

In two articles published in May and June 2022, *The New York Times* reported that a small number of Wells Fargo employees had conducted "sham" interviews of diverse candidates for positions that had already been promised to other applicants.  Employees supposedly conducted these fake interviews to comply with Wells Fargo's Diverse Slates Guidelines, a policy similar to the National Football League's "Rooney Rule," which required that at least 50% of interviewees for most positions earning over $100,000 per year to be diverse as to at least one of several "diversity dimensions."  Any fake interviews would have been directly contrary to both the letter and spirit of Wells Fargo's policies, including the Diverse Slates Guidelines.  Wells Fargo took the allegations in the newspaper articles very seriously, immediately launching an investigation into the allegations and ultimately pausing the use of the Guidelines to conduct a review and ensure that the Guidelines were working as intended.

Plaintiffs — purported shareholders of Wells Fargo — have seized on those allegations in an attempt to bring claims derivatively, not against any of the individuals who supposedly were involved in the alleged misconduct, but instead against Wells Fargo's Board of Directors and members of senior management.  Crucially, the claims that Plaintiffs seek to pursue *belong to Wells Fargo*.  "A shareholder derivative suit is a uniquely equitable remedy in which a shareholder asserts on behalf of a corporation a claim belonging not to the shareholder, but to the corporation."  *Laborers' Loc.* v. *Intersil*, 868 F. Supp. 2d 838, 844 (N.D. Cal. 2012).  Shareholders may usurp the role of a company's board of directors and pursue claims that belong to the company only in very limited circumstances.  Delaware law — which applies here because Wells Fargo is incorporated in Delaware — requires that, before Plaintiffs file suit asserting claims on behalf of the Company, they make a demand on the Board that it investigate and, if warranted, pursue the claims that Plaintiffs seek to assert.

Plaintiffs failed to make the required demand, and instead contend that Delaware's demand requirement should be excused as futile.  To meet the high standard for pleading demand futility, however, Plaintiffs must allege *particularized facts* demonstrating that a majority of Wells Fargo's current Board (at least seven of Wells Fargo's 14 Directors) is disqualified from assessing a demand because the Directors are self-interested — either because they face a substantial likelihood of liability on the asserted claims or received a material personal benefit from the alleged misconduct — or lack independence from

SULLIVAN &
CROMWELL LLP

those who are interested.  The Complaint does not come close to meeting this rigorous pleading standard.

*First*, Plaintiffs fail to muster a single particularized allegation linking any Director Defendant to the purported misconduct by certain Wells Fargo employees, let alone plead particularized facts sufficient to show a substantial likelihood that a majority of the Board face personal liability for knowingly breaching their fiduciary duties or violating the federal securities laws.  Instead, Plaintiffs rely on a series of conclusory inferences repeatedly rejected by courts as insufficient to meet a shareholder's high burden under Rule 23.1.  *Second*, Plaintiffs fail to allege that any Director Defendant materially benefited from the alleged misconduct.  Plaintiffs point to the annual compensation received by the Director Defendants, but fail to allege such compensation was unusual or excessive, nor do they allege any connection between that compensation and the purported misconduct.  *Third*, having failed to plead that any Director Defendant is interested, Plaintiffs cannot establish demand futility by claiming a majority of the Board lack independence from an interested director.

Plaintiffs cannot wrest control from Wells Fargo's Board and pursue claims on the Company's behalf with mere conclusory assertions and speculative inferences.  A derivative action is an extraordinary procedure reserved for the rare case where a majority of the company's board is so clearly and demonstrably conflicted that it could not impartially consider a demand.  This is not one of those cases.

## ISSUE TO BE DECIDED

Should Plaintiffs' amended shareholder-derivative complaint be dismissed for failure adequately to plead demand futility where Plaintiffs fail to allege with particularity that a majority of the Wells Fargo Board of Directors faces a substantial likelihood of personal liability, received a material personal benefit from the alleged misconduct, or is not independent?

## BACKGROUND

Wells Fargo is a large financial institution that provides banking, investment, and mortgage products.  (Complaint ("Compl.") ¶ 2.)  The Company employs nearly 250,000 people spread across the United States.  (Ex. A at 2.)[1]  The individual Defendants are two senior executives of Wells Fargo (Kleber Santos and Carly Sanchez) — neither of whom is on the Board — and ten current Wells Fargo Directors

---

[1]    Citations in the form "Ex. [_]" refer to exhibits to the Declaration of Brendan P. Cullen, filed contemporaneously herewith.

-2-

1   (CEO Charles Scharf, Steven Black, Mark Chancy, Celeste Clark, Theodore Craver, Wayne Hewett,

2   Maria Morris, Richard Payne, Juan Pujadas, and Ronald Sargent).  Four of Wells Fargo's 14 current

3   Directors (Richard Davis, CeCelia Morken, Felicia Norwood, and Suzanne Vautrinot) are not named as

4   Defendants.

5       ***Wells Fargo Generally Describes the Diverse Slates Guidelines.***  In March 2020, Wells Fargo

6   announced that it was expanding a policy requiring that at least half of all candidates interviewed for

7   certain positions be diverse.  (Compl. ¶ 7.)  The policy — formally referred to as the Diversity Sourcing

8   and Interview Team Guidelines ("Diverse Slates Guidelines" or "Guidelines") — was part of Wells

9   Fargo's ongoing efforts to promote diversity in its senior ranks.  (*Id.*)  The Guidelines went into effect

10  later that year, and required that "for most U.S. roles with total direct compensation greater than $100,000,"

11  "[a]t least 50% of interview candidates must be diverse with respect to at least one diversity dimension."

12  (*Id.* ¶ 12.)  The Guidelines defined "diverse" to include racial minorities, women, LGBTQ individuals,

13  veterans, and people with disabilities.  (*Id.* ¶ 164.)

14      In its subsequent public reporting, Wells Fargo generally described the Guidelines and provided

15  periodic updates on the Company's diversity initiatives in reports and interviews.  (*See, e.g.*, *id.* ¶¶ 189,

16  191-96, 206, 208, 213, 215, 235.)  For instance, on February 23, 2021, Wells Fargo stated in its annual

17  report that the Company was "requiring a diverse slate of candidates . . . for most roles with total direct

18  compensation of more than $100,000 per year."  (*Id.* ¶ 189.)  Wells Fargo officers also sometimes

19  mentioned the Guidelines.  In an interview on October 7, 2021, Ms. Sanchez referenced the "candidate

20  slate requirement for roles $100K and above," and explained that "50% of . . . the candidate slate that will

21  be interviewed needs to be diverse."  (*Id.* ¶ 210.)  In a June 3, 2022 article, *Business Insider* noted that

22  Wells Fargo had "instituted a rule that for all posted roles in the US with annual compensation greater

23  than $100,000, at least half of interview candidates must be from a historically underrepresented group."

24  (*Id.* ¶ 236.)  The article also paraphrased a conversation with Mr. Santos, writing that, according to

25  Mr. Santos, "[t]he rule is working."  (*Id.*; Ex. B at 4.)

26      ***Allegations of Sham Interviews Appear in Two Newspaper Articles.***  On May 19, 2022, *The New*

27  *York Times* published an article recounting what the reporter described as instances of purported "sham"

28  interviews of diverse candidates.  (Compl. ¶ 16.)  The article focused primarily on the allegations of Joe

-3-

1   Bruno — a former employee in Wells Fargo's Wealth Management Division at its Jacksonville, Florida

2   location — who claimed that he had been instructed by his supervisors in certain instances to conduct

3   interviews of diverse candidates "even though the decision had already been made to give the job to

4   another candidate." (*Id.* ¶ 230; *see also* Ex. C at 1.)  The article recounted one instance in 2017 in which

5   an applicant was allegedly interviewed for a position that had already been filled, and stated that several

6   other current or former employees claimed that they were aware of or participated in "sham" interviews

7   while at the Company.  (Ex. C at 1, 4.)

8           When the article was published, Wells Fargo stated that "[t]o the extent that individual employees

9   are engaging in the behavior as described by *The New York Times*, we do not tolerate it." (Compl. ¶ 232.)

10  Wells Fargo also explained that it investigated "all of the specific claims *The New York Times* shared with

11  the Company before the article was published but could not corroborate them as factual."  (*Id.* ¶ 16.)

12  Nevertheless, on June 6, 2022, Wells Fargo announced a "pause" of the Guidelines "so Company leaders

13  could 'study its use and make changes,' 'gain confidence that the guidelines live[d] up to their promise,'

14  and ensure 'hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should

15  work.'" (*Id.* ¶ 19.)  On June 9, 2022, *The New York Times* published a follow-up article alleging that other

16  fake interviews had occurred, based on claims from "10 current and former employees" who reportedly

17  believed that they "were subject to fake interviews, or conducted them, or saw paperwork documenting

18  the practice." (*Id.* ¶ 239; Ex. D at 2.)  The article also reported that the U.S. Attorney's Office for the

19  Southern District of New York had initiated an investigation into the claims in the May 19 article.

20  (Compl. ¶ 239.)

21           ***Plaintiffs Seek To Transform the Interview Allegations into a Derivative Action.***  Certain Wells

22  Fargo shareholders have sought to turn this handful of allegations of employee misconduct into securities

23  fraud, filing the related putative securities class action, *SEB Investment Management AB* v. *Wells Fargo*

24  *& Co.*, No. 22-cv-3811-TLT (N.D. Cal.).  Plaintiffs here take a different tack, attempting to wrest control

25  from Wells Fargo's Board to pursue against directors and officers various claims that belong to the

26  Company.  Based almost entirely on the two newspaper articles, Plaintiffs claim that the individual

27  Defendants breached their fiduciary duties and violated federal securities law by "caus[ing] or permitt[ing]

28  the Company" to "hold[] sham interviews," "fail[ing] to maintain an adequate system of oversight,

-4-

1   disclosure controls and procedures, and internal controls," and "making and/or causing the Company to

2   make . . . materially false and misleading statements" about the Diverse Slates Guidelines.  (Compl.

3   ¶¶ 170, 363, 364, 366.)  According to Plaintiffs, Wells Fargo's public statements describing the Guidelines

4   were "false and misleading" because "the Company was not complying with its diverse hiring policies"

5   by "holding sham interviews."  (*Id.* ¶¶ 170, 190.)  Plaintiffs claim that this "truth" was revealed when *The*

6   *New York Times* published the June 9 article.  (*Id.* ¶ 239.)  Neither newspaper article even mentions the

7   Board or any particular director other than Mr. Scharf, let alone suggests that any director (including

8   Mr. Scharf) had involvement in or knew about the alleged fake interviews.  But Plaintiffs nevertheless

9   speculate, based on those alleged instances of fake interviews, that the individual Defendants "consciously

10  disregard[ed]" their duties to conduct adequate oversight over the Company's diversity hiring practices

11  and knowingly caused the Company to misinform shareholders about those practices.  (*Id.* ¶¶ 316-25,

12  366.)

13          Plaintiffs assert Delaware state-law claims for breach of fiduciary duty, unjust enrichment, and

14  "abuse of control" against the individual Defendants.  Plaintiffs also bring claims under Section 10(b) of

15  the Exchange Act, 15 U.S.C. § 78j(b), Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and SEC

16  Rule 10b-5 against the individual Defendants.  Finally, Plaintiffs bring claims under Section 14(a) of the

17  Exchange Act, 15 U.S.C. § 78n(a)(1), and SEC Rule 14a-9 against the Director Defendants.  Plaintiffs

18  seek to pursue these claims derivatively on behalf of Wells Fargo and assert that they have standing to do

19  so because a pre-suit demand asking the Board to pursue these claims would be futile as to a majority of

20  the Board for three reasons:  each of the Director Defendants purportedly (1) faces a substantial likelihood

21  of liability (Compl. ¶¶ 316-325); (2) received a material personal benefit from the challenged conduct

22  (*id.* ¶ 343); and (3) is beholden to an interested member of the Board and, therefore, is not independent

23  (*id.* ¶¶ 313, 316).

24          ***Wells Fargo's Efforts To Address Unrelated Regulatory Matters and Lawsuits.***  Over the last

25  several years, Wells Fargo has expended considerable efforts to address past regulatory issues.  Those

26  years-old "scandals" (*id.* ¶ 3) have nothing to do with the allegations in this case, yet Plaintiffs lavish

27  pages of the Complaint on them.  Plaintiffs dedicate numerous paragraphs of the Complaint to the Federal

28  Reserve's February 2018 consent order and asset cap, which were put in place following a "fake account"

-5-

1    scandal (the unauthorized opening of checking accounts and related misconduct in Wells Fargo bank

2    branches), which was widely publicized in 2016, years before the adoption of the Guidelines. (*Id.* ¶¶ 131-

3    143.) Plaintiffs also spend several paragraphs of the Complaint describing past discrimination lawsuits

4    against the Company dating back to 2008 and instances of regulatory scrutiny by the Department of Labor.

5    (*Id.* ¶¶ 144-153.) None of those issues, nearly all of which predate by years the current Directors' tenures

6    on the Board, has anything to do with alleged fake interviews or the Diverse Slates Guidelines. Including

7    these allegations in the Complaint is a transparent effort to distract from Plaintiffs' pleading failures, and

8    the allegations should be disregarded.

9        ***Wells Fargo's Current Board of Directors.*** Wells Fargo's Board consists of 14 Directors, only

10   10 of whom are named as Defendants. In order to create a reasonable doubt that a majority of the Board

11   is interested or lacks independence, Plaintiffs must adequately plead that demand would be futile as to

12   seven of the 10 Director Defendants. Throughout the Complaint, Plaintiffs broadly lump these defendants

13   together as "Director Defendants" or "Individual Defendants" to avoid making the requisite individualized,

14   director-by-director allegations. (*See, e.g., id.* ¶ 93 ("The Individual Defendants, because of their positions

15   of control and authority as directors and/or officers of Wells Fargo, were able to and did, directly and/or

16   indirectly, exercise control over the wrongful acts"); *id.* ¶ 311 ("[E]ach of the Director-

17   Defendants . . . solicited the 2021 Proxy Statement to call for a shareholder vote").) But the Complaint

18   contains almost no individualized allegations about any specific director — let alone any particularized

19   allegations sufficient to plead demand futility as to a majority of them.

20                      **STANDARD FOR THIS DEMAND FUTILITY MOTION**

21        Federal Rule of Civil Procedure 23.1(b)(3) requires that a shareholder-derivative complaint "state

22   with particularity" any "effort by the plaintiff to obtain the desired action from the directors," or, if the

23   shareholder failed to make any such efforts, "the reasons for not obtaining the action or not making the

24   effort" — in other words, why making such a demand would have been "futile." *See also Rosenbloom* v.

25   *Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014). Because Wells Fargo is incorporated in Delaware, demand

26   futility here is governed by Delaware law. *See id.* The requirement that a shareholder make a demand on

27   a company's board before bringing claims that belong to the company is a cornerstone of Delaware

28   corporate law, derived from the "cardinal precept" that "directors, rather than shareholders, manage the

                                                    -6-

1    business and affairs of the corporation." *Aronson* v. *Lewis*, 473 A.2d 805, 811 (Del. 1984). It is the "rare

2    case" where the requirement is excused because demand is futile. *In re Citigroup Inc. S'holder Deriv.*

3    *Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009). When assessing demand futility, the focus is on the demand

4    board — that is, "the board of directors 'sitting at the time the complaint is filed.'" *Rosenbloom*, 765 F.3d

5    at 1148.

6            The Delaware Supreme Court has adopted a three-part test for assessing demand futility. Courts

7    must determine whether the directors (i) received "a material personal benefit from the alleged

8    misconduct," (ii) "face[] a substantial likelihood of liability on" the claims, or (iii) "lack[] independence"

9    from someone who is interested under the first two prongs of the test. *United Food & Com. Workers*

10   *Union & Participating Food Indus. Emps. Tri-State Pension Fund* v. *Zuckerberg*, 262 A.3d 1034, 1059

11   (Del. 2021). "If the answer to any of the questions is 'yes' for at least half of the members of the demand

12   board" — here, seven of 14 Directors — "then demand is excused as futile." *Id*. To satisfy this test,

13   Plaintiffs must plead particularized facts as to *each* Director and *each* claim. *Desimone* v. *Barrows*, 924

14   A.2d 908, 943 (Del. Ch. 2007); *see Oswald* v. *Identiv, Inc.*, 2018 WL 1783838, at *2 (N.D. Cal. Apr. 13,

15   2018) ("Courts assess demand futility on a claim by claim basis"). Plaintiffs "may not rely on broad group

16   allegations or presume a director's knowledge of wrongdoing based on his or her status as a director." *In*

17   *re PayPal Holdings, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *5 (N.D. Cal. Jan. 18, 2018).

18           Wells Fargo's charter, as permitted by Section 102(b)(7) of the Delaware General Corporation

19   Law, exculpates its Directors from liability for breaches of fiduciary duty except those that arise from acts

20   taken in bad faith or from intentional misconduct. (Ex. E at 7-8.) Wells Fargo's Directors thus face no

21   likelihood of personal liability for claims based on negligence or any other conduct short of bad faith. *See*

22   *Desimone*, 924 A.2d at 935.

23                                                  **ARGUMENT**

24           Plaintiffs do not come close to satisfying their high burden of pleading demand futility under any

25   of the three prongs. *First,* Plaintiffs fail to plead particularized facts establishing a substantial likelihood

26   of liability for any Director Defendant: They do not adequately allege that any of the Director Defendants

27   knowingly breached their fiduciary duties or made false or misleading statements in connection with the

28   Diverse Slates Guidelines, nor do they adequately allege that any of the Director Defendants violated the

-7-

1   federal securities laws. *Second*, Plaintiffs claim that the Director Defendants received a material personal

2   benefit because they were compensated under the Company's Long-Term Incentive Compensation Plan.

3   But they fail to allege that the compensation was anything other than customary, nor do they connect

4   shareholder approval of the Plan with any purported misstatements by showing how the Director

5   Defendants received a personal benefit from the actual alleged misconduct. *Third*, absent particularized

6   allegations that any Director Defendant is interested in the outcome of this litigation, Plaintiffs cannot

7   establish demand futility for a majority of the Board by claiming that the other Director Defendants lack

8   independence.  In any event, the Complaint fails to plead particularized facts showing that any Director

9   Defendant was beholden to another member of the Board.

10  **I.    PLAINTIFFS FAIL TO PLEAD THAT A MAJORITY OF THE BOARD FACES A
         SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY.**

11

12      **A.    Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board
             Breached Their Fiduciary Duties.**

13          Plaintiffs first contend that the Director Defendants are interested because they face a substantial

14  likelihood of personal liability for allegedly breaching their fiduciary duties by (1) failing adequately to

15  oversee the Company's implementation of the Diverse Slates Guidelines and (2) misinforming

16  shareholders about the Company's implementation of the Guidelines and commitment to diversity hiring

17  practices.  Plaintiffs have not pleaded with particularity that any of the Director Defendants faces a

18  substantial likelihood of liability under either of these theories, much less that a majority of the Board

19  does.[2]

20

21

22

23

24  ────────────────
    [2]     Plaintiffs' causes of action for unjust enrichment, waste, and mismanagement do not independently
25  give rise to a "substantial likelihood" of Director liability because they are duplicative of, and thus fall
    with, Plaintiffs' breach of fiduciary duty claims. *Gamco Asset Mgmt., Inc.* v. *iHeartMedia, Inc.*, 2016
26  WL 6892802, at *19 (Del. Ch. Nov. 23, 2016) (dismissing "duplicative" unjust enrichment claims
    following dismissal of fiduciary duty claims because "unjust enrichment claim depends per force on the
27  breach of fiduciary duty claim"); *see also Citigroup*, 964 A.2d at 114 n.6 ("Delaware law does not
    recognize an independent cause of action against corporate directors and officers for reckless and gross
28  mismanagement; such claims are treated as claims for breach of fiduciary duty.").

                                              -8-

1    **1.    The Complaint Lacks Particularized Facts Alleging that a Majority of the Board Knowingly Failed To Oversee the Company's Implementation of the Diverse Slates Guidelines.**

2

3    Plaintiffs primarily assert that the individual Defendants, including the 10 Director Defendants,

4    breached their fiduciary duties by failing to exercise adequate oversight of the Company's implementation

5    of the Diverse Slates Guidelines.  (Compl. ¶ 30 ("[I]n breach of their fiduciary duties, the Individual

6    Defendants caused the Company to fail to maintain adequate internal controls."); *id.* ¶ 363 ("In breach of

7    their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the

8    Discrimination Misconduct.").)  These are classic "*Caremark* claims," where a plaintiff alleges that the

9    company's directors breached their fiduciary duties by "allow[ing] a situation to develop and continue

10   which exposed the corporation to enormous legal liability" and "in so doing . . . violat[ing] a duty to be

11   active monitors of corporate performance." *Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del.

12   Ch. 1996).  A *Caremark* claim is "possibly the most difficult theory in corporation law upon which a

13   plaintiff might hope to win a judgment." *Id.*  Plaintiffs must plead particularized facts demonstrating

14   either that "(a) the directors utterly failed to implement any reporting or information system or controls[]

15   *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its

16   operations thus disabling themselves from being informed of risks or problems requiring their attention."

17   *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).  Plaintiffs fail to make either showing.

18   ***Plaintiffs concede that Wells Fargo had internal controls.***  Although Plaintiffs make several

19   conclusory assertions that the Director Defendants caused the Company to fail to maintain *adequate*

20   internal controls (*see, e.g.*, Compl. ¶¶ 30, 366), that is not the test.  Plaintiffs elsewhere expressly plead

21   that Wells Fargo in fact *had* information systems and controls, including systems and controls focused on

22   Wells Fargo's diversity initiatives.  For example, Plaintiffs admit that Wells Fargo's Board "frequently

23   reviewed, monitored, and discussed the Company's diversity initiatives"; that the Board "regularly

24   received reports on Wells Fargo's DE&I initiatives"; and that Wells Fargo "used numerous internal and

25   external metrics to monitor its progress on enhancing diversity at all levels of the Company."  (*Id.* ¶ 243.)

26   Indeed, the Complaint even acknowledges that a Board-level committee — the Human Resources

27   Committee — is tasked with overseeing "talent management" and "diversity, equity, and inclusion."  (*Id.*

28   ¶ 119.)  Those allegations preclude any claim based on *Caremark*'s first prong, which requires that the

1    Board have "utterly failed" to implement *any* controls.  *See Behrmann* v. *Brandt*, 2020 WL 4432536,

2    at \*12 (D. Del. July 31, 2020) (complaint that "concedes 'the existence of board-level systems of

3    monitoring and oversight such as a relevant committee' . . . generally fails" under *Caremark*'s first prong).

4        ***Plaintiffs do not plead facts alleging a deliberate failure to monitor.***    Nor do Plaintiffs allege

5    facts showing that any Director Defendant, let alone seven of them, faces a substantial likelihood of

6    personal liability for breaches of fiduciary duty by "consciously fail[ing] to monitor or oversee [the

7    Company's] operations." *Stone*, 911 A.2d at 370.  Plaintiffs must plead "with particularity that there were

8    so-called 'red flags' that put the directors on notice of problems with their systems . . . which were

9    consciously disregarded." *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at \*16 & n.113 (Del.

10    Ch. June 26, 2015).  Plaintiffs must allege that the Board "*knew* that internal controls were inadequate"

11    but "chose to do *nothing*." *Desimone*, 924 A.2d at 940 (emphases added); *Constr. Indus. Laborers*

12    *Pension Fund* v. *Bingle*, 2022 WL 4102492, at \*10 (Del. Ch. Sept. 6, 2022) (noting that plaintiffs must

13    allege facts demonstrating that the Board "ignor[ed] red flags so vibrant that scienter is implied").

14    Plaintiffs fail to plead any particularized allegations of a knowing lack of oversight by the majority of the

15    Board.  Indeed, the Complaint is devoid of particularized allegations of any red flag as to *any* Director —

16    there is not a single particularized allegation showing that any Director was aware of even one fake

17    interview before the *New York Times* articles.  Instead, Plaintiffs rely on a series of impermissible

18    inferences and non-particularized allegations of the sort that courts routinely reject.

19        *First*, Plaintiffs repeatedly suggest that an oversight failure by the Director Defendants should be

20    presumed from the instances of alleged fake interviews reported in the *Times*.  For instance, the Complaint

21    refers to "persistent mismanagement and oversight failures, reflected by Wells Fargo's repeated

22    misconduct."  (*Id*. ¶ 135.)  But individual instances of non-compliance with a Company-wide policy do

23    not, *without particularized allegations of bad-faith conduct by any specific Director*, give rise to a

24    *Caremark* claim.  "Delaware courts routinely reject the conclusory allegation that because illegal behavior

25    occurred, internal controls must have been deficient, and the board must have known so." *Desimone*, 924

26    A.2d at 940.  Plaintiffs instead must, but fail to, plead particularized facts demonstrating that a majority

27    of the Directors "consciously failed" to exercise adequate oversight — *i.e.* that there were specific "red

28    flags" that each Director Defendant encountered but did *nothing*. *Stone*, 911 A.2d at 370.

-10-

*Second*, Plaintiffs contend that the Director Defendants must have been aware of the purported misconduct because, for instance, they "frequently reviewed, monitored, and discussed the Company's diversity initiatives"; "DE&I metrics and activities were included in all regular business reviews"; "the Board and the HRC regularly received reports on Wells Fargo's DE&I initiatives"; the Board received "DE&I updates at each regularly scheduled Board meeting, which included updates on the Company's progress pertaining to its DE&I initiatives"; and "DE&I was a 'key focus' for the Board." (Compl. ¶¶ 243, 244.)  Again, these speculative assertions fall far short of the requisite pleading standard for demand futility.  Plaintiffs fail to plead any particularized allegations that as part of their reviewing, monitoring, and discussing, any Board member actually encountered information about purported fake interviews. The Complaint "nowhere alleges anything that the directors were told about the [purported] incidents, what the Board's response was, or even that the incidents were connected in any way." *South* v. *Baker*, 62 A.3d 1, 17 (Del. Ch. 2010).  Nor do Plaintiffs specify whether these "regular business reviews," "reports," and "updates" even contained information on purported sham interviews.  Without these details, Plaintiffs totally fail to plead that the Directors were aware of the alleged misconduct at issue — fake interviews of diverse candidates to satisfy the Diverse Slate Guidelines.  Generic allegations of "close monitoring" do "not rise to the level that courts have found sufficient to put directors on notice." *In re Rocket Fuel Inc.*, 2016 WL 4492582, at *8 (N.D. Cal. Aug. 26, 2016).

Plaintiffs similarly allege that the Director Defendants must have known about purported sham interviews because Wells Fargo "kept records of every job interview" conducted by the Company, supposedly in anticipation of regulatory audits.  (Compl. ¶ 242.)  But Plaintiffs do not allege that these records contained information that would indicate that any interviews were fake, nor do they even allege that any Director Defendant — much less a majority of the Board — ever received or reviewed any of these records.  Indeed, Plaintiffs do not even attempt to explain why the employees who were purportedly conducting sham interviews in violation of the Company's policies would *admit* their non-compliance in a repository of data supposedly maintained for the purpose of an audit by a regulator.

*Third*, Plaintiffs imply that the six Director Defendants who served on the Audit Committee (Craver, Chancy, Sargent) or the Human Resources Committee (Black, Hewett, Morris, Sargent) must have known about and consciously ignored the purported fake interviews because they were charged with

-11-

1   overseeing "the effectiveness of the Company's internal controls" and its "complian[ce] with its DE&I

2   policies," respectively. (*Id*. ¶¶ 321-22, 327.)  This theory fails to account for the requisite seven members

3   of the Board required to plead demand futility.  But even if it did, Delaware law is clear that "an allegation

4   that the underlying cause of a corporate trauma falls within the delegated authority of a board committee

5   does not support an inference that the directors on that committee knew of and consciously disregarded

6   the problem for purposes of Rule 23.1."  *South*, 62 A.3d at 17; *see also Wood* v. *Baum*, 953 A.2d 136,

7   142-43 (Del. 2008) (holding that it is "contrary to well-settled Delaware law" to infer "a culpable state of

8   mind" because directors served on a committee and, "as a consequence, should have been aware of the

9   facts on which the plaintiff premised" her claims).

10      *Fourth*, Plaintiffs lavish pages of the Complaint on allegations about past, unrelated regulatory

11   actions and other lawsuits involving Wells Fargo, apparently in an effort to show that these other matters

12   were red flags that should have put the Director Defendants on notice of purported fake interviews.  (*See,*

13   *e.g.*, Compl. ¶¶ 319, 320, 322, 324, 325 (noting that various directors were members of the Board before

14   February 2018, "thus indicating [they] knew about the Company's sprawling instances of misconduct and

15   fragile position resulting from the Asset Cap, yet failed to take action").)  Wells Fargo takes these

16   regulatory matters seriously and has expended considerable efforts addressing them.  But they have

17   nothing to do with the Company's diversity hiring practices and allegations of sham interviews that are at

18   issue in this action, and Plaintiffs do not contend otherwise.  Plaintiffs cannot rely on the existence of

19   unrelated regulatory matters or lawsuits for an inference that the Director Defendants were aware of the

20   purported fake interviews and therefore acted in bad faith.  *In re Facebook, Inc. S'holder Deriv. Privacy*

21   *Litig.*, 367 F. Supp. 3d 1108, 1125 (N.D. Cal. 2019) ("various litigation and regulatory matters" regarding

22   privacy were not sufficient red flags to put directors on notice about the unrelated privacy matter at issue).

23      *Finally*, even if Plaintiffs pointed to a single red flag sufficient to show that the directors were on

24   notice of problems with the Company's implementation of the Diverse Slates Guidelines, their *Caremark*

25   claim would still fail because they do not "plausibly allege that the Director Defendants took no steps in

26   a good faith effort to prevent or remedy the situation."  *In re Allergan, Inc.*, 2011 WL 1429626, at *4 (C.D.

27   Cal. Apr. 12, 2011).  In fact, they plead the *opposite*.  Regarding the allegations in the May 19 article,

28   Plaintiffs note that Wells Fargo "had researched all of the specific claims *The New York Times* shared with

-12-

1  the Company before the article was published," but could not verify them as factual.  (Compl. ¶ 16.)  And

2  on June 6, 2022, Wells Fargo announced that it would "pause" the Guidelines "so that the Company's

3  leaders could 'study its use and make changes,' 'gain confidence that the guidelines live[d] up to their

4  promise,' and ensure 'hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines

5  should work.'"  (*Id.* ¶ 19.)  Plaintiffs also allege that the Director Defendants "frequently reviewed,

6  monitored, and discussed the Company's diversity initiatives," "regularly received reports on Wells

7  Fargo's DE&I initiatives," and generally made diversity a "key focus."  (*Id.* ¶¶ 243-246.)  Each of these

8  actions, and all of them combined, refutes Plaintiffs' allegation that the Director Defendants "took no

9  steps" when, in fact, confronted with information related to possible fake interviews.

10  *                       *                       *

11  Plaintiffs do not plead any particularized facts sufficient to state a *Caremark* claim against any

12  Director Defendant, let alone seven of them.[3]  Plaintiffs assert, in conclusory fashion, that the Director

13  Defendants consciously failed to exercise adequate oversight.  But the Complaint fails to identify a single

14  red flag that would have put the Director Defendants on notice about any purported fake interviews.

15  **2.    The Complaint Lacks Particularized Facts Alleging that a Majority of the**
   **Board Deliberately Misinformed Shareholders about the Diverse Slates**
16  **Guidelines and Wells Fargo's Commitment to Diversity Hiring Practices.**

17  Plaintiffs also contend that demand is futile because a majority of the Board faces a substantial

18  likelihood of liability for breaching their fiduciary duties by making or approving false and misleading

19  statements regarding Wells Fargo's Diverse Slates Guidelines.  (Compl. ¶¶ 310, 364.)  Plaintiffs challenge

20  statements contained in Wells Fargo's 2021 and 2022 Proxy Statements and other SEC filings, statements

21  made by Ms. Sanchez during an interview with the Institute for Corporate Productivity and by Mr. Santos

22

23  ────────────────────

24  [3]    This failure is unsurprising — Plaintiffs did not make a Section 220 demand to inspect Wells
   Fargo's books and records before pursuing this derivative action.  Given the exacting pleading standard
25  for demand futility under Delaware law, Delaware courts have strongly encouraged plaintiffs seeking to
   bring derivative claims to use Section 220 books-and-records requests, *see* 8 Del. C. § 220, to investigate
26  their claims before filing a complaint.  All demand-futility complaints are subjected to exacting scrutiny
   under Delaware law, but complaints filed without the benefit of a factual record obtained from such a
27  request are especially likely to be dismissed.  *See, e.g., Wood*, 953 A.2d at 144; *In re Dow Chem. Co.
   Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010); *Rattner* v. *Bidzos*, 2003 WL 22284323, at
28  *14 (Del. Ch. Sept. 30, 2003).

-13-

1   during a conversation that was paraphrased in an article in *Business Insider*, and Mr. Scharf's testimony

2   before the U.S. Senate.  (*Id.* ¶¶ 189, 193-96, 198-99, 206, 208, 210, 211, 213, 218, 220, 222, 224.)  None

3   of Plaintiffs' allegations adequately pleads that a majority of Wells Fargo's Directors faces a substantial

4   likelihood of personal liability for breach of fiduciary duty by deliberately misinforming shareholders.

5       *First*, the Amended Complaint is devoid of facts demonstrating that a majority of the Board was

6   involved in the preparation or making of the challenged statements.  (*Id.* ¶¶ 191-205, 208-09, 213-226.)

7   Plaintiffs are required to plead with particularity "board involvement in the preparation of the disclosures."

8   *Citigroup*, 964 A.2d at 134; *see also In re Facebook*, 367 F. Supp. 3d at 1127 (no substantial likelihood

9   of liability absent "particularized facts demonstrating how each [] Defendant was involved in, prepared,

10  or even knew about the alleged misstatements and omissions").  But here, Plaintiffs merely assert that

11  Wells Fargo made various misstatements about the Company's diversity hiring practices in SEC filings

12  and other reports in 2021 and 2022.  (Compl. ¶¶ 189-205, 208-09, 213-26.)  The only reference to any

13  Director Defendant is that Mr. Scharf signed two of those filings.  Under Delaware law, Plaintiffs must

14  allege more than that the Directors "reviewed" the statements or "execut[ed]" annual reports containing

15  them.  *Citigroup*, 964 A.2d at 134 & n.92.  Plaintiffs do not even attempt to explain how the statements

16  by Ms. Sanchez and Mr. Santos — who are not members of the Board — have any bearing on whether a

17  majority of the Directors faces liability.  That leaves only Mr. Scharf's congressional testimony, but

18  Plaintiffs do not allege that any other Director Defendant was involved in the preparation of that

19  testimony.[4]  Plaintiffs' utter failure to allege involvement by a majority of the Board in any of the

20  challenged statements, let alone with particularity, is fatal to their disclosure-based claims.

21      *Second*, given Wells Fargo's exculpatory provision, Plaintiffs must allege that a majority of the

22  Board "deliberately misinform[ed] shareholders about the business of the corporation" — that is, that they

23  acted in "bad faith, knowingly or intentionally."  *Citigroup*, 964 A.2d at 132; *see also Merckel* v. *Sacks*,

24  2010 WL 11586832, at *7 (C.D. Cal. July 12, 2010) (where "a corporation's governing charter exculpates

25

26  [4]    In any event, Plaintiffs fail to allege that this statement was knowingly false.  The Complaint lacks
any allegations indicating that Mr. Scharf's broad and general testimony about the Diverse Slates
27  Guidelines — "[W]e have implemented guidelines that require a diverse slate of candidates (at least 50
percent)" — was not true.  In fact, Wells Fargo did implement such guidelines and these were among their
28  requirements.  (*See infra* at 15-16.)

-14-

1  the directors from liability 'except for claims based on fraudulent, illegal or bad faith conduct, a plaintiff

2  must also plead particularized facts that demonstrate that the directors acted with scienter'") (citation

3  omitted).  Even assuming any Director Defendant knowingly participated in making or issuing one of the

4  challenged statements, there is no non-conclusory allegation that he or she knew that the statements were

5  false or misleading.  The Complaint thus falls far short of pleading particularized facts demonstrating that

6  any Director, much less a majority, knowingly or intentionally engaged in deception.

7      *Third*, apart from Plaintiffs' failure to plead the requisite involvement by any of the Directors in

8  the preparation of the statements, the Complaint also fails to plead with particularity that any of the

9  challenged statements was false or misleading when made.  The majority of the challenged statements are

10  nearly identical descriptions of Wells Fargo's Diverse Slates Guidelines and diversity commitments in the

11  Company's annual reports, Proxy Statements, other written reports, and Mr. Scharf's congressional

12  testimony.  (*See* Compl.  ¶¶ 189, 192-96, 206, 208, 213, 218.)  The Complaint lacks specific facts

13  demonstrating how any of these statements, describing in broad, programmatic language what the Diverse

14  Slates Guidelines required, were false or misleading.  Plaintiffs instead rely on vague assertions from a

15  handful of current or former employees that they had participated in or were aware of fake interviews of

16  diverse candidates.  (*Id.* ¶¶ 181-88.)  But those instances, even assuming that they occurred, do not render

17  Wells Fargo's statements about the Guidelines and their parameters materially false.

18      The first challenged statement is illustrative.  Plaintiffs claim that the following language from the

19  CEO's letter in Wells Fargo's 2020 Annual Report, dated February 23, 2021, is false and misleading:  "In

20  the U.S., we are requiring a diverse slate of candidates — and a diverse interview team — for most roles

21  with total direct compensation of more than $100,000 per year." (*Id.* ¶ 189.)  In instituting the Diverse

22  Slates Guidelines, Wells Fargo *did* require that a percentage of candidates for certain roles be diverse, *did*

23  require that the interview team be diverse, and *did* apply the requirement to most positions with annual

24  compensation over $100,000.  Plaintiffs do not allege otherwise.  Plaintiffs do not dispute that Wells Fargo

25  implemented the Diverse Slates Guidelines and that these were the Guidelines' requirements.  Plaintiffs

26  instead point to the allegations of fake interviews in *The New York Times*.  But that there were isolated

27  instances of non-compliance with the policy does not make the fact that Wells Fargo had implemented a

28  policy with certain parameters — that there be a "diverse slate of candidates" and a "diverse interview

-15-

1    team" "for most roles with total direct compensation of more than $100,000" (*Id.* ¶¶ 189, 193-94, 206,

2    208, 213, 218) — false. *See Africa* v. *Jianpu Tech. Inc.*, 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28,

3    2022) ("[T]he fact that there were noncompliant providers . . . does not mean that . . . statements regarding

4    the Company's regulatory compliance measures were untrue when made[.]"); *In re Citigroup Sec. Litig.*,

5    2023 WL 2632258, at *17 (S.D.N.Y. Mar. 24, 2023) (regulatory findings regarding "'longstanding

6    enterprise-wide risk management and control deficiencies . . .' do[] not support the contention that

7    Citigroup's risk management systems were inoperable throughout the Class Period, much less establish

8    that any of the Defendants knew that Citigroup's risk management systems were so deficient that any

9    reference to or description of them was misleading").

10          Plaintiffs also assert that the 2021 and 2022 Proxy Statements were "false and misleading because,

11    despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the

12    Discrimination Misconduct." (¶¶ 202, 225.)  But "a code of conduct is 'inherently aspirational,'" *Retail*

13    *Wholesale & Dep't Store Union Loc. 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th

14    Cir. 2017), and therefore not actionable.  *See also Kahnert* v. *Kotick*, 2022 WL 2167792, at *9 (C.D. Cal.

15    May 20, 2022) (code of conduct providing that the company "do[es] not tolerate [harassment] actions in

16    any form," "doesn't tolerate discrimination or make employment-related decisions on the basis of a

17    protected characteristic or any other basis protected by applicable law," and "[does not] tolerate retaliation

18    against employees for asking questions or attempting to invoke their rights under applicable laws" is

19    aspirational and not actionable).[5]

20          Plaintiffs do not plead with particularity that a majority of the Board participated in the preparation

21    of any of the challenged statements; that any Director Defendant was aware of any purported fake

22    interviews; or that any of the challenged statements is false or misleading.  These deficiencies are fatal to

23    Plaintiffs' disclosure-based breach-of-fiduciary-duty claims.  Accordingly, Plaintiffs have failed to plead

24    sufficient facts to support any of their breach-of-fiduciary-duty claims against the Director Defendants.

25

26    [5]    Plaintiffs also appear to suggest that the Director Defendants breached their fiduciary duties by violating the Company's Code of Conduct and their respective committee charters. (Compl. ¶¶ 328, 329.)

27    These claims categorically fail under Delaware law:  "[P]leading a breach of an internal policy is not equivalent to pleading a breach of a common law fiduciary duty."  *NuVasive, Inc.* v. *Miles*, 2020 WL

28    5106554, at *13 (Del. Ch. Aug. 31, 2020).

-16-

1  Those claims thus cannot serve as the basis for excusing their failure to first serve a demand on Wells

2  Fargo's Board before commencing this lawsuit.

3  **B.    Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board Faces a Substantial Likelihood of Liability Under Section 14(a).**

4

5  Plaintiffs next contend that the Director Defendants face a substantial likelihood of liability under

6  Section 14(a) of the Exchange Act and SEC Rule 14a-9 because "the 2021 and 2022 Proxy Statements

7  failed to disclose" the occurrence of purported fake interviews and the supposed inadequacy of "the

8  Board's oversight and risk mechanisms." (Compl. ¶¶ 340-41.)  Plaintiffs must plead that "(1) a proxy

9  statement contained a material misrepresentation or omission which (2) caused [their] injury and (3) that

10 the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential

11 link in the accomplishment of the transaction." *N.Y.C. Emps.' Ret. Sys.* v. *Jobs*, 593 F.3d 1018, 1022 (9th

12 Cir. 2010).  Plaintiffs also must plead that "the misstatement or omission was made with the requisite level

13 of culpability."  *Desaigoudar* v. *Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).  Although ordinarily

14 "negligence [will] suffice," exculpation clauses like the one in Wells Fargo's charter require Plaintiffs to

15 plead "particularized factual allegations that 'support the inference that the disclosure violation was made

16 in bad faith, knowingly or intentionally.'"  *City of Birmingham Relief & Ret. Sys.* v. *Hastings*, 2019 WL

17 3815722, at *9 (N.D. Cal. Feb. 13, 2019) (citation omitted); *In re Wells Fargo & Co. S'holder Deriv.

18 Litig.*, 2022 WL 345066, at *5 (N.D. Cal. Feb. 4, 2022).  Plaintiffs fail to plead with particularity any of

19 these required elements as to a majority of the Board.

20 **1.    Plaintiffs Fail To Allege a Material Misstatement or Omission.**

21 Plaintiffs fail to plead a substantial likelihood of personal liability for their Section 14(a) claim for

22 the same reason that they fail to plead a substantial likelihood of liability for their disclosure-based breach

23 of fiduciary duty claims:  They have not adequately pleaded that any statement in the 2021 or 2022 proxy

24 was false or misleading.  (*See supra* at 14-16.)  To plead falsity, Plaintiffs must allege particularized

25 factual allegations showing that the challenged statements "affirmatively create[d] an impression of a state

26 of affairs that differ[ed] in a material way from the one that actually exist[ed]."  *Brody* v. *Transitional

27 Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted); *In re PayPal*, 2018 WL 466527, at *4

28 (applying *Brody* to Section 14(a) claim).  "A litany of alleged false statements, unaccompanied by the

-17-

1  pleading of specific facts indicating why those statements were false, does not meet this standard." *In re*

2  *Facebook*, 367 F. Supp. 3d at 1128.  A statement also is actionably false only if it is "capable of objective

3  verification." *Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

4  As discussed, Plaintiffs' allegation that the Director Defendants failed to disclose that "the

5  Company was not complying with its diverse hiring policies and was misleading the public to believe that

6  it was committed to improving diversity in its workplace" (Compl. ¶ 340) is not supported by well-pleaded

7  allegations.  Take, for instance, the first challenged statement in the 2021 Proxy Statement.  Plaintiffs

8  claim that the following language is false and misleading:  "[I]n the U.S., we are requiring a diverse slate

9  of candidates — and a diverse interview team — for most roles with total direct compensation of more

10  than $100,000 per year." (*Id.* ¶ 193.)  Again, Wells Fargo *did* implement the Diverse Slates Guidelines,

11  *did* require that a percentage of candidates for certain roles be diverse, *did* require that the interview team

12  be diverse, and the requirement *did* apply to most positions with annual compensation over $100,000.

13  Plaintiffs do not allege otherwise.  Plaintiffs instead contend that these generic statements were false

14  because of the occurrence of purported fake interviews.  But, as explained above (*see supra* at 15-16), that

15  there were isolated instances of non-compliance with the Guidelines does not make the fact that Wells

16  Fargo had implemented the Guidelines, which indisputably set out these requirements, false.

17  Plaintiffs also point to a number of aspirational statements regarding the Company's general

18  commitment to diversity, but they fail to explain how any of those statements is false.  For instance, the

19  Complaint challenges statements about "expanding [] diversity and inclusion commitments with a focus

20  on hiring, promotions, and turnover" (Compl. ¶ 192), "overall and continuing efforts to enhance workforce

21  diversity" (*id.* ¶ 194), "promoting and enhancing DE&I priorities and goals within the Company and

22  externally" (*id.* ¶ 197), the importance of "employees' commitment and integrity" (*id.* ¶ 222), and

23  "focus[ing] on attracting, hiring, and supporting diverse talent" (*id.* ¶ 224).  Plaintiffs do not explain how

24  any of these statements is false — they do not (and cannot), for instance, allege that Wells Fargo was not

25  committed to improving workplace diversity or that it did not consider employee integrity important.  And

26  in any case, these statements are "not capable of objective verification," and "lack[] a standard against

27  which a reasonable investor could expect them to be pegged." *In re Cornerstone Propane Partners, L.P.*,

28  355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005).  They are aspirational statements expressing the Company's

-18-

1     commitment to achieving a certain objective, *i.e.*, promoting workplace diversity. *See City of Pontiac*

2     *Gen. Emps.' Ret. Sys.* v. *Bush*, 2022 WL 1467773, at \*4 (N.D. Cal. Mar. 1, 2022) ("aspirational

3     statements . . . which emphasize a desire to commit to and embrace diversity . . . [are] not capable of

4     objective verification").

5         Finally, the various statements regarding the Company's Code of Conduct and non-retaliation

6     policies in the Proxy Statements (*see, e.g.*, Compl. ¶¶ 198, 199, 221, 222) are not actionable as a matter

7     of law. As explained above (*see supra* at 16), the Ninth Circuit has been clear that "a code of conduct is

8     'inherently aspirational,'" *Hewlett-Packard Co.*, 845 F.3d at 1276, and therefore not actionable. *See also*

9     *Nathanson* v. *Polycom, Inc.*, 87 F. Supp. 3d 966, 976-77 (N.D. Cal. 2015) ("commitment to" ethical

10    practices was "inherently aspirational and hence immaterial").

11         **2.**      **Plaintiffs Fail To Allege that the Director Defendants Acted in Bad Faith.**

12         Plaintiffs also fail to establish a substantial likelihood of liability for their Section 14(a) claims

13    because the Complaint lacks particularized facts indicating that each Director Defendant acted knowingly

14    or in bad faith. Wells Fargo's charter exculpates its Directors from liability for breaches of fiduciary duty

15    except those arising from bad faith or intentional misconduct, including, as here, Section 14(a) claims that

16    are predicated on purported breaches of fiduciary duty. *See In re Wells Fargo*, 2022 WL 345066, at \*5

17    (N.D. Cal. Feb. 4, 2022). Accordingly, as Plaintiffs appear to acknowledge (Compl. ¶¶ 342-43), they must

18    plead particularized facts demonstrating that the Director Defendants acted knowingly or in bad faith. As

19    discussed (*see supra* at 10-13), however, Plaintiffs plead no facts indicating that any Director Defendant

20    was aware of the purported fake interviews. The Complaint's conclusory assertions that the Director

21    Defendants must have known about the isolated instances of non-compliance with the Diverse Slates

22    Guidelines because "DE&I was a 'key focus' for the Board and the Company's management team"

23    (Compl. ¶ 244), "the bank kept records of every job interview" (*id.* ¶ 242), and the board "frequently

24    reviewed, monitored, and discussed the Company's diversity initiatives" (*id.* ¶ 243), are insufficient.

25    Absent are particularized facts showing "the who, what, where, when, and how regarding *each*

26    Defendant's access to the relevant information that belies fraudulent intent." *Police Ret. Sys. of St. Louis*

27    v. *Intuitive Surgical, Inc.*, 2012 WL 1868874, at \*19 (N.D. Cal. May 22, 2012).

28

-19-

**3.    Plaintiffs Fail To Allege that the Proxies Were an "Essential Link" to the Purportedly Loss-Generating Corporate Action.**

Finally, Plaintiffs fail to plead that the 2021 and 2022 Proxy Statements were an "essential link" in causing the damages sought by Plaintiffs.  *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017).  "[D]amages are recoverable under § 14(a) 'only when the votes for a specific corporate transaction requiring shareholder authorization . . . are obtained by a false proxy statement, and that transaction was the direct cause of pecuniary injury for which recovery is sought.'"  *In re Marvell Tech. Grp. Ltd. Sec. Litig.*, 2008 WL 4544439, at *12 (N.D. Cal. Sept. 29, 2008).

Here, Plaintiffs allege that the "false and misleading elements of the 2021 Proxy Statement led Company shareholders to . . . elect Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, [and] Sargent, and [*sic*] to the Board, allowing them to continue or being [*sic*] breaching their fiduciary duties to the Company."  (Compl. ¶ 344.)  Plaintiffs make the same allegation with respect to the 2022 Proxy Statement.  (*Id.* ¶ 345.)  But "[a] claim that the reelection of the directors was an essential link to loss-generating corporate action because of the directors' subsequent mismanagement cannot form the basis of liability under Section 14(a)."  *In re Diamond Foods, Inc. Deriv. Litig.*, 2012 WL 1945814, at *7 (N.D. Cal. May 29, 2012); *see also In re PayPal*, 2018 WL 466527, at *4.

Plaintiffs also allege that the "false and misleading elements of the 2021 Proxy Statement led Company shareholders to . . . approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including [the Director Defendants], who were breaching their fiduciary duties to the Company."  (Compl. ¶ 344.)  Plaintiffs offer the same allegation with respect to executive compensation for the 2022 Proxy Statement.  (*Id.* ¶ 345.)  These claims fail too.  As Plaintiffs acknowledge, the compensation paid to the Company's executive officers was subject only to "non-binding advisory vote" by shareholders.  (*Id.* ¶¶ 344, 345.)  "Advisory votes do not authorize any corporate action" and, therefore, cannot be the "essential link" needed to plead a Section 14(a) claim.  *Hastey* v. *Welch*, 449 F. Supp. 3d 1053, 1064 (D. Kan. 2020); *see also Advanced Advisors G. P.* v. *Berman*, 2014 WL 12772264, at *14 (C.D. Cal. Sept. 16, 2014) (no "essential link" where "proxy statement was issued for the purpose of providing information regarding a non-binding, advisory vote on" compensation plan).

-20-

1    Finally, Plaintiffs allege that the 2022 Proxy Statement led Company shareholders to "approve the

2    Plan, which, among other things, would provide for an additional 80 million shares in connection with

3    eligible awards to be received by the Company's directors and officers." (Compl. ¶ 345.) This allegation

4    fares no better. As Plaintiffs acknowledge, the Plan was meant to aid the Company in "attracting, retaining

5    and rewarding employees, officers and directors, and to motivate them to achieve [C]ompany goals and

6    to drive sustained shareholder value" with additional compensation through the Company's Long-Term

7    Incentive Compensation Plan. (*Id.* ¶ 15.) The approval of a compensation plan, "which provided (and

8    provides) material benefits" to Defendants (*id.* ¶ 343), is not at all linked to the alleged diversity

9    misconduct. *Ocegueda* v. *Zuckerberg*, 526 F. Supp. 3d 637, 652 (N.D. Cal. 2021) ("conclusory allegations"

10   about "approval of compensation to directors who helped perpetuate the unlawful practices" did not

11   establish causation for proxy statement about lack of commitment to diversity).

12

### C.    Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board Faces a Substantial Likelihood of Liability Under Section 10(b).

13

14   Plaintiffs next assert that the Director Defendants face a substantial likelihood of liability under

15   Exchange Act Section 10(b) and Rule 10b-5. To state a claim under Section 10(b) and Rule 10b-5, a

16   "complaint must plausibly allege: '(1) a material misrepresentation or omission by the defendant;

17   (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

18   security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"

19   *Weston Family P'ship LLP* v. *Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation omitted).

20   Plaintiffs fail to plead that the Director Defendants face a substantial likelihood of personal liability

21   under Section 10(b) for the same reasons they fail to plead a substantial likelihood of personal liability for

22   their breach of fiduciary duty and Section 14(a) claims: They have not adequately alleged that any

23   statement is actionably false or that any Director Defendant acted with scienter.

24   ***Falsity.*** As explained above, Plaintiffs have not adequately alleged that any of the challenged

25   statements is actionably false. (*See supra* at 14-16, 17-18.) The majority of the challenged statements

26   generally described the existence of the Diverse Slates Guidelines and their parameters. (*See* Compl.

27   ¶¶ 189, 192-96, 206, 208, 213, 218.) Again, Plaintiffs fail to explain why, even assuming that the

28   purported fake interviews occurred, these statements are false. (*See supra* at 14-16.) The remaining

-21-

1   statements regarding the Company's general commitments to promoting diversity (Compl. ¶¶ 192, 194,

2   197, 222, 224), the Code of Conduct (*id.* ¶¶ 198, 220, 221), and anti-retaliation policies (*id.* ¶¶ 199, 222)

3   are not actionable.  *See Bush*, 2022 WL 1467773, at *4 ("aspirational statements . . . which emphasize a

4   desire to commit to and embrace diversity, provide a 'vague statement[ ] of optimism' . . . not capable of

5   objective verification"); *Kahnert*, 2022 WL 2167792, at *8-9 (code of conduct and anti-retaliation policies

6   are aspirational and not actionable).  (*See also supra* at 16, 18-19.)

7         ***Scienter.***  Plaintiffs also fail to "state with particularity facts giving rise to a *strong inference* that

8   the [Director Defendants] acted with" scienter.  *Metzler Inv. GMBH* v. *Corinthian Colleges, Inc.*, 540 F.3d

9   1049, 1066 (9th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)).  Again, the Complaint does not contain

10  specific allegations that any Director Defendant was aware of even a single fake interview during the

11  relevant time period, let alone that any had a basis to believe that her or his statements about the Guidelines

12  were somehow disingenuous or untrue.  (*See supra* at 10-13, 19.)  Plaintiffs' conclusory assertions that

13  the Director Defendants must have known about the purported fake interviews by virtue of their positions

14  (Compl. ¶ 242-43), access to unspecified data (*id.*), and "focus" on diversity (*id.* ¶ 244) do not support a

15  strong inference that the Director Defendants knowingly lied.[6]

16  **II.    PLAINTIFFS FAIL TO PLEAD THAT A MAJORITY OF THE BOARD RECEIVED A
        MATERIAL PERSONAL BENEFIT FROM THE ALLEGED MISCONDUCT.**

17

18        Plaintiffs separately contend that demand should be excused as to their claims based on the 2022

19  Proxy Statement because the Director Defendants (with the exception of Mr. Scharf) benefitted from the

20  compensation they received under the Company's updated 2022 Long-Term Incentive Compensation

21  Plan.  (Compl. ¶¶ 169, 228, 312).  Plaintiffs claim that the Director Defendants somehow used purported

22  misstatements about the Company's diversity hiring practices in the 2022 Proxy Statement to secure

23

---

24  [6]    Because, for the reasons stated above, Plaintiffs have failed to allege adequately that any of the
        Director Defendants face a substantial likelihood of liability under Section 14(a) or Section 10(b),
25      Plaintiffs also necessarily have failed to adequately allege that any of the Director Defendants face a
        substantial likelihood of liability under Section 20(a).  *See Jackson* v. *Fischer*, 2013 WL 6732872, at *13
26      (N.D. Cal. Dec. 20, 2013) ("In order to maintain a claim for control-person liability under § 20(a), a
        plaintiff must establish a claim of primary liability.").  Further, Plaintiffs base their Section 20(a) claim
27      on the Individual Defendants' purported ability "to cause Wells Fargo to engage in the [alleged] illegal
        conduct."  (Compl. ¶ 357.)  But in a derivative action, where the plaintiff is trying to assert claims on
28      behalf of the corporation, "the corporation cannot be a primary violator for control purposes." *In re Maxim
        Integrated Prod., Inc., Deriv. Lit.*, 574 F. Supp. 2d 1046, 1067 (N.D. Cal. 2008).

-22-

1   shareholder approval for the new plan. (*Id.*) But those allegations are insufficient to plead that the Director

2   Defendants received "a material personal benefit from the alleged misconduct." *Zuckerberg*, 262 A.3d

3   at 1059.

4          As an initial matter, Plaintiffs fundamentally misunderstand the proposed changes to the incentive

5   compensation plan described in the 2022 Proxy Statement.  Under the then-existing plan, the Governance

6   and Nominating Committee ("GNC") had sole discretion to set the amount of director compensation

7   awards.  In the 2022 Proxy, shareholders were asked to vote on a revised plan that imposed new *limits* on

8   director compensation that the GNC could award.  (*Compare* Ex. F at A-10 *with* Ex. G at A-6.)  In other

9   words, far from materially benefitting from the proposed changes to the plan in the 2022 Proxy, the

10  Director Defendants' ability to earn compensation was restricted.  Plaintiffs' assertion that the awards the

11  Director Defendants did ultimately receive in 2022 — none of which Plaintiffs have pleaded was excessive

12  — "could have nearly doubled" under the new plan (Compl. ¶ 312) wholly misunderstands what the 2022

13  Proxy proposed.

14         In any event, to plead adequately that director compensation amounted to a material personal

15  benefit, such compensation must be "extraordinary or excessive." *Ryan* v. *Gursahaney*, 2015 WL

16  1915911, at *8 (Del. Ch. Apr. 28, 2015).  But Plaintiffs fail to allege any particularized facts showing that

17  the Defendant Directors' compensation under the Plan "materially exceeded what is commonly

18  understood and accepted to be a usual and customary director's fee." *Freedman* v. *Adams*, 2012 WL

19  1345638, at *7 (Del. Ch. Mar. 30, 2012).  "[O]rdinary director compensation alone is not enough to show

20  demand futility." *Ryan*, 2015 WL 1915911, at *8 (citation omitted).

21         But even if Plaintiffs had adequately alleged that the Director Defendants' compensation under the

22  Plan was anything other than customary, as discussed above (*see supra* at 20-21), Plaintiffs fail to explain

23  how the purported misstatements in the 2022 Proxy Statement — a handful of statements relating to the

24  Company's diversity hiring practices contained in the 136-page document — have anything to do with

25  the proposed plan discussed elsewhere in the document.  Rather, Plaintiffs ask the Court to infer that the

26  purported misstatements about the Diverse Slates Guidelines somehow caused shareholders to vote in

27  favor of the plan when they would not have otherwise.  Plaintiffs provide no allegations to support such

28  an inference, and such an inferential leap is wholly inconsistent with the particularized pleading

-23-

1    requirements for demand futility under Delaware law.  If it were enough, a plaintiff could adequately plead

2    demand futility for virtually every disclosure-based claim based on purported misstatements in a public

3    company's proxy statement.  That is because proxy statements almost always seek shareholder approval

4    of director compensation plans.  *Cf. In re E.F. Hutton Banking Pracs. Litig.*, 634 F. Supp. 265, 271

5    (S.D.N.Y. 1986) ("Receipt of director's fees does not suggest a conflict of interest" because "[s]uch a rule

6    would eviscerate the rationale for ever making a demand and would strip Rule 23.1 of all meaning.").[7]

7    **III.    PLAINTIFFS FAIL TO PLEAD THAT A MAJORITY OF THE BOARD IS NOT
            INDEPENDENT.**

8

9         Because Plaintiffs have not shown that any Director Defendant faces a substantial likelihood of

10   liability or received a material personal benefit from the purported misconduct (*i.e.*, is interested), the

11   Court need not consider Plaintiffs' independence allegations.  *See In re Oracle Corp. Deriv. Litig.*, 2011

12   WL 5444262, at *6 (N.D. Cal. Nov. 9, 2011).  But even if Plaintiffs had adequately alleged that any one

13   of the Director Defendants were interested, Plaintiffs would still need to plead with particularity that the

14   remaining Director Defendants (enough to amount to a majority of the Board) were so beholden to the

15   interested Director that they could not independently consider a demand.  Delaware law presumes the

16   independence of directors.  *See, e.g.*, *Aronson*, 473 A.2d at 815.  To overcome this presumption, "Plaintiffs

17   must 'show that [a majority of the non-interested] directors are beholden to the [interested director(s)] or

18   so under their influence that their discretion would be sterilized.'"  *In re Facebook*, 367 F. Supp. 3d at 1128

19   (citation omitted).  Plaintiffs have not done so.

20        Plaintiffs contend that nine Director Defendants — Black, Chancy, Clark, Craver, Hewett, Morris,

21   Payne, Pujadas, and Sargent — are not independent because four of them served on the GNC and,

22   ────────────────────────

23   [7]    Plaintiffs suggest elsewhere that they have adequately pleaded material personal benefits as to the
       claims relating to the 2022 Proxy based on a case from the Middle District of Tennessee, *Davis* v. *Baier*,

24     2023 WL 1073188 (M.D. Tenn. Jan. 27, 2023).  (*See* ECF No. 45 at 22.)  That case is fundamentally
       different.  While the alleged misstatements in Wells Fargo's 2022 Proxy Statement had no bearing on

25     director compensation, the alleged misstatements at issue in *Davis* allegedly "conceal[ed] [the company]'s
       potential liabilities."  2023 WL 1073188, at *10.  There was thus a clear link between the alleged

26     misstatements and incentive compensation.  As the court explained: "The payments being approved were,
       after all, incentives and rewards; the sustainability and wisdom of the company's business model and

27     trajectory were therefore highly relevant."  *Id.*  No such link exists here.  And to the extent Plaintiffs rely
       on this case for the proposition that demand is automatically excused when a shareholder challenges *any*

28     statement contained in a proxy that also solicits approval of a director compensation plan, no court, in
       Delaware or otherwise, has endorsed such a radical position.

                                                    -24-

1   therefore, had the power "to determine how many shares of Company common stock to administer under

2   the [Company's Long-Term Incentive Compensation] Plan to non-employee directors, including

3   themselves." (Compl. ¶ 313.) But the mere fact that certain Director Defendants had their compensation

4   determined by the GNC does not make them beholden to the members of that committee. *See Durgin* v.

5   *Sharer*, 2017 WL 2214618, at *8-9 (C.D. Cal. Jan. 10, 2017) (rejecting "attempts to challenge directorial

6   independence on the sole ground that [a director] lack[ed] independence" from other directors "who, in

7   their capacity as members of the Compensation Committee, exert[ed] influence over [his] compensation").

8          Plaintiffs also make a passing suggestion that Wells Fargo's CEO, Mr. Scharf, "is a non-

9   independent director" because "the Company provides Defendant Scharf with his principal occupation for

10  which he receives lucrative compensation." (Compl. ¶ 316.) But general independence from the company

11  as an employee-director is not the inquiry here. Delaware law instead asks whether the director lacks

12  independence from an "interested" director in the demand futility context. *See Forestal* v. *Caldwell*, 739

13  F. App'x. 895, 898 (9th Cir. 2018) (describing as "a non-starter" for demand futility an employee-

14  director's "classification as a non-independent director" under public listing rules). And merely being a

15  company's chief executive is "not enough to establish [a] lack of independence, because that would

16  'eviscerate' the disinterested prong of the demand futility test and would find any director involved in the

17  day-to-day running of [a] company to be 'interested' under any set of facts." *In re Facebook*, 367 F.

18  Supp. 3d at 1128. In any event, this allegation against a single Director Defendant obviously does not

19  demonstrate that a majority of Wells Fargo's 14 Directors lacks independence.

20                                     **CONCLUSION**

21         For the foregoing reasons, Plaintiffs fail to plead that demand on the Board is excused as futile.

22  The Complaint therefore should be dismissed under Rule 23.1(b)(3).

23

24

25

26

27

28

                                        -25-

SULLIVAN &
CROMWELL LLP

1     DATED:  April 3, 2023            Respectfully submitted,

2

                                       */s/ Brendan P. Cullen*

3                                        Brendan P. Cullen (SBN 194057)
                                       (cullenb@sullcrom.com)

4                                        Sverker K. Hogberg (SBN 244640)
                                       (hogbergs@sullcrom.com)

5                                        SULLIVAN & CROMWELL LLP
                                       1870 Embarcadero Road

6                                        Palo Alto, CA 94303
                                       Telephone: (650) 461-5600

7

8                                        Christopher M. Viapiano (*pro hac vice*)
                                       (viapianoc@sullcrom.com)

9                                        SULLIVAN & CROMWELL LLP
                                       1700 New York Avenue N.W., Suite 700

10                                       Washington, D.C. 20006
                                       Telephone: (202) 956-7500

11

12                                        Leonid Traps (*pro hac vice*)
                                       (trapsl@sullcrom.com)

13                                        SULLIVAN & CROMWELL LLP
                                       125 Broad Street

14                                        New York, NY 10004
                                       Telephone: (212) 558-4000

15                                        *Counsel for Nominal Defendant*
                                       *Wells Fargo & Company*

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-

1

## **ATTESTATION**

2
3

I, Brendan P. Cullen, in compliance with Civil L.R. 5-1(i)(3), hereby attest that I obtained the concurrence of all of the above-listed counsel in filing this document.

4

DATED:  April 3, 2023                                      */s/ Brendan P. Cullen*

5                                                                            Brendan P. Cullen

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28