Lesley E. Weaver (SBN 191305)
Nancy A. Kulesa (*pro hac vice* forthcoming)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4004
Facsimile: (415) 445-4020
E-mail:  lweaver@bfalaw.com
         nkulesa@bfalaw.com

Marlon E. Kimpson (admitted *pro hac vice*)
William S. Norton (admitted *pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  (843) 216-9000
Facsimile:    (843) 216-9450
E-mail: mkimpson@motleyrice.com
         bnorton@motleyrice.com

*Counsel for Plaintiffs City of Pontiac Reestablished*
*General Employees' Retirement System and*
*City of Plantation Police Officers' Retirement Fund*

*[Additional counsel on signature page]*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY HIRING PRACTICES DERIVATIVE LITIGATION, <br><br> This Document Relates to: <br><br> ALL ACTIONS | Lead Case No. 3:22-cv-05173-TLT <br><br> ~~(SEALED)~~ **VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

CITY OF PONTIAC REESTABLISHED GENERAL EMPLOYEES' RETIREMENT SYSTEM AND CITY OF PLANTATION POLICE OFFICERS' RETIREMENT FUND,

Plaintiffs,

v.

STEVEN D. BLACK, MARK A. CHANCY, CELESTE A. CLARK, THEODORE F. CRAVER, JR., RICHARD K. DAVIS, WAYNE M. HEWETT, DONALD M. JAMES, CECELIA G. MORKEN, MARIA R. MORRIS, FELICIA F. NORWOOD, CHARLES H. NOSKI, RICHARD B. PAYNE, JR., JUAN A. PUJADAS, CARLY SANCHEZ, KLEBER R. SANTOS, RONALD L. SARGENT, CHARLES W. SCHARF, AND SUZANNE M. VAUTRINOT,

Defendants,

And

WELLS FARGO & COMPANY,

Nominal Defendant.

Case No.: 3:23-cv-03366-TLT

**VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT**

**(1) BREACH OF FIDUCIARY DUTY AGAINST INDIVIDUAL DEFENDANTS**
**(2) VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9 (AGAINST THE DIRECTOR DEFENDANTS)**
**(3) VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST DEFENDANTS)**
**(4) VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS)**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ...................................................................................... 1

II.    INTRODUCTION ...................................................................................................... 1

III.   JURISDICTION AND VENUE .................................................................................. 6

IV.    PARTIES ................................................................................................................... 6

V.     PLAINTIFFS' SECTION 220 BOOKS-AND-RECORDS INSPECTION ................. 10

VI.    SUBSTANTIVE ALLEGATIONS ........................................................................... 10

    A.    Background on Wells Fargo ........................................................................... 10

    B.    Wells Fargo's Lending Practices Discriminate Against Minority Borrowers ................ 12

        1.    Mortgage Lenders in the United States Have a Long History of Lending Discrimination and Redlining of Minority Communities ................... 12

        2.    Congress and the Courts Have Long Recognized that Discriminatory Lending Practices, Such as Redlining, Are Illegal ............... 14

        3.    Lending Discrimination Continues Today as "Digital Redlining" ................ 16

        4.    Wells Fargo's Board Knew that Discrimination in Lending Is a Mission-Critical Risk for The Company, and Yet the Board Did Nothing to Assess Whether Its Algorithm Engaged in Redlining ...................... 19

        5.    *Bloomberg's* March 2022 Investigation Confirms Wells Fargo's Systematic Discrimination Against Black and Hispanic Borrowers ................. 23

        6.    Board-Level Documents Confirm the Board's Failure to Implement a Mission-Critical Reporting Structure to Prevent Redlining............. 27

        7.    Former Wells Fargo Employees Independently Corroborate Wells Fargo's Racially Discriminatory Lending Practices ............... 33

        8.    Subsequent Litigation Confirms Wells Fargo's Systematic Discrimination Against Black Borrowers ............... 35

            a.    Geographic Indicators ................................................. 37

            b.    Post-Close Liquidity Requirements.............................. 38

            c.    Demographic Indicators .............................................. 38

            d.    Uncorrected and Racially Biased Appraisals .............. 39

            e.    Unjustified Increased FICO Requirements ................. 39

    C.    Wells Fargo's Hiring Practices Discriminate Against Diverse Candidates.................... 40

        1.    Joe Bruno, a Former Wells Fargo Executive in the Company's Wealth Management Division, Reported the Practice of Conducting Sham Interviews to Senior Management ........................... 40

2.     Wells Fargo's Practice of Conducting Sham Interviews Was Reported in an "Email to Wells Fargo's Board of Directors" .................................................. 41

3.     *The New York Times* Investigation ........................................................ 44

4.     The Board Knew Wells Fargo's Hiring and Promotion of Diverse Candidates Were Mission-Critical Risks, But Failed To Put in Place Appropriate Internal Controls to Ensure that Fake Interviews of Minority Candidates Did Not Occur .................................................. 51

D.     Wells Fargo's 2021 and 2022 Proxy Statements Misleadingly Promoted the Company's "Diverse Search Requirement" and "Banking Inclusion Initiative" While Opposing Stockholder Proposals to "Conduct a Racial Equity Audit" ............... 56

E.     Wells Fargo's Discriminatory Practices Have Damaged the Company Financially and Reputationally .................................................................. 61

VII.     FIDUCIARY DUTIES OF THE DEFENDANTS ................................................ 68

A.     Duties of All Defendants ................................................................ 68

B.     Fiduciary Duties of Directors of Federal Banking Institutions ........................ 69

C.     The Board's Committees Were Expressly Charged with Overseeing and Monitoring Risk to Wells Fargo ........................................................ 72

1.     Duties of Risk Committee Members ................................................ 74

2.     Duties of Audit and Examination Committee Members ........................... 76

3.     Duties of Corporate Responsibility Committee Members ........................ 78

4.     Duties of Human Resource Committee Members ................................. 80

D.     Defendants' Fiduciary Duties Under *Caremark* and *Marchand* ..................... 82

VIII.     IN EXCHANGE FOR TAKING ON THE FIDUCIARY DUTIES DESCRBIED HEREIN, DEFENDANTS ARE HIGHLY PAID ................................................ 86

IX.     DERIVATIVE ALLEGATIONS ............................................................ 87

X.     DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE ..................... 87

A.     Each of the Current Directors Faces a Substantial Likelihood of Personal Liability ...... 88

B.     Additional Red Flags Arose Before Davis, Morken and Norwood Joined the Board ... 90

C.     Committees Within the Board Received Additional Red Flags ......................... 91

D.     Prior Courts Have Already Determined that Demand is Futile Against Certain of the Director Defendants on Related Issues ......................................... 92

E.     Defendant Scharf's Unique Motivations Provide Additional Reasons Why Demand is Futile as to Him ........................................................ 93

XI.     CLAIMS FOR RELIEF .................................................................... 94

XII.     PRAYER FOR RELIEF ................................................................... 101

XIII.     JURY DEMAND .......................................................................... 101

ii

## I.  NATURE OF THE ACTION

The City of Pontiac Reestablished General Employees' Retirement System ("Pontiac") together with the City of Plantation Police Officers' Retirement Fund ("Plantation") (together, the "Plaintiffs"), by and through the undersigned attorneys, submit this Verified Amended Stockholder Derivative Complaint (the "Amended Complaint") against certain members of the Board of Directors (the "Board") of Wells Fargo & Company ("Wells Fargo" or the "Company") for breaches of fiduciary duty and related federal securities violations in connection with their failure to meaningfully monitor Wells Fargo's discriminatory lending and hiring practices.   Except for the allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge, the allegations in the Amended Complaint are based upon the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of filings made with the U.S. Securities and Exchange Commission ("SEC"); review of internal Company documents provided by Wells Fargo in connection with a books-and-records demand pursuant to title 8, section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220 ("Section 220" or "§ 220"); interviews of former Wells Fargo employees with first-hand knowledge of Wells Fargo's internal documents and operations; press releases; news reports; and other publicly available documents.

## II.  INTRODUCTION

1.      Discrimination against Black Americans and other minority groups in the business world is nothing new.  While unequal, unfair and exclusionary practices date back centuries, laws have been on the books prohibiting such conduct for more than 50 years.  This includes laws related to access to fair housing and jobs.  For most Americans, access to fair housing requires access to a mortgage; access to equal employment requires a legitimate job interview.  Wells Fargo is consistently among the three largest mortgage lenders in the United States.  In 2019, the Company was America's top lender with $201.8

billion in volume that year.  In terms of job opportunities, Wells Fargo is one of American's largest corporate employers, consistently employing more than 250,000 people.

2.    Wells Fargo and its Board have an obligation to put in place and monitor internal controls to ensure that the Company operates within the boundaries of U.S. law.  This includes laws and regulations enacted decades ago like the Fair Housing Act of 1968, the Equal Credit Opportunity Act, and the Civil Rights Acts of 1866, 1964, and 1991, among others.  These laws were passed to ensure that discriminatory practices that existed for generations would no longer be tolerated in the business world. A widely studied, publicized, and litigated discriminatory practice is "redlining," the practice of banks avoiding or simply refusing to provide mortgages to loan applicants for properties in predominantly Black, Hispanic, or other minority communities under the false (and patently unfair) premise that those communities by virtue of the race of their inhabitants, present a heightened credit risk as compared to loans for properties in predominantly White communities.

3.    Directors of companies like Wells Fargo not only have a duty to be aware of laws that govern the core business, they have a duty to ensure that the Company and its employees actually follow those laws.  This duty not only arises under established federal law, but also under corporate law.  Since Wells Fargo is a Delaware corporation, its board of directors owe fiduciary duties, including a duty of oversight, to affirmatively monitor and control the Company's compliance with legal obligations— especially when it comes to "mission-critical" legal and compliance risks.  This issue is particularly acute with respect to Wells Fargo since in February 2018 the Federal Reserve placed a crippling asset cap on Wells Fargo due to its weak internal controls.  The longer Wells Fargo takes to assure the Federal Reserve it has effective internal controls, the longer the Federal Reserve will keep the asset cap in place.

4.    It is this area—oversight and monitoring of core legal risk related to discriminatory lending and hiring—where Wells Fargo's Board has shirked its duty, and why Plaintiffs, long-term Wells

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Fargo stockholders, have filed this action to hold the Board accountable to the Company and its stockholders.

5.      On March 11, 2022, *Bloomberg* conducted an analysis of public housing data showing that Wells Fargo—a behemoth in the mortgage world—was a significant outlier among its peers (JP Morgan Chase & Co., Citigroup Inc., and Bank of America) in terms of originating mortgages to Black and Hispanic Americans.  *Bloomberg's* analysis also found that in 2020, Wells Fargo was the *only* major lender in 2020 to reject more refinancing applications from Black homeowners than it accepted: only 47% of Black and 53% of Hispanic homeowners who completed refinance applications were approved, compared with 72% of White homeowners.  In contrast, other lenders approved 74% of all Black refinancing applications.  Perhaps most surprising, this disparity appeared to be part of a near decade-long trend as Wells Fargo was the *only* major lender to approve a smaller share of refinancing applications from Black homeowners in 2020 than it did ten years earlier in 2010.



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Approval rate

**Wells Fargo**

WHITE 72%
ASIAN 67%
HISPANIC 53%
BLACK 47%

**All other lenders**

WHITE 87%
ASIAN 85%
HISPANIC 79%
BLACK 71%

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

6.      *Bloomberg* also found that Wells Fargo granted a higher percentage of loans to White applicants with yearly incomes below $63,000 than to Black applicants with yearly incomes between $120,000 and $168,000.

7.      The statistics above are even more striking when viewed alongside internal Board-level Wells Fargo books and records that Plaintiffs have obtained, pursuant to Section 220, prior to filing suit. Specifically, according to the Company's April 2022 meeting minutes and presentation materials, upon learning of *Bloomberg's* March 2022 reports, Wells Fargo's Head of Home Lending admitted that the *Bloomberg* article was "**factually accurate**" and that "**mistakes were made with respect to stakeholder engagement following publication of the [Bloomberg] article**."[1]   Defendant Scharf agreed that "**mistakes . . . were made [by the Company] in the ordinary course.**" "**Scharf [also] noted the reasons the Company did not conduct sufficient stakeholder engagement early on, including because the Company did not have all necessary data until recently**."

8.      These same meeting minutes admitted Wells Fargo needed "to address" the Company's "approval gap" as to "African American (AA) approval rates" and confirmed that the "approval gap" between "African American" and "White, Non Hispanic" applicants—which the Company also called its "Denial Rate Gap"—exceeded 24% in 2020 and 21% in 2021 and involved hundreds of thousands of applications.

9.      Despite *Bloomberg's* "factually accurate" findings and the Company's acknowledgement of its "approval gap," it appears that Wells Fargo and its Board were content to go back to business-as-usual.   In August 2020, following a 12-month business unit review presented to the Board's Risk Committee, in discussing "current and emerging Fair Lending Issues and Trends," the Company

---

[1] All emphasis is added unless otherwise noted.

concluded that "monitoring activities had ***not identified any systematic fair lending risk***"; that "control effectiveness has improved"; and that "fair lending Compliance . . . provides challenge to business controls as ***isolated risks*** are identified."

10.     When *Bloomberg's* analysis is considered alongside the Company's own internal acknowledgement of the factual accuracy of that analysis and the Company's substantial "Denial Rate Gap," nothing even remotely suggests that the risk Wells Fargo engaged in discriminatory lending practices was "isolated" or anything less than "systematic."  At best, the Company's internal documents confirm—consistent with Plaintiffs' allegations herein—that Wells Fargo's Board acted in bad faith by failing to have mission-critical reporting systems in place consistent with their fiduciary duties to monitor or track relevant data and analyses to ensure that the Company's operations, including the use of automated technology that could result in discriminatory practices like redlining, did not discriminate against minority groups, particularly Black and Hispanic Americans.  At worst, the Board may have asked management not to provide it with such data.  In either case, the Board breached its fiduciary duties and caused significant financial and reputational damage to Wells Fargo.

11.     Wells Fargo's Board also breached its fiduciary duties in bad faith by failing to exercise proper oversight over the Company and ignoring red flags that the Company had illegal discriminatory hiring practices.  On May 19, 2022, *The New York Times* published an article revealing that Wells Fargo engaged in a practice of conducting "fake interviews" of diverse candidates where managers, to give the appearance of complying with diversity quotas, would interview minority applicants for positions that were either already filled or promised to white male applicants.  "[S]even current and former Wells Fargo employees . . . said that they were instructed by their direct bosses or human resources managers in the bank's wealth management unit to interview "diverse" candidates — even though the decision had already been made to give the job to another candidate."  Following this report, federal prosecutors in the U.S. Attorney's Office for the Southern District of New York opened a criminal investigation into

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

whether Wells Fargo had violated federal laws by conducting sham interviews of minority candidates. The SEC is also investigating.

## III.   JURISDICTION AND VENUE

12.   This Court has jurisdiction over the subject matter of Plaintiffs' federal securities claims in accordance with 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state-law breach-of-fiduciary-duty claims in accordance with 28 U.S.C. § 1367.

13.   This Court has jurisdiction over each of the Defendants because each Defendant is either a resident of California or otherwise has sufficient minimum contacts with California (or, in the case of Plaintiffs' federal securities claims, with the United States as a whole) to render the exercise of jurisdiction by this Court permissible under California Code of Civil Procedure § 410.10 as well as the United States and California Constitutions.  Additionally, in connection with the misconduct alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

14.   This case is part of the consolidated stockholder derivative action pending in this District: *In re Wells Fargo & Company Hiring Practices Derivative Litigation*, Lead Case No. 3:22-cv-05173-TLT.

## IV.   PARTIES

15.   Plaintiff Pontiac is a stockholder of nominal defendant Wells Fargo with current holdings of 8,120 shares.  Pontiac has owned Wells Fargo stock continuously since at least January 2019.  Pontiac is a citizen of Michigan.

16.   Plaintiff Plantation is a stockholder of nominal defendant Wells Fargo with current holdings of 14,710 shares.  Plantation has owned Wells Fargo stock continuously since at least July 2019.  Plantation is a citizen of Florida.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

17.     Nominal Defendant Wells Fargo is a Delaware corporation with its principal executive offices located in San Francisco, and thus is a citizen of Delaware and California.  Wells Fargo operates as a diversified financial services company.  The Company provides banking, insurance, investments, mortgage, leasing, credit cards, and consumer finance.  In 2022, Wells Fargo generated nearly $1.4 billion in revenue from its mortgage banking business, nearly another $1.4 billion on lending-related fees, and $4.35 billion on card fees.

18.     Defendant Steven D. Black ("Black") has been a Director of Wells Fargo since April 2020 and is the Chair of the Finance Committee.  Black is currently the Board Chairman and a member of the Human Resources Committee.  Black is a citizen of Utah.

19.     Defendant Mark A. Chancy ("Chancy") has been a Director of Wells Fargo and a Director of WF Bank since August 2020.  Chancy also is a member of Wells Fargo's Audit Committee and the Finance Committee.  Chancy is a citizen of Georgia.

20.     Defendant Celeste A. Clark ("Clark") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Corporate Responsibility Committee of the Wells Fargo Board.  Clark also is a member of the Governance & Nominating Committee of the Wells Fargo Board.  Clark is a citizen of Michigan.

21.     Defendant Theodore F. Craver, Jr. ("Craver") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Audit Committee of the Wells Fargo Board.  Craver also is a member of the Finance Committee and the Governance & Nominating Committee of the Board.  Craver is a citizen of California.

22.     Richard K. Davis ("Davis") has been a Director of Wells Fargo between since 2022.  Davis has been a member of the Risk Committee.  Davis is a citizen of Minnesota.

23.     Defendant Wayne M. Hewett ("Hewett") has been a Director of Wells Fargo since 2019. Hewett has also been member of the Risk Committee, the Human Resources Committee and the Governance & Nominating Committee.  Hewett is a citizen of Florida.

24.     Defendant Donald M. James ("James") was a Director of Wells Fargo between 2009 and 2020.  James was a member of the Human Resources Committee including during the period 2018 to 2020.  James is a citizen of California.

25.     Defendant Cecelia G. Morken ("Morken") has been a Director of Wells Fargo since 2022. Morken has also been a member of the Corporate Responsibility Committee.  Morken is a citizen of California.

26.     Defendant Maria R. Morris ("Morris") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Risk Committee of the Wells Fargo Board.  Morris also is a member of the Human Resources Committee of the Wells Fargo Board.  Morris is a citizen of New York.

27.     Defendant Felicia F. Norwood ("Norwood") has been a Director of Wells Fargo since 2022.  Norwood has also been a member of the Risk Committee.  Norwood is a citizen of Indiana.

28.     Defendant Charles H. Noski ("Noski") was a Director of Wells Fargo between 2019 and 2021.  Noski served as Board Chairman and on the Audit Committee.  Noski is a citizen of Connecticut.

29.     Defendant Richard B. Payne, Jr. ("Payne") has been a Director of Wells Fargo since October 2019 and a Director of WF Bank since 2020.  Payne also is a member of the Risk Committee and the Chair of the Credit Subcommittee of the Wells Fargo Board.  Payne is a citizen of North Carolina.

30.     Defendant Juan A. Pujadas ("Pujadas") was a Director of Wells Fargo between 2017 and 2022.  Pujadas served on the Risk Committee and Finance Committee.  Pujadas is a citizen of California.

31.     Defendant Carly Sanchez ("Sanchez") is a Senior Executive in Human Resources at Wells Fargo.  From 2013 to 2022, Sanchez was VP, Talent Acquisition, AA/EEO, Diversity Recruiting at the Company.  Sanchez is a citizen of Texas.

32.     Defendant Kleber R. Santos ("Santos") is currently a Senior Executive Vice President and CEO of Consumer Lending and a member of the Operating Committee at Wells Fargo.  Santos is responsible for consumer lending products and services, including Home Loans, Auto Loans, Personal Lending, Credit Cards, Retail Services, and Merchant Services.  Santos is a citizen of Washington, D.C.

33.     Defendant Ronald L. Sargent ("Sargent") has been a Director of Wells Fargo since February 2017 and is the Chair of the Human Resources Committee.  Sargent also is a member of the Audit Committee and a member of the Governance & Nominating Committee.  Sargent is a citizen of Ohio.

34.     Defendant Charles W. Scharf ("Scharf") has been the CEO and President of Wells Fargo and WF Bank and a Director of Wells Fargo and WF Bank since October 2019.  Scharf is a citizen of New York.

35.     Defendant Suzanne M. Vautrinot ("Vautrinot") has been a Director of Wells Fargo since February 2015 and is a member of the Corporate Responsibility Committee and a member of the Risk Committee.  Vautrinot is a citizen of Colorado.

36.     Collectively, Defendants Black, Chancy, Clark, Craver, Davis, Hewett, James, Morken, Morris, Norwood, Noski, Payne, Pujadas, Sanchez, Santos, Sargent, Scharf, and Vautrinot are referred to herein as the "Individual Defendants."

37.     Collectively, Defendants Black, Chancy, Clark, Craver, Davis, Hewett, James, Morken, Morris, Norwood, Noski, Payne, Pujadas, Sargent, Scharf, and Vautrinot are referred to herein as the "Director Defendants."

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

## V.   PLAINTIFFS' SECTION 220 BOOKS-AND-RECORDS INSPECTION

38.     As part of Plaintiffs' pre-suit investigation, Plaintiffs, through counsel, sought and obtained inspection of certain books and records of the Company pursuant to Section 220.  These books and records included nearly 7,000 pages of Board-level documents, including meeting minutes and presentation materials, from the Company.  The categories of documents that Wells Fargo agreed to search and produce were described by Wells Fargo's counsel as follows:

> Wells Fargo & Co. agrees to search formal Board materials for the full Board and for the Human Resources Committee between January 1, 2020 and the date of the demand, and produce non-privileged material that concerns:
>
> - Discrimination in home lending, including mortgage refinancing;
>
> - Hiring and promotion practices and policies related to increasing workforce diversity, including any materials relating to the Diverse Slates Guidelines; and
>
> - Discrimination in hiring and promotion;
>
> Wells Fargo also agrees to produce the Diverse Slates Guidelines and conduct a reasonable search for other relevant company-wide policies.

39.     On March 17, 2023, Wells Fargo's counsel sent Plaintiff Pontiac's counsel a letter representing: "Barring any small clean-up production(s) that may result from our final quality control checks, ***Wells Fargo's production in this matter is now complete***."

40.     Wells Fargo's books and records, along with other information obtained by Plaintiffs through their investigation, evidence the fact that Wells Fargo's Board failed to live up to its fiduciary duties to 1) engage in meaningful and effective oversight, and 2) fail to act on red flags relating to the Company's systematic discriminatory lending and hiring practices.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.    Background on Wells Fargo

41.     Wells Fargo is a registered bank holding company that is incorporated in Delaware and headquartered in San Francisco, California.  The Company was founded on March 18, 1852, and, through

internal growth and a variety of mergers and acquisitions, including a merger with Wachovia Corporation in 2008, has grown into one of the largest financial institutions in the U.S.

42.    Wells Fargo ranked 41st on *Fortune*'s 2022 rankings of America's largest corporation and, as of June 2023, had a market capitalization of more than $150 billion.  Wells Fargo's revenue in 2022 exceeded $74 billion.

43.    The Company consistently ranks as one of the largest employers in the U.S. and has more than 250,000 employees operating out of more than 7,000 locations.

44.    Wells Fargo wholly owns and controls WF Bank, headquartered in Sioux Falls, South Dakota.  WF Bank is the fourth largest bank in the U.S. by total assets.  Together with JPMorgan Chase, Bank of America, and Citigroup, WF Bank is one of the "Big Four Banks" of the United States, with approximately $1.9 trillion in assets as of the end of 2022.

45.    Wells Fargo has one of the largest consumer banking footprints in the country and is consistently among the three largest mortgage lenders in the United States.  It also is among the largest lenders providing auto loans and other types of consumer lending.  Overall, Wells Fargo provides some type of financial services to nearly one-third of all U.S. households.

**B.** **Wells Fargo's Lending Practices Discriminate Against Minority Borrowers**

**1.** **Mortgage Lenders in the United States Have a Long History of Lending Discrimination and Redlining of Minority Communities**

46.     Homeownership is the primary source of wealth for American householders.[2]  A 2022 study by the National Association of Realtors found that the average homeowner who purchased a single-family home in 2012 would have built $225,000 in home-equity over the next ten years.[3]

47.     Empirical data demonstrates that homeownership confers a myriad of benefits that are passed down generationally.  Harvard University's Joint Center for Housing Studies found that "children of homeowners have better home environments, high[er] cognitive test scores, and fewer behavior problems than do children of renters."[4]  Children of owners were found to have "math scores up to nine percent higher, reading scores up to seven percent higher, and reductions in children's behavior problems of up to three percent."[5]  This was true even after controlling for a multitude of economic, social, and demographic variables.[6]  In other words, on average, children of homeowners are better off than children of renters even if their parents have similar salaries, backgrounds, and education.[7]

---

[2] Scholastica Coraton, *Single-family Homeowners Typically Accumulated $225,000 in Housing Wealth Over 10 Years*, Nat'l Assn. of Realtors, (Jan. 7, 2022), https://www.nar.realtor/blogs/economists-outlook/single-family-homeowners-typically-accumulated-225K-in-housing-wealth-over-10-years.
[3] *Id.*
[4] Donald R. Haurin, Toby L. Parcel, & R. Jean Haurin, *The Impact of Homeownership on Child Outcomes*, Joint Center for Housing Studies of Harvard Univ. (Oct. 2001), https://www.jchs.harvard.edu/sites/default/files/liho01-14.pdf.
[5] *Id.*
[6] *Id.*
[7] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

48.     The United States has a well-documented history of systematically denying homeownership and the benefits it confers to Black Americans through a process known as "redlining."[8] The term "redlining" originates from federal government programs instituted in the wake of the Great Depression through which the government insured certain qualifying mortgages in an effort to lift individuals out of poverty through homeownership.[9]  The federal government, in coordination with banks and local real estate agents, drew color-coded maps of neighborhoods, ranking them on a scale from least-risky to most-risky, and drawing neighborhoods deemed most-risky in red.[10]  The government used these maps to determine whether or not to guarantee loans; banks used these maps to determine whether or not to give loans.[11]  Banks typically denied credit, or extended credit on much worse terms, to applicants living in red-drawn neighborhoods.[12]  Due to an explicitly racially-discriminatory formula, neighborhoods in which Black or other minority citizens lived were virtually always drawn in red, and Black and minority American families were thus denied the benefits of homeownership while white citizens were given the opportunity to build generational wealth through homeownership.[13]

---

[8] *See, e.g.*, Candace Jackson, *What is Redlining*, NEW YORK TIMES, (Aug. 17, 2021), https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

[9] *Id.*

[10] Khristopher J. Brooks, *Redlining's legacy: Maps are gone, but the problem hasn't disappeared*, CBS NEWS, (last updated June 12, 2020), https://www.cbsnews.com/news/redlining-what-is-history-mike-bloomberg-comments/.

[11] City of New York, *A brief history of redlining*, (Jan. 6, 2021), https://a816-dohbesp.nyc.gov/IndicatorPublic/beta/data-stories/redlining/.

[12] *Id.*

[13] *Id.*

---

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-CV-05173-TLT

49.     In the first half of the twentieth century, racially restrictive covenants were commonly found in housing deeds that forbid the purchase, lease, or occupation of a house to Black Americans.[14] These covenants were often used as an excuse by lenders to deny mortgages to Black applicants.[15]

50.     The lasting impact of historical redlining has been documented by economists at the Federal Reserve Bank of Chicago, who found that neighborhoods drawn in red in the 1930s continue to have lower homeownership rates, lower home values, and residents with lower credit scores.[16] Economics professors Robert Margo and William Collins found that the gap in homeownership between Black and white Americans has changed very little over the last century, which helps to explain the enduring wealth gap between white and Black Americans that has actually continued to widen in recent decades.[17]

51.     In 2016, according to a report commissioned by the National Association of Real Estate Brokers ("NAREB"), the homeownership rate for Black Americans today is lower than the national rate during the Great Depression years of the 1930s.[18]

### 2.     Congress and the Courts Have Long Recognized that Discriminatory Lending Practices, Such as Redlining, Are Illegal

52.     In 1948, the U.S. Supreme Court held that racially restrictive covenants were unenforceable.  *See Shelly v. Kraemer*, 334 U.S. 1 (1948).

---

[14] Russell Fowler, *The Ugly History of Redlining: A Federal Policy 'Full of Evil'*, TENN. BAR ASS'N, (Jan. 1, 2023), https://www.tba.org/?pg=Articles&blAction=showEntry&blogEntry=85873.
[15] *Id.*
[16] Emily Badger, *How Redlining's Racist Effects Lasted for Decades*, NEW YORK TIMES, (Aug. 24, 2017), https://www.nytimes.com/2017/08/24/upshot/how-redlinings-racist-effects-lasted-for-decades.html?action=click&module=RelatedLinks&pgtype=Article.
[17] *Id.*
[18] James H. Carr, *et al.*, *State of Housing in Black America* (2016), https://www.nareb.com/site-files/uploads/2016/08/NAREB-SHIBA-REPORT-2016-final.pdf.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-CV-05173-TLT

53.     In 1968, Congress passed the Fair Housing Act ("FHA") which made it illegal for lenders to consider race in credit analyses.  Lending discrimination continued, however, and zoning ordinances began to be used in an effort to stop Black Americans from living in areas adjacent to predominately white neighborhoods.  In the landmark case of *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), the Eighth Circuit struck down a racially-motivated zoning plan that involved a neighborhood of white citizens living in an unincorporated St. Louis suburb incorporating and passing zoning restrictions in an effort to stop the construction of townhouses in which a majority of the residents would be Black.[19]

54.     In 1974, Congress passed the Legal Services Corporation Act to federally fund legal-aid organizations whose mission it was to litigate FHA claims on behalf of those being discriminated against.[20]   In 1975 and 1977, respectively, Congress passed the Home Mortgage Disclosure Act ("HDMA") and the Community Reinvestment Act ("CRA"), which unequivocally outlawed redlining by private banks and allowed for the imposition of penalties on banks that discriminated in lending.[21]  More recently, in 2017, Congress passed the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, which makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program."  The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages, mortgage refinancing, and other forms of credit.

---

[19] Russell Fowler, *supra* note 14.
[20] *Id.*
[21] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

### 3.     Lending Discrimination Continues Today as "Digital Redlining"

55.     For more than 20 years, banks and other lenders have relied on what has been referred to by regulators as automated lending where banks enter information from an applicant into a computer along with information collected from credit reporting agencies.  The automated underwriting system then weighs all this information to determine the likelihood that this loan will be fully and timely repaid, based on the way similar mortgages with comparable borrower, property and loan characteristics have performed in the past. Automated underwriting systems (theoretically) assess the riskiness of the loan based on a comprehensive evaluation.  Lenders using such systems are able to make faster and (theoretically) more accurate loan decisions, and, by consistently applying (theoretically) uniform standards of creditworthiness, automated underwriting systems can (theoretically) provide objective treatment of all borrowers.

56.     Modern automated lending practices, however, like their predecessors, have also been shown to result in discriminatory lending, including what regulators have referred to as "algorithmic" or "digital redlining."  As Bankrate, a consumer services company, explains: "digital redlining can mean not just the ways technology perpetuates low property values in historically redlined neighborhoods, but also other ways that all kinds of tech can be subtly or overtly discriminatory.  'Redlining, historically, created a disparity in valuation in majority-Black neighborhoods,' says Mark Alston, public affairs chairman of the NAREB.  'If you have a perfect appraisal in a majority-Black neighborhood today with perfect comps and no bias on the part of the appraiser,' it's likely still going to be valued lower compared to a similar property in a majority-white neighborhood because of that historical bias."[22]

---

[22] *See* Zach Wichter, *Appraisal Bias and digital redlining: No one-step solution* (May 9, 2022), https://www.bankrate.com/mortgages/appraisal-bias-and-digital-redlining/.

57.     The NAREB in 2016 also specifically identified "sophisticated technology" and new "proprietary financial models" as a primary cause of the current disparities in lending to Black Americans as compared to non-Hispanic Whites:

> Rather than breaking the barriers of discrimination, financial firms use sophisticated technology systems, driven by proprietary financial models, to justify their limited [loan] originations to Blacks.  These proprietary models are unavailable for public scrutiny. Continued lack of access to home mortgage credit for Blacks is neither fair nor insurmountable; increasing home ownership demands only the removal of discriminatory, unfair, and deceptive barriers to credit access, including those that are programmed into the technologies and practices of our modern housing finance system.[23]

58.     The U.S. Consumer Financial Protection Bureau ("CFPB") and Department of Justice ("DOJ") have also recognized the discriminatory impact of algorithmic or digital redlining. The "CFPB has prioritized digital redlining, including bias in algorithms and technologies marketed as AI.  As part of this effort, the CFPB is working with federal partners to protect homebuyers and homeowners from algorithmic bias within home valuations and appraisals through rulemaking."[24]  CFPB's Director, Rohit Chopra, further noted in 2021 that "[d]igital redlining may simply engrain old forms of discrimination."[25]

59.     In 2021, the DOJ reached "a settlement with Trustmark National Bank" that resolve[d] allegations that Trustmark engaged in lending discrimination by redlining predominantly Black and Hispanic neighborhoods in Memphis, Tennessee."[26]  In remarking on this settlement, which was the DOJ's "second redlining settlement in less than two months," U.S. Attorney General Merrick Garland discussed the harms of redlining:

---

[23] See supra note 18.

[24] See https://www.justice.gov/opa/pr/justice-department-announces-new-initiative-combat-redlining.

[25] See https://www.cbsnews.com/news/justice-department-redlining-investigation-digital-racist-practices/.

[26] See https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-announcing-new-initiative-combat.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Redlining is a process by which lenders deny services to individuals in a neighborhood because of the race or national origin of the people who live in those communities.

* * *

Lending discrimination runs counter to fundamental promises of our economic system. When a person is denied credit simply because of their race or national origin, their ability to share in our nation's prosperity is all but eliminated.

* * *

Redlining contributed to the large racial wealth gap that exists in this country. The practice made it extremely difficult for people of color to accumulate wealth through the purchase, refinancing, or repair of their homes. That discrepancy in wealth is clearly reflected in current homeownership rates.

* * *

Today, we are committing ourselves to addressing modern-day redlining by making far more robust use of our fair lending authorities.[27]

60.     In July 2023, Michael S. Barr, Vice Chair for Supervision, Board of Governors of the Federal Reserve Bank, discussed "digital redlining" at the National Fair Housing Alliance's ("NFHA") 2023 National Conference in Washington, D.C.[28]  Mr. Barr described the "risks" faced by "bank[s]" that engage in "digital redlining" and how those "risks are amplified when a [bank's] model is opaque and lacks a sufficient degree of explainability" as to how the bank's "data, variables, and other features inform [its] credit decisions":

If we determine that a bank has engaged in a pattern or practice of discrimination, we refer the matter to the Department of Justice (DOJ).  *Federal Reserve referrals have resulted in DOJ actions in critical areas, such as redlining . . . . [D]igital redlining in marketing—the use of criteria to exclude majority-minority communities or minority applications—is one risk, and it has already been the subject of several settlements, including one several years*

---

[27] *Id.*

[28] Michael S. Barr, Vice Chair for Supervision, Board of Governors of the Federal Reserve Bank, Furthering the Vision of the Fair Housing Act, at "Fair Housing at 55—Advancing a Blueprint for Equity," National Fair Housing Alliance 2023 National Conference, Washington, D.C., https://www.federalreserve.gov/newsevents/speech/barr20230718a.htm.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

*ago involving the NFHA and Facebook.*[29]  Digital redlining may result if advertisers select their audiences based on a characteristic that is correlated with protected characteristics.8 New technologies can also result in "reverse redlining," or steering in the advertisement of more expensive or otherwise inferior products to minority communities.

\* \* \*

These risks are amplified when a model is opaque and lacks a sufficient degree of explainability—the degree to which the bank can understand how data, variables, and other features inform the credit decisions.

**4.    Wells Fargo's Board Knew that Discrimination in Lending Is a Mission-Critical Risk for The Company, and Yet the Board Did Nothing to Assess Whether Its Algorithm Engaged in Redlining**

61.    Wells Fargo and its Board have repeatedly failed to address the fact that the Company's algorithm engaged in digital redlining, despite recognizing the importance of ensuring that the Company must not discriminate against minority borrowers.  Wells Fargo has a long history of discriminatory lending practices that have cost the Company and its stockholders hundreds of millions of dollars.  For example, in July 2012, the DOJ announced a $184.3 million settlement with Wells Fargo stemming from claims that, between 2004 and 2008, the Company engaged in a pattern or practice of discrimination against qualified African-American and Hispanic borrowers in its mortgage lending.[30]  Specifically, the DOJ alleged that Wells Fargo unfairly steered Black and Hispanic homeowners into subprime mortgages and charged them higher fees and interest rates than it did non-Hispanic White borrowers with similar credit profiles.[31]

---

[29] *Id.* (citing NFHA, *et. al*, Summary of Settlements Between Civil Rights Advocates and Facebook (March 19, 2019), https://nationalfairhousing.org/wp-content/uploads/2022/01/3.18.2019-Joint-Statement-FINAL-1.pdf).

[30] *Press Release, Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

[31] *Id.*

---

19

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

62.     More recently, in 2019, the Company settled claims brought by the City of Philadelphia ("Philadelphia") alleging discriminatory lending practices.[32]  The lawsuit in question, filed in May 2017, averred that beginning in 2004, the Company violated the FHA by steering African-American and Hispanic borrowers toward high-cost or high-risk loans even when those borrowers' credit permitted them to obtain more advantageous loans.  Philadelphia further claimed that the Company was aware of this practice and, in fact, incentivized the marketing of high-cost or high-risk loans to minorities.  Although the Company did not admit liability, Wells Fargo agreed to settle the case for $10 million, with $8.5 million of that money allocated for grants for down payments and closing cost assistance for low- and moderate-income persons and households within Philadelphia's limits.[33]

63.     In March 2020, Maxine Waters and Al Green submitted a detailed 74-page Report Prepared by the Majority Staff of the Committee on Financial Services, U.S. House of Representatives, titled "The Real Wells Fargo:  Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight."   The report concluded that Wells Fargo "failed to correct serious deficiencies in its infrastructure for managing consumers and complying with the law.  As a result, Wells Fargo's customers have been exposed to countless abuses, including racial discrimination . . .."  The report further concluded that "Wells Fargo's board failed to hold senior management accountable for the Bank's lack

---

[32] *City of Philadelphia v. Wells Fargo & Co*., No. 17-cv-02203-AB (E.D. Pa. 2019), ECF No. 1. *See also* Jeff Blumenthal, *Wells Fargo agrees to settle discriminatory lending lawsuit brought by City of Philadelphia*, Phila. Bus. J. (Dec. 16, 2019), https://www.bizjournals.com/philadelphia/news/2019/12/16/wells-fargo-agrees-to-settlement-discriminatory.html#:~:text=The%20City%20of%20Philadelphia%20has%20reached%20a%20settlement%20in%20its,%2D%20and%20moderate%2Dincome%20residents.

[33] *See* Press Release, City of Philadelphia and Wells Fargo Resolve Litigation (Dec. 16, 2019), https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

of progress under the consent orders, despite the performance concerns raised by regulators and certain board members."[34]

64.     In August 2020, Wells Fargo issued its 2020 ESG Report, in which the Company noted that, based on interviews with key stakeholders and stockholders, including the California State Teachers' Retirement System ("CalSTRS"), that diversity, equity, and inclusion ("DEI") issues were a top priority for the Company's stockholders.  The ESG Report stated that the topics "most significant to our internal and external stakeholder . . . [included] . . . [d]iversity and inclusion."

65.     In December 2020, two stockholders of Wells Fargo issued a demand on the Company requesting that it "take action to recover damages for alleged misconduct and correct alleged, deficiencies in the Company's controls relating to: (i) minority borrowing practices," and the Company's compliance with certain consent orders discussed below, among other things (the "December 2020 Demand").[35]  In response, on January 26, 2021, the Board delegated the consideration of the demand to a Demand Review Committee consisting of Board members Steven Black and Mark Chancy.[36]  While the Demand Review Committee evaluated how to respond to the December 2020 Demand, on May 6, 2021, six Wells Fargo PhDs published an article titled *Bias, Fairness, and Accountability with AI and ML Algorithms* on arXiv, an open-access Cornell University archive of scholarly articles in the fields of computer science, quantitative finance, statistics, and economics, among others (the "May 2021 Article").  The May 2021 Article relied on several Wells Fargo Internal Reports and was authored by Wells Fargo employees well-

---

[34] The Hon. Maxine Waters & The Hon. Al Green,  *The Real Wells Fargo: Board & Management Failures, Consumer Abuses, And Ineffective Regulatory Oversight*, U.S. HOUSE OF REPRESENTATIVES (March 2020), https://www.congress.gov/116/meeting/house/110719/documents/HHRG-116-BA00-20200311-SD003.pdf.

[35] Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank National Association Held on October 25-26, 2021 (WF_DS_000001943 at 1959-60).

[36] *Id.* at 1961.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

positioned to understand whether Wells Fargo's lending algorithm resulted in discrimination: Nengfeng Zhou (SVP, Principal Quantitative Analytics Consultant), Zach Zhang (former Wells Fargo Machine Learning and AI Research employee), Vijayan N. Nair (Head, Statistical Learning and Advanced Computing), Harsh Singhal (former Wells Fargo Head of Decision Science and AI Validation, Managing Director), Jie Chen (Head of Decision Science and Artificial Intelligence Model Validation, Corporate Model Risk), and Agus Sudjianto (EVP, Head of Corporate Model Risk).

66.    The May 2021 article stated that a "hot topic" regarding the use of artificial intelligence ("AI") and machine learning ("ML") to make financing decisions is the "potential for bias and lack of fairness." The article explains that both the data supporting a lending algorithm and its machine learning can result in discrimination. For example, "[h]istorical data are often skewed towards, or against, particular groups" and "insufficient attention is being paid to inherent biases in the data collection mechanisms and lack of representation." In addition, the article explained that "[d]ata bias together with poor optimization of algorithms can cause severe harm to protected groups." The article then provided proposed solutions for de-biasing and mitigating unfairness in lending algorithms.

67.    Despite the clear magnitude of the risk that discriminatory lending practices presented to Wells Fargo, the Board did nothing to address or even assess whether Wells Fargo's lending algorithm engaged in so called "digital redlining." Ten months after receiving the December 2020 Demand, at the Board's October 26, 2021 meeting, Board member Chancy "reported that after weighing all of the above considerations, the Committee recommends that the Board reject the Demand because it is not in the Company's best interests to conduct further investigation into the Demand's subject matter or the merits

of the allegations, commence litigation, alter ongoing Company and Board compliance efforts or take other action as requested in the Demand at this time."[37]

68.     Following the Board's failure to act in response to the December 2020 Demand, Wells Fargo would pay $1 billion to settle a lawsuit related to its compliance with the consent orders and face a flood of lending discrimination lawsuits.  Christopher Williams, the first of **fourteen plaintiffs**, filed a class action lawsuit against Wells Fargo for redlining in the U.S. District Court for the Northern District of California on February 17, 2022 (No. 3:22-cv-00990, the "*Williams* Action").  The *Williams* Action alleged that in determining home loans, interest rates, and mortgage points, Wells Fargo intentionally used factors to determine eligibility for home loan rates, terms, and conditions that facilitate redlining and reverse redlining against and disfavoring African American borrowers.  The Wells Fargo Board does not appear to have even bothered to discuss the *Williams* Action after it was filed.

### 5.     *Bloomberg's* March 2022 Investigation Confirms Wells Fargo's Systematic Discrimination Against Black and Hispanic Borrowers

69.     On March 11, 2022, *Bloomberg* published the results of its analysis of nationwide data published under the Home Mortgage Disclosure Act from more than 8 million completed applications for conventional refinancing loans from 2020.[38]  The results of the study were striking:  Wells Fargo approved only 47% (and rejected 53%) of Black mortgage applicants in 2020, by far the worst record among its peers when considering refinancing for Black homeowners.  Wells Fargo also rejected 47% (and approved 53%) of Hispanic mortgage applicants.  In comparison, the Company approved 72% (and rejected only 28%) of all white homeowners' refinancing applications during that same year.  The chart

---

[37] *Id.*

[38] Shawn Donnan, *et al.*, *Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom*, Bloomberg (Mar. 11, 2022), https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

below, created by *Bloomberg*,[39] compares Wells Fargo's approval rate by race relative to its peers.  While

Black applicants overall had a lower approval rate than white applicants across the board, Wells Fargo

had the largest disparity between the two groups and rejected more Black homeowners' applications than

it accepted:



Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

70.    Moreover, the data revealed that "the highest-income Black applicants . . . had an approval

rate about the same as White borrowers in the lowest-income backet."[40]   Stated differently, "Wells

Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for

all but the highest-income Black applicants."

---

[39] *Id.*
[40] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

71.     As a result of Wells Fargo's discriminatory practices, the Company was the ***only*** major lender in the United States that "approved a smaller share of refinancing applications from Black homeowners in 2020" than it had in 2010.  Wells Fargo's "47% approval rate was its second lowest during the past decade."[41]

72.     While disparate treatment is a problem throughout the banking industry, Wells Fargo is by far the worst among its peers when it comes to favoring white over Black applicants as it was the ***only*** major U.S. lender in 2020 that rejected more Black homeowner refinancing applications than it accepted.  JPMorgan Chase & Co., for example, approved 81% of Black homeowners' refinancing applications in 2020 and 90% of white homeowners' applications.  Bank of America Corp. approved 66% of its Black

_____

[41] *Id.*

applicants while approving 78% of White applicants.  Rocket Mortgage LLC approved 79% of Black applicants and 86% of white ones.  These numbers stand in stark contrast to Wells Fargo's 47% approval rate for Blacks in 2020.

73.     Also troubling is that Wells Fargo was the only lender among its peers to approve a smaller share of refinancing applications from Black homeowners in 2020 when compared to 2010.  In other words, for a 10-year period Wells Fargo was the only major lender to **reduce** its overall percentage of refinancings for Black borrowers when compared to Whites.

74.     Following the *Bloomberg* publication Aaron Braxton (No. 3:22-cv-01748) (the "*Braxton* Action") and Alfred Pope (No. 3:22-cv-01793) filed class actions against Wells Fargo in the U.S. District Court for the Northern District of California alleging the Company's lending algorithm engaged in digital redlining.

75.     In addition, on March 18, 2022, Senator Sherrod Brown announced that he, joined by Senators Dick Durbin, Tina Smith, Raphael Warnock, Elizabeth Warren, Ron Wyden, Jon Ossoff, Jeff Merkley, Alex Padilla, Bernie Sanders, and Mark Warner had sent a letter to the Department of Housing & Urban Development ("HUD") and CFPB to request a review of Wells Fargo's mortgage loan refinance processes amid concerns and reporting that suggested Black and Hispanic borrowers were less likely to be approved for refinance loans in 2020 as interest rates hit record lows.[42]

76.     On March 25, 2022, *Bloomberg* published a second article related to Wells Fargo's persistent racial gap in mortgage refinancing based on new data from loans in 2021.[43]  The article reported

---

[42] Majority Press Release, *Brown, Colleagues Call for Review of Wells Fargo Refinancing Process* (Mar. 17, 2022), https://www.banking.senate.gov/newsroom/majority/brown-colleagues-review-wells-fargo-refinancing-process.

[43] Ann Choi, *et al.*, *Wells Fargo Faces Persistent Racial Gap in Mortgage Refinancing,* Bloomberg (Mar. 25, 2022), https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

26

that while the lending rates for Black and Hispanic homeowners had improved over the prior year, Wells

Fargo "continued to have the lowest approval rate for Black borrowers of any major lender."  The chart

below, created by *Bloomberg*,[44] compares Wells Fargo's loan approval rate by race relative to its

competitors.



### 6.   Board-Level Documents Confirm the Board's Failure to Implement a Mission-Critical Reporting Structure to Prevent Redlining

77.    While it has never assessed whether and how Wells Fargo's algorithms may be causing

the Company to engage in redlining, Wells Fargo's Board has repeatedly recognized that discrimination

in lending is a growing area of risk, making it a "mission-critical" legal and regulatory compliance issue

for the Company.  For example, during the Board's August 11, 2020 Corporate Responsibility Committee

meeting, the Committee recognized "minority lending distribution as an emerging risk" and Eric Brooks,

Wells Fargo's Head of Fair Lending, HDMA and CRA Compliance stated that "residential mortgage

redlining continues to be a priority issue for regulators and the [DOJ] and discussed information

regulators and the DOJ review for redlining, including comparisons of the Company's performance

---

[44] *Id.*

against peers."[45]  During this same meeting, however, in discussing "current and emerging Fair Lending Issues and Trends," Mr. Brooks concluded that "monitoring activities had ***not identified any systematic fair lending risk***"; that "control effectiveness has improved"; and that "***fair lending Compliance*** . . . provides challenge to business controls as ***isolated risks*** are identified."[46]  As explained above, public mortgage data reviewed by *Bloomberg* demonstrated that the risk Wells Fargo was discriminating against Black Americans was far from isolated but involved hundreds of thousands of applications—and hence, was in fact systemic.

78.    Also, during the "August 11, 2020 Corporate Responsibility Committee Meeting" the "Key Highlights" included a "Fair Lending and CRA Update" which stated:

- Fair Lending Oversight monitoring has not detected systemic fair lending risk for the enterprise.

- ***Emerging residential mortgage minority lending distribution (redlining) risk*** – efforts are underway to strengthen minority lending distribution in identified markets."

79.    On September 22, 2022, United States Senators Sherrod Brown, Elizabeth Warren, and Robert Menendez issued a press release noting that they "Hold Wells Fargo Accountable for Conducting Misleading Interviews with Women and Minority Candidates." The press release stated that the Senators had "deep concern regarding recent reports that Wells Fargo conducts 'fake interviews' with women and minority candidates for positions that have already been filled."  The press release further noted that as reported by *The New York Times*, Wells Fargo conducted these interviews to "satisfy an internal goal to interview at least one woman and one person of color for each open position—a goal that was meant to increase diversity among Wells Fargo's workforce."  The Senators further noted that these revelations

---

[45] Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Company Held on August 11, 2020 (WF_DS_000003600 at 3605).

[46] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

"also may represent a pattern of misleading shareholders and federal and state regulators in oversight of Wells Fargo's execution of nondiscrimination laws and broader, public commitment to diversity, equity, and inclusion."

80.    Other internal documents similarly demonstrate that prior to the *Bloomberg* investigation, Wells Fargo's Board failed to have a mission-critical reporting structure in place to monitor the risk of discriminatory redlining.  For example, an April 25-26, 2022 "Enterprise Risk Report" (the "April 2022 Risk Report") that was "Prepared for [the] Wells Fargo Board of Directors" stated under the bullet point "Mortgage Fair Lending" that "[m]anagement will provide data to illustrate why the company's approval rates for black and white mortgage refinance rates substantially differ in response to a recent article involving MHDA data[.]"[47]  In other words, the Director Defendants apparently failed to take steps— prior to the public release of the *Bloomberg* investigation—to obtain and review relevant lending data, including data comparing Wells Fargo's lending statistics to its peers, in order understand "why" the Company's approval rates for Black applicants was significantly lower than White applicants.

81.    Indeed, according to the documents that Wells Fargo produced to Plaintiffs (in connection with Plaintiffs' Section 220 books-and-records investigation), this April 2022 Risk Report was the first instance in which the Board had requested and/or received lending data to assess (either way) whether (1) there were significant disparities in lending practices at the Company between Black and White applicants; and relatedly (2) how Wells Fargo compared to its peers.  By any measure, had the Board had effective and meaningful controls in place to monitor the potential for redlining Black applicants, they would have requested the same or similar data that *Bloomberg* reviewed much sooner than April 2022.

---

[47] *See* Wells Fargo's April 25-26, 2022 Enterprise Risk Report prepared for the Company's Board of Directors (WF_DS_Supp000001119-1121).

---

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

82.     While one April 25, 2022 presentation to the Board's Risk Committee did state that "[i]n February 2022, Wells Fargo Fair Lending Compliance completed its annual review confirming differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit factors. The review concluded that decisioning consistency processes and controls appear effective in limiting practically significant results for confirming Non-Hispanic Black applicants compared to Non-Hispanic White"—the remaining discussion of that "annual review" was redacted and withheld by Wells Fargo:[48]

- In February 2022, Wells Fargo Fair Lending Compliance completed its annual review confirming differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit factors. The review concluded that decisioning consistency processes and controls appear effective in limiting practically significant results for conforming Non-Hispanic Black applicants compared to Non-Hispanic White

**REDACTED-BEP-CFPB**

83.     The results of any such review were not produced to Plaintiffs pursuant to § 220 suggesting they were never reviewed or discussed at the ***Board*** level.  And even if they had been, the annual review's apparently conclusion that "decisioning consistency processes and controls appear effective in limiting practically significant results for conforming Non-Hispanic Black applicants compared to Non-Hispanic White" is utterly contradicted by *Bloomberg's* findings, which as discussed below, the Board conceded were "***factually accurate***."[49]

84.     With the publication of the March 2022 *Bloomberg* articles, Wells Fargo's discriminatory lending practices were brought into the public spotlight.  On April 25, 2022, the Company's Corporate Responsibility Committee met[50] and full Board separately met on April 25-26, 2022,[51] to discuss the

---

[48] *See* Wells Fargo's Apr. 25, 2022 Bloomberg HMDA Discussion prepared for the Company's Board of Directors (WF_DS_ Supp000001105 at 1106).

[49] *Id.*

[50] Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Company Held on April 25, 2022 (WF_DS_000005814 at 5814-5815).

[51] Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank, National Association Held on April 25-26, 2022 (WF_DS_000005818 at 5834-5835).

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

*Bloomberg* articles.  Notably, these appear to be the only meetings at which the Board discussed the *Bloomberg* articles.  Critically, the minutes of this meeting do not reflect any consideration of whether the Company's lending algorithm engaged in discriminatory redlining.  During the same meeting, Wells Fargo's Head of Home Lending admitted that the *Bloomberg* article was "***factually accurate***" and that "***mistakes were made with respect to stakeholder engagement following publication of the [Bloomberg] article***."[52]  In response to this observation, "***Scharf noted the reasons the Company did not conduct sufficient stakeholder engagement early on, including because the Company did not have all necessary data until recently***."[53]

85.     The Board's conclusion that the *Bloomberg* article was "***factually accurate***" is corroborated by an April 25, 2022 presentation "Prepared for [the] Risk Committee of Wells Fargo Board of Directors" titled "*Bloomberg* HMDA Discussion" which discussed that "[i]n early March 2022, *Bloomberg* posted an article using raw public HMDA data stating Wells Fargo's 2020 approval rates for Home Lending Conforming Conventional Refinance applications for Non-Hispanic Black customers were ***significantly below industry peers***.  In late March 2022, they posted another article using the same raw public HMDA data stating while 2021 approval rates were better than 2020, they were still ***below industry peers***."[54]  The presentation concluded that "[t]he *Bloomberg* story" was "***factually accurate***" and acknowledged the Company's "***approval gap***" and "***difference in approval rates***" and in particular "***African American (AA) approval rates***."[55]  The presentation also recognized the need to "[w]ork . . . to

---

[52] *Id.*

[53] *Id.*

[54] *See* Wells Fargo's Apr. 25, 2022 Bloomberg HMDA Discussion prepared for the Company's Board of Directors (WF_DS_ Supp000001105 at 1106).

[55] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

address the *Bloomberg* assertions and the approval gap . . . ."[56]  In fact, the presentation confirmed that in 2020, whereas Wells Fargo "Denied for Credit" only *7%* of "White, Non Hispanic Refinance Applications," it denied *19%* of "African American Refinance Application[s]" and that this disparity of 7%-19% (nearly three-to-one) was vastly different from competitors such as JP Morgan Chase & Co. ("Chase"), Bank of America ("BOA"), and Quicken, where the comparable percentage disparities were 1%-2%, 4%-10%, and 1%-1%, respectively:

**2020 Conforming Refinance, Primary Residence, 1st Lien only - Sourced from Public HMDA Data (no adjustments)**

**African American Refinance Application Volume**

|  | WF | | Chase | | BOA | | Quicken | |
|---|---|---|---|---|---|---|---|---|
| Apps | 14,048 | 100% | 6,339 | 100% | 4,276 | 100% | 36,538 | 100% |
| Denied for Credit | 2,694 | 19% | 141 | 2% | 409 | 10% | 419 | 1% |
| All Other Denial Reasons | 4,554 | 32% | 800 | 13% | 691 | 16% | 5,988 | 16% |
| Approved | 6,800 | 48% | 5,398 | 85% | 3,176 | 74% | 30,131 | 82% |

**White, Non Hispanic Refinance Application Volume**

|  | WF | | Chase | | BOA | | Quicken | |
|---|---|---|---|---|---|---|---|---|
| Apps | 134,739 | 100% | 98,711 | 100% | 49,514 | 100% | 443,613 | 100% |
| Denied for Credit | 8,816 | 7% | 678 | 1% | 1,859 | 4% | 2,358 | 1% |
| All Other Denial Reasons | 28,160 | 21% | 6,944 | 7% | 5,445 | 11% | 48,493 | 11% |
| Approved | 97,763 | 73% | 91,089 | 92% | 42,210 | 85% | 392,762 | 89% |

86.     As the percentages above confirm, Wells Fargo's 19% denial rate for Black refinance applications was nearly *twice* BOA's, *ten times* that of Chase, and *19 times* that of Quicken.

87.     The same presentation confirmed a massive "Denial Rate Gap" between "African American" and "White, Non-Hispanic" borrowers that submitted "Refinance Applications" to Wells Fargo during 2020 and 2021.  During 2020, the "African American" "Denial Rate" was 52% compared to 28% for White, Non-Hispanic" applicants, resulting in a "Denial Rate Gap" of 24%:

---

[56] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

**2020 Conventional Conforming (1st Lien, Primary Residence) Refinance Applications – Denial Analysis**
22 percentage points of the 24 percentage points between Black and White customers were due to application of the GSE guidelines or incomplete applications

| 2020 | Reported Results | | Adjusted (removed FHA denials)[1] | |
| --- | --- | --- | --- | --- |
| | African American | White, Non- | African American | White, Non-Hispanic |
| Total Applications | 19,604 | 180,557 | 17,608 | 174,906 |
| Denial Rate | 52% | 28% | 44% | 24% |
| Denial Rate Gap | | 24% | | 20% |
| Drivers of the gap | | | | |
| Application of GSE guidelines | | 20% | | 16% |
| Incomplete applications | | 2% | | 1% |
| subtotal | | 22% | | 18% |
| Cashout refi not available | | 1% | | 1% |
| Post forbearance exit perf | | 1% | | 1% |

88.    During 2021, the "African American" "Denial Rate" was 42% compared to 20% for White, Non-Hispanic" applicants, resulting in a "Denial Rate Gap" of 22%:

**2021 Conventional Conforming (1st Lien, Primary Residence) Refinance Applications – Denial Analysis**
21 percentage points of the 22 percentage points between Black and White customers were due to application of the GSE guidelines or incomplete applications

| 2021 | Reported Results | | Adjusted (removed FHA denials)[1] | |
| --- | --- | --- | --- | --- |
| | African American | White, Non- | African American | White, Non-Hispanic |
| Total Applications | 32,583 | 233,031 | 28,710 | 225,260 |
| Denial Rate | 42% | 20% | 32% | 17% |
| Denial Rate Gap | | 22% | | 15% |
| Drivers of the gap | | | | |
| Application of GSE guidelines | | 19% | | 13% |
| Incomplete applications | | 2% | | 1% |
| subtotal | | 21% | | 14% |
| Cashout refi not available | | 1% | | 1% |
| Post forbearance exit perf | | <1 | | <1 |

### 7.    Former Wells Fargo Employees Independently Corroborate Wells Fargo's Racially Discriminatory Lending Practices

89.    Plaintiffs' private investigator spoke to a former Executive Office Case Specialist Head at Wells Fargo based in Orlando, Florida during 2020 and 2021 ("Former Employee 1" or "FE 1").

90.     FE 1's job was to investigate complaints from customers, which were mostly small businesses seeking a Small Business Administration loan or Paycheck Protection Program benefits or even credit cards via Wells Fargo and had been turned down.

91.     FE 1 investigated between 450-500 cases per year and about 30 to 40 percent of those involved some form of discrimination, mostly racial. In about 50 percent of those cases, FE 1 found the discrimination allegations were founded.

92.     According to FE 1, "Really what it would come down to is the customer would feel they were racially discriminated against and it would come down to what the policies were at the time and judgments of character," FE 1 said. "It was really my determination as to whether they were discriminated against and I would say about half the time I felt they were."

93.     Based on FE 1's work as an Executive Office Case Specialist Head, FE 1 believed Wells Fargo had discriminatory practices in lending: "In actuality I do think so," FE 1 said. "At first, I was a little skeptical.  I've been banking with Wells Fargo since I was a teenager.  I wasn't aware of the news stories about this until I started at the company.  I'd get a lot of complaints about discrimination. ***As time went on, after speaking to multiple people in different levels of positions, I did come to the conclusion that yes it was going on quite a bit.  It's the culture at the root of the company***."

94.     Plaintiffs' investigator also interviewed a former Senior Executive Escalations Representative ("Former Employee 2" or "FE 2") during June 2020 through early 2022, whose job responsibilities included resolving escalated complaints from small-business customers including complaints about discrimination.  FE 2's "job [was] to make [complaints about discrimination] go away" and keep the customer from escalating the complaint into a "formal discrimination complaint."  To do this, FE 2 was instructed by FE 2's supervisors to offer $200 to customers complaining of discrimination. FE 2 explained that "when it got really hostile we were allowed to give them $200" and that "the goal is to deescalate by offering them money, especially if it was discrimination."

### 8. Subsequent Litigation Confirms Wells Fargo's Systematic Discrimination Against Black Borrowers

95.     Following the publication of the March 25, 2022 *Bloomberg* article, seven more Wells Fargo customers filed or joined class actions against the Company in the U.S. District Court for the Northern District of California.  Winfred Thomas and Michelle Sims filed suit on March 26, 2022 (No. 3:22-cv-01931).  On April 12, 2022, Gia Gray, Bryan Brown, and Paul Martin joined the pending *Braxton* Action (No. 3:22-cv-01748).  On April 14, 2022, Sam Albury and Shaia Beckwith Simmons joined the pending *Williams* Action (No. 3:22-cv-00990).

96.     Additionally, between April 26, 2022 and November 4, 2022, four more plaintiffs filed class actions or joined existing actions against Wells Fargo asserting the Company had engaged in redlining.  Ifeoma Ebo filed suit on April 26, 2022 (No. 3:22-cv-02535) (the "*Ebo* Action").  Elretha Perkins and Laronica Johnson filed suit on June 10, 2022 (No. 3:22-cv-03455).  Terah Kuykendall-Montoya joined the *Ebo* Action on November 4, 2022 (No. 3:22-cv-0235).

97.     Also, on June 28, 2022, Congresswoman and Chairwoman of the U.S. House of Representatives Committee on Financial Services, Maxine Waters, wrote a letter to The U.S. Department of Housing & Urban Development, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau and the Office of the Comptroller of the Currency regarding Wells Fargo's unchecked misconduct ("Congresswoman Waters' Letter").[57]  The letter stated:  "[a]s I have made clear in the past, Congress has given regulators like yourselves significant tools to properly penalize Wells Fargo for its continuous wrongdoing, and based

---

[57] *See* Letter from Maxine Waters, Chairwoman of the United States House of Representatives Committee on Financial Services, to the Hon. Marcia Fudge, *et al.* (June 28, 2022), https://democrats-financialservices.house.gov/uploadedfiles/june_28th.pdf.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

on Wells Fargo's recent behavior, I am writing to urge you to escalate penalties in a way that is reflective of its history of repeat offenses."[58]

98.     Of the current abuses by Wells Fargo, Congresswoman Waters explained:

*Bloomberg* has revealed large disparities in Wells Fargo's mortgage refinancing operations.  By sheer volume, Wells Fargo was the largest bank mortgage provider to Black homeowners in 2020, and helped more Black customers refinance their homes than any other bank.  However, "only 47% of Black homeowners who completed a refinance application with Wells Fargo in 2020 were approved, compared with 72% of White homeowners…While Black applicants had lower approval rates than White ones at all major lenders, the data show, Wells Fargo had the biggest disparity and was alone in rejecting more Black homeowners than it accepted."  Consumers and homeowners deserve to be treated with respect and it is their civil right under the Fair Housing Act and Equal Credit Opportunity Act to access credit equally and fairly, regardless of the color of their skin.  Wells Fargo has continued to dismantle the little trust that the public has in it and must be held accountable to the full extent of the law.[59]

99.     The numerous class actions related to Wells Fargo's "digital redlining" have continued to progress.  On January 18, 2023, Judge James Donato issued an order consolidating the redlining class actions against Wells Fargo in the U.S. District Court for the Northern District of California into Civil Action No. 22-990 (the "Consolidated Action") and appointed interim lead counsel.

100.     The Consolidated Redlining Complaint exposed additional facts related to Wells Fargo's "digital redlining," which demonstrate that Wells Fargo violated the Equal Credit Opportunity Act (15 U.S.C. § 16901, *et seq.*), violated the Fair Housing Act of 1968 (42 U.S.C. § 3601, *et seq.*), engaged in racial discrimination (42 U.S.C. § 1981), violated the Unruh Civil Rights Act (California Civil Code § 51) and violated the California Unfair Competition Law.

---

[58] *Id.*
[59] *Id.*

101.     The lending algorithms at banks like Wells Fargo have been described by the director of the CFPB as "black boxes behind brick walls."[60]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias."[61]  In March 2022, reacting to the *Bloomberg* article discussed above, senators Elizabeth Warren and Ron Wyden, wrote separate letters to Wells Fargo's CEO, Charlie Scharf demanding that the bank produce the data and algorithms it uses to evaluate applicants and cited what they called "potentially illegal discrimination."[62]  Moreover, the fact that the public has very limited insight into the working of Wells Fargo's algorithm, makes it all the more important that the Board focus meaningful oversight to ensure Wells Fargo's lending algorithms do not discriminate against minority groups, including Blacks and Hispanics.

102.     Despite the public's limited insight into Wells Fargo's algorithm, the Consolidated Redlining Complaint brought to light numerous ways in which the Wells Fargo algorithm engages in digital redlining based on the limited information that is publicly available.

### a.      Geographic Indicators

103.     Among the overlays utilized by Wells Fargo's CORE automated underwriting processes are geographic indicators, the effect of which is modern-day redlining.  Borrowers seeking to refinance properties in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority

---

[60] Remarks of Director Rohit Chopra at a Joint DOJ, CFPB, and OCC Press Conference on the Trustmark National Bank Enforcement Action (Oct. 22, 2021), https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action.

[61] *Id.*

[62] Donnan, et al, Bloomberg News, *Wells Fargo Pressed by Senators on Race Disparity in Refinancing* (Mar. 17, 2022), https://www.bnnbloomberg.ca/wells-fargo-pressed-by-senators-on-race-disparity-in-refinancing-1.1739254.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

neighborhoods. Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low- and moderate-income census tract data within Wells Fargo's internal systems, identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in White-majority neighborhoods.

### b. Post-Close Liquidity Requirements

104.    Before March 2020, Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans. Following the Covid-19 pandemic, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers. Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts. Wells Fargo knew this would have a racially disparate impact. As explained in an April 2020 JP Morgan Chase Institute report, for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[63] In addition, while Black families have, on average, $2,000 or less in liquid savings, the typical White family has more than four times that amount.[64]

### c. Demographic Indicators

105.    Wells Fargo's automated underwriting processes use Bayesian Improved Surname Geocoding, a method that applies Bayes' Rule to predict the race or ethnicity of an individual utilizing the individual's surname and geocoded location, when that information is not otherwise provided.[65] This

---

[63] JP Morgan Chase & Co. Institute Presentation, *Racial Gaps in Financial Outcomes* (April 2020), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

[64] *Id*.

[65] Jie Chen, Wells Fargo Presentation, *Ethics and Bias in Algorithms* (June 4, 2020), https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.cfm?file=309619.pdf.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

process requires an internal determination by the Wells Fargo algorithm of which neighborhoods are associated with which racial group.

### d.      Uncorrected and Racially Biased Appraisals

106.    Wells Fargo considered uncorrected historical and current appraisal data from geographically differentiated locations in its refinance process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  According to a March 23, 2022 report by *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which Wells Fargo identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods—despite having similar neighborhood and property characteristics and amenities."[66] Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhood came in below the contract price, compared with 7.4 percent of appraisals in White neighborhoods."[67]  The below-market appraisals intentionally skew the loan-to-value calculations against Black homeowners and prospective homeowners and serve as a tool for racial discrimination.  Wells Fargo's automated underwriting system does not correct appropriately for these racial disparities in appraisals, and instead places undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by non-white homeowners.

### e.      Unjustified Increased FICO Requirements

107.    Wells Fargo's CORE system uses increased credit score requirements.  While it is impossible to know given the black-box nature of Wells Fargo's algorithm, Plaintiffs believe that Wells

---

[66] Tracy Jan, *Home Values Soared During the Pandemic, Except for These Black Families*, The Washington Post (Mar. 23, 2022), https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.
[67] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Fargo imposed a higher minimum credit score than that required for an FHA loan or a Fannie Mae-backed loan. Accordingly, if Fannie Mae required a minimum credit score of 600, Wells Fargo would require a minimum score of 620. In February 2021, it was reported that one in five Black consumers have FICO scores below 620, while one out of every 19 White consumers are in the sub-620 category.[68] A study by the Board of Governors of the Federal Reserve System analyzing federal mortgage data identified no "evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[69] And after controlling for relevant underwriting factors (Debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants [like Wells Fargo] tend to have the largest unexplained excess denials of minority applicants."[70]

### C. Wells Fargo's Hiring Practices Discriminate Against Diverse Candidates

#### 1. Joe Bruno, a Former Wells Fargo Executive in the Company's Wealth Management Division, Reported the Practice of Conducting Sham Interviews to Senior Management

108. On September 7, 2021, whistleblower Joseph Bruno, a former Wells Fargo executive in the wealth management division, sent an email to over 250 Wells Fargo employees, including three senior Wells Fargo officers at the time: Kleber Santos (Head of Diverse Segments, Representation and Inclusion, Scott Powell (Chief Operating Officer) and Mary Mack (CEO of Consumer and Small

---

[68] Natalie Campisi, *From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models*, Forbes (Feb. 26, 2021), https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[69] Neil Bhutta, et al., *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, (July 2021), at 12, n.20, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663.

[70] *Id.* at 12.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Business Banking raising concerns regarding Wells Fargo's practice of conducting sham interviews to comply with the Company's diverse hiring initiative.

109.    The email described "fake interviews [Wells Fargo] managers do that [are] directed by HR."  It further explained that when the whistleblower "brought up the fake interviews, and [that the whilstleblower] wasn't comfortable doing them, [Keith] Venderveen [one of eight regional directors overseeing Wells Fargo's core private client group] said put your head down and focus on recruiting."  Bruno further reported that he "wasn't allowed to have a 50/50 pool of diverse candidate in [his] market. . . . I was told that I was too aggressive in creating pools and benches of Black people.  I'm ready to name names."

110.    Due to Wells Fargo's ineffective internal controls, Mr. Bruno's email was never provided to the Board.

### 2.    Wells Fargo's Practice of Conducting Sham Interviews Was Reported in an "Email to Wells Fargo's Board of Directors"

111.    According to an "Employment Investigation Report" written by "Wanda Conway, Sr. Employment Investigator," on February 18, 2021, Phillip Miller, an "external job applicant," sent an "email to Wells Fargo's Board of Directors" in which Miller "complain[ed] that he experienced discrimination in the form of racist and offensive statement[s] directed toward him by the hiring manager of a position he applied for on 9/28/20 when the Wells Fargo manager told Miller 'you don't sound black'" and after which "a white female was selected for the position."[71]  According to the report, based on what he experienced, Miller questioned Wells Fargo's commitment to hiring Black candidates or

---

[71] WF_DS_000000004.

whether "his race and ethnicity were being used to reach the newly established goal to consider diverse candidates" and not an actual "commitment to hire qualified black candidates."[72]

112. Regarding Mr. Miller's February 18, 2021 "email to Wells Fargo's Board of Directors," as of February 16, 2022, Wells Fargo's corporate website stated that "Stockholders and other interested parties who wish to communicate with the Company's non-management directors may direct correspondence to . . . boardcommunications@wellsfargo.com[.]"[73]  Wells Fargo's website stated that communications sent to this website are handled differently depending on whether they are considered to concern "an ordinary business matter" or "not involving an ordinary business matter."  On one hand, "[c]ommunications involving the following will be considered an *ordinary business matter* and will be forwarded to management to research and respond, if appropriate"; on the other hand, "[c]ommunications *not involving an ordinary business matter* will be forwarded by the Company":

> To an individual director, only if the communication names a specific director
>
> To the Chair of the Audit and Examination, Corporate Responsibility, Credit, Finance, Governance and Nominating, Human Resources, or Risk Committee depending on the subject matter and if the communication does not name a specific director
>
> To the Chair of the Audit and Examination Committee if the communication is a complaint or concern involving accounting, internal accounting controls, or auditing matters, whether or not it's specifically addressed to the Audit and Examination Committee.[74]

113. On December 13, 2021, the Board's Governance and Nominating Committee received a presentation from Michael Cleary, Head of Sales Practices and Conduct Management, which was titled

---

[72] *Id.*

[73] *See* https://web.archive.org/web/20210216141028/https://www.wellsfargo.com/about/corporate/governance/contact/.

[74] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

"Board of Directors Communications" and whose "Purpose [was to] [p]rovide an update on monitoring, routing, and escalation of Board communications in accordance with the Board Communications Policy and Procedures."[75]   The presentation categorized Mr. Miller's "2/18/21" email to the Board as a "*Non-Ordinary*" communication, and noted that Mr. Miller asked whether "he was interviewed only as a means for the hiring executives to appear as if they are pursuing diverse candidates":[76]

### Non-Ordinary communications detail (January through October 2021)

| Date Received | EAP Case # | Executive Summary | Conduct Management Intake Status |
|---|---|---|---|
| | | REDACTED-NON-RESPONSIVE CONTENT POTENTIALLY INCLUDING PRIVILEGE, WORK PRODUCT, CSI, AND/OR SAR MATERIAL | |
| 2/25/2021 | 474478 | Allegation in which a former employee shares concerns regarding a former Management Committee member's behavior. Former employee provides links to social media posts that he believes are discriminatory and include disparaging comments towards senior leadership and Wells Fargo. He feels that the employee's actions pose a risk to the bank and its shareholders. | Closed 07/22/2021; Unsubstantiated. The allegations of racial discrimination, inappropriate social media postings, account fraud, and other misconduct in violation of Wells Fargo's policies and procedures were handled by Wells Fargo's legal department and outside counsel. The investigation found no evidence to substantiate the allegations |
| 2/18/2021 | 469803 | Allegation of race discrimination during an interview process for a Head of Merchant Services position conducted by Head of Small Business Banking and Consumer Lending Shared Services Leader. The applicant shares concerns about his interview process as it relates to comments made by the Chief Executive Officer (CEO) pertaining to Wells Fargo's commitment to diversity. He speculates that he was interviewed only as means for the hiring executives to appear as if they are pursuing diverse candidates. | Closed 5/13/21; Unsubstantiated. Employment Investigations found that allegations of discrimination related to race in violation of the following policies were unsubstantiated: Anti-Harassment, Employment and Hiring, Affirmative Action, Equal Employment Opportunity (EEO), and Diversity & Inclusion. |

114.   Under the Company's above policy concerning emails to the Board, how Mr. Miller's February 18, 2021 email to the Board should have been handled depended on whether the Company categorized it as an "ordinary" or "non-ordinary" business matter.[77]   Because the Company categorized

---

[75]   Michael Cleary (Head of Sales Practices and Conduct Management), Board of Directors Communications prepared for Governance and Nominating Comm. of Wells Fargo (Dec. 13, 2021) (WF_DS_000004661 at 4666).

[76]   *Id.*

[77]   For example, if Mr. Miller's email "name[d] a specific director" or concerned "accounting, internal accounting controls, or auditing matters" it would be sent to that specific director or to "the Chair of the

Mr. Miller's February 18, 2021 email as "[n]on-ordinary," under Company policy, that email would have been "forwarded by the Company" to "the Chair of the Audit and Examination, Corporate Responsibility, Credit, Finance, Governance and Nominating, Human Resources, or Risk Committee depending on the subject matter and if the communication does not name a specific director[.]"  Considering the fact that Mr. Miller's email was described in the December 13, 2021 presentation to the Board's Governance and Nominating Committee, together with the "Board Communications Policy and Procedures" as described on the Company's website, it is logical that the Board Committee Chair to whom Mr. Miller's email was forwarded was the Chair of the Governance and Nominating Committee, which at the time was Donald M. James.[78]

### 3.   *The New York Times* Investigation

115.   On May 19, 2022, *The New York Times* published an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interview."[79]  The article reported that Mr. Bruno, who had previously sent a whistleblower email to 250 Wells Fargo employees regarding, among other things, Wells Fargo's practice of conducting sham interviews, had "long been troubled by the way his unit handled certain job interviews."[80]  Bruno alleged that for many open positions, employees would interview a "diverse" candidate (a woman or person of color, according to Wells Fargo) in keeping with the bank's yearslong informal policy. [81]  However, Bruno noticed that often, the diverse candidate would

---

Audit and Examination Committee."  *See* https://web.archive.org/web/20210216141028/https://www.wellsfargo.com/about/corporate/governance/contact/.
[78] Mr. James resigned from the Wells Fargo Board in April 2021.
[79] Emily Flitter, *At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews,* The N.Y. TIMES (May 19, 2022), https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html.
[80] *Id.*
[81] *Id.*

be interviewed for a job that had already been promised to someone else.[82]  Bruno said that when he complained to his bosses about the behavior, his claims were dismissed.[83]  Bruno believes he was later fired for retaliation against him for telling his superiors that the fake interviews were "inappropriate, morally wrong, ethically wrong."[84]

116.    *The New York Times'* May 19, 2022 article stated that Bruno was one of seven current and former Wells Fargo employees who asserted they were instructed in the bank's wealth management unit to interview diverse candidates for jobs that no longer existed.[85]  Five others said they were aware of the practice or helped to arrange it.[86]  The current and former employees said that the interviews were more about helping Wells Fargo to record its diversity efforts (in anticipation of potential regulatory audits) rather than hiring more women or people of color.[87]

117.    The Company issued a statement for the May 19, 2022 article stating that Wells Fargo expected all employees to follow its hiring policies and guidelines and that "to the extent that individual employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it."[88]  The spokeswoman did state that she was aware of "informal directives" about hiring diverse candidates, but stated those rules were from an earlier era that Wells Fargo's current leaders "had nothing to do with."[89]

---

[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

118.    *The New York Times* article also discussed the *Slaughter* Action, which was a case filed in 2013 by a group of Black financial advisers at Wells Fargo accusing Wells Fargo of "systemic, intentional race discrimination" through the implementation of policies that segregated its workforce and disparately impacted its African-American employees. [90]  In May 2017, an Illinois federal judge approved a $35.5 million settlement between Wells Fargo Advisors LLC and a class of the Company's African-American Employees, ending the class's claims of discriminatory treatment with changes to programs they said encouraged racial disparities. [91]  The agreement instructed bank executives to examine their demographic data and initiate opportunities for African-American financial advisers, as well as designate specific recruiters and coaches for African-American employees. [92]  Under the settlement, Wells Fargo's senior executives were also supposed to collaborate with the Company's African-American employees to get feedback on its diversity efforts. [93]

119.    On May 27, 2022, *Business Insider* published an article following up on *The New York Times* article, based on an interview it conducted with Kleber Santos, Wells Fargo's Head of Diverse Segments. [94]  The article reported that *Business Insider* attempted to confirm whether the *The New York Times* continued to stand by its reporting:  "As is standard journalistic practice, we sought comment from Wells Fargo, and included it in the story.  This comment did not refute our findings.  *The New York Times* stands behind our May 19 article."

---

[90] Vin Gurrieri, *Wells Fargo Workers Seek Final OK for $35M Race Bias Deal*, Law360 (May 1, 2017), https://www.law360.com/articles/918990/wells-fargo-workers-seek-final-ok-for-35m-race-bias-deal.

[91] See Diana Novak Jones, *Wells Fargo Exits Race Bias Suit With $35.5M Settlement*, Law360 (May 4, 2017), http://stowellfriedman.com/files/images/stories/Wells_Fargo_Race_Settlement.pdf.

[92] *Id.*

[93] *Id.*

[94] See Marguerite Ward, *Wells Fargo Exec Responds to Reports That it Denied Mortgages to Black Applicants and Held Sham Job Interviews* (May 27, 2022), A Wells Fargo Exec Answers Questions Over Diversity Controversies (businessinsider.com).

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

120.    On May 31, 2022, Senator Sherrod Brown, Chairman of the U.S. Senate Committee on Banking, Housing, and Urban Affairs, sent a letter to the Company's President & CEO, Charles Scharf, noting, *inter alia*, that "[r]ecent revelations of racial disparities in mortgage lending, [and] fake job interviews for minority and female candidates . . . are troubling as Wells Fargo, unfortunately, continues to demonstrate its inability to address its longstanding risk management failures." [95]  Senator Brown added that "Wells Fargo's ongoing, failed efforts to combat lending discrimination and increase diversity within its ranks raise questions about your ability to fix the myriad internal controls, risk management, and general governance issues that have been a problem for nearly a decade." [96]

121.    In June 2022, U.S. Representative Maxine Waters urged several federal agencies, including the OCC and the FDIC, to "properly penalize Wells Fargo for its continuous wrongdoing," noting "commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that financial institutions hold.  It is unacceptable that Wells Fargo would mislead applicants and the public."[97]

122.    On June 6, 2022, whistleblower Bruno posted an article he wrote on LinkedIn which stated that the "fake interviews" were "an open secret at Wells Fargo, and it has gone on for years."[98]

---

[95] Letter from Chairman Sherrod Brown to Charles W. Scharf (May 31, 2022), https://www.banking.senate.gov/imo/media/doc/Brown%20WF%20Scharf%20Letter%2005312022.pdf.

[96] *Id.* at 2.

[97] Press Release, Chairwoman Waters calls on Regulators to Hold Wells Fargo Accountable for Continued Troubling Patterns and Practices of Anti-Consumer Behavior (June 29, 2022), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409612.

[98] https://www.linkedin.com/pulse/fake-interviews-dei-joe-bruno-/?trk=public postcontentshare-article.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

123.    On June 9, 2022, *The New York Times* published an article titled "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices."[99]  The June 9, 2022 article noted that Federal prosecutors in New York opened a criminal investigation into whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates. [100]  The investigation was being conducted by members of a newly created civil rights unit inside the criminal division of the Manhattan U.S. attorney's office.  The article stated that the investigation was spurred by the May 19 report in *The New York Times* that centered on whistleblower Joe Bruno. [101]

124.    Also *on* June 9, 2022, *Forbes* published an article regarding the federal investigation.[102] That same day, Wells Fargo issued a press release confirming that "[e]arlier this week, the company temporarily paused the use of its diverse slate guidelines," and that "[d]uring this pause, the company is conducting a review so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented—and so we can have confidence that our guidelines live up to their promise."[103]

---

[99] *See* Emily Flitter, *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*, N.Y. TIMES, (June 9, 2022), https://www.nytimes.com/2022/06/09/business/wells-fargo-fake-interviews-investigation.html.

[100] *Id.*

[101] *Id.*

[102] Joe Walsh, *Feds Reportedly Launch Criminal Probe Into Wells Fargo Following Allegations Of Sham Job Interviews*, FORBES (June 9, 2022), https://www.forbes.com/sites/joewalsh/2022/06/09/feds-reportedly-launch-criminal-probe-into-wells-fargo-following-allegations-of-sham-job-inte views/?sh=41c6ea2954f7.

[103] Press Release, Wells Fargo response to New York Times article (June 9, 2022), https://newsroom.wf.com/English/news-releases/news-release-details/2022/Wells-Fargo-response-to-New-York-Times-article/default.aspx.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

125.    On June 14, 2022, Joe Bruno published a video discussing the reaction to *The New York Times* report.[104]  In this video, Mr. Bruno explained that "fake interviews" were "an open secret at Wells Fargo and it has gone on for years."[105]

126.    Mr. Bruno proceeded to give "recent examples of fake interviews" including (1) an example from 2021 where a Wells Fargo team internally selected a candidate for a financial consultant position, but was obliged by HR to conduct interviews which under their best practices would include at least one diverse candidate; (2) another example from 2021 where a Wells Fargo team was changing an existing role from "Financial Advisor" to a "Financial Consultant" where HR required interviews to be conducted which under their best practices would include at least one diverse candidate; and (3) the "market leader" position for the combination of the Ford Lauderdale market and the Miami market, where Wells Fargo conducted fake interviews for the prior leaders of the Fort Lauderdale and Miami Markets— where the preselected candidate was an unqualified employee from the Wells Fargo corporate office with no relevant experience.

127.    In addition, Bruno explained that if a candidate is brought in for a sham interview, they will be assigned an artificially deflated score based on their interview performance so that the pre-selected candidate would get hired.  This score permanently followed the applicant should they seek subsequent employment with Wells Fargo at any time and therefore harmed the candidate prospectively.

128.    Bruno's video led to several former Wells Fargo employees coming forward. The comment section below his YouTube video reflects the opinions of several former Wells Fargo employees. Three in particular (from users @tecben, @johnthesavage-ufc8182, and Dawn G) purport to

---

[104]    Joe Bruno, *FAKE INTERVIEWS at Wells Fargo*, YouTube (June 14, 2022), https://www.youtube.com/watch?v=jopIT8m6-Rk.
[105]    *See Wells Fargo pauses diverse slate hiring policy after reports of fake job interviews*, Reuters (June 6, 2022), https://www.reuters.com/business/wells-fargo-pauses-diverse-slate-hiring-policy-after-reports-fake-job-interviews-2022-06-06/.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

have insider knowledge validating Joe Bruno's assertions. @johnthesavage-ufc8182 commented that "I worked at Wells Fargo and Joe is correct about what's happening with interviews. . . ." Dawn G commented: "Thank you for speaking on this I was with Wells Fargo Advisors for 18 years, I can attest to these practices and am available for comments if needed."

129.    Upon information and belief, "Dawn G" may be Dawn Gray of Plainfield, New Jersey.[106] Another former Wells Fargo employee, @tecben commented "When I worked for WF it was an unwritten rule that the regional manager already filled job openings and we would have to ask around if it was a 'real' open position."   Other information on @tecben's profile suggests that @tecben is Benjamin Paniagua[107] who worked at Wells Fargo for over six years.

130.    On June 22, 2022 *Business Insider* reported that Don Banks was a victim of Wells Fargo's sham interviews, during two separate interviews conducted in 2016 and 2017.[108]

131.    Following the May 2022 *New York Times* report, a securities fraud class action was filed against Wells Fargo accusing the Company of damaging its stock value and thereby harming its stockholders by conducting alleged fake interviews to falsely appear that it was complying with an internal policy mandating diverse pools of job candidates.[109]   The complaint alleges that, throughout the class period, the Company made materially false and misleading statements or omissions regarding its commitment to diversity in the workplace and that when the truth was ultimately revealed, class members suffered significant losses.[110]   The U.S. Attorney's Office for the Southern District of New York also

---

[106] https://www.linkedin.com/in/dawn-gray-28316b142
[107] https://www.linkedin.com/in/benpaniagua
[108] Urooba Jamal, *Wells Fargo Interviewed me just to meet its diversity criteria. I felt less than human when I found out*, INSIDER (June 22, 2022), https://www.businessinsider.com/wells-fargo-fake-job-interviews-diversity-feel-less-than-human-2022-6.
[109] *Ardalan v. Wells Fargo & Co.*, No. 3:22-cv-03811 (N.D. Cal. 2022).
[110] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

launched a criminal investigation into the Company's diversity hiring and practices.[111]  Furthermore, in August 2022, in its Form 10-Q for the quarterly period ended June 30, 2022, Wells Fargo announced that the U.S. Department of Labor and other government agencies had initiated an inquiry and investigation into the Company's hiring practices related to diversity.[112]

132.    Following the suspension of Wells Fargo's diverse slate hiring policy in June 2022, the Company announced on August 1, 2022 that its hiring policy will be reinstated effective August 19, 2022.[113]  According to *Reuters*, the Company expects 50% diversity in both the candidates interviewed, as well as in the panel of interviewers.[114]  For its part, rather than conducting an investigation into the sham interview scandal, the Board simply "discussed conclusions that may be drawn from the data," decided without speaking to any interview candidates that the Company lacked a systemic problem and discussed the importance of pursuing a public-relations campaign "proactively engaging on the issue and communicating the Company's position that the data does not support the allegations."[115]

### 4. The Board Knew Wells Fargo's Hiring and Promotion of Diverse Candidates Were Mission-Critical Risks, But Failed To Put in Place Appropriate Internal Controls to Ensure that Fake Interviews of Minority Candidates Did Not Occur

133.    As explained above, Wells Fargo has a history of discriminatory practices in its hiring and promoting of monitories.  For example, on December 9, 2019, the Wells Fargo Board received a "Monitoring Company Culture Report" that highlighted the Company's weak internal controls related to

[111] *See* Minutes of the Special Meeting of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank, National Association Held on May 22, 2022 (WF_DS_000002863).

[112] Wells Fargo & Co., Quarterly Report (Form 10-Q), at 110 (Aug. 1, 2022).

[113] *Wells Fargo Reinstates Diverse Slate Hiring Policy Following June Pause*, REUTERS (Aug. 1, 2022 3:39PM),   https://www.reuters.com/business/finance/wells-fargo-reinstates-diverse-slate-hiring-policy-following-june-pause-2022-08-01/.

[114] *Id.*

[115] Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank, National Association Held on June 27-28, 2022 (WF_DS_000003136 at 3164-65).

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-CV-05173-TLT

hiring discrimination prevention.  The presentation noted Wells Fargo had "Ineffective Team Member Diversity Management."[116]  It further concluded that "[t]he number of substantiated allegations related to [discrimination, harassment and retaliation] behaviors could indicate ineffective human capital management in areas including poor hiring/selection decisions . . . that may need to be addressed" and "expose WF to significant . . . legal and reputational risk and potentially reflect unsafe and unsound management practices."[117]  Days after the Board received the report, Stanford Graduate School's Corporate Governance Research Initiative issued a report indicating that not only did Wells Fargo's CEO lack racial or ethnically diversity, but his 12 direct reports lacked racial or ethnic diversity as well."

134.    To address the issue of lack of hiring diversity in March 2020, Wells Fargo's CEO, Charles Scharf, "announced that diverse candidate slates and interview panels will be required for all Wells Fargo positions with total direct compensation of more than $100,000."[118]  From the start, Wells Fargo did not take the program seriously.  On June 16, 2020, Wells Fargo's CEO, Charles Scharf, wrote a memo to the Company's employees discussing its hiring practices in which he said the bank's regulatory troubles have made it harder to cast a wide net for top jobs and concluded that "[t]he unfortunate reality is that there is a very limited pool of Black talent to recruit from . . . ."[119]  "Many workers were upset by his comments at the time, particularly Black employees who were rising through the ranks.  When the comments

---

[116] Sophie Sharp (Human Resources Chief Operating Officer), Monitoring Company Culture Report (Q3 2019) (WF_DS_0000024 at 80).

[117] *Id.* at 0094.

[118] Excerpt from Nov. 16, 2020 Governance and Nominating Committee Materials (WF_DS_000001401 at 1405).

[119] Liz Hoffman & Susan Pulliam, *Wall Street Knows It's Too White.  Fixing It Will Be Hard*, WALL ST. J. (July 2, 2020), https://www.wsj.com/articles/wall-street-knows-its-too-white-fixing-it-will-be-hard-11593687600?mod=article_inline.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

resurfaced in a Reuters story in September, Mr. Scharf was widely criticized."[120]   In response to Mr. Scharf's comments, Ken Bacon, a former mortgage industry executive and board member at Comcast, Ally Financial, Welltower, said, "If people say they can't find the talent, they either aren't looking hard enough or don't want to find it."[121]

135.    In August 2020, Wells Fargo paid nearly $8 million to settle claims brought by the Department of Labor that it had discriminated against more than **34,000** Black applicants during the hiring process.[122]  Wells Fargo pledged to do better and, in 2020, the Company expanded its policy requiring that at least 50% of the interview candidates represent a historically underrepresented group with respect to at least one diversity dimension.[123]   Throughout 2020 and 2021, the Company touted its diversity and inclusion efforts.[124]

---

[120] Ben Eisen, *Wells Fargo CEO Finds Himself on Defense After a Tough First Year*, WALL ST. J. (Oct. 8, 2020), https://www.wsj.com/articles/wells-fargo-ceo-finds-himself-on-defense-after-a-tough-first-year-11602149402?mod=hp_lead_pos5.

[121] Rachel Sandler, *Wells Fargo CEO Reportedly Blames Limited Pool of Black Talent for Trouble Reaching Diversity Goals*, FORBES (Sept. 22, 2020), https://www.forbes.com/sites/rachelsandler/2020/09/22/wells-fargo-ceo-reportedly-blames-limited-pool-of-Black-talent-for-trouble-reaching-diversity-goals/.

[122] *See* News Release, U.S. Dep't of Labor, Wells Fargo Agrees to Pay $7.8 Million in Back Wages After U.S. Department of Labor Alleges Hiring Discrimination (Aug. 24, 2020), https://www.dol.gov/newsroom/releases/ofccp/ofccp20200824.

[123] Emily Flitter, *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*, N.Y. TIMES (June 9, 2022 11:45 EST), https://www.nytimes.com/2022/06/09/business/wells-fargo-fake-interviews-investigation.html (noting Wells Fargo implemented a "diverse slate" policy in mid-2020 "which stipulated at least half of the candidates interviewed for jobs paying $100,000 or more needed to be 'diverse'.").

[124] *See, e.g.*, Wells Fargo & Co., Annual Report (Form 10-K), at 1 (Feb. 22, 2022) ("Wells Fargo values and promotes diversity, equity and inclusion (DE&I) in every aspect of our business.  We are dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions.  We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase diverse representation in leadership roles.").

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-CV-05173-TLT

136.     On September 30, 2020, *The Charlotte Observer* reported that "[a]t least seven Black female senior executives have left Wells Fargo in the past 12 months, depleting the pipeline of women executives of color to the bank's most senior positions."[125]  "Two people with direct knowledge of the matter say the bank's culture around race and gender was a factor in why some of the Black women left."[126]  "Sharon Goodwine, Wells Fargo's head of enterprise talent," was quoted as saying "we need to do more to recruit, promote and retain diverse talent" and "[w]e have put new programs in place this year to hold our leaders accountable to increase diverse representation at all levels of the company." [127] Similarly, "Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion," stated that "[t]here definitely is a sense that bias lives vibrantly at Wells Fargo.  And I think it is around gender, gender identity, as well as race and ethnicity."[128]

137.     Following the negative publicity, Wells Fargo internally recognized the importance of addressing the Company's diversity and inclusion hiring efforts.  On October 26, 2020, the Board's Risk Committee received a presentation noting that "[t]here is increased risk[] of negative reputation impacts following media coverage referenc[ing] a comment on diverse talent from the chief executive officer's June 'Our commitment to change' memo, which generated significant social media conversation and a **critical social conversation risk advisory rating (highest level).** . . .  Mr. Scharf discussed the importance of bringing real focus to D&I across the enterprise, and Ms. Clark encouraged directors to

---

[125] Austin Weinstein, *"We need to do more": Seven high-ranking Black women leave Wells Fargo*, CHARLOTTE                    OBSERVER                    (Sept. 30,                    2020), https://amp.charlotteobserver.com/news/business/banking/article246012155.html ("Two went to work at Citigroup, which just announced the first female CEO of a major U.S. bank.  One went to work at American Express, reporting to one of the most senior Black men in finance.  Another left for Equifax.").
[126] *Id.*
[127] *Id.*
[128] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

participate in stakeholder engagement efforts when possible."[129]  Similarly, during a board meeting the same and following day Wells Fargo's Vice Chairman of Public Affairs, William Daley, "noted that D&I is an imperative of the Company's senior management team."[130]  Scharf and Daley's comments would prove to serve as mere lip service as the Board took no practical action.

138.    In November 2020, the Board's Human Resources Committee highlighted that "[s]ubstantiated cases [of racial discrimination] were characterized by: Derogatory/racist statements and unfair treatment towards customers and employees."[131]  Indeed, Mr. Scharf attributed his own "insensitive comment" about a supposed shortage of minority talent as "reflecting my own unconscious bias."[132]

139.    Over the ensuing months, the Wells Fargo Board and Senior Management would repeatedly highlight the importance of addressing diversity in hiring, yet the Board took no meaningful steps to address the issue.  For example:

> On November 16, 2020, the Board's Corporate Responsibility Committee received a presentation stating that "Wells Fargo is at a pivotal moment in re-establishing and advancing its leadership on diversity and inclusion issues, particularly as an employer and a bank of choice."[133]

> On November 17, 2020, the Board's Human Resources Committee received a presentation stating that "Ongoing impacts of social justice movements, coupled with negative diversity related media attention in Q3, may contribute to emerging HCR [Human Capital

---

[129] Mandy Norton (Chief Risk Officer) and Price Sloan (Chief Strategic Enterprise Risk Management Officer), *IRM Update* (inc. Notable Risk Updates and Emerging Risks Presentation) (Oct. 26, 2020) (WF_DS_000001325 at 1338 & 1387).

[130] Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Company and Wells Fargo Bank, National Association Held on October 26-27, 2020 (WF_DF_000000640 at 651).

[131] Human Resource Committee Meeting "Tab F:  HR Risk, Regulatory, and Other Updates" (Nov. 17, 2020) (WF_DS_000001228 at 1245).

[132] *Wells Fargo CEO apologizes for remark about diverse talent*, REUTERS (Sept. 23, 2020), https://www.reuters.com/article/global-race-wells-fargo/wells-fargo-ceo-apologizes-for-remark-about-diverse-talent-idUSL3N2GK37W.

[133] Barri Rafferty (Head of Communications), *Reputation Update*, (Nov. 16, 2020) (WF_DS_000003610 at 3611).

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Risk] tied to insufficient diversity in the workforce by making it more difficult to retain and hire diverse talent."[134]

On April 27, 2021, a Diverse Segments presentation to the Board characterized the diverse interview slates and teams initiative as one of the Company's "critical initiatives and actions supporting diversity, equity & inclusion."[135]

On June 29, 2021, the Human Resources Committee of the Board received a presentation noting "Emerging diversity and inclusion risks" and that "YTD-2021 Insufficient Diversity in the Workforce has accounted for $10MM or 88% of internal losses-primarily attributed to alleged discrimination and retaliation."[136]

On December 14, 2021, the Human Resources Committee of the Board received a presentation noting that "Q3 HCR losses without COVID are estimated at 1.4MM, where insufficient diversity in the workforce has accounted for $11MM or 86% of YTD internal losses-primarily within branch banking."[137]

### D. Wells Fargo's 2021 and 2022 Proxy Statements Misleadingly Promoted the Company's "Diverse Search Requirement" and "Banking Inclusion Initiative" While Opposing Stockholder Proposals to "Conduct a Racial Equity Audit"

140. Rather than address the issues repeatedly raised to the Board related to diversity and inclusion, in filings with the SEC, the Board sought to misrepresent and hide the facts.

141. *First*, on March 16, 2021, Wells Fargo published and filed with the SEC its 2021 annual proxy statement. The 2021 proxy statement stated that "We Are Advancing Diversity, Equity, and Inclusion"; "Wells Fargo values and promotes DE&I in every aspect of our business"; and that "We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase representation in leadership roles."

---

[134] Human Resource Committee Meeting "Tab F: HR Risk, Regulatory, and Other Updates" (Nov. 17, 2020) (WF_DS_000001228 at 1238).

[135] Kieber Santos (Head of Diverse Segments, Representation and Inclusion), *Diverse Segments, Representation and Inclusion: Status* Update (Apr. 27, 2021) (WF_DS_000000754).

[136] Human Resource Committee Meeting "Tab E: Risk, Regulatory, and Other Updates" (Jun. 29, 2021) (WF_DS_0000000914-15).

[137] Human Resource Committee Meeting "Appendix E: Risk, Regulatory, and Other Updates) (Dec. 14, 2021) (WF_DS_000001450).

142.     The 2021 proxy statement further stated that Wells Fargo is "expanding [its] diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all these areas and are taking specific actions in support of these commitments."  These include "requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year."  Wells Fargo described the Diverse Search Requirement in a further section of the 2021 Proxy:

> Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement). Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

> The Diverse Search Requirement requires the following for most U.S. roles with

> total direct compensation greater than $100,000:

> At least 50% of interview candidates must be diverse with respect to at least one diversity dimension; and

> At least one interviewer on the hiring panel must represent at least one diversity dimension.

143.     **Second**, on March 14, 2022, Wells Fargo published and filed its 2022 annual proxy statement, which stated that "Wells Fargo values and promotes DE&I across out business."  The 2022 proxy further stated:

144.     Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include:

**Diverse Candidates[:]** Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

\* \* \*

**Our Affirmative Action Team[:]** We conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups.

145.    **Our Diversity Sourcing Group[:]**  We seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles. They pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants.

146.    The above statements in Wells Fargo's 2021 and 2022 proxy statements were materially false and misleading when made and/or omitted material information because, in fact, Wells Fargo <u>did not</u> have a "strong record of recruiting, promoting and rewarding racially and ethnically diverse employees " as evidenced by various lawsuits and settlements with the Company, including the settlement in August 2020 where **34,000** Black applicants had alleged discriminatory hiring practices.

147.    In addition, in both the 2021 and 2022 proxy statements, the Board recommended that its stockholders "vote AGAINST" stockholder proposals that (1) "Wells Fargo report annually on its policies and practices to help ensure its elected Board of Directors attains racial and gender representation that is better aligned with the demographics of its employees and customers and/or regions in which it operates"; and (2) that the Board "oversee an independent racial equity audit analyzing [Wells Fargo]'s adverse impacts on nonwhite stakeholders and communities of color."[138]  The Board recommended that stockholders **reject** these proposals despite stockholders' concerns that "Wells Fargo's board diversity is largely disproportionate with its employee makeup and customer base" and stockholders requested that

---

[138] Wells Fargo & Co., Proxy Statement (Form DEF 14A), at 118-19, 124-26 (Mar. 14, 2022).

Wells Fargo "assess its behavior through a racial equity lens in order to obtain a complete picture of how it contributes to, and could help dismantle, systemic racism."[139]  Although Wells Fargo did ultimately conduct a racial equity audit,[140] it has to date not published the interim or final results of that audit, which would likely demonstrate further abuses by the Company.

148.    High-profile police killings of black people – most recently George Floyd – have galvanized the movement for racial justice.  That movement, together with the disproportionate impacts of the COVID-19 pandemic have focused the attention of the media, the public and policy makers on systemic racism, racialized violence and inequities in employment, health care, and the criminal justice system.  This has further raised the importance of addressing the mission critical issue of ensuring the Company has sufficient internal controls to prevent hiring and lending discrimination.

149.    In June 2020, Wells Fargo CEO Charles Scharf urged that "the inequality and discrimination that has been so clearly exposed . . . must not continue," and Wells Fargo announced initiatives to improve workforce diversity and inclusion and invest in black-owned businesses.[141]  Those actions followed some missteps: Scharf previously stated that the reason Wells Fargo had difficulty hiring diverse candidates was due to the "very limited pool of Black talent, demoralizing black employees, and the loss of black female top managers.[142]

150.    Wells Fargo's problems predate Scharf's 2019 arrival.  Wells Fargo has settled employment discrimination claims on several recent occasions, including incidents of race discrimination

---

[139] *Id.* at 118, 124.

[140] Wells Fargo Press Release, *Wells Fargo to Commission Third-Party Racial Equity Audit* (September 13, 2022), https://newsroom.wf.com/English/news-releases/news-release-details/2022/Wells-Fargo-to-Commission-Third-Party-Racial-Equity-Audit/default.aspx.

[141] *See* https://stories.wf.com/wells-fargo-ceo-a-watershed-moment/.

[142] https://www.wsj.com/articles/wells-fargo-ceo-finds-himself-on-defense-after-a-tough-first-year-11602149402?mod=hp_lead_pos5.

in 2014 uncovered through a Labor Department audit.  In 2019, Wells Fargo settled a lawsuit by the City of Philadelphia alleging that Wells Fargo targeted nonwhite neighborhoods for high-fee and high-interest rate loans.[143]  In 2012, the same practices led to a $184 million Department of Justice settlement.  A 2021 investigation found racial disparities in Wells Fargo's lending under the Paycheck Protection Program in Los Angeles: businesses in majority-white neighborhoods were more than twice as likely to receive funding as businesses in majority-nonwhite neighborhoods.[144]

151.    Wells Fargo's activities with potential adverse impacts are not limited to the employment and lending contexts.  Wells Fargo has supported numerous police foundations, which bypass normal procurement processes to buy equipment for police departments, including surveillance technology that has been used to target communities of color and nonviolent protestors.  In the 2020 election cycle, Wells Fargo gave $135,000 to members of Congress who objected to certifying the election results,[145] an action some viewed as "a direct attack on the voting rights of people of color."[146]  Although Wells Fargo paused PAC contributions after the insurrection, it resumed them following a review of its criteria.  Wells Fargo is a member of the American Bankers Association, which continues to donate to objecting members.[147]

152.    A racial equity audit would help Wells Fargo identify, prioritize, remedy and avoid adverse impacts on nonwhite stakeholders and communities of color.  We urge Wells Fargo to assess its

---

[143] https://whyy.org/articles/wells-fargo-will-pay-philadelphia-10m-to-settle-citys-discriminatory-lending-lawsuit/.

[144] https://www.latimes.com/california/story/2021-05-01/ppp-loans-coronavirus-pandemic-businesses-trump.

[145] https://edition.cnn.com/interactive/2021/01/business/corporate-pac-suspensions/.

[146] *See* https://www.nytimes.com/2021/01/15/us/politics/lankford-apology-election-biden.html;
https://www.marketwatch.com/story/business-leaders-call-for-action-on-trump-after-mob-siege-at-capitol-11609976655.

[147] https://www.citizensforethics.org/reports-investigations/crew-reports/corporations-have-given-10-million-to-the-sedition-caucus/.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

behavior through a racial equity lens in order to obtain a complete picture of how it contributes to, and could help dismantle, systemic racism.

153.    In response, in both its 2021 and 2022 proxies, Wells Fargo stated that "[o]ur Board recommends a vote AGAINST this proposal[.]"  The Company's "reasons" for rejecting the proposal included that "*we continue our focus on supporting communities of color. Through the Banking Inclusion Initiative—a 10-year commitment to help unbanked individuals gain access to affordable, mainstream, digitally-enabled transactional accounts—we aim to create a meaningful entry point to facilitate full participation in the economy and achievement of financial stability. The initiative will focus on reaching unbanked communities and, in particular, helping remove barriers to financial inclusion for Black and African American, Hispanic, and Native American/Alaska Native families, which according to the 2019 FDIC Survey of Household Use of Banking and Financial Services (released October 2020), account for more than half of America's 7 million unbanked households*."

154.    Wells Fargo further stated that, "[g]iven our comprehensive approach to DE&I, with continued oversight from our Board, management accountability, and our robust DE&I disclosures, we do not believe that performing a Racial Equity Audit ultimately serves the best interests of our shareholders."

155.    Wells Fargo's and the Board's statements in opposing this stockholder proposal were materially false and misleading because, at the same time the Board claimed that Wells Fargo was "helping to remove barriers to financial inclusion" for Blacks and Hispanics the Company's lending algorithms were systematically discriminating against Black and Hispanic credit applicants.

### E.    Wells Fargo's Discriminatory Practices Have Damaged the Company Financially and Reputationally

156.    As discussed above, the Director Defendants' failure to act has resulted in greater risk that the Federal Government will impose additional penalties on Wells Fargo.  Wells Fargo is currently

subject to a number of consent orders resulting from misconduct at the Company.[148]  The most significant

of which is a February 3, 2018 Consent Order by the Federal Reserve Board which placed a $1.93 trillion

asset cap on the Company (the "Asset Cap" or the "2018 Consent Order").[149]  Market commentators have

referred to the 2018 Consent Order as the Federal Reserve's "Fear of God" penalty.[150]  Market

commentators have estimated that the Asset Cap cost Wells Fargo billions of dollars.  Even worse, on

May 16, 2023, the U.S. District Court for the Southern District of New York preliminarily approved a $1

billion settlement related to Wells Fargo's materially false and misleading statements about its

compliance with the 2018 Consent Order.[151]  Wells Fargo will continue to be subject to the Asset Cap

until regulators are satisfied with the Company's internal controls, or if Wells Fargo fails to satisfy

regulators they could decide to break up the bank.

157.    In November 2022, Deutsche Bank issued a report title "Question Bank: Key Issues and

Questions Surrounding WFC."  The report noted that Wells Fargo disclosed in a recent 10-Q filed with

the SEC that the DOJ was investigating "hiring practices related to diversity."  In a subsequent SEC

---

[148] *See e.g.*, Bram Berkowitz, *A Guide to All of Wells Fargo's Consent Orders*, The Motley Fool (Oct. 10, 2021), https://www.fool.com/investing/2021/10/10/a-guide-to-all-of-wells-fargos-consent-orders/. Wells Fargo was also fined $3.7 billion in a consent order issued by CFPB for violations of the law with respect to auto loan servicing, Respondent incorrectly applied loan payments, erroneously imposed certain fees and charges, incorrectly repossessed customers' vehicles, and failed to refund certain unearned fees on debt cancellation products; (ii) with respect to home mortgage servicing, Respondent incorrectly denied mortgage loan modifications to certain qualified borrowers; and (iii) with respect to consumer deposit accounts, Respondent improperly froze or closed customer accounts, improperly charged certain overdraft fees, and did not always waive monthly account service fees consistent with its disclosures.  The  fine  is  the  largest  penalty  ever  levied  by  the  CFPB.  *See* https://www.sec.gov/Archives/edgar/data/72971/000007297118000229/exhibit993consentorder.htm.

[149] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a1.pdf.

[150] Felice Maranz, *Fed's 'Fear of God' Penalty Sours Wall Street on Wells Fargo*, Bloomberg (Feb. 5, 2018), https://www.bloomberg.com/news/articles/2018-02-05/fed-s-fear-of-god-penalty-sours-wall-street-on-wells-fargo#xj4y7vzkg.

[151] *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-cv-04494-GHW-SN, Order Preliminarily Approving Settlement And Authorizing Dissemination Of Notice Of Settlement (S.D.N.Y. May 16, 2023).

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

filing, Wells Fargo disclosed that the SEC also opened an investigation.  Deutsche Bank concluded its discussion by noting that it "seems logical (to us at least) that the above issues *need to be resolved before the Fed lifts the asset cap*."

158.    Pursuant to the 2018 Consent Order, Wells Fargo was required to "adopt an improved firmwide risk management program designed to identify and manage risks across the consolidated organization."  The 2018 Consent Order required that the Board evaluate the Firm's risk management capacity.  Within 60 days of the order, the Board was required to submit a written plan to further enhance the Board's effectiveness in carrying out its oversight and governance of Wells Fargo, acceptable to the Reserve Bank.  The 2018 Consent Order also provided that within 30 days after the end of each calendar quarter, the Board or an authorized committee thereof shall submit to the Reserve Bank written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The order specifically provides that "[i]f Wells Fargo does not make progress satisfactory to the Board of Governors in addressing the deficiencies cited in this Order, the Board of Governors may impose additional restrictions or limits, or take other action as permitted under applicable law."  Because the Board failed to ensure the Company had sufficient internal controls related to discrimination in lending and hiring, the Federal Reserve may take further action against the Company as advocated for by Congresswoman Maxine Waters.  For this reason alone, ensuring fair lending and hiring is a mission-critical issue for Wells Fargo.

159.    As a result of the Board's failure of oversight, Wells Fargo has suffered significant financial and reputational harm.  For example, Wells Fargo and certain of its executives are currently defendants in a federal securities fraud class action pending before this Court titled *SEB Investment Management AG v. Wells Fargo & Company*, No. 3:22-cv-03811-TLT (N.D. Cal.) ("the *SEB Action*").  This securities fraud class action alleges that between February 24, 2021 and June 9, 2022, the Company and its senior executives misrepresented Wells Fargo's diversity hiring policy, and in particular, its

Diverse Search Requirement in violation of Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5. The securities-fraud plaintiffs' allegations are set forth in their Complaint for Violations of the Federal Securities Laws (ECF No. 69) and it their June 6, 2023 memorandum in opposition to Defendants' motion to dismiss (ECF No. 102), which states:

> For two decades, Wells Fargo has repeatedly engaged in abusive practices, including continued violations of laws prohibiting discrimination. This serial misconduct has had a devastating impact on Wells Fargo's reputation and its stock price. In an effort to regain investor trust, leading into the Class Period, Wells Fargo told investors it was laser-focused on improving diversity. To that end, in March 2020, Wells Fargo announced that it was implementing the Diverse Search Requirement, which mandated that for U.S.-based jobs that paid $100,000 or more per year, at least half of the candidates interviewed had to be diverse (i.e., persons from underrepresented racial or ethnic groups, women, veterans, LGBTQ individuals, and those with disabilities).
>
> Thereafter, throughout the Class Period, Defendants highlighted the Diverse Search Requirement, boasted about Wells Fargo's compliance with the policy, and detailed the steps Defendants took to ensure diverse candidates were included in interview slates. These statements were misleading. Unbeknownst to investors, Wells Fargo was engaging in widespread "sham" or "fake" interviews of diverse candidates. Indeed, **over 25** current and former Wells Fargo employees confirm that fake interviews were systemic at the Company—occurring across multiple business lines—both prior to and throughout the Class Period. These interviews, which took place even though another candidate had already been selected for the job, allowed Wells Fargo to publicly claim compliance with the Diverse Search Requirement.
>
> After reports surfaced in a May 2022 article by *The New York Times* that fake interviews had occurred in one of Wells Fargo's business lines, Defendants doubled down, brazenly repeating their misleading statements and assuring investors on June 3, 2022, that the "***rule is working.***" Despite their public reassurances, Defendants' façade quickly crumbled. Just three days later, on June 6, 2022, Wells Fargo suspended the policy so that it could "study its use and make changes" and "gain confidence that the guidelines live[d] up to their promise." The relevant truth was finally revealed on June 9, 2022, when *The New York Times* published a follow-up article reporting—based on the accounts of multiple current and former Wells Fargo employees—that the sham interviews had been taking place across multiple Wells Fargo business lines for many years, and revealing that the federal government had opened a criminal investigation into the practice. In response to this news, Wells Fargo's stock price fell more than 10%, erasing ***$17 billion*** in shareholder value and causing significant damage to Plaintiffs and the Class.

160.    Thus, the Board's failures of oversight caused the Company to issue false and misleading statements to investors in violation of the anti-fraud provisions of the Exchange Act, thereby exposing the Company to a substantial risk of liability in the *SEB Action*.

161.    Beyond the *SEB Action*, Wells Fargo's securities violations also directly damaged the Company in another way.  During 2021 and 2022, the Board authorized the Company to repurchase a massive quantity of its own shares of common stock.  The Board's Finance Committee is responsible for recommending whether to repurchase securities to the Board.  As members of the Finance Committee during 2021 and 2022, Defendants Black, Chancy, Craver, and Pujadas recommended share repurchases, and the Board approved them.  Specifically, the Company repurchased 306 million shares during 2021 at a cost of $14.5 billion and 110 million shares during the first quarter of 2022 at a cost of $6 billion— which altogether totaled at least 416 million shares at a cost of at least $20.5 billion.[152]

162.    Wells Fargo's share repurchases from January 2021 through June 2022 were reported in the Company's Forms 10-Q and 10-K and are summarized as follows:

| Calendar Month | Total number of shares repurchased | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| January 2021 | 11,558,076 | $32.15 | 655,683,183 |
| February 2021 | 53,726 | $34.67 | 655,629,457 |

---

[152] Wells Fargo's SEC filings listed its stock repurchases during 2021 and 2022.  *See* Wells Fargo & Co., Quarterly Report (Form 10-Q) at 47 (May 5, 2021) ("During first quarter 2021, [the Company] repurchased 17 million shares of common stock at a cost of $596 million."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 51 (July 28, 2021) ("During the first half of 2021, [the Company] repurchased 53 million shares of common stock at a cost of $2.2 billion."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 51 (Nov. 1, 2021) ("During the first nine months of 2021, [the Company] repurchased 167 million shares of common stock at a cost of $7.5 billion."); Wells Fargo & Co., Annual Report (Form 10-K) at 56 (Feb. 22, 2022) ("In 2021, [the Company] repurchased 306 million shares of common stock at a cost of $14.5 billion."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 46 (May 3, 2022) ("In first quarter 2022, [the Company] repurchased 110 million shares of common stock at a cost of $6 billion."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 48 (Aug. 1, 2022) ("[i]n the first half of 2022, [the Company] repurchased 110 million shares of common stock at a cost of $6 billion.").

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

| March 2021 | 5,599,343 | $39.71 | 650,030,114 |
|---|---|---|---|
| April 2021 | 20,075,596 | $43.60 | 629,954,518 |
| May 2021 | 10,893,389 | $46.11 | 619,061,129 |
| June 2021 | 4,354,796 | $43.08 | 614,706,333 |
| July 2021 | 36,810,627 | $44.76 | 577,895,706 |
| August 2021 | 41,340,615 | $47.85 | 536,555,091 |
| September 2021 | 36,057,193 | $46.18 | 500,497,898 |
| October 2021 | 36,092,310 | $50.07 | 464,405,588 |
| November 2021 | 80,585,475 | $50.66 | 383,820,113 |
| December 2021 | 23,001,846 | $48.79 | 360,818,267 |
| January 2022 | 33,687,433 | $54.55 | 327,130,834 |
| February 2022 | 55,819,880 | $56.79 | 271,310,954 |
| March 2022 | 20,586,039 | $49.07 | 250,724,915 |
| April 2022 | 24,862 | $47.54 | 250,700,053 |
| May 2022 | 25,465 | $43.63 | 250,674,588 |
| June 2022 | 38,459 | $42.45 | 250,636,129 |
| **Total Shares:** | **416,605,130** | | |

163.    By causing Wells Fargo to conduct these massive share repurchases, Defendants falsely signaled to investors their purported belief that Wells Fargo shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up. Relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share and return on stockholder equity, as the repurchases resulted in fewer outstanding shares. The combined effect was to further artificially inflate Wells Fargo's share price, which had already been inflated by the concealment of Wells Fargo's discriminatory hiring and lending practices. The result of this was that the Board's share repurchases during 2021 and 2022 caused the Company to purchase more than $20 billion of its own stock at inflated prices, thereby damaging the Company.

164.    Wells Fargo also faces significant liability related to discriminatory lending from applicants who were denied credit due to digital redlining. In another action pending in the Northern District of California before the Hon. James Donato, *In re Wells Fargo Mortgage Discrimination Litig.*, Civ. No. 3:22-cv-00990-JD, a putative class of non-white plaintiffs who alleged that they were denied home mortgages or the ability to refinance. The complaint alleges that "[t]ens of thousands [of credit

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

applicants] have been victimized both by Wells Fargo's intentional, knowing, and systematic race discrimination and the disparate impact of its practices, violating the contractual, commercial, and civil rights of Class members and causing millions (and perhaps billions) of dollars in damages to the Class."

165.    According to an April 25, 2022 internal presentation "Prepared for [the Company's] Risk Committee of Wells Fargo's Board of Directors"[153] in response to *Bloomberg's* March 2022 article revealing Well Fargo's discriminatory approval rates for home lending to minorities, "the New York City Mayor and Comptroller sent a letter to the company informing us the City of NY will not be opening any new depository accounts."[154]    Thus, Wells Fargo has already begun losing customers as a result of its discriminatory lending practices.

166.    Finally, on September 23, 2022, the Board received a "Communications & Brand Management Update" from the Board's "Corporate Responsibility Committee" which stated that "negative storylines regarding allegations of racial discrimination in mortgage refinancing and hiring emerged in March and April and remained a headwind through June."[155]    The update noted that these "negative storylines" had been "kicked off by reporting in far reaching outlets like Bloomberg and the New York Times . . . ."[156]    The update further noted that "Negative" "News Stories" that created "Headwinds" for the Company included "Lawsuits due to alleged race discrimination in its mortgage lending practices" and "Accusations of staged job interviews for minorities as part of diversity

---

[153] *See* Wells Fargo's Apr. 25, 2022 Bloomberg HMDA Discussion prepared for the Company's Board of Directors (WF_DS_ Supp000001105 at 1106).
[154] *Id.*
[155] *See* WF_DS_000005058 at 5062, 5064.
[156] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

slate[.]" Also on September 23, 2023, the Board received an Enterprise Risk Report stating: "**Reputation Risk** – _At Risk_ after exceeding last quarter driven by two Bloomberg articles."[157]

## VII.   FIDUCIARY DUTIES OF THE DEFENDANTS

### A.   Duties of All Defendants

167.   By reason of their positions as officers or directors of Wells Fargo and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed Wells Fargo and its stockholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Wells Fargo operated in compliance with all applicable federal and state laws, rules, and regulations.  This includes ensuring that Wells Fargo does not violate laws and regulations designed to prevent and deter discriminatory lending practices – such as any form of illegal redlining.

168.   Defendants were and are required to act in furtherance of the best interests of Wells Fargo and its stockholders so as to benefit all stockholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owes to Wells Fargo and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

169.   Because of their positions of control and authority as directors or officers of Wells Fargo, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Amended Complaint.  Due to their positions with Wells Fargo, Defendants had knowledge of material non-public information regarding the Company.

170.   To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the

---

[157] _See_ WF_DS_000005071 (emphasis in original).

Company.  By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

(a)     Manage, conduct, supervise, and direct the employees' businesses, and affairs of Wells Fargo in accordance with existing laws, rules, and regulations, as well as the charter and by-laws of Wells Fargo;

(b)     Ensure that Wells Fargo did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

(c)     Remain informed as to how Wells Fargo was, in fact, operating, and, upon receiving notice or information of imprudent, unsound or illegal business practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

(d)     Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Wells Fargo, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company; and

(e)     Preserve and enhance Wells Fargo's reputation as befits a public corporation; exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business.

**B.     Fiduciary Duties of Directors of Federal Banking Institutions**

171.    The Board has a responsibility, as part of its fiduciary duties to Wells Fargo and its stockholders, to oversee the operations of the Company and to maintain sufficient systems or controls to be reasonably certain that misconduct at the operational level would be elevated to the Board and executive management for remediation.  The Board fails in that responsibility if it (i) fails to implement appropriate reporting systems or controls to identify potential imprudent, unsound, or illegal business

practices, or (ii) consciously fails to monitor or oversee the systems and controls it put in place for this purpose.

172. While the boards of directors of all Delaware corporations have this oversight duty, federal regulatory bodies place special emphasis on the oversight function of boards of banking institutions. Indeed, following the 2007-2008 global financial crisis that threw a spotlight on imprudent, unsound, and illegal banking practices, the federal government enacted regulations and issued guidance on the duties of banks and, in particular, their boards of directors, to oversee the Company's operations. Each of these regulatory schemes is meant to drive home the core principle that banks must employ systems and controls designed to monitor policies and procedures required by statutes or regulations. By any measure, this includes statutes and regulations ensuring that Wells Fargo does not violate laws and regulations that pertain to the banking industry, including laws and regulations prohibiting discriminatory lending practices such as redlining.

173. The Federal Deposit Insurance Corporation ("FDIC") has enumerated the duties of bank directors as follows:

Th[e] [fiduciary duties of care and loyalty mean] that ***directors are responsible*** for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; ***monitoring and assessing the progress of business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; and for making business decisions on the basis of fully informed and meaningful deliberation.***[158]

174. Similarly, the Office of Comptroller of the Currency ("OCC"), another banking regulation, describes the primary fiduciary duties of bank directors as follows:

While holding companies of large banks are typically managed on a line of business basis, directors at the bank level are responsible for oversight of the bank's charter—the legal entity. Such responsibility requires separate and focused governance. ***We have reminded***

---

[158] Financial Institution Letter FIL–87–92 (FDIC dated December 3, 1992) available https://www.fdic.gov/regulations/laws/rules/responsibilities-bank-directors-officers.pdf.

*the boards of banks that their primary fiduciary duty is to ensure the safety and soundness of the national bank or federal savings association. Execution of this responsibility involves focus on the risk and control infrastructure necessary to maintain it. Directors must be certain that appropriate personnel, strategic planning, risk tolerance, operating processes, delegations of authority, controls, and reports are in place to effectively oversee the performance of the bank. The bank should not simply function as a booking entity for the holding company. It is incumbent upon bank directors to be mindful of this primary fiduciary duty as they execute their responsibilities.[159]*

175.    The OCC recently updated its "Director's Book: Role of Directors for National Banks and Federal Savings Association." (the November 2020 "Director's Book),[160] a guidance document that describes the role of duties of directors of national banks. The November 2020 Director's Book makes it clear that boards of banks like Wells Fargo must among other things:

- provide effective oversight;

- exercised independent judgment;

- provide a credible challenge to management;

- establish an appropriate culture and set the tone at the top;

- understand the legal and regulatory framework applicable to the bank's activities;

- comply with fiduciary duties and all applicable laws and regulations.[161]

176.    In addition to the above, the November 2020 Director's Book states that the board must set an appropriate corporate culture at the bank, including a culture that "does not condone or encourage

---

[159] Testimony of Thomas J. Curry, Comptroller of the Currency, before the Financial Services Committee, U.S. House of Representatives (June 19, 2012), https://occ.gov/news-issuances/congressional-testimony/2012/pub-test-2012-91-written.pdf.

[160] https://www.occ.gov/publications-and-resources/publications/banker-education/files/pub-directors-book.pdf.

[161] *Id.* at 22-23.

---

71

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

imprudent risk taking, unethical behavior, or the circumvention of laws, regulations, or safe and sound policies and procedures in pursuit of profits or business objectives."[162]

177.    The November 2020 Director's Book also recognizes that "[b]anking laws and regulations cover a wide range of areas . . . [and] [t]he board and management should recognize the scope and implications of laws and regulations that apply to the bank and its activities."[163]   Additionally, it states that "the board and management should understand the potential consequences of violations of law and regulations that could result in financial losses, reputational and legal risks, and enforcement actions."[164]

## C.    The Board's Committees Were Expressly Charged with Overseeing and Monitoring Risk to Wells Fargo

178.    Among the Board's most-critical duties is overseeing the Company's risk management structure.[165]  Wells Fargo's 2022 Annual Report to stockholders, for example, states:

> The Board carries out its risk oversight responsibilities directly and through its committees.  The Risk Committee reviews and approves the Company's risk management framework and oversees management's implementation of the framework, including how the Company manages and governs risk.  The Risk Committee also oversees the Company's adherence to its risk appetite.  In addition, the Risk Committee supports the stature, authority and independence of IRM and oversees and receives reports on its operation.  The Chief Risk Officer (CRO) reports functionally to the Risk Committee and administratively to the CEO."[166]

179.    Further, the Board's standing committees are charged with monitoring specific aspects of Wells Fargo's business.  Among these are the Risk Committee, the Audit and Examination Committee, the Corporate Responsibility Committee, the Human Resources Committee, and the Governance and

---

[162] *Id.* at 25.

[163] *Id.* at 62.

[164] *Id.* at 62.

[165] *See* Wells Fargo & Company, Annual Report, at 28 (Form 10-k) (2022).

[166] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Nominations Committee.  Each committee has its own charter setting forth duties for their respective members, in addition to the duties of board members generally.

180.    Between January 1, 2019 to the present (the "Relevant Period") the members of the Board's standing committees were:

| Director Defendant | Risk | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources |
|---|---|---|---|---|---|
| Black | | | | | 2020, 2021 |
| Chancy | 2020, 2021 | 2020, 2021, 2022 | | | |
| Clark | | | 2019, 2020, 2021, 2022 | 2019, 2020, 2021, 2022 | |
| Craver | | 2019, 2020, 2021, 2022 | | 2021, 2022 | |
| Davis | 2022 | | | | |
| Hewett | 2019, 2020, 2021, 2022 | | 2019, 2020, 2021, 2022 | 2021, 2022 | 2019, 2020, 2021, 2022 |
| James | | | | 2019, 2020 | 2019, 2020 |
| Morken | | 2022 | 2022 | | |
| Morris | 2019, 2020, 2021, 2022 | | | | 2019, 2020, 2021, 2022 |
| Norwood | 2022 | | | | |
| Noski | | 2019, 2020 | | 2019, 2020 | |
| Payne | 2020, 2021, 2022 | | | | |

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

| Director Defendant | Risk | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources |
|---|---|---|---|---|---|
| Pujadas | | 2019, 2020, 2021 | | | |
| Sargent | | 2019, 2020, 2021, 2022 | | 2019, 2020, 2021, 2022 | 2019, 2020, 2021, 2022 |
| Vautrinot | 2019, 2020, 2021, 2022 | | 2019, 2020, 2021, 2022 | | |

### 1.    Duties of Risk Committee Members

181.    According to its charter, the purpose of Wells Fargo's Risk Committee is to "assist the Board of Directors in fulfilling its responsibilities to oversee the Company's company-wide risk management framework and Independent Risk Management function, including the significant programs, policies, and plans established by management to identify, assess, measure, monitor, and manage the material risks facing the Company, including compliance risk . . . credit risk, interest rate risk, liquidity risk, market risk, reputation risk, and strategic risk."

182.    Regarding the Risk Committee's expected communications with management, the charter states that "the Committee chair, or other individual Committee member designated by the Committee, is expected to have regular communication between Committee meetings with the Chief Risk Officer and, as needed, other members of management.  The Chief Risk Officer and, as needed, other members of management are expected to communicate with the Chair on any significant risk issues that arise between Committee meetings, including issues raised or escalated by management's Enterprise Risk & Control Committee."

183.    The Risk Committee charter states that the Committee shall, among other things:

- Approve and periodically review the Company's risk management framework and oversee management's establishment and implementation of the framework, including how the Company supports a strong risk management culture, manages and governs

its risk, and defines the risk roles and responsibilities of the Company's three lines of defense;

- Oversee and receive reports from management on the operation of the Company's company-wide risk management framework, including policies, procedures, processes, controls, systems, and governance structures for the identification, measurement, assessment, control, mitigation, reporting, and monitoring of risks facing the Company;

- Periodically review and, as appropriate or unless otherwise reviewed or approved by another Board committee with primary oversight of the specific risk type, approve significant risk management policies relating to the material risk types identified through the Company's enterprise risk identification and assessment program;

- Review regular reports from the Chief Risk Officer and other members of management regarding emerging risks, escalated risks or issues, and other selected company-wide risks and issues and/or risk topics; and

- Review and receive regular reports from the Chief Risk Officer and other members of management regarding management's assessment of the effectiveness of the Company's risk management program, including risk management effectiveness and actions taken by management to address risk matters and the implementation of risk management enhancements.

184. In order to comply with these enumerated responsibilities, the charter states that the Risk Committee shall oversee and periodically review and receive reports from management on:

- compliance risk and general condition of compliance risk management, including the effectiveness of the Company's compliance program, the annual compliance plan, and the related annual Compliance function staffing plan (including the Compliance financial forecast, staffing, and resource needs);

- conduct risk, including conduct management activities and Independent Risk Management's conduct risk oversight; financial crimes risk and general condition of financial crimes risk management and internal controls, including the effectiveness of the Company's financial crimes program and suspicious activity monitoring and reporting;

- model risk and the general condition of model risk management, including model governance;

- operational risk and general condition of operational risk management, including the Company's operational risk program, operational risk profile, and the effectiveness of the Company's operational risk program and control environment;

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

- reputation risk, including periodic reporting on reputation risk through enterprise risk reporting;

- strategic risk, including the alignment of the risk profile and risk management effectiveness with the Company's strategic plan and risk appetite, and risks that may be associated with significant new business or strategic initiatives (including any acquisition activities) as it may deem appropriate.

185.    During the Relevant Period, and as set forth in ¶ 180, Defendants Chancy, Davis, Hewett, Morris, Norwood, Payne, and Vautrinot served as members of the Risk Committee.  In light of the duties described above as set forth in Wells Fargo's Risk Committee charter, these individuals should have received and reviewed data consistent with the data described in the *Bloomberg* publication showing how Wells Fargo's minority lending practices, and specifically the Company's approval/denial gap for Blacks and other minority groups, compared with other large banking institutions like JPMorgan Chase, Citi, and Bank of America.

186.    Moreover, after reviewing such data, the Risk Committee should have immediately taken steps to prevent and correct the problem as it placed Wells Fargo at risk of violating laws and regulations prohibiting redlining.  Yet, based on documents produced by Wells Fargo during Plaintiffs' § 220 investigation, the Risk Committee failed to discuss or consider, prior to the *Bloomberg* publication, the approval/denial gap for Blacks and other minority groups, including the fact that Wells Fargo's approval rates were far lower than its banking peers.

### 2.    Duties of Audit and Examination Committee Members

187.    According to its charter, Wells Fargo's Audit and Examination Committee ("Audit Committee") is responsible for ensuring that the Company has "appropriate oversight of risk and other issues, including the Company's allowance for credit losses and compliance with legal and regulatory requirements, without unnecessary duplication, the Chairs of the Audit Committee and each of the other Board committees communicate as they deem advisable.  In addition, the Committee shall share information of common interest with the Risk Committee as determined appropriate by the committees.

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

The Audit Committee Chair and other members of the Audit Committee, as appropriate, are expected to bring to the attention of the Risk Committee Chair any risks that such committee members believe should be discussed by the Risk Committee."

188.    Specifically, the Audit Committee is responsible for the following oversight activities:

- Review and discuss, prior to filing, the Company's annual audited financial statements (and Form 10-K) and quarterly unaudited financial statements (and Form 10-Q) with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Review at least annually, and receive on a timely basis from the independent auditor their report regarding, all critical accounting policies used by management in the preparation of the financial statements as well as any critical audit matters. Discuss with the independent auditor their judgments about the quality and acceptability of the Company's accounting principles as applied to its financial reporting.

- Review and discuss with management and the independent auditor any major issues regarding accounting principles and financial statement presentations, including any significant changes in the selection or application of accounting principles, as well as the financial effects of regulatory and accounting initiatives and off-balance sheet structures.

- Review disclosures to the Committee by the Chief Executive Officer ("CEO") and CFO in connection with their certification of the Company's Forms 10-K and 10-Q regarding any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting and any fraud involving any employees who have a significant role in the Company's internal controls over financial reporting.

- Periodically review and approve the Company's policy establishing its disclosure framework for financial and regulatory reports prepared for the Board, management, and bank regulatory agencies.

- Periodically review updates from management regarding the Company's data environment impacting regulatory reporting and compliance with its regulatory reporting governance and oversight policy.

- Monitor the Company's progress in appropriately and promptly addressing, correcting, and resolving any matters reported to the Committee that in the Committee's judgment could materially jeopardize the Company's financial condition, results of operations and accuracy of the Company's financial statements.

- Review reports on significant changes in staffing, processes, and industry trends as needed, and review results of the quality assessment review required by the Institute of Internal Auditors every five years.

- Review the audit results prepared annually by the internal audit function, and reported to both the Risk Committee and the Audit Committee, assessing the effectiveness of the Company's risk management framework and capabilities.

- Review and discuss with management, at least annually, the implementation and effectiveness of the Company's compliance risk management program.

- Periodically review updates and reports from management, including the Chief Compliance Officer, Chief Risk Officer, General Counsel and Chief Auditor, regarding compliance and legal matters that may have a significant impact on the Company's compliance risk management or financial statements.

- In accordance with NYSE rules and taking into consideration the Risk Committee's oversight of the Company's company-wide risk management framework and oversight of all of the Company's major risks and the allocation of certain risk oversight responsibilities to other committees of the Board, the Committee shall discuss at least annually the Company's guidelines and policies for assessing and managing risk, including reputation risk, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

189.    During the Relevant Period, and as set forth in ¶ 180, Defendants Chancy, Craver, Morken, Noski, Pujadas, and Sargent served as members of Wells Fargo's Audit Committee.  In light of the duties described above and as set forth in the Audit Committee's charter, members of the Audit Committee should have known, through reports from management "regarding compliance and legal matters that may have a significant impact on the Company's compliance risk management," that they were not receiving reports concerning Wells Fargo's approval/denial gap, data that would allowed Audit Committee members to take action and otherwise ensure that the Company's lending practices did not violate laws and regulations prohibiting redlining.

### 3.    Duties of Corporate Responsibility Committee Members

190.    According to its charter, Wells Fargo's Corporate Responsibility Committee's ("CRC") purpose is to "assist the Board of Directors in fulfilling its responsibilities to oversee the Company's significant strategies, policies, and programs on social and public responsibility matters and the

Company's relationships and enterprise reputation with external stakeholders on those matters."  This includes the following:

- The CRC shall oversee the Company's significant strategies, policies, and programs on social and public responsibility matters, including environmental sustainability and climate change, human rights, and supplier diversity.

- The CRC shall oversee the Company's community development and reinvestment activities and performance.

- The CRC shall oversee the Company's social impact and sustainability strategy and impacts through the support of non-profit organizations by the Company or a Company sponsored charitable foundation.

- The CRC shall monitor the state of the Company's relationships and enterprise reputation with external stakeholders on social and public responsibility matters.

- The CRC shall review stockholder proposals related to social and public responsibility matters.

191.    During the Relevant Period, and as set forth in ¶ 180, Defendants Clark, Hewett, Morken, and Vautrinot served as members of Wells Fargo's CRC.  In light of the duties described above and as set forth in the Committee's charter, including that members of the CRC "shall oversee significant strategies, policies, and programs on social and public responsibility matters," these individuals should have received and reviewed the same or similar approval/denial gap data described in the *Bloomberg* investigation, data that showed Wells Fargo's approval rates for black and other minorities was far below that of its peers.  After reviewing such data, the CRC should have immediately taken steps to prevent and correct the problem.

192.    According to documents produced during Plaintiffs' § 220 investigation, on August 11, 2020, the CRC received a report that "minority lending distribution" was an "emerging risk" to the Company and that regulators considered redlining a "priority issue."[167]  However, this same report stated

---

[167] Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Company Held on August 11, 2020 (WF_DS_000003600 at 3605).

that management had not identified "any systemic fair lending risk" at Wells Fargo,[168] even though *Bloomberg's* analysis demonstrated otherwise.

193.    Thus, the full extent of the CRC members' actions – following a report that redlining was an "emerging risk" and "priority issue" for regulators – was to simply do nothing.  At a minimum, the CRC should have provided the August 11, 2020 report to the Risk Committee so that it could further evaluate this "priority" "emerging risk."  Indeed, it was not until April 2022, *after* the *Bloomberg* report was published, that the Risk Committee was made aware of this issue and received reporting on Wells Fargo's approval/denial gap data.

194.    In order to comply with their fiduciary duties of oversight, at a minimum, the CRC members should have provided information on the "emerging risk" of redlining to the Risk Committee for further evaluation and action if necessary.  However, according to Plaintiffs' § 220 investigation, prior to the publication of the *Bloomberg* article, the Risk Committee was unaware that this was an "emerging risk" for the Company.

195.    Because the CRC failed to take action regarding this "priority" risk – and failed to follow up regarding managements' (incorrect) report that Wells Fargo did not have a "systematic fair lending risk," the CRC members failed to faithfully exercise their fiduciary duties as directors of Wells Fargo.

### 4.    Duties of Human Resource Committee Members

196.    According to its charter, the Wells Fargo Human Resource Committee ("HRC"), among other responsibilities, oversees the following:

- approval of the Company's compensation philosophy and principles;

- oversees executive compensation, including to conduct the annual CEO performance evaluation process;

---

[168] *Id.*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

- oversee the Company's incentive compensation risk management program, human capital risk, and human capital management;

- oversee the Company's culture and Code of Conduct;

- oversee reputation risk related to the HRC's responsibilities described in this Charter.

197.    Additionally, the HRC was responsible for Wells Fargo's Diverse Search Requirement Program, an initiative that required hiring managers to interview (rather than hire) at least one woman and one person of color for job openings with salaries of $100,000 or more.  According to *The New York Times* investigation, *see supra* ¶¶ 115-119, the Company's diversity hiring program was merely a check-the-box step in the hiring process, rather than a meaningful effort to actually hire diverse candidates.

198.    Members of the HRC, in order to comply with their fiduciary duties as directors, should have ensured that the diverse hiring program was not implemented in a way that was abused or mere window dressing.  Additionally, they should have known that the "interview" program could easily be implemented as a checking-the-box program.  Yet, prior to *The New York Times* investigation, none of the materials produced by Wells Fargo in response to Plaintiffs' § 220 investigation demonstrates that the HRC was engaged on this issue—or even discussed the likelihood that the diverse interview requirement could be abused or implemented in a way that would not result in Wells Fargo actually increasing diversity among its workforce.

199.    Two months after the May 2022 *New York Times* report, on June 28, 2022, the HRC held a meeting at which it received a "Conduct Update" regarding "Allegations from Employees" stating that the "[v]olume of allegations by employees remains high" and noting "16,000 employee-reported allegations over the past year" of "harassment and discrimination," which were a "high number given the employee base."  The report also noted a 17% "substantiation rate across all employee allegations" with "Retaliation (subcategory within Harassment)" being "the largest allegation subcategory (over 1,600) . . . ."

### D.      Defendants' Fiduciary Duties Under *Caremark* and *Marchand*

200.    By reason of their positions as directors, officers, and/or fiduciaries of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, Defendants at all relevant times owed fiduciary duties to Wells Fargo and its stockholders, including the duties of care, loyalty, and good faith.

201.    Under the relevant line of Delaware Supreme Court cases, including *Caremark*,[169] *Marchand*,[170] and their progeny, a board of directors of a Delaware corporation, as well as its officers, have the specific fiduciary duties to: (a) implement an information and reporting system and controls of compliance particularly as it relates to mission-critical issues; and (b) oversee and monitor the operations of that information and reporting system.  Under the second prong of *Caremark*, directors and officers breach their fiduciary duty of loyalty if, having implemented a reporting and information system and controls, they consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.[171]

202.    The *Caremark* duty is especially heightened with respect to the monitoring of fraudulent or criminal conduct, as opposed to other, more general business risks.  As the Delaware Court of Chancery has stated, "[d]irectors should, indeed must under Delaware law, ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company.  Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct."[172]

---

[169] *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[170] *Marchand v. Barnhill*, 212 A.3d 805, 807 (Del. 2019).

[171] *Stone v. Ritter*, C.A. No. 1570-N, 2006 WL 302558, at *1-2 (Del. Ch. 2006), *aff'd sub nom. Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[172] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009).

203.   Moreover, the Delaware Court of Chancery has recently confirmed that *Caremark* duties extend to corporate officers.   As Vice Chancellor Laster noted, "[t]he same policies that motivated Chancellor Allen to recognize the duty of oversight for directors apply equally, if not to a greater degree, to officers.   The Delaware Supreme Court has held that under Delaware law, corporate officers owe the same fiduciary duties as corporate directors, which logically include a duty of oversight."[173]

204.   As noted above, it is an axiomatic tenet of Delaware corporate law that Delaware corporations may only pursue "lawful business" by "lawful acts."   8 *Del. C.* §§ 101(b), 102(a)(3).   "Delaware law does not charter law breakers.   Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'   As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[174]

205.   Here, Wells Fargo's pattern of discriminatory practices against minority groups in mortgage lending and hiring, is a mission-critical risk that exposes the Company to civil (and potentially criminal) liability under various federal and state statutes, including those referenced below.

206.   ***First***, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program."   15 U.S.C § 1691(a).   The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages, mortgage refinancing, and other forms of credit.   Here,

---

[173] *In re McDonald's Corp. S'holder Deriv. Litig.*, --- A.3d ---, 2023 WL 407668, at *1 (Del. Ch. Jan. 26, 2023).

[174] *In re Massey Energy Co. Derivative & Class Action Litig.*, C.A. No. 5430-VCS, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (quoting 8 *Del. C.* §§ 101(b), 102(a)(3), (b)(7)).

83

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

Wells Fargo is a creditor because it regularly issues, extends, and renews credit to borrowers. The Company's systematic and discriminatory denials of loan applications—including residential, small business, and/or personal loans or lines of credit—submitted by minority applicants constituted race-based discrimination forbidden by the Equal Credit Opportunity Act.

207. ***Second***, the Fair Housing Act, 42 U.S.C. § 3601, *et seq*., prohibits discrimination by direct providers of housing, such as landlords and real estate companies as well as other entities, such as municipalities, banks or other lending institutions and homeowners insurance companies whose discriminatory practices make housing unavailable to persons because of race or color, religion, sex, national origin, familial status, or disability. The Fair Housing Act makes it unlawful to discriminate against designated classes of individuals in residential real estate transactions, including residential lending. Here, Wells Fargo discriminated against minority borrowers by denying residential and other loan applications, or by not approving residential loan applications on the same terms and timelines as those of similarly qualified applicants who were not members of a protected class, or by causing applicants to withdraw their applications due to roadblocks and feigned difficulties.

208. ***Third***, 42 U.S.C. § 1981 (§ 1 of the Civil Rights Act of 1866 as revised and amended by subsequent Acts of Congress, including the Civil Rights Acts of 1964 and 1991) guarantees persons "[e]qual rights under the law" to "make and enforce contracts," regardless of race. The term "make and enforce" contracts including "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* Section 1981 creates a federal cause of action for individuals claiming intentional racial discrimination. Here, Wells Fargo's discrimination—including its lending, refinancing, hiring, and promotion practices—violated minorities rights to make and enforce contracts and exposes the Company and its employees to liability under Section 1981.

209.   **Fourth**, the Unruh Civil Rights Act (California Civil Code Section 51) provides that "[a]ll persons within the jurisdiction of [the State of California] are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." The Unruh Civil Rights Act provides that all persons within the State of California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments and thus prohibits discrimination of any kind against any person in any business establishment. Here, Wells Fargo's discrimination—including its discriminatory lending, refinancing, hiring, and promotion practices—harmed minority loan applicants by the Company's refusal to transact business with them and therefore denied these applicants full and equal treatment as required by the Unruh Civil Rights.

210.   **Fifth**, the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition" including "any unlawful, unfair or fraudulent business act or practice." "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction" and that "[t]he court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203. The UCL confers standing on both private parties and public prosecutors. *Id.* Here, Wells Fargo's discrimination—including its lending, refinancing, hiring, and promotion practices—constituted an unlawful, unfair, and/or fraudulent business act or practice as defined by the UCL.

211.   Thus, in light of the liability that Wells Fargo faces under these and other statutes, the Company's Board should have been especially vigilant in ensuring that the proper reporting systems and internal controls were in place to monitor, detect, and prevent discriminatory lending and hiring.

212.    As set forth herein, Defendants breached their fiduciary duties by both failing to implement reporting systems or controls to detect, prevent and address (under the first prong of *Caremark*):  (1) redlining in any form, including digital or algorithmic redlining; and (2) discriminatory hiring practices.  To the extent any such ostensible systems or controls may have existed (if only nominally), Defendants breached their fiduciary duties by failing to oversee and monitor such systems or controls (under the second prong of *Caremark*).

213.    As alleged herein, Defendants owed very specific responsibilities to monitor reporting systems (to the extent they existed) to ensure that Company's business practices complied with all legal and regulatory requirements, including laws and regulations prohibiting discrimination in lending and hiring.  Moreover, these responsibilities indisputably were known by Defendants.  In conscious disregard of these responsibilities, Defendants failed to monitor or oversee the operations of Wells Fargo's information and reporting system (or even ensure that a meaningful a reporting structure was in place), thereby disabling themselves from being informed of the non-compliance and unlawful practices.  By failing to act in the face of a known duty to act, and by demonstrating a conscious disregard for their responsibilities, Defendants failed to act in good faith and breached their fiduciary duty of loyalty.

## VIII.  IN EXCHANGE FOR TAKING ON THE FIDUCIARY DUTIES DESCRBIED HEREIN, DEFENDANTS ARE HIGHLY PAID

214.    While Defendants agree to take on a myriad of duties and responsibilities to serve on Wells Fargo's Board, these individuals are paid handsomely for their service.  For example, in 2021, the year before the *Bloomberg* expose was published, on average, Wells Fargo's board members were compensated $354,519.58.  This calculation does not include Defendant's Scharf's 2021 compensation which was $24,500,000.00.  Below is a chart indicating how much each Wells Fargo board member was compensated during the years 2019-2022.

| Wells Fargo Director Compensation Totals | | | | | |
|---|---|---|---|---|---|
| **Member** | **2019** | **2020** | **2021** | **2022** | **Total** |
| Baker* | $353,025.00 | $72,542.00 | | | $425,567.00 |
| Clark | $337,858.00 | $358,004.00 | $342,044.00 | $370,769.00 | $1,408,675.00 |
| Craver | $360,025.00 | $372,004.00 | $378,211.00 | $411,269.00 | $1,521,509.00 |
| Duke* | $635,025.00 | $94,282.00 | | | $729,307.00 |
| Hewett | $423,841.00 | $373,004.00 | $354,923.00 | $380,769.00 | $1,532,537.00 |
| James | $376,025.00 | $374,004.00 | $66,222.00 | | $816,251.00 |
| Morris | $453,358.00 | $478,004.00 | $440,044.00 | $425,019.00 | $1,796,425.00 |
| Noski | $232,786.00 | $534,633.00 | $443,504.00 | | $1,210,923.00 |
| Payne | $128,871.00 | $365,837.00 | $349,211.00 | $367,269.00 | $1,211,188.00 |
| Peetz* | $67,111.00 | | | | $67,111.00 |
| Pujadas | $381,089.00 | $421,004.00 | $383,044.00 | $367,769.00 | $1,552,906.00 |
| Quigley* | $425,025.00 | $55,185.00 | | | $480,210.00 |
| Sargent | $394,025.00 | $382,004.00 | $374,044.00 | $397,519.00 | $1,547,592.00 |
| Vautrinot | $349,191.00 | $379,004.00 | $337,044.00 | $355,269.00 | $1,420,508.00 |
| Black | | $258,629.00 | $428,900.00 | $599,769.00 | $1,287,298.00 |
| Chancy | | $190,094.00 | $357,044.00 | $372,311.00 | $919,449.00 |
| Davis | | | | $313,866.00 | $313,866.00 |
| Morken | | | | $308,075.00 | $308,075.00 |
| Norwood | | | | $308,075.00 | $308,075.00 |
| **Average** | | | $354,519.58 | | |
| The asterisk (*) denotes non-party. | | | | | |

## IX.   DERIVATIVE ALLEGATIONS

215.   Plaintiffs bring this action derivatively in the right and for the benefit of Wells Fargo to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and other breaches by Defendants.

216.   Plaintiffs have owned Wells Fargo stock continuously during the time of the wrongful course of conduct by the Defendants alleged herein and continue to hold Wells Fargo stock.

217.   Plaintiffs will adequately and fairly represent the interests of Wells Fargo and its stockholders in enforcing and prosecuting the Company's rights.

## X.   DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE

218.   Plaintiffs repeat and reallege all of the allegations set forth in the paragraphs above as if fully set forth herein.

219.   Plaintiffs have not made, and are excused from making, a pre-suit demand on the Board to assert the claims herein for the reasons that follow.

220.   Delaware law applies a director-by-director "three-part test as the universal test for assessing whether demand should be futile." *United Food and Commercial Workers Union and Participating Food Indus. Emp'rs Tr-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1057-58 (Del. 2021).  The three-part test asks with respect to the current members of the board:  "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.*

221.   The current Wells Fargo Board consists of the following thirteen individuals:  Defendants Scharf, Vautrinot, Sargent, Clark, Craver, Morris, Payne, Hewett, Black, Chancy, Davis, Morken, and Norwood (the "Current Directors").  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act for the reasons set forth herein and below:

**A.    Each of the Current Directors Faces a Substantial Likelihood of Personal Liability**

222.   Each of the Current Directors faces a substantial likelihood of liability for breaching their duty of loyalty as a director of Wells Fargo by repeatedly and systematically failing to ensure Wells Fargo had sufficient internal controls related to the mission-critical issues of preventing hiring and lending discrimination.

223.     Each of the Current Directors was on the Board when Congresswoman Waters issued her Letter of June 28, 2022, urging regulators to take action against Wells Fargo due to its discriminatory lending and hiring practices.  This placed each Current Director on notice that both issues were mission critical for the Company.

224.     The Current Directors failed to act on numerous red flags related to the Company's discriminatory lending practices, despite knowing that fair lending practices are a mission-critical issue for Wells Fargo.

225.     The Current Directors took no action to address whether Wells Fargo's lending algorithms resulted in digital redlining despite the filing of at least fourteen different class action lawsuits related to Wells Fargo's discriminatory lending practices, including a highly detailed consolidated amended complaint, each of which independently served as further red flags that Wells Fargo's lending algorithms likely resulted in redlining.

226.     In addition, the Current Directors repeatedly ignored red flags related to the Company's discriminatory hiring practices, despite knowing avoiding employment discrimination was a mission-critical issue for Wells Fargo.

227.     The Current Directors participated in the June 27-28, 2022 Board meeting where the Wells Fargo Board determined in bad faith the Company lacked a systematic problem with its hiring practices and policies.

228.     The Current Directors received another red flag on May 19, 2022, when *The New York Times* detailed allegations by certain bank managers that they were directed by the Company to conduct sham interviews.

229.     The investigation by Federal prosecutors into the sham interview scandal provided yet another red flag to each of the Current Directors.

230.    Rather than address the issues raised by these red flags the Current Directors have all concluded, without adequate investigation, Wells Fargo lacked any issues with its diverse hiring initiative.

231.    Each of the Current Directors also faces a risk of liability for claims surrounding their disclosures concerning the issues discussed in this Amended Complaint.

**B.    Additional Red Flags Arose Before Davis, Morken and Norwood Joined the Board**

232.    Additional red flags arose prior to Davis, Morken, and Norwood joining the Board, which apply to all of the other Current Directors (the "Pre-2022 Directors").

233.    For example, the Pre-2022 Directors received the December 2020 Demand which requested that the Board "take action to recover damages for alleged misconduct and correct alleged, deficiencies in the Company's controls relating to: (i) minority borrowing practices."  Rather than take action in response to this red flag, the Pre-2022 Directors took 10 months to reject the demand.  Moreover, in August 2020, members of Wells Fargo's CRC were told that "minority lending distribution" and "residential mortgage redlining" "continues to be a priority" for regulators and that "(redlining)" was an "emerging risk."[175]

234.    The Pre-2022 Directors received yet another red flag on May 6, 2021, when six Wells Fargo PhDs published the May 2021 Article which highlighted the problems with Wells Fargo's lending algorithms.

235.    The Pre-2022 Directors were Board members when *Bloomberg* published the March 11, 2022 and March 25, 2022 articles discussing the HMDA data from 2020 and 2021.  The *Bloomberg* articles served as further red flags related to Wells Fargo's discriminatory lending practices.

---

[175] Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Company Held on August 11, 2020 (WF_DS_000003600 at 3605).

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

236.     Rather than take action in response to the *Bloomberg* article, the Pre-2022 Directors participated in the April 25-26, 2022 Board meeting where the Board discussed the *Bloomberg* articles, but failed investigate (either way) whether Wells Fargo's lending algorithms resulted in redlining.

237.     Even worse, documents produced in response to Plaintiffs' Section 220 demand demonstrate that prior to the release of the *Bloomberg* article, the Pre-2022 Directors did not even take steps to obtain data to determine whether or not the Company's lending algorithm engaged in digital redlining.

### C.     Committees Within the Board Received Additional Red Flags

238.     Sargent, Morris, Hewett, and Black served on the Human Resource Committee ("HRC") during the relevant time period.  The HRC's charter provides that the members of the HRC "shall oversee the Company's human capital risk and human capital management, including . . . diversity, equity, and inclusion."  The charter also required that the members of the HRC "oversee the Company's culture, including management's efforts to foster ethical behavior and decision-making throughout the Company and the Company's Code of Ethics and Business Conduct and any significant changes or exceptions thereto."  Due to the breaches of duty alleged herein the Directors who served on the HRC thereby abdicated their duties under the HRC's charter.

239.     On June 29, 2021, the HRC of the Board received a presentation noting that "Diversity and inclusion opportunities create emerging risks" and that "YTD-2021 Insufficient Diversity in the Workforce has accounted for $330K or 89% of Internal Losses; losses primarily attributed for settlements for alleged discrimination," but failed to act.

240.     Rather than take action in response to the *Bloomberg* article, Directors Vautrinot, Hewett, and Clark also attended a meeting of the Corporate Responsibility Committee on April 25, 2022, just before the April 25-26, 2022 Board meeting where the Board failed to investigate following the *Bloomberg* articles.

241.     Additionally, Directors Vautrinot, Morris, Payne, Hewett, Chancy, and Norwood served on Wells Fargo's Risk Committee during the Relevant Period (the "Risk Committee Directors").  According to the Risk Committee's charter, the purpose of Risk Committee "is to assist the Board of Directors in fulfilling its responsibilities to oversee the Company's company-wide risk management framework.  This includes reviewing and approving significant programs and/or policies relating to the following risks:  "compliance risk, financial crimes risk (including Bank Secrecy Act and anti-money laundering risk), model risk, operational risk, information security risk (including cybersecurity risk), technology risk, data management risk, credit risk, liquidity and funding risks, market risk, interest rate risk, and investment risk, including the Company's business resiliency program, compliance program policy, technology and data management strategies, financial crimes program, and third-party risk management policy."

242.     The Risk Committee Directors should have requested and reviewed data showing how Wells Fargo compared with its peers related to the approval/denial gap for Blacks and other minority groups.  According to Plaintiffs' § 220 investigation, the Director Defendants failed to request this information prior to the *Bloomberg* investigation.

### D.     Prior Courts Have Already Determined that Demand is Futile Against Certain of the Director Defendants on Related Issues

243.     Judge Andrew Y.S. Cheng of the Superior Court of California, County of San Francisco Department 613, has previously found demand on the Wells Fargo Board (which at the time included Defendants Scharf, Vautrinot, Clark, Sargent, Craver, Morris, Payne, and Hewett) excused because the Board faced a substantial likelihood of liability for their alleged breaches of fiduciary duty for abdicating their responsibility to exercise proper oversight to ensure the Company complied with the consent orders including by engaging in sustained, knowing inaction and ignoring red flags (the "2022 Consent Order

Demand Futility Ruling"). *Timothy Himstreet and Montini Family Trust v. Scharf, et. al.*, Case No. CGC-22-599223 (Cal. Super. Ct. Oct. 5, 2022).

244.    Moreover, Judge Jon S. Tigar, United States District Judge for the Northern District of California, previously found demand excused on the Wells Fargo Board, which at the time included Defendant Vautrinot related to derivative allegations that the Wells Fargo Board "knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent." *Shaev v. Baker*, No. 16-cv-05541-JST (N.D. Cal. May 4, 2017). In finding demand on the Wells Fargo board futile, Judge Tigar explained that: "the abundance of particularized allegations in the Consolidated Amended Complaint support an inference that a majority of the Director Defendants—and in particular those Director Defendants who were on the risk committee, audit and examination committee [which included Defendant Vautrinot], and corporate responsibility committee—knew about widespread illegal activity and consciously disregarded their fiduciary duties to oversee and monitor the company."

### E.    Defendant Scharf's Unique Motivations Provide Additional Reasons Why Demand is Futile as to Him

245.    Defendant Scharf has been Wells Fargo's CEO, President and a member of the Board since October 2019. Wells Fargo's annual Proxy filed on Form DEF 14A with the SEC on March 15, 2023, admits Scharf is not disinterested due to his employment with Wells Fargo. In 2022 alone Scharf received total compensation of a staggering $24,500,000. Since the Board has the ability to remove Scharf from his position at the Company and set his compensation, he lacks independence from Defendants Vautrinot, Sargent, Clark, Craver, Morris, Payne, Hewett, Black, Chancy, Davis, Morken, and Norwood.

246.    Scharf had good reason to not report the sham interviews since his compensation was tied in part to the success of the Company's diversity and inclusion efforts. As the 2022 Proxy reported at

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

page 72: "In determining [Named Executive Officer] performance, the HRC utilizes a performance assessment and variable incentive determination process that provides the HRC with the ability to assess performance through the evaluation of pre-established financial and nonfinancial goals, including risk and DE&I.  For DE&I, the HRC evaluates the CEO's progress on key Company-wide DE&I priorities, and for other NEOs, the HRC uses progress on diverse representation and inclusion across specific diversity dimensions of NEO leadership teams with potential adjustments to variable incentive compensation based on a holistic assessment of progress in on or more diversity dimensions."  Demand is futile as to Scharf for this reason alone.

247.    Demand is also futile as to Scharf because he faces a substantial likelihood of liability for breaching his fiduciary duties duty of loyalty **and** care as an officer[176] and his duty of loyalty as a director as described herein, including by abdicating his responsibility to exercise proper oversight of Wells Fargo's hiring and lending policies and practices and failing to implement adequate remedial measures and risk and compliance management programs related to those policies and practices.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### BREACH OF FIDUCIARY DUTY AGAINST INDIVIDUAL DEFENDANTS

248.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

249.    As Wells Fargo's directors and/or officers of Wells Fargo, the Individual Defendants owed Wells Fargo the highest obligation of loyalty, good faith, due care, oversight and candor.

250.    The fiduciary duties the Individual Defendants owed to Wells Fargo included, without limitation, implementing and overseeing a system of internal controls to monitor, detect and prevent the

---

[176] While Wells Fargo's corporate charter does exculpate directors for breaches of the duty of care it does not exculpate officers from breaches of the duty of care.

illegal redlining and discriminatory hiring practices alleged herein. The Individual Defendants had a fundamental duty to make good faith efforts to ensure that the Company's policies, procedures and practices did not systematically discriminate against or otherwise result in unfair treatment of minority customers, prospective customers, and company employees and applicants for hire.

251.    The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a.    despite being aware that historically racial discrimination, particularly in the areas of lending and hiring, is illegal, harmful and financially devasting to Black Americans and other minority groups, they consciously and repeatedly failed to ensure that the Company's reporting systems were adequately designed to detect systemic discriminatory practices such as redlining and sham interviews thus disabling them from being informed of risks or problems requiring their attention;

b.    consciously disregarding their duty to investigate red flags and to remedy any misconduct uncovered; and

c.    issuing false and misleading statements to stockholders, including in the Company's 2021 and 2022 Proxy Statements.

252.    The conduct of the Individual Defendants, individually and collectively, as set forth herein, was due to their intentional, knowing, and/or reckless disregard for the fiduciary duties owed to the Company.

253.    The Individual Defendants consciously turned a blind eye to the fact that that they were not receiving relevant data or reports that would have placed them on notice of the Company's discriminatory practices in lending and hiring. The Individual Defendants, consistent with their fiduciary duties, were required to implement and monitor policies and systems to monitor such illegal conduct.

254.    The Individual Defendants had actual or constructive knowledge that they caused the Company to fail to maintain adequate internal controls and failed to provide adequate oversight to protect the Company from liability related to the Company's unlawful discriminatory practices.

255.    These actions were not good-faith exercises of prudent business judgment to protect and promote the Company's corporate interests and those of its stockholders.

256.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary duties, Wells Fargo has sustained significant damages, both financially and to its corporate image and goodwill.  Such damages to Wells Fargo include, and will include, substantial risk of liability, legal costs, increased regulatory scrutiny, reputational damages, declining customer base, declining revenue, declining stock price, increased cost of capital, and other costs, damages and liabilities.

257.    For their conscious and bad faith misconduct alleged herein, Individual Defendants are liable to the Company.

**COUNT II**
**VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9**
**(AGAINST THE DIRECTOR DEFENDANTS)**

258.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

259.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

260.    No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

261.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2021 and 2022 Proxy Statements.  The 2021 and 2022 Proxy Statements contained proposals to Wells Fargo's stockholders urging them to re-elect the members of the Board and approve executive compensation.  The Proxy Statements, however, misstated or failed to disclose (i) deficiencies in Wells Fargo's internal and disclosure controls that were known to the Board when the Proxy Statements were filed; (ii) reporting failures known to the Board when the Proxy Statements were filed, which failed to address on-going discriminatory lending and hiring practices.  By reason of the conduct alleged in this Amended Complaint, the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Director Defendants' wrongful conduct, Wells Fargo misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Wells Fargo's recommendation to re-elect the current Board, approve certain executive compensation, and vote against stockholder proposals presented to the Company, including stockholder proposals related to diversity reporting.

262.   The misleading information contained in the 2021 and 2022 Proxy Statements was material to Wells Fargo's stockholders in determining whether or not to elect the Director Defendants and approve certain executive compensation.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with

the Proxy Statements was an essential link in (i) the reelection of nominees to the Board, and (ii) the approval of the executive compensation plan.

263.    Plaintiffs, on behalf of Wells Fargo, seek relief for damages inflicted upon the Company based on the misleading 2021 and 2022 Proxy Statements in connection with the improper re-election of the members of the Board and approval of executive compensation.

264.    This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

**COUNT III**
**VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND**
**SEC RULE 10B-5 PROMULGATED THEREUNDER**
**(AGAINST DEFENDANTS)**

265.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

266.    During the Relevant Period, Defendants disseminated or approved false or misleading statements about Wells Fargo related to its discriminatory practices, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

267.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase more than $7 billion of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.

268.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or

omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Wells Fargo in connection with the Bank's purchases of Wells Fargo stock during the Relevant Period.

269.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Wells Fargo stock, which were intended to, and did, (a) deceive Wells Fargo regarding, among other things, the Company's lack of internal controls to monitor, detect and prevent illegal redlining and hiring practices; (b) artificially inflate and maintain the market price of Wells Fargo stock.

270.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

271.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.    The misstatements and omissions of material facts set forth in this Amended Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them.    Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

272.     As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Wells Fargo stock during the Relevant Period.  By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

273.     Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

**COUNT IV**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(AGAINST THE INDIVIDUAL DEFENDANTS)**

274.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

275.     During their tenures as officers and/or directors of Wells Fargo, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Wells Fargo, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Wells Fargo, including its materially misleading 2021 and 2022 proxy statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

276.     As set forth above, Wells Fargo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Amended Complaint.  By virtue of their positions as controlling persons of Wells Fargo and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Wells Fargo, each of these

Defendants was culpable for the material misstatements and omissions made by Wells Fargo, including such misstatements as the Company's misleading 2021 and 2022 proxy statements, as set forth above.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.     An order declaring that Plaintiffs may maintain this action on behalf of Wells Fargo and that Plaintiffs are adequate representatives of the Company;

An order declaring that Defendants have breached their fiduciary duties to Wells Fargo;

B.     An order determining and awarding to Wells Fargo the damages sustained as a result of the violations set forth above by all Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

C.     An order directing Wells Fargo to take all necessary actions to reform and improve its corporate governance, internal controls, and policies by implementing a Board-level reporting and information system—and to monitor that system—to ensure that the Company addresses redlining in any form, including digital or algorithmic redlining, and the discriminatory hiring practices alleged herein, and any other civil and criminal laws relating to racial discrimination in lending and hiring;

D.     An order against all Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity as this Court deems just and appropriate;

E.     Awarding Plaintiffs' costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

F.     Granting such other relief as this Court deems just and appropriate.

## XIII.   JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  October 23, 2023

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Lesley E. Weaver*
Lesley E. Weaver
Nancy A. Kulesa (*pro hac vice* forthcoming)
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone:    (415) 445-4004
Facsimile:     (415) 445-4020
E-mail:         lweaver@bfalaw.com
                   nkulesa@bfalaw.com

**MOTLEY RICE LLC**
Marlon E. Kimpson
William S. Norton
Joshua C. Littlejohn
Meredith B. Weatherby
Vanessa A. Davis
Shade (Ridge) Mazingo
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:   (843) 216-9450
E-mail:       mkimpson@motleyrice.com
                 bnorton@motleyrice.com
                 jlittlejohn@motleyrice.com
                 mweatherby@motleyrice.com
                 vdavis@motleyrice.com
                 rmazingo@motleyrice.com

*Counsel for Plaintiffs City of Pontiac Reestablished*
*General Employees' Retirement System and*
*City of Plantation Police Officers' Retirement Fund*

(SEALED) VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT
LEAD CASE NUMBER: 3:22-cv-05173-TLT

## <u>VERIFICATION</u>

*City of Pontiac Reestablished General Employees' Retirement System*

I, Sheldon Albritton, do hereby declare:

1.     I am the Chairman and a duly recognized agent and representative for City of Pontiac Reestablished General Employees' Retirement System (the "Fund"), located in Auburn Hills, MI.

2.     I verify that I have reviewed the Verified Amended Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern the Fund, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.     The Fund has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Fund; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the ____ day of October, 2023   10/19/2023

DocuSigned by:

3A9D7B968D7247C...

Sheldon Albritton
Chairman
City of Pontiac Reestablished General Employees'
Retirement System

**VERIFICATION**

*City of Pontiac Reestablished General Employees' Retirement System, et al. v. Black, et al.*

I, Brian Kendall, hereby states as follows:

1.       I am the Chairman of the Board of Directors of City of Plantation Police Officers' Retirement Fund (the "Fund"), which is a beneficial owner of Wells Fargo (the "Company") common stock. As the Chairman of the Fund, I have authority to act on its behalf.

2.       The Fund is a derivative plaintiff in the above-titled action. I verify that I have reviewed the Verified Amended Stockholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern the Fund, are true to my personal knowledge. I believe the facts and statements pleaded in the Complaint on information and belief or investigation of counsel are true and correct to the best of my knowledge and information.

3.       The Fund has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except as to: (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Fund; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

4.       I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 23 day of October, 2023.

Brian Kendall
Chairman
City of Plantation Police Officers' Retirement Fund

**VERIFICATION OF CITY OF PLANTATION POLICE OFFICERS' RETIREMENT FUND**
