Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California  94301
Telephone:  (650) 461-5600

*Counsel for Nominal Defendant*
*Wells Fargo & Company*

[*Additional counsel listed on signature page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| | Lead Case No. 3:22-cv-05173-TLT |
| IN RE WELLS FARGO & COMPANY HIRING PRACTICES DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | **NOMINAL DEFENDANT WELLS FARGO & COMPANY'S NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED COMPLAINT FOR FAILURE ADEQUATELY TO PLEAD DEMAND FUTILITY; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>Hearing:  August 27, 2024<br>Time:  2:00 p.m.<br>Courtroom 9, 19th Floor<br>The Honorable Trina L. Thompson |

<u>**NOTICE OF MOTION AND MOTION**</u>

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 27, 2024 at 2:00 p.m., or as soon thereafter as counsel may be heard in Courtroom 9 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Nominal Defendant Wells Fargo & Company ("Wells Fargo" or the "Company") will and hereby does move this Court to dismiss the Consolidated Amended Complaint (ECF No. 147) under Federal Rule of Civil Procedure 23.1 for failure to make a pre-suit demand on Wells Fargo's Board of Directors or adequately to plead that the demand requirement is excused.  This Motion is based on this Notice, the supporting Memorandum of Law, the Declaration of Brendan P. Cullen and exhibits thereto, and the accompanying Request for Judicial Notice filed concurrently herewith, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing or thereafter.

DATED:  June 11, 2024

Respectfully submitted,

*/s/ Brendan P. Cullen*
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California  94301
Telephone:  (650) 461-5600

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
Telephone:  (202) 956-7500

Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000

*Counsel for Nominal Defendant*
*Wells Fargo & Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................................1

ISSUE TO BE DECIDED .................................................................................................................2

ALLEGATIONS OF THE AMENDED COMPLAINT.....................................................................3

    A.    Wells Fargo's Mortgage Lending Practices..........................................................3

    B.    Wells Fargo's Diversity Hiring Practices .............................................................4

    C.    Plaintiffs' Claims against the Director Defendants ..............................................5

    D.    Plaintiffs Distort the Company's Books and Records ..........................................5

    E.    Plaintiffs' Allegations about Unrelated Regulatory Matters and Lawsuits ..........6

    F.    Wells Fargo's Demand Board...............................................................................7

STANDARD FOR THIS DEMAND FUTILITY MOTION...............................................................7

ARGUMENT ....................................................................................................................................8

I.    Plaintiffs Fail To Plead that a Majority of the Board Faces a Substantial Likelihood of Personal Liability for Alleged Failure of Oversight Claims...........................................................8

    A.    Plaintiffs Do Not Plead Particularized Facts Alleging that a Majority of the Board Knowingly Failed To Oversee the Company's Mortgage Lending Practices. ......................9

        1.    Plaintiffs Do Not Adequately Allege that the Director Defendants Utterly Failed To Put in Place a Reporting System Concerning Fair Lending................................. 9

        2.    Plaintiffs Do Not Adequately Allege that the Director Defendants Did Nothing in Response to Red Flags............................................................................................ 12

    B.    Plaintiffs Do Not Plead Particularized Facts Alleging that a Majority of the Board Knowingly Failed To Oversee the Company's Diversity Hiring Practices..........................16

        1.    Plaintiffs Do Not Adequately Plead that the Director Defendants Utterly Failed To Implement any Reporting System Concerning Diversity Hiring........................ 16

        2.    The Amended Complaint Lacks Particularized Facts Alleging that a Majority of the Board Saw Red Flags of Fake Interviews but Did Nothing. ............................... 18

II.    Plaintiffs Fail To Plead that a Majority of the Board Faces a Substantial Likelihood of Personal Liability for Alleged Violations of the Federal Securities Laws. ...................................................19

    A.    Plaintiffs Fail Adequately To Plead that a Majority of the Board Faces a Substantial Likelihood of Liability under Section 14(a). ...........................................................20

    B.    Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board Faces a Substantial Likelihood of Liability Under Section 10(b)...................................................23

CONCLUSION.................................................................................................................................25

SULLIVAN & CROMWELL LLP

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Africa* v. *Jianpu Tech. Inc.*,
   2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022).................................................................22

*In re Am. Apparel, Inc. 2014 Derivative S'holder Litig.*,
   2015 WL 12724070 (C.D. Cal. Apr. 28, 2015) .................................................................9

*Beam* v. *Stewart*,
   833 A.2d 961 (Del. Ch. 2003)..........................................................................................13

*In re Boeing Co. Derivative Litig.*,
   2021 WL 4059934 (Del. Ch. Sept. 7, 2021) .....................................................................18

*In re Caremark Int'l Inc. Derivative Litig.*,
   698 A.2d 959 (Del. Ch. 1996)......................................................................................*passim*

*In re Citigroup Inc. S'holder Deriv. Litig.*,
   964 A.2d 106 (Del. Ch. 2009)......................................................................7, 13, 19, 20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ....................................................................................24, 25

*City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*,
   2022 WL 2387653 (Del. Ch. June 30, 2022) ..............................................................*passim*

*City of Pontiac Gen. Emps.' Ret. Sys.* v. *Bush*,
   2022 WL 1467773 (N.D. Cal. Mar. 1, 2022)..........................................................22, 23-24

*City of Royal Oak Ret. Sys.* v. *Juniper Networks, Inc.*,
   880 F. Supp. 3d 1045 (N.D. Cal. 2012) ...........................................................................24

*Clem* v. *Skinner*,
   2024 WL 668523 (Del. Ch. Feb. 19, 2024) .....................................................................17

*Constr. Indus. Laborers Pension Fund* v. *Bingle*,
   2022 WL 4102492 (Del. Ch. Sept. 6, 2022) ...............................................................17, 18

*Desimone* v. *Barrows*,
   924 A.2d 908 (Del. Ch. 2007).................................................................................8, 9, 12

*In re Diamond Foods, Inc. Derivative Litig.*,
   2012 WL 1945814 (N.D. Cal. May 29, 2012).................................................................22-23

*In re Facebook, Inc. S'holder Derivative Privacy Litig.*,
   367 F. Supp. 3d 1108 (N.D. Cal. 2019) ......................................................................20, 21

SULLIVAN &
CROMWELL LLP

*Firemen's Ret. Sys. of St. Louis* v. *Sorenson*,
2021 WL 4593777 (Del. Ch. Oct. 5, 2021) ............................................................. 16

*In re Gen. Motors Co. Derivative Litig.*,
2015 WL 3958724 (Del. Ch. June 26, 2015) ...................................................... 11, 17

*Hastey* v. *Welch*,
449 F. Supp. 3d 1053 (D. Kan. 2020) .................................................................... 23

*Jackson* v. *Fischer*,
2013 WL 6732872 (N.D. Cal. Dec. 20, 2013) ....................................................... 25

*In re LendingClub Corp. Derivative Litig.*,
2019 WL 5678578 (Del. Ch. Oct. 31, 2019) .......................................................... 10

*Marchand* v. *Barnhill*,
212 A.3d 805 (Del. 2019) ...................................................................................... 18

*In re Maxwell Techs., Inc. Derivative Litig.*,
2014 WL 2212155 (S.D. Cal. May 27, 2014) ......................................................... 25

*Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*,
2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ........................................................... 15

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................................ 24

*Ocegueda* v. *Zuckerberg*,
526 F. Supp. 3d 637 (N.D. Cal. 2021) ................................................................... 23

*Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*,
2017 WL 6452240 (Del. Ch. Dec. 18, 2017) ......................................................... 19

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .................................................................................. 22

*In re PayPal Holdings, Inc. S'holder Derivative Litig.*,
2018 WL 466527 (N.D. Cal. Jan. 18, 2018) .......................................................... 21

*Pinto* v. *Arlo Techs., Inc.*,
2022 WL 3155411 (N.D. Cal. Aug. 8, 2022) ......................................................... 20

*Rales* v. *Blasband*,
634 A.2d 927 (Del. 1993) ......................................................................................... 8

*N.Y.C. Emps.' Ret. Sys.* v. *Jobs*,
593 F.3d 1018 (9th Cir. 2010) ................................................................................ 20

*Rojas* v. *Ellison*,
2019 WL 3408812 (Del. Ch. July 29, 2019) .......................................................... 10

SULLIVAN &
CROMWELL LLP

*Rosenbloom* v. *Pyott*,
  765 F.3d 1137 (9th Cir. 2014) ...................................................................... 7

*South* v. *Baker*,
  62 A.3d 1 (Del. Ch. 2010)............................................................................. 8

*Stone* v. *Ritter*,
  911 A.2d 362 (Del. 2006) ........................................................................ 9, 10

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..................................................................................... 25

*United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State
  Pension Fund* v. *Zuckerberg*,
  262 A.3d 1034 (Del. 2021) ........................................................................ 7, 8

*In re Verifone Holdings, Inc. S'holder Derivative Litig.*,
  2010 WL 3385055 (N.D. Cal. Aug. 26, 2010) ............................................ 25

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  2022 WL 345066 (N.D. Cal. Feb. 4, 2022) ........................................... 20, 21

**Statutes and Rules**

28 U.S.C. § 1367(c)(3).......................................................................................... 20

Delaware General Corporation Law Section 102(b)(7)........................................... 8

Delaware General Corporation Law Section 220 ................................................... 5

Federal Rule of Civil Procedure 23.1 ............................................................... 7, 12

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b)
  and SEC Rule 10-b5 promulgated thereunder .......................................... *passim*

Securities Exchange Act Section 14(a), 15 U.S.C. § 78n(a),
  and SEC Rule 14a-9 promulgated thereunder ........................................... *passim*

SULLIVAN &
CROMWELL LLP

## PRELIMINARY STATEMENT

In March 2022, *Bloomberg* published an article describing purported racial disparities in Wells Fargo's approval rates for mortgage refinancing applications in 2020. The article reported that Black, Latino, and Asian homeowners allegedly had their applications denied at higher rates than white homeowners and that this racial disparity was larger than those at peer banks. Wells Fargo took these matters seriously. As that same article noted, Wells Fargo was already taking measures to address the mortgage refinancing gap and exploring new ways to address existing racial inequalities when evaluating refinancing eligibility.

Separately, in two articles published in May and June 2022, *The New York Times* reported that a handful of Wells Fargo employees had allegedly conducted "sham" interviews of diverse candidates for positions that had been promised to other applicants. Employees supposedly conducted these fake interviews to comply with Wells Fargo's Diverse Slates Guidelines, which required that at least 50% of interviewees for most positions earning over $100,000 per year be diverse. Wells Fargo took the allegations in these articles seriously as well, immediately launching an investigation and pausing the use of the Guidelines to conduct a review and ensure that the Guidelines were working as intended.

This is not an action brought by individuals who claim that their mortgage refinancing applications were wrongly denied; that litigation is already pending in this District before Judge James Donato. Nor is this an action brought by individuals who claim that they were subjected to sham interviews. Plaintiffs are purported shareholders, and they have seized on these unrelated newspaper articles to attempt to assert *Wells Fargo*'s claims against Wells Fargo's directors and senior officers for alleged breaches of their fiduciary duties. Plaintiffs cycled through a number of different theories over the past two years trying to find something that might stick. The first complaints in this consolidated action claimed that the Company's Board and senior officers knew that widespread fake interviews were occurring across the Company, and they lifted their allegations wholesale from a securities fraud action pending before this Court. But when this Court dismissed that related securities complaint, and when books-and-records demands did not turn up what Plaintiffs had hoped, Plaintiffs pivoted. This go-around, Plaintiffs take most of their allegations from the mortgage refinancing litigation before Judge Donato, copying pages of exhibits and allegations from that action into the Amended Complaint. But what has been consistently

1   absent from each of Plaintiffs' many attempts to plead derivative claims are any allegations specifically

2   concerning the *Wells Fargo Board of Directors*.  That failure is fatal to Plaintiffs' derivative claims.

3   Shareholders may usurp the role of a company's board and pursue claims that belong to the

4   company, as Plaintiffs seek to do here, only in limited circumstances.  Delaware law requires that Plaintiffs

5   plead particularized facts showing that a majority of Wells Fargo's Board (seven of the 13 directors) is

6   disqualified from assessing a demand that the Company pursue the asserted claims because they are self-

7   interested — because they either face a substantial likelihood of liability on the claims or received a

8   material personal benefit from the alleged misconduct — or lack independence from someone who is self-

9   interested.  Plaintiffs fail to make that showing as to *any* of the directors, let alone a majority of them.

10   *First*, Plaintiffs assert that the Director Defendants face a substantial likelihood of liability for

11   claims that they knowingly failed to exercise oversight over the Company's mortgage refinancing and

12   diverse hiring practices — often called a *Caremark* claim.  But to adequately plead those claims, Plaintiffs

13   must allege either that the Board *utterly failed* to put in place any reporting systems or that the Director

14   Defendants were faced with "red flags" of misconduct and chose to *do nothing*.  Not only do Plaintiffs

15   fail to plead particularized facts supporting either of those assertions, but the Amended Complaint and

16   documents incorporated therein demonstrate precisely the opposite — that the Board *did* have reporting

17   systems in place and that the Board *did* take action when purported red flags arose.

18   *Second*, Plaintiffs claim that the Director Defendants violated the federal securities laws by making

19   false or misleading statements about the Company's mortgage refinancing services and diversity hiring

20   practices in public statements.  Certain of those claims — under Section 14(a) of the Exchange Act — are

21   exculpated under Delaware law and Wells Fargo's charter and thus present no, let alone a substantial,

22   likelihood of liability.  Plaintiffs' claims under Section 10(b) fail because Plaintiffs cannot meet their high

23   burden to allege that any of the Director Defendants intentionally misled the public.  In any event, all of

24   Plaintiffs' disclosure-based claims fail because Plaintiffs have not pleaded (and cannot plead) with

25   particularity that any of the challenged statements — general descriptions of the Guidelines, mortgage

26   practices, or the Company's diversity goals — is false.

27   **ISSUE TO BE DECIDED**

28   Should Plaintiffs' consolidated amended shareholder-derivative complaint be dismissed for failure

adequately to plead demand futility where Plaintiffs fail to plead with particularity that a majority of the Wells Fargo Board of Directors faces a substantial likelihood of personal liability, received a material personal benefit from the alleged misconduct, or is not independent?

### ALLEGATIONS OF THE AMENDED COMPLAINT

Wells Fargo is a Delaware corporation and one of the largest U.S. financial institutions. (*See* Amended Complaint ("AC") ¶¶ 39, 72.) The Company provides banking, mortgage, and other products and employs over 200,000 people. (*Id.* ¶¶ 70, 72.) The individual Defendants are five senior executives of Wells Fargo (Scott Powell, Michael Santomassimo, Kleber Santos, Carly Sanchez, and Jonathan Weiss) — none of whom is on the Board — and 12 current Wells Fargo directors (CEO Charles Scharf, Steven Black, Mark Chancy, Celeste Clark, Theodore Craver, Richard Davis, Wayne Hewett, Cecelia Morken, Maria Morris, Felicia Norwood, Ronald Sargent, and Suzanne Vautrinot). Plaintiffs also name as defendants four former directors (Donald James, Charles Noski, Juan Pujadas, and Richard Payne). (*Id.* ¶¶ 40-60.) One of Wells Fargo's 13 current directors (Fabian Garcia) is not named as a Defendant.

### A.    Wells Fargo's Mortgage Lending Practices

On March 11, 2022, *Bloomberg* published an article describing purported racial disparities in Wells Fargo's mortgage refinancing rates during 2020. According to the article, Wells Fargo approved 47% of mortgage refinancing applications submitted by Black homeowners, compared with 72% of applications by white homeowners. (AC ¶ 16; Ex. 1 at 2.)[1] The article states that Wells Fargo, like other banks, was already considering additional ways to account for existing inequalities reflected in factors that are commonly used to evaluate mortgage refinancing applications. (Ex. 1 at 8, 10.) In a second article published on March 25, 2022, *Bloomberg* reported that Home Mortgage Disclosure Act data for 2021 revealed that Wells Fargo had increased the percentage of mortgage refinancing approvals for Black applicants from 47% to 58% during 2021. (AC ¶ 115; Ex. 2 at 1.)

In the wake of the *Bloomberg* reporting, several mortgage borrowers filed putative class actions against Wells Fargo and its affiliates alleging racial discrimination in mortgage lending. (AC ¶ 101 &

---

[1]    Citations to numbered exhibits in the form "Ex. [\_]" refer to exhibits to the Declaration of Brendan P. Cullen, filed contemporaneously herewith. Citations to lettered exhibits in the form "Ex. [\_]" refer to exhibits to the Amended Complaint. (ECF No. 147.)

n.47.)  On January 18, 2023, Judge James Donato consolidated those actions under the caption *In re Wells Fargo Mortgage Discrimination Litigation*, 3:22-cv-00990 (N.D. Cal.).  (*Id.* n.47.)

### B.     Wells Fargo's Diversity Hiring Practices

Separately, in March 2020, Wells Fargo announced that it was expanding a policy requiring that at least half of all candidates interviewed for certain positions be diverse.  (*Id.* ¶ 8.)  The policy — formally referred to as the Diversity Sourcing and Interview Team Guidelines ("Guidelines") — was part of Wells Fargo's ongoing efforts to promote diversity in its senior ranks.  (*Id.*; *see also id.* ¶¶ 222, 242.)  The Guidelines went into effect later that year, and required that "for most U.S. roles with total direct compensation greater than $100,000," "[a]t least 50% of interview candidates must be diverse with respect to at least one diversity dimension."  (*Id.* ¶ 222.)  The Guidelines defined "diverse" to include racial minorities, women, LGBTQ individuals, veterans, and people with disabilities.  (*Id.*)

On May 19, 2022, *The New York Times* published an article recounting what the reporter described as instances of purported "sham" interviews of diverse candidates.  (AC ¶¶ 26, 182.)  The article focused primarily on the allegations of Joe Bruno — a former employee in Wells Fargo's Wealth Management Division at its Jacksonville, Florida location — who claimed that he had been instructed by his supervisors in certain instances to conduct interviews of diverse candidates "even though the decision had already been made to give the job to another candidate."  (*Id.* ¶ 182; *see also* Ex. 3 at 1-2.)  The article recounted one instance in 2017 (well before the Guidelines) in which an applicant was allegedly interviewed for a position that had already been filled, and stated that several other current or former employees claimed that they were aware of or participated in "sham" interviews while at the Company.  (Ex. 3 at 1, 4.)

When the article was published, Wells Fargo stated that "to the extent that individual employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it."  (AC ¶ 184.)  Wells Fargo also explained that it investigated "all the specific hiring-practice allegations the reporter shared prior to the story's publication and [] could not corroborate these allegations as factual."  (*Id.* ¶ 254.)  Nevertheless, on June 9, 2022, Wells Fargo announced a "pause" of the Guidelines, effective June 6, so Company leaders could "gain confidence that the guidelines live[d] up to their promise," and ensure that "hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should be implemented."  (*Id.* ¶ 191; Ex. 5 at 1.)  Also on June 9, 2022, *The New York Times* published a follow-

SULLIVAN &
CROMWELL LLP

1    up article alleging that other fake interviews had occurred based on claims from "10 current and former

2    employees," who reportedly believed that they "were subject to fake interviews, or conducted them, or

3    saw paperwork documenting the practice." (AC ¶ 190; Ex. 4 at 2.) The article also reported that the U.S.

4    Attorney's Office for the Southern District of New York had initiated an investigation into the claims in

5    the May 19 article. (AC ¶ 190.) The U.S. Attorney's Office has since closed its investigation without

6    taking action.

7         **C.**    **Plaintiffs' Claims against the Director Defendants**

8         Certain Wells Fargo shareholders have since seized on these articles to bring lawsuits against the

9    Company. Some shareholders have claimed securities fraud, filing a putative securities class action, *SEB*

10   *Investment Management AB* v. *Wells Fargo & Co.*, No. 22-cv-03811-TLT (N.D. Cal.). Plaintiffs here

11   take a different tack, attempting to wrest control from Wells Fargo's Board to pursue claims that belong

12   to the Company. Drawing on the news articles, non-Board materials produced in the mortgage

13   discrimination class action, and misleading characterizations of Company books and records, Plaintiffs

14   claim that the Director Defendants breached their fiduciary duties under Delaware law by failing to

15   implement reporting systems to monitor alleged discrimination in mortgage lending and hiring, and by

16   consciously ignoring red flags regarding these purported issues. (AC ¶ 367.)

17        Plaintiffs also allege that the Director Defendants breached their fiduciary duties by "consciously

18   issuing false and misleading statements to stockholders" (*id.* ¶ 425(c)), and they separately assert federal-

19   law claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), on the same basis. Plaintiffs also

20   bring claims under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), against the Director

21   Defendants on the ground that they "negligently issued, caused to be issued, and participated in the

22   issuance of materially misleading written statements" in the 2021 and 2022 Proxy Statements. (*Id.* ¶ 435.)

23        **D.**    **Plaintiffs Distort the Company's Books and Records**

24        In August 2022 and June 2023, Plaintiffs made demands under Section 220 of the Delaware

25   General Corporation Law that Wells Fargo produce books and records regarding the Company's mortgage

26   lending and diversity hiring practices. Wells Fargo produced to Plaintiffs hundreds of documents, totaling

27   nearly 7,000 pages, dated between January 2020 and June 2023 from the Board and its Risk, Human

28   Resources, Governance and Nominating, and Corporate Responsibility Committees. (*Id.* ¶¶ 64-66.)

1    Plaintiffs misleadingly cite only snippets of these documents to suggest that the Director

2    Defendants ignored issues relating to potential discrimination in the Company's mortgage lending

3    practices and implementation of the Guidelines.  For example, Plaintiffs note that, on December 13, 2021,

4    the Board's Governance and Nominating Committee (GNC) received an update on an email from Phillip

5    Miller, a prospective employee, who "asked whether 'he was interviewed only as a means for the hiring

6    executives to appear as if they are pursuing diverse candidates.'"  (*Id.* ¶ 179.)  Plaintiffs leave out that the

7    report also said the allegation was found to be "unsubstantiated."  (Ex. Z at -4666.)  Plaintiffs allege that

8    when the Board met on April 25, 2022, "the minutes of this meeting do not reflect any consideration of

9    whether the Company's lending algorithm resulted in disparate impacts towards minorities" (AC

10   ¶ 147) — ignoring the part of the meeting when Kristy Fercho, then head of Wells Fargo Home Lending,

11   informed the Board that "since the publication of the [*Bloomberg*] article, management has been focused

12   on three things:  (i) the data; (ii) engagement with stakeholders; and (iii) creating an action plan for how

13   the Company will move forward and help more people," including "doing more to improve Black home

14   ownership rates."  (Ex. U at -5834-35.)

15   Plaintiffs also cite a "4,500-word email" from Mr. Bruno concerning his termination, dated

16   September 7, 2021, to "nearly 250 Wells [Fargo] employees."  (AC ¶ 267; *see also* Ex. 6.)  Mr. Bruno's

17   email purportedly "inform[ed]" the recipients "of the Company's practice of holding fake interviews."

18   (AC ¶ 267; *see also id.* ¶ 174.)  The email contains two sentences, both in the 20th paragraph, vaguely

19   alluding to alleged fake interviews.  (Ex. 6 at -0011.)  The Delaware Court of Chancery has already found

20   that this email was not a document "one would . . . expect to warrant board attention."  (Ex. 7 at 34.)

21   **E.    Plaintiffs' Allegations about Unrelated Regulatory Matters and Lawsuits**

22   Plaintiffs dedicate several paragraphs of the Amended Complaint to regulatory issues and lawsuits

23   that have nothing to do with the allegations in this case.  For example, Plaintiffs repeatedly describe the

24   Federal Reserve's 2018 consent order, which was put in place following a "fake account" scandal from

25   2016.  (AC ¶¶ 4, 6, 272, 308.)  Plaintiffs also discuss unrelated past discrimination lawsuits and instances

26   of regulatory scrutiny by the Department of Labor.  (*Id.* ¶¶ 92-93, 185, 203.)  Plaintiffs dedicate special

27   attention to settlements with the Department of Justice in 2012 and the City of Philadelphia in 2019.  (*E.g.*,

28   *id.* ¶ 383.)  Those actions involved allegations that Wells Fargo disproportionately placed Black and

1   Hispanic borrowers into subprime loans with adverse terms or charged those borrowers higher rates than

2   white borrowers between 2004 and 2009.  (*Id.* ¶¶ 92-93.)  None of those issues, which predate the current

3   directors' tenures, has anything to do with the Company's loan underwriting algorithm or fake interviews.

4       **F.    Wells Fargo's Demand Board**

5       When Plaintiffs filed the Amended Complaint, Wells Fargo's Board consisted of 13 directors, all

6   but one of whom are named as Defendants.  (Plaintiffs mistakenly assert that the Demand Board has 14

7   members (AC ¶ 378), seemingly overlooking Directors Payne's and Pujadas's departures from the Board

8   and the addition of Fabian Garcia.  (Cullen Decl. ¶ 19.))  The Demand Board is Directors Black, Chancy,

9   Clark, Craver, Davis, Garcia, Hewett, Morken, Morris, Norwood, Sargent, Scharf, and Vautrinot.

10  Throughout the Amended Complaint, Plaintiffs refer to the "Director Defendants," "Demand Directors,"

11  or "the Board" to avoid making the requisite director-by-director allegations.  (*E.g.*, AC ¶¶ 383, 432.)

12                    **STANDARD FOR THIS DEMAND FUTILITY MOTION**

13      Rule 23.1(b)(3) requires that a shareholder-derivative complaint "state with particularity" any

14  "effort by the plaintiff to obtain the desired action from the directors," or, if the shareholder failed to make

15  any such effort, the "reasons for not obtaining the action or not making the effort" — in other words, why

16  making such a demand would have been "futile."  *Rosenbloom* v. *Pyott*, 765 F.3d 1137, 1148 n.10 (9th

17  Cir. 2014).  Because Wells Fargo is incorporated in Delaware, demand futility is governed by Delaware

18  law.  *See id.* at 1148.  It is the "rare case" in which demand is futile.  *In re Citigroup Inc. S'holder*

19  *Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).  When assessing demand futility, the focus is on

20  "the board of directors 'sitting at the time the complaint is filed.'"  *Rosenbloom*, 765 F.3d at 1148.  Thus,

21  Plaintiffs must adequately plead that demand would be futile as to at least seven of the 13 directors.

22      Delaware has a three-part test for assessing demand futility.  Courts must determine whether the

23  directors (i) received "a material personal benefit from the alleged misconduct," (ii) "face[] a substantial

24  likelihood of liability on" the claims, or (iii) "lack[] independence" from someone who is interested under

25  the first two prongs.  *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State*

26  *Pension Fund* v. *Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).  "If the answer to any of the questions is

27  'yes' for at least half of the members of the demand board, then demand is excused as futile."  *Id*.  To

28  satisfy this test, a plaintiff must plead particularized facts as to *each* director and *each* claim.  *See*

SULLIVAN &
CROMWELL LLP

1    *Desimone* v. *Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007).

2       Plaintiffs rely almost entirely on the second prong, which "requires particularized allegations"

3 showing that the "directors face a substantial likelihood of liability for engaging in the conduct that the

4 derivative claim challenges." *Zuckerberg*, 262 A.3d at 1057. A "substantial likelihood" is not a "mere

5 threat" of liability. *Rales* v. *Blasband*, 634 A.2d 927, 936 (Del. 1993). Plaintiffs cannot "simply

6 . . . describ[e] [a] calamity and alleg[e] that it occurred on the directors' watch"; they must "establish[] a

7 sufficient connection between the corporate trauma and the board such that at least half of the directors

8 face 'a substantial likelihood of personal liability.'" *South* v. *Baker*, 62 A.3d 1, 14 (Del. Ch. 2012).

9       Wells Fargo's charter, as permitted by Section 102(b)(7) of the Delaware General Corporation

10 Law, exculpates its directors from liability for claims arising from alleged breaches of fiduciary duty,

11 except to the extent alleged misconduct was intentional or taken in bad faith. (Ex. 8 at 7-8.)

12 **ARGUMENT**

13       Plaintiffs fail to carry their heavy burden to show that they are entitled to wrest control from the

14 Board and assert claims belonging to the Company. Indeed, over the course of a 160-page complaint, the

15 Director Defendants barely feature. The Amended Complaint does not adequately allege that any Director

16 Defendant knowingly breached his or her fiduciary duties by failing to oversee the Company's mortgage

17 lending practices or implementation of the Guidelines. Nor does it adequately allege that any of the

18 Director Defendants violated the federal securities laws.

19 **I.    PLAINTIFFS FAIL TO PLEAD THAT A MAJORITY OF THE BOARD FACES A**
**SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY FOR ALLEGED FAILURE**
20 **OF OVERSIGHT CLAIMS.**

21       Plaintiffs first contend that the Director Defendants are self-interested because they face a

22 substantial likelihood of liability for allegedly failing to oversee the Company's mortgage lending and

23 diversity hiring practices. (AC ¶¶ 355-69, 422-32.) Under Delaware corporate law, these kinds of failure

24 of oversight claims are known as *Caremark* claims. *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d

25 959, 967 (Del. Ch. 1996). A *Caremark* claim is "possibly the most difficult theory in corporation law

26 upon which a plaintiff might hope to win a judgment." *Id.*; *see also In re Am. Apparel, Inc. 2014*

27 *Derivative S'holder Litig.*, 2015 WL 12724070, at *17 (C.D. Cal. Apr. 28, 2015) ("Claims asserted under

28 *Caremark* must meet an exceptionally high [pleading] burden."). Plaintiffs must plead particularized facts

1   demonstrating either that "(a) the directors utterly failed to implement any reporting or information system

2   or controls[] or (b) having implemented such a system or controls, consciously failed to monitor or oversee

3   its operations thus disabling themselves from being informed of risks or problems requiring their attention."

4   *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).  Under either prong, a *Caremark* claim is viable only if

5   Plaintiffs plead with particularity that "the directors acted with the state of mind traditionally used to

6   define the mindset of a disloyal director — bad faith."  *Desimone*, 924 A.2d at 935.  Plaintiffs fail to

7   satisfy that high pleading standard.

### A.   Plaintiffs Do Not Plead Particularized Facts Alleging that a Majority of the Board Knowingly Failed To Oversee the Company's Mortgage Lending Practices.

Plaintiffs allege that the Director Defendants face a substantial likelihood of liability under both

prongs of *Caremark* for failing to oversee the Company's mortgage lending practices.  (AC ¶ 367.)  Both

theories fail.  *First*, Plaintiffs not only fail to plead particularized facts showing that the Board "utterly

failed" to implement reporting systems, but repeatedly cite to Board materials describing these systems.

*Second*, Plaintiffs fail to adequately allege any red flags regarding the Company's mortgage underwriting

algorithm prior to the March 2022 *Bloomberg* article, and far from pleading particularized allegations that

the Board consciously "did nothing" after the article came out, the Amended Complaint shows the

opposite — that the Board actively engaged management on the issues and requested updates on remedial

measures.  As for their pricing exception allegations, Plaintiffs do not plead any specific misconduct at

all, let alone plead particularized facts demonstrating that the Board ignored that misconduct.

### 1.   Plaintiffs Do Not Adequately Allege that the Director Defendants Utterly Failed To Put in Place a Reporting System Concerning Fair Lending.

Plaintiffs assert that the Director Defendants face a substantial likelihood of liability under

*Caremark*'s first prong because the Board allegedly failed "to implement a mission-critical reporting

structure to monitor fair lending compliance and discriminatory pricing."  (AC at 49.)  Plaintiffs must

plead particularized facts showing that the Director Defendants "*utterly* failed to implement any reporting

or information system or controls."  *Stone*, 911 A.2d at 370 (emphasis added).  The Delaware Supreme

Court has "been quite deliberate in its use of the adverb 'utterly' — a 'linguistically extreme

formulation' — to set the bar high when articulating the first way to hold directors personally liable for a

failure of oversight under *Caremark*."  *Rojas* v. *Ellison*, 2019 WL 3408812, at *9 (Del. Ch. July 29, 2019).

-9-

1    Delaware courts "give[] deference to boards and ha[ve] dismissed *Caremark* cases even when illegal or

2    harmful company activities escaped detection, when the plaintiffs have been unable to plead that the board

3    failed to make the required good faith effort to put a reasonable compliance and reporting system in place."

4    *In re LendingClub Corp. Derivative Litig.*, 2019 WL 5678578, at *10 (Del. Ch. Oct. 31, 2019).

5    Plaintiffs' own allegations defeat their claim.  In the same paragraphs about the Board's purported

6    failure to implement a "reporting structure to monitor fair lending compliance and discriminatory pricing"

7    (AC at 49), Plaintiffs describe the very Board reporting on fair lending issues that they claim did not exist.

8    For example, Plaintiffs allege that the Board's Corporate Responsibility Committee (CRC) discussed

9    during its August 11, 2020 meeting that "minority lending distribution [w]as an emerging risk."  (*Id.*

10   ¶ 140.)  During the same meeting, "Eric Brooks, Wells Fargo's Head of Fair Lending, HMDA and CRA

11   Compliance stated that" "monitoring activities had not identified any systemic fair lending risk" and that

12   "control effectiveness ha[d] improved." (*Id.*)  And the CRC's August 11, 2020 "Key Highlights" included

13   a "Fair Lending and CRA Update" stating that "Fair Lending Oversight monitoring ha[d] not detected

14   systemic fair lending risk" and that "efforts [were] underway to strengthen minority lending distribution

15   in identified markets." (*Id.* ¶ 141.)  As another example, Plaintiffs allege that the Risk Committee received

16   and reviewed a presentation titled "Bloomberg HMDA Discussion," dated April 25, 2022, which noted

17   that "[i]n February 2022, Wells Fargo Fair Lending Compliance completed its annual review confirming

18   differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants

19   were based on loan and credit factors."  (*Id.* ¶ 145) (alteration in original).

20   Given their own allegations, Plaintiffs cannot adequately plead, as they must, that the Board was

21   not monitoring the Company's fair lending practices "at all." (*Id.* ¶ 142.)  Instead, the thrust of Plaintiffs'

22   prong-one claim appears to be that the Board did not receive specific information about the Company's

23   "automated underwriting system or algorithm" that would have allegedly alerted it to potential "disparate

24   impact towards minorities."  (*Id.* ¶ 143.)  But that is not a viable claim under *Caremark*'s first prong.

25   Plaintiffs must "allege a total lack of *any* reporting system" — it is not enough to allege that "the reporting

26   system should have transmitted certain pieces of information."  *In re Gen. Motors Co. Derivative Litig.*,

27   2015 WL 3958724, at *14 (Del. Ch. June 26, 2015).  That the Board allegedly did not receive the

28   information in the *Bloomberg* article until its April 2022 meeting is insufficient to adequately plead that

1   the Board utterly failed, in bad faith, to implement a reporting system concerning fair lending. "The

2   bottom-line question that *Caremark* asks is whether the Board made a good faith effort to put in place a

3   reasonable board-level system." *City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*, 2022 WL 2387653,

4   at *16 (Del. Ch. June 30, 2022). And here, the Amended Complaint's "allegations demonstrate the

5   existence of a system rather than its absence," even if it did not capture specific information that Plaintiffs

6   believe it should have captured. *Id.*

7       Perhaps recognizing that they cannot credibly allege that the Board utterly failed to monitor the

8   Company's fair lending practices, Plaintiffs insist that the Director Defendants still face a substantial

9   likelihood of liability because they purportedly received only "infrequent and *ad hoc* 'updates' . . . on fair

10  lending risk." (AC ¶ 142; *see also id.* ¶ 382.) Plaintiffs specifically assert that "between August 2020 and

11  April 2022 . . . the Board never discussed fair lending, mortgage discrimination, or disparate impact at all

12  during any Board or Committee meeting." (*Id.* ¶ 142.)

13      But this argument has no basis in Delaware law. If Plaintiffs could self-servingly identify a period

14  of time without instances of the specific type of Board reporting at issue, and then state a *Caremark* claim

15  merely by alleging that the Board did not receive reports on Plaintiffs' preferred (and arbitrary) timetable,

16  *Caremark* claims would not be "the most difficult theory in corporation law." *Caremark*, 698 A.2d at 967.

17  Indeed, the Court of Chancery has expressly rejected the argument that *Caremark*'s first prong requires

18  "consistent reporting." In *Hamrock*, the plaintiff argued that a "'one-time discussion' during [] May 2017

19  meetings [wa]s simply too infrequent to meet the standard" set out under *Caremark* and its progeny. 2022

20  WL 2387653, at *16. The court disagreed and dismissed the plaintiff's prong-one claim. Even for a

21  "mission-critical risk," the court held that "this argument diverge[d] too dramatically from the high 'utter

22  failure standard.'" *Id.* at *15-16. What matters for *Caremark* purposes is "whether the Board made a

23  good faith effort to put in place a reasonable board-level system." *Id.* at *16. Because the board in

24  *Hamrock* had implemented such a system, the plaintiff failed to plead a prong-one claim. So too here.[2]

25

26  _____

    [2]     Plaintiffs' allegation that the Board received no reporting between August 2020 and April 2022
27  also is contradicted by the very books and records that Plaintiffs incorporated by reference into their
    Amended Complaint. For example, the Risk Committee received and reviewed a slide deck on July 26,
28  2021 titled "Fair Lending Training," which "provide[d] an overview of fair lending, the Board's related
    obligations, and key issues." (Ex. 12 at -5798.)

SULLIVAN &
CROMWELL LLP

**2. Plaintiffs Do Not Adequately Allege that the Director Defendants Did Nothing in Response to Red Flags.**

Plaintiffs' prong-two claim fares no better. A *Caremark* prong-two claim requires a plaintiff to allege that directors "*knew* that internal controls were inadequate" and "chose to do *nothing*." *Desimone*, 924 A.2d at 940 (emphases added). The Amended Complaint falls well short of this high standard.

***There Were No Pre-March 2022 "Red Flags."*** Plaintiffs purport to identify four red flags regarding disparities in mortgage lending caused by the Company's underwriting algorithm. These red-flag allegations fail because Plaintiffs do not adequately allege that the Board ever received the purported red flags or because the purported red flags never mention the underwriting algorithm, or both.

*First*, Plaintiffs allege that "[o]n May 6, 2021, the Pre-2022 Directors received [a] red flag when six Wells Fargo PhDs published" a "May 2021 Article highlighting the potential discriminatory effects of lending algorithms." (AC ¶ 392.) But Plaintiffs plead no particularized allegations showing that any Director Defendant even knew of, let alone reviewed, this report. *See Hamrock*, 2022 WL 2387653, at *24 ("Blanket statements that the Board 'should have known' about a purported red flag are not sufficient under Rule 23.1."). Even if they had, the paper is not a red flag of specific problems with the Company's mortgage underwriting algorithm because it discusses only the general risk of bias associated with artificial intelligence. Although Plaintiffs assert that the article "explains" that "the data supporting a lending algorithm . . . can result in discrimination," and that "[t]he article then provided proposed solutions for de-biasing and mitigating unfairness in lending algorithms" (AC ¶ 98), the paper is not about mortgage lending. Indeed, the entire paper mentions mortgage lending only once in a hypothetical example. Generalized risks associated with AI are not red flags that would alert the Board to specific problems with Wells Fargo's mortgage underwriting algorithm.

*Second*, Plaintiffs contend that a series of lawsuits generally involving discrimination and mortgages were red flags that should have put the Director Defendants on notice of purported issues with the Company's underwriting algorithm. "For a red-flag theory to work," however, "the red flag must be sufficiently connected *to the corporate trauma at issue* to elevate the [B]oard's inaction in the face of the red flag to the level of bad faith." *Hamrock*, 2022 WL 2387653, at *20 (emphasis added). The 2012 DOJ settlement and the 2019 *Philadelphia* settlement, as Plaintiffs concede, involved claims that Wells Fargo

SULLIVAN &
CROMWELL LLP

disproportionately placed Black and Hispanic borrowers "into subprime loans, with adverse terms and conditions, such as high interest rates" between 2004 and 2009. (AC ¶ 92.)  Plaintiffs do not explain how these actions would alert the Director Defendants to the particular problems at issue in this case — that the Company's underwriting algorithm allegedly resulted in racial disparities in approval rates for mortgage refinance loans in 2020.  The Court of Chancery has rejected the argument that "alleged prior, unrelated wrongdoing would make directors sensitive to similar circumstances."  *In re Citigroup*, 964 A.2d at 129.[3]

*Third*, Plaintiffs point to a litigation demand that the Board received in December 2020, which purportedly "related to . . . the Company's . . . minority borrowing practices."  (AC ¶ 96.)  Plaintiffs misrepresent the demand, which primarily concerned alleged consumer abuses unrelated to mortgage lending.  The single paragraph concerning "minority borrowing practices" refers to the subprime mortgage conduct from the DOJ and *Philadelphia* actions described above.  (*See* Ex. 10 at -0005 ("From 2004 through 2009, Wells Fargo 'engaged in a pattern or practice of discrimination' by 'systematically' charging African-American and Hispanic borrowers higher fees and rates than similarly qualified white borrowers.").)  The Board's evaluation of the demand would not have alerted it to purported issues with the Company's underwriting algorithm because those actions involved different conduct years earlier.

*Finally*, Plaintiffs allege that "[i]n August 2020, the CRC members were told that 'minority lending distribution' and 'residential mortgage redlining' 'continues to be a priority' for regulators and that '(redlining)' was an 'emerging risk.'" (AC ¶ 396.)  But "[g]eneral risks," such as residential mortgage redlining, "are not 'red flags' of a specific corporate trauma."  *Hamrock*, 2022 WL 2387653, at *25.  Indeed, Board reports about general risks are more appropriately viewed as "evidence that the reporting system in place is working as it should."  *Id.*  Plaintiffs also do not explain how the August 2020 CRC

---

[3]     Plaintiffs' reliance on decisions in unrelated derivative actions — *Himstreet* v. *Scharf*, No. CGC-22-599223 (Cal. Super. Ct.), and *Shaev* v. *Baker*, No. 16-cv-05541-JST (N.D. Cal.) — is perplexing.  (AC ¶ 420.)  Neither action had anything to do with the alleged conduct here.  *Himstreet* concerns Wells Fargo's compliance with three regulatory consent orders and makes no mention of discrimination in mortgage lending or diversity hiring.  *Shaev* involved allegations regarding improper sales practices that came to light in 2016.  Plaintiffs appear to suggest that a court's finding of demand futility means that making a demand to the same company's board would be futile for any other claims, a contention that has no basis in Delaware law.  *See Beam* v. *Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis."), *aff'd*, 845 A.2d 1040 (Del. 2004).

1    meeting is a red flag when management informed the CRC during the meeting that "monitoring activities

2    *had not identified* any systematic fair lending risk." (AC ¶ 140 (emphasis added).)  Plaintiffs contend that

3    management was mistaken given the *Bloomberg* reporting.  (*Id.*)  But whether management was correct

4    is irrelevant to whether the Director Defendants breached their duty of loyalty.  "The bottom-line question

5    that *Caremark* asks is whether the Board made a good faith effort to put in place a reasonable board-level

6    system," not whether that system was ultimately effective.  *Hamrock*, 2022 WL 2387653, at *16.

7         ***Board Members Did Not Consciously Ignore the March 2022 Bloomberg Article.***  Plaintiffs also

8    assert that the March 11, 2022 *Bloomberg* article describing purported racial disparities in Wells Fargo's

9    mortgage refinancing rates during 2020 is a red flag.  But the Amended Complaint and documents

10   incorporated by reference show that the Board did precisely what *Caremark* requires:  engaging with

11   management to address the allegations in the article.

12        For instance, Plaintiffs concede that the CRC, Risk Committee, and full Board each discussed the

13   mortgage lending allegations in the *Bloomberg* article during their April 25-26, 2022 meeting.  (AC

14   ¶¶ 145, 147-49.)  Plaintiffs allege, for example, that the Risk Committee received a slide deck titled

15   "*Bloomberg* HMDA Discussion."  (*Id.* ¶ 145 n.106.)  Plaintiffs neglect to mention that the slide deck

16   informed the Risk Committee that "[w]ork ha[d] been done and more [wa]s underway to address the

17   *Bloomberg* assertions and the approval gap, including" an "[a]ction plan to increase minority

18   homeownership developed and presented to HUD Secretary and [the Federal Housing Finance Agency]

19   Director." (Ex. X at -1106.)  The April 26, 2022 Board minutes also include a section titled "Consumer

20   Lending – Bloomberg Update," during which Ms. Fercho "provide[d] an update with respect to the

21   *Bloomberg* article regarding the Company's 2020 Home Lending approval rates," and informed the Board

22   that "management has been focused on . . . engagement with stakeholders" and "creating an action plan

23   for how the Company will move forward." (Ex. U at -5834-35.)  Several directors asked Ms. Fercho about

24   "process changes the Company could implement to align the presentation of its Home Lending data

25   relative to the data of its peers" and about whether "Internal Audit and the Controller's team ha[d] verified

26   the relevant data." (*Id.* at -5835.)  Ms. Morris, a Director Defendant, noted that "the Risk Committee

27   spent a lot of time on this topic during its meeting on Monday." (*Id.*)  Ms. Clark, another Director

28   Defendant, "reported that the [CRC] discussed the stakeholder outreach component." (*Id.*)  And the

SULLIVAN &
CROMWELL LLP

1  "Board discussed [the] topic" of the "primary differentiators between the Company and its peers." (*Id.*)

2  Plaintiffs also point to the racial equity audit that the Company commissioned — which was

3  completed in December 2023 and which contains numerous recommendations to minimize potential racial

4  discrimination in mortgage lending — on the apparent belief that this might bolster their red-flag theory.

5  (AC ¶¶ 169-71.)  In fact, the Board's commissioning an external law firm to conduct a comprehensive

6  investigation and to recommend potential solutions to the same problems at the heart of Plaintiffs'

7  Amended Complaint is the *opposite* of doing nothing in response to a red flag.

8  These documents doom Plaintiffs' prong-two claim.  Plaintiffs do not (because they cannot) plead

9  that the Board took no action in response to the *Bloomberg* article.  Instead, they assert their belief that

10  the Board did not do enough.  But "simply alleging that a board incorrectly exercised its business judgment

11  and made a 'wrong' decision in response to red flags . . . is insufficient to plead bad faith."  *Melbourne*

12  *Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*, 2016 WL 4076369, at *9 (Del. Ch. Aug. 1, 2016).

13  ***Plaintiffs Plead No Particularized Facts Connecting the Board to Pricing Exceptions.***  Plaintiffs

14  also assert that the Director Defendants breached their duty under *Caremark* because "discriminatory

15  pricing exceptions continued unabated." (*Id.* ¶ 386.)  Plaintiffs point to (1) the DOJ and *Philadelphia*

16  settlements and (2) a December 2023 article reporting that Wells Fargo purportedly received notice of a

17  "matter requiring attention" from the CFPB as red flags.  This theory suffers from two defects.

18  *First*, Plaintiffs never explain how the DOJ and *Philadelphia* settlements concerning conduct from

19  more than 15 years ago would put the Director Defendants on notice of purported *current* problems with

20  pricing exceptions.  Plaintiffs do not plead particularized facts explaining why the Director

21  Defendants — none of whom was on the Board between 2004 and 2009 — would believe the alleged

22  problems in those cases would have persisted after the settlements.

23  *Second*, and more fundamentally, Plaintiffs plead no particularized facts demonstrating any

24  specific ongoing problems with discriminatory pricing exceptions.  Plaintiffs seize on a December 2023

25  article alleging that "regulators found 'statistically significant disparities' in the rates in which Black and

26  female borrowers got pricing exceptions." (*Id.* ¶ 172.)  Neither Plaintiffs nor the article, however,

27  specifies the nature of the regulatory action or the conduct at issue.  The article itself notes that "[i]t's

28  unclear if regulators accused the bank of discrimination or sloppy oversight." (*Id.*)  And even if Plaintiffs

had adequately alleged that this article was a red flag of some specific misconduct, their prong-two claim would still fail because they do not allege that the Board has done nothing since December 2023.

### B. Plaintiffs Do Not Plead Particularized Facts Alleging that a Majority of the Board Knowingly Failed To Oversee the Company's Diversity Hiring Practices.

Plaintiffs next contend that demand is futile because a majority of the Board faces a substantial likelihood of personal liability under both prongs of *Caremark* for failing to oversee the Company's "discriminatory hiring practices." (*Id.* ¶¶ 367, 387.)  These claims fail for the same reason their mortgage lending oversight claims fail:  Plaintiffs allege the existence of monitoring systems, fail to identify any actual red flags before the Board, and discuss Board materials that show active Board engagement.

### 1. Plaintiffs Do Not Adequately Plead that the Director Defendants Utterly Failed To Implement any Reporting System Concerning Diversity Hiring.

Once again, Plaintiffs' own allegations foreclose any claim under *Caremark*'s first prong. Plaintiffs concede that the Board and several of its committees regularly received updates on the Company's diversity hiring practices.  The Plaintiffs allege, for example, that:

- During the October 26-27, 2020 Board meeting, then Chair Charles Noski "commented on the importance of the Company's diversity & inclusion . . . efforts, and he noted the Board's request to include D&I updates on the regular Board meeting agenda." (Ex. HH at -0651.)

- During the April 27, 2021 Board meeting, Mr. Santos provided a periodic "Diverse Segments, Representation and Inclusion:  Status Update," which included metrics tracking "leader headcount and movement trends" for Asian, female, Black/African American, and Hispanic/Latino employees covered by the Guidelines. (Ex. KK at -0759-61.)

- During the December 13, 2021 meeting of the Governance and Nominating Committee, "committee members discussed the Company's diversity programs, and how the Company intended to report on the progress of those programs." (AC ¶ 181.)

These documents more than "demonstrate that [Wells Fargo's] directors surpassed *Caremark*'s baseline requirement that they 'try' in good faith to put a 'reasonable compliance and reporting system in place.'"  *Firemen's Ret. Sys. of St. Louis* v. *Sorenson*, 2021 WL 4593777, at *13 (Del. Ch. Oct. 5, 2021).

Plaintiffs insist that "the Board had established no reporting system that required management to alert the Board of potential violations or abuses regarding the DEI policy and the Guidelines." (AC ¶ 387.) But the sole concrete allegation in the Amended Complaint about a possible fake interview — Mr. Miller's speculation that he may have been subjected to one when he was interviewed but not hired — *was reported* to members of the Board in December 2021. (*Id.* ¶ 179.)  As with their mortgage lending oversight claims,

-16-

SULLIVAN &
CROMWELL LLP

1    the real thrust of Plaintiffs' argument seems to be that the reporting system was not good enough.

2    Plaintiffs claim that the Board never received a copy of Mr. Bruno's September 7, 2021 email and that

3    Mr. Miller's original email was not communicated to the Board until December 2021.  (*Id.* ¶¶ 176,179-80.)

4    According to Plaintiffs, that the Board did not receive this information demonstrates bad faith.   But

5    Plaintiffs have again taken a criticism of the Company's design of its reporting systems — a matter of

6    business judgment — and dressed it up in the garb of a prong-one claim.  *Caremark*'s first prong, however,

7    "gives boards a wide berth to exercise [] discretion with respect to business risk" and "'design context-

8    and industry-specific approaches tailored to their companies' businesses and resources.'"  *Hamrock*, 2022

9    WL 2387653, at *12; *Clem* v. *Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) ("[T]he Board

10   [i]s required to exercise good faith oversight — not to employ a system to the plaintiffs' liking.").

11          That the Board did not implement procedures requiring management to escalate Mr. Bruno's email

12   (AC ¶ 176) is therefore insufficient to plead that the Director Defendants utterly failed to implement any

13   reporting systems or controls.  Indeed, the Court of Chancery, in a books-and-records action regarding the

14   Guidelines, already found Mr. Bruno's email was not a document "one would . . . expect to warrant board

15   attention." (Ex. 7 at 34.)  Even if it were, Plaintiffs' allegation boils down to an argument that Wells Fargo

16   "could have, should have, had a better reporting system" — "not that it had *no* such system."  *In re Gen.*

17   *Motors Co.*, 2015 WL 3958724, at *15.  "A subpar reporting system" — which Plaintiffs do not even

18   plead — "is not equivalent to an 'utter failure to attempt to assure' that a reporting system exists."  *Constr.*

19   *Indus. Laborers Pension Fund* v. *Bingle*, 2022 WL 4102492, at *14 (Del. Ch. Sept. 6, 2022).

20          If Plaintiffs believe the Board had a special obligation to exercise extra monitoring over diversity

21   in hiring because it was a "mission critical issue" for the Company (AC ¶ 7), they are mistaken.  To be

22   "mission-critical" for *Caremark* purposes, the issue must be so "essential" to the viability of the

23   company's core product that a director's failure to exercise more rigorous oversight would breach his or

24   her duty of loyalty.  *Hamrock*, 2022 WL 2387653, at *13-14.  Paradigmatic cases involve food and

25   airplane manufacturers allegedly failing to implement systems for monitoring food and airplane safety.

26   *See Marchand* v. *Barnhill*, 212 A.3d 805, 822-23 (Del. 2019); *In re Boeing Co. Derivative Litig.*, 2021

27   WL 4059934, at *25-33 (Del. Ch. Sept. 7, 2021).  Here, Plaintiffs do not adequately plead that compliance

28   with the Guidelines is to a bank what non-toxic food and safe planes are to ice cream and plane

manufacturers.  The Board's attention to diversity generally and the Guidelines specifically, which are indisputably important, does not transform compliance with the Guidelines into a mission-critical risk.[4] But even if it were, Plaintiffs *still* fail to plead a prong-one claim given the level of monitoring reflected in the Amended Complaint and the documents incorporated by reference.  *See Hamrock*, 2022 WL 2387653, at *16 (rejecting argument that a "one-time discussion" during Board meetings was "too infrequent" because it "diverges too dramatically from the high 'utter failure' standard").

### 2. The Amended Complaint Lacks Particularized Facts Alleging that a Majority of the Board Saw Red Flags of Fake Interviews but Did Nothing.

Plaintiffs relegate their prong-two argument, previously a cornerstone of their oversight theory, to a couple of paragraphs.  (AC ¶¶ 388-89.)  They barely try to identify any red flags alerting the Board to issues with the Guidelines before May 2022.  Plaintiffs assert in passing that "[o]ne red flag was when the Governance & Nominating Committee . . . learned about the Miller email on December 13, 2021."  (*Id.* ¶ 388.)  But that presentation informed the GNC members that "Employment Investigations found" Mr. Miller's allegation to be "unsubstantiated."  (Ex. Z at -4666.)  Far from Plaintiffs' identifying "red flags so vibrant that scienter is implied," *Bingle*, 2022 WL 4102492, at *10, that Plaintiffs, after reviewing more than three-years' worth of Board materials, can cite to only a single instance in which the Board was made aware of an alleged fake interview before May 2022 — and that the allegation was found to be unsubstantiated — precludes any inference that a majority of Director Defendants had reason to believe that fake interviews in connection with the Guidelines were a widespread practice.[5]

Plaintiffs also contend that the May 19, 2022 and June 9, 2022 *New York Times* articles were "additional" red flags.  (AC ¶ 388.)  But Plaintiffs have to plead particularized facts that the Board saw

---

[4]     Plaintiffs falsely allege that the U.S. House Financial Services Committee's March 4, 2020 Majority Report "was a scathing indictment of Wells Fargo's discriminatory policies in . . . hiring," which purportedly put the Director Defendants "on notice that preventing discriminatory hiring" was a "mission critical issue for the Company."  (AC ¶ 7.)  That report concerned risk management deficiencies and the Company's efforts to comply with three 2018 regulatory consent orders regarding risk management.  The report does not discuss diversity in hiring at all.  Plaintiffs' allegation that the Company adopted the Guidelines "in direct response to this report" is equally mystifying and wholly unfounded.  (*Id.* ¶ 8.)

[5]     Plaintiffs describe a series of non-particularized allegations about fake interviews *after* the *New York Times* articles, virtually all involving Mr. Bruno.  (AC ¶¶ 195-96.)  It is not clear what additional information Plaintiffs believe Mr. Bruno's videos and other online posts would convey to the Board regarding purported fake interviews that the *New York Times* articles did not provide.  Plaintiffs do not even allege that any Director Defendant was aware of these posts.

-18-

SULLIVAN &
CROMWELL LLP

these red flags and chose to *do nothing*.   As before, the Amended Complaint and the documents incorporated therein show ample Board engagement after the articles were published.   For instance, at the June 27, 2022 Board meeting, directors and management discussed "learnings from the review of the Company's diversity hiring practices" and "opportunities to improve [its] recruiting process."  (Ex. BB at -3141.)   This meeting was after the Company paused the Guidelines on June 6 to gain confidence that "our guidelines live[d] up to their promise," and ensure that "hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented."  (AC ¶ 191.)   And on July 25, 2022, the Human Resources Committee reviewed a presentation describing a battery of corrective measures that the Company was adopting, including a "30-60 Day Plan" and three "Mid to Long-Term Plan[s]."  (Ex. 11.)

Plaintiffs' assertion that, "[o]nce the Board finally learned about the hiring discrimination problem, the Demand Directors consciously ignored red flags," thus has no basis in the Amended Complaint.  (AC ¶ 388.)   Plaintiffs do not actually plead that the Board *did nothing*.   Plaintiffs appear to mean that they believe the Board should have taken different or additional action.   But again, Delaware law is clear that "it is not enough to say that the board's response was ineffective" and that a court "cannot infer bad faith" from allegations that a company's "efforts apparently proved unavailing."  *Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*, 2017 WL 6452240, at *16-17 (Del. Ch. Dec. 18, 2017).[6]

## II.     PLAINTIFFS FAIL TO PLEAD THAT A MAJORITY OF THE BOARD FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY FOR ALLEGED VIOLATIONS OF THE FEDERAL SECURITIES LAWS.

Plaintiffs also assert derivative federal securities claims against the Director Defendants for violations of Sections 14(a) and 10(b) of the Exchange Act.   None of Plaintiffs' allegations adequately

---

[6]     Plaintiffs allege in passing an additional theory of liability for breach of fiduciary duty:  that the Director Defendants "consciously issu[ed] false and misleading statements to stockholders, including in the Company's 2021 and 2022 Proxy Statements."  (AC ¶ 425(c).)  Those disclosure claims are duplicative of the federal securities claims and fail for the reasons discussed in Section II.  But those claims fail for the additional reason that Plaintiffs have not pleaded particularized allegations of "board involvement in the preparation of the disclosures."  *Citigroup*, 964 A.2d at 134.  Plaintiffs allege that certain of the Director Defendants signed reports containing some of (but not all) the challenged statements (*e.g.*, AC ¶¶ 220, 222, 242.), but Plaintiffs must plead more than that the Director Defendants merely "reviewed" the statements or "execut[ed]" reports containing them.  *Citigroup*, 964 A.2d at 134 & n.92; *see also In re Facebook, Inc. S'holder Derivative Privacy Litig.*, 367 F. Supp. 3d 1108, 1127-28 (N.D. Cal. 2019).

pleads that a majority of the Board faces a substantial likelihood of personal liability on these claims.[7]

### A.    Plaintiffs Fail Adequately To Plead that a Majority of the Board Faces a Substantial Likelihood of Liability under Section 14(a).

Plaintiffs contend that the Director Defendants violated Section 14(a) because they "negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements . . . contained in the 2021 and 2022 Proxy Statements," and because those Proxy Statements "misstated or failed to disclose" purported failures in reporting and internal controls with respect to mortgage lending and diversity hiring practices. (AC ¶ 435.)  To state a Section 14(a) claim, Plaintiffs must plead that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused [their] injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *N.Y.C. Emps.' Ret. Sys.* v. *Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010).  Plaintiffs fail to plead with particularity any of these required elements.

***Plaintiffs' Section 14(a) Claims as Alleged Are Exculpated.***  Presumably to avoid Rule 9(b)'s heightened pleading requirements, Plaintiffs base their Section 14(a) claims solely on negligence and *expressly* disclaim reliance on any reckless or knowing misconduct.  (AC ¶ 433 ("This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.").)  Plaintiffs' exclusive reliance on negligence is fatal to their claims.  This is because Wells Fargo's charter exculpates the Director Defendants from liability for claims arising from alleged breaches of fiduciary duty unless the alleged misconduct was intentional or in bad faith.  (*See* Ex. 8 at Article XIV.)  As courts in this District and elsewhere consistently have held, exculpation clauses defeat attempts to plead demand futility predicated on a negligence-based Section 14(a) claim.  *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 2022 WL 345066, at *5 (N.D. Cal. Feb. 4, 2022).

***Plaintiffs Fail To Plead Any Material Misstatement or Omission.***  Plaintiffs also fail to allege any material misstatements in the 2021 or 2022 Proxies.  To plead falsity, Plaintiffs must allege with

---

[7]    Where, as here, dismissal of the federal securities law claims (Counts II-V) is warranted, the Court may decline to exercise supplemental jurisdiction over the remaining state law breach of fiduciary duty claim (Count I).  *See* 28 U.S.C. § 1367(c)(3).  Because "the case remains at the pleading stage, there are no apparent considerations weighing in favor of retaining jurisdiction over the state law claims," and it would be "appropriate to decline to exercise supplemental jurisdiction."  *In re Wells Fargo & Co.*, 2022 WL 345066, at *7; *see also Pinto* v. *Arlo Techs., Inc.*, 2022 WL 3155411, at *4 (N.D. Cal. Aug. 8, 2022).

1    particularity that the challenged statements "affirmatively create[d] an impression of a state of affairs that

2    differ[ed] in a material way from the one that actually exist[ed]." *In re PayPal Holdings, Inc. S'holder*

3    *Derivative Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018). "A litany of alleged false statements,

4    unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet

5    this standard." *In re Facebook*, 367 F. Supp. 3d at 1128.

6         The Amended Complaint lacks specific facts showing how any of the challenged statements in the

7    2021 or 2022 Proxy Statements was false or misleading.  Plaintiffs rely on vague assertions from a handful

8    of employees about the purported incidence of "widespread" fake interviews.  (*See supra* at 4-5.)  But

9    these isolated instances, even assuming they occurred, do not render any of the challenged statements

10   generally describing the Guidelines materially false.  For example, Plaintiffs challenge the following

11   language from the 2021 Proxy Statement:  "[W]e are expanding our diversity and inclusion commitments

12   with a focus on hiring, promotions, and turnover, with increased accountability across all of those areas

13   and are taking specific actions in support of th[e]se commitments," and "[i]n the U.S., we are requiring a

14   diverse slate of candidates — and a diverse interview team — for most roles with total direct compensation

15   of more than $100,000 per year." (AC ¶ 222.) But Wells Fargo *did* require that a percentage of candidates

16   for certain roles be diverse, *did* require diverse interview teams, and *did* apply the requirement to most

17   positions with annual compensation over $100,000.  Plaintiffs do not allege otherwise.

18        Indeed, this Court has already explained in the related securities action that Plaintiffs "must allege

19   more than isolated incidents to support [their] theory that Defendants' statements were misleading due to

20   widespread sham interviews." *SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*, 2023 WL 11691540, at *6 (N.D.

21   Cal. Aug. 18, 2023).  The Court's reasoning applies just the same here:  The purported isolated instances

22   of noncompliance with the Guidelines alleged in the Amended Complaint do not render false or

23   misleading statements that Wells Fargo had *implemented* such a policy.  And they say nothing about Wells

24   Fargo's "record" of recruiting and promoting diverse employees.  *See Africa* v. *Jianpu Tech. Inc.*, 2022

25   WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022) ("[T]he fact that there were noncompliant providers . . .

26   does not mean that . . . statements regarding the Company's regulatory compliance measures were untrue

27   when made.").  The same is true with respect to challenged statements about "accountability of senior

28   management for progress in improving diverse representation and inclusion."  (AC ¶ 227; *see id.* ¶ 246.)

SULLIVAN &
CROMWELL LLP

1   Plaintiffs claim these statements were misleading because of widespread fake interviews (*id.* ¶ 223), but

2   plead no particularized facts to support that blanket assertion, and indeed do not dispute that members of

3   senior management *were* in fact evaluated based on their performance with respect to diversity hiring

4   initiatives, including the Guidelines (*see id.* ¶¶ 294-306).

5      Plaintiffs also challenge various aspirational statements from the 2021 and 2022 Proxy Statements

6   regarding Wells Fargo's general commitment to diversity, but fail to explain how any of those statements

7   is false.  A statement is actionably false only if it is "capable of objective verification."  *Or. Pub. Emps.*

8   *Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  Statements that Wells Fargo is

9   "Advancing Diversity, Equity, and Inclusion" (AC ¶ 222); "values and promotes DE&I in every aspect of

10  our business" (*id.*); "seek[s] to recruit the best and brightest talent with a keen focus on diversity for senior-

11  level roles" (*id.* ¶ 242); and "believe[s]" its efforts "enable[] the Company to play a positive role in

12  supporting diverse stakeholders" (*id.* ¶ 245) merely "emphasize a desire to commit to and embrace

13  diversity" and are not "capable of objective verification."  *City of Pontiac Gen. Emps.' Ret. Sys.* v. *Bush*,

14  2022 WL 1467773, at *4 (N.D. Cal. Mar. 1, 2022).  Plaintiffs also challenge statements that Wells Fargo

15  "supports the communities in which it does business" and "play[s] a significant role in both supporting

16  diverse communities across the nation and helping foster a more inclusive society."  (AC ¶ 228.)  But

17  these "expressions of opinion" amount to nothing more than "mildly optimistic, subjective assessment[s]"

18  and are not actionable under Section 14(a).  *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606.

19     ***Plaintiffs Fail To Allege that the Challenged Statements Were an "Essential Link" to any***

20  ***Purportedly Loss-Generating Corporate Action.***  Plaintiffs assert that the challenged statements were

21  "essential" to the re-election of the Board, whose purported control failures resulted in losses to the

22  Company.  (*See* AC ¶¶ 435-36.)  But "the re-election of directors who have allegedly mismanaged the

23  company is insufficient to meet the 'essential link' requirement of Section 14(a)."  *In re Diamond Foods,*

24  *Inc. Derivative Litig.*, 2012 WL 1945814, at *7 (N.D. Cal. May 29, 2012).  Plaintiffs further speculate that

25  various challenged statements induced shareholders to approve the Company's annual executive

26  compensation plans and to vote against "stockholder proposals."  (AC ¶ 435.)  But Plaintiffs plead no

27  particularized facts demonstrating how the challenged statements resulted in any compensable harm to the

28  Company, instead speculating that the Company's compensation program gave Defendants a "motive and

incentive to orchestrate additional fake interviews." (*Id.* ¶ 300.)  Such "conclusory allegations" about "the approval of compensation" do not suffice to establish any connection between any alleged misstatements and a "loss-generating corporate action." *Ocegueda* v. *Zuckerberg*, 526 F. Supp. 3d 637, 651-52 (N.D. Cal. 2021).  And in any event, Plaintiffs omit from the Amended Complaint that the Company's executive compensation plans were subject only to non-binding advisory votes that "do not authorize any corporate action" and cannot form the necessary "essential link" needed to plead a Section 14(a) claim.  *Hastey* v. *Welch*, 449 F. Supp. 3d 1053, 1064 (D. Kan. 2020).  (*See* Ex. 13 at 65; Ex. 14 at 63.)

### B.    Plaintiffs Fail To Plead Particularized Facts Alleging that a Majority of the Board Faces a Substantial Likelihood of Liability Under Section 10(b).

Plaintiffs next allege that the Director Defendants face a substantial likelihood of liability under Section 10(b) and Rule 10b-5 for allegedly making false or misleading statements.  (AC ¶¶ 439-46.)  But Plaintiffs have wholly failed to plead the required elements of falsity and scienter.

***Falsity.***    The Amended Complaint lacks particularized allegations that any of the challenged statements is actionably false or misleading.   The majority of the challenged statements generally described diversity hiring initiatives, including the Guidelines.  (*See* AC ¶¶ 215-16, 220, 222, 227, 232, 234, 236, 239, 242, 250, 257, 259.)  Again, as this Court explained in the securities action, Plaintiffs must allege "more than isolated incidents" to satisfy their burden to plead "particularized allegations sufficient to infer that sham interviews . . . were widespread." *SEB*, 2023 WL 11691540, at \*5-6.  And as with their Section 14(a) claims, Plaintiffs do not explain why statements describing how senior executives are evaluated are false when Plaintiffs concede elsewhere that these evaluations took place.  (*See id.* ¶¶ 294-306.)  And general statements regarding Wells Fargo's commitment to promoting diversity and helping customers achieve homeownership goals are "aspirational" expressions of "optimism" and are not actionable.  *Bush*, 2022 WL 1467773, at \*4.  (*See* AC ¶¶ 214, 216, 220, 222, 228, 238, 242, 262.)

Plaintiffs also challenge statements relating to Wells Fargo's mortgage lending practices but again fail to explain with particularity how these statements were false when made, or why any of the Director Defendants faces a substantial likelihood of liability for them.  For instance, Plaintiffs challenge a March 2022 statement in a local news article attributed to Wells Fargo, which expressed an opinion that the Company is "confident" its "underwriting practices are consistently applied" and described the findings

-23-

of an internal analysis into mortgage refinancing that identified "credit-related factors" "responsible for the differences in our refinance approval rate." (*Id.* ¶ 252-53.) When opinion statements contain embedded factual statements, Plaintiffs "must allege that 'the supporting fact [the speaker] supplied [is] untrue.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). Plaintiffs have not done so here. Indeed, the Amended Complaint illustrates that Wells Fargo had expressed internally that "differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit factors." (AC ¶ 145.) Plaintiffs also challenge statements from Mr. Santos that Wells Fargo did not use "proprietary credit-underwriting models" and "follow[s] the guidelines of the GSEs." (*Id.* ¶ 255.) Plaintiffs provide no support for their claim of falsity, and allege elsewhere that Wells Fargo *did* use the underwriting models provided by Fannie Mae and Freddie Mac. (*Id.* ¶ 166.) And in any event, Plaintiffs do not explain how any of the Director Defendants could be liable for these statements because the Amended Complaint contains no allegations that any of the Director Defendants made or had "ultimate authority" over them. *City of Royal Oak Ret. Sys.* v. *Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070-71 (N.D. Cal. 2012).

**Scienter.** Plaintiffs' Section 10(b) claims fail for the additional reason that they fail to "state with particularity facts giving rise to a *strong inference* that the [Defendants] acted with" scienter. *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008). Plaintiffs point to only one single instance in which the Board and senior management were made aware of a single fake interview allegation. This falls far short of the necessary showing that any Defendant knew his or her statements about the Guidelines were misleading or untrue. Plaintiffs' conclusory assertions that Defendants must have known about purported "widespread" fake interviews by virtue of access to a "trove of information" (AC ¶ 268), repeated public statements about the Guidelines (*id.* ¶ 269), unrelated "misconduct" (*id.* ¶ 270), and the Company's decision to pause the Guidelines following the publication of the *New York Times* article (*id.* ¶ 271) do not support an inference that Defendants knowingly lied or acted with an "extreme departure from the standards of ordinary care." *Align Tech., Inc.*, 856 F.3d at 619. And with respect to the challenged statements about mortgage refinancing, the Plaintiffs never attempt to allege any particularized facts giving rise to a strong inference that the Director Defendants made any challenged statement with "intent to deceive." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).

1  Lastly, because Plaintiffs fail to allege that any Defendants face a substantial likelihood of liability

2  under Section 14(a) or Section 10(b), their Section 20(a) claims against Defendants necessarily fail.  *See*

3  *Jackson* v. *Fischer*, 2013 WL 6732872, at *13 (N.D. Cal. Dec. 20, 2013).[8]

4  **CONCLUSION**

5  For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint with

6  prejudice.  It has been nearly two years since Plaintiffs made a demand on Wells Fargo's Board for books

7  and records regarding the allegations in the Amended Complaint.  During that time, the Department of

8  Justice has opened *and closed without taking any adverse action* an investigation arising out of *The New*

9  *York Times*'s reporting, and this Court has dismissed related federal securities law claims.  Plaintiffs have

10  had ample opportunity to present particularized allegations to support their claims and have failed to do

11  so.  They should not be afforded another opportunity to try.  *See In re Verifone Holdings, Inc. S'holder*

12  *Derivative Litig.*, 2010 WL 3385055, at *2, *10 (N.D. Cal. Aug. 26, 2010) (dismissing action with

13  prejudice where plaintiff inspected company's books and records before filing amended complaint).

14

15

16

17

18

19

20

21  [8]      Plaintiffs assert in passing that "the Board cannot be expected to file the claims asserted in this

22  derivative lawsuit" because the Company's directors-and-officers insurance policy contains an "insured versus insured exclusion."  (AC ¶ 414.)  Courts have consistently held that "such an insurance provision

23  alone is not a sufficient basis to infer demand futility under Delaware law."  *In re Maxwell Techs., Inc. Derivative Litig.*, 2014 WL 2212155, at *17 (S.D. Cal. May 27, 2014).  Plaintiffs also argue that demand

24  on Mr. Scharf would be futile under *Zuckerberg*'s first prong (because his "compensation was tied in part to the success of the Company's diversity and inclusion efforts" (AC ¶ 416)) and third prong (because his

25  compensation is controlled by the other Director Defendants, "who have disabling conflicts concerning these derivative claims" (*id.* ¶ 419)).  Both arguments fail because they depend on Plaintiffs' claim that

26  Mr. Scharf and the other Director Defendants face a substantial likelihood of liability on the asserted claims.  Absent particularized allegations that Mr. Scharf faces a substantial likelihood of liability,

27  Plaintiffs fail to explain how pursuing these claims would result in Mr. Scharf's compensation being clawed back.  Similarly, Plaintiffs' argument that Mr. Scharf is not independent of the other Director

28  Defendants requires Plaintiffs first to adequately plead that those other Director Defendants are themselves interested, which, for the reasons explained, Plaintiffs have not done.

-25-

SULLIVAN &
CROMWELL LLP

1    DATED:  June 11, 2024           Respectfully submitted,

2

                              */s/ Brendan P. Cullen*

3                              Brendan P. Cullen (SBN 194057)
                             (cullenb@sullcrom.com)

4                              Sverker K. Hogberg (SBN 244640)
                             (hogbergs@sullcrom.com)

5                              SULLIVAN & CROMWELL LLP
                             550 Hamilton Avenue

6                              Palo Alto, California  94301
                             Telephone:  (650) 461-5600

7

8                              Christopher M. Viapiano (*pro hac vice*)
                             (viapianoc@sullcrom.com)

9                              SULLIVAN & CROMWELL LLP
                             1700 New York Avenue N.W., Suite 700

10                             Washington, D.C. 20006
                            Telephone:  (202) 956-7500

11

12                             Leonid Traps (*pro hac vice*)
                            (trapsl@sullcrom.com)

13                             SULLIVAN & CROMWELL LLP
                            125 Broad Street

14                             New York, New York  10004
                            Telephone:  (212) 558-4000

15                             *Counsel for Nominal Defendant*

16                             *Wells Fargo & Company*

17

18

19

20

21

22

23

24

25

26

27

28

SULLIVAN &
CROMWELL LLP