1  Brendan P. Cullen (SBN 194057)
   (cullenb@sullcrom.com)
2  Sverker K. Hogberg (SBN 244640)
   (hogbergs@sullcrom.com)
3  SULLIVAN & CROMWELL LLP
   550 Hamilton Avenue
4  Palo Alto, California 94301
   Telephone:  (650) 461-5600
5

6  *Counsel for Defendants Scott Powell, Michael
   Santomassimo, Carly Sanchez, Kleber Santos, and
7  Jonathan Weiss*

8  [*Additional counsel listed on signature page*]

9

10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14 | Lead Case No. 3:22-cv-05173-TLT |
| 15 | |
| 16 | **DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS, AND JONATHAN WEISS'S NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED COMPLAINT FOR FAILURE ADEQUATELY TO PLEAD DEMAND FUTILITY AND FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF LAW IN SUPPORT THEREOF** |
| 17 | |
| IN RE WELLS FARGO & COMPANY 18 HIRING PRACTICES DERIVATIVE LITIGATION 19 This Document Relates To: 20      ALL ACTIONS 21 | |
| 22 | Hearing:  August 27, 2024 Time:  2:00 p.m. |
| 23 | Courtroom 9, 19th Floor The Honorable Trina L. Thompson |
| 24 | |

25

26

27

28

SULLIVAN & CROMWELL LLP

DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS, AND JONATHAN WEISS'S MOTION TO DISMISS THE AMENDED COMPLAINT LEAD CASE NO. 3:22-CV-05173-TLT

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3      PLEASE TAKE NOTICE that on August 27, 2024 at 2:00 p.m., or as soon thereafter as counsel

4   may be heard in Courtroom 9 of the United States District Court for the Northern District of California,

5   located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Scott Powell, Michael

6   Santomassimo, Carly Sanchez, Kleber Santos, and Jonathan Weiss will and hereby do move this Court to

7   dismiss the Consolidated Amended Complaint (ECF No. 147) under Federal Rules of Civil Procedure

8   12(b)(6) and 23.1.   This Motion is based on this Notice, the supporting Memorandum of Law, the

9   Declaration of Brendan P. Cullen and exhibits thereto (ECF No. 152-1), Wells Fargo's Request for Judicial

10   Notice (ECF No. 152-2), the complete files and records in this action, and any additional material and

11   arguments as may be considered in connection with the hearing or thereafter.

12   DATED:  June 11, 2024                                  Respectfully submitted,

13                                                          */s/ Brendan P. Cullen*
                                                            _____
14                                                          Brendan P. Cullen (SBN 194057)
                                                            (cullenb@sullcrom.com)
15                                                          Sverker K. Hogberg (SBN 244640)
                                                            (hogbergs@sullcrom.com)
16                                                          SULLIVAN & CROMWELL LLP
                                                            550 Hamilton Avenue
17                                                          Palo Alto, California  94301
                                                            Telephone:  (650) 461-5600

18

19                                                          Christopher M. Viapiano (*pro hac vice*)
                                                            (viapianoc@sullcrom.com)
20                                                          SULLIVAN & CROMWELL LLP
                                                            1700 New York Avenue, N.W., Suite 700
21                                                          Washington, D.C.  20006
                                                            Telephone:  (202) 956-7500

22

23                                                          Leonid Traps (*pro hac vice*)
                                                            (trapsl@sullcrom.com)
24                                                          SULLIVAN & CROMWELL LLP
                                                            125 Broad Street
25                                                          New York, New York  10004
                                                            Telephone:  (212) 558-4000

26                                                          *Counsel for Defendants Scott Powell, Michael*
                                                            *Santomassimo, Carly Sanchez, Kleber Santos,*
27                                                          *and Jonathan Weiss*

28

SULLIVAN &
CROMWELL LLP

DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS,
AND JONATHAN WEISS'S MOTION TO DISMISS THE AMENDED COMPLAINT
LEAD CASE NO. 3:22-CV-05173-TLT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

ISSUES TO BE DECIDED ..................................................................................................2

ALLEGATIONS OF THE AMENDED COMPLAINT.........................................................3

      A.     Wells Fargo's Mortgage Lending Practices................................................4

      B.     Wells Fargo's Diversity Hiring Practices ..................................................4

      C.     Plaintiffs Distort the Company's Books and Records ...............................5

      D.     Plaintiffs Bring Derivative Claims against the Officer Defendants ..........6

      E.     Plaintiffs' Allegations about Unrelated Regulatory Matters and Lawsuits ...........................7

ARGUMENT .......................................................................................................................7

I.     Plaintiffs Have Failed To Establish Demand Futility as to the Officer Defendants.......................8

II.    Plaintiffs Fail To State *Caremark* Claims for Breach of the Duty of Oversight Against the Officer Defendants.................................................................................9

      A.     Plaintiffs Fail To Plead a Prong-One Claim. .........................................10

      B.     Plaintiffs Fail To Plead a Prong-Two Claim. ........................................13

III.   Plaintiffs Fail To State Section 10(b) Claims against the Officer Defendants. ...........................18

IV.   Plaintiffs Fail To State Section 20(a) Claims against the Officer Defendants. ...........................22

V.    Plaintiffs Fail To State a Section 20A Claim against Santos.......................................................23

CONCLUSION..................................................................................................................25

-ii-

SULLIVAN &
CROMWELL LLP

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Am. Apparel, Inc. 2014 Derivative S'holder Litig.*,
2015 WL 12724070 (C.D. Cal. Apr. 28, 2015) .......................................................................8

*Beam* v. *Stewart*,
833 A.2d 961 (Del. Ch. 2003) ...............................................................................................8

*Buban* v. *O'Brien*,
1994 WL 324093 (N.D. Cal. Jun. 22, 1994) ....................................................................24, 25

*In re Citigroup Inc. S'holder Derivative Litig.*,
964 A.2d 106 (Del. Ch. 2009) ..............................................................................................17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .........................................................................................20, 21

*City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*,
2022 WL 2387653 (Del. Ch. June 30, 2022) .......................................................................17

*City of Royal Oak Ret. Sys.* v. *Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...............................................................................18

*Constr. Indus. Laborers Pension Fund* v. *Bingle*,
2022 WL 4102492 (Del. Ch. Sept. 6, 2022) ........................................................................17

*Desimone* v. *Barrows*,
924 A.2d 908 (Del. Ch. 2007) ..........................................................................................9-10

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) ..............................................................................................18

*Hefler* v. *Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ......................................................................18

*Howard* v. *Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .............................................................................................23

*Howard* v. *Hui*,
2001 WL 1159780 (N.D. Cal. Sept. 24, 2001) .....................................................................23

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
564 U.S. 135 (2011) ............................................................................................................18

-iii-

SULLIVAN &
CROMWELL LLP

*Johnson* v. *Aljian*,
    490 F.3d 778 (9th Cir. 2007) ........................................................................................24

*In re McDonald's Corp. S'holder Derivative Litig.*,
    2023 WL 2329711 (Del. Ch. Mar. 1, 2023) .................................................................9

*In re McDonald's Corp. S'holder Derivative Litig.*,
    289 A.3d 343 (Del. Ch. 2023) ............................................................................. *passim*

*McElrath* v. *Kalanick*,
    2019 WL 1430210 (Del. Ch. Apr. 1, 2019) .................................................................9

*Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*,
    2016 WL 4076369 (Del. Ch. Aug. 1, 2016) .................................................................9

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................................................21

*Murphy* v. *Precision Castparts Corp.*,
    2020 WL 4040827 (D. Or. July 17, 2020) ..................................................................23

*ODP Corp.* v. *Allen*,
    277 A.3d 296 (Del. Ch. 2022) .....................................................................................14

*Okla. Firefighters Pension & Ret. Sys.* v. *Amazon.com, Inc.*,
    2022 WL 1760618 (Del. Ch. June 1, 2022) ..................................................................6

*Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................................18, 24

*Purple Mountain Tr.* v. *Wells Fargo & Co.*,
    432 F. Supp. 3d 1095 (N.D. Cal. 2020) ......................................................................23

*City of Pontiac Gen. Emps.' Ret. Sys.* v. *Bush*,
    2022 WL 1467773 (N.D. Cal. Mar. 1, 2022) ..............................................................20

*Rosenbloom* v. *Pyott*,
    765 F.3d 1137 (9th Cir. 2014) ......................................................................................8

*SEB Inv. Mgmt. AB* v. *Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................24, 25

*Segway Inc.* v. *Cai*,
    2023 WL 8643017 (Del. Ch. Dec. 14, 2023) .........................................................11, 17

*Stone* v. *Ritter*,
    911 A.2d 362 (Del. 2006) ..............................................................................................9

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
    551 U.S. 308 ...........................................................................................................21, 22

-iv-

SULLIVAN &
CROMWELL LLP

*In re Twitter, Inc. Sec. Litig.*,
　　506 F. Supp. 3d 867 (N.D. Cal. 2020) ............................................................22

*United Food & Commercial Workers Union & Participating Food Indus. Employers Tri-State Pension Fund* v. *Zuckerberg*,
　　262 A.3d 1034 (Del. 2021) .........................................................................8, 9

*Zucco Partners, LLC* v. *Digimarc Corp.*,
　　552 F.3d 981 (9th Cir. 2009) ...................................................................21, 22

**Statutes**

Delaware General Corporation Law Section 220 .....................................................5, 6

Federal Rule of Civil Procedure 9(b) ...............................................................18, 23

Federal Rule of Civil Procedure 12(b)(6) ...........................................................7, 25

Federal Rule of Civil Procedure 23.1 .................................................................*passim*

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a) *et seq.*...................3, 18

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b)
　　and SEC Rule 10-b5 promulgated thereunder ..............................................*passim*

Securities Exchange Act Section 14(a), 15 U.S.C. § 78n(a),
　　and SEC Rule 14a-9 promulgated thereunder ...............................................*passim*

Securities Exchange Act Section 20(a), 15 U.S.C. § 78t(a) ......................................2, 3 7, 22, 23

Securities Exchange Act Section 20A, 15 U.S.C. § 78t-1 .....................................2, 3, 7, 23, 24, 25

-v-

SULLIVAN &
CROMWELL LLP

## PRELIMINARY STATEMENT

As Wells Fargo explains in its accompanying Rule 23.1 motion ("Wells Fargo's Motion") (ECF No. 152), Plaintiffs are attempting to pursue derivative claims against Wells Fargo's directors based on a complaint in which those directors barely feature.  Seizing on snippets from news articles in 2022 from *Bloomberg* and *The New York Times*, materials obtained through books-and-records demands, and publicly available materials produced in an unrelated mortgage discrimination class action pending in this District, Plaintiffs cobbled together an Amended Complaint that, despite spanning over 160 pages and 455 paragraphs, alleges virtually nothing at all about any of the Director Defendants, much less how demand as to a majority of them would be futile.  But Plaintiffs also purport to bring Delaware state law and federal securities law claims on the Company's behalf against five officers:  Scott Powell, Michael Santomassimo, Carly Sanchez, Kleber Santos, and Jonathan Weiss.  These Officer Defendants, like the Director Defendants, are also virtually absent from the Amended Complaint.

Plaintiffs' attempt to bring claims against the Officer Defendants on the Company's behalf fails at the threshold for the reasons outlined in Wells Fargo's Motion — Plaintiffs have failed to plead particularized facts demonstrating that a majority of the Board could not disinterestedly or independently evaluate a demand.  If the Court grants Wells Fargo's Motion, then Plaintiffs cannot pursue the Company's claims against the Officer Defendants either, and the Court need not resolve this Motion.  In any event, Plaintiffs' claims against the Officer Defendants fail for several additional, independent reasons.

*First*, even if Plaintiffs pleaded particularized facts demonstrating that a majority of the Board faces a substantial likelihood of liability for Plaintiffs' failure-of-oversight and federal securities law claims, Plaintiffs do not allege that a majority of the Board faces a substantial likelihood of liability for the claims against the *Officer* Defendants.  Delaware law is clear that demand futility proceeds on a claim-by-claim basis, and Plaintiffs fail to plead (with particularity or otherwise) that the Wells Fargo Board cannot disinterestedly and independently consider the claims asserted against the Officer Defendants.

*Second*, Plaintiffs assert that, like the Director Defendants, the Officer Defendants failed to oversee Wells Fargo's mortgage lending and diversity hiring practices.  An officer can be held liable only for failing to oversee those issues within his or her area of responsibility.  Plaintiffs fail to allege that most of the Officer Defendants had responsibility for either mortgage lending or diversity hiring.  In any event,

the Amended Complaint and documents it incorporates by reference demonstrate both the existence of monitoring systems and efforts by Wells Fargo's management to respond to the *Bloomberg* and *New York Times* articles after they were published.

*Third*, Plaintiffs claim that the Officer Defendants violated Section 10(b) of the Exchange Act by making false or misleading statements about the Company's mortgage refinancing and diversity hiring practices in public statements.  Plaintiffs' claims under Section 10(b) fail because Plaintiffs cannot meet their high burden to allege that any of the Officer Defendants intentionally misled the public.  And Plaintiffs have not pleaded (and cannot plead) with particularity that any of the challenged statements — general descriptions of the Guidelines, mortgage practices, or the Company's diversity goals — is false.

*Fourth*, Plaintiffs contend that each Officer Defendant is liable for statements they did not make because they were control persons within the meaning of Section 20(a) of the Exchange Act.  Plaintiffs' Section 20(a) claims fail, however, because they do not adequately plead any predicate primary violation under Section 10(b) and because they do not plead particularized facts demonstrating that any Officer Defendant had control over the makers of any of the challenged statements.

*Finally*, Plaintiffs assert that Santos violated Section 20A of the Exchange Act because he allegedly sold certain of his shares of Wells Fargo stock while the Company was engaged generally in share repurchases.  This claim fails because Plaintiffs do not adequately plead that Santos is liable for any primary violation of the Exchange Act and because Plaintiffs fail to plead with particularity that Santos made specific trades that were "contemporaneous" with Wells Fargo's within the meaning of Section 20A.

### ISSUES TO BE DECIDED

1.    Should Plaintiffs be permitted to pursue Wells Fargo's claims against the Officer Defendants where the Amended Complaint fails to plead with particularity that a majority of the Wells Fargo Board of Directors faces a substantial likelihood of personal liability on those claims, received a material personal benefit from the alleged misconduct, or is not independent?

2.    Should Plaintiffs' failure-of-oversight claims under Delaware law be dismissed where the Amended Complaint fails adequately to plead that the Officer Defendants utterly failed to implement reporting systems or consciously ignored red flags regarding misconduct within their areas of responsibility?

-2-

SULLIVAN &
CROMWELL LLP

3. Should Plaintiffs' claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5 be dismissed where the Amended Complaint fails to allege particularized facts demonstrating that any alleged misstatement was materially false or misleading or that any Officer Defendant had the requisite intent to defraud, as required by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a) *et seq.*?

4. Should Plaintiffs' claims under Section 20(a) of the Securities Exchange Act be dismissed where the Amended Complaint fails to adequately allege (i) any primary violation of the securities laws or (ii) particularized facts showing that the Officer Defendants controlled the alleged violators?

5. Should Plaintiffs' claim under Section 20A of the Securities Exchange Act against Santos be dismissed where the Amended Complaint fails to adequately allege (i) any primary violation of the securities laws or (ii) particularized facts showing that Wells Fargo engaged in "contemporaneous" share repurchases at or above the price at which Santos allegedly sold his own shares?

### ALLEGATIONS OF THE AMENDED COMPLAINT

Wells Fargo is a Delaware corporation and one of the largest U.S. financial institutions. (*See* Amended Complaint ("AC") ¶¶ 39, 72.) The Company provides banking, mortgage, and other products and employs over 200,000 people. (*Id.* ¶¶ 70, 72.) The Officer Defendants are five senior executives of Wells Fargo: Scott Powell, Chief Operating Officer since 2019; Michael Santomassimo, Chief Financial Officer since 2020; Kleber Santos, former head of Diverse Segments, Representation, and Inclusion and, since July 2022, CEO of Consumer Lending; Carly Sanchez, former Vice President of Talent Acquisition from 2013 to 2022; and Jonathan Weiss, CEO of Corporate and Investment Banking since 2020.[1] (*See id.* ¶¶ 52, 54-56, 60.)

---

[1] Although Plaintiffs at one point refer to Mary Mack, former CEO of Consumer and Small Business Banking, as a defendant (*see* AC ¶ 432 ("Defendants Scharf, Santos, Mack, Powell, and others . . .")), Plaintiffs do not identify Mack when listing the parties to the action (*id.* ¶¶ 36-60) or when defining "Individual Defendants" (*id.* ¶ 61). In any event, Plaintiffs hardly mention Mack, except to point out that diversity efforts factored into the compensation of members of the Company's Operating Committee and that she was one of nearly 250 employees to whom Joe Bruno addressed his September 7, 2021 email.

-3-

SULLIVAN & CROMWELL LLP

DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS, AND JONATHAN WEISS'S MOTION TO DISMISS THE AMENDED COMPLAINT
LEAD CASE NO. 3:22-CV-05173-TLT

### A.      Wells Fargo's Mortgage Lending Practices

On March 11, 2022, *Bloomberg* published an article describing purported racial disparities in Wells Fargo's mortgage refinancing rates during 2020.  According to the article, Wells Fargo approved 47% of mortgage refinancing applications submitted by Black homeowners, compared with 72% of applications by white homeowners.  (*Id.* ¶ 16; Ex. 1 at 2.)[2]  The article stated that Wells Fargo, like other banks, was already considering additional ways to account for existing inequalities reflected in factors that are commonly used to evaluate mortgage refinancing applications.  (Ex. 1 at 8, 10.)  In a second article published on March 25, 2022, *Bloomberg* reported that Home Mortgage Disclosure Act data for 2021 revealed that Wells Fargo had increased the percentage of mortgage refinancing approvals for Black applicants from 47% to 58% during 2021.  (AC ¶ 115; Ex. 2 at 1.)

In the wake of the *Bloomberg* reporting, several mortgage borrowers filed putative class actions against Wells Fargo and its affiliates alleging racial discrimination in mortgage lending resulting in part from the Company's mortgage underwriting algorithm.  (AC ¶ 101 & n.47.)  On January 18, 2023, Judge James Donato consolidated those actions under the caption *In re Wells Fargo Mortgage Discrimination Litigation*, 3:22-cv-00990 (N.D. Cal.).  (*Id.* n.47.)

### B.      Wells Fargo's Diversity Hiring Practices

Separately, in March 2020, Wells Fargo announced that it was expanding a policy requiring that at least half of all candidates interviewed for certain positions be diverse.  (*Id.* ¶ 8.)  The policy — formally referred to as the Diversity Sourcing and Interview Team Guidelines ("Guidelines") — was part of Wells Fargo's ongoing efforts to promote diversity in its senior ranks.  (*Id.*; *see also id.* ¶¶ 222, 242.)  The Guidelines went into effect later that year, and required that, "for most U.S. roles with total direct compensation greater than $100,000," "[a]t least 50% of interview candidates must be diverse with respect to at least one diversity dimension."  (*Id.* ¶ 222.)  The Guidelines defined "diverse" to include racial minorities, women, LGBTQ individuals, veterans, and people with disabilities.  (*Id.*)

---

[2]      Citations to numbered exhibits in the form "Ex. [_]" refer to exhibits to the Declaration of Brendan P. Cullen, filed contemporaneously herewith.  (ECF No. 152-1.)  Citations to lettered exhibits in the form "Ex. [_]" refer to exhibits to the Amended Complaint.  (ECF No. 147.)

-4-

SULLIVAN &
CROMWELL LLP

On May 19, 2022, *The New York Times* published an article recounting what the reporter described as instances of purported "sham" interviews of diverse candidates.  (*Id.* ¶¶ 26, 182.)  The article focused primarily on the allegations of Joe Bruno — a former employee in Wells Fargo's Wealth Management Division at its Jacksonville, Florida location — who claimed that he had been instructed by his supervisors in certain instances to conduct interviews of diverse candidates "even though the decision had already been made to give the job to another candidate."  (*Id.* ¶ 182; *see also* Ex. 3 at 1-2.)  The article recounted one instance in 2017 (well before the Guidelines were instituted) in which an applicant was allegedly interviewed for a position that had already been filled, and stated that several other current or former employees claimed that they were aware of or participated in "sham" interviews while at the Company. (Ex. 3 at 1, 4.)

When the article was published, Wells Fargo stated that "to the extent that individual employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it."  (AC ¶ 184.) Wells Fargo also explained that it investigated "all the specific hiring-practice allegations the reporter shared prior to the story's publication and [] could not corroborate these allegations as factual." (*Id.* ¶ 254.)  Nevertheless, on June 9, 2022, Wells Fargo announced a "pause" of the Guidelines, effective June 6, so Company leaders could "gain confidence that the guidelines live[d] up to their promise," and ensure that "hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should be implemented."  (*Id.* ¶ 191; Ex. 5 at 1.)  Also on June 9, 2022, *The New York Times* published a follow-up article alleging that other fake interviews had occurred based on claims from "10 current and former employees," who reportedly believed that they "were subject to fake interviews, or conducted them, or saw paperwork documenting the practice."  (AC ¶ 190; Ex. 4 at 2.)  The article also reported that the U.S. Attorney's Office for the Southern District of New York had initiated an investigation into the claims in the May 19 article.  (AC ¶ 190.)  The U.S. Attorney's Office has since closed its investigation without taking action.

### C.    Plaintiffs Distort the Company's Books and Records

In August 2022 and June 2023, Plaintiffs made demands under Section 220 of the Delaware General Corporation Law that Wells Fargo produce books and records regarding the Company's mortgage

-5-

SULLIVAN &
CROMWELL LLP

1   lending and diversity hiring practices.   Wells Fargo produced to Plaintiffs hundreds of Board-level

2   documents, totaling nearly 7,000 pages, dated between January 2020 and June 2023 from the Board and

3   its Risk, Human Resources, Governance and Nominating, and Corporate Responsibility Committees.  (*Id.*

4   ¶¶ 64-66; *see also* Ex. D.)  With the exception of a September 7, 2021 email from Mr. Bruno to "nearly

5   250 Wells [Fargo] employees" regarding his termination (AC ¶ 267), Wells Fargo did not produce

6   officer-level materials, because under Delaware law, "[f]ormal board-level documents are often the

7   beginning and end of a Section 220 production where a plaintiff aims to investigate whether directors

8   exercised proper oversight."  *Okla. Firefighters Pension & Ret. Sys.* v. *Amazon.com, Inc.*, 2022 WL

9   1760618, at *12 (Del. Ch. June 1, 2022).

10      Plaintiffs cite several times to Mr. Bruno's September 2021 email concerning his termination,

11   which he sent to "nearly 250 Wells [Fargo] employees," including Powell and Santos.  (AC ¶ 267.)

12   Mr. Bruno's email purportedly "inform[ed]" the recipients "of the Company's practice of holding fake

13   interviews."  (*Id.*; *see also id.* ¶ 174.)  In fact, the email contains only two sentences, both in the 20th

14   paragraph, vaguely alluding to alleged fake interviews and that read, in their entirety:  "I will have more

15   emails to share . . . one on the fake Interviews we managers do that is directed by HR . . . this is being

16   investigated also.   When I brought up the fake interviews, and I wasn't comfortable doing them,

17   Vanderveen said put your head down and focus on recruiting."  (*See* Ex. 6 at -0011) (ellipses in original).

18      Plaintiffs also cite a handful of year-end performance and compensation summaries for members

19   of the Company's Operating Committee, including Powell, Santomassimo, Santos, and Weiss.  These

20   summaries identify performance objectives, such as "lead[ing] the advancement of D&I efforts across the

21   company," as well as qualitative performance summaries.  (*E.g.*, Ex. TT.)  The summaries also include a

22   comparison of each Operating Committee member's compliance with the Guidelines compared to the

23   Company average.

24      **D.    Plaintiffs Bring Derivative Claims against the Officer Defendants**

25      In addition to their claims against the Director Defendants, Plaintiffs also attempt to pursue four

26   kinds of derivative claims against the Officer Defendants.  *First*, Plaintiffs assert that each Officer

27   Defendant breached his or her fiduciary duties under Delaware law by failing to oversee the Company's

28

-6-

mortgage lending and diversity hiring practices and for "issuing false and misleading statements to stockholders" on these issues.  (AC ¶¶ 422-32.)  *Second*, Plaintiffs bring federal securities law claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 against the Officer Defendants for allegedly "disseminat[ing] or approv[ing] false or misleading statements about Wells Fargo related to its discriminatory practices."[3]  (*Id.* ¶ 440.)  *Third*, Plaintiffs assert that each Officer Defendant is liable as a control person under Section 20(a), 15 U.S.C. § 78t(a).  (*Id.* ¶¶ 448-50.)  *Finally*, Plaintiffs assert that Santos violated Section 20A, 15 U.S.C. § 78t-1, because he sold 22,700 shares of Wells Fargo common stock on May 3, 2022 while "Wells Fargo was contemporaneously repurchasing shares during this same period."  (*Id.* ¶ 452-53.)

### E.    Plaintiffs' Allegations about Unrelated Regulatory Matters and Lawsuits

Plaintiffs dedicate several paragraphs of the Amended Complaint to regulatory issues and lawsuits that have nothing to do with the allegations in this case.  For example, Plaintiffs repeatedly describe the Federal Reserve's 2018 consent order, which was put in place following a "fake account" scandal from 2016.  (*Id.* ¶¶ 4, 6, 272, 308.)  Plaintiffs focus primarily on two settlements with the Department of Justice in 2012 and the City of Philadelphia in 2019.  (*E.g.*, *id.* ¶ 383.)  Those actions involved allegations that Wells Fargo disproportionately placed Black and Hispanic borrowers into subprime loans with adverse terms or charged those borrowers higher rates than white borrowers between 2004 and 2009 (*id.* ¶¶ 92-93) — alleged conduct that predates by many years the tenure of each Officer Defendant.  Moreover, none of those issues has anything to do with the Company's mortgage loan underwriting algorithm or fake interviews.

### ARGUMENT

As explained in Wells Fargo's Motion, Plaintiffs have failed to plead adequately that making a demand on the Board would be futile, and therefore Plaintiffs have not established that they have standing to pursue Wells Fargo's claims against any of the Defendants — Directors or Officers — on behalf of the Company.  (*See generally* Wells Fargo's Mot.)  But even if demand were excused, Plaintiffs' claims

---

[3]    Other shareholders are simultaneously pursuing related direct claims under Section 10(b) against Santos and Sanchez in a putative securities class action also before this Court captioned *SEB Investment Management AB* v. *Wells Fargo & Co.*, No. 22-cv-03811-TLT (N.D. Cal.).

1    against the Officer Defendants should be dismissed for the independent reason that Plaintiffs fail to state

2    a claim under Rule 12(b)(6).  Plaintiffs plead no facts demonstrating that the Officer Defendants breached

3    their Delaware state-law oversight duties under either prong of *Caremark* or that any Officer Defendant

4    violated the federal securities laws.

5    **I.    PLAINTIFFS HAVE FAILED TO ESTABLISH DEMAND FUTILITY AS TO THE OFFICER DEFENDANTS.**

6         When assessing demand futility, the focus is on "the board of directors 'sitting at the time the

7    complaint is filed.'"  *Rosenbloom* v. *Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).  For the reasons stated in

8    Wells Fargo's Motion, the Amended Complaint does not set forth particularized facts showing that a

9    majority of the demand board — seven of 13 directors — would be unable to disinterestedly and

10   independently evaluate claims against the Officer Defendants.[4]  The Officer Defendants adopt in full the

11   demand futility arguments in Wells Fargo's Motion.  As explained below, Plaintiffs' demand futility

12   allegations are particularly deficient as to the claims against the Officer Defendants.

13        Federal Rule of Civil Procedure 23.1(b)(3) requires that a shareholder-derivative complaint "state

14   with particularity" any "effort by the plaintiff to obtain the desired action from the directors," or, if the

15   shareholder failed to make any such effort, "the reasons for not obtaining the action or not making the

16   effort" — in other words, why making such a demand would have been "futile."  *Rosenbloom*, 765 F.3d

17   at 1148.  Demand futility is "a matter of substantive law for which the Court looks to the law of the state

18   of incorporation — in this case Delaware."  *In re Am. Apparel, Inc. 2014 Derivative S'holder Litig.*, 2015

19   WL 12724070, at *13 (C.D. Cal. Apr. 28, 2015).  The "purpose of the demand-futility analysis is to assess

20   whether the board should be deprived of its decision-making authority because there is reason to doubt

21   that the directors would be able to bring their impartial business judgment to bear on a litigation demand."

22   *United Food & Commercial Workers Union & Participating Food Indus. Employers Tri-State Pension

23   Fund* v. *Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).  The "[d]emand futility analysis is conducted on

24   a claim-by-claim basis."  *Beam* v. *Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003).

---

26   [4]    Plaintiffs mistakenly assert that the Demand Board has 14 members (AC ¶ 378), seemingly
27   overlooking Directors Payne's and Pujadas's departures from the Board and the addition of Fabian Garcia.
     (Cullen Decl. ¶ 19.)  Either way, Plaintiffs fail to plead particularized facts that seven directors on either
28   Board are interested or dependent on someone who is.

Plaintiffs make no effort to plead that pre-suit demand on the Board would have been futile with respect to any claims against the Officer Defendants.  Plaintiffs do not even try to explain how a majority of the Board could face a substantial likelihood of liability for the claims brought against Wells Fargo's officers — as opposed to the Director Defendants themselves.  *See Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*, 2016 WL 4076369, at *13 (Del. Ch. Aug. 1, 2016) ("It is unclear . . . how a majority of the Board could face a substantial likelihood of liability as to [the claims against the Officer Defendants] when only two of the fifteen members of the Board . . . are included as Officer Defendants.").  Nor have Plaintiffs alleged facts that any director lacks independence from the Officer Defendants.  Making this showing requires a plaintiff to plead with particularity facts raising a reasonable inference that a director is "so beholden" to an interested fiduciary — in this case, an officer — that "his or her discretion would be sterilized."  *See Zuckerberg*, 262 A.3d at 1060.  But here, Plaintiffs allege nothing in the Amended Complaint even suggesting that a single director lacks independence with respect to claims that the Officer Defendants breached their fiduciary duties.  *See In re McDonald's Corp. S'holder Derivative Litig.*, 2023 WL 2329711, at *1 (Del. Ch. Mar. 1, 2023) (*McDonald's II*) (dismissing claim against officer for failure to plead demand futility because directors could impartially consider demand); *McElrath* v. *Kalanick*, 2019 WL 1430210, at *17 n.188 (Del. Ch. Apr. 1, 2019) (dismissing when plaintiff made "no argument that any of the members of the Demand Board lack independence from [officer-defendant]").  For this reason alone, the claims against the Officer Defendants should be dismissed.

## II.   PLAINTIFFS FAIL TO STATE *CAREMARK* CLAIMS FOR BREACH OF THE DUTY OF OVERSIGHT AGAINST THE OFFICER DEFENDANTS.

Count I of the Amended Complaint asserts failure-of-oversight claims against the Officer Defendants.  (*See* AC ¶¶ 422-32.)  As explained in Wells Fargo's Motion, to state a failure-of-oversight claim — also known as a *Caremark* claim — Plaintiffs must plead facts demonstrating either that "(a) the [officers] utterly failed to implement any reporting or information system or controls[] or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).  Under either prong, a *Caremark* claim is viable only if Plaintiffs plead that "the [defendants] acted with the state of mind traditionally used to define the mindset of a disloyal

-9-

[fiduciary] — bad faith." *Desimone* v. *Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007).  Plaintiffs' *Caremark* claims against the Officer Defendants fail because Plaintiffs do not adequately plead that the Officer Defendants failed, in bad faith, to oversee mortgage lending or diversity hiring.  To the contrary, the Amended Complaint and the documents it incorporates by reference show active oversight of these areas by members of management.

Plaintiffs' oversight claims against the Officer Defendants also fail for an additional reason. *Caremark* claims have historically concerned directors; Delaware courts have only very recently extended them to officers.  *See In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 358-375 (Del. Ch. 2023) ("*McDonald's I*").  In *McDonald's I*, the Court of Chancery held that officers "owe duties of oversight comparable to those of directors," but cautioned that its holding "does not mean that the situational application of those duties will be the same."  *Id.* at 369.  This is because while directors are "charged with plenary authority over the business and affairs of the corporation," officers "generally have a more constrained area of authority," and accordingly a more "constrained version" of the duty of oversight under *Caremark*.  *Id.*  Under this constrained duty, officers will generally be expected to undertake oversight or monitoring activities only "within their areas of responsibility." *Id.* at 359, 369-70. Plaintiffs never even attempt to make that showing for Powell, Santomassimo, or Weiss.  As for Santos, Plaintiffs do not plead that he had responsibility over mortgage lending before July 2022 and again concede the existence of monitoring and good-faith efforts to respond to the *Bloomberg* and *New York Times* articles.  And as for Sanchez, Plaintiffs do not allege that she was ever responsible for mortgage lending and plead no facts suggesting that she did not make a good-faith effort to oversee the Company's diversity hiring practices.

### A.    Plaintiffs Fail To Plead a Prong-One Claim.

Plaintiffs first assert that the Officer Defendants utterly failed to implement monitoring systems regarding racial disparities in mortgage lending and the Company's diversity hiring practices.  These claims fail for two reasons.  *First*, Plaintiffs do not even attempt to plead that Powell's, Sanchez's, Santomassimo's, or Weiss's responsibilities encompassed racial disparities in mortgage lending. Plaintiffs allege that Santos was responsible for mortgage lending, but only since July 2022 — four months

-10-

SULLIVAN & CROMWELL LLP

1  after the *Bloomberg* article.  And as for diversity hiring and compliance with the Guidelines, Plaintiffs

2  make no effort to plead that Powell, Santomassimo, or Weiss had any responsibility for these issues.

3  *Second*, Plaintiffs plead no facts establishing that any Officer Defendant utterly failed, in bad faith, to

4  implement monitoring systems.  As with the Director Defendants, the Amended Complaint is replete with

5  examples of oversight of both topics.

6      ***Mortgage Lending.***  The fundamental deficiency with Plaintiffs' prong-one claim regarding

7  mortgage lending is that Plaintiffs make no specific allegations that racial disparities in mortgage lending

8  were within any of the Officer Defendants' "areas of responsibility" before the March 2022 *Bloomberg*

9  article.  *McDonald's I*, 289 A.3d at 370.  Just as an "executive officer in charge of sales and marketing is

10 not responsible for the financial or legal reporting systems" of a corporation, *id.*, Plaintiffs do not allege

11 facts suggesting that fair lending fell specifically within Powell's general operations remit, Sanchez's

12 talent acquisition remit, Santomassimo's general financial remit, or Weiss's investment banking remit.

13 Indeed, the Amended Complaint is devoid of *any* allegations regarding the "situational application" of

14 these four Officer Defendants' specific oversight duties.  *Id.* at 369.  The most Plaintiffs plead about

15 Powell's, Sanchez's, Santomassimo's, and Weiss's job responsibilities is his or her job title.  (AC ¶¶ 52,

16 54-55, 60.)  Plaintiffs' prong-one claim regarding mortgage lending fails against these Officer Defendants

17 for this reason alone.  *See Segway Inc.* v. *Cai*, 2023 WL 8643017, at *4 (Del. Ch. Dec. 14, 2023)

18 (dismissing *Caremark* claims against officer where alleged oversight violation did not "fall within [the

19 officer's] sphere of corporate responsibility").

20      Plaintiffs do allege that Santos was "responsible for consumer lending products and services,

21 including Home Loans" after he became "CEO of Consumer Lending" in July 2022.  (AC ¶ 56.)  But

22 Santos was not in that role until four months after the *Bloomberg* article.  Plaintiffs do not explain why

23 Santos would be responsible for monitoring the Company's mortgage lending practices before July 2022.

24 And Plaintiffs say nothing about Santos's monitoring efforts after he became CEO of Consumer Lending.

25      In addition to these threshold failures, Plaintiffs fail to state a prong-one claim against any of the

26 five Officer Defendants because Plaintiffs do not plead that any of them utterly failed to implement

27 monitoring systems in bad faith.  Liability under *Caremark* requires a plaintiff to plead that an officer

28 defendant utterly failed to "gather information and provide timely reports to the board about the officer's

-11-

SULLIVAN &
CROMWELL LLP

1   area of responsibility." *McDonald's I*, 289 A.3d at 366.  Plaintiffs do not carry their burden to plead that

2   the Officer Defendants "utterly failed" to conduct any such monitoring here.  Unsurprisingly, Plaintiffs

3   plead nothing, one way or the other, about the Officer Defendants in connection with monitoring racial

4   disparities in mortgage lending — issues that were not within any of the Officer Defendants' "area of

5   responsibility" until Santos became CEO of Consumer Lending in July 2022.

6        Tellingly, and only further demonstrating the fundamental deficiencies of Plaintiffs' prong-one

7   claim, Plaintiffs *do* repeatedly describe instances of monitoring systems regarding fair lending by officers

8   whose responsibilities *did* encompass fair lending practices.  For instance, Plaintiffs acknowledge that

9   "Eric Brooks, Wells Fargo's Head of Fair Lending, HMDA and CRA Compliance," described his

10  department's "monitoring activities" to the Corporate Responsibility Committee on August 11, 2020, and

11  reported that it had "not identified any systematic fair lending risk" and had concluded that "control

12  effectiveness ha[d] improved." (AC ¶ 140.)  Plaintiffs also acknowledge that Wells Fargo's "Fair Lending

13  Compliance" function conducted an "annual review." (*Id.* ¶ 145.)  On April 25, 2022, Kristy Fercho, then

14  head of Wells Fargo Home Lending, reported to the Risk Committee the results of Wells Fargo Fair

15  Lending Compliance's February 2022 annual review, which found that "differences in approval rates

16  between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit

17  factors." (*Id.*; *see also* Ex. X at -1106.)  These allegations are more than sufficient to demonstrate that the

18  Officer Defendants, even if they had some responsibility for overseeing mortgage lending (which

19  Plaintiffs do not plead), did not utterly fail to implement information systems.

20       ***Diverse Hiring Practices.***  Plaintiffs' prong-one claims regarding diversity hiring do not fare any

21  better.  Plaintiffs make virtually no effort to plead that Powell, Santomassimo, or Weiss was responsible

22  for implementing the Guidelines specifically or diversity hiring generally.  At most, Plaintiffs allege that

23  these three Officer Defendants, as members of the Operating Committee, received performance-based

24  compensation and were evaluated based on their "advancement of D&I efforts" (Ex. TT) and attempts to

25  "make progress towards reducing underutilization that exists with respect to women and racial/ethnic

26  minorities at executive levels within [their] group[s]" (Ex. SS).  But that each member of the Operating

27  Committee was evaluated for his or her efforts to "make progress towards reducing underutilization" of

28  women and non-white employees at the executive levels says nothing about any member's specific

-12-

1  oversight responsibilities, let alone the oversight responsibilities of the particular Officer Defendants

2  regarding diverse hiring practices across the entirety of Wells Fargo.

3        Plaintiffs' prong-one claims against Santos and Sanchez, whose responsibility did cover diversity

4  in hiring, also fail.  As for Santos, the Amended Complaint and the documents it incorporates by reference

5  show that he was actively monitoring diversity hiring and the Company's implementation of the

6  Guidelines.  For instance, Plaintiffs allege that Santos prepared and shared a periodic "Diverse Segments,

7  Representation and Inclusion" "Status Update" during the April 27, 2021 Board meeting, which included

8  metrics tracking "leader headcount and movement trends" for Asian, female, Black/African American,

9  and Hispanic/Latino employees covered by the Guidelines.  (AC ¶ 208 & Ex. KK at -0759-61.)  Plaintiffs

10  also allege that, during the June 28, 2022 meeting of the Human Resources Committee, "the Directors

11  were given a detailed update on the Company's Diverse Slate program by Santos."  (AC ¶ 27.)  These

12  allegations more than demonstrate that Santos made an effort to "gather information and provide timely

13  reports to the" Board regarding the Company's diversity hiring practices.  *McDonald's I*, 289 A.3d at 366.

14  As for Sanchez, aside from the names of her positions and her October 7, 2021 statements, Plaintiffs say

15  nothing at all about her.  The Amended Complaint is devoid of any allegations regarding Sanchez's

16  reporting efforts or processes, let alone allegations that she consciously chose, in bad faith, not to

17  implement information systems regarding diversity hiring.  Again, as explained above, Plaintiffs' own

18  allegations and exhibits make clear that management *did* have reporting systems in place to track

19  information regarding diversity hiring generally and the progress of the Guidelines specifically.  And

20  Plaintiffs do not plead facts suggesting that Sanchez herself utterly failed to gather and report data

21  regarding diversity hiring or the Guidelines.

22        **B.**    **Plaintiffs Fail To Plead a Prong-Two Claim.**

23        Plaintiffs also contend that the Officer Defendants "consciously disregard[ed] their duty to

24  investigate red flags and to remedy any misconduct uncovered."  (AC ¶ 425(b).)  But the Amended

25  Complaint does not sufficiently allege that "the fiduciar[ies] knew of evidence of corporate misconduct"

26  and "consciously failed to take action in response."  *McDonald's I*, 289 A.3d at 376.

27        Again, Plaintiffs fail to allege that mortgage lending fell within any of the Officer Defendants'

28

-13-

1  "areas of responsibility" until Santos became CEO of Consumer Lending in July 2022 or that Powell,

2  Santomassimo, or Weiss were responsible for diversity hiring or implementing the Guidelines across

3  Wells Fargo.  Those threshold failures are equally fatal to any prong-two claim against any of the Officer

4  Defendants (to the extent based on mortgage-lending allegations) or against Powell, Santomassimo, and

5  Weiss (to the extent based on diverse-hiring allegations).

6      But Plaintiffs also fail to allege adequately that any of the Officer Defendants "had knowledge of

7  certain 'red flags' indicating corporate misconduct and acted in bad faith by consciously disregarding

8  [their] duty to address that misconduct."  *ODP Corp.* v. *Allen*, 277 A.3d 296, 337 (Del. Ch. 2022).

9  *McDonald's I* illustrates why Plaintiffs' prong-two claims against the Officer Defendants miss the mark.

10  In *McDonald's I*, the Court of Chancery declined to dismiss a *Caremark* claim against the Global Chief

11  People Officer of McDonald's because he allegedly ignored 18 particularly pleaded red flags indicating

12  his plain and obvious awareness that the company was violating laws prohibiting sexual harassment.  *Id.*

13  at 377-78.  The red flags included, for example: (i) the defendant officer's personal engagement in sexual

14  harassment as witnessed by 30 employees, leading to discipline by the audit committee; (ii) complaints

15  about the conduct of executives; (iii) two instances in which a dozen employees complained to the Equal

16  Employment Opportunity Commission about sexual harassment and misconduct; and (iv) a company

17  walkout across 30 cities to protest sexual harassment.  *Id.*  Based on these specific and numerous

18  allegations of red flags faced by the Chief People Officer — red flags concerning issues that were clearly

19  within his area of responsibility — the court drew a pleading stage inference that he consciously and in

20  bad faith ignored red flags that the company engaged in sexual harassment and misconduct.  *Id.* at 379.

21  Plaintiffs allege nothing of the sort here.

22      ***Mortgage Lending.***  Plaintiffs here plead no facts demonstrating that any of the Officer Defendants

23  was alerted to purported issues with the Company's mortgage underwriting algorithm or alleged

24  discriminatory use of pricing exceptions before the March 2022 *Bloomberg* article.  Indeed, Plaintiffs say

25  *nothing at all* about any Officer Defendant in connection with discrimination in mortgage lending.  The

26  Amended Complaint describes only four purported red flags of which Plaintiffs believe the *Director*

27  *Defendants* were aware:  (1) a May 6, 2021 white paper by several Wells Fargo employees regarding the

28  general risk of bias associated with artificial intelligence (AC ¶¶ 384, 392); (2) two lawsuit settlements

-14-

SULLIVAN &
CROMWELL LLP

DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS,
AND JONATHAN WEISS'S MOTION TO DISMISS THE AMENDED COMPLAINT
LEAD CASE NO. 3:22-CV-05173-TLT

1  from 2012 and 2019 regarding conduct between 2004 and 2009 (*id.* ¶ 383); (3) a December 2020 litigation

2  demand on the Board referencing these two settlements (*id.*¶¶ 383, 391); and (4) an August 2020 update

3  to the Corporate Responsibility Committee regarding the general risk associated with "'minority lending

4  distribution' and 'residential mortgage redlining'" (*id.* ¶ 396).

5        Even assuming for the sake of argument that Plaintiffs meant to allege that these red flags also

6  applied to the Officer Defendants, none of them concerned the particular alleged problems with the

7  Company's mortgage underwriting algorithm or pricing exceptions at issue in this case.  These red-flag

8  allegations therefore fail for the Officer Defendants for the same reason they fail for the Director

9  Defendants.  (Wells Fargo's Mot. 12-14.)

10        Furthermore, even if Plaintiffs adequately alleged that these red flags went to the Officer

11  Defendants *and* contained information that alerted them to purported issues regarding discrimination in

12  mortgage lending, Plaintiffs would *still* fail to plead adequately a prong-two claim against the Officer

13  Defendants because the Amended Complaint simply says nothing at all about what the Officer Defendants

14  did or did not do with respect to mortgage lending.  Indeed, as with their prong-one claim, Plaintiffs

15  repeatedly allege that the officers who *were* responsible for overseeing the Company's fair lending

16  practices complied with their duties under *Caremark* by "report[ing] upward" and working to "address"

17  problems when they arose.  *McDonald's I*, 289 A.3d at 366.  For example, Plaintiffs allege that Kristy

18  Fercho "provide[d] an update" to the Board during its April 26, 2022 meeting "with respect to the

19  *Bloomberg* article regarding the Company's 2020 Home Lending approval rates," and informed the Board

20  that "management has been focused on . . . engagement with stakeholders" and "creating an action plan

21  for how the Company will move forward and help more people," including by "doing more to improve

22  Black home ownership rates."  (AC ¶ 147 & Ex. U at -5834-35.)  Fercho also informed the Board about

23  "process changes the Company could implement to align the presentation of its Home Lending data

24  relative to the data of its peers" and about whether "Internal Audit and the Controller's team ha[d] verified

25  the relevant data."  (*Id.* at -5835.)

26        The sole Officer Defendant who Plaintiffs allege was responsible for mortgage lending —

27  Santos — was not CEO of Consumer Lending until July 2022.  His responsibility for mortgage lending

28  thus postdates by four months the March 2022 *Bloomberg* article, which is the last alleged red flag

-15-

SULLIVAN &
CROMWELL LLP

DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS,
AND JONATHAN WEISS'S MOTION TO DISMISS THE AMENDED COMPLAINT
LEAD CASE NO. 3:22-CV-05173-TLT

identified by Plaintiffs.[5]  Plaintiffs do not explain how Santos could be liable for failing to respond to red flags that predate his responsibility for mortgage lending by several months.  Nor do Plaintiffs allege that Santos consciously did nothing to address the purported problems identified in the *Bloomberg* article after he assumed responsibility for mortgage lending.  The Amended Complaint and the documents incorporated by reference show that after the *Bloomberg* article, officers like Fercho were working to address the purported issues with racial disparities in mortgage lending.  And Plaintiffs plead no facts suggesting that Santos, when he assumed responsibility for mortgage lending, would not have known about those efforts or would have reason to doubt that these efforts were sufficient to address the problem.

**Diverse Hiring Practices.**  As for purported issues with diverse hiring, Plaintiffs attempt to allege only two red flags before the *New York Times* articles in May and June 2022:  (1) that Powell and Santos were two of the 250 addressees of Mr. Bruno's September 7, 2021 email (AC ¶ 14), and (2) that "[g]iven Santos'[s] role it is inconceivable that he did not have material non-public information about the Company's discriminatory conduct" (*id.* ¶ 25).  Neither allegation constitutes a red flag.  And Plaintiffs do not even attempt to plead that Santomassimo, Sanchez, or Weiss was aware of any red flags before the *New York Times* articles.

*First*, Plaintiffs continue to attempt to use Mr. Bruno's email to carry a weight it will not bear.  Mr. Bruno's email devoted only "two sentences to" fake interviews out of "nearly 4,500 words."  (Ex. 7 at 34.)  And unlike the plaintiffs in *McDonald's I*, Plaintiffs here do not plead any facts demonstrating widespread, obvious awareness of purported fake interviews across the Company — like public walkouts across the nation or dozens of complaints to U.S. agencies.  To the extent Plaintiffs mean to argue that Santos, to whom Mr. Bruno allegedly sent his email screed, violated his oversight duty under *Caremark*'s second prong by consciously failing to "report upward" to the Board, this argument fails because the

---

[5]     Exhibit P to the Amended Complaint is a December 2021 email chain discussing questions from a *Bloomberg* reporter about her HMDA analysis prior to the publication of the *Bloomberg* article.  Santos was copied on three of these emails.  Plaintiffs do not allege that this email was a red flag for Santos — it predates his responsibility for mortgage lending by eight months — but even if they did, this email chain cannot serve as a red flag, and, if anything, is the opposite.  The only part of the chain on which Santos is copied reflects an internal preliminary assessment that *Bloomberg*'s analysis was inaccurate and that Wells Fargo's mortgage lending rates *were* "consistent with or better than other large lenders and the industry as a whole."  (*See* Ex. P at -2546.)

-16-

SULLIVAN &
CROMWELL LLP

1   decision whether to provide this email to the Board is a question of business judgment well within the

2   discretion of Wells Fargo's management — not a bad-faith breach of fiduciary duty.  *See City of Detroit*

3   *Police & Fire Ret. Sys.* v. *Hamrock*, 2022 WL 2387653, at *12 (Del. Ch. June 30, 2022) (*Caremark* affords

4   a company's fiduciaries "great discretion to design context- and industry-specific approaches tailored to

5   their companies' businesses and resources").  Indeed, the Court of Chancery has already reviewed

6   Mr. Bruno's email and concluded that it was "largely focused on personal issues that Mr. Bruno had with

7   his supervisor . . . that one would not expect to warrant board attention."  (Ex. 7 at 34.)

8          *Second*, Plaintiffs' bare assertion that Santos must have been aware of purported widespread fake

9   interviews because it is "inconceivable" that he did not know about them "given [his] role" comes nowhere

10  close to demonstrating that he knew of purported misconduct and consciously chose to ignore it.  To state

11  a prong-two *Caremark* claim against Santos, Plaintiffs must plead some "failure to act in the face of 'red

12  flags' disclosed to [him] so vibrant that lack of action implicates bad faith."  *Constr. Indus. Laborers*

13  *Pension Fund* v. *Bingle*, 2022 WL 4102492, at *1 (Del. Ch. Sept. 6, 2022).  Plaintiffs' belief that he must

14  have known because of his position "does not clear the high hurdle of pleading scienter."  *Id.* at *10.  If it

15  were sufficient to state a prong-two claim against an officer merely by alleging some corporate trauma

16  related to that officer's area of responsibility without also pleading facts showing that the officer was

17  alerted to the red flag and consciously failed to act, that would eviscerate the standard that has long been

18  applied to *Caremark* claims against directors.  The Court of Chancery has rejected the argument that the

19  "high bar to plead a *Caremark* claim is lowered when the claim is brought against an officer" as "a

20  distressing reading of our law."  *Segway*, 2023 WL 8643017, at *1; *see also In re Citigroup Inc. S'holder*

21  *Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (lowering the bar for *Caremark* liability would

22  "eviscerate the core protections of the business judgment rule — protections designed to allow corporate

23  managers and directors to pursue risky transactions without the specter of being held personally liable if

24  those decisions turn out poorly").

25         Plaintiffs plead nothing to support the conclusion that the Officer Defendants "consciously

26  turn[ed] a blind eye" to instances of discrimination in mortgage lending or fake interviews or any other

27  purported red flag.  *McDonald's I*, 289 A.3d at 379.

28

-17-

DEFENDANTS SCOTT POWELL, MICHAEL SANTOMASSIMO, CARLY SANCHEZ, KLEBER SANTOS,
AND JONATHAN WEISS'S MOTION TO DISMISS THE AMENDED COMPLAINT
LEAD CASE NO. 3:22-CV-05173-TLT

SULLIVAN &
CROMWELL LLP

**III.   PLAINTIFFS FAIL TO STATE SECTION 10(b) CLAIMS AGAINST THE OFFICER DEFENDANTS.**

Plaintiffs next contend that the Officer Defendants violated Section 10(b) and Rule 10b-5 for allegedly making false or misleading statements.  (AC ¶¶ 439-46.)  Section 10(b) claims "must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."  *Or. Pub. Emps. Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  The Amended Complaint is devoid of any allegations whatsoever that any of the Officer Defendants "made" or had authority over the large majority of the challenged statements at all.  And as with the Director Defendants (Wells Fargo's Mot. 23-25), Plaintiffs have failed to plead with particularity the required elements of falsity and scienter against any of the Officer Defendants.[6]

*"Ultimate Authority."*  As an initial matter, Plaintiffs fail to explain how any of the Officer Defendants can be liable for any of the challenged statements from Wells Fargo's SEC filings or other public statements attributed to the Company.  "A defendant can be held liable under § 10(b) for a false or misleading statement only if the defendant 'made' the statement."  *City of Royal Oak Ret. Sys.* v. *Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070 (N.D. Cal. 2012).  And a defendant is only the "maker" of a statement when he or she has "ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011).  Plaintiffs thus "must plead specific facts to show the [Officer Defendants'] ultimate authority over each of the alleged misstatements in Wells Fargo's releases and SEC filings."  *Hefler* v. *Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018).  But Plaintiffs do not plead that the Officer Defendants "signed any SEC filings," and otherwise plead no facts whatsoever concerning any purported control or authority that the Officer Defendants would have had in preparing the SEC disclosures and public

---

[6]      As with the Director Defendants (Wells Fargo's Mot. 19 n.6), Plaintiffs allege in passing that the Officer Defendants "consciously issu[ed] false and misleading statements to stockholders, including in the Company's 2021 and 2022 Proxy Statements."  (AC ¶ 425(c).)  These disclosure claims — which are fraud claims, and therefore subject to the particularized pleading requirement of Rule 9(b) — are duplicative of Plaintiffs' Section 10(b) claims and fail for the reasons discussed in this section.  *See In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1057 (9th Cir. 2023) ("[I]f 'a plaintiff . . . choose[s] . . . to allege in the complaint that the defendant has engaged in fraudulent conduct,' then 'the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).'").

SULLIVAN & CROMWELL LLP

1   Company statements at issue.  *Id.*  Indeed, Plaintiffs "do not even clearly allege that the defendants were

2   even provided with all of these documents before their issuance."  *Id.*  The Officer Defendants cannot be

3   liable for challenged statements they did not "make."[7]

4       ***Falsity.***  The Amended Complaint also lacks particularized allegations that any of the challenged

5   statements is actionably false or misleading.  The majority of the challenged statements generally describe

6   diversity hiring initiatives, including the Guidelines.  (*See* AC ¶¶ 215-16, 220, 222, 227, 232, 234, 236,

7   239, 242, 250, 257, 259.)  Plaintiffs specifically challenge, for example, statements from Sanchez that

8   Wells Fargo has "focused a lot on the external sourcing" and "formalized the candidate slate requirement

9   for roles $100K and above."  (*Id.* ¶ 239.)  Wells Fargo *did* in fact formalize such a requirement, and

10  Plaintiffs do not sufficiently plead facts showing how these descriptive statements were false or

11  misleading.  As this Court recently explained, Plaintiffs must allege "more than isolated incidents" of

12  purported fake interviews to satisfy their burden to plead "particularized allegations sufficient to infer that

13  sham interviews . . . were widespread."  *SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*, 2023 WL 11691540,

14  at *5-6 (N.D. Cal. Aug. 18, 2023).  Plaintiffs also fail to allege how the statement attributed to Santos

15  regarding the Guidelines that "[t]he rule is working" (*id.* ¶ 259) is false or misleading.  This is because

16  Plaintiffs do not explain how this statement is "capable of being objectively verified" in the first place.

17  *SEB*, 2023 WL 11691540, at *7.  And while Plaintiffs challenge Santos's statement to *Business Insider*

18  that Wells Fargo "could not corroborate . . . as factual" allegations of fake interviews following the

19  publication of the *New York Times* article (AC ¶ 254), Plaintiffs entirely fail to plead any facts supporting

20  an assertion that Wells Fargo did not in fact conduct an investigation and come to this conclusion.

21      Plaintiffs' challenges to other statements suffer from similar deficiencies.  Plaintiffs do not explain

22  why statements describing how senior executives are evaluated are false when Plaintiffs concede

23  elsewhere that these evaluations took place.  (*See id.* ¶¶ 294-306.)  And general statements regarding Wells

24

---

25  [7]    Santomassimo did sign the Company's 2020 Annual Report (AC ¶¶ 219-21), although Plaintiffs

26  do not allege so in the Amended Complaint.  Even if Santomassimo made the challenged statements in
    the 2020 Annual Report for Section 10(b) purposes, Plaintiffs' claims against him would still fail for the

27  same reason they fail for the other challenged statements — Plaintiffs plead no particularized facts
    demonstrating that the challenged statements in the 2020 Annual Report were false or that Santomassimo

28  made those statements with intent to deceive.

-19-

1  Fargo's commitment to promoting diversity and helping customers achieve homeownership goals are

2  "aspirational" expressions of "optimism" and are not actionable. *City of Pontiac Gen. Emps.' Ret. Sys.* v.

3  *Bush*, 2022 WL 1467773, at \*4 (N.D. Cal. Mar. 1, 2022). (*See* AC ¶¶ 214, 216, 220, 222, 228, 238, 242,

4  262.)

5         Plaintiffs challenge a handful statements relating to Wells Fargo's mortgage lending practices, but

6  again fail to explain with particularity how these statements were false or misleading when made.

7  Plaintiffs first challenge statements published in an article in *Business Insider* and attributed to Santos that

8  Wells Fargo did not use "proprietary credit-underwriting models" and "follow[s] the guidelines of the

9  GSEs." (*Id.* ¶ 255.) But Plaintiffs allege elsewhere that Wells Fargo *did* use the underwriting models

10  provided by Fannie Mae and Freddie Mac (*id.* ¶ 166) and fail to explain with particularity why Santos's

11  statement — that Wells Fargo did *not* use its own underwriting models — was false. As to Santos's

12  opinion expressing disagreement that Wells Fargo was engaged in "damaging practices" (*id.* ¶ 255),

13  Plaintiffs plead no facts alleging that Santos "did not hold the belief [he] professed" or that his opinion

14  was "objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,

15  856 F.3d 605, 616 (9th Cir. 2017).

16         Plaintiffs also challenge a March 2022 statement in a local news article attributed to Wells Fargo,

17  which expressed an opinion that the Company is "confident" its "underwriting practices are consistently

18  applied" and described the findings of an internal analysis into mortgage refinancing that identified

19  "credit-related factors" "responsible for the differences in our refinance approval rate." (AC ¶ 252.) As

20  noted above, Plaintiffs do not allege that any of the Officer Defendants made or had "ultimate authority"

21  over this statement. Even so, when opinion statements contain embedded factual statements, Plaintiffs

22  "must allege that 'the supporting fact [the speaker] supplied [is] untrue." *Align Tech., Inc.*, 856 F.3d

23  at 616. But far from demonstrating that any of the Officer Defendants did not believe that Wells Fargo's

24  underwriting practices were not "consistently applied" (AC ¶ 253), the Amended Complaint itself alleges

25  that Wells Fargo had expressed internally that "differences in approval rates between Non-Hispanic Black

26  applicants and Non-Hispanic White applicants were based on loan and credit factors," not inconsistent

27  application of Wells Fargo's underwriting standards (*id.* ¶ 145).

28         ***Scienter.*** Plaintiffs' Section 10(b) claims fail for the additional reason that they fail to "state with

-20-

SULLIVAN &
CROMWELL LLP

1    particularity facts giving rise to a *strong inference* that the [Officer Defendants] acted with" scienter.

2    *Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008). Plaintiffs must plead

3    particularized facts showing that the Officer Defendants "made false or misleading statements either

4    intentionally or with deliberate recklessness." *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981,

5    991 (9th Cir. 2009). The "deliberate recklessness" standard requires particularized allegations

6    demonstrating an "*extreme* departure from the standards of ordinary care." *Align Tech., Inc.*, 856 F.3d

7    at 619. The requirement to plead a strong inference of scienter is demanding and "must be more than

8    merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other

9    explanations." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).

10        To the extent the Officer Defendants "made" any of the challenged statements and thus can be

11   liable for them at all (*see supra* at 18-19), Plaintiffs fail to plead particularized facts demonstrating that

12   any Officer Defendant knowingly lied or acted with deliberate recklessness. Plaintiffs do not allege that

13   any of the Officer Defendants were aware of Plaintiffs' only concrete allegation of a fake interview —

14   Mr. Miller's February 2021 email to the Board's communication inbox (*see* AC ¶ 267) — which was

15   subsequently investigated and found to be "unsubstantiated." (*id.* ¶ 179). Plaintiffs allege that Powell and

16   Santos (and none of the other Officer Defendants) were among the 250 recipients of Mr. Bruno's

17   "4,500-word email" (*id.* ¶¶ 174, 267), but fail to explain how two vague sentences about purported fake

18   interviews support the inference that either Powell or Santos knew or was reckless in not knowing that

19   *widespread* fake interviews were occurring across the Company. Otherwise, Plaintiffs' conclusory

20   assertions that the Officer Defendants must have known about purported "widespread" fake interviews by

21   virtue of access to an unspecified "trove of information" (*id.* ¶ 268), repeated public statements (*id.* ¶ 269),

22   unrelated "misconduct" (*id.* ¶ 270), and the Company's decision to pause and evaluate the Guidelines

23   following the publication of the *New York Times* article (*id.* ¶ 271) do not support an inference that the

24   Officer Defendants knowingly lied or acted with an "*extreme* departure from the standards of ordinary

25   care." *Align Tech., Inc.*, 856 F.3d at 619. These generalized claims do not amount to "particularized

26   allegations supporting a strong inference that each of the individual Defendants were aware or should have

27   been aware of widespread sham interviews," particularly where there are no allegations that the purported

28   "trove of information" "amounted to a database of sham interviews" or that Wells Fargo's "past regulatory

SULLIVAN &
CROMWELL LLP

1   issues dealt specifically with sham interviews." *SEB*, 2023 WL 11691540, at *8.[8]

2   Plaintiffs' allegations of scienter with respect to the challenged statements about mortgage

3   refinancing are even more barebones. As explained above (*supra* at 14-15), Plaintiffs entirely fail to allege

4   that any of the Officer Defendants was aware of or alerted to issues with Wells Fargo's underwriting

5   algorithm or alleged pricing exceptions prior to the publication of the March 2022 *Bloomberg* article.

6   Indeed, with respect to the challenged May 2022 statement from Santos that Wells Fargo did not use

7   "proprietary credit-underwriting models" and "follow[s] the guidelines of the GSEs" (AC ¶ 256),

8   Plaintiffs plead no particularized facts whatsoever establishing that Santos knew or should have known

9   anything about those models at all. The Amended Complaint falls far short of what is needed to give rise

10  to a strong inference that any Officer Defendant made the challenged statements with "intent to deceive,

11  manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

## IV.   PLAINTIFFS FAIL TO STATE SECTION 20(a) CLAIMS AGAINST THE OFFICER DEFENDANTS.

13  Count IV of the Amended Complaint asserts that "[b]y virtue of their positions as controlling

14  persons of Wells Fargo and as a result of their own aforementioned conduct, the Individual Defendants

15  are liable pursuant to Section 20(a) of the Exchange Act." (AC ¶ 450.) Under Section 20(a) "a defendant

16  employee of a corporation who has violated the securities laws will be jointly and severally liable to the

17  plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the

18  defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990. Plaintiffs

19  assert that "each of the[] Defendants was a controlling person of the Company within the meaning of

20  Section 20(a)," and that each, "[b]y reason of their positions of control and authority as officers and/or

21  directors," was "able to and did control, directly and indirectly, the content of the public statements made

22  by Wells Fargo." (AC ¶ 449.) In other words, Plaintiffs contend that each Officer Defendant is liable for

23  each challenged statement, even if they did not make it, because each Officer Defendant purportedly had

---

[8]   Plaintiffs also argue that the "temporal proximity" of certain challenged statements about the Guidelines to the publication of the June 9, 2022 *New York Times* article supports an inference of scienter. (AC ¶ 271.) But "while temporal proximity can 'bolster' the inference that a misstatement was intentional, mere proximity is insufficient to establish that defendants knowingly lied." *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890 (N.D. Cal. 2020) (citations omitted).

SULLIVAN &
CROMWELL LLP

1  control over the person or persons responsible for the challenged statements.  Plaintiffs' control person

2  claims against the Officer Defendants fail for two reasons.

3      *First*, for the reasons explained above, Plaintiffs' underlying Section 10(b) claims fail.  Plaintiffs'

4  control person claims against the Officer Defendants rise and fall with their Section 10(b) claims.  *See*

5  *Howard* v. *Hui*, 2001 WL 1159780, at *3 (N.D. Cal. Sept. 24, 2001) ("to prove a prima facie case under

6  § 20(a), plaintiff must prove . . . a primary violation of federal securities laws").

7      *Second*, even if Plaintiffs had adequately pleaded a primary violation, they still do not plead with

8  particularity, as required under Rule 9(b), how any of the Officer Defendants would have "specific control

9  over the preparation and release of" the statements at issue.  *Howard* v. *Everex Sys., Inc.*, 228 F.3d 1057,

10  1065-67 & n.13 (9th Cir. 2000).  Conclusory assertions that the Officer Defendants are control persons

11  "[b]y reason of their positions of control and authority as officers" (AC ¶ 449) are inadequate.  *See Purple*

12  *Mountain Tr.* v. *Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1106 (N.D. Cal. 2020) ("barebones allegations"

13  that defendants "had the power and ability to control the actions of Wells Fargo and its employees" "[b]y

14  virtue of their positions and their power to control public statements about Wells Fargo" were insufficient

15  to state claim under Section 20(a)).  Plaintiffs' three-paragraph control person section does not identify

16  any Officer Defendant by name, let alone explain how any of them would have had control over any of

17  the particular challenged statements made by the Company.  For example, Plaintiffs do not explain with

18  particularized facts how any of the Officer Defendants would have had control over the March 18, 2022

19  statement to a Charlotte, North Carolina newspaper attributed to "Wells Fargo."  (AC ¶ 252.)  Nor do

20  Plaintiffs plead any particularized facts suggesting that Powell, Santomassimo, or Weiss had control over

21  Santos's and Sanchez's oral statements, or that Santos and Sanchez had control over each other's oral

22  statements.  *See Murphy* v. *Precision Castparts Corp.*, 2020 WL 4040827, at *25 (D. Or. July 17, 2020)

23  (no control where "evidence d[id] not support a conclusion that [defendant] had any meaningful control

24  over what words came out of [speaker's] mouth").

25  **V.  PLAINTIFFS FAIL TO STATE A SECTION 20A CLAIM AGAINST SANTOS.**

26      Finally, Plaintiffs assert that Santos is liable under Section 20A of the Exchange Act because he

27  allegedly sold certain of his shares of Wells Fargo stock while the Company was engaged generally in

28  share repurchases.  (AC ¶¶ 451-55.)  To state a claim for "contemporaneous" insider trading under

-23-

Section 20A, Plaintiffs must plead (1) a predicate violation of the securities laws, and (2) particularized facts showing that the trading activity of the defendant and the plaintiff (here, Wells Fargo) occurred "contemporaneously." *SEB Inv. Mgmt. AB* v. *Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020).  Plaintiffs fail to plead either.

*First*, Plaintiffs' Section 20A claim fails for the simple reason that the Amended Complaint fails to plead any primary violation of the securities laws by Santos.  (*See supra* at 18-22.)  "Claims under Section 20A are derivative and therefore require an independent violation of the Exchange Act." *Johnson* v. *Aljian*, 490 F.3d 778, 781 (9th Cir. 2007).  Plaintiffs have not stated any claim that Santos violated the securities laws.  This alone warrants dismissal of their Section 20A claim.  *See, e.g.*, *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 610.

*Second*, the Amended Complaint lacks particularized allegations that Wells Fargo, on whose behalf Plaintiffs purport to bring claims, made specific trades that were "contemporaneous" with Santos's alleged stock sales.  Section 20A's contemporaneity requirement is meant to ensure that "only private parties who have traded with someone who had an *unfair advantage* will be able to maintain insider trading claims." *SEB*, 485 F. Supp. 3d at 1135 (emphasis added).  More specifically, the contemporaneity requirement functions as a "proxy for the traditional requirement of contractual privity between plaintiffs and defendants," and courts have explained that liability attaches under Section 20A only when "it appears the plaintiff might, in fact, have *traded with* the defendant." *Buban* v. *O'Brien*, 1994 WL 324093, at *3 (N.D. Cal. June 22, 1994) (emphasis added).  For this reason, "courts have consistently held that shares purchased [by the plaintiff] below the defendant's sale price cannot satisfy the contemporaneity requirement, because it is impossible that those trades occurred with [the] defendant at an unfair advantage." *SEB*, 485 F. Supp. 3d at 1136.

Plaintiffs fail to plead that Wells Fargo engaged in *specific* "contemporaneous" share repurchases at or above the price at which Santos allegedly sold his own shares.  The Amended Complaint alleges that on May 3, 2022, Santos "sold 22,700 shares of his Wells Fargo stock . . . for proceeds of approximately $1,008,788," resulting in an average sale price of $44.44 per share.  (AC ¶ 321.)  By contrast, Plaintiffs allege that, in the same month, Wells Fargo repurchased shares at a "[w]eighted average price paid" of only $43.63 per share.  (*Id.* ¶ 292.)  Because Plaintiffs have only alleged that Wells Fargo repurchased

-24-

SULLIVAN & CROMWELL LLP

shares at a *lower average price* than Santos's average sale price, "it is manifest that [Wells Fargo] could not have traded with [Santos]." *Buban*, 1994 WL 324093, at *3. Stock trades cannot be "contemporaneous" when a defendant sells shares for more than a plaintiff paid, so Plaintiffs' Section 20A claim against Santos necessarily fails. *SEB*, 485 F. Supp. 3d at 1136.

**CONCLUSION**

For the foregoing reasons, Plaintiffs fail to plausibly state a claim that any Officer Defendants breached his or her Delaware state-law fiduciary duties or violated federal securities laws. The Amended Complaint should be dismissed under Rules 12(b)(6) and 23.1 with prejudice.

DATED: June 11, 2024          Respectfully submitted,

 */s/ Brendan P. Cullen*
Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500

Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

*Counsel for Defendants Scott Powell,*
*Michael Santomassimo, Carly Sanchez,*
*Kleber Santos, and Jonathan Weiss*