Lesley E. Weaver (SBN 191305)
Nancy A. Kulesa (*pro hac vice*)
Derrick B. Farrell (*pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4004
E-mail:  lweaver@bfalaw.com
          nkulesa@bfalaw.com
          dfarrell@bfalaw.com

Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
E-mail:  mmolumphy@cpmlegal.com
          tredenbarger@cpmlegal.com
          gjung@cpmlegal.com

Marlon E. Kimpson (*pro hac vice*)
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
E-mail: mkimpson@motleyrice.com
          bnorton@motleyrice.com
          jlittlejohn@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

*[Additional counsel on signature page]*

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY CONSOLIDATED DERIVATIVE SHAREHOLDER LITIGATION, | Case No. 3:22-cv-05173-TLT<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY**<br><br>Hearing:   August 27, 2024<br>Time:      2:00 p.m.<br>Courtroom 9, 19th Floor<br>The Honorable Trina L. Thompson |

## TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................ 1

ISSUES TO BE DECIDED ................................................................ 3

STATEMENT OF FACTS ................................................................ 3

A.   Wells Fargo Has a Long History of Discriminatory Lending Practices. ................................. 3

B.   The Board Failed to Monitor Wells Fargo's Compliance with Fair Lending Laws. .................. 6

C.   The Diverse Search Requirement Was a Mission Critical Issue. ................................. 7

D.   The Board Failed to Claw Back Compensation Tied to the Diverse Search Requirement. ........ 11

E.   Prior to Filing Suit, Plaintiffs Demanded and Received Board-Level Documents From Wells Fargo Pursuant to Delaware Law. ................................. 11

ARGUMENT ................................................................ 12

I.     Plaintiffs Are Entitled to All Reasonable Inferences. ................................. 12

II.    The Directors Face a Substantial Risk of Liability Under *Caremark*. ................................. 13

       A.   Plaintiffs Plausibly Allege the Directors Failed to Monitor for Fair Lending Compliance—a Mission-Critical Issue. ................................. 13

            1.   Wells Fargo Lacked a Board-Level System of Monitoring and Reporting for Fair Lending Compliance. ................................. 14

            2.   Numerous Red Flags Further Demonstrate That the Directors Failed to Monitor Fair Lending Compliance. ................................. 22

       B.   Plaintiffs Plausibly Allege the Directors Failed to Monitor the Diverse Search Requirement ................................. 24

            1.   Plaintiffs Plausibly Allege Monitoring Compliance with the Diverse Search Requirement Was a "Mission-Critical" Issue. ................................. 24

            2.   Plaintiffs Plausibly Allege the Directors Ignored Red Flag Warnings the Company Did Not Have a Monitoring System for Timely Reporting of Hiring Discrimination. ................................. 25

            3.   Plaintiffs Plausibly Allege the Directors Failed to Place a Reporting Mechanism in Place to Detect Failure to Comply with the Diverse Search Requirement. ................................. 26

       III.   Demand Related to Claims Against the Officer Defendants Was Futile. ................................. 28

       IV.    Plaintiffs Have Plausibly Alleged the Officer Defendants' Scope of Duty Included Monitoring for Discrimination in Hiring and Lending. ................................. 29

       V.     The Directors Face a Substantial Likelihood for Violations of the Federal Securities Laws. ................................. 30

A.   Plaintiffs Have Adequately Alleged a Section 10(b) Cause of Action Against the Officers and Directors ........................................................ 30

   1.   Plaintiffs Adequately Alleged Falsity. ..................................... 30

   2.   Plaintiffs Adequately Alleged Scienter. .................................. 32

   3.   Defendants Had Ultimate Authority of the False Statements. ................. 34

B.   Plaintiffs Adequately Allege Control Under Section 20(a) ................................ 35

C.   The Complaint States Insider-Trading Claims Against Santos Under Federal and State Law ........................................................................ 36

D.   The Director Defendants Face Liability Under Section 14(a) for Materially Misrepresenting Diversity ...................................................................... 37

   1.   Wells Fargo's Exculpation Clause Does Not Apply to Section 14(a). .... 38

   2.   The 2021 and 2022 Proxy Statements Were Materially False and Misleading ..................................................................... 38

   3.   The Misstatements Were an Essential Link to Stockholder Decisions. ... 39

CONCLUSION ................................................................................ 40

ii

## **TABLE OF AUTHORITIES**

PAGE(S)

**CASES**

*Acri v. Varian Assocs., Inc.*,
114 F.3d 999 (9th Cir. 1997) ................................................................................ 30

*Alidina v. Internet.com Corp.*,
2002 WL 31584292 (Del. Ch. Nov. 6, 2002) .......................................................... 38

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ......................................................... 33

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................... 30, 31

*In re Boeing Co. Derivative Litig.*,
2021 WL 4059934 (Del. Ch. Sept. 7, 2021) ..................................................... *passim*

*Buban v. O'Brien*,
1994 WL 324093 (N.D. Cal. June 22, 1994) ........................................................... 37

*Burrell v. City of Vallejo*,
2020 WL 1532293 (E.D. Cal. Mar. 31, 2020) .......................................................... 20

*In Caremark Int'l Inc. Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996) ....................................................... 13, 20, 22, 27

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ................................................................................ 39

*In re China Agritech, Inc. S'holder Derivative Litig.*,
2013 WL 2181514 (Del. Ch. May 21, 2013) ................................................. 12, 18, 19

*City of Detroit Police & Fire Ret. Sys. v. Hamrock*,
2022 WL 2387653 (Del. Ch. June 30, 2022) ..................................................... 19, 21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................................. 35

*In re Clovis Oncology, Inc. Derivative Litig.*,
2019 WL 4850188 (Del. Ch. Oct. 1, 2019) ....................................................... 16, 24

*Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................. 36

*Del. Cnty. Emps. Ret. Fund v. Sanchez*,
124 A.3d 1017 (Del. 2015) ................................................................................... 12

*In re Diamond Foods, Inc. Derivative Litig.*,
2012 WL 1945814 (N.D. Cal. May 29, 2012) .......................................................... 39

*In re EZCORP Inc. Consulting Agreement Derivative Litig.*,
2016 WL 301245 (Del. Ch. Jan. 25, 2016) ............................................................. 12

*Garfield on behalf of ODP Corp. v. Allen*,
277 A.3d 296 (Del. Ch. 2022) ............................................................................... 23

*Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*,
   2024 WL 390890 (Del. Ch. Feb. 1, 2024) ................................................................. 28

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal., Feb. 27, 2018) ....................................................... 31, 35

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ............................................................................... 36

*Hughes v. Xiaoming Hu*,
   2020 WL 1987029 (Del. Ch. Apr. 27, 2020) ....................................................... 18, 19

*In re Intuitive Surgical S'holder Derivative Litig.*,
   146 F. Supp. 3d 1106 (N.D. Cal. 2015) ................................................................... 24

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ............................................................................................. 34

*Marchand v. Barnhill*,
   212 A.3d 805 (Del. 2019) ............................................................................... *passim*

*In re Maxim Integrated Prod., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................................... 35

*In re Maxim Integrated Prod., Inc., Derivative Litig.*,
   574 F. Supp. 2d 1046 (N.D. Cal. 2008) ................................................................... 39

*In re McDonald's Corp. S'holder Derivative Litig.*,
   2023 WL 2329711 (Del. Ch. Mar. 1, 2023) ........................................................... 28

*In re McDonald's Corp. S'holder Derivative Litig.*,
   289 A.3d 343 (Del. Ch. 2023) ........................................................ 14, 18, 19, 29

*In re McDonald's Corp. S'holder Derivative Litig.*,
   291 A.3d 652 (Del. Ch. 2023) ............................................................................... 25

*McElrath v. Kalanick*,
   2019 WL 1430210 (Del. Ch. Apr. 1, 2019) ........................................................... 28

*Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*,
   2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ........................................................... 28

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................... 39

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ............................................................................... 39

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) ..................................................................................... 13

*Reiter v. Fairbank*,
   2016 WL 6081823 (Del. Ch. Oct. 18, 2016) ......................................................... 22

*Rosenbloom v. Pyott*,
   765 F.3d 1137 (9th Cir. 2014) ............................................................................. 12

iv

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................ 37

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
   2023 WL 11691540 (N.D. Cal. Aug. 18, 2023) ................................................... 31

*Shaev v. Baker*,
   2017 WL 1735573 (N.D. Cal. May 4, 2017) ....................................................... 34

*Stack v. Lobo*,
   903 F. Supp. 1361 (N.D. Cal. 1995) ................................................................... 34

*Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*,
   2020 WL 5028065 (Del. Ch. Aug. 24, 2020) ..................................................... 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................ 33

*United Food & Com. Workers Union & Participating Food Indus.*
   *Emps. Tri-State Pension Fund v. Zuckerberg*,
   262 A.3d 1034 (Del. 2021) ......................................................................... 12, 13

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
   2022 WL 345066 (N.D. Cal. Feb. 4, 2022) ....................................................... 38

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
   282 F. Supp. 3d 1074 (N.D. Cal. 2017) ....................................................... *passim*

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007) ............................................................... 39

**STATUTES**

17 C.F.R. § 230.405 .................................................................................................... 35

17 C.F.R. § 240.14a–9 ................................................................................................ 37

8 Del. C. § 220 ............................................................................................................ 11

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b) ................................. 3, 30, 31, 35

Securities Exchange Act Section 14(a), 15 U.S.C. § 78n(a) ..................................... 3, 37, 38

Securities Exchange Act Section 20(a), 15 U.S.C. § 78t(a) ........................................... 3, 35

**RULES**

Fed. R. Civ. P. 23.1 ................................................................................................ 3, 13

### GLOSSARY

| Term or Abbreviation | Meaning |
| --- | --- |
| ¶__ | Paragraphs of the Complaint |
| 220 Production | Wells Fargo's production, pursuant to 8 Del. C. § 220, of Board-level materials concerning, *inter alia*, "[d]iscrimination in home lending," "hiring and promotion," which Defendants certified was "now complete" on March 17, 2023.  ¶¶ 64-65. |
| AIR | Adverse Impact Ratio |
| Audit Committee | The Board's Audit and Examination Committee |
| BIA | Business Insights & Analytics |
| The Board | The Board of Directors of Wells Fargo |
| CFPB | Consumer Financial Protection Bureau |
| The Company | Wells Fargo & Company |
| Complaint | Plaintiffs' Consolidated Amended Stockholder Derivative Complaint (ECF No. 147) |
| CORE | Common Opportunities, Results, and Experiences |
| CRA | Community Reinvestment Act |
| CRC | The Board's Corporate Responsibility Committee |
| December 2020 Demand | Letter dated December 3, 2020 from James and Sonja Hendrickson to the Board.  ¶96. |
| Demand Defendants or Demand Board | Defendants Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, Scharf, and Vautrinot |
| Director Defendants or the Directors | Defendants Black, Chancy, Clark, Craver, Davis, Hewett, James, Morken, Morris, Norwood, Noski, Payne, Pujadas, Sargent, Scharf, and Vautrinot |
| DOJ | U.S. Department of Justice |
| ECOA | Equal Credit Opportunity Act, 15 U.S.C. § 1691 |
| ECS | Enhanced Credit Score |
| Ex. __ | Exhibits to the Complaint |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a |
| FDIC | Federal Deposit Insurance Corporation |
| FE | Former Employee |
| FHA | Fair Housing Act, 42 U.S.C. § 3601 |
| G&NC | The Board's Governance & Nominating Committee |
| HDMA | Home Mortgage Disclosure Act |
| HRC | The Board's Human Resources Committee |
| Mortgage Discrimination Class Action | *In re Wells Fargo Mortg. Discrimination Litig.*, No. 3:22-cv-00990-JD (N.D. Cal.) |
| MTD, MTD __, and MTD Ex. __ | Wells Fargo's Motion to Dismiss (ECF No. 152), pages of the MTD, and exhibits to the MTD |
| *NYT* | *The New York Times* |
| OCC | Office of the Comptroller of the Currency |
| Off. MTD and Off. MTD __ | The Officer Defendants' Motion to Dismiss (ECF No. 153) and pages of the Off. MTD |

| Term or Abbreviation | Meaning |
|---|---|
| RJN and RJN __ | Defendants' Request for Judicial Notice (ECF No. 152-2) and pages of the RJN |
| UCL | California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 |
| Section 1983 | 42 U.S.C. § 1981 |
| Wells Fargo | Wells Fargo & Company |

# PRELIMINARY STATEMENT[1]

Delaware law requires a company's board of directors to make a good-faith effort to regularly monitor for compliance issues "intrinsically critical to the company's business" —*i.e.*, "mission-critical" compliance risks—through a reasonable board-level system of monitoring and reporting.  Failing to do so violates a board's duty of loyalty and is equivalent to bad faith.  Here, in seeking dismissal, Defendants argue that Wells Fargo took fair lending compliance and its Diverse Search Requirement "seriously" and that the Board, in fact, had established a system of reporting that provided regular oversight of these issues.  MTD 1.  But whether this is true today or was true after *Bloomberg* and the *NYT* published articles criticizing the Company's practices in March, May, and June of 2022—the relevant question is whether these Directors discharged their fiduciary duties of oversight in the years *before* these articles were published.  As Plaintiffs' allegations (and the Company's own internal documents) make clear, for years the Board did little, if anything, to regularly monitor fair lending compliance and the Diverse Search Requirement, and instead falsely denied these practices to their stockholders.

*First*, regarding Plaintiffs' lending claims, Defendants all but ignore the controlling legal standards espoused by Delaware's Supreme Court in *Marchand v. Barnhill*, 212 A.3d 805 (Del. 2019), opting instead to rely on cases that are inapposite or pre-date *Marchand*.  A review of *Marchand* and a subsequent Delaware Chancery opinion, *In re Boeing Co. Derivative Litig.*, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021), reveals why Defendants avoid discussing these decisions:  the Board's failure to monitor for fair lending compliance fully aligns with the factors those courts reviewed in finding no regular monitoring system for "mission-critical" risks.  Significantly, Defendants do not even argue that fair lending compliance is not mission critical.  Nor can they, as decades of federal legislation requires lenders like Wells Fargo to treat all borrowers fairly and equitably.  *Bloomberg's* investigation, internal Company documents, and large dollar settlements strongly suggest violations of fair lending laws were occurring at the Company prior to *Bloomberg's* publication—and are likely continuing today.

Defendants ignore these documents and settlements (which they conveniently and incorrectly label as "unrelated," MTD 6-7), including the March 2019 "Fair Lending Risk Assessment" that shows

---

[1] All emphasis is added unless otherwise indicated.

1

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

Wells Fargo had woefully deficient or non-existent *management*-level controls (as opposed to the required *Board*-level controls) over fair lending compliance.  Defendants imply the Board never saw this "non-Board" document (MTD 5), yet they continue to maintain the Board took fair lending seriously, citing two Board-level documents, minutes from August 2020 and a fair lending training document from 2021.  *Id.* at 10.  But these documents, even considered together, do not come close to a "regular" Board-level system of management apprising the Board of the then-current state of the Company's compliance with fair lending laws.  As *Marchand* and *Boeing* make clear, isolated or *ad hoc* reporting (at management's discretion) is not the type of "regular," "scheduled," reporting required for mission-critical issues.  Plaintiffs' particularized allegations—based on Board-level and internal Company documents from their 220 Production and the Mortgage Discrimination Class Action—easily create the plausible inference that for more than two years the full Board did not regularly monitor fair lending compliance.

That individual Directors "barely feature" (MTD 8) is a strawman and beside the point.  Plaintiffs have sufficiently alleged that *all* Directors failed to take fair lending seriously, as they were all were responsible for ensuring a Board-level system to regularly monitor fair lending was in place.  The documents show that none of them did.

***Second***, the Board lacked any timely mechanism for reporting hiring discrimination to the Board.  As a result, the Board did not receive timely notice the Diverse Search Requirement program was being abused in a way that discriminated against minority job applicants.  This included correspondence from job applicants describing "fake interviews" that Wells Fargo managers were directed to do with minority candidates by the Company's Human Resources department.  Indeed, it took ten months for a report of hiring discrimination sent to the Board's "inbox" to reach the Board.  When it finally did reach a committee of the Board, despite learning of the reporting delay, the Board did nothing.  Similarly, after Bruno sent an email to 250 Wells Fargo employees including the Company's CEO and numerous other senior executives, the Board did not learn of it until 10 months later through the *NYT* article.  The Court should reject these arguments, which fail to explain why the Board did not receive timely reports of hiring discrimination, and Defendants do not assert the Company, ***currently*** has a timely monitoring system for hiring discrimination.  In addition, Defendants brazenly contend that having fair and non-discriminatory

hiring and interviewing practices was not "mission critical" for Wells Fargo, absolving them of such monitoring duties.  MTD 17-18.  Defendants, however, gloss over the fact that the Company itself descried the Diverse Search Requirement as one of the Company's "***critical*** initiatives."  At bottom, Defendants have created factual disputes on hiring that cannot be decided at this stage.

*Finally*, the Complaint sufficiently pleads federal claims under the Exchange Act.  Defendants' motions should be denied.

## ISSUES TO BE DECIDED

1.      Whether the Court should deny Defendants' motions to dismiss based on demand futility under Fed. R. Civ. P. 23.1(b)(1)(3) because the Complaint plausibly alleges that at least half of the Board faces a substantial likelihood of liability for their failure of oversight under *Caremark* and *Marchand*.

2.      Whether the Complaint plausibly alleges federal claims under Sections 10(b), 14(a), 20(a), and 20A of the Exchange Act.

## STATEMENT OF FACTS

### A.      Wells Fargo Has a Long History of Discriminatory Lending Practices.

Nominal Defendant Wells Fargo is one of the four largest banks in the United States, employing more than 200,000 people.  ¶¶ 70-72.  It is also one of the country's top three mortgage lenders.  *Id*.  Wells Fargo has a fourteen-member board of directors and several board-level committees that assist the Board in fulfilling its oversight responsibilities.  ¶¶ 376, 334-35.  Ostensibly, the Board's Risk Committee is responsible for overseeing central compliance issues like fair lending.  ¶¶ 337-42.  However, nothing in the Risk Committee's list of duties and responsibilities reflects this or references fair lending at all.  *Id*.

Wells Fargo uses an automated system to make loan underwriting decisions.  ¶¶ 102, 166-67.  These include Wells Fargo's "CORE" system, ¶ 122 n.75 ("CORE . . . is our loan origination system that we use to originate, process, underwrite, and close first mortgages"), and its "ECS" model, *id*. (the "Enhanced Credit Score" is a "risk engine" included in CORE that places applicants into risk classes).  One banking regulator referred to modern-day automated underwriting systems like Wells Fargo's CORE/ECS as "black boxes behind brick walls."  ¶ 102.  In 2021, researchers at Cornell University and

3

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

several Wells Fargo employees together published an article raising concerns about the harm automated lending systems can have on protected groups.  ¶¶ 97-99.[2]

Despite laws and regulations that for decades have prohibited lenders from discriminating on the basis of race or ethnicity, Wells Fargo has a track record of repeatedly flouting these protections.  For example, in July 2012 the DOJ announced a $184.3 million settlement with Wells Fargo stemming from claims that the Company discriminated against more than 30,000 Black and Hispanic borrowers by steering them into mortgages with higher interest rates compared to similarly situated White borrowers. ¶ 92.  Within the mortgage lending industry, the practice of offering select borrowers with discounts is commonly referred to as "pricing exceptions." ¶¶ 79-81, 172-73.  The DOJ's detailed allegations drew on Wells Fargo's own records and data and found that customers from *82 geographic markets across at least 36 states* and the District of Columbia were victims of the discriminatory practices, which included placing Black and Hispanic borrowers into subprime loans with adverse terms and charging these borrowers higher interest rates, higher fees, and higher prices than White borrowers.  *Id.*  In 2019, Wells Fargo paid $10 million to the City of Philadelphia to settle similar allegations of discriminatory pricing exceptions against Black borrowers.  ¶ 93.  Despite these settlements, in December 2023, *CNBC* reported that Wells Fargo is *again* under investigation by the CFPB related to discriminatory pricing exceptions. ¶¶ 172-73.

Private litigants and an analysis by *Bloomberg* further demonstrate that for years Wells Fargo's lending practices have flouted fair lending laws, despite repeated legal and regulatory action.  In February 2022, the Mortgage Discrimination Class Action was filed against the Company on behalf of Black loan applicants.  ¶ 101 n.47.  Among other allegations, the plaintiffs allege that Wells Fargo's automated lending model—*i.e.*, its CORE/ECS systems—causes disparate impact towards Black and Hispanic borrowers.  ¶¶ 101-03, 119-39.  One month later, in March 2022, *Bloomberg* published an article summarizing its investigation into nationwide HDMA data from eight million loan applications submitted during 2020.  ¶¶ 108-12.  The results were striking:  Wells Fargo approved only 47% of Black and

---

[2] One of these Wells Fargo employees, Agus Sudjianto, testified in the Mortgage Discrimination Class Action that even though Wells Fargo "identified disparate impact for various protected classes in relationship to [the] ECS Model," the Company *still* currently uses this same ECS model.  ¶ 130 n.89.

Hispanic applicants for mortgage loans while 72% of White applicants were approved. *Id*. In addition, the data revealed that the *highest*-income Black applicants had approval rates similar to the *lowest*-income White applicants. *Id*. In contrast, Wells Fargo's lending rates for Hispanic and Black applicants fell well below peer banks (71% for Black applicants and 79% for Hispanic applicants). *Id*.

Internal senior-executive-level documents from the Mortgage Discrimination Class Action further confirm that for years, Wells Fargo's lending practices systematically discriminated against Black borrowers and other minorities. For example, a March 2019 internal document titled "2018 Fair Lending Risk Assessment" states that Wells Fargo had "HIGH" and "Inherent" fair lending risks that were "largely driven by" the Company's "*[a]llowance of exceptions to underwriting criteria, credit decisioning judgmental tolerances, [and] geographic based credit policies*"; "Pricing" based on "Market/geography"; the "percentage of [its] *loans with pricing exception allowances* (i.e., average of 5%)"; and the Company's "*Redlining: [loan-to-value] restrictions for property located in distressed or severely distressed market conditions* . . . ." ¶ 120.

A section of this same document titled "Home Equity – 2018 Risk & Control Rating Analysis" shows the Company's "Inherent Risk Rating" and "Control Effectiveness Rating" for various "Fair Lending Risk Focal Points"—including "Underwriting/Fulfillment," "Pricing," "Sales/Steering," and "Redlining." ¶¶ 120-21 (quoting Ex. H at 5). The analysis reveals that, for these intrinsically critical fair lending compliance risks, only a handful of company-level (i.e., *management*-level as opposed to *Board*-level)—fair lending risk controls were considered by Wells Fargo's executives to be "effective" while most were rated "needs improvement" or identified as "gaps" (i.e., fair lending risks where the Company had no controls at all). *Id*. In total, of the *25* company-level fair lending risks, only *twelve* were deemed effective. Ex. H at 9. In addition, a March 24, 2022 presentation titled "Fair Lending Analyses of Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model – Model Number 11960" states that Wells Fargo's "[Fair Lending Model Development team] *identified disparate impact for various protected classes in the ECS conventional model*[.]" ¶ 123.

In the wake of the publication of the *Bloomberg* article in March 2022, Wells Fargo tasked its BIA team with analyzing the same HDMA data that *Bloomberg* reviewed. ¶ 132. One BIA team member

5

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

explained in a text message that she was able to confirm *Bloomberg's* analysis "***on the nose, like 100%***." ¶ 135; *see also* ¶ 147.  Another BIA team member, reflecting on *Bloomberg's* work and a potential cause of the lower approval rates for minority applicants stated in an email that "***since about 2013 we have gotten progressively worse*** . . . [t]his is not a COVID related issue, ***this is a systemic [Wells Fargo] policy issue*** . . . ***when we only prioritize non conforming loans and the most affluent/profitable customers . . . we shouldn't be overly surprised by the results***." ¶ 133.  He concluded, "I do not believe this is a recent anomaly.  ***This is a long-term systemic issue at [Wells Fargo]***."  *Id.*

Notably, in the only instance where Wells Fargo's Board was urged to take action related to the Company's borrowing practices, the Directors failed to identify any issues or take action.  ¶¶ 96, 100.  On October 26, 2021, following the creation of a Demand Review Committee (consisting of Defendants Black and Chancy) to consider a December 2020 stockholder demand to correct control deficiencies in the Company's "minority borrowing practices," the Board determined that "it [was] not in the Company's best interests to conduct further investigation into the [] subject matter or the merits of the allegations, commence litigation, alter ongoing Company and Board compliance efforts or take other action." ¶ 100.  Thus, the Board did nothing to address these compliance issues.

### B. The Board Failed to Monitor Wells Fargo's Compliance with Fair Lending Laws.

Despite the mission-critical importance of complying with fair lending laws (¶¶ 360-65), Wells Fargo's history of *non*-compliance and the numerous fair lending control deficiencies and gaps described above, the Board-level documents produced as part of the 220 Production indicate that, at most, the Board monitored general "trends" or "emerging risks" in fair lending regulation—risks applicable to *any* mortgage lender—and not the risk that *Wells Fargo's practices* ran afoul of fair lending laws.

For example, on August 11, 2020, the Board's CRC—a committee tasked with overseeing public relations—acknowledged that "minority lending distribution [was] ***an emerging risk*,"  ¶ 140, and that no "systemic fair lending risk" was detected.  This stood in stark contrast to the March 2019 "Fair Lending Risk Assessment."

### C.     The Diverse Search Requirement Was a Mission Critical Issue.

Wells Fargo has a long history of discriminatory hiring.  In 2013, a group of Black financial advisors at Wells Fargo filed a complaint accusing Wells Fargo of "systemic, intentional race discrimination" through the implementation of policies that segregated its workforce and disparately impacted its African American employees (the "*Slaughter* Action").  ¶ 185.  Wells Fargo settled the case for $35.5 million in May 2017.  *Id.*  Among other things, the settlement required that Wells Fargo instruct its "executives to examine their demographic data and initiate opportunities for African American financial advisors, as well as designate specific recruiters and coaches for African American employees." *Id.*  Likewise, on December 9, 2019, the Wells Fargo Board received a "Monitoring Company Culture Report" which concluded that "[t]he number of substantiated allegations related to [discrimination, harassment and retaliation] behaviors could indicate ineffective human capital management in areas including poor hiring/selection decisions" and that this "expose[d] WF to significant . . . legal and reputational risk."  ¶ 200.

The *Slaughter* Action and the Monitoring Company Culture Report demonstrate that ensuring nondiscriminatory hiring practices was a mission-critical issue for Wells Fargo.  In recognition of this fact, in March 2020 Company CEO Charles Scharf announced the "Diverse Search Requirement" program.  That program mandated that (i) at least 50% of the interview candidates for jobs paying at least $100,000 come from a historically underrepresented group with respect to at least one diversity dimension; and (ii) at least one diverse interviewer participate in the hiring panel.   ¶¶ 8, 222.  Significantly, Wells Fargo tied executive compensation awards to the Diverse Search Requirement such that if employees failed to comply it could negatively affect their compensation.  ¶ 247; *see also* ¶¶ 294-307.  The Board tasked its HRC with direct oversight of the Diverse Search Requirement program and responsibility for overseeing "approval of the Company's compensation philosophy and principles" and "executive compensation."  ¶¶ 8, 351-52.  Between 2020 and 2022, Defendants Black, Hewett, James, Morris, and Sargent served on the HRC.  ¶ 336.

Wells Fargo never took the Diverse Search Requirement seriously.  ¶ 201.  For example, on June 16, 2020, Wells Fargo CEO Scharf wrote a memo to Company employees discussing the Company's

7

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

hiring practices and claiming that "[t]he unfortunate reality is that there is a very limited pool of Black talent to recruit from." *Id.* Many workers were upset by Scharf's comments, particularly Black employees successfully rising through the ranks. *Id.* When the comments resurfaced in a *Reuters* story in September, Scharf was widely criticized. *Id.*

In the months following Scharf's memo, numerous facts came to light that reiterated the mission-critical importance of the Diverse Search Requirement. In particular, in August 2020, Wells Fargo paid nearly $8 million to settle Department of Labor claims it had discriminated against **34,000** Black applicants during the hiring process. ¶ 203. An August 2020 "Enterprise Risk Report," received by the Board's Risk Committee, identified "[s]ustained Team Member Allegations of Harassment, Discrimination, and Retaliation" as a "reoccurring trigger." ¶ 204. Because Wells Fargo failed to devote sufficient resources to reports of discrimination, the report noted Wells Fargo needed to "work to tackle the backlog of allegations." *Id.* At this time, Defendants Chancy, Hewett, Morris, Payne, and Vautrinot served on the Risk Committee. ¶ 336. Wells Fargo's discriminatory hiring practices adversely affected the Company. For example, on September 30, 2020, *The Charlotte Observer* reported that "[a]t least seven Black female senior executives have left Wells Fargo in the past 12 months, depleting the pipeline of women executives of color to the bank's most senior positions" and that "[t]wo people with direct knowledge of the matter say the bank's culture around race and gender was a factor in why some of the Black women left." ¶ 205.

Throughout the remainder of 2020 and into 2021 Wells Fargo continued to recognize the mission-critical importance of nondiscriminatory hiring practices, but it paid only lip service to the issue.

- At an October 26, 2020 Board meeting, Wells Fargo's Vice Chairman of Public Affairs claimed "that D&I is an imperative of the Company's senior management team." ¶ 206.

- In November 2020, the HRC highlighted that "[s]ubstantiated cases [of racial discrimination] were characterized by: Derogatory/racist statements and unfair treatment towards customers and employees." ¶ 207.

- On November 17, 2020 the HRC received a presentation stating that "[o]ngoing impacts of social justice movements, coupled with negative diversity related media attention in Q3, may contribute to emerging [Human Capital Risk] tied to insufficient diversity in the workforce by making it more difficult to retain and hire diverse talent." ¶ 208.

8

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

- On April 27, 2021, a Diverse Segments presentation to the board characterized the Diverse Search Requirement as one of Wells Fargo's "critical initiatives and actions supporting diversity, equity & inclusion." *Id.*

Although Wells Fargo acknowledged nondiscriminatory hiring as a mission-critical issue, the Company lacked sufficient controls to ensure the timely reporting of hiring discrimination to the Board. More specifically, on February 18, 2021, Phillip Miller, an "external job applicant," sent an email to Wells Fargo's Board stating that he experienced "discrimination in the form of racist and offensive statement[s]" by the hiring manager, including that the manager told Miller that "you don't sound black" and after which "a white female was selected for the position." ¶¶ 12, 177-78. According to other internal Company documents, the communication from Mr. Miller was considered a "Non-Ordinary" Board-level communication and sent to the Board's email "inbox," which means it should have been shared with one or more Board committees immediately. ¶¶ 178-79, 387-88. Instead, approximately ***ten months later*** the G&NC (not the full Board), including Defendants Clark, Craver, Hewett, and Sargent, received the email and were told that Mr. Miller was asked whether "he was interviewed only as a means for the hiring executives to appear as if they were pursuing diverse candidates." *Id.* This was telling, given that news reports had not yet surfaced about the abuses in the Diverse Search Requirement program.

The Company's lack of internal controls resulted in another whistleblower's email regarding sham interviews not reaching the full Board. On September 7, 2021, Joseph Bruno, a former Wells Fargo executive, sent an email to over 250 Wells Fargo employees—including Defendants Scharf, Powell, and Santos, and Mary Mack (CEO of Consumer and Small Business Banking)—raising concerns over Wells Fargo's practice of conducting what he believed were fake interviews of diverse candidates designed to comply with the Diverse Search Requirement program. ¶¶ 174, 418. The email described "fake interviews [Wells Fargo] managers do that [are] directed by HR." ¶ 175. It further explained that when Bruno "brought up the fake interviews, and [that Bruno] wasn't comfortable doing them, [Keith] Venderveen [one of eight regional directors overseeing Wells Fargo's core private client group] said put your head down and focus on recruiting." *Id.* Bruno was also "told that [he] was too aggressive in creating pools and benches of Black people." *Id.* Due to the lack of any controls ***requiring*** management to report these issues to the Board, Scharf never reported the email to the Board. ¶ 176. As a result, the

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

1   Board did not learn of Bruno's allegations until over **eight months later** when *NYT* published an article

2   discussing Bruno's whistleblower allegations.  ¶¶ 26, 182-83.

3          Instead of taking action to establish the necessary internal controls, the Company sought to hide

4   the facts.  On March 16, 2021 and March 14, 2022, the Board recommended that its stockholders "vote

5   AGAINST" a stockholder proposal that the Board "oversee a racial equity audit analyzing [Wells

6   Fargo's] adverse impacts on nonwhite stakeholders and communities of color."  ¶¶ 225-30, 244-46.

7          On May 19, 2022, the *NYT* published an investigative report based on allegations by Bruno and

8   **seven other** current and former Wells Fargo employees who alleged that, for years, Wells Fargo

9   conducted fake interviews to meet their "Diverse Search Requirement."  ¶¶ 182-85.  Employees claimed

10  the Company "would interview a 'diverse' candidate (a woman or a person of color, according to Wells

11  Fargo) in keeping with the bank's years long informal policy," even when the job "had already been

12  promised to someone else."  ¶ 182.  They claimed that the "interviews were more about helping Wells

13  Fargo create a record its diversity efforts on paper (in anticipation of possible regulatory audits) rather

14  than actually hiring more women or people of color."  ¶ 183.  The Board never discussed the article.

15         Without proper Board oversight, Wells Fargo management attempted to marginalize the

16  allegations.  ¶ 184.  On May 27, 2022, in an interview with *Business Insider*, Defendant Santos publicly

17  denied the findings.  ¶¶ 186, 254-56.  Only days before the *NYT* article, Santos, then Head of the Diverse

18  Segments, Representation and Inclusion, sold 22,700 shares of Wells Fargo stock for proceeds of more

19  than $1 million.  ¶¶ 25, 321.

20         Following the *NYT* article and management's denial that Wells Fargo had a problem, even more

21  facts further substantiated the sham interview claims.  On June 6, 2022, whistleblower Bruno posted an

22  article on LinkedIn which stated that the "fake interviews" were "an open secret at Wells Fargo, and it

23  has gone on for years."  ¶ 189.  On June 9, 2022 the *NYT* published a second article that referenced **ten**

24  **more** current and former employees who confirmed the Company's practice of sham interviews, bringing

25  the number of employees raising concerns about sham interviews to at least *19*.  ¶ 388.

26         On June 14, 2022, Bruno published a video discussing in detail "recent examples of fake

27  interviews."  ¶¶ 192-94.  Bruno further explained that if a candidate is brought in for a sham interview,

28

they are assigned an artificially deflated score for their interview performance so that the pre-selected candidate would get hired.   ¶ 194.   Several Wells Fargo employees commented on the video and confirmed the accuracy of Bruno's whistleblower allegations.   ¶¶ 195-96.   Plaintiffs likewise directly confirmed Bruno's allegations.   Plaintiffs spoke to a former Wells Fargo employee who confirmed they had direct knowledge of the sham interviews and stated that "I think sometimes they brought in people who were underqualified so they could say, 'Ok, well we interviewed this Latino candidate.'"   ¶¶ 162-63.   Despite the extensive evidence of discriminatory hiring practices and without even discussing Bruno's LinkedIn article or video, including the employee comments on the video, the Board determined at its June 27-28, 2022 Board meeting that the Company lacked a systematic problem.   ¶ 389.

### D.   The Board Failed to Claw Back Compensation Tied to the Diverse Search Requirement.

Defendants Scharf, Santomassimo, Powell, Weiss and others received incentive compensation based in part on their purported "individual performance achievement" in making "progress" on the Diverse Search Requirement despite this "progress" being achieved through widespread fake interviews. ¶¶ 294-307.   On January 1, 2021, Wells Fargo adopted and implemented a broad and vastly enhanced compensation Clawback Policy, which applied to a wide range of employee misconduct.   ¶ 314.   The HRC was responsible to implement the Clawback Policy in order to "hold individuals accountable." ¶¶ 308-20.   However, although the Board and HRC received reports of the Company's discriminatory hiring practices, ¶ 319, Plaintiffs' investigation revealed that the HRC failed to even consider clawing back compensation related to failures in the Diverse Search Requirement program.   ¶ 320.

### E.   Prior to Filing Suit, Plaintiffs Demanded and Received Board-Level Documents From Wells Fargo Pursuant to Delaware Law.

Prior to filing suit, Plaintiffs served demands on Wells Fargo for Board-level books and records pursuant to 8 Del. C. § 220, a Delaware statute that permits stockholders of Delaware corporations to inspect corporate books and records upon a showing of a proper purpose.   ¶¶ 64-65; *see also* Exs. A-F. In response, the Company agreed to produce documents concerning "[d]iscrimination in home lending, including mortgage discrimination," "materials relating to the Diverse Slate Guidelines," and "[d]iscrimination in hiring and promotion," ¶ 64, and produced nearly 7,000 largely redacted pages of

11

1    documents and certified that "Wells Fargo's production in this matter is now complete," ¶ 65 (quoting

2    Ex. B at 2).  Plaintiffs rely on these Board-level documents to support their allegations.  ¶¶ 64-67.

3         However, there is a remarkable lack of Board-level materials (whether meeting minutes,

4    presentations, or other materials) concerning fair lending compliance in the 220 Production.  As discussed

5    below, the near total lack of any indication of oversight or monitoring of fair lending compliance in

6    Board-level documents firmly supports the "reasonable inference" that no such oversight occurred—as

7    numerous Delaware courts have held.  *See, e.g.*, *In re China Agritech, Inc. S'holder Derivative Litig.*,

8    2013 WL 2181514, at *17 (Del. Ch. May 21, 2013).

9         With respect to the Diverse Search Requirement, to the extent documents were produced they

10   evidence inaction in response to red flags, rather than regular monitoring.

## ARGUMENT

## I.    Plaintiffs Are Entitled to All Reasonable Inferences.

13        On a motion to dismiss, Plaintiffs "need not plead particularized facts sufficient to sustain a

14   'judicial finding' either of director interest or lack of director independence or of another disabling

15   factor," and they "need not plead evidence." *In re EZCORP Inc. Consulting Agreement Derivative Litig.*,

16   2016 WL 301245, at *33 (Del. Ch. Jan. 25, 2016) (cleaned up).  When considering the particularity

17   requirement, "the Court does not weigh the evidence, must accept as true all of the complaint's

18   particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's

19   favor." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund*

20   *v. Zuckerberg*, 262 A.3d 1034, 1048 (Del. 2021); *see also Rosenbloom v. Pyott*, 765 F.3d 1137, 1159 (9th

21   Cir. 2014) (a Rule 23.1 motion requires "reasonable inferences that [] must [be] draw[n] in Plaintiffs'

22   favor.").  Smoking-gun evidence of board knowledge is not required.  *Id.* at 1156 (the trial court erred by

23   "insist[ing] on a smoking gun of Board knowledge" and explaining demand futility can be shown by

24   pleading "an *inference* of conscious inaction") (emphasis in original).  The trial court must "consider all

25   the particularized facts . . . in their totality and not in isolation from each other." *Del. Cnty. Emps. Ret.*

26   *Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

27

28

When "evaluating allegations of demand futility," courts ask three questions on a director-by-director basis:   (i) "whether the director received a material personal benefit from the alleged misconduct"; (ii) "whether the director faces a substantial likelihood of liability"; and (iii) "whether the director lacks independence from someone who [meets one of the two prior criteria]." *Zuckerberg*, 262 A.3d at 1059.   "If the answer to any of the questions is 'yes' for *at least half* of the members of the demand board"—here seven out of 14 Demand Directors—"then demand is excused as futile."   *Id.*[3]

With the exception of a footnote, Defendants' motion focuses on *Zuckerberg's* second prong, "substantial likelihood of liability," which requires that the plaintiff make "a threshold showing, through the allegation of particularized facts, that [the] claims have some merit."   *Zuckerberg*, 262 A.3d at 1048 (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).   Defendants' motion ignores these long-held pleading principles of Delaware law and Rule 23.1.   Specifically, they ask the Court to (1) misconstrue Plaintiffs' well-pled allegations; (2) consider, for their truth, facts beyond the Complaint; (3) afford Defendants (rather than Plaintiffs) the benefit of all reasonable inferences; and (4) evaluate the allegations individually rather holistically.   Defendants' efforts to re-write the pleading standards must be rejected.

## II.   The Directors Face a Substantial Risk of Liability Under *Caremark.*

### A.   Plaintiffs Plausibly Allege the Directors Failed to Monitor for Fair Lending Compliance—a Mission-Critical Issue

To satisfy their duty of loyalty "directors must make a good faith effort to implement an oversight system and then monitor it."   *Marchand*, 212 A.3d at 821.   When a breach is alleged (as it is here), it is often referred to as a *Caremark* claim under *In Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996), and its progeny.

A *Caremark* claim has two prongs, either of which can independently confer liability:   the first prong, commonly referred to as an "Information-Systems Claim" requires "alleging that the board lacked the requite information systems and controls."   *In re McDonald's Corp. S'holder Derivative Litig.*, 289

---

[3] Wells Fargo states that Plaintiffs have "mistaken[]" the number of Board members.   MTD 7.   Not so. As the Complaint makes clear (*see* ¶ 376 n.280), Plaintiffs allege that a Board member who a departed during 2023, after Plaintiffs filed their complaint, Defendant Pujadas, is part of the "demand board" under Delaware law.   *Id.*   Nevertheless, whether the number of Board members is 13 or 14 "the numerical demand-futility analysis is the same" (*id.*), because at least half of 13 (or 14) is 7.

A.3d 343, 359-60 (Del. Ch. 2023).  The second prong, known as a "Red-Flags Claim," requires "alleging that the board's information systems generated red flags indicating wrongdoing and that the directors failed to respond."  *Id*.  Regarding *Caremark's* first prong, Delaware's Supreme Court stated:

> When a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue ***intrinsically critical to the company's business*** operation, then that supports an inference that the board has not made the good faith effort that *Caremark* requires.

*Marchand*, 212 A.3d at 822.

When either an Information-Systems or Red-Flags Claim has been sufficiently alleged, the plaintiff has alleged bad faith.  *Id*. at 809; *see also McDonald's*, 289 A.3d at 350.

### 1.    Wells Fargo Lacked a Board-Level System of Monitoring and Reporting for Fair Lending Compliance.

As explained above, an Information-Systems Claim is sufficiently pled when the directors fail to "make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting."  *Marchand*, 212 A.3d at 821; s*ee also Boeing*, 2021 WL 4059934, at *25 (same).  Here, Defendants' oversight failures are similar to the recent *Marchand* and *Boeing* cases, where Delaware courts sustained Information Systems Claims at the pleading stage.  The plaintiffs in those cases alleged facts supporting an inference that the directors failed to make a good faith effort to have in place board-level monitoring and reporting controls over "mission-critical" aspects of their businesses—food safety and airplane safety, respectively.  *See Marchand*, 212 A.3d at 821; *Boeing*, 2021 WL 4059934, at *25-33.

In *Marchand*, the Delaware Supreme Court held that the following allegations supported an inference that the directors failed to make a good-faith effort to put in place a board-level monitoring/reporting structure on the mission-critical issue of food safety: (1) no board committee addressed food safety; (2) no regular process existed requiring management to apprise the board of food safety compliance practices, risks or reports; (3) the board did not consider food safety risks on a regular basis; (4) during a key period, management received reports containing red or yellow flags, but no evidence these matters were disclosed to the board; (5) the board was given certain favorable information, but was not given important reports presenting a much different picture; and (6) food safety issues were

not regularly discussed at board meetings.  212 A.3d at 822.  In *Boeing*, the plaintiffs brought "remarkably similar factual allegations" of board-level deficiencies as those in *Marchand*, which the court found supported an inference of bad-faith failure to monitor.  2021 WL 4059934, at *26.

Here, like in *Marchand* and *Boeing*, the Directors fell far short of ensuring that fair lending compliance—"a compliance issue intrinsically critical to the company's business operation" which is "externally imposed" by regulation—was overseen by "a reasonable board-level system of monitoring and reporting."  *Marchand*, 212 A.3d at 821-22.  A review of these same *Marchand*/*Boeing* factors demonstrates that Plaintiffs have created the plausible inference that Wells Fargo lacked *any Board-level* monitoring or reporting system concerning fair lending compliance and at best, received **one** lending *ad hoc* report.  *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *26.

### i.     "[N]o board committee that addressed [fair lending compliance] existed."

In *Marchand* and *Boeing*, plaintiffs sufficiently pled an inference that "no board committee that addressed [food/passenger] safety existed."  *Id.*  The same is true here.  Although two Board-level committees, the Risk and Audit committees (¶¶ 337-45), were responsible for *generally* overseeing matters like legal and regulatory compliance, for more than a two-year period between January 1, 2020 until the *Bloomberg* article's publication in March 2022, no discussion took place during Risk and Audit committee meetings about fair lending.  ¶¶ 141-42.  Wells Fargo claims otherwise, citing an August 2020 CRC committee meeting and a July 2021 training document (MTD 11 n.2 (citing MTD Ex. 12)); but the only fair reading of these documents is that they instead show the *absence* of regular monitoring.  The CRC minutes (as Wells Fargo readily admits) largely concern "[g]eneral risks" (MTD 13) related to fair lending rather any *specific* fair lending compliance issue *at Wells Fargo*.  And though the document briefly references to fair lending risk (¶ 140), this isolated reference does nothing to support Defendants' claim of "regular" monitoring given that it is the only time fair lending risk is mentioned in over more than two-years.  Indeed, it was the *Bloomberg* article, not any Company monitoring system that raised concerns the Company's lending practices could be violating fair lending laws.

1   Defendants' training document (MTD Ex. 12) fares no better, as it could be used to train *any*

2   employee or board member at *any* mortgage lender.  Regardless, general training about fair lending is not

3   the same as receiving regular reports about the state of the Company's fair lending compliance.

4   The near total lack of Board-level discussion of fair lending demonstrates that (just like for food

5   and airplane safety in *Marchand* and *Boeing*) no specific Board committee was charged with direct

6   responsibility for monitoring or addressing fair lending compliance.   "Perhaps because [no board

7   committee ] was . . . asked to do so, the pleading stage record indicates th[at] [no committee] . . . regularly

8   or meaningfully address[e]d or discuss[ed] [fair lending]."  *Boeing*, 2021 WL 4059934, at \*27.

9          **ii.       "[N]o regular process or protocols that required**
                        **management to keep the board apprised of [fair**
10                      **lending] compliance practices, risks, or reports."**

11   Likely because no Board-level committee was regularly monitoring the issue, fair lending was

12   also not part of any regular or consistent process or protocol that required management to keep the Board

13   apprised of practices, risks, and reports related to the issue.  To be sure, had the Board actually seen such

14   reports, documents produced in the Mortgage Discrimination Class Action offer insight into what would

15   have been shared.  For example, an internal March 2019 presentation titled "2018 Fair Lending Risk

16   Assessment" concluded that the Company's "Control Effectiveness" for "Fair Lending Risk"

17   "NEED[ED] IMPROVEMENT," ¶ 121 (quoting Ex. H).  This is because only *12* of the *25* company-

18   level fair lending controls in place were deemed effective.  *Id.*  With less than half of company-level

19   controls operating effectively, it is no surprise that Wells Fargo (and its Board) was late to address and

20   respond to *Bloomberg*, or that the Company continues to be investigated by the federal government about

21   discriminatory pricing exceptions.  ¶¶ 172-73.  Because this document (or any like it) was never shared

22   with the Board, it follows that, as in Marchand and Boeing, there was not a protocol or process requiring

23   management do so.  Clearly the "Board [] le[ft] 'compliance with [fair lending] safety mandates to

24   management's discretion rather than implementing and then overseeing a more structured compliance

25   system.'"  *Boeing*, 2021 WL 4059934, at \*29 (quoting *In re Clovis Oncology, Inc. Derivative Litig.*, 2019

26   WL 4850188, at \*12 (Del. Ch. Oct. 1, 2019) (describing *Marchand*)).

27

28

### iii.    "[N]o schedule for the board to consider on a regular basis . . . any key [fair lending compliance] risks existed."'

As discussed above, in the two-year period between August 2020 and the April 2022 *Bloomberg* article (¶¶ 141-42), Wells Fargo's 220 Production reveals only *one* Board-level meeting where fair lending compliance was actually discussed.  *Id.*[4]  As *Marchand* and *Boeing* make clear, occasional or *ad hoc* reporting of a mission-critical compliance risk is not the type of regularly scheduled reporting that is indicative of a reasonable Board-level monitoring system.  "[T]hose occasional occurrences fail to dislodge Plaintiffs' allegations that the Board did not specifically charge [any committee] with monitoring [fair lending compliance]."  *Boeing*, 2021 WL 4059934, at *27, *30; *Marchand*, 212 A.3d at 822 (referencing the absence of any schedule for considering mission-critical risks "on a regular basis").

### iv.    "[D]uring a key period . . . management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board."

Following *management's* March 2019 conclusion that "Control Effectiveness" for the Company's "Fair Lending Risk" "NEED[ED] IMPROVEMENT," ¶ 121 (quoting Ex. H) and that only *12* out of *25* company-level fair lending controls were deemed effective (*id.*), there is no evidence from the 220 Production that these numerous, company-level control deficiencies were ever disclosed to the Board. Thus, the only plausible inference is that these "red, or at least yellow, flags" which were "known to management [but] failed to make their way to the Board," "support[s] the conclusion that the Board failed to establish a reporting system."  *Boeing*, 2021 WL 4059934, at *32.

The Board's lack of monitoring system is further supported by other documents from the Mortgage Discrimination Class Action which unquestionably show that employees tasked with evaluating *Bloomberg's* analysis found that the Company's minority approval gap is a long-term, systemic issue for Wells Fargo:  "This is something we've been noticing and raising our hand on for awhile and no one seems to listen or we all continue to ignore," ¶ 133; "since about 2013 we have gotten progressively worse," *id.*; "none of the[] [Company's] leaders were paying attention" despite having

---

[4] Plaintiffs intentionally omit the "training" document here because no minutes indicate it was discussed.

"plenty [sic] of opportunity to understand this before," ¶ 135; "it is" a "fact" that "we are not helping customers at [the] same rate across race," *id.*; "our approval rate gap between us and the industry is bad and the gap there got worse . . . because everyone else improved more than us," *id.*; and this "failure" was a "collective miss," *id.*

> ### v.       "The Board was given favorable information about [fair lending] by management, but was not given important reports that presented a much different picture."

This factor also supports Plaintiffs' Information Systems claim given that, as explained above, over a near two-year period the CRC received one *ad hoc* and non-specific report that no "systemic fair lending risk" had been detected. *Supra* at 6. The management-level, March 2019 "Fair Lending Risk Assessment" and the *Bloomberg* article present "a much different picture." *Id.*

> ### vi.      "[T]he board meetings are devoid of any suggestion that there was any regular discussion of [fair lending compliance] issues."

Because Wells Fargo's 220 Production identifies only one set of Board minutes—the August 2020 CRC meeting minutes—over a two-year period (*see* ¶¶ 140-41; MTD Ex. 12)—there is no factual support for Defendants' claim that the Board or any committee had "regular" discussions about fair lending compliance before *Bloomberg* published its investigation.

*       *       *

Plaintiffs' allegations of a near total lack of Board-level oversight over fair lending compliance puts this case on all fours with *China Agritech*, 2013 WL 2181514; *Hughes v. Xiaoming Hu*, 2020 WL 1987029 (Del. Ch. Apr. 27, 2020); and *McDonald's*, 289 A.3d 343—all cases where the plaintiffs sufficiently pled demand futility.

***First***, in *China Agritech*, in response to a Section 220 books-and-records demand concerning various financial discrepancies, the company failed to produce Board or committee minutes and instead "produced only three documents." 2013 WL 2181514, at *11. The court held that this "*absence* of books

18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

and records in critical areas, support[ed] a reasonable inference" that the directors had "acted in bad faith in the sense that they consciously disregarded their duties." *Id*. at *17, *20.[5]

**Second**, in *Hughes*, the company failed to produce minutes for a four-year period, entitling plaintiff to the inference that no meetings took place at which the company's "chronic deficiencies" were addressed, leading the court to conclude that despite having "the trappings of oversight" the board had in fact "followed management blindly" and "devoted patently inadequate time" to understanding. 2020 WL 1987029, at *2, *16.[6]  Likewise here, Defendants only point to minutes of *one meeting*, ¶ 140, that ever discussed fair lending prior to *Bloomberg* contacting the Company in December 2021 (Ex. P at 1191).

**Third**, in *McDonald's*, the court inferred from an "absence of evidence from the Section 220 production" that a senior executive had failed to report employee misconduct to the board, and the board had failed to "tak[e] meaningful action to address [those] problems," where the minutes failed to mention those matters. 289 A.3d at 379.  Here, the near total lack of minutes or other documents (in the years before *Bloomberg's* December 2021 inquiry) entitles Plaintiffs to a similar inference.

For their part, Defendants conspicuously sidestep *Marchand* and *Boeing* when discussing Plaintiffs' lending claim, and hardly address the other pleading-stage cases referenced above.  Instead, they rely on misdirection and a recasting of Plaintiffs' allegations.  For example, Wells Fargo argues that "the thrust" of Plaintiffs' Information Systems claim is that "the Board did not receive specific

---

[5] Defendan*t*s misleadingly argue that "Plaintiffs are not entitled to any negative inferences 'reasonably drawn from the absence of records produced in response to the Section 220 demand.'"  RJN 5 (quoting *China Agritech*, 2013 WL 2181514, at *1).  But *China Agritech*—like the overwhelming majority of Delaware cases—"support[s] [this] reasonable inference." 2013 WL 2181514, at *20; *see also Hughes*, 2020 WL 1987029, at *2 (where plaintiff asked for certain minutes and in response, the company "did not produce any minutes evidencing any meetings addressing those topics until a [particular committee] meeting," the plaintiff was "entitled to the reasonable inference that no earlier meetings took place at which those topics were addressed").

[6] Defendants argue that their failure to produce documents discussing fair leading or mortgage discrimination between August 2020 and April 2022 is irrelevant.  MTD 11 (citing *City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653 (Del. Ch. June 30, 2022)).  But in *Hamrock*, the court found that the Board *did* have a "reasonable board-level [reporting] system" in place because "the Section 220 Documents [were] replete" with multiple instances each year in which the same committee reviewed and discussed reports on "pipeline safety compliance." 2022 WL 2387653, at *16.  Here, in contrast, there is no evidence that the Board or any committee regularly reviewed anything regarding fair lending compliance.

information" about the Company's "automated underwriting system or algorithm that would have []
alerted it to potential disparate impact toward minorities."  MTD 10.  This is far afield from the
Complaint.  Indeed, the thrust of Plaintiffs' claims is not that the Board *failed to receive* certain
information—it is that, consistent with *Caremark* and *Marchand*, it failed to "make a good faith effort—
*i.e.*, *try*—to put in place a reasonable board-level system of monitoring and reporting" for a mission-
critical compliance issue.  *Marchand*, 212 A.3d at 821.  As set forth above and with guidance set forth in
recent and authoritative Delaware cases, Plaintiffs have created an inference that the Board failed to do
so.

Defendants have also managed to dig up a few Board-level documents, like the August 2020 CRC
minutes and the training document discussed *supra* at 15, in order to claim that fair lending compliance
was regularly monitored.  MTD 10.  Defendants likewise point to another document, the April 25, 2022
"Bloomberg HMDA Discussion" (Ex. X) and "April 25-26, 2022 Bloomberg Update" (Ex. U) as support
for the Board's monitoring efforts.  But this discussion and update occurred *after Bloomberg* published
its March 2022 article.[7]  But by this time, the Board's years of inattention to fair lending compliance had
already done its damage, resulting in *Bloomberg's* article and a class action lawsuit.  Defendants
confusedly assert that "Board members did not consciously ignore the March 2022 *Bloomberg* article."
MTD 14.  This is a red herring:  nowhere in the Complaint do Plaintiffs complain that the Board *ignored*
*Bloomberg*; rather, Plaintiffs allege that for years prior to *Bloomberg*—and despite numerous red flags,
¶ 383, including the 2012 DOJ and 2019 Philadelphia actions, ¶¶ 92-93, the December 2020 Demand,
¶ 96, and management's own internal reports, ¶¶ 120-31—the Board *ignored fair lending compliance*.[8]

In any event, a closer reading of the April 25-26 "Bloomberg Update" (Ex. U) illustrates the depth
of the Board's failure to monitor fair lending compliance and its inattention to *Bloomberg's* allegations
up to that point in time.  The minutes concede that "mistakes were made in the ordinary course," including

---

[7] ¶ 132 n.92; *see also* Ex. P at 1191 (email from Dec. 10, 2021 email from Bloomberg to Company).

[8] The Court should reject Defendants' attempt to "to rewrite the complaint so as to include . . . examples
of misconduct" Plaintiffs do not allege to create an alternate "fact pattern."  *Burrell v. City of Vallejo*,
2020 WL 1532293, at *2 (E.D. Cal. Mar. 31, 2020) (finding defendants' attempt to "alter[]" the
"complaint" "stretch[es] the purposes of Rule 12(b)(6)").

20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

"mistakes . . . with respect to stakeholder engagement following publication of the [*Bloomberg*] article," and that "the Company [had] not conduct[ed] sufficient stakeholder engagement early on . . . because [it] did not have all necessary data until recently." ¶ 147.  Yet, rather than focus on improving its fair lending controls, the Board's discussions with management primarily focused on (i) PR-style damage control with "stakeholders"; and (ii) how they planned tell "stakeholders" that Wells Fargo "will not be able to meet the commitments" it had "made in 2016 and 2017 to promote homeownership among African-American and Hispanics." Ex. U at 58935.  A closer reading of the April 25, 2022 "Bloomberg HMDA Discussion" is equally troubling:  although it internally conceded that the "[t]he Bloomberg story" was "factually accurate" it acknowledges that after "the New York City Mayor and Comptroller" responded to that article by "informing us the City of NY will not be opening any new depositary accounts," the "Company issued a response" publicly stating that the "allegations of discrimination" were "irresponsible" and "do not stand up to scrutiny." Ex. X at 1106; ¶ 149.

Finally, Defendants suggest that "consistent reporting" is not required for a board to fulfill its duties of oversight under *Caremark* and that even a "one-time discussion" would suffice to avoid "prong-one" liability under.  MTD 11 (quoting *Hamrock*, 2022 WL 2387653, at *16).  This too is a red herring that misconstrues Plaintiffs' allegations.  As set forth in the factors enumerated in *Marchand* and *Boeing*, Plaintiffs have plausibly alleged an inference that the Board failed to have "regular" reporting, processes, protocols, or discussions about fair lending compliance, a mission-critical compliance issue for Wells Fargo.  *Supra* Section II.A.  Whether this was also a failure to have "consistent reporting" (as Wells Fargo has characterized it) is of no moment and the facts of the *Hamrock*, a case on which Defendants extensively rely, do not suggest otherwise.  In *Hamrock*, internal books and records confirmed that the defendant board had in place a board-level "ES&S Committee" overseeing the mission-critical issue of human safety that "receiv[ed] extensive reports from senior executives and regular[] report[s] on safety risks to the full Board." 2022 WL 2387653, at *15.  This is nothing like the case here, where the Directors, over a more than two-year time period, can only point to one set of Board meeting minutes mentioning fair lending at all, and even then (as Wells Fargo concedes), the minutes largely reference "[g]eneral risks" as opposed to any specific fair lending issues at Wells Fargo.  MTD 13.

### 2. Numerous Red Flags Further Demonstrate That the Directors Failed to Monitor Fair Lending Compliance.

A plaintiff states a *Caremark* prong-two claim by "plead[ing] [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Reiter v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016). Here, Plaintiffs' allegations demonstrate the Board knew—or at the very least, should have known—that Wells Fargo previously engaged in a pattern of discriminatory pricing exceptions against minority groups.

*First*, the 2012 DOJ and 2019 Philadelphia settlements themselves constituted red flags of Wells Fargo's pattern of mortgage discrimination. ¶¶ 92-93. While Wells Fargo conveniently claims these lawsuits are "unrelated" and not "sufficiently connected" to Plaintiffs' allegations involving "the Company's underwriting algorithm," MTD 12-13, 15, this ignores Plaintiffs' well-pled allegations. Plaintiffs clearly explain that pricing exceptions are another discriminatory mortgage lending practice that plagued the Company for years and continues today (¶¶ 172-73). That discriminatory "pricing" in mortgage lending is not exactly the same as discriminatory "underwriting algorithms" in mortgage lending is beside the point as both practices violate fair lending laws, a central issue in this case.

Not to mention, Defendants characterization of the DOJ's complaint (incorporated by reference at ¶ 92 n.38) is simply wrong as the DOJ's complaint does in fact discuss Wells Fargo's "automated computerized filter" and "automated system" and noted "screening for broker compensation caps was automated within the origination system." DOJ Cmplt ¶¶ 31, 36, 62 (attached hereto as Exhibit 1 to the Declaration of Lesley E. Weaver). Specifically, the DOJ alleged that Wells Fargo's "A-Paper Filter, an internal system designed to ensure that all prime-eligible borrowers were referred to the Bank's prime division, [which] was ineffective and subject to easy manipulation." *Id.* ¶¶ 7, 24, 31-36, 50. Thus, the DOJ's complaint made clear that the widespread discrimination it found at Wells Fargo—including "higher prices," "higher fees and costs," ¶ 92[9]—was in part caused by the Company's "automated computerized filter[s]" and "automated system." DOJ Cmplt ¶¶ 31, 36.[10]

---

[9] *See also* DOJ Cmplt ¶¶ 5, 20, 22, 51-52, 59-63, 76-78 (discussing "pricing" dozens of times).

[10] Hence, the DOJ clearly connected Wells Fargo's defective algorithms with pricing exceptions.

1        Moreover, the DOJ's 2012 allegations of automated/algorithmic lending discrimination include
2  pricing exceptions.  For example, the 2019 Philadelphia Action alleged that Wells Fargo violated the
3  FHA by steering minority borrowers toward higher interest rate loans—in other words, pricing
4  exceptions.  ¶ 93.  Internal documents and a former employee confirmed that these problems have
5  persisted to the present.  *See, e.g.*, ¶¶ 122-24 & n.75 (March 24, 2022 "Fair Lending Analysis" (Ex. I at
6  2257) confirmed that Wells Fargo's the automated CORE/ECS system resulted in "disparate impact");
7  ¶ 120 & Ex. H at 0807, 0810 (March 2019 internal "2018 Fair Lending Risk Assessment" found that
8  "pricing exception allowances" are one of the "high" risks that "needs improvement" for which the
9  Company had identified a "control gap" and "2 controls rated Needs Improvement"); ¶¶ 165-67 (FE 4
10  explaining how the Company had "algorithms" and "decision-making engines" consisting of "overlays").
11  Thus, the DOJ's 2012 settlement was clearly related to both Wells Fargo's discriminatory pricing
12  exceptions and automated loan underwriting algorithm.

13        **Second**, the December 2020 Demand, "request[ed] that the Company take action to recover
14  damages for alleged misconduct and correct alleged deficiencies in the Company's controls relating to
15  . . . minority borrowing practices."  ¶ 96 (quoting Ex. G (Oct. 25-26, 2021 Board minutes)).  The Board
16  refused.  ¶ 100.[11]  The Board's inaction following the December 2020 Demand demonstrates Defendants
17  ignored red flags concerning potential misconduct.  *See Garfield on behalf of ODP Corp. v. Allen*, 277
18  A.3d 296, 305-06 (Del. Ch. 2022) ("Delaware law treats a conscious failure to act as the equivalent of
19  action, so if a [stockholder] brings a clear violation to the directors' attention and they do not act, then it
20  is reasonably conceivable that the directors' conscious inaction constitutes a breach of duty.  The same
21  logic animates a *Caremark* claim that rests on the theory that the board consciously ignored proverbial
22  red flags[.]").

23        **Finally**, the May 6, 2021 PhD article, based on Wells Fargo Internal Reports, published by six
24  *Wells Fargo* PhDs "highlight[] the potential discriminatory effects of lending algorithms" amidst the
25  Board's evaluation of the December 2020 Demand and the Company's long-standing issues with

26  ───────────────
27  [11] Wells Fargo contends that Plaintiffs "misrepresent" what the December 2020 Demand "purportedly
   'related to'" (MTD 13) but ignores that the Complaint merely quotes (verbatim) the demand's description
28  in the Board's meeting minutes.  *Compare* ¶ 96 *with* Ex. G at 1960.

23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

1  discriminatory lending practices.  ¶¶ 97-99, 392.  *See also In re Intuitive Surgical S'holder Derivative*

2  *Litig.*, 146 F. Supp. 3d 1106, 1117 (N.D. Cal. 2015) (finding it "reasonable to infer that scholarly studies

3  evaluating the . . . system and its performance would be known by the board" and "constitute [a] red

4  flag.").

5     **B.**     **Plaintiffs Plausibly Allege the Directors Failed to Monitor the Diverse**
       **Search Requirement**

6

7     **1.**     **Plaintiffs Plausibly Allege Monitoring Compliance with the Diverse**
                 **Search Requirement Was a "Mission-Critical" Issue.**

8          Wells Fargo argues that the Board did not have a special obligation to exercise extra monitoring

9  over the Diverse Search Requirement because it was not a "mission-critical issue" for the Company.

10  MTD 17.  In Wells Fargo's view, for discriminatory sham interviews to qualify as "mission-critical,"

11  Plaintiffs must plead "that compliance with the Diverse Search Requirement is to a bank what non-toxic

12  food and safe planes are to ice cream and plane manufacturers."  MTD 17-18.  Defendants overstate the

13  standard.

14          Mission-critical items are ones that relate to "safety and legal compliance issue[s] facing [a]

15  company"—including "a relatively more complex corporation" than [an ice cream manufacturer].

16  *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *18 (Del. Ch. Aug. 24,

17  2020); *see also Clovis*, 2019 WL 4850188, at *12-13 ("Our Supreme Court's recent decision in *Marchand*

18  *v. Barnhill* underscores the importance of the board's oversight function when the company is operating

19  in the midst of 'mission critical' regulatory compliance risk.").  Here numerous federal and state laws

20  make hiring discrimination illegal, including ECOA, FHA, Section 1983, UCL, and the Unruh Civil

21  Rights Act.  ¶¶ 361-65.  Wells Fargo's legal risk of failing to comply with these laws is very real.  Indeed,

22  the Company has already had to settle lawsuits for tens of millions of dollars related to its discriminatory

23  hiring practices, faced Congressional scrutiny, a federal investigation, and had executive-level employees

24  resign because of it.  ¶¶ 185-90, 201-05.

25          In any event, this Court need not infer nondiscriminatory hiring was a mission-critical issue

26  because in an April 27, 2021, Diverse Segments presentation to the Board, management explicitly

27  characterized the Diverse Search Requirement as one of Wells Fargo's "***critical*** initiatives and actions

28

supporting diversity, equity & inclusion." ¶ 208. *See In re McDonald's Corp. S'holder Derivative Litig.*, 291 A.3d 652, 680-81 (Del. Ch. 2023) ("The court does not have to infer that sexual harassment and misconduct constituted a mission critical risk. The Company said it.").

### 2. Plaintiffs Plausibly Allege the Directors Ignored Red Flag Warnings the Company Did Not Have a Monitoring System for Timely Reporting of Hiring Discrimination.

"Where management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board, it is reasonable to infer the absence of a reporting system." *Boeing*, 2021 WL 4059934, at *31 (citing *Marchand*, 212 A.3d at 817). Here, management received just such red, or at least yellow, flags—which never made their way to the Board in timely fashion and did not result in action by the Board.

First, the ten-month delay in receiving Miller's whistleblower email put the Board on notice that it was not receiving timely reporting of hiring discrimination. ¶ 387. Whether or not management determined Miller's allegations were "unsubstantiated" does not change the fact that this put the Board on notice their direct employee reporting mechanism did not result in timely reports. Second, the *NYT* article put the Board on notice that it *still* did not have a timely reporting mechanism in place. ¶¶ 182-85. It further put the Board on notice of not just Bruno's allegations, but also the allegations of ***seven*** other whistleblower employees. *Id.* Third, the second *NYT* article put the Board on notice of ***ten*** more whistleblower employees. ¶ 388. Despite these red flags, the Board chose not to take the issue seriously and instead engaged in a PR campaign against the allegations in the article. ¶ 26.

Defendants assert they did more than "do nothing" in response to the *NYT* article; however, they fail to identify a single policy change the Board implemented in response to the *NYT* article that addresses the timely reporting of hiring discrimination to the Board or for that matter any reporting of hiring discrimination to the Board, whether timely or not. MTD 18-19. Instead, the Board determined at its June 27-28, 2022 meeting that the Company lacked a systematic problem with its hiring practices and

25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

failed to implement a board reporting mechanism for timely reporting of hiring discrimination.  ¶ 389.
The documents Defendants cite do not refute this conclusion.[12]

Finally, despite these red flags of hiring discrimination and sham interviews, to this day neither
the Board nor the HRC have undertaken any investigation or steps to exercise the Company's rights under
its Clawback Policy, ¶¶ 308-20, to reclaim the tens of millions of dollars in improperly inflated Pay-for-
Performance" compensation that Scharf, Santomassimo, Powell, Weiss, and others received during 2020-
2022 based on their supposed "achievement level[s]" of 121%, 110%, 125%, and 120%, ¶¶ 295-99, in
supposedly helping the Company make "progress" in its "diversity" initiatives, ¶¶ 294-307.[13]

### 3. Plaintiffs Plausibly Allege the Directors Failed to Place a Reporting Mechanism in Place to Detect Failure to Comply with the Diverse Search Requirement.

Defendants argue that Plaintiffs' own allegations demonstrate that the Director Defendants
"surpassed *Caremark's* baseline requirement that they try in good faith to put a reasonable compliance
and reporting system in place."  MTD 16-18.  None of the allegations Defendants cite relate to a
monitoring system related to the Diverse Search Requirement, or for that matter even address
discriminatory hiring issues at a high level.  Rather, they are all generic discussions of the Company's
diversity, equity and inclusion efforts and metrics related to diversity within the Company.  *See* MTD 16
(a board member "commented on the importance of the Company's diversity & inclusion . . . efforts" and
asking for "D&I updates"); *id.* (the Board received a "Diverse Segments, Representation and Inclusion:
Status Update," and received information about the racial demographics of the Company); *id.*
(Governance and Nominating Committee members "discussed the Company's diversity programs, and
how the Company intended to report on the progress of those programs.").

Defendants' failure to implement a monitoring system related to compliance with the Diverse
Search Requirement does not comport with the Board's duties under *Caremark*.  That is particularly true

---

[12] Defendants point to a July 25, 2022 presentation to the HRC as evidence of the Board's "corrective
measures."  MTD 19 (citing MTD Ex. 11).  But this self-serving document *post-dates* both *NYT* articles,
¶¶ 182, 190, the ensuing publicity and scandal, ¶¶187-88, 201-06, and stock price declines, ¶ 274.

[13] Tellingly, despite the substantial and detailed allegations (¶¶ 294-320) Defendants' MTD hardly even
addresses these allegations (*see* MTD 25 n.8).  Defendants have therefore waived this issue.

here since the Diverse Search Requirement was a mission-critical issue for the Company, which triggered heightened monitoring obligations. *See* Section II.B.1 *supra*. The Board's generic discussions related to diversity initiatives do not satisfy the Board's oversight obligations with respect to the Diverse Search Requirement under Delaware law because "discretionary management reports that mention safety as a part of the Company's overall operations are insufficient to support the inference that the Board expected and received regular reports on product safety." *Boeing*, 2021 WL 4059934, at *29.

Defendants next claim the fact that the Board received Miller's complaint, despite the fact that it took *ten months* to reach the Board, demonstrates the Board had a monitoring system in place. MTD 16. The Company furthers claims the ten-month delay in reporting to the Board was a mere "criticism" of the Board's reporting mechanism that falls within the Board's "business judgment." MTD 16-17. A ten-month delay in reporting discrimination to the Board is not a minor "criticism." If reports of discrimination take nearly *a year* to reach the Board, they arrive far too late for anyone to meaningfully address them due to the passage of time and are therefore as a practical matter worthless. Moreover, the fact that the Board belatedly received Miller's email should have raised a red flag to the Board that it did not have a regular reporting mechanism in place for a mission-critical issue. A board acting in good faith would have taken action to ensure a timely reporting mechanism was in place.

Miller's email, however, is not the only red flag the Board received that Wells Fargo did not have a timely reporting mechanism for reporting discriminatory hiring to the Board. When Joe Bruno submitted a whistleblower complaint to 250 employees including Scharf and several other senior Wells Fargo officers, it was never provided to the full Board. ¶ 14. Rather, the Board learned about Bruno's allegations from the *NYT*, rather than senior management. ¶¶ 26, 182-83. Of course, if the Board had a regular reporting system in place, it would have learned of Bruno's whistleblower email long before the *NYT* article. Worse still, Defendants do not contend the Board *ever* received Bruno's email, his later LinkedIn article, the detailed video he posted, or the Wells Fargo employee comments on that video. MTD 18 n.5. Thus, despite receiving multiple red flags, the Board *still* has not put in place a monitoring system to timely report hiring discrimination to the Board. Therefore, Plaintiffs have stated a so called "prong-one" claim under *Caremark* for failure to implement a reporting system.

**III.     Demand Related to Claims Against the Officer Defendants Was Futile.**

Defendants assert that "Plaintiffs do not even try to explain how a majority of the Board could face a substantial likelihood of liability for the claims brought against Wells Fargo's officers—as opposed to the Director Defendants themselves." Off. MTD 9. Defendants are mistaken factually and legally.

> Where the factual allegations underlying claims against officers are "congruous" with the facts underlying claims against directors, then adequately alleging a substantial likelihood of liability as to the directors satisfies the demand requirement concerning the claims against the officers. This is because an investigation of the officers "would necessarily implicate the same set of facts" at issue in the claim against the directors.

*Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890, at *12 (Del. Ch. Feb. 1, 2024). That is precisely the situation here. In contrast, none of the cases on which Defendants rely (Off. MTD 9) adequately alleged (as Plaintiffs do here) that the board faced a substantial likelihood of liability. For example, in *Melbourne Mun. Firefighters' Pension Trust Fund v. Jacobs*, the court found demand futile as to the officer defendants because "Plaintiff's legal theory in Count II [against the officers] is the same as in Count I [against the directors]" and "the Complaint fails to plead particularized facts from which it is reasonable to infer the Board faces a substantial likelihood of liability as to Count I." 2016 WL 4076369, at *13 (Del. Ch. Aug. 1, 2016).[14] Thus, because the Complaint contains well-pled allegations that the Director Defendants face a substantial likelihood of liability related to similar facts underlying Plaintiffs' claims against the Officer Defendants, demand is futile as to the Officer Defendants.

---

[14] All of Defendants' other cases likewise held in each case that the Board did not face a substantial likelihood of liability. *See Zuckerberg*, 262 A.3d at 1050 (Del. 2021) ("the Director Defendants face no risk of personal liability from the allegations asserted in this action"); *In re McDonald's Corp. S'holder Derivative Litig.*, 2023 WL 2329711, at *1 (Del. Ch. Mar. 1, 2023) ("*McDonald's II*") ("This Court has now held that the complaint fails to state a claim on which relief could be granted against the Director Defendants. For purposes of this case, the road to establishing demand futility that the plaintiffs sought to travel is closed.") (internal citations omitted); *McElrath v. Kalanick*, 2019 WL 1430210, at *20 (Del. Ch. Apr. 1, 2019) ("Plaintiff has not sufficiently pled that at least seven of the eleven members of the Demand Board are either interested or lack independence.").

28

**IV.     Plaintiffs Have Plausibly Alleged the Officer Defendants' Scope of Duty Included Monitoring for Discrimination in Hiring and Lending.**

The Officer Defendants assert that Plaintiffs failed to adequately allege that the challenged lending and hiring practices fell "within their areas of responsibility."  Off. MTD 10 (quoting *McDonald's*, 289 A.3d at 370).  That assertion is unsupported.

Three of the Officer Defendants had responsibility for diversity initiatives: (1) COO Powell; (2) CFO Santomassimo; and (3) SVP of Corporate and Investment Banking Weiss.  ¶¶ 52 55, 60.  As members of the Operating Committee, these executives' annual bonuses depended in part on their "progress" on diversity initiatives.  ¶¶ 297-99, 306.  Additional well-pled allegations tie these Officer Defendants to hiring and lending.  Whistleblower Joseph Bruno emailed Powell about the discriminatory hiring practices.  ¶ 174.  As CFO, Santomassimo was "responsible for the Company's financial management functions including . . . line of business finance functions," which include lending.  ¶ 55.

Defendant Santos's areas of responsibility as Wells Fargo's former Head of Diverse Segments, Representation, and Inclusion, and since July 2022, CEO of Consumer Lending, ¶ 56, included ensuring that the Company did not engage in illegal discrimination in either hiring or lending.  Santos reported directly to CEO Scharf on diversity issues, *id.*; presented to the Board on diversity issues, ¶ 27; and spoke publicly to the press denying allegations that the Company discriminated in ***both*** lending and hiring. ¶¶ 259-61.  Mr. Bruno emailed Santos about the discriminatory hiring practices.  ¶ 174.

Defendant Sanchez's area of responsibility as Vice President, Talent Acquisition, AA/EEO, and Diversity Recruiting from 2013 to 2022 also included non-discriminatory hiring.  ¶ 54.  Sanchez gave a public interview claiming she was "focused" on "building diverse candidate slates." ¶¶ 239-41.

Under Delaware law, "[a]n officer who receives credible information indicating that the corporation is violating the law cannot turn a blind eye and dismiss the issue as 'not in my area.'" *McDonald's*, 289 A.3d at 370.  It comes with ill grace for the Officer Defendants to disclaim responsibility for non-discriminatory lending and hiring when their compensation depended on diversity initiatives and/or their job titles make clear that they had responsibility in these areas.  Given their status as full-time employees, the Officer Defendants should have responded even more quickly to red flags within their areas of responsibility.  *Id.* at 373 ("[W]hile directors are part-time monitors who may meet

29

a handful of times per year, officers are full-time employees who are deeply involved in corporate decision-making on a daily basis.").

## V.    The Directors Face a Substantial Likelihood for Violations of the Federal Securities Laws.

### A.    Plaintiffs Have Adequately Alleged a Section 10(b) Cause of Action Against the Officers and Directors

Section 10(b) of the Securities Exchange Act of 1934 prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.  *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1089 (N.D. Cal. 2017) ("*Wells Fargo 2017 Deriv. Litig.*").  To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant and (2) scienter.  *Id.*

Here, the Director Defendants and the Officer Defendants argue that Plaintiffs failed to plead falsity and scienter with enough particularity.  *See* MTD 23; Off. MTD 18.  The Officer Defendants also argue that they did not have the necessary authority to be held liable under Section 10(b).  Off. MTD 18. Those arguments fail for the following reasons.[15]

### 1.    Plaintiffs Adequately Alleged Falsity.

A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Here, Plaintiffs have alleged, in 20 detailed pages, that Defendants issued numerous false and misleading statements and omitted material information which inaccurately downplayed and concealed the Company's discriminatory practices, including statements concerning its Diverse Search Requirement and lending practices.  ¶ 209.  For example, the Complaint describes the following false statements from the 2020 Proxy: "we have a strong record of recruiting, promoting, and rewarding gender

---

[15] Defendants argue the Court "may decline to exercise supplemental jurisdiction over the remaining state law" claims if Plaintiffs' federal claims were dismissed.  MTD 20 n.7.  However, dismissal of "federal claims before trial is *wholly discretionary*."  *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997).

30

and racially/ethnically diverse employees" and "our hiring process is fair and equitable." ¶ 217. These statements were false because "many of the diverse candidates did not have 'fair and equitable' chance of obtaining a position for which they were interviewing because often another candidate had already been selected for the position." *Id.* The Complaint is full of additional examples of Defendants falsely promoting DEI programs and the success of Wells Fargo's "non-discriminatory" business practices.[16]

Each of these statements separately (and taken together) establish a claim under Section 10(b) of the Exchange Act, as each "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985. Moreover, these inflated comments would lead a reasonable investor to believe that Wells Fargo cared about serving customers fairly and equitably, not that Wells Fargo would discriminate against black and Hispanic borrowers (which they were, ¶¶ 108, 203). The Court should, therefore, deny the motion. *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *6 (N.D. Cal., Feb. 27, 2018) (derivative 10(b) claim sufficiently pled where plaintiffs alleged Wells Fargo inflated cross-selling metrics and fabricated the success of the cross-selling).

Both Wells Fargo and the Individual Defendants argue that because the Court found that the related securities class action *initially* failed to plead a 10(b) claim with sufficient particularity, then the Complaint in this case also fails to plead its 10(b) claim with sufficient particularity. Not so. Plaintiffs' Complaint is far more detailed than the complaint dismissed in *SEB*. Specifically, in *SEB*, the Court found that, while "a reasonable investor, under the circumstances alleged, would not expect sham interviews to be conducted to fulfill the Diverse Search Requirement", the plaintiffs complaint failed to allege that the "sham interviews took place during the Class Period and that they were widespread." *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2023 WL 11691540, at *5 (N.D. Cal. Aug. 18, 2023). Here,

---

[16] *See* ¶¶ 222-25, 232-33 (instead of successful diversity programs, Defendants were faking interviews and engaging in potentially discriminatory practices); ¶¶ 239-41 (false statements by Defendant Sanchez); ¶¶ 242, 245-46 (false 2022 proxy statement); ¶¶ 252-53 (false claim that Company "was confident" underwriting practices were "consistently applied regardless of the customer's race or ethnicity"); ¶ 256 (false statements denying discriminatory systems); ¶ 255 (denying allegations that "Wells Fargo was the sole lender that rejected more Black applicants than it accepted"); ¶ 261 (statements that the diversity programs were "working" was false).

Plaintiffs' Complaint does not suffer the same defects. For example, Plaintiffs have alleged the sham interviews occurred throughout the relevant time period. *See* ¶¶ 155-65 (former employees corroborating fake interviews and discrimination from 2020 to 2022). Plaintiffs also alleged in detail that the sham interviews were widespread. *See* ¶¶ 162, 274. Defendants' reliance on *SEB* is also premature as the *SEB* case has not been dismissed. *See* Case No. 3:22-cv-03811-TLT, ECF No. 141.

Both Motions argue that Plaintiffs must allege (1) more than "isolated incidents," (2) that the statements are not false because the "evaluations took place," and (3) that Wells Fargo's commitments on diversity were only "aspirational" or "optimism." These arguments fail because each overlooks detailed allegations in the Complaint, which describe just the opposite. Specifically, the Complaint alleges the sham interviews were widespread. *See, e.g.*, ¶¶ 162, 183, 217, 261, 274 ("accounts of 11 former Wells Fargo employees and contractors, who worked in six different divisions of the Company…corroborate the widespread nature of these fake interviews"); ¶271 (the sham interviews took place in "the mortgage servicing, home lending, and retail banking businesses").

Defendants' argument that the "evaluations took place" misses the point. The falsity is not that the evaluations did not take place—the falsity relates to statements that the Company *had achieved* diversity goals or that the programs were "*working*" when in reality the Company was faking it. ¶ 294.

Additionally, Defendants' claims that Wells Fargo's diversity claims were only "aspirational" or "optimism" is belied by the statements themselves—including "Wells Fargo was dedicated to…diversity" (¶ 214) and ". . . our hiring process is fair and equitable" (¶ 216). *See also* ¶ 232; ¶ 238 (the Company's policies "intended to promote growth in traditionally underserved markets"); ¶ 239 ("[W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates."); ¶ 252 ("we are confident"); and ¶ 255 ("We don't have proprietary credit-underwriting models.") These are not aspirational claims. These are definitive statements that Plaintiffs have alleged are false.

### 2.      Plaintiffs Adequately Alleged Scienter.

A plaintiff sufficiently pleads a defendant's scienter if "assess[ing] all the allegations holistically," the plaintiff has created an inference of scienter—i.e., "that the defendant acted intentionally or

32

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

recklessly"—that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 319 n.3, 326 (2007).  The inference . . . need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.  Rather, a "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

Here, the Complaint details numerous facts that give rise to a strong inference that the Defendants acted with scienter.  First, Defendants were repeatedly informed about the fake interviews.  ¶ 267. Second, Defendants had access to information allowing them to ensure the Company was achieving its diversity goals.  ¶ 268.  Third, the Defendants stated that they were "fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives." *Id.*  Fourth, Defendants repeatedly touted the diversity programs and tracking.  ¶ 269.  Fifth, CEO Scharf admitted to personally overseeing the activities.  ¶ 270.

In *Wells Fargo 2017 Deriv. Litig.*, the court found that the plaintiffs had adequately alleged scienter where the Plaintiffs alleged pervasive fraud, which in turn, made it

> reasonable to infer senior executives knew about, or at least '[r]ecklessly turn[ed] a 'blind eye' to,' the stream of red flags alerting them that employees were committing fraud to meet otherwise unattainable sales goals and that the Company's risk-management processes and internal controls were not sufficient to prevent or curtail those practices.

282 F. Supp. 3d at 1099.

The same is true here—Plaintiffs have alleged that the diversity programs were core to Wells Fargo's business, ¶ 241; that Defendants had access to a "trove" of relevant metrics, ¶ 268; that Defendants were aware of complaints by employees, ¶ 159; that they spoke extensively about these issues, ¶¶ 209-65); and were knowledgeable enough to promptly comment about the merit of the claims when they became public. *Id.*  Contrary to the Officer Defendants' arguments, Plaintiffs have adequately alleged facts showing a strong inference of scienter as to the Officer Defendants, in part because they were responsible for managing the day-to-day operations, especially core aspects of the business, such as hiring. *See Wells Fargo 2017 Deriv. Litig.*, 282 F. Supp. 3d at 1101.

For the same reasons, these allegations are sufficient against the Director Defendants. *See Shaev*

33

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

*v. Baker*, 2017 WL 1735573, at *10-12 (N.D. Cal. May 4, 2017).  Specifically, just like in *Shaev*, the allegations concerning scienter here are properly alleged where (1) the board regularly monitored the diversity programs, ¶¶ 268-69; (2) complaints were sent to the board, ¶ 267; (3) the board was aware of related legal claims, ¶ 270; (4) public reporting described the issues in detail, ¶ 271; (5) there was regulatory intervention, ¶ 270; (6) Defendants' immediate response indicates previous knowledge of the issues, ¶ 271; and (7) the board repeatedly stated that diversity programs were critical to the company, ¶ 270.  *See Shaev*, 2017 WL 1735573, at *16.

### 3.    Defendants Had Ultimate Authority of the False Statements.

"For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  Liability may attach if a defendant personally makes a statement or signs a filing with misleading information.  *Wells Fargo 2017 Deriv. Litig*., 282 F. Supp. 3d at 1095.  Moreover, "allegations of securities fraud based on false or misleading statements in "prospectuses, registration statements, annual reports, press releases or other 'group-published information,' are presumed to be the collective actions of officers and directors are directly involved in the day-to-day affairs, management or control of the company." *Stack v. Lobo*, 903 F. Supp. 1361, 1376 (N.D. Cal. 1995).

Both Motions argue that the Defendants did not have ultimate authority over the relevant statements and thus cannot be liable.  MTD 24; Off. MTD 18.  Those arguments are unsupported and wrong.  Defendants either made the statements personally, signed the statements, or had day-to-day control over the Company such that the statements were a result of the collective action of each Defendant.  For example, Scharf and Noski signed the March 2020 proxy.  ¶ 211.  The Company's 2020 Annual Report was signed by Black, Chancy, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, Scharf, and Vautrinot.  ¶ 220.  The 2021 proxy included a letter from Scharf and Noski and was issued by "Order of our Board of Directors." ¶ 222.  On May 26, 2021, Defendant Scharf testified in the U.S. Senate.  ¶ 234.  *See also* ¶¶ 236, 239, 242, 262, 257, 259.

---

34

1    Moreover, Defendants were members of committees that were expressly charged with overseeing

2    risk to Wells Fargo, including risks associated with discriminatory practices.   ¶¶ 334-54.   These

3    allegations are more than enough to establish liability for each Defendant.  *See Wells Fargo 2017 Deriv.*

4    *Litig.*, 282 F. Supp. 3d at 1095 (allegations sufficient where complaint included a table showing Board

5    committee membership for each Director Defendant during the relevant period [*see* ¶ 336]).

6    Defendants' citation to *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d

7    1045 (N.D. Cal. 2012) is unavailing.  There, the issue was limited to liability asserted against one outside

8    director for comments made by officers during an analyst call.  *Id.* at 1071.  Here, Plaintiffs are seeking

9    to hold defendants liable for public statements and filings they made, signed, or had day-to-day control

10   over.

### B.    Plaintiffs Adequately Allege Control Under Section 20(a)

12   "In order to prove a prima facie case under section 20(a), a plaintiff must prove: (1) a primary

13   violation of federal securities laws, and (2) that the defendant exercised 'actual power or control' over

14   the primary violator."  *Hefler*, 2018 WL 1070116, at *13.

15   As to Section 20(a)'s first element, because Plaintiffs adequately state a primary violation of

16   Section 10(b), this element is met as to all the Individual Defendants.  And, because only the Officer

17   Defendants—and none of the Directors, including Scharf) challenge Section 20(a)'s second element

18   (*compare* MTD 25 *with* Off. MTD 22-23)—this ends the inquiry for the Directors.

19   As to Section 20(a)'s second element, at the pleading stage "general allegations concerning an

20   individual [defendant]'s title and responsibilities [are] sufficient to establish control."  *Hefler*, 2018 WL

21   1070116, at *13 (finding plaintiffs "adequately pleaded control [by then-CEO 'Stumpf and the other

22   Officer and Director Defendants'] other under Rule 8's lower pleading standards").  Here, as in *Hefler*,

23   Plaintiffs have properly alleged "a prima facie case" that Scharf, Powell, Santomassimo, Sanchez, Santos,

24   and Weiss "possess[ed], direct[ly] or indirect[ly] . . . the power to direct or cause the direction of the

25   management" of Wells Fargo.  *In re Maxim Integrated Prod., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1050

26   (N.D. Cal. 2009) (quoting 17 C.F.R. § 230.405 (defining "control").  *See, e.g.*, ¶¶ 8, 58, 211, 215, 219-

27   20, 222 (Scharf); ¶¶ 14, 52, 174-76, 167, 270, 198, 298, 300 (Powell); ¶¶ 55, 297, 307 (Santomassimo);

28

35

¶¶ 54, 239-41, (Sanchez); ¶¶ 14, 56, 174-76, 186, 254-58, 259-61, 267, 271 (Santos); ¶¶ 60, 299-300, 307 (Weiss).

Defendants' citation to *Howard v. Everex Sys., Inc*., 228 F.3d 1057 (9th Cir. 2000) is unavailing because that court found that a director who served for less than three months and was not "active in the day-to-day affairs of [the company]" and did not have the "requisite actual authority" over the preparation of financial statements. *Id*. at 1067 n.13. Here, in contrast, the Officer Defendants were actively involved in the day-to-day affairs of Wells Fargo and directly involved in the dissemination of misstatements through their roles as executives. ¶¶ 174-76, 186, 254-61, 267, 271, 297, 321-26.

### C. The Complaint States Insider-Trading Claims Against Santos Under Federal and State Law

Defendant Santos contends that Plaintiffs have not alleged a claim for insider trading because Plaintiffs failed to (1) plead the primary violation, and (2) plead that Wells Fargo's trades were "contemporaneous" with Santos's stock sales. Both arguments are meritless.

First, Plaintiffs have stated primary violations of Section 10(b). *See* Section V.A. *supra*.

Second, Santos's "contemporaneous" argument should be rejected because it is based on an incorrect standard that does not apply to derivative cases. In a derivative shareholder case, it is sufficient to allege that the company was consistently repurchasing a large number of shares during the defendant's selling period to show the trading activity occurred contemporaneously. *See Wells Fargo 2017 Deriv. Litig.*, 282 F. Supp. 3d at 1075. *Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008) is instructive. In *Countrywide*, as in this case, the company purchased shares continually during the period when an insider was selling shares. *Id.* at 1075. The court there found that this was sufficient to proceed with discovery. *Id.* ("A narrow interpretation of "contemporaneously" is not warranted here . . . the fact that the repurchase program was conducted during [the same month] is sufficiently specific."). Judge Tigar's decision in *Wells Fargo 2017 Deriv. Litig.* follows the same rule. *Id.* at 1106–07.

Plaintiffs have done exactly that, providing a detailed chart summarizing the Company's Forms 10-Q and 10-K showing that Wells Fargo repurchased 25,465 shares during the same month Mr. Santos

36

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT

sold 22,700 shares, thereby demonstrating the contemporaneous requirement.  ¶¶ 292; *see also* ¶¶ 451-55.

Defendant Santos cites *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020) and *Buban v. O'Brien*, 1994 WL 324093 (N.D. Cal. June 22, 1994) to support his incorrect argument that Plaintiffs failed to plead contemporaneous share repurchase at or above the price that Santos sold his shares.  MTD 24.  But that is not the standard—Plaintiffs only have to show "that Wells Fargo engaged in a share repurchase program and provided the general time frame of the repurchases." *See Wells Fargo 2017 Deriv. Litig.*, 282 F. Supp. 3d at 1106.  Moreover, both *SEB* and *Buban* are distinguishable as they were shareholder class action cases, not derivative cases.  *See SEB Inv. Mgmt. AB*, 485 F. Supp. 3d at 1119, 1135; *Buban*, 1994 WL 324093 at *1.

### D. The Director Defendants Face Liability Under Section 14(a) for Materially Misrepresenting Diversity

Section 14(a) of the Securities Exchange Act makes it unlawful to solicit shareholder approval by use of a proxy statement that does not comply with the rules and regulations of the Securities Exchange Commission.  15 U.S.C. § 78n.  Rule 14a–9 prohibits proxy statements that are false or misleading with regard to any material facts at the time they are issued and in light of the circumstances under which they are made.  17 C.F.R. § 240.14a–9.

Here, the Director Defendants issued false and misleading statements contained in the 2021 and 2022 Proxy Statements, including misstating or failing to disclose (i) deficiencies in Wells Fargo's internal and disclosure controls that were known to the Board when the Proxy Statements were filed; and (ii) reporting failures known to the Board when the Proxy Statements were filed, including failure to address ongoing discriminatory lending and hiring practices.  *See* ¶¶ 222-31, 242-49, 433-38.  This misleading information was material to Wells Fargo's stockholders in determining whether or not to elect the Director Defendants and approve certain executive compensation.  Plaintiffs have pled each of these misstatements with particularity.  *See* ¶¶ 222-31, 242-49.

1. **Wells Fargo's Exculpation Clause Does Not Apply to Section 14(a).**

Wells Fargo attempts to shield the Director Defendants behind an exculpation clause, but that clause does not apply to this claim by its plain language.  MTD Ex. 8 at 7-8; *see also Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002) ("when a duty of care breach is not the exclusive claim, a court may not dismiss based upon an exculpatory provision").  Wells Fargo cites *In re Wells Fargo & Co. S'holder Derivative Litig.*, 2022 WL 345066 (N.D. Cal. Feb. 4, 2022), but that case is distinguishable.  There, the court held that "plaintiffs have failed to show those directors would face a 'substantial likelihood of liability' for violating section 14(a), and, accordingly, plaintiffs have failed to show their failure to make a demand is excused as futile."  *Id.* at *5.  Unlike in that case, Plaintiffs' Section 14(a) claim is a stand-alone securities violation and is not Plaintiffs' basis for demand futility.

2. **The 2021 and 2022 Proxy Statements Were Materially False and Misleading.**

As pled above, the Complaint adequately pleads specific facts showing that the 2021 and 2022 Proxy Statements contained materially misleading statements.  The allegations in the Complaint plead with particularity more than isolated incidents, detailing Wells Fargo's history of discriminatory practices (¶¶ 200-03), concerns raised by an executive whistleblower (¶¶ 174-75), and many examples of sham interviews as described by applicants and Wells Fargo managers (¶¶ 177-99).  These allegations all show that the statements made in the 2021 and 2022 Proxy Statements (statements downplaying and concealing Wells Fargo's discriminatory practices) were materially false or misleading.  Thus, "the thrust of Plaintiffs' complaint is that Defendants knew of, but failed to disclose, a fraudulent business practice that put the company at material risk." *Wells Fargo 2017 Deriv. Litig.*, 282 F. Supp. 3d at 1103.  As described in detail in the Complaint, the Director Defendants knew that Wells Fargo's discriminatory practices were a critical issue but did not disclose the material risks in its publicly filed documents.

Wells Fargo attempts to argue that the 2021 and 2022 Proxy Statements were "aspirational" and "expressions of opinion" also fails.  *See* MTD 22.  "Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are

38

anchored in misrepresentations of existing facts." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). As noted by the Ninth Circuit, "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *see also Mulligan*, 36 F. Supp. 3d at 966.

Here, reasonable investors relied on the statements in the 2021 and 2022 Proxies, which are capable of objective verification and therefore actionable. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606-07 (9th Cir. 2014). For example, statements in the 2021 Proxy like "We Are Advancing Diversity, Equity and Inclusion," Wells Fargo "values and promotes DE&I in every aspect of our business," and that Wells Fargo "play[s] a significant role in both supporting diverse communities across the nation and helping foster a more inclusive society," are, as shown in the Complaint, demonstrably false. ¶¶ 222-31. A reasonable investor would have and did rely on these statements in deciding to elect the board.

### 3. The Misstatements Were an Essential Link to Stockholder Decisions.

The misstatements made by the Director Defendants harmed Wells Fargo when stockholders, on the basis of that misinformation, chose to reelect Defendants and ratify their compensation plans, thereby encouraging the discriminatory lending and hiring practices that Defendants continued to perpetuate, and which ultimately harmed the Company when these schemes were revealed. *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007) (proxy solicitation allowing board to maintain their positions was an essential link to continued harm); *In re Maxim Integrated Prod., Inc., Derivative Litig.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) (negligence in preparing proxy statements was an essential link in accomplishing further backdating transactions which harmed the company).

Defendants' reliance on *In re Diamond Foods, Inc. Derivative Litig.* is unavailing. 2012 WL 1945814 (N.D. Cal. May 29, 2012). There, Judge Alsup reasoned, "re-election of directors who have allegedly mismanaged the company is insufficient to meet the 'essential link' requirement of Section 14(a)." 2012 WL 1945814, at *7. But the alleged wrongdoing here goes beyond corporate "mismanagement." The Director Defendants, through the HRC, were responsible for approving

compensation programs that incentivized the sham interviews and discriminatory lending practices, each of which contributed to the metrics that were part of executive compensation.  By re-electing the Director Defendants based on incomplete information, shareholders unwittingly allowed them to perpetuate those policies, which encouraged the discriminatory lending and hiring practices to continue.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss its entirety. Plaintiffs respectfully request leave to amend in the event the Court grants any part of the motion.


Dated:  June 25, 2024

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Lesley E. Weaver*
Lesley E. Weaver
Nancy A. Kulesa (*pro hac vice*)
Derrick B. Farrell (*pro hac vice*)
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone:     (415) 445-4004
Facsimile:     (415) 445-4020
E-mail:          lweaver@bfalaw.com
                     nkulesa@bfalaw.com
                     dfarrell@bfalaw.com

**MOTLEY RICE LLC**
Marlon E. Kimpson (*pro hac vice*)
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Meredith B. Weatherby
Vanessa A. Davis
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:   (843) 216-9450
E-mail:       mkimpson@motleyrice.com
                  bnorton@motleyrice.com
                  jlittlejohn@motleyrice.com
                  mweatherby@motleyrice.com
                  vdavis@motleyrice.com
                  rmazingo@motleyrice.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COTCHETT, PITRE & MCCARTHY LLP**
Mark C. Molumphy (SBN 168009)
Tyson Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
San Francisco Airport Office Center
840 Malcolm Road Burlingame, CA 94010
Telephone:     (650) 697-6000
Fax:                (650) 697-0577
E-mail:           mmolumphy@cpmlegal.com
                       tredenbarger@cpmlegal.com
                       gjung@cpmlegal.com

*Co-Lead Counsel for Lead Plaintiffs*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne B. Beste (SBN 326881)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002
E-mail:           fbottini@bottinilaw.com
                       achang@bottinilaw.com
                       abeste@bottinilaw.com

*Counsel for Plaintiff Amy Cook*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED STOCKHOLDER
DERIVATIVE COMPLAINT FOR FAILURE TO PLEAD DEMAND FUTILITY
CASE NO. 3:22-CV-05173-TLT