Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600

*Counsel for Nominal Defendant*
*Wells Fargo & Company*

[*Additional counsel listed on signature page*]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY HIRING PRACTICES DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 3:22-cv-05173-TLT<br><br>**NOMINAL DEFENDANT WELLS FARGO & COMPANY'S REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT FOR FAILURE ADEQUATELY TO PLEAD DEMAND FUTILITY**<br><br>Hearing: August 27, 2024<br>Time: 2:00 p.m.<br>Courtroom 9, 19th Floor<br>The Honorable Trina L. Thompson |

# TABLE OF CONTENTS

**Page**

I. PLAINTIFFS' OVERSIGHT CLAIMS HAVE NO BASIS IN DELAWARE LAW. ....................1

A. The Opposition Confirms Plaintiffs' Failure To Plead that the Director Defendants Knowingly Failed To Oversee the Company's Mortgage Refinancing Practices. .................1

1. Plaintiffs' Opposition Confirms that the Director Defendants Did Not "Utterly Fail" To Implement Monitoring Systems Regarding Fair Lending. ........................... 1

2. Plaintiffs' Allegations Are Not Similar to Those in *Marchand* and *Boeing*. .............. 3

3. Plaintiffs' Opposition Abandons One Purported Red Flag and Ignores Defendants' Arguments Regarding Three Others. ...................................................... 8

B. The Opposition Confirms Plaintiffs' Failure To Plead that the Director Defendants Knowingly Failed To Oversee the Company's Implementation of the Guidelines................9

II. THE DIRECTOR DEFENDANTS DO NOT FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR VIOLATIONS OF THE SECURITIES LAWS. ............................................12

A. Plaintiffs Fail To Explain How the Director Defendants Face a Substantial Likelihood of Liability under Section 14(a). ...........................................................................................12

B. Plaintiffs Fail To Show that the Director Defendants Face a Substantial Likelihood of Liability under Section 10(b). ...........................................................................................14

CONCLUSION.............................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

*Abdo* v. *Fitzsimmons*,
2017 WL 6994539 (N.D. Cal. Nov. 3, 2017) ....................15

*Alidina* v. *Internet.com Corp.*,
2002 WL 31584292 (Del. Ch. Nov. 6, 2002) ....................12

*In re Boeing Co. Derivative Litigation*,
2021 WL 4059934 (Del. Ch. Sept. 7, 2021) .................... *passim*

*In re China Agritech, Inc. S'holder Derivative Litig.*,
2013 WL 2181514 (Del. Ch. May 21, 2013) ....................7

*In re Citigroup Inc. S'holder Derivative Litig.*,
964 A.2d 106 (Del. Ch. 2009) .................... 2-3, 10

*City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*,
2022 WL 2387653 (Del. Ch. June 30, 2022) .................... *passim*

*City of Pontiac Gen. Emps.' Ret. Sys.* v. *Bush*,
2022 WL 1467773 (N.D. Cal. Mar. 1, 2022) ....................14

*Clem* v. *Skinner*,
2024 WL 668523 (Del. Ch. Feb. 19, 2024) ....................4, 11

*In re Clovis Oncology, Inc. Derivative Litig.*,
2019 WL 4850188 (Del. Ch. Oct. 1, 2019) ....................3

*In re Facebook, Inc. S'holder Derivative Privacy Litig.*,
367 F. Supp. 3d 1108 (N.D. Cal. 2019) ....................8

*In re Gen. Motors Co. Derivative Litig.*,
2015 WL 3958724 (Del. Ch. June 26, 2015) ....................9, 10

*Hughes* v. *Xiaoming Hu*,
2020 WL 1987029 (Del. Ch. Apr. 27, 2020) ....................7, 8

*Marchand* v. *Barnhill*,
212 A.3d 805 (Del. 2019) .................... *passim*

*In re Maxim Integrated Prods. Inc. Derivative Litig.*,
574 F. Supp. 2d 1046 (N.D. Cal. 2008) ....................13

*In re McDonald's Corp. S'holder Derivative Litig.*,
289 A.3d 343 (Del. Ch. 2023) ....................7, 8

*In re McDonald's Corp. S'holder Derivative Litig.*
291 A.3d 652, 674-85 (Del. Ch. 2023) ....................8

*Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*,
2016 WL 4076369 (Del. Ch. Aug. 1, 2016) ....................12

*Ocegueda* v. *Zuckerberg*,
526 F. Supp. 3d 637 (N.D. Cal. 2021) ....................13, 14

*SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*,
2023 WL 11691540 (N.D. Cal. Aug. 18, 2023) ....................13, 15

*Segway Inc.* v. *Cai*,
2023 WL 8643017 (Del. Ch. Dec. 14, 2023) ....................1

*Shaev* v. *Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) ....................15

*Teamsters Loc. 443 Health Servs. & Ins. Plan* v. *Chou*,
2020 WL 5028065 (Del. Ch. Aug. 24, 2020) ....................10

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
2022 WL 345066 (N.D. Cal. Feb. 4, 2022) ....................12, 13

*In re Zoran Corp. Derivative Litig.*,
511 F. Supp. 2d 986 (N.D. Cal. 2007) ....................13

The Opposition confirms that Plaintiffs have failed to plead adequately that a majority of the Board faces a substantial likelihood of liability. *First*, Plaintiffs' claims that the Director Defendants breached their duty of loyalty by failing to oversee the Company's mortgage-lending and diversity-hiring practices fail because Plaintiffs do not plead particularized facts showing the "necessary predicate to any *Caremark* claim": "bad faith." *Segway Inc.* v. *Cai*, 2023 WL 8643017, at *1 (Del. Ch. Dec. 14, 2023). As to their *Caremark* prong-one claims, Plaintiffs do not even mention that they must plead under governing Delaware law that the Board *utterly failed* to put in place *any* monitoring system. Plaintiffs instead attempt to match their prong-one claims to the allegations in *Marchand* v. *Barnhill*, 212 A.3d 805 (Del. 2019) — where, after an ice cream company faced a widespread, fatal listeria outbreak, it emerged that the board had no system in place to oversee food safety — and in *In re Boeing Co. Derivative Litigation*, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021) — where, after two deadly plane crashes, it emerged that Boeing's board purportedly had no process in place for overseeing plane safety. But Plaintiffs minimize the egregious allegations in those actions, mischaracterize their allegations here, and distort the Delaware law standard for bad faith. Plaintiffs also barely attempt to defend their prong-two "red flag" claims, either flatly ignoring Defendants' arguments or abandoning their theory altogether.

*Second*, Plaintiffs do not meaningfully defend their federal securities law claims. As for Section 14(a), Plaintiffs have pleaded themselves out of court by expressly disclaiming reliance on anything other than negligence. As for Section 10(b), Plaintiffs rely on the same allegations that this Court has already determined are insufficient in the related securities fraud action.

Plaintiffs have now cycled through a mishmash of legal claims and factual theories in an attempt to find something that might meet their high burden to plead with particularity that demand would be futile. They have failed, and the Amended Complaint should be dismissed.

## I. PLAINTIFFS' OVERSIGHT CLAIMS HAVE NO BASIS IN DELAWARE LAW.

### A. The Opposition Confirms Plaintiffs' Failure To Plead that the Director Defendants Knowingly Failed To Oversee the Company's Mortgage Refinancing Practices.

#### 1. Plaintiffs' Opposition Confirms that the Director Defendants Did Not "Utterly Fail" To Implement Monitoring Systems Regarding Fair Lending.

As Defendants explained (Rule 23.1 Mot. 9-10), the Delaware Supreme Court was "'quite deliberate' in endorsing the adverb 'utterly' — a 'linguistically extreme formulation' intended 'to set a

high bar when articulating the standard to hold directors personally liable for a failure of oversight under the first *Caremark* prong.'" *City of Detroit Police & Fire Ret. Sys.* v. *Hamrock*, 2022 WL 2387653, at *16 (Del. Ch. June 30, 2022). Plaintiffs remarkably never mention that standard, and the Opposition and Amended Complaint actually demonstrate the opposite of an utter failure to establish a monitoring system.

Take the August 11, 2020 meeting minutes of the Board's Corporate Responsibility Committee ("CRC"). These minutes reflect that Eric Brooks, Wells Fargo's Head of Fair Lending, HMDA and CRA Compliance, provided a "Fair Lending and CRA Update" to the Committee in which he:

- "commented on the Company's creation of a fair lending Compliance team";
- "discussed fair lending Compliance monitoring activities, including the number of business reviews conducted over the last 12 months";
- "reported that control effectiveness ha[d] improved";
- "discussed work by Wells Fargo Home Mortgage to enhance lending distribution in minority communities, including by establishing market specific goals and action plans, increasing affordable lending strategies, and enhancing executive focus and reporting";
- "commented on ongoing monitoring activities, including Compliance and Legal Department review of proposed business changes and assessment of the impact of product suspensions and other credit risk mitigating activities";
- and "commented on industry efforts to evaluate alternatives" to "the use of FICO scores."

(Ex. V at -3605-06.)[1] It is hard to imagine a more vivid illustration of the type of monitoring and reporting to the Board that Plaintiffs insist did not exist.

Unable to support their assertion that no monitoring system existed at the Company whatsoever, Plaintiffs insist that the Board was required to discuss discrimination in mortgage lending some unspecified number of additional times during an arbitrarily defined period between August 2020 and April 2022. As explained (Rule 23.1 Mot. 11; *infra* at 6-7), the Court of Chancery rejected this argument in *Hamrock*. In that case, the plaintiff argued that the board acted in bad faith by failing to review pipeline safety more frequently, and insisted that a "one-time discussion" during a single board meeting was "simply too infrequent to meet the standard of *Marchand*." 2022 WL 2387653, at *16. The court held that the plaintiff's argument "diverge[d] too dramatically from the high 'utter failure' standard." *Id.* So too here. Plaintiffs may believe that reports specific to fair lending should have been more frequent. But the "kind of judicial second guessing" Plaintiffs invite "is what the business judgment rule was designed

[1] Plaintiffs bizarrely claim that Defendants "managed to dig up" this document (Opp. 20), but Plaintiffs actually attached it to the Amended Complaint. (*See* Ex. V.)

to prevent." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009).

Plaintiffs next attempt to dress up their prong-one claim by labeling lending discrimination as "mission-critical." (Opp. 14.) Even if that label were accurate, Delaware law is clear that "even in th[e] context" of a "mission critical" risk, "*Caremark* does not demand omniscience" — only a "good faith effort to *implement* an oversight system and then monitor it." *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at *13 (Del. Ch. Oct. 1, 2019) (emphasis added). Plaintiffs fail to plead anything other than good-faith effort. They contend, for example, that the CRC minutes only "briefly reference[] . . . fair lending risk." (Opp. 15.) But the document speaks for itself — Brooks's report to the Board is specifically about fair (*i.e.*, non-discriminatory) lending compliance and goes into detail about efforts to improve the Company's fair lending practices. Plaintiffs also argue that the minutes "largely concern '[g]eneral risks' related to fair lending rather [than] any *specific* fair lending compliance issue *at Wells Fargo*." (*Id.*) Plaintiffs misrepresent the document, which discusses *Wells Fargo*'s "ongoing monitoring activities," the "work by Wells Fargo Home Mortgage to enhance lending distribution in minority communities," and *Wells Fargo*'s "creation of a fair lending Compliance team." (Ex. V at -3605, -3606). Far from showing that the Board utterly failed to implement any monitoring system, Plaintiffs' pleadings show that a Board committee received a comprehensive update on fair lending risk specific to the Company and on the ongoing work being done at the Company to monitor this risk.

**2. Plaintiffs' Allegations Are Not Similar to Those in *Marchand* and *Boeing*.**

Rather than engage with Delaware law's "high 'utter failure' standard," *Hamrock*, 2022 WL 2387653, at *16, Plaintiffs primarily argue that this case is "similar to the recent *Marchand* and *Boeing* cases" (Opp. 14). But even a cursory examination of those cases show that they are not similar.

In *Marchand*, an ice cream manufacturer experienced a listeria outbreak at each of its plants, which required a product recall, shut down production, and killed three people. 212 A.3d at 814-15. In 2013 and 2014, management was allegedly informed that several batches of ice cream had tested positive for listeria. *Id.* at 811-12. The problem continued to spread until February 2015, when a government agency informed the company that batches in several states were contaminated, at which point management finally informed the board. *Id.* at 813. The plaintiffs pleaded with particularity that this was the first time the board had been informed of *any* sanitation issues with the company's only product. Until then, the

board had discussed food safety only a single time. *Id.* Plaintiffs had thus adequately pleaded that the board utterly failed to implement *any* monitoring system because no board committee was responsible for food safety and the board did not meaningfully discuss food safety at any time. *Id.* at 822-24.

In *Boeing*, a 737 MAX airplane manufactured by Boeing crashed in October 2018. 2021 WL 4059934, at *1. A second one crashed in March 2019. *Id.* Both crashes killed everyone on board. The Court of Chancery held that plaintiffs pleaded a prong-one claim because they had adequately alleged that no board committee was tasked with monitoring airplane safety until after the FAA grounded Boeing's 737 MAX fleet; that the board purportedly did not discuss airplane safety until "after the FAA grounded the 737 MAX fleet"; and that the board did not hear from the company's top executives responsible for commercial airline engineering and safety until April 2019. *Id.* at *26-31.

Plaintiffs assert that this case — in which Plaintiffs allege that Wells Fargo relied on an algorithm that disproportionately affected minority applicants compared to Wells Fargo's peers, and that the Board did not receive sufficiently frequent or detailed reports about fair lending compliance to identify this sooner — is no different. That comparison fails for several fundamental reasons:

*First*, Plaintiffs insist that, as in *Marchand* and *Boeing*, "[n]o board committee that addressed [fair lending compliance] existed." (Opp. 15.) But the Board's Audit, Risk, and Corporate Responsibility Committees all have responsibility over aspects of fair lending. Indeed, Plaintiffs alleged that the CRC's charter provided that its "responsibilities" included "oversee[ing] the Company's significant strategies, policies, and programs on social and public responsibility matters," and that the alleged "discrimination described in the *Bloomberg* articles fell with[in] the CRC's jurisdiction." (AC ¶¶ 395, 397.) Plaintiffs' own pleadings also show that the CRC received a comprehensive update on the Company's fair lending practices and compliance efforts in August 2020. Plaintiffs wave away this document, claiming that it discussed only "[g]eneral risks," and only "briefly references . . . fair lending risk" (Opp. 15), but as explained (*supra* at 3), that is inaccurate. Rather than pleading its absence, Plaintiffs themselves allege the existence of a "board committee that addressed" fair lending compliance. (Opp. 15.)[2]

---

2 If Plaintiffs mean to argue that the Board was required to create a committee specifically devoted to fair lending, they are mistaken. *See Clem* v. *Skinner*, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) (board was not required to form "dedicated FCA compliance committee" because "how directors choose to craft a monitoring system in the context of their company and industry is a discretionary matter").

*Second*, Plaintiffs contend that there was "[n]o regular process" for apprising the Board of "fair lending compliance risks," "[n]o schedule for the board to consider" "fair lending compliance risks" on a "regular basis," and that "meetings [we]re devoid of any suggestion that there was any regular discussion of [fair lending compliance] issues." (Opp. 16-18.) Plaintiffs treat these as three separate factors, but their point is the same each time: Wells Fargo's reporting on fair lending was, according to Plaintiffs, too "occasional or *ad hoc*" to satisfy the duty of oversight. (*Id.* at 17.) But in *Marchand*, the plaintiffs did not plead "occasional" reporting; the board allegedly did not discuss food sanitation *at all* until after the company was forced to recall its ice cream. 212 A.3d at 813-14. Likewise, in *Boeing*, the board allegedly discussed the safety of the 737 MAX for the first time in April 2019, after two crashes and after the FAA grounded the 737 MAX fleet. 2021 WL 4059934, at *28. In arguing that "occasional occurrences" are insufficient to establish a good-faith effort to implement monitoring systems based on *Boeing*, Plaintiffs misunderstand that case. *Boeing* was referring to "one-off instances like when [the board] responded to FAA questions about" an unrelated battery failure, or "when it referred to 'quality' or 'safety' in passing." *Id.* at *27. In other words, issues occasionally making their way to the Board through unrelated channels cannot substitute for a monitoring system. But here, Plaintiffs *concede* the existence of the monitoring system — the CRC was responsible for fair lending oversight (AC ¶¶ 395, 397) and received an in-depth report regarding fair lending compliance (Ex. V at -3605-06). Plaintiffs simply claim that the *reporting* was too "occasional." That is not sufficient to plead an utter failure under *Caremark*.

*Third*, Plaintiffs claim that "management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board." (Opp. 17.) Specifically, Plaintiffs assert that management failed to report information from a March 2019 report purportedly showing fair lending compliance deficiencies. (*Id.* at 17-18.) According to Plaintiffs, "there is no evidence from the 220 Production that these numerous, company-level control deficiencies were ever disclosed to the Board." (*Id.* at 17.) That is misleading because the parties' negotiated Section 220 production did not include *any* Board materials before January 2020 on *any* topic. (Rule 23.1 Mot. 5.)[3] Plaintiffs' assertion that the Board did not discuss fair lending

[3] Plaintiffs obtained the March 2019 report from the public docket of the mortgage refinancing litigation proceeding before Judge Donato, not from Defendants' Section 220 production.

or the March 2019 report before January 2020 is thus pure speculation. Worse, the August 2020 CRC minutes actually discuss detailed efforts to improve fair lending compliance and monitoring activities "over the last 12 months," demonstrating that the Board *was* reacting to concerns previously identified by management. (Ex. V at 3605.) This is in stark contrast to *Marchand*, where "management had received reports about listeria's growing presence" in the company's plants but the board's minutes did not reflect any discussion of listeria until two years later, 212 A.3d at 812-14, or *Boeing*, where plaintiffs alleged that the board did not discuss the safety of the 737 MAX until after the FAA grounded Boeing's fleet despite many earlier alleged complaints and dire safety analyses, 2021 WL 4059934, at *28, 31.

*Finally*, Plaintiffs claim that the Board "was given favorable information about [fair lending] by management, but was not given important reports that presented a much different picture." (Opp. 18.) This allegation does not suggest *Board*-level bad faith. Plaintiffs' argument also misunderstands the point in *Marchand* and *Boeing*, which was that management allegedly provided reports that were "one-sided at best and false at worst" at the same time that it purportedly knew problems existed. *Boeing*, 2021 WL 4059934, at *31. In conjunction with the boards' other alleged failures, this allegation supported the plaintiffs' claims that the boards left monitoring entirely to management. By contrast, Plaintiffs here complain that management purportedly learned about fair lending compliance issues in March 2019 and then 15 months later informed the Board that those issues had improved by August 2020. That risks emerge and recede over time is ordinary, not a particularized allegation of bad faith.

The more instructive case is *Hamrock*, which postdates both *Marchand* and *Boeing*. There, a natural gas pipeline operated by a company subsidiary exploded, killing one person and injuring 22 others, and the plaintiff brought *Caremark* claims against NiSource's directors "for utterly failing to implement any reporting or monitoring system to oversee pipeline safety, which was 'mission critical' for NiSource's gas business." *Hamrock*, 2022 WL 2387653, at *1. As here, the plaintiff argued that the relevant committee — the "[Environmental, Safety and Sustainability] Committee" — "monitored risk in a generic way only and improperly failed to focus on the specific, mission critical risk that mattered — pipeline safety." *Id.* at *15. "Parroting *Marchand* and *Boeing*," the plaintiff "contend[ed] that the oversight system established by the Board was insufficiently rigorous in addressing that specific, mission-critical risk." *Id.* Although the court accepted that pipeline safety was "mission critical," it dismissed the plaintiff's

prong-one claim, specifically rejecting the plaintiff's argument that a "one-time discussion" was "too infrequent to meet the standard of *Marchand*" because it "diverge[d] too dramatically from the high 'utter failure' standard, even as understood through the refined lens of *Marchand* and *Boeing*." *Id.* at *16.

Plaintiffs try to distinguish *Hamrock* several ways, none of which withstands scrutiny. For example, they argue that, in *Hamrock*, "internal books and records confirmed that the defendant board had in place a board-level 'ES&S Committee' overseeing the mission-critical issue of human safety that 'receiv[ed] extensive reports from senior executives and regular[] report[s] on safety risks to the full Board." (Opp. 21.) It is true that NiSource had an "ES&S Committee," but that committee was not dedicated specifically to pipeline safety — as the name implies, it dealt generally with environmental, sustainability, and safety issues. Likewise, Plaintiffs here acknowledge that the Board and several of its committees — including the CRC — "monitored general 'trends' or 'emerging risks' in fair lending regulation" (*id.* at 6) and that "the discrimination described in the *Bloomberg* articles fell with[in] the CRC's jurisdiction" (AC ¶ 397). And just as the ES&S Committee received an update on pipeline safety in May 2017, the CRC received briefing on the Company's fair lending compliance efforts in August 2020. *Hamrock* is clear that *Caremark* does not require that companies create pipeline committees or fair lending committees — just that they have a committee responsible for receiving important information.[4]

Unable meaningfully to distinguish *Hamrock*, Plaintiffs cite three additional cases that are purportedly "on all fours" (Opp. 18) — *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514 (Del. Ch. May 21, 2013), *Hughes* v. *Xiaoming Hu*, 2020 WL 1987029 (Del. Ch. Apr. 27, 2020), and *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343 (Del. Ch. 2023) (*McDonald's I*). None of these cases is helpful to Plaintiffs. In *China Agritech*, "the [company] did not produce any Audit committee minutes." 2013 WL 2181514, at *11, *19. Because the company produced *no* minutes from its audit committee (on *any* subject) during the relevant two-year period, the plaintiffs were entitled to an inference that the board had no monitoring system for overseeing fraud. *Id.* In *Hughes*, the company

[4] Plaintiffs also dismiss *Hamrock* because there "'the Section 220 Documents [were] replete' with multiple instances each year in which the [ES&S] committee reviewed and discussed reports on 'pipeline compliance safety.'" (Opp. 19 n.6.) But Plaintiffs neglect to mention that the court identified this as an additional, independent reason that the plaintiff's prong-one theory failed. The court was clear that, "[i]n the end," the additional 220 materials did "not matter." *Hamrock*, 2022 WL 2387653, at *17.

failed to produce minutes for a four-year period, and when the company's audit committee did meet, it did so only once a year for less than an hour. The court thus concluded that the plaintiffs adequately pleaded that the board utterly failed to implement any monitoring systems to oversee the company's financial statements. 2020 WL 1987029, at *14-15. By contrast, Plaintiffs here acknowledge that Wells Fargo produced "nearly 7,000" pages of Board materials, including Board meeting minutes discussing fair lending. (Opp. 11-12.) Plaintiffs do not claim that Wells Fargo's committees existed in name only or did not meet for years. Finally, Plaintiffs cite to *McDonald's I* for the proposition that shareholders are entitled to a negative inference when the company's Section 220 materials show no board engagement. *McDonald's I* did not involve a prong-one claim, but a prong-two claim, which the court ultimately *dismissed*. 291 A.3d 652, 674-85 (Del. Ch. 2023) (*McDonald's II*). In any event, the materials here affirmatively demonstrate board engagement. (*See supra* at 2-6.)

### 3. Plaintiffs' Opposition Abandons One Purported Red Flag and Ignores Defendants' Arguments Regarding Three Others.

Plaintiffs spend little time defending their prong-two "red flag" theory, and abandon altogether their allegation that the *Bloomberg* articles were red flags that the Board consciously ignored. (*See* Opp. 20.) Instead, Plaintiffs now focus on three purported red flags — (1) the 2012 and 2019 DOJ and *Philadelphia* settlements; (2) a December 2020 litigation demand; and (3) a white paper about AI — but without any meaningful response to Defendants' arguments.

*First*, Plaintiffs claim that "the 2012 DOJ and 2019 *Philadelphia* settlements themselves constituted red flags of Wells Fargo's pattern of mortgage discrimination." (*Id.* at 22.) But Plaintiffs do not explain how years-old *settlements*, which release claims on the assumption that the defendant has ceased or will remediate alleged misconduct, would alert the Board that misconduct had continued unabated all along. Plaintiffs also insist that it does not matter that the allegations in the settlements are "not exactly the same as discriminatory 'underwriting algorithms' in mortgage lending." (*Id.*) But under Delaware law, it is not enough that the DOJ and *Philadelphia* actions generally involved "fair lending laws." (*See* Rule 23.1 Mot. 12-13); *see In re Facebook, Inc. S'holder Derivative Privacy Litig.*, 367 F. Supp. 3d 1108, 1125-26 (N.D. Cal. 2019) (that earlier actions "all concern[ed] significant privacy issues" was insufficiently particularized "to support the inference that the majority of the Board knew of

sufficiently similar violations and consciously ignored them").[5] Plaintiffs never even attempt to respond to this point.

*Second*, Plaintiffs reiterate, without elaborating, that the December 2020 litigation demand on the Board mentioned "minority borrowing practices." (Opp. 23.) As explained, the demand's only mention of "minority borrowing practice" is a single sentence discussing the 2012 DOJ settlement — not the alleged mortgage-lending problems at issue here. (Rule 23.1 Mot. 13.) Again, Plaintiffs do not respond.[6]

*Finally*, Plaintiffs continue to insist that "the May 6, 2021 PhD article" was a red flag because it "highlight[ed] the potential discriminatory effects of lending algorithms." (Opp. 23.) But as explained, that article is not about "lending algorithms" (let alone Wells Fargo's) — it is about the general risk of bias associated with AI. And even so, Plaintiffs plead no particularized facts that any Director Defendant was ever aware of this article. (Rule 23.1 Mot. 12.) Once again, Plaintiffs say nothing in response.

### B. The Opposition Confirms Plaintiffs' Failure To Plead that the Director Defendants Knowingly Failed To Oversee the Company's Implementation of the Guidelines.

Plaintiffs' attempts to save their oversight claims regarding Wells Fargo's Diverse Slates Guidelines are just as deficient as their mortgage-lending claims, and even more convoluted.

***Plaintiffs' Timeliness Complaints Do Not Establish Bad Faith***. Plaintiffs argue that because the Board did not receive an update on Miller's email for ten months, the Director Defendants acted in bad faith. (Opp. 27.) Plaintiffs do not explain why ten months is unreasonable for management to investigate a serious allegation before reporting it to the Board. But even assuming that the GNC's review of Miller's complaint was not, by Plaintiffs' standards, "timely," Plaintiffs' allegation amounts to an argument that Wells Fargo "could have, should have, had a better reporting system" — "not that it had no such system." *In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *15 (Del. Ch. June 26, 2015). Plaintiffs

[5] Plaintiffs emphasize that the DOJ complaint also involved an "automated computerized filter." (Opp. 22.) But again, red flags must alert directors to the specific issue that proximately caused the alleged corporate trauma. Plaintiffs do not explain how a complaint regarding a "computerized filter" and sub-prime lending between 2004 and 2009, which the Company settled more than ten years ago, would alert the Board to problems with a different algorithm concerning a different kind of mortgage lending.

[6] Plaintiffs assert that, because the Board "determined that 'it [was] not in the Company's best interests'" to act on the demand, "the Board did nothing." (Opp. 6.) Plaintiffs misleadingly omit that the October 26, 2021 minutes show that the Demand Review Committee recommended that the Board refuse the demand only after an investigation and "weighing" several listed "considerations." (Ex. G at -1961.)

respond that this is "not a minor 'criticism'" (Opp. 27), but Delaware law is clear that *Caremark* "gives boards a wide berth to exercise [] discretion with respect to business risk" and to "'design context- and industry-specific approaches tailored to their companies' businesses and resources.'" *Hamrock*, 2022 WL 2387653, at *12. Again, "[i]nstead of alleging facts that could demonstrate bad faith on the part of the directors," Plaintiffs "are inviting the Court to engage in the exact kind of judicial second guessing that is proscribed by the business judgment rule." *Citigroup*, 964 A.2d at 131.

Plaintiffs also insist that the Board must have utterly failed to implement any monitoring system because it did not receive Bruno's September 2021 email. (Opp. 27.) Plaintiffs do not acknowledge, let alone attempt to respond to, the Delaware Court of Chancery's factual determination that Bruno's email is not a document "one would . . . expect to warrant board attention." (Rule 23.1 Mot. 17; *see also* Ex. 7 at 34.) But even if it did warrant Board attention, Plaintiffs again run headlong into Delaware law. *See In re Gen. Motors Co.*, 2015 WL 3958724, at *14 (plaintiffs must "allege a total lack of *any* reporting system," not merely that "the reporting system should have transmitted certain pieces of information").

***Plaintiffs Fail To Plead that the Guidelines Were "Mission-Critical."*** Plaintiffs insist that the Board was obligated to create a system specifically devoted to Board oversight of misconduct related to the Guidelines because "numerous federal and state laws make hiring discrimination illegal," and therefore the risks were "mission critical." (Opp. 24.) As explained, even for mission-critical risks, *Caremark* requires only good faith, not omniscience. (*See supra* at 3.) Even so, compliance with the Guidelines is not a mission-critical risk, which must be analogous to non-toxic food and safe planes for food and plane manufacturers. *Compare Hamrock*, 2022 WL 2387653, at *15 ("It is fair to conclude that pipeline safety is to a pipeline operating company what airplane and food safety are to airplane and food companies."). Plaintiffs respond that "Defendants overstate the standard" (Opp. 24), but it is Plaintiffs who misrepresent the law by asserting that the Court of Chancery in *Chou* defined a mission-critical risk as any risk that relates to "safety and legal compliance issue[s] facing [a] company." (*Id.*) Plaintiffs leave out some key words. *Chou* says, in full, that a mission-critical risk is the "*most central* . . . safety and legal compliance issue facing the company." *Teamsters Loc. 443 Health Servs. & Ins. Plan* v. *Chou*, 2020 WL 5028065, at *18 (Del. Ch. Aug. 24, 2020) (emphasis added). Under Plaintiffs' made-up definition, it is not clear what issue would *not* be mission-critical to a large corporation.

***Plaintiffs Fail To Plead an Utter Lack of Monitoring.*** Regardless of Plaintiffs' mission-critical argument, their assertions that the Board had no "monitoring system related to the" Guidelines and that all the materials cited in the Amended Complaint show only "generic discussions of the Company's diversity, equity and inclusion efforts" are inconsistent with their pleadings. (Opp. 26.) For example, Plaintiffs' allegation that the GNC received a report on Miller's complaint is itself an example of monitoring "related to" the Guidelines. *See Clem*, 2024 WL 668523, at *18 ("In any event, the reporting system *worked*. When potential problems . . . became apparent, information was conveyed to the Board."). Plaintiffs also attach to their Amended Complaint an April 7, 2021 "Diverse Segments, Representation and Inclusion: Status Update" that the Board received periodically. (Ex. KK.) Plaintiffs respond that this document shows only "information about the racial demographics of the Company." (Opp. 26.) In fact, it updates the Board on the year-over-year progress for Asian, Black, Latino, and female employees covered by the Guidelines. (Ex. KK at -0759-61.)

***Plaintiffs Confuse the Prongs of Caremark***. In attempting to save their prong-one claim, Plaintiffs also appear to conflate the *Caremark* prongs. Plaintiffs' shifting argument regarding the GNC report is now that the "delay" in receiving an update on Miller's complaint "put the Board on notice that it was not receiving timely reporting of hiring discrimination," citing *Boeing*. (Opp. 25.) Putting aside that Plaintiffs fail to explain why ten months is too long for management to conduct a thorough investigation before briefing the Board (*see supra* at 9), Plaintiffs' allegations are fundamentally different from *Boeing*. There, *management* received red flags but there was "no evidence that these were disclosed to the board," which supported an inference that no reporting system existed. 2021 WL 4059934, at *31. Here, Plaintiffs assert that the Board *did* receive the red flag, and was "on notice" that its reporting system was not "timely," but failed to act. That is a *prong-two* argument — and one that makes little sense. "For a red-flag theory to work, the red flag must be sufficiently connected to the corporate trauma at issue to elevate the board's inaction in the face of the red flag to the level of bad faith." *Hamrock*, 2022 WL 2387653, at *20. Plaintiffs do not even attempt to plead particularized facts demonstrating that the "ten-month delay" (Opp. 25) in reviewing Miller's allegation somehow *led* to widespread fake interviews.

Plaintiffs' reliance on Bruno's September 2021 email as a red flag to management that should have been reported to the Board fares no better. As the Court of Chancery found, Bruno's email only "devoted

two sentences to [purported fake interviews]," out of more than 20 paragraphs, "and otherwise largely focused on personal issues that Bruno had with his supervisor" that "one would not expect to warrant board attention." (Ex. 7 at 32.) And again, Plaintiffs themselves plead that the one specific complaint of an alleged fake interview *was* reported to the Board through its ordinary channels.[7]

## II. THE DIRECTOR DEFENDANTS DO NOT FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR VIOLATIONS OF THE SECURITIES LAWS.

### A. Plaintiffs Fail To Explain How the Director Defendants Face a Substantial Likelihood of Liability under Section 14(a).

***Plaintiffs' Section 14(a) Claims Are Exculpated.*** The Director Defendants cannot face a substantial likelihood of liability under Section 14(a) because Plaintiffs' Section 14(a) claims are based solely on negligence (AC ¶ 433), and Wells Fargo's charter exculpates the Company's directors from negligence-based claims (*see* Rule 23.1 Mot. 20). That is precisely what Judge Chesney concluded in dismissing a nearly identical Section 14(a) claim. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 2022 WL 345066, at *5 (N.D. Cal. Feb. 4, 2022).

Plaintiffs argue that *In re Wells Fargo* is "distinguishable" because there "the court held that 'plaintiffs have failed to show those directors would face a substantial likelihood of liability for violating section 14(a), and, accordingly, plaintiffs have failed to show their failure to make a demand is excused as futile,'" while here Plaintiffs' Section 14(a) claim "is a stand-alone securities violation and is not Plaintiffs' basis for demand futility." (Opp. 38.) That makes no sense. Plaintiffs assert Section 14(a) claims derivatively (AC ¶ 437), and thus must show that demand would be futile as to *that claim*.[8] That

---

[7] It is unclear whether Plaintiffs mean to argue under *Caremark* prong two that the Board consciously did nothing in response to the *New York Times* articles. (Opp. 25.) If so, this argument fails. As Defendants explained (Rule 23.1 Mot. 19), on July 25, 2022, the Human Resources Committee reviewed a presentation describing corrective measures management had prepared in response to the articles. (Ex. 11.) Plaintiffs dismiss this document because it "post-dates both *NYT* articles." (Opp. 26 n.12.) Of course it did. To plead a prong-two claim, Plaintiffs must plead particularized facts showing that the Board "completely failed to act *in response* to [] red flags." *Melbourne Mun. Firefighters' Pension Tr. Fund* v. *Jacobs*, 2016 WL 4076369, at *12 (Del. Ch. Aug. 1, 2016) (emphasis added). That the Board took action after it learned of the articles is not a response to Defendants' argument — it is a concession.

[8] Plaintiffs mischaracterize *Alidina* v. *Internet.com Corp.*, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002), which was not a derivative action and says only that that a court will not dismiss a breach of fiduciary duty claim under a duty-of-care theory when a plaintiff adequately alleges that the directors also breached their duty of loyalty — *i.e.*, by acting in bad faith, which is not exculpated. Here, Plaintiffs are clear that their Section 14(a) claim is based only on negligence, not bad faith. (AC ¶ 433.)

"plaintiffs have failed to show those directors would face a 'substantial likelihood of liability' for violating Section 14(a)" is precisely the point. *In re Wells Fargo*, 2022 WL 345066, at *5.

***Plaintiffs Fail To Plead any Material Misstatement or Omission.*** The Opposition also confirms that none of the challenged statements in the 2021 or 2022 Proxy Statements is actionably false or misleading. As for general descriptions of the Guidelines, Plaintiffs do not dispute that they are factually accurate. (*See* Rule 23.1 Mot. 21.) Plaintiffs instead claim that they plead "with particularity more than isolated incidents" of fake interviews, thereby rendering these statements misleading. (Opp. 38.) For the purported "many examples of sham interviews," Plaintiffs rely on the allegations of Bruno and the articles in *The New York Times*. (*See id.*) These are the same allegations that this Court previously characterized as "isolated incidents" that do not make descriptive statements about the Guidelines false or misleading. *SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*, 2023 WL 11691540, at *6 (N.D. Cal. Aug. 18, 2023).

As for the aspirational statements about Wells Fargo's commitment to diversity, Plaintiffs never even engage with the specific statements themselves, let alone attempt to explain how statements that Wells Fargo is "Advancing Diversity," "values and promotes DE&I," or has a "strong record of recruiting" diverse talent (AC ¶ 222) are capable of objective verification. Plaintiffs simply insist, without explanation, that each "aspirational" statement is also "demonstrably false." (Opp. 38-39.) But they rely on the same conclusory allegations of widespread fake interviews that are not substantiated anywhere in the Amended Complaint (*see*, *e.g.*, AC ¶¶ 223, 231), and never even attempt to connect any of those allegations to any particular statement in the Proxies.

***Plaintiffs Fail To Plead any "Essential Link."*** Plaintiffs likewise fail to allege that the challenged statements were "an essential link" in causing harm to Wells Fargo. *Ocegueda* v. *Zuckerberg*, 526 F. Supp. 3d 637, 651-52 (N.D. Cal. 2021). In the two cases cited by Plaintiffs (Opp. 39), the challenged proxies directly resulted in the grant of back-dated stock options to corporate board members, causing pecuniary harm to the company. *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007); *In re Maxim Integrated Prods. Inc. Derivative Litig.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008). No similar transaction is alleged here. Instead, Plaintiffs speculate, without particularized allegations, that the challenged statements induced the re-election of the Director Defendants and the non-binding shareholder advisory votes on the Director Defendants' compensation plans, which, in turn, "incentivized

the sham interviews and discriminatory lending practices." (Opp. 40.) These "conclusory allegations" are insufficient to state a Section 14(a) claim. *Ocegueda*, 526 F. Supp. 3d at 652.

**B. Plaintiffs Fail To Show that the Director Defendants Face a Substantial Likelihood of Liability under Section 10(b).**

Plaintiffs never even mention their Section 10(b) claims with respect to statements about Wells Fargo's mortgage-lending practices, and thus abandon them. As to the remaining statements about hiring practices, Plaintiffs still fail to demonstrate that they have adequately pleaded falsity or scienter.

***Falsity.*** Plaintiffs insist that the Amended Complaint is laden with "20 detailed pages" establishing that general statements describing the Guidelines are false, and that the Amended Complaint is "far more detailed" than the complaint in the securities action. (Opp. 30-31.) But Plaintiffs repeat the very same allegations that this Court has already found insufficient to state a claim under Section 10(b). For example, Plaintiffs claim that "the Complaint alleges the sham interviews were widespread," citing to paragraphs in the Amended Complaint that summarize the June 9, 2022 article in *The New York Times*. (*Id.* at 32.) These are the same allegations relied upon by the plaintiffs in the related securities action, which demonstrate nothing more than "isolated incidents" insufficient to establish falsity. (*See*, *e.g.*, Dkt. No. 69 ¶ 141, *SEB Inv. Mgmt. AB* v. *Wells Fargo & Co.*, No. 3:22-cv-03811-TLT (N.D. Cal. Jan. 31, 2023).) Plaintiffs also cite the June 9 article to claim that "[f]ederal prosecutors in New York opened a criminal investigation into whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates" (AC ¶ 190), but say nothing in response to the reality that "[t]he U.S. Attorney's Office has since closed its investigation without taking action" (Rule 23.1 Mot. 5).

Plaintiffs' arguments as to other challenged statements are similarly unavailing. Plaintiffs fail to articulate why statements regarding evaluations of senior management are misleading, other than falling back on conclusory and previously rejected allegations that fake interviews were widespread. (Opp. 32.) Plaintiffs do not explain how aspirational statements that Wells Fargo was "dedicated" (AC ¶ 214), "committed" (*id.* ¶ 216), or "values and promotes" diversity (*id.* ¶¶ 220, 222) are "capable of objective verification," or why investors would rely on these expressions of corporate "optimism." *See City of Pontiac Gen. Emps.' Ret. Sys.* v. *Bush*, 2022 WL 1467773, at *4 (N.D. Cal. Mar. 1, 2022).

Finally, Plaintiffs suggest that each individual Director Defendant can be liable for statements

attributed to the Company, even if he or she did not sign those statements, because such statements are the "collective action of each Defendant." (Opp. 34.) But they never elaborate. Conclusory allegations that "the directors of the Company" "were . . . directly responsible for" (AC ¶ 444) all challenged statements are not enough. *Abdo* v. *Fitzsimmons*, 2017 WL 6994539, at *8 (N.D. Cal. Nov. 3, 2017). And Plaintiffs never attempt to explain why the Director Defendants could be liable for an oral statement attributed to Santos or a Company press statement to a news reporter. (*See* Rule 23.1 Mot. 23-24.)

***Scienter.*** The Opposition likewise confirms that Plaintiffs have not adequately alleged scienter as to any of the Director Defendants. Plaintiffs rely on a prior derivative action related to Wells Fargo's sales practices (*see* Opp. 33-34), but this case is nothing like it. There, the court held that congressional testimony acknowledging Board awareness of improprieties, lawsuits against the Company, "significant regulatory interventions," and "widespread employee terminations" — together with the inference that the Board would take interest in a subject "essential to Wells Fargo's financial growth and success" — all collectively supported an inference of scienter. *Shaev* v. *Baker*, 2017 WL 1735573, at *10-12 (N.D. Cal. May 4, 2017). No such indicia of scienter are alleged here. Plaintiffs point to no public statements acknowledging Board awareness of pervasive wrongdoing, no lawsuits about fake interviews, and no employee terminations resulting from fake interviews. What Plaintiffs claim are "repeated" reports about fake interviews (Opp. 33) are in fact allegations of isolated incidents that were either unsubstantiated or buried in an email that would not "warrant board attention." (Ex. 7 at 34.) Nothing in the Amended Complaint suggests that any purported "'trove' of relevant metrics" (Opp. 33) "amounted to a database of sham interviews." *SEB*, 2023 WL 11691540, at *8. And none of the supposed "regulatory intervention[s]" (Opp. 34) "dealt specifically with sham interviews." *SEB*, 2023 WL 11691540, at *8. Finally, that the Company made general statements about the Guidelines, and then paused the Guidelines after the allegations in *The New York Times*, if anything, gives rise to the more cogent and compelling inference that the Director Defendants paused and investigated the Guidelines once they learned about allegations of fake interviews. (*See* Rule 23.1 Mot. 24.)

**CONCLUSION**

For the foregoing reasons, and for the reasons outlined in Wells Fargo's opening brief, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

DATED: July 2, 2024

Respectfully submitted,

*/s/ Brendan P. Cullen*

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600

Christopher M. Viapiano (*pro hac vice*)
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500

Leonid Traps (*pro hac vice*)
(trapsl@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

*Counsel for Nominal Defendant Wells Fargo & Company*