United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY HIRING PRACTICES DERIVATIVE LITIGATION | Case No. 22-cv-05173-TLT |
| | **ORDER GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS' MOTIONS TO DISMISS** |
| | Re: Dkt. Nos. 152, 153 |

Before the Court are Defendant Wells Fargo & Company ("Wells Fargo")'s motion to dismiss for failure to adequately plead demand futility and Defendants Scott Powell, Michael Santomassimo, Carly Sanchez, Kleber Santos, and Jonathan Weiss ("Officer Defendants")'s motion to dismiss for failure to adequately plead demand futility and for failure to state a claim. ECF 152 ("Mot."), 153 ("Off. Mot."). Defendants challenge Lead Plaintiffs City of Pontiac Reestablished General Employees' Retirement System ("Pontiac"), the City of Plantation Police Officers' Retirement Fund ("Plantation"), and Amy J. Cook (together, "Plaintiffs")'s amended complaint.

The amended complaint alleges breaches of fiduciary duty and related causes of action in connection with the Wells Fargo Board of Directors (the "Board")'s and/or executive management's failure to meaningfully monitor Wells Fargo's discriminatory lending and discriminatory hiring practices. ECF 147 ("Compl.").

Wells Fargo challenges the following claims: (1) breach of the fiduciary duty of oversight, (2) violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), (3) violation of Section 10(b) of the Exchange Act and Security and Exchange Commission ("SEC") Rule 10b-5, and (4) violation of Section 20(a) of the Exchange Act. Defendants Steven D. Black, Mark A. Chancy, Celeste A. Clark, Theodore F. Craver, Jr., Richard K. Davis, Wayne M. Hewett, Cecelia G. Morken, Maria R. Morris, Felicia F. Norwood, Richard B. Payne, Jr., Juan A. Pujadas,

Ronald L. Sargent, and Suzanne M. Vautrinot, and CEO Charles W. Scharf (the "Director Defendants") joined in on Wells Fargo's motion to dismiss. Separately, Officer Defendants challenge the following claims: (1) breach of fiduciary duty of oversight, (3) violation of Section 10(b) of the Exchange Act, (4) violation of Section 20(a) of the Exchange Act, and (5) insider trading violations under Section 20A of the Exchange Act against Officer Defendant Santos.

The underlying dispute in this case concerns allegations that the Board of one of the largest financial institutions in the United States failed to oversee and respond to widespread discriminatory lending and hiring practices. After review and consideration of the motions, oral arguments, relevant legal authority, briefings, attachments and exhibits thereto, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendants' motions to dismiss.

## I.    BACKGROUND

### A.    Procedural Background

On April 11, 2024, the Court issued an order consolidating four related cases with the lead case under the caption *In re Wells Fargo & Company Hiring Practices Derivative Litigation*. ECF 139. On May 2024, Plaintiffs filed a consolidated amended stockholder derivative complaint alleging five causes of action: (1) breach of fiduciary duty of oversight against Director Defendants and Officer Defendants, (2) violation of Section 14(a) of the Exchange Act based on negligence against Director Defendants, (3) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Wells Fargo, Director Defendants, and Officer Defendants, (4) violation of Section 20(a) of the Exchange Act against Director Defendants and Officer Defendants, and (5) violation of Section 20A of the Exchange Act against Officer Defendant Santos. Compl. These causes of action related to two broad categories of alleged misconduct: (a) discriminatory hiring practices and (b) discriminatory lending practices. *Id.*

Wells Fargo filed its motion to dismiss for failure to adequately plead demand futility. Mot. Officer Defendants separately filed their motion to dismiss for failure to adequately plead demand futility and for failure to state a claim. Off. Mot. Director Defendants joined Wells Fargo's motion to dismiss. ECF 160. Separately, Wells Fargo CEO and Defendant Charles W. Scharf also joined Wells Fargo's motion to dismiss. ECF 155.  Plaintiffs filed an opposition to the motions to dismiss.

United States District Court
Northern District of California

ECF 165 ("Opp'n"). Wells Fargo and Officer Defendants separately filed replies. ECF 168 ("Reply"), 169 ("Off. Reply"). On August 27, 2024, the Court heard oral argument.

### B.    Factual Background

#### 1.    Wells Fargo's History of Issues with Discrimination

Wells Fargo & Company is a Delaware corporation and one of the largest U.S. financial institutions. Compl. ¶¶ 39, 72. Wells Fargo provides banking, mortgage, and other products and consistently ranks as one of the largest employers in the U.S. with more than 250,000 employees operating out of more than 7,000 locations. *Id.* ¶¶ 70, 72.

Wells Fargo has a fourteen-member board of directors and several board-level committees that assist the Board in fulfilling its oversight responsibilities. ¶¶ 376, 334-35. Plaintiffs allege that during the relevant period, the Wells Fargo Board of Directors consisted of Steven D. Black, Mark A. Chancy, Celeste A. Clark, Theodore F. Craver, Jr., Richard K. Davis, Wayne M. Hewett, Cecelia G. Morken, Maria R. Morris, Felicia F. Norwood, Richard B. Payne, Jr., Juan A. Pujadas, Ronald L. Sargent, Suzanne M. Vautrinot, and Chief Executive Officer Charles W. Scharf. *Id.* ¶ 376. The Officer Defendants are five senior executives of Wells Fargo: Scott Powell, Chief Operating Officer since 2019; Michael Santomassimo, Chief Financial Officer since 2020; Kleber Santos, former head of Diverse Segments, Representation, and Inclusion and, since July 2022, CEO of Consumer Lending; Carly Sanchez, former Vice President of Talent Acquisition from 2013 to 2022; and Jonathan Weiss, CEO of Corporate and Investment Banking since 2020. *Id.* ¶¶ 52, 54-56, 60.

Over the recent years, Wells Fargo has faced a litany of complaints and public scrutiny related to discriminatory practices. *Id.* ¶ 92. In July 2012, the U.S. Department of Justice ("DOJ") announced a $184.3 million settlement with Wells Fargo stemming from claims that, between 2004 and 2008, the Company engaged in a pattern or practice of steering Black and Hispanic applicants into mortgages with higher interest rates and fees compared to similarly situated White applicants. *Id.* ("2012 DOJ Action"). In 2017, the City of Philadelphia alleged that Wells Fargo violated the Fair Housing Act ("FHA") by steering Black and Hispanic borrowers toward higher interest rate loans even when those borrowers qualified for more advantageous loans. *Id.* ¶ 93 ("*Philadelphia* Action"). Wells Fargo agreed to settle the *Philadelphia* Action for $10 million, with $8.5 million

allocated to grants for down payments and closing cost assistance for low- and moderate-income persons and households in Philadelphia. *Id.*

In March 2020, U.S. Representatives Maxine Waters and Al Green submitted a report prepared by the Majority Staff of the Committee on Financial Services, U.S. House of Representatives that concluded that Wells Fargo "failed to correct serious deficiencies in its infrastructure for managing consumers and complying with the law. As a result, Wells Fargo's customers have been exposed to countless abuses, including racial discrimination . . . ." *Id.* ¶ 94. On December 3, 2020, Wells Fargo shareholders sent a demand letter (the "December 2020 Demand") to the Board alleging, among other issues, deficiencies in minority borrowing practices. *Id.* ¶ 96. After months of deliberation, the Board-level Demand Review Committee rejected the demand. *Id.* ¶ 100. Wells Fargo also currently faces a consolidated Mortgage Discrimination Class Action pending in this district with plaintiffs alleging racial and ethnic discrimination when applying for home loans and refinancing. *Id.* ¶ 101.

### 2.  Alleged Discriminatory Lending Practices

In the pending Mortgage Discrimination Class Action (3:22-cv-00990-JD), the plaintiffs allege that in determining home loans, interest rates, and mortgage points, Wells Fargo used factors to determine eligibility for home loan rates, terms, and conditions that result in disparate impact towards minority borrowers. *Id.* Plaintiffs here allege the same.

Wells Fargo uses an automated system to make loan underwriting decisions. *Id.* ¶¶ 102, 166-67. These include Wells Fargo's "CORE" system, *id.* ¶ 122 n.75 ("CORE . . . is our loan origination system that we use to originate, process, underwrite, and close first mortgages"), and its "ECS" model, *id.* (the "Enhanced Credit Score" is a "risk engine" included in CORE that places applicants into risk classes). One banking regulator referred to modern-day automated underwriting systems like Wells Fargo's CORE/ECS as "black boxes behind brick walls." *Id.* ¶ 102. Plaintiffs allege that Wells Fargo's automated underwriting system functions as a form of digital redlining. *Id.*

For example, borrowers seeking to refinance properties in Black-majority neighborhoods are deemed by the CORE/ECS system to be a greater lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority neighborhoods. *Id.* ¶ 103. Wells

1   Fargo uses Bayesian Improved Surname Geocoding, a method that applies Bayes' Rule to predict
2   the race or ethnicity of an individual utilizing the individual's surname and geocoded location, when
3   that information is not otherwise provided. *Id.* ¶ 105. Further, Wells Fargo considers uncorrected
4   historical and current appraisal data from geographically differentiated locations in its refinance
5   process. *Id.* ¶ 106. The Complaint goes on to describe other ways in which Wells Fargo's automated
6   lending process functions as digital redlining. *Id.*

7          In addition to allegations of digital redlining, Plaintiffs also allege that Wells Fargo granted
8   pricing exceptions in a discriminatory manner. *Id.* ¶ 367. On December 11, 2023, *CNBC* reported
9   that Wells Fargo was under federal investigation by the Consumer Financial Protection Bureau
10  ("CFPB") for the very same discriminatory practices that came to light years earlier in settlements
11  with the 2012 DOJ Action and the *Philadelphia* Action in 2019: offering White borrowers "pricing
12  exceptions," or discounted interest rates and fees that were not offered to minority borrowers. *Id.* ¶
13  29, 173.

14         On March 11, 2022, *Bloomberg* published an article describing racial disparities in Wells
15  Fargo's mortgage refinancing rates during 2020. *Id.* ¶ 16. *Bloomberg* published the results of its
16  analysis of nationwide data published under the Home Mortgage Disclosure Act ("HMDA") from
17  more than eight million completed applications for conventional refinancing loans from 2020. *Id.* ¶
18  108. According to the article, Wells Fargo approved 47 percent of mortgage refinancing applications
19  submitted by Black homeowners, compared with 72 percent of applications by White homeowners.
20  *Id.* Stated differently, "Wells Fargo's refinancing approval rates were higher for the lowest-income
21  White applicants in 2020 than for all but the highest-income Black applicants." *Id.* ¶ 109. Wells
22  Fargo fared poorly when compared to peers as the Company was the only major U.S. lender in 2020
23  that rejected more Black homeowner refinancing applications than it accepted. *Id.* ¶ 111.

24         On March 25, 2022, *Bloomberg* published a second article related to Wells Fargo's racial
25  gap in mortgage refinancing based on new data from loans in 2021. *Id.* ¶ 115. The article reported
26  that the lending rates for Black and Hispanic homeowners had improved over the prior year. *Id.*
27  However, Wells Fargo "continued to have the lowest approval rate for Black borrowers of any major
28  lender." *Id.* In response to *Bloomberg*'s analysis, Wells Fargo tasked employees in its data analytics

United States District Court
Northern District of California

team with analyzing the data underlying *Bloomberg*'s analysis in order to confirm the article's claim of disparate impact. *Id.* ¶ 132. Wells Fargo's Business Insights & Analytics ("BIA") team validated *Bloomberg*'s analysis as accurate. *Id.* Plaintiffs corroborated these allegations of discriminatory lending practices with former Wells Fargo employees. *Id.* ¶ 154.

Plaintiffs allege the Board and its several committees' meeting minutes indicate only one discussion of Wells Fargo's fair lending compliance at any Board-level from August 2020 to April 2022. *Id.* ¶ 142.

### 3. Alleged Discriminatory Hiring Practices

In March 2020, Wells Fargo announced that it was expanding a policy requiring that at least half of all candidates interviewed for certain positions be diverse. *Id.* ¶ 8. The policy—formally referred to as the Diversity Sourcing and Interview Team Guidelines ("Diverse Search Requirement")—was part of Wells Fargo's ongoing efforts to promote diversity in its senior ranks. *Id.*; *see also id.* ¶¶ 222, 242. The Diverse Search Requirement went into effect later that year, and required that, "for most U.S. roles with total direct compensation greater than $100,000," "[a]t least 50 [percent] of interview candidates must be diverse with respect to at least one diversity dimension." *Id.* ¶ 222. The Diverse Search Requirement defined "diverse" to include racial minorities, women, LGBTQ individuals, veterans, and people with disabilities. *Id.*

On February 18, 2021, Phillip Miller, an "external job applicant," sent an "email to Wells Fargo's Board of Directors" ("Miller's Email") in which Miller "complain[ed] that he experienced discrimination in the form of racist and offensive statement[s] directed toward him by the hiring manager of a position he applied for on [September 28, 2020] when the Wells Fargo manager told Miller 'you don't sound black'" and after which "a white female was selected for the position." *Id.* ¶ 177. Miller questioned Wells Fargo's commitment to hiring Black candidates or whether "his race and ethnicity were being used to reach the newly established goal to consider diverse candidates" and not an actual "commitment to hire qualified black candidates." *Id.*

On December 13, 2021, the Board's Governance and Nominating Committee ("GNC") received a presentation which detailed, among other things, non-ordinary communications including Miller's Email. *Id.* at Ex. ZZ. The presentation noted that "Employment Investigations found that

allegations of discrimination [in Miller's Email] related to race . . . were *unsubstantiated*". *Id.* (emphasis added).

Separately, on September 7, 2021, Joseph Bruno, a former Wells Fargo executive in the wealth management division, sent an email ("Bruno's Email") to over 250 Wells Fargo employees, including Officer Defendants Scharf (also a Director Defendant), Powell, and Santos. *Id.* ¶ 174. In the email, Bruno raised concerns regarding a practice of conducting sham interviews to comply with the Company's diverse hiring initiative. *Id.* Bruno further reported that when he "brought up the fake interviews [to his regional director], and [stated that he] wasn't comfortable doing them, [his regional director] said put your head down and focus on recruiting." *Id.* ¶ 175. Plaintiffs allege that the full Board never received reporting on Bruno's Email. *Id.*

On May 19, 2022, *The New York Times* featured Bruno in an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interview." *Id.* ¶ 182. The article reported that Bruno had "long been troubled by the way his unit handled certain job interviews." *Id.* Bruno alleged that for many open positions, employees would interview a "diverse" candidate in keeping with Diverse Search Function. *Id.* However, Bruno noticed that often, the diverse candidate would be interviewed for a job that had already been promised to someone else. *Id.* Bruno said that when he complained to his bosses about the behavior, his claims were dismissed. *Id. The New York Times* article stated that Bruno was one of seven current and former Wells Fargo employees who asserted they were instructed in the Wells Fargo's wealth management unit to interview diverse candidates for jobs that no longer existed. *Id.* ¶ 183. Plaintiffs further corroborated these allegations of discriminatory hiring practices with former Wells Fargo employees. *Id.* ¶ 154.

Wells Fargo issued a statement in response to *The New York Times* article stating that Wells Fargo expected all employees to follow its hiring policies and guidelines and that "to the extent that individual employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it." *Id.* ¶ 184.

On June 9, 2022, *The New York Times* published a follow-up article alleging that other sham interviews had occurred based on claims from "10 current and former employees," who reportedly believed that they "were subject to fake interviews, or conducted them, or saw paperwork

documenting the practice." *Id.* ¶ 190. On the same day, Wells Fargo announced a "pause" of the Diverse Search Function, effective on June 6, 2022, so Company leaders could "gain confidence that the guidelines live[d] up to their promise," and ensure that "hiring managers, senior leaders and recruiters fully underst[oo]d how the guidelines should be implemented." *Id.* ¶ 191.

### 4. Alleged Claims

Plaintiffs, long-term Wells Fargo shareholders, sought and obtained inspection of certain books and records of the Company in California pursuant to California Corporations Code § 1600 et seq. and in separate proceeding in Delaware state court pursuant to Section 220 of the Delaware General Corporation Law. *Id.* ¶ 64. These books and records, taken together, included nearly 7,000 pages of Board-level documents, including meeting minutes and presentation materials, from Wells Fargo. *Id.*

Plaintiffs claim that Defendants breached their fiduciary duties under Delaware law by failing to implement reporting systems to monitor alleged discrimination in mortgage lending and hiring, and by consciously ignoring red flags regarding these purported issues. *Id.* ¶ 367. Plaintiffs allege that the Director Defendants breached their fiduciary duties by "consciously issuing false and misleading statements to stockholders." *Id.* ¶ 425(c). Plaintiffs further allege that Defendants "negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements" in the 2021 and 2022 Proxy Statements. *Id.* ¶ 435. Finally, Plaintiffs assert that Officer Defendants are liable as control persons and that Defendant Santos engaged in insider trading. *Id.* ¶¶ 448-50, 452-53.

### a. False or Misleading Statements

In the Complaint, Plaintiffs allege fourteen false or misleading statements made by Defendants regarding the alleged discriminatory lending and hiring practices. Out of these 14 statements, 11 statements are identical to the statements subject to litigation in *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, No. 22-CV-03811-TLT, 2024 WL 3579322 (N.D. Cal. July 29, 2024). The accused statements are identified below.

### i.      March 16, 2020 – 2020 Proxy

On March 16, 2020, Wells Fargo filed its 2021 proxy statement on Form DEF 14A, which included at the front a letter signed by Defendant Scharf and then Chair Charles Noski. Compl. ¶ 211. Plaintiffs challenge a host of statements in the 2020 Proxy. The Proxy told stockholders that the Company's "performance assessment framework for our executive officers and other senior leaders to drive outcomes of both annual and long-term incentive awards" had been "enhanced" in "2020." *Id.* The 2020 Proxy further stated that this performance assessment framework was "robust" and "overseen by our Board's [HRC]," and that it considered "progress against diversity initiatives." *Id.*

The Proxy represented that Wells Fargo was "dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions." *Id.* ¶ 214. The Proxy also recommended a vote against a shareholder proposal for a "Report on Global Median Pay Gap" because:

> We are committed to advancing the diversity of leadership across the Company and preparing these leaders for success through career development, training, and mentoring. We have a strong record of recruiting, promoting, and rewarding gender and racially/ethnically diverse employees at all levels of our Company, which reflects our commitment to increasing diversity in leadership roles.
>
> Hiring and Talent Mobility Strategy. We employ a selection and assessment program that ensures our hiring process is fair and equitable.
>
> Wells Fargo has a three-prong talent strategy where all employees are expected to focus on attracting, hiring, and supporting diverse talent.

*Id.* ¶ 215. Plaintiffs further allege that the 2020 Proxy omitted information—including the fact that the "interview teams" would be conducting sham interviews. *Id.*

### ii.      February 23, 2021 – 2020 Annual Report

On February 23, 2021, Wells Fargo filed its 2020 Annual Report with the SEC on Form 10-K (the "2020 Form 10-K), which was signed by Defendants Black, Chancy, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, Scharf, and Vautrinot. *Id.* ¶ 220. The 2020 Form 10-K stated:

> Promoting Diversity, Equity, and Inclusion. Meeting the increasingly diverse needs of Wells Fargo's global customer base is critical to our

company's long-term growth and success. Wells Fargo values and promotes diversity, equity, and inclusion (DE&I) in every aspect of our business. We are dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions. We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase diverse representation in leadership roles.

*Id.*

### iii.    March 16, 2021 – 2021 Proxy

On March 16, 2021, Wells Fargo filed its 2021 proxy statement on Form DEF 14A (the "2021 Proxy"), which included at the front a letter signed by Scharf and a letter signed by then Chair Charles Noski. *Id.* ¶ 222. The 2021 Proxy stated, "We Are Advancing Diversity, Equity, and Inclusion"; "Wells Fargo values and promotes DE&I in every aspect of our business"; and that "We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase representation in leadership roles." *Id.* Under a subheading entitled, "Improving Diverse Representation and Inclusion within the Company," Defendants stated, "[w]e are expanding our diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all of those areas and are taking specific actions in support of these commitments." *Id.* Defendants stated, "[i]n the U.S., we are requiring a diverse slate of candidates—and a diverse interview team— for most roles with total direct compensation of more than $100,000 per year." *Id.*

The 2021 Proxy described the Diverse Search Requirement as:

The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000:

• At least 50% of interview candidates must be diverse with respect to at least one diversity dimension; and

• At least one interviewer on the hiring panel must represent at least one diversity dimension

*Id.* Plaintiffs also allege that the 2021 Proxy contained a "Shareholder Proposal" that the Board "Conduct a Racial Equity Audit." The Board recommended voting against the proposal because:

• Wells Fargo has taken a number of actions to promote and enhance diversity, equity, and inclusion goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership), accountability

10

of senior management for progress in improving diverse representation and inclusion, unconscious bias education and training for employees, and new business initiatives and investments focused on support for diverse communities.

• Wells Fargo is providing updates on its diversity, equity, and inclusion initiatives and actions to promote racial equity in our public disclosures such as the Company's Environmental, Social, and Governance (ESG) reporting, our website, and this proxy statement.

• The Board believes that the Company's significant and ongoing diversity, equity, and inclusion initiatives and its existing and planned future disclosures about its diversity, equity, and inclusion initiatives, including to report on the results of its Human Rights Impact Assessment which is being conducted by a third party and includes a focus on racial equity, are fully responsive to the proposal.

*Id.* ¶ 227. Plaintiffs allege that the Board further states that "Wells Fargo supports the communities in which it does business through our products and services, community engagement, philanthropy, and employee volunteerism. We play a significant role in both supporting diverse communities across the nation and helping foster a more inclusive society. Wells Fargo has long believed that focusing on the needs of all of our stakeholders, including customers, employees, regulators, suppliers, communities, and shareholders, drives long-term value creation." *Id.* ¶ 228.

### iv. April 26, 2021 – 2020 Social Impact and Sustainability Highlights

On April 26, 2021, Wells Fargo published a report entitled, "2020 Social Impact and Sustainability Highlights." *Id.* ¶ 232. A section entitled "Elevating diversity, equity, and inclusion" outlined the Company's Diverse Search Requirement:

To be successful, we must continue to create a truly diverse and inclusive workforce that brings a wide range of insights and perspectives to all levels of our company. Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension. Further, at least one interviewer on the hiring panel must represent at least one diversity dimension. For these purposes, our definition of diversity includes race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. We're expanding this program internationally. As of December 31, 2020, the Diverse Search Requirement:

Applied to approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and

Applied to approximately 48% of all active U.S. employees irrespective of their total direct compensation

• 91% of applicable requisitions had a diverse interview slate [and]

• 94% of applicable requisitions had a diverse interview team.

11

*Id.*

### v.   May 26, 2021 – Defendant Scharf's Testimony to the United States Senate Committee on Banking, Housing, and Urban Affairs

On May 26, 2021, Defendant Scharf testified during a hearing before the United States Senate Committee on Banking, Housing, and Urban Affairs. In a portion of his testimony entitled, "Our Commitment to Diversity, Equity, and Inclusion", Scharf stated, among other things, "for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel." *Id.* ¶ 234.

### vi.   July 15, 2021 – 2021 ESG Report

On July 15, 2021, Wells Fargo published its 2021 ESG Report, which began with a letter signed by Defendant Scharf. *Id.* ¶ 236. In the 2021 ESG Report, Defendants provided an "[u]pdate on Wells Fargo's DE&I commitments," stating that the Company "[r]equire[s] diverse candidate slates and interview teams for key roles with total direct compensation of more than $100,000." *Id.* Defendants further stated that Wells Fargo was requiring "at least 50% of interview candidates to identify with at least one diversity dimension." *Id.*

### vii.   October 7, 2021 – Defendant Sanchez's Virtual Interview with the Institute for Corporate Productivity

On October 7, 2021, Defendant Sanchez participated in a virtual interview with the Institute for Corporate Productivity ("i4cp") during an installment of its Talent Acquisition Next Practices Monthly series. *Id.* ¶ 239. During the interview, i4cp host Lorrie Lykins asked Sanchez to "talk a little bit about building diverse candidate slates and increasing opportunities" for diverse job candidates at Wells Fargo. Sanchez responded:

> [W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates . . . . [W]e formalized the candidate slate requirement for roles $100K and above. It's probably about a year and a half or two years ago to say that you have to have 50% of the slate – of the candidate slate that will be interviewed needs to be diverse in one dimension or another. Also, the interview team has to be diverse, and so that's very important as well.

*Id.*

### viii.    March 14, 2022 – 2022 Proxy

On March 14, 2022, Wells Fargo filed its 2022 proxy statement on Form DEF 14A (the "2022 Proxy"), which included at the front a letter signed by Scharf and a letter signed by Director Defendant Black. *Id.* ¶ 242. Wells Fargo made various representations regarding the Company's Diverse Search Requirement, including:

> Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include:
>
> Diverse Candidates[:] Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.
>
> Our Diversity Sourcing Group[:] We seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles. They pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants.

*Id.* The 2022 Proxy also contained a "Shareholder Proposal" that the Board "Conduct a Racial Equity Audit." *Id.* ¶ 244. The Board recommended voting against the proposal. *Id.* The Board stated that "We have significantly increased our focus on our DE&I strategy, which we believe enables the Company to play a positive role in supporting diverse stakeholders including its employees, customers, suppliers, and communities." *Id.* ¶ 245. The Board concluded that "[g]iven our comprehensive approach to DE&I, with continued oversight from our Board, management accountability, and our robust DE&I disclosures, we do not believe that performing a Racial Equity Audit ultimately serves the best interests of our shareholders." *Id.* ¶ 246.

### ix.    February 15, 2022 – Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response

On February 15, 2022, Wells Fargo published its "Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response." *Id.* ¶ 250. In the "Diversity, equity, and inclusion" section of this document, under the "Sourcing of diverse talent" sub-heading, the Company stated: "We also instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation." *Id.*

### x.  March 18, 2022 – Wells Fargo's Statements to *WCNC Charlotte*

On March 18, 2022, WCNC Charlotte published an article titled "In light of disparities, senators call for review of Wells Fargo refinancing practices". *Id.* ¶ 252. The article quoted a written statement that Wells Fargo provided to WCNC Charlotte in connection with the article:

> "We will review the letter and provide our perspective on the analysis reflected in the recent story, which ignored critical information about Wells Fargo's lending to Black homeowners and the full range of our efforts to help meet the homeownership needs of diverse customers," Wells Fargo told WCNC Charlotte in a statement Friday. "We are confident that our underwriting practices are consistently applied regardless of the customer's race or ethnicity. Our analysis shows that additional, legitimate, credit related factors that are not available in HMDA data were responsible for the differences in our refinance approval rate for Black homeowners."

*Id.*

### xi.  May 27, 2022 – Defendant Santos's Statements to *Business Insider*

On May 27, 2022, *Business Insider* published an article entitled, "Wells Fargo exec responds to reports that it denied mortgages to Black applicants and held sham job interviews". *Id.* ¶ 254. According to the article, Officer Defendant Santos told *Business Insider*, "We researched all the specific hiring-practice allegations the reporter shared prior to the story's publication, and we could not corroborate these allegations as factual." *Id.* Santos further stated, "[i]f we believe that any manager has conducted an interview with a predetermined outcome in mind, we believe we should investigate and punish if we find wrongdoing." *Id.* Santos also stated that "We don't have proprietary credit-underwriting models. We follow the guidelines of the GSEs." *Id.* ¶ 255. Santos acknowledged that the banking industry has long participated in damaging practices that marginalized Black Americans but said he "vehemently" disagrees that that's what's going on in this instance. *Id.*

### xii.  June 1, 2022 – 2022 DE&I Report

On June 1, 2022, Wells Fargo published its 2022 DE&I Report. *Id.* ¶ 257. The report contained two "Messages" in the front, one from Scharf (which he signed) and one from Santos (which he signed). *Id.* In a section of that report entitled, Diverse candidate slates and interview teams, Wells Fargo stated:

> For most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension and at least one interviewer on the hiring panel must also represent a historically underrepresented group with respect to at least one diversity dimension.

*Id.*

### xiii.    June 3, 2022 – Defendant Santo's Further Statements to *Business Insider*

On June 3, 2022, *Business Insider* published an article entitled, "Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street." *Id.* ¶ 259. The article reported that:

> Wells Fargo's Santos said the bank was focused on improving diversity among leaders. In 2020, the banking giant instituted a rule that for all posted roles in the US with annual compensation greater than $100,000, at least half of interview candidates must be from a historically underrepresented group.
>
> The rule is working, Santos said.

*Id.*

### xiv.    March 15, 2023 – 2023 Proxy

On March 15, 2023, Wells Fargo filed its 2023 proxy statement on Form DEF 14A (the "2023 Proxy"), which included at the front letters to shareholders signed by Defendants Scharf and Black. *Id.* ¶ 262. The 2023 Proxy stated that the Board "will continue to set the tone from the top regarding our expectations for the highest standards of integrity, excellence, and sound risk management"; that "[w]e have a governance structure that allows for robust Board oversight and senior management leadership over environmental sustainability, social, and DE&I strategies"; that "we are reducing the size of our mortgage servicing portfolio and exiting our correspondent business, while continuing our goal to be the primary mortgage lender to our customers and minority homebuyers"; and that "we are guided by 'doing what is right for our customers' at the center of everything we do" were false and misleading when made or otherwise omitted material information because the Board was not, in fact, setting the appropriate "tone from the top" or providing "robust Board oversight" or "guided by 'doing what is right.'" *Id.*

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Under Failure to Adequately Plead Demand Futility

Rule 23.1(b)(3) provides the demand futility standard, requiring that a shareholder-derivative complaint "state with particularity" any "effort by the plaintiff to obtain the desired action from the directors," or, if the shareholder failed to make any such effort, the "reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1.

Wells Fargo "is a Delaware corporation and Delaware law therefore applies." Compl. ¶ 34; *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (finding that the substantive law which determines whether demand is futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief). Under Delaware law, "a shareholder who declines to make a demand on the board of directors may not bring a derivative action until he has demonstrated, with particularity, the reasons why pre-suit demand would be futile." *Id.* (citing *Khanna v. McMinn*, Civ. A. 20545-NC, 2006 WL 1388744, at *11 (Del. Ch. May 9, 2006)) (cleaned up). "Futility is gauged by the circumstances existing at the commencement of a derivative suit and concerns the board of directors sitting at the time the complaint is filed." *Id.* (citing *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F.Supp.2d 419, 430 (S.D.N.Y.2010), *aff'd*, 415 F.App'x. 285 (2d Cir.2011)) (internal quotations omitted). "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *Id.*

Demand is futile under Delaware law if, "on a director-by-director basis," a majority of the board (1) "received a material personal benefit from the alleged misconduct"; (2) "faces a substantial likelihood of liability on any of the claims"; or (3) "lacks independence from someone who received a material personal benefit . . . or who would face a substantial likelihood of liability on any of the claims." *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021); *see also Riley v. Chopra*, No. 21-55518, 2022 WL 614450, at *1 (9th Cir. Mar. 2, 2022). "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Zuckerberg*, 262 A.3d at 1059.

1

**B.     Motion to Dismiss Under Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

**C.     Rule 9(b) and PSLRA**

"Securities fraud class actions must meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Plaintiffs alleging securities fraud must plead all the elements of a securities fraud action with particularity, including "circumstances constituting fraud or mistake." *Id.* at 605; Fed. R. Civ. P. 9(b). It is not enough for a plaintiff merely to identify an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Plaintiffs must allege "why the disputed statement was untrue or misleading when made." *Id.* at 1549.

Moreover, under the PSLRA, plaintiffs are required to "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), as amended (Feb. 10, 2009) (citations omitted). To properly plead falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). To properly plead scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–

United States District Court
Northern District of California

4(b)(2).  Regarding the "strong inference" standard, a complaint will survive a motion to dismiss, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 310 (2007).

If pleading negligence, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with" negligence with respect to each alleged false statement or omission. 15 U.S.C. § 78u-4(b)(2)(A); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000) ("[Under the PSLRA standard,] a Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence.").

### D.   Leave to Amend

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Proc. 15(a)(2). But courts have discretion to deny leave to amend because of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment.'"  *Leadsinger, Inc. v. BMG Music Pub*., 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## III.   DISCUSSION

### A.   Judicial Notice

"The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b). Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint.  [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document."  *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011); *see also In re Diamond Foods, Inc. Sec. Litig.*, No. C 11–05386 WHA, 2012 WL 6000923, at *16 (N.D. Cal. Nov. 30, 2012) ("Under the incorporation

by reference doctrine, a court may also consider documents submitted by defendants that were referenced in the complaint and whose authenticity has not been questioned.")

Defendants have filed a request for judicial notice along with their motion to dismiss. *See* ECF 152-2 ("RJN"). Defendants asks the Court to consider 17 exhibits. *Id.* Plaintiffs do not oppose Defendants' requests. The Court takes judicial notice of all 17 exhibits.

Defendants argue that exhibits 1 to 5, 9, 10, 13, and 14 are incorporated by reference in the Complaint and Plaintiffs specifically cite to and quote from these documents in support of their allegations. The Court finds that all nine exhibits are incorporated by reference and alternatively, are appropriate documents for judicial notice.  *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

Defendants next argue that exhibit 7 is properly subject to judicial notice because it is an official court record. Exhibit 7 is a post-trial final bench report, dated September 14, 2023, in the matter captioned *Pompano Beach General Employees' Retirement System v. Wells Fargo & Co.*, C.A. No. 2023-0656-BWD, in the Court of Chancery of the State of Delaware. Courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992). Because the report discusses certain documents referenced in the Complaint and produced by Wells Fargo in response to books-and-records demands, the Court finds exhibit 7 as an appropriate document for judicial notice.

Defendant next argue that exhibit 8, Wells Fargo's Restated Certificate of Incorporation, is properly subject to judicial notice. Defendants contend that it is a publicly filed corporate governance document whose accuracy cannot be reasonably questioned. The Court finds exhibit 8 as an appropriate document for judicial notice. *See, e.g.*, *In re Facebook, Inc. S'holder Derivative Privacy Litig.*, 367 F. Supp. 3d 1108, 1118 (N.D. Cal. 2019) (taking judicial notice of certificate of incorporation attached to SEC filing).

Finally, Defendants argue that exhibits 6, 11, 12, 15, 16, and 17, documents produced by Wells Fargo in connection with Plaintiffs' books-and-records demand, are also incorporated by reference. Defendants contend that exhibits 6, 11, and 12 are documents that were part of the books-

19

and-records demand, but Plaintiffs relied on the purported absence of these documents to draw adverse inferences in their Complaint. Defendants argue that these exhibits are properly incorporated by reference because they "properly provide a basis for [Wells Fargo's] argument that Plaintiffs sometimes inaccurately characterize the contents of those documents." *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 896 (N.D. Cal. 2022). Exhibits 15, 16, and 17 are the operative Confidentiality and Non-Disclosure Agreements executed by Plaintiffs' counsel that govern Plaintiffs' inspection and use of Wells Fargo's books and records. The Court finds that all six exhibits are incorporated by reference.

### B.    Demand Futility

Plaintiff's Complaint alleges four justifications for demand futility: (1) each demand director faces a substantial likelihood of personal liability for lack of oversight, (2) each demand director faces a substantial likelihood of personal liability for approving the issuance of false and misleading statements, (3) each demand director has a disabling personal interest based on the existence for an "insured versus insured" exclusion in Wells Fargo's D&O Policy, and (4) demand is futile as to Defendant Scharf for personal benefit, substantial likelihood of personal liability, and lack of independence. Compl. ¶¶ 379-419.

For (3) the "insured versus insured" exclusion in Wells Fargo's D&O Policy, courts have routinely rejected the argument that such an exclusion demonstrates an inability of the directors to disinterestedly consider a demand. *See, e.g.*, *Brown v. Moll*, No. C 09-05881 SI, 2010 WL 4704372, at *4 (N.D. Cal. Nov. 12, 2010); *Caruana v. Saligman*, Civ. A. No. 11135, 1990 WL 212304, at *4 (Del.Ch. Dec.21, 1990). For (4) demand futility as to Defendant Scharf, the Court need not address this argument as demand must be futile as to a majority of the Board—not any single director. The Court will address the remaining justifications in turn.

### 1.    Substantial Likelihood of Personal Liability for Lack of Oversight

Plaintiffs allege that "each Demand Director faces a substantial likelihood of liability for breaching his or her oversight duties in bad faith." Compl. ¶ 379. A claim for breach of fiduciary duty challenging a board's oversight failure is characterized as a *Caremark* action. *In re Caremark Int'l*, 698 A.2d 959 (Del. Ch. 1996). Plaintiffs must allege particularized facts that (1) "the directors

1   utterly failed to implement any reporting or information system or controls"; or (2) "having

2   implemented such a system or controls, [the directors] consciously failed to monitor or oversee its

3   operations." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006).

4   Plaintiffs assert that Director Defendants failed under both *Caremark* prongs. For the reasons stated

5   below, the Court **DENIES-IN-PART** motion to dismiss for the *Caremark* prong one claim as to

6   discriminatory lending practices. The Court **GRANTS-IN-PART** with prejudice motion to dismiss

7   for the *Caremark* prong one and prong two claims as to discriminatory hiring practices.

8                    **b.** *Caremark* **Prong One**

9       *Caremark* prong one claim requires that plaintiffs allege that the directors utterly failed to

10  implement any reporting or information system or controls. *Ritter*, 911 A.2d at 369. "Delaware

11  courts routinely reject the conclusory allegation that because illegal behavior occurred, internal

12  controls must have been deficient, and the board must have known so." *In re Boeing Co. Derivative

13  Litig.*, No. CV 2019-0907-MTZ, 2021 WL 4059934, at *24 (Del. Ch. Sept. 7, 2021) (citing

14  *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007). "Rather, the plaintiff must plead with

15  particularity a sufficient connection between the corporate trauma and the board." *Id.* (internal

16  quotations omitted). "To be sure, even in this context, Caremark does not demand omniscience." *Id.*

17  (citing *In re Clovis Oncology, Inc. Derivative Litig.*, No. CV 2017-0222-JRS, 2019 WL 4850188,

18  at *13 (Del. Ch. Oct. 1, 2019)). "But it does mandate that 'to satisfy their duty of loyalty, directors

19  must make a good faith effort to implement an oversight system and then monitor it.'" *Id.* (citing

20  *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019)). "When a plaintiff can plead an inference

21  that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically

22  critical to the company's business operation, then that supports an inference that the board has not

23  made the good faith effort that Caremark requires." *Marchand*, 212 A.3d at 822.

24      Plaintiffs allege that the Board failed "to implement a mission-critical reporting structure to

25  monitor fair lending compliance and discriminatory pricing." Compl. at 49. "[W]hen a company

26  operates in an environment where externally imposed regulations govern its 'mission critical'

27  operations, the board's oversight function must be more rigorously exercised." *City of Detroit Police

28  & Fire Ret. Sys. on Behalf of NiSource, Inc. v. Hamrock*, No. CV 2021-0370-KSJM, 2022 WL

United States District Court
Northern District of California

2387653, at *14 (Del. Ch. June 30, 2022) (citing *Clovis*, 2019 WL 4850188, at *13); *see also Boeing*, 2021 WL 4059934, at *26, n.244. A mission critical operation is an operation in which the laws and regulations governing the operation are the "most central . . . safety and legal compliance issue facing the company." *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, No. CV 2019-0816-SG, 2020 WL 5028065, at *18 (Del. Ch. Aug. 24, 2020) (quoting *Marchand*, 212 A.3d at 824); *see also Marchand*, 212 A.3d at 824 (finding food safety to be mission critical to an ice cream company); *Boeing*, 2021 WL 4059934, at *26 (finding airplane safety to be mission critical to an airline); *Hamrock*, 2022 WL 238753, at *15 (finding pipeline safety to be mission critical to a pipeline operating company).

In *Marchand*, the Delaware Supreme Court found that the plaintiff pled sufficient facts to support the inference that no "reasonable compliance system and protocols were established as to the obviously most central consumer safety and legal compliance issue facing the company." *Marchand*, 212 A.3d at 824. The court found that the complaint fairly alleged the following deficiencies:

> • no board committee that addressed food safety existed;
>
> • no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed;
>
> • no schedule for the board to consider on a regular basis, such as quarterly or biannually, any key food safety risks existed;
>
> • during a key period leading up to the deaths of three customers, management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board;
>
> • the board was given certain favorable information about food safety by management, but was not given important reports that presented a much different picture; and
>
> • the board meetings are devoid of any suggestion that there was any regular discussion of food safety issues.

*Id.* at 822. Subsequent courts have looked to these deficiencies as non-exhaustive factors to determine whether plaintiffs have met their pleading burden. *See, e.g.*, *Boeing*, 2021 WL 4059934, at *26; *In re Abbott Lab'ys Infant Formula S'holder Derivative Litig.*, No. 22-CV-05513, 2024 WL 3694533, at *13 (N.D. Ill. Aug. 7, 2024) ("As with *Boeing*, many of the *Marchand* factors are also applicable here . . . ."). To be clear, these deficiencies are factors and "not any sort of prescriptive

list" of all possible deficiencies. *Boeing*, 2021 WL 4059934, at \*26; *see Marchand*, 212 A.3d at 821 ("As with any other disinterested business judgment, directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources.").

### i. Plaintiffs Adequately Allege that Demand Directors Failed to Implement Reporting Systems and Controls as to the Mission Critical Issue of Fair Lending Compliance.

Plaintiffs allege that the Director Defendants failed to implement reporting systems or controls to detect, prevent and address issues with Wells Fargo's fair lending compliance, specifically: "(1) redlining in any form, including digital or algorithmic redlining" and "(2) pricing exceptions in any form." Compl. ¶ 367. Defendants do not dispute Plaintiffs' allegations that fair lending compliance is a mission critical risk. Opp'n at 1; Compl. ¶ 7. It is fair to say that fair lending compliance is a mission critical risk to bank like food safety compliance is to an ice cream company or like flight safety compliance is to an airline. *Marchand*, 212 A.3d at 824; *Boeing*, 2021 WL 4059934, at \*26. Because fair lending compliance is a mission critical risk to Wells Fargo, the Court may look to the *Marchand* factors as a non-exhaustive guide to determine whether Plaintiffs have met their pleading burden.

**The Board had no committee charged with direct responsibility to monitor fair lending compliance.** For the first deficiency, both *Marchand* and *Boeing* weighed the fact that no board committee existed to directly address the mission critical issues of food safety or flight safety, respectively. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at \*27.

Defendants argue that the Board's Audit and Risk Committees have responsibility over aspects of fair lending. Reply at 4. Plaintiffs allege in the Complaint that the Risk Committee is charged with overseeing and periodically reviewing "compliance risk and general condition of compliance risk management." Compl. ¶ 340. Similarly, Plaintiffs allege that the Audit Committee is responsible for "appropriate oversight of risk" including reviewing and discussing "the implementation of the Company's compliance risk management program." *Id.* ¶¶ 343-4. However, the "mere existence of an audit committee . . . does not provide universal protection against a Caremark claim." *Hughes v. Xiaoming Hu*, No. CV 2019-0112-JTL, 2020 WL 1987029, at \*14

1    (Del. Ch. Apr. 27, 2020). Plaintiffs have plausibly alleged that from August 2020 to April 2022,

2    neither the Risk Committee nor the Audit Committee ever discussed fair lending compliance.

3    Compl. ¶¶ 141-2.

4         Defendants argue that the Board's Corporate Responsibility Committee ("CRC") is also

5    responsible for aspects of fair lending compliance. Plaintiffs allege that the purpose of the CRC is

6    to "assist the Board of Directors in fulfilling its responsibilities to oversee the Company's significant

7    strategies, policies, and programs on social and public responsibility matters and the Company's

8    relationships and enterprise reputation with external stakeholders on those matters." *Id.* ¶ 346.

9    Nothing in the CRC charter indicates that the Board charged it with overseeing fair lending

10   compliance. *Id.* Nevertheless, Defendants point to CRC August 11, 2020 meeting minutes which

11   indicate that Eric Brooks, Wells Fargo's Head of Fair Lending, HMDA and CRA Compliance,

12   provided a "Fair Lending and CRA Update" to the Board. *Id.* at Ex. V. The update largely consists

13   of general fair lending risks faced by the banking industry and how management plans mitigate

14   those risks. *Id.* But, as part of the update, Brooks also "discussed fair lending [c]ompliance

15   monitoring activities, including the number of business reviews conducted over the last 12 months,

16   and said that those monitoring activities had not identified any systemic fair lending risk" and that

17   "control effectiveness ha[d] improved." *Id.* This portion of the meeting minutes are the only

18   discussion of Wells Fargo's fair lending compliance at any Board-level from August 2020 to April

19   2022.

20        Plaintiffs argue that this single discussion is similar to the occasional discussions of safety

21   by the Audit Committee in *Boeing*. In *Boeing*, the Audit Committee, charged with broad risk

22   oversight, addressed plane safety risk through "one-off instances like when it responded to FAA

23   questions about the Dreamliner battery incident, or when it referred to 'quality' or 'safety' in

24   passing." *Boeing*, 2021 WL 4059934, at *27. The Court found that "those occasional occurrences

25   fail to dislodge Plaintiffs' allegations that the Board did not specifically charge the Audit Committee

26   with monitoring airplane safety." *Id.*

27        Similarly, as evidence of the Board's oversight responsibilities, Defendants can only point

28   to a single management-led discussion on fair lending business reviews in a Board committee not

charged with the oversight of fair lending compliance. Further, the minutes do not indicate any discussion of the actual results of the fair lending business reviews—the minutes only indicates that the Board was informed that "no systemic fair lending risk" was identified and "control effectiveness ha[d] improved." Compl. at Ex. V. However, "minimal regulatory compliance and oversight do not equate to a *per se* indicator of a reasonable reporting system." *Boeing*, 2021 WL 4059934, at *28. The fact that management mentioned to a subset of the Board that there was "no systemic fair lending risk" once over the relevant period does not indicate that the Board implemented a reasonable reporting system.

Defendants also point to a presentation that the Risk Committee received on July 26, 2021, titled "Fair Lending Training." Mot. at Ex. 12. Defendants assert that this training provided the Board with "an overview of fair lending, the Board's related obligations, and key issues." *Id.* Defendants argue that this presentation is another example of reporting related to fair lending compliance that the Board received. Mot. at 11. However, general training about fair lending is not the same as receiving reports about the state of the Company's fair lending compliance.

Defendants next argue that the single management-led discussion on fair lending business reviews over the relevant period is sufficient to demonstrate that the Board had implemented a reasonable reporting system under *Hamrock*. Defendants assert that *Hamrock* stands for the proposition that *Caremark* prong one does not require "consistent reporting." *Id.* Defendants argue the following:

> In *Hamrock*, the plaintiff argued that a "'one-time discussion' during [] May 2017 meetings [wa]s simply too infrequent to meet the standard" set out under *Caremark* and its progeny. 2022 WL 2387653, at *16. The court disagreed and dismissed the plaintiff's prong-one claim. Even for a "mission-critical risk," the court held that "this argument diverge[d] too dramatically from the high 'utter failure standard.'" *Id.* at *15-16.

Mot. at 11. However, Defendants misrepresent *Hamrock*. In *Hamrock*, plaintiffs argued that one-time discussions at two separate May 17 meetings regarding the mission critical risk of pipeline safety were too infrequent to meet the standard of *Marchand*. *Hamrock*, 2022 WL 2387653, at *16. However, beyond the two discussions, "the Section 220 Documents [were] replete with other information suggesting that the Board and ES&S Committee monitored and reported on pipeline

safety compliance." *Id.* at *16-17. Thus, in *Hamrock*, the court's analysis did not hinge on a single discussion of the mission critical risk over the relevant period.

Defendants are not required to create a Board-level committee specifically devoted to fair lending compliance or redlining or pricing exceptions. *See Clem v. Skinner*, C.A. No. 2021-0240-LWW, 2024 WL 668523, at *8 (Del. Ch. Feb. 19, 2024) (board was not required to form "dedicated FCA compliance committee" because "how directors choose to craft a monitoring system in the context of their company and industry is a discretionary matter"). But Plaintiffs do not plead this. Rather, Plaintiffs adequately plead that, like in *Marchand* and *Boeing*, no board committee existed to directly address the mission critical issue of fair lending compliance.

**The Board did not monitor, discuss, or address fair lending compliance on a regular schedule.** For the next deficiency, the courts in *Marchand* and *Boeing* looked beyond Board committees to the boarder Board to determine whether it monitored, discussed, or addressed mission critical risks on a regular basis. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *27. Plaintiffs' Complaint alleges that "there was no routine monitoring of [fair lending, mortgage discrimination, or disparate impact] at all at the Board level." Compl. ¶ 142. Because the Complaint alleges that the Board never discussed fair lending, mortgage discrimination, or disparate impact over the relevant period, it follows that, like in *Boeing*, the "Board did not regularly allocate meeting time or devote discussion" to fair lending and "did not establish a schedule under which it would regularly assess" fair lending. *Id.*; *Boeing*, 2021 WL 4059934, at *27.

Plaintiffs allege that "internal board documents show that Director Defendants received infrequent and ad hoc updates . . . on fair lending risk at management's discretion." *Id.* And even the alleged ad hoc update (the CRC August 11, 2020 meeting minutes) was addressed to the CRC and not to the full Board. The full Board never discussed fair lending issues over the relevant period until the full Board meeting on April 25-25, 2022 to discuss an "update with respect to the Bloomberg article regarding the Company's 2020 lending approval rates." Compl. ¶ 147.

**The Board had no regular process or protocols that required management to keep the Board apprised for fair lending compliance practices, risks, or reports.** For the third deficiency the courts in *Marchand* and *Boeing* considered the fact that the board did not have a regular process

26

or protocol that required management to apprise the board about the mission critical issue. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *29. Further, *Marchand* and *Boeing* also considered the fact that board meetings were devoid of any suggestion that there was a regular discussion of the mission critical issue. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *29. In *Boeing*, the court held that for "mission-critical safety" areas, "discretionary management reports that mention safety as part of the Company's overall operations are insufficient to support the inference that the Board expected and received regular reports on product safety." *Boeing*, 2021 WL 4059934, at *29.

Plaintiffs allege that an April 25-26, 2022 "Enterprise Risk Report" "that was 'Prepared for [the] Wells Fargo Board of Directors'" stated under the bullet point 'Mortgage Fair Lending' that '[m]anagement will provide data to illustrate why the company's approval rates for Black and White mortgage refinance rates substantially differ in response to a recent [Bloomberg] article involving MHDA data[.]'" Compl. ¶ 143. Plaintiffs allege that from this report it may be inferred that the Board failed to take steps prior to the *Bloomberg* article to obtain and review relevant lending data. *Id.* This report indicates that the Board was learning for the first time why the "company's approval rates for Black and White mortgage refinance rates substantially differ." This failure was a result of the Board having no regular process or protocols that required management to report fair lending compliance issues.

Plaintiffs further allege that the fair lending update in the CRC August 11, 2020 meeting minutes was an ad hoc management report as evidenced by the fact that the next Board-level fair lending update was in April 2022. *Id.* Specifically, Plaintiffs allege that the Board "failed to have a mission-critical reporting structure in place to monitor the risk that the Company's automated underwriting system or algorithm resulted in disparate impact towards minorities or whether discriminatory pricing exceptions were continuing to occur." *Id.* ¶ 142. The facts alleged in the Complaint indicate that the Board was not notified of and did not discuss fair lending compliance until after *Bloomberg* report confirming differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit factors.

**During a key period, management received reports that contained what could be considered red, or at least yellow, flags, and the Board minutes of the relevant period revealed no evidence that these were disclosed to the Board.** Another deficiency considered by *Marchand* and *Boeing* was if management received reports of red or yellow flags but there was no evidence that these were disclosed to the Board. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *31. Plaintiffs argue that management failed to report red flags related to the *Bloomberg* article to the Board. The Complaint alleges that employees tasked with evaluating Bloomberg's analysis found that the Company's minority approval gap is a long-term, systemic issue for Wells Fargo. Compl. ¶ 132. Plaintiffs allege that on March 12, 2022, when asked about whether the gap in minority approval was due to COVID impact or forbearance impact, an employee responded "I don't believe this has anything to do with a COVID impact or forbearance impact. This is something we've been noticing and raising our hand on for awhile and no one seems to listen or we all continue to ignore." *Id.* ¶ 133. The employee continued, "I do not believe this is a recent anomaly. This is a long-term systemic issue at [Wells Fargo] . . . ." *Id.*; *see Id.* at Ex. O. Plaintiffs argue that this indicates that employees had been aware of these issues and had raised them to management, but they never made it to the Board.

Plaintiffs further allege that because the Board never discussed fair lending compliance over the relevant period, there is no evidence that these red or yellow flags were disclosed to the Board. In *Marchand* and *Boeing*, management had clearly received red flags regarding mission critical issues and failed to disclose them to the Board. *Marchand*, 212 A.3d at 822; *Boeing*, 2021 WL 4059934, at *31. Here, Plaintiffs allege that employees knew of red and yellow flags, these employees allegedly reported them to management, and management did not report them to the Board. Plaintiffs have adequately pleaded that red and yellow flags regarding fair lending issues were present, but they were not reported to the Board.

On the issue of scienter, the court in *Marchand* inferred scienter from the lack of any board committee focused on safety, any regular process or protocols requiring management to report on safety risks, any regular schedule for the board to address safety, any board minutes or documents suggesting that they regularly discussed safety, and any evidence that red, or at least yellow, flags,

28

were disclosed to the board. In the Section 220 production, Defendants produced hundreds of documents, totaling nearly 7,000 pages, dated between January 2020 and June 2023. From these hundreds of documents, Defendants point to a single management-led discussion on fair lending business reviews in a Board committee not charged with the oversight of fair lending compliance as evidence of the Board's oversight. This Court declines to reduce *Caremark* prong one claim to claim that may be neutralized by such a minute showing. Plaintiffs' well-pleaded Complaint supports an inference of scienter.

As the court in *Marchand* recognized, many commenters bemoan that *Caremark* does not require enough from boards. *See Marchand*, 212 A.3d at 823. However, "it does require that a board make a good faith effort to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks." *Id.* Plaintiffs have sufficiently alleged that the Director Defendants face a substantial likelihood of liability on the *Caremark* prong one claim as to fair lending and that demand on the Board would have been futile and is therefore excused.

### ii.    Plaintiffs Fail to Allege that Demand Directors Did Not Implement Reporting Systems and Controls as to Discriminatory Hiring.

Plaintiffs allege that the Director Defendants failed to implement reporting systems or controls to detect, prevent and address issues with Wells Fargo's diversity hiring, specifically: "(3) discriminatory hiring practices." Compl. ¶ 367. Plaintiffs allege that the Diverse Search Requirement was a mission critical issue for Wells Fargo. *Id.* ¶ 7. On March 16, 2020, Wells Fargo implemented a "Diverse Search Requirement." *Id.* ¶ 8. This requirement mandated that "(a) at least half of the candidates interviewed for open jobs with a salary over $100,000 be diverse . . . and (b) an interviewer on the hiring panel represent at least one diversity dimension." *Id.*

Defendants argue that diversity hiring pursuant to the Diverse Search Requirement—while undisputably important—is not a mission critical issue for Wells Fargo because it is not the "most central . . . safety and legal compliance issue facing the company." Mot. at 17-18; Reply at 10 (citing *Teamsters*, 2020 WL 5028065, at *18). Plaintiffs argue that numerous federal and state laws make hiring discrimination illegal, and Wells Fargo has already had to settle lawsuits related to discriminatory hiring practices. Further, Plaintiffs argue that in an April 27, 2021, Diverse Segments

1    presentation to the Board, management explicitly characterized the Diverse Search Requirement as
2    one of Wells Fargo's "critical initiatives." Compl. ¶ 208.

3         Defendants contend that compliance with the Diverse Search Requirement to a bank is not
4    what non-toxic food is to an ice cream manufacturer or safe planes are to a plane manufacturer.
5    *Marchand*, 212 A.3d at 824; *Boeing*, 2021 WL 4059934, at *26. In *Marchand*, the court recognized
6    that "one of the most central issues at the [ice cream] company was] whether . . . the only product it
7    makes . . . is safe to eat." *Marchand*, 212 A.3d at 822. The issue was "intrinsically critical to the
8    company's business operation." *Id.* Similarly, in *Boeing*, the court recognized that "airplane safety
9    was essential and mission critical to Boeing's business, and externally regulated." *Boeing*, 2021 WL
10   4059934, at *26 (internal quotations omitted). The Court finds that, while diversity hiring is
11   undisputably crucial to a company like Wells Fargo, it is not precedentially mission critical to its
12   operations like fair lending compliance.[1]

13        Defendants point to three documents that show regular reporting to the Board regarding
14   diversity hiring:

15             During the October 26-27, 2020 Board meeting, then Chair Charles
               Noski "commented on the importance of the Company's diversity &
16             inclusion . . . efforts, and he noted the Board's request to include D&I
               updates on the regular Board meeting agenda." Compl. at Ex. HH.

17             During the April 27, 2021 Board meeting, Mr. Santos provided a
               periodic "Diverse Segments, Representation and Inclusion: Status
18             Update," which included metrics tracking "leader headcount and
               movement trends" for Asian, female, Black/African American, and
19             Hispanic/Latino employees covered by the Guidelines. Compl. at Ex.
               KK.
20
               During the December 13, 2021 meeting of the Governance and
21             Nominating Committee, "committee members discussed the
               Company's diversity programs, and how the Company intended to
22             report on the progress of those programs." Compl. ¶ 181.

23   Further, Defendants argue that the only allegation of a possible fake interview—an email sent to
24   boardcommunications@wellsfargo.com by Phillip Miller—was reported the Board on December
25

26   ──────────────
27   [1] The Court notes that alleging a linkage between diversity hiring to the mission critical issue of
     fair lending compliance—such as a management finding that a diverse workforce leads to a
28   decline in fair lending risk—would have presented a compelling argument for finding diversity
     hiring to be mission critical activity. However, given the dearth of caselaw on this issue, the Court
     acknowledges that this argument is not supported by any current precedent.

United States District Court
Northern District of California

13, 2021. Compl. ¶ 177-179. On February 18, 2021, Miller, an external job applicant, sent an email to the Board communications email listed on the Wells Fargo corporate website. *Id.* at 177. In this email, Miller complained that he experienced racist and offensive behavior directed toward him during an interview for a position at Wells Fargo. *Id.* He questioned Wells Fargo's commitment to hiring Black candidates or whether "his race and ethnicity were being used to reach the newly established goal to consider diverse candidates" and not an actual "commitment to hire qualified black candidates." *Id.* Defendants contend that after a ten-month investigation into this serious allegation, management reported it to the Board. Reply at 9. Defendants argue that these documents and reporting demonstrate that the Board made a good faith effort to implement an oversight system over diversity hiring.

Plaintiffs argues that "[t]he Board's generic discussions related to diversity initiatives do not satisfy the Board's oversight obligations with respect to the Diverse Search Requirement". Opp'n at 27. Plaintiffs also argue that the fact that Miller's Email was not reported to the Board for 10 months demonstrates that the Board did not act in good faith. *Id.*

Further, Plaintiffs argue that the full Board never received reporting on an email sent by Joseph Bruno. *Id.* On September 7, 2021, Bruno, a former Wells Fargo executive, sent an email to over 250 Wells Fargo employees including Defendants Scharf, Powell, and Santos "raising concerns regarding Wells Fargo's practice of conducting sham interviews to comply with the Company's diverse hiring initiative." Compl. ¶ 14. Plaintiffs argues that management's failure to report this red flag to the Board demonstrates the lack of monitoring system. Defendants argue that Bruno's Email was not one that would expect to warrant Board attention. Bruno's Email only devoted two sentences to purported fake interviews out of more than 20 paragraphs and largely focused on personal issues that Bruno had with his supervisor.

Plaintiffs' arguments fail to demonstrate how Defendants "utterly failed" to implement an oversight system. As an initial matter, the Court agrees with Plaintiffs that general discussions related to diversity initiatives are not "sufficiently connected" to the corporate trauma of discriminatory hiring practices. *Hamrock*, 2022 WL 2387653, at *20. For example, Chair Charles Noski comments on the importance of diversity and inclusion do not evidence the existence of a

reporting system as to discriminatory hiring practices. Compl. at Ex. HH. However, excluding these general comments, the Board and its committees received updates on the Company's diversity hiring practices. The Complaint itself alleges that:

> Wells Fargo's Board and the HRC received regular reporting on the Company's DEI initiatives, including updates on the Company's progress and accomplishments across its DEI commitments and information related to *talent acquisition* and development and diversity reporting. Beginning in the fall of 2020, the full Board received DEI updates at each regularly scheduled Board meeting, including regarding the Company's progress on its DEI commitments.

*Id.* ¶ 413 (emphasis added). Further, while management did not report Miller's Email for 10 months, it was eventually reported to the Board. "A subpar reporting system is not equivalent to an 'utter failure to attempt to assure' that a reporting system exists." *Constr. Indus. Laborers Pension Fund v. Bingle*, C.A. No. 2021-0940-SG, 2022 WL 4102492, at *14 (Del. Ch. Sept. 6, 2022). The Court finds that the Board did not utterly fail to implement any reporting or information system or controls as to diversity hiring. Plaintiffs have not sufficiently alleged that the Director Defendants face a substantial likelihood of liability on the *Caremark* prong one as to discriminatory hiring practices. Demand on the Board would not have been futile.

### c.   *Caremark* Prong Two

*Caremark* prong two claim requires that plaintiffs allege "that the board's information systems generated red flags and that the directors failed to respond." *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 360 (Del. Ch. 2023). In other words, plaintiffs must plead facts that allege that directors "knew that internal controls were inadequate" and "chose to do nothing." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007). "For a red-flag theory to work, the red flag must be sufficiently connected to the corporate trauma at issue to elevate the board's inaction in the face of the red flag to the level of bad faith." *Hamrock*, 2022 WL 2387653, at *20. Thus, "the relationship between the red flag and the corporate trauma cannot be too attenuated." *Id.*

Plaintiffs allege that when illegal practices related to (1) redlining, (2) pricing exceptions, and (3) discriminatory hiring practices "trickled up to the Board, Defendants breached their fiduciary duties by ignoring the red flags." Compl. ¶ 367.

Because Plaintiffs sufficiently allege a *Caremark* prong one claim as to fair lending, the Court need not decide whether the Director Defendants face a substantial likelihood of liability under *Caremark* prong two. *See Teamsters*, 2020 WL 5028065, at *26; *Boeing*, 2021 WL 4059934, at *34; *Abbott*, 2024 WL 3694533, at *20. However, because Plaintiffs did not sufficiently allege *Caremark* prong one claim as to discriminatory hiring, the Court will next address whether Plaintiffs have sufficiently alleged *Caremark* prong two claim as to discriminatory hiring.

### i.   Plaintiffs Fail to Allege that Demand Directors Did Not Act on Red Flags Connected Discriminatory Hiring.

In the Complaint, Plaintiffs allege six red flags connected to discriminatory hiring practices that Director Defendants consciously failed to act on. These red flags include (1) *The New York Times* articles from May 19, 2022, and June 9, 2022, Compl. ¶ 388; (2) the GNC report detailing Miller's Email, *Id.*; (3) the HRC report detailing increase in harassment, discrimination, and retaliation allegations, *Id.* ¶ 400; (4) the HRC presentation noting that "[d]iversity and inclusion opportunities create emerging risks", *Id.* ¶ 401; (5) the Risk Committee report indicating that the substantiated reports of harassment, discrimination, and retaliation was beyond the company-set upper bound, *Id.* ¶ 406; and (6) the Risk Committee report noting that the Company's social conversation risk advisory was critical, *Id.* ¶ 407. The Court will address these alleged red flags in turn.

The Complaint alleges that the Director Defendants failed to act when *The New York Times* articles from May 19, 2022, and June 9, 2022, were waved in their faces. On May 19, 2022, *The New York Times* published an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interview." *Id.* ¶ 182. The article reported on Bruno's Email to 250 Wells Fargo employees regarding, among other things, Wells Fargo's practice of conducting sham interviews. *Id.* The article stated that Bruno "was one of seven current and former Wells Fargo employees who asserted they were instructed in the bank's wealth management unit to interview diverse candidates for jobs that no longer existed." *Id.* ¶ 183. Additionally, "[f]ive others said they were aware of the practice or helped to arrange it." *Id.* In response, Wells Fargo issued a statement stating that expected all employees to follow its hiring policies and guidelines and that "to the extent that individual

33

employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it." *Id.* ¶ 184.

On June 9, 2022, *The New York Times* published an article titled "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices." *Id.* ¶ 190. The article noted that that Federal prosecutors in New York opened a criminal investigation into whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates. *Id.* Notably, the article disclosed that "it had spoken with ten additional current and former Wells Fargo employees who confirmed that 'fake' interviews were prevalent throughout the Company, and also occurred in many of the Company's other business lines, including the mortgage servicing, home lending, and retail banking businesses." *Id.* ¶ 271, 388.

Defendants do not dispute whether *The New York Times* articles were red flags connected to discriminatory hiring practices. Rather, Defendants argue that the Board did not fail to act in response to these articles, pointing to several actions taken. Mot. at 18-19. First, on June 9, 2022, the same day the second *New York Times* article was published, Wells Fargo issued a press release confirming that "[e]arlier this week, the company temporarily paused the use of its [Diverse Search Requirement]," and that "[d]uring this pause, the company is conducting a review so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented—and so we can have confidence that our guidelines live up to their promise." Compl. ¶ 191. Defendants contend that this "pause" was implemented on June 6, 2022. Mot. at 19. Defendants argue that this demonstrates a policy change enacted in response to the articles.

After implementing the pause, on the June 27, 2022, Director Defendants met with management to discuss "learnings from the review of the Company's diversity hiring practices" and "opportunities to improve [its] recruiting process." Compl. at Ex. BB. Defendants also contend that the HRC met on July 25, 2022 to review management's corrective measures taken in response to the articles. Mot. at 19, Ex. 11. The HRC presentation, judicially noticed by the Court, details a 30-to-60-day plan to improve the diverse slate and process and candidate experience. Mot. at Ex. 11. The presentation also highlights mid-to-long-term plan to address an internal movement pilot, the stand-up manager advisory function, and investments in employees' careers. *Id.*

Plaintiffs argue that the Board's meeting on June 27, 2022 concluded in the determination that Wells Fargo lacked a systematic problem with its hiring practices. Opp'n at 25. As for the HRC presentation, Plaintiffs argue that the document post-dates both articles, the ensuing publicity and scandal, and stock price declines. *Id.* at 26 n.12. Finally, Plaintiffs argue that the Board and the HRC have not taken any steps to exercise the Company's rights under its broad clawback policy, which could reclaim executive compensation tied to failures in the Diverse Search Requirement program. *Id.* at 26.

While *The New York Times* articles are red flags connected to the corporate trauma of discriminatory hiring practices, Plaintiffs have failed to allege that the Board did nothing in response to these red flags. The HRC presentation indicates that the Board monitored a litany of corrective measures management had implemented or planned to implement in response to the articles. The HRC presentation had to post-date both articles, otherwise it would not be a response to the articles. Further, the pause in the Diverse Search Requirement announced on June 9, 2022, and the Board meeting on June 27, 2022 indicate that the Board did take actions in response to the articles. The Court finds that the Board did not fail to respond to *The New York Times* articles from May 19, 2022, and June 9, 2022.

The Complaint next alleges that on December 13, 2021, the GNC, which includes Director Defendants Clark, Craver, Hewett, and Sargent, learned about Miller's Email, and failed to respond to it. Compl. ¶ 388. The GNC received a presentation which detailed, among other things, non-ordinary communications including Miller's Email. *Id.* at Ex. ZZ. The presentation continues, "Employment Investigations found that allegations of discrimination related to race . . . were unsubstantiated". *Id.*

Defendants argue that the Board did not act in response to learning of Miller's Email because management had determined that Miller's allegations were "unsubstantiated." Mot. at 18. Thus, the Board was informed of Miller's Email and the results of the management's investigation into the email. *Id.* Relying on the results of management's investigation, the Board did not take further action into the matter. *Id.* Plaintiffs contend that the fact that management's investigation found Miller's allegations to be unsubstantiated does not absolve the Board of action. Opp'n at 25. The Board was

put on notice that their direct employee reporting mechanism did not result in timely reports. *Id.* Thus, the Board should have taken action to rectify this reporting mechanism. *Id.*

The Court finds that the Board was not on notice to act in response to management's reporting of Miller's Email. *Caremark* "gives boards a wide berth to exercise [] discretion with respect to business risk" and to "'design context- and industry-specific approaches tailored to their companies' businesses and resources.'" *Hamrock*, 2022 WL 2387653, at *12. Further, Plaintiff's argument that the Board did not receive a timely report and should have acted in response is too attenuated from the corporate trauma of discriminatory hiring. The Court finds that the Board did not fail to respond to Miller's Email.

The Complaint next alleges the two red flags were waved in front of the HRC, which includes Director Defendants Black, Hewett, Morris, and Sargent, but the HRC failed to respond. On October 8, 2020, the HRC received a report entitled, "Wells Fargo Human Resources Risk and Regulatory Update: Culture-Monitoring Company Culture Report (MCCR)." Compl. ¶ 400. The report found that harassment, discrimination, and retaliation allegations were rising, and fewer Wells Fargo employees believe Wells Fargo championed diversity and inclusion in the workplace. *Id*. Subsequently, on June 29, 2021, the HRC received a presentation noting that "[d]iversity and inclusion opportunities create emerging risks" and that "YTD-2021 Insufficient Diversity in the Workforce has accounted for $330K or 89% of Internal Losses; losses primarily attributed for settlements for alleged discrimination." *Id*. ¶ 401.

The Complaint also alleges that two red flags were waved in front of the Risk Committee, which includes Director Defendants Chancy, Hewett, Morris, Payne, Norwood, and Vautrinot, but the Risk Committee failed to respond. On August 13, 2020, the Risk Committee received a report that the number of substantiated reports of harassment, discrimination, and retaliation in Q2 2020 was 201, well above the "upper bound" that Wells Fargo had set of 116. *Id.* ¶ 406. The report noted that the "backlog of allegations is resulting in elevated levels of confirmed allegations." *Id.* Subsequently, on October 26, 2020, the Risk Committee received a report titled "IRM Update (incl. Notable Risk Updates and Emerging Risks," noted that the Company's social conversation risk advisory was "Critical," which was the "Highest Level." *Id.* ¶ 407.

1    While the Complaint alleges these four reports and presentations are red flags waved in front

2    of Board committee, neither party dedicates briefing or oral argument on these purported red flags.

3    The Court finds that these reports and presentations—which address meaningful issues related to

4    fairness, access, and justice—are too attenuated from the corporate trauma of discriminatory hiring

5    practices. *Hamrock*, 2022 WL 2387653, at *20. The Court does not find that these reports and

6    presentations would have put the Board on notice to act and address its discriminatory hiring

7    practices. Plaintiffs have not sufficiently alleged that the Director Defendants face a substantial

8    likelihood of liability on the *Caremark* prong two as to discriminatory hiring practices. Demand on

9    the Board would not have been futile.

10    **2.    Substantial Likelihood of Personal Liability for Approving the Issuance of False**

11    **and Misleading Statements**

12    Plaintiffs allege that each Director Defendant approved one or more false and misleading

13    statements despite possessing actual knowledge of the undisclosed material facts. Compl. ¶ 410-

14    411. Plaintiffs allege (2) violation of Section 14(a) of the Exchange Act based on negligence against

15    Director Defendants, (3) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against

16    Wells Fargo, Director Defendants, and Officer Defendants, (4) violation of Section 20(a) of the

17    Exchange Act against Director Defendants and Officer Defendants, and (5) violation of Section 20A

18    of the Exchange Act against Officer Defendant Santos. For the reasons stated below, the Court

19    **DENIES-IN-PART** motion to dismiss for the Section 10(b), Rule 10b-5, and Section 20(a) claims

20    as to discriminatory hiring practices. The Court **GRANTS-IN-PART** with prejudice motion to

21    dismiss for Section 14(a) claim as to all discriminatory practices and Section 10(b), Rule 10b-5, and

22    Section 20(a) claims as to discriminatory lending practices.

23    **a.    Plaintiffs Fail to Allege Substantial Likelihood of Personal Liability as to the**

24    **Section 14(a) Claim.**

25    The Court finds that the Director Defendants cannot face a substantial likelihood of liability

26    under Section 14(a) because Plaintiffs' Section 14(a) claims are based solely on negligence, and

27    Wells Fargo's charter exculpates the Company's directors from negligence-based claims. Compl. ¶

28    433; Mot. at Ex. 8; *see also In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 20-cv-08750-

1  MMC, 2022 WL 345066, at *5 (N.D. Cal. Feb. 4, 2022) (finding that plaintiffs failed to show that

2  Wells Fargo directors would face a substantial likelihood of liability for violating section 14(a)

3  based on negligence when the Wells Fargo charter exempted directors from liability for negligent

4  conduct).

5     **b.  Plaintiffs Adequately Allege Substantial Likelihood of Personal Liability as to**

6            **Violations of Section 10(b) and Rule 10b-5.**

7            Plaintiffs allege that the Director Defendants face a substantial likelihood of liability under

8  Section 10(b) and Rule 10b-5 for allegedly making false or misleading statements. Compl. ¶¶ 439-

9  446. To assert a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material

10  misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between

11  the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer Cap. Mgmt.,*

12  *L.P. V. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023) (citing *In re Nvidia Corp. Sec. Litig.*,

13  768 F.3d 1046, 1052 (9th Cir. 2014)). Defendants argue that Plaintiffs insufficiently plead material

14  misrepresentation or omission and scienter.

15            In oral argument, the parties disputed whether *SEB Investment Management AB, et al. v*

16  *Wells Fargo & Company, et al.* should control or at least guide the Court's analysis as to the Section

17  10(b) and Rule 10b-5 claims. On July 29, 2024, in *SEB*, this Court denied defendants' motion to

18  dismiss class action complaint filed against Wells Fargo and Officer Defendants Scharf, Santos, and

19  Sanchez for violations of Section 10(b), Rule 10b-5, and Section 20(a). *SEB*, 2024 WL 3579322. In

20  *SEB*, plaintiffs alleged that defendants made 11 false or misleading statements regarding the Diverse

21  Search Requirement. *Id.* at *4.

22            This Complaint alleges the same 11 false or misleading statements alleged in *SEB* and

23  includes three additional false or misleading statements. Compl. ¶¶ 209-264. However, unlike in

24  *SEB*, here, the posture of the Court's analysis is under the standard of demand futility. The Court

25  must determine "on a director-by-director basis," whether a majority of the board "faces a

26  substantial likelihood of liability" for approving the issuance of the alleged 14 false and misleading

27  statements. *Zuckerberg*, 262 A.3d at 1059. Thus, in *SEB*, the Court determined plaintiffs sufficiently

28  pleaded that Officer Defendants Scharf, Santos, and Sanchez made material misrepresentations with

United States District Court
Northern District of California

scienter. *SEB*, 2024 WL 3579322, at *8. Here, the Court will determine whether Plaintiffs sufficiently pleaded that Director Defendants approved the issuance of material misrepresentations with scienter. Further, the Court will address whether Director Defendants had ultimate authority for these statements.

### i.   Plaintiffs Adequately Allege Material Misrepresentations or Omissions.

The first element of a claim under Section 10(b) and Rule 10b-5 requires a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). "A statement is false or misleading if it 'directly contradict[s] what the defendant knew at that time' or 'omits material information.'" *Glazer Cap. Mgmt.*, 63 F.4th at 764 (citing *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 1008–9 (9th Cir. 2018)). Even if a statement is technically "not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–9. When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–6 (9th Cir. 2016) (quotation marks and citation omitted). Courts evaluate whether a statement is misleading from the perspective of a "reasonable investor." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021). To sufficiently plead material misrepresentation, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

As an initial matter, under Rule 10b-5, Plaintiffs must demonstrate that Defendants "ma[de] an untrue statement of material fact or fail[ed] to disclose a material fact . . . necessary to prevent an investor from being misled under the circumstances of which the statements were made." 17 C.F.R. § 240.10b-5(b). Like in *SEB*, Plaintiffs allege that Defendants' statements regarding the Diverse Search Requirement were misleading based on widespread sham interview. Plaintiffs additionally allege that Defendants' statement regarding lending practices were misleading based on discriminatory underwriting algorithms and pricing exceptions. In support of their contention,

United States District Court
Northern District of California

Plaintiffs cite to numerous sources including their own independent investigation in which former Wells Fargo employees made claims that discrimination was systemic at Wells Fargo. Compl. ¶ 217. The Court finds that Plaintiffs have pleaded particularized facts showing that the sham interviews were widespread, and that underwriting algorithms and pricing exceptions led to discriminatory lending outcomes.

The Complaint identifies 14 statements that are allegedly false or misleading. Compl. ¶¶ 209-264. The Court in *SEB* has already ruled that 11 of these 14 statements are material misrepresentations. *SEB*, 2024 WL 3579322, at *13. *SEB* held the following statements to be material misrepresentations—as ordered in the present Complaint: (2) February 23, 2021 – 2020 Annual Report; (3) March 16, 2021 – 2021 Proxy; (4) April 26, 2021 – 2020 Social Impact and Sustainability Highlights; (5) May 26, 2021 – Defendant Scharf's Testimony to the United States Senate Committee on Banking, Housing, and Urban Affairs; (6) July 15, 2021 – 2021 ESG Report; (7) October 7, 2021 – Defendant Sanchez's Virtual Interview with the Institute for Corporate Productivity; (8) March 14, 2022 – 2022 Proxy; (9) February 15, 2022 – Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response; (11) May 27, 2022 – Defendant Santos's Statements to *Business Insider*; (12) June 1, 2022 – 2022 DE&I Report; and (13) June 3, 2022 – Defendant Santo's Further Statements to *Business Insider*. Compl. ¶¶ 219-251, 254-261. Accordingly, the Court finds that Plaintiffs have adequately pleaded material misrepresentations for these 11 statements. *See SEB*, 2024 WL 3579322, at *13 ("Plaintiffs provided sufficient reasoning for why each statement was misleading and sufficiently particularized facts in support of these reasons.").

The Complaint contains three additional statements not addressed in *SEB* that are allegedly false or misleading: (1) March 16, 2020 – 2020 Proxy; (10) March 18, 2022 – Wells Fargo's Statements to *WCNC Charlotte*; and (14) March 15, 2023 – 2023 Proxy. Compl. ¶¶ 211-219, 252-253, 262-264. Like the statements in *SEB*, the Court finds that these statements also contain material misrepresentations when viewed in the greater context in which the statements were made. In the 2020 Proxy, Defendants emphasized that they had "a strong record of recruiting, promoting, and rewarding gender and racially/ethnically diverse employees." *Id.* ¶ 217.  They had "a strong record

United States District Court
Northern District of California

of recruiting . . . diverse employees at all levels of [the] Company, which reflects [their] commitment to increasing diversity in leadership roles." *Id.* Defendants also stated that "[their] hiring process is fair and equitable." *Id.* In the 2023 Proxy, Defendants state that they set the appropriate "tone from the top" or provide "robust Board oversight" and are "guided by 'doing what is right.'" *Id.* ¶ 263. Taking Plaintiffs' allegations of widespread sham interviews to be true, Defendants misleadingly state their record and process of providing robust oversight and hiring diverse employees.

Statements in (10) March 18, 2022 – Wells Fargo's Statements to *WCNC Charlotte* pertain specifically to Wells Fargo's alleged discriminatory lending practices. In Wells Fargo's Statements to *WCNC Charlotte*, Defendants claim that "underwriting practices are consistently applied regardless of the customer's race or ethnicity" and are the results of "legitimate, credit-related factors." *Id.* ¶ 253. However, Plaintiffs allege that Wells Fargo's automated underwriting system was systematically discriminating against Black and Hispanic credit applicants. *Id.* Further, at the time, Wells Fargo was failing to offer minority borrowers the same interest rate discounts—in the form of "pricing exceptions"—as White borrowers. *Id.*

Additionally, in (11) May 27, 2022 – Defendant Santos's Statements to *Business Insider*, *SEB* concerned Defendant Santo's statements specific to the diverse hiring practices. *SEB*, 2024 WL 3579322, at *10. In the present Complaint, Plaintiffs also allege that in this same *Business Insider* article, Defendant Santos made material misrepresentations as to discriminatory lending practices. *Id.* ¶ 256. Defendant Santos's statements to *Business Insider* vehemently denied *Bloomberg*'s allegations of mortgage discrimination and claimed that "[w]e don't have proprietary credit-underwriting models" and instead merely "follow the guidelines of the GSEs." *Id.* Taking Plaintiffs' allegations of discriminatory underwriting algorithms and pricing exceptions to be true, Defendants misleadingly described their lending practices. Plaintiffs have adequately alleged material misrepresentations or omissions.

### ii.    Plaintiffs Adequately Allege Scienter.

"To establish liability under [Section] 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–194,

United States District Court
Northern District of California

and n. 12 (1976)). Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness[.]'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citations omitted). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation and internal quotation marks omitted).

In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. In performing this inquiry, courts should determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Again, under the standard of demand futility, the Court must determine "on a director-by-director basis," whether a majority of the board acted with scienter. *Zuckerberg*, 262 A.3d at 1059.

The Complaint details five categories of facts to allege scienter: (1) Defendants were repeatedly informed about the sham interviews, Compl. ¶ 267; (2) Defendants had unfettered access to information concerning Wells Fargo's DEI initiatives and stated that "fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives", *Id.* ¶ 268; (3) Defendants repeatedly touted the diversity programs and tracking, *Id.* ¶ 269; (4) given Wells Fargo's history of discriminatory conduct against diverse individuals, CEO Scharf admitted to personally overseeing the diversity hiring efforts, *Id.* ¶ 270; and (5) the temporal proximity of Defendants' statements with the pause of the Diverse Search Requirement, *Id.* ¶ 271.

The Court will first address allegations of scienter as to discriminatory lending practices. The Complaint alleges that on March 11, 2022, Bloomberg published its analysis revealing, among other things, that Wells Fargo had the largest racial disparity in approval rates of any major U.S. bank and rejected more Black homeowners' applications than it accepted. *Id.* On March 24, 2022, Wells Fargo's "Fair Lending Analyses" of its ECS Model 11960 found "practically significant

disparities for 4 protected classes" during 2020 and 2021. *Id.* ¶¶ 123-29. The Corporate Model Risk and FLMD team "identified disparate impact for various protected classes in relationship to ECS Model 11960." *Id.* ¶ 123. Despite these findings, on May 27, 2022, Defendant Santos gave an interview with *Business Insider* during which he denied and refuted the *Bloomberg* report, stating that he "vehemently disagree[d]" with *Bloomberg*'s allegations regarding Wells Fargo's lending practices. *Id.* He further stated that "[w]e don't have proprietary credit-underwriting model . . . [and] [w]e follow the guidelines of the GSEs." *Id.* Plaintiffs allege that the temporal proximity of management's findings and Defendant Santos's statements to *Business Insider* support a strong inference of scienter. *Id.* ¶ 271. However, Plaintiffs do not allege that Defendant Santos ever saw management's report. Further, the Complaint contains not allegations of scienter as to Wells Fargo's Statements to *WCNC Charlotte*. Accordingly, the Court finds that Plaintiffs have not sufficiently alleged scienter as to statements regarding discriminatory lending practices.

The Court next turns to allegations of scienter as to discriminatory hiring practices. The Complaint must allege that a majority of the Board knew or must have known that the statements regarding diversity hiring initiatives presented a danger of misleading the public in light of the widespread sham interviews. *Schueneman*, 840 F.3d at 705. In *SEB*, the court found that Defendants Scharf, Santos, and Sanchez acted with scienter. *SEB*, 2024 WL 3579322, at *20. Defendant Scharf as part of the Board directly received Miller's Email. *Id.* at 18. Defendants Scharf and Santos directly received Bruno's Email. *Id.* And Defendant Sanchez would have been aware of both communications given her role in supervising diversity initiatives. *Id.* The Court also found circumstantial evidence of scienter: (a) defendants "had access to and used reports documenting" trends in that topic, (b) the Board and senior management "regularly reviewed, monitored, and discussed diversity initiatives", (c) diversity initiatives at Wells Fargo receive significant amount of internal and external attention, and (d) an employee retired allegedly in response to Bruno's Email. *Id.* *19-20.

Here, Plaintiffs allege that on September 7, 2021, Director Defendant Scharf, among 250 other Wells Fargo employees, received Bruno's Email which mentioned the practice of holding sham interviews. Compl. ¶ 14. On February 18, 2021, the Board received an email from Miller

alleging that "he was interviewed only as a means for the hiring executives to appear as if they are pursing diverse candidates." *Id.* ¶ 179. On December 13, 2021, the GNC, comprised of Director Defendants Clark, Craver, Hewett, and Sargent, were informed of the investigation into Miller's alleged sham interview. *Id.* at Ex. Z. From these communications, Plaintiffs have alleged that Director Defendants were informed of the issue of sham interviews. In *SEB*, the Court found that the fact that the Miller's communications were delivered to the Board's email address suggested that the Board was aware of these issues. *SEB*, 2024 WL 3579322, at *18.

Beyond this alleged direct notice of sham interviews, Plaintiffs also allege circumstantial evidence. Plaintiffs allege that Defendants must have known about the widespread sham interviews by virtue of access to a "trove of information," repeated public statements about the Diverse Search Requirement, and historical discriminatory "misconduct." Compl. ¶¶ 268-270. In March 2020, Scharf testified that he held monthly business reviews which included review of "the diversity component". *Id.* ¶ 268. The March 2021 Proxy stated that "[t]he Board and its Human Resources Committee are fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital management to support management in its efforts to drive meaningful change." *Id.* Defendants frequently spoke about the Diverse Search Requirement, recruiting diverse individuals at all levels of the Company, and Wells Fargo's intense focus on tracking and evaluating data concerning its DE&I initiatives. *Id.* ¶ 269. Further, Wells Fargo faced internal and external pressures to address discriminatory misconduct. *See, e.g.*, *id.* ¶¶ 185 ("In May 2017, an Illinois federal judge approved a $35.5 million settlement between Wells Fargo Advisors LLC and a class of the Company's African-American Employees, ending the class's claims of discriminatory treatment with changes to programs they said encouraged racial disparities."), 225 (The 2021 Proxy "contained a 'Shareholder Proposal' that the Board 'Conduct a Racial Equity Audit.'").

Plaintiffs also allege scienter due to temporal proximity with Defendant Santos statements. On May 27, 2022, Defendant Santos gave an interview with *Business Insider* during which he denied and refuted *The New York Times* report by stating that "We researched all the specific hiring-practice allegations [*The New York Times*] reporter shared prior to the story's publication[,] and we could not corroborate these allegations as factual." Compl. ¶ 271. However, on June 9, 2022, *The New*

44

*York Times* published another article disclosing that it had spoken with ten additional current and former Wells Fargo employees who confirmed that sham interviews were prevalent throughout the Company. *Id.*

Defendants contend that Plaintiffs can only point to Miller's Email as evidence that a majority of the Board knew of widespread sham interviews. Mot. at 24. Further, Plaintiff's assertions that a majority of the Board must have known of widespread sham interviews due to "trove of information," repeated public statements about the Diverse Search Requirement, unrelated "misconduct," and Wells Fargo's decision to pause the Diverse Search Requirement following the publication of *The New York Times* article do not support an inference that a majority of the Board knowingly lied or acted with deliberate recklessness. *Id.*

"Ultimately, *Tellabs* requires courts to assess allegations of scienter holistically." *Leventhal v. Chegg, Inc.*, No. 21-CV-09953-PCP, 2024 WL 924484, at *3 (N.D. Cal. Mar. 4, 2024) (citing *Tellabs*, 551 U.S. at 319). In *SEB*, viewing the allegations holistically, the Court found strong inference of scienter as to Officer Defendants Scharf, Santos, and Sanchez. *SEB*, 2024 WL 3579322, at *20. Similarly, here, the Court finds that viewing the allegations holistically, Plaintiffs have alleged sufficient facts to support a strong inference of scienter as to a majority of the Board. The Board learned of a possible sham interview from Miller's Email as early as February 18, 2021. The Board and HRC received regular reporting on Wells Fargo's DEI initiatives including information related to talent acquisition. The Board frequently touted its Diverse Search Requirement and DEI progress in public statements. Further, the Board faced internal and external pressure regarding prior discriminatory misconduct. Taken together, the Court finds that Plaintiffs have alleged a strong inference of scienter as to discriminatory hiring practices. Accordingly, the Court finds that Director Defendants face a substantial likelihood of personal liability for violations of Section 10(b) and Rule 10b-5. Demand is excused as futile for discriminatory hiring practices, but it is not excused as futile to discriminatory lending practices.

### c. Plaintiffs Adequately Allege Substantial Likelihood of Personal Liability as to Violations of Section 20(a).

"In order to prove a prima facie case under [Section] 20(a), plaintiff must prove: (1) a primary violation of federal securities laws . . . .; and (2) that the defendant exercised actual power or control over the primary violator . . . ." *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* There is no binding authority establishing whether a plaintiff must meet the Rule 9(b) pleading standard for alleging "actual power or control," and there is a split of authority among district courts in the Ninth Circuit on this issue. *Compare Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012), *with In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 66281, at *19 (N.D. Cal. Jan. 4, 2017). This Court finds that the heightened pleading standard does not apply to allegations of control or power.

As addressed above, Plaintiffs have sufficiently pleaded a primary violation of federal securities law under Section 10(b) for discriminatory hiring practices against Director Defendants. Director Defendants do not challenge the "actual power or control" element of a Section 20(a) violation. The Complaint alleges that "[b]y reason of their positions…directors of Wells Fargo . . . were able to and did control, directly and indirectly, the content of the public statements made by Wells Fargo, including its materially misleading 2021 and 2022 proxy statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein." Compl. ¶ 449. The Court finds that Plaintiffs have adequately pleaded facts that show Director Defendants face a substantial likelihood of liability for violations of Section 20(a).

### 3. Plaintiffs Fail to Allege Demand Futility as to Any Claims Asserted Against Officer Defendants.

The Complaint alleges the following claims against Officer Defendants Powell, Santomassimo, Sanchez, Santos, and Weiss: (1) breach of fiduciary duty of oversight, (3) violation of Section 10(b) of the Exchange Act, (4) violation of Section 20(a) of the Exchange Act, and (5)

46

violation of Section 20A of the Exchange Act against Officer Defendant Santos. Parties dispute whether Plaintiffs must allege that pre-suit demand on the Board would have been futile with respect to any claims against the Officer Defendants. As currently pleaded, the Complaint does not contain allegations the demand would be futile with respect to any claims against the Officer Defendants.

Plaintiffs argue that when "the factual allegations underlying claims against officers are 'congruous' with the facts underlying claims against directors, then adequately alleging a substantial likelihood of liability as to the directors satisfies the demand requirement concerning the claims against the officers." *Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*, No. 2023-0464-KSJM, 2024 WL 390890, at *12 (Del. Ch. Feb. 1, 2024). Plaintiffs contend that because the Complaint contains allegations that the Director Defendants face a substantial likelihood of liability related to similar facts underlying Plaintiffs' claims against the Officer Defendants, demand is also futile as to the Officer Defendants. Opp'n at 28.

Defendants distinguish *Grabski* from the present case. In *Grabski*, the plaintiffs alleged that "all Defendants received the same [material, non-public information] at the same time and traded on that [material, non-public information] around the same time." *Grabski*, 2024 WL 390890, at *12. In other words, there was "near-total overlap in allegations" against the directors and officers, such that the demand futility analyses for the claims against the directors and the claims against the officers would be identical. *Id.* In contrast, for example, a *Caremark* claim for lack of oversight on the Board-level versus the management-level implicates a different set of facts. Off. Reply at 2-3.

The Court also finds *Teamsters* to be instructive here. In *Teamsters*, plaintiffs alleged a *Caremark* claim against director defendants and a conventional breach of fiduciary duty claim against officer defendants. *Teamsters*, 2020 WL 5028065, at *26. The court found that demand was futile for the *Caremark* claim. *Id.* The court then noted that factual allegations for the *Caremark* claim against the director defendants were "congruous" with the factual allegations for the conventional breach of fiduciary duty claim against the officer defendants. *Id.* Accordingly, even though the claims were different, because the set of facts were the same, the court held that demand was futile for the conventional breach of fiduciary duty claim as well. *Id.*

Here, the Court finds that allegations against the Director Defendants and Officer Defendants are not "near-total overlap" for all claims. *Grabski*, 2024 WL 390890, at \*12. The Delaware Chancery Court recently recognized that *Caremark* claim may be brought against corporate officers as to matters within their areas of responsibility. *McDonald's*, 289 A.3d at 358. However, for a *Caremark* claim against Officer Defendants, the Officer Defendants oversight of discriminatory lending and discriminatory hiring practices will implicate a different set of facts than a *Caremark* claim against the Director Defendants. The reporting systems or controls at a management-level are typically different from the reporting systems or controls for a company like Wells Fargo. Further, it is also unclear from the pleadings whether the set of facts would be congruous for the Section 10(b), Rule 10b-5, and Section 20(a) claims. The set of facts would not be congruous for the Section 20A claim against Defendant Santos.

The Court agrees with Defendants that this case is distinguishable from *Grabski* as the allegations against the Director Defendants and Officer Defendants are not "near-total overlap." *Grabski*, 2024 WL 390890, at \*12. The Complaint does not contain any allegations that pre-suit demand on the Board would have been futile with respect to any claims against the Officer Defendants. Accordingly, the Court does not find that Plaintiffs have adequately alleged demand futility under any of the *Zuckerberg* factors as to the claims asserted against the Officer Defendants. *See Zuckerberg*, 262 A.3d at 1059. The Court **GRANTS-IN-PART** motion to dismiss without prejudice for failure to plead demand futility for all claims asserted against Officer Defendants. The Court grants Plaintiffs leave to amend to include allegations—such as congruency of facts—that plead demand futility for claims asserted against Officer Defendants.

Because the Court has resolved claims asserted against Officer Defendants under demand futility, the Court need not address Officer Defendants' arguments under Rule 12(b)(6).

## IV.    CONCLUSION

For the reasons stated above, and after review and consideration of the motions, oral arguments, relevant legal authority, briefings, attachments and exhibits thereto:

(1) The Court **DENIES-IN-PART** the motion to dismiss the *Caremark* prong one claim against Director Defendants as to discriminatory lending practices.

(2) The Court **GRANTS-IN-PART** the motion to dismiss with prejudice the *Caremark* prong one and prong two claims against Director Defendants as to discriminatory hiring practices.

(3) The Court **GRANTS-IN-PART** the motion to dismiss with prejudice the Section 14(a) claim against Director Defendants as to discriminatory hiring and lending practices.

(4) The Court **DENIES-IN-PART** the motion to dismiss the Section 10(b), Rule 10b-5, and Section 20(a) claims against Wells Fargo and Director Defendants as to discriminatory hiring practices.

(5) The Court **GRANTS-IN-PART** the motion to dismiss with prejudice Section 10(b), Rule 10b-5, and Section 20(a) claims against Director Defendants as to discriminatory lending practices.

(6) The Court **GRANTS-IN-PART** the motion to dismiss without prejudice for failure to plead demand futility for all claims asserted against Officer Defendants. The Court grants leave to amend to include allegations that plead demand futility for claims asserted against Officer Defendants.

Plaintiffs may amend its complaint within **14 days** of this Order.

This Order terminates ECF 152 and 153.

IT IS SO ORDERED.

Dated: September 19, 2024

TRINA L. THOMPSON
United States District Judge