Lesley Weaver (SBN 191305)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Telephone:    (415) 445-4004
E-mail:        lweaver@bfalaw.com

Nancy A. Kulesa (*pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
300 Park Ave, Suite 1301
New York, New York 10022
Telephone:    (212) 789-1343
E-mail:        nkulesa@bfalaw.com

Derrick B. Farrell (*pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
3411 Silverside Rd.
Baynard Building, Suite 104
Wilmington, DE 19810
Telephone:    (302) 499-2158
E-mail:        dfarrell@bfalaw.com

Marlon E. Kimpson (*pro hac vice*)
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (pro hac vice)
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
E-mail:        mkimpson@motleyrice.com
                bnorton@motleyrice.com
                jlittlejohn@motleyrice.com

Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone:  (650) 697-6000
E-mail:        mmolumphy@cpmlegal.com
                tredenbarger@cpmlegal.com
                gjung@cpmlegal.com

*Co-Lead Counsel for Co-Lead Plaintiffs*

*[Additional counsel on signature page]*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY CONSOLIDATED DERIVATIVE SHAREHOLDER LITIGATION | Case No. 3:22-cv-05173-TLT<br><br>**SECOND AMENDED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ........................................................................... 1

II.   INTRODUCTION ......................................................................................... 2

III.  JURISDICTION AND VENUE ................................................................... 11

IV.  PARTIES ..................................................................................................... 11

V.   PROCEDURAL HISTORY OF PLAINTIFFS' INVESTIGATIONS THROUGH TWO
BOOKS-AND-RECORDS PROCEEDINGS ............................................... 14

VI.  SUBSTANTIVE ALLEGATIONS ............................................................. 16

    A.    Background on Wells Fargo ............................................................. 16

    B.    Wells Fargo's Lending Practices Discriminate Against Minority Borrowers ................. 17

          1.    Mortgage Lenders in the United States Have a Long History of
Discriminating Against Minorities ......................................... 17

          2.    Congress and the Courts Have Long Recognized that Discriminatory
Lending Practices, Such as Redlining and Discretionary Pricing, Are
Illegal    .......................................................................... 21

          3.    Discriminatory Lending Continues Today Through Automated
Underwriting Systems and "Digital Redlining" ...................... 22

          4.    Wells Fargo's Board Knew that Compliance With Fair Lending Laws Was
a Mission-Critical Risk for the Company ............................... 25

          5.    The Mortgage Discrimination Class Action Alleges Wells Fargo's
Systematic Discrimination Against Minority Borrowers ......... 30

          6.    *Bloomberg's* March 2022 Investigation Confirms Wells Fargo's
Systematic Discrimination Against Black and Hispanic Borrowers .............. 33

          7.    Internal Documents Show Wells Fargo's Automated Lending Program
Resulted in Widespread, Systematic Disparities for Minority Borrowers
Despite Management's Knowledge of "High" "Risks" and "Control Gaps" ...... 38

          8.    Board-Level Documents Confirm the Board's Failure to Implement a
Mission-Critical Reporting Structure to Monitor Fair Lending Compliance
and Discriminatory Pricing ................................................... 49

          9.    Former Wells Fargo Employees Independently Corroborate Wells Fargo's
Racially Discriminatory Lending and Hiring Practices ............ 55

          10.   Covington & Burling's Report to Wells Fargo on Racial Equity Reflects
Wells Fargo's Failure to Address Discrimination Issues .......... 58

          11.   In December 2023, the CFPB Issues an MRA Notice to Wells Fargo
Concerning Discriminatory "Pricing Exceptions" .................. 59

    C.    Wells Fargo's Hiring Practices Discriminate Against Diverse Candidates .......... 60

| | | |
|---|---|---|
| | 1. | Joe Bruno, a Former Wells Fargo Executive in the Company's Wealth Management Division, Reported the Practice of Conducting Sham Interviews to Senior Management ................................................. 60 |
| | 2. | Wells Fargo's Practice of Conducting Sham Interviews Was Reported in an "Email to Wells Fargo's Board of Directors" ................................. 61 |
| | 3. | *The New York Times* Publishes Its Investigation ................................. 64 |
| | 4. | The Board Knew Wells Fargo's Hiring and Promotion of Diverse Candidates Were Mission-Critical Risks, But Failed To Put in Place Appropriate Internal Controls to Ensure that Fake Interviews of Minority Candidates Did Not Occur ................................. 70 |
| D. | | Wells Fargo Issued False and Misleading Statements and Omissions Concerning the Company's Discriminatory Hiring and Lending Practices ....................... 75 |
| | 1. | March 16, 2020 – 2020 Proxy ................................. 75 |
| | 2. | February 23, 2021 – 2020 Annual Report ................................. 78 |
| | 3. | March 16, 2021 – 2021 Proxy ................................. 79 |
| | 4. | April 26, 2021 – 2020 Social Impact and Sustainability Highlights ............. 83 |
| | 5. | May 26, 2021 – Defendant Scharf's Testimony to the United States Senate Committee on Banking, Housing, and Urban Affairs ............................. 84 |
| | 6. | July 15, 2021 – 2021 ESG Report ................................. 85 |
| | 7. | October 7, 2021 – Defendant Sanchez's Virtual Interview with the Institute for Corporate Productivity ................................. 86 |
| | 8. | March 14, 2022 – 2022 Proxy ................................. 87 |
| | 9. | February 15, 2022 – Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response ....................... 90 |
| | 10. | March 18, 2022 – Wells Fargo's Statements to *WCNC Charlotte* .............. 91 |
| | 11. | May 27, 2022 – Defendant Santos's Statements to *Business Insider* ............ 92 |
| | 12. | June 1, 2022 – 2022 DE&I Report ................................. 94 |
| | 13. | June 3, 2022 – Defendant Santo's Further Statements to Business Insider ........ 94 |
| | 14. | March 15, 2023 – 2023 Proxy ................................. 96 |
| E. | | The Individual Defendants Made Their Misrepresentations Knowingly or with Reckless Disregard for the Truth ................................. 97 |
| F. | | Wells Fargo's Discriminatory Practices Have Damaged the Company Financially and Reputationally ................................. 101 |
| G. | | The Board Caused Wells Fargo to Repurchase Its Stock at Inflated Prices, Causing Over $7.14 Billion in Damages ................................. 104 |
| H. | | The Individual Defendants Were Awarded Improper Compensation Based on Alleged Success in Increasing Diversity ................................. 111 |

I.      Defendants Failed to Perform Any Investigation of Whether Executive Compensation Should be Clawed Back Because of the DEI Fraud ............................ 116

J.      Defendant Santos, Who Was in Charge of the Diverse Slate Program, Engaged in Insider Selling Shortly Before the Truth Was Announced ............................ 121

VII.    FIDUCIARY DUTIES OF THE DEFENDANTS ........................................................ 122

A.      Duties of All Defendants ........................................................ 122

B.      Fiduciary Duties of Directors of Federal Banking Institutions ...................... 123

C.      The Board's Committees Were Expressly Charged with Overseeing and Monitoring Risk to Wells Fargo ........................................................ 126

        1.      Duties of Risk Committee Members .......................................... 127

        2.      Duties of Audit and Examination Committee Members .......................... 130

        3.      Duties of Corporate Responsibility Committee Members ....................... 132

        4.      Duties of Human Resource Committee Members ................................ 133

D.      Defendants' Fiduciary Duties Under *Caremark* and *Marchand* ...................... 134

VIII.   IN EXCHANGE FOR TAKING ON THE FIDUCIARY DUTIES DESCRIBED HEREIN, DEFENDANTS ARE HIGHLY PAID ........................................................ 138

IX.     DERIVATIVE ALLEGATIONS ........................................................ 139

X.      DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE ...................... 140

A.      Demand Is Futile Because at Least Half of the Demand Board Has Disabling Conflicts of Interest ........................................................ 140

B.      Each Demand Director Faces a Substantial Likelihood of Personal Liability for Lack of Oversight ........................................................ 141

C.      Additional Red Flags Waved in Front of the Pre-2022 Directors—Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, Scharf, and Vautrinot ........................................................ 144

D.      Additional Red Flags Waved in Front of the Corporate Responsibility Committee Members—Clark, Hewett, Morken, and Vautrinot ...................... 145

E.      Additional Red Flags Waved in Front of the Human Resource Committee Members—Black, Hewett, Morris, and Sargent—Who Failed to Investigate Whether Executives' Compensation Should Be Clawed Back ...................... 146

F.      Additional Red Flags Waved in Front of the Risk Committee Members—Chancy, Hewett, Morris, Payne, Norwood, and Vautrinot ...................... 147

G.      Each Demand Director Faces a Substantial Likelihood of Liability for Approving the Issuance of False and Misleading Public Statements ...................... 148

H.      Each Demand Director Has a Disabling Personal Interest Based on the Operation of Wells Fargo's D&O Insurance Policy ...................... 150

I.      Demand Is Futile as to Scharf for Additional Reasons ...................... 151

J.    Prior Courts Have Already Determined that Demand Is Futile Against Certain of the Director Defendants on Related Issues ................................................................... 153

K.    Demand on the Board Is Futile for the Securities Claims Against the Officer Defendants Because Such Investigation or Litigation Would Implicate the Director Defendants' Own Wrongdoing ............................................................................. 153

XI.    CLAIMS FOR RELIEF ..................................................................................................... 155

XII.    PRAYER FOR RELIEF ..................................................................................................... 160

XIII.    JURY DEMAND ................................................................................................................. 161

## I.    NATURE OF THE ACTION

Lead Plaintiffs City of Pontiac Reestablished General Employees' Retirement System ("Pontiac"), the City of Plantation Police Officers' Retirement Fund ("Plantation"), and Amy J. Cook (together, "Plaintiffs"), by and through their undersigned attorneys, submit this Second Amended Consolidated Stockholder Derivative Complaint (the "Second Amended Complaint") against certain current and/or former members of the Board of Directors (the "Board") and/or executive management of Wells Fargo & Company ("Wells Fargo" or the "Company") for breaches of fiduciary duty and related causes of action in connection with their failure to meaningfully monitor Wells Fargo's discriminatory lending and hiring practices.

Pursuant to the Court's Order Granting-In-Part And Denying-In-Part Defendants' Motions To Dismiss (ECF No. 176), this Second Amended Complaint amends the prior complaint solely to (1) add a sub-section in the Demand Futility section alleging that a demand on the Director Defendants would have been futile with respect to claims against Officer Defendants Scott Powell, Carly Sanchez, and Kleber Santos under Section 10(b), Rule 10b-5, and Section 20(a) for misstatements relating to discriminatory hiring practices (*see* Order, ECF No. 176 at 49, §(6)), and (2) remove all other claims that the Court dismissed with or without prejudice.

Except for the allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge, the allegations in the Second Amended Complaint are based upon the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of filings made with the U.S. Securities and Exchange Commission ("SEC"); review of internal Company documents provided by Wells Fargo in connection with a books-and-records demand pursuant to title 8, section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220 ("Section 220" or "§ 220"); review of internal company documents produced in other litigation involving Wells Fargo; California Corporations Code § 1600 *et seq.*; interviews by Plaintiffs' counsel's investigators of former Wells Fargo employees with first-hand knowledge of the Company's business practices and operations; and counsel's review of filings in other lawsuits, press releases, news reports, and other publicly available documents.  Counsel believe discovery will elicit further evidentiary support for Plaintiffs' allegations.

## II.    INTRODUCTION

1.      Plaintiffs bring this consolidated action derivatively on behalf of Wells Fargo and against the Individual Defendants for breaching their fiduciary duties of oversight (Count One); against all Defendants under Section 10(b) of the Exchange Act for making or causing the Company to make materially false and misleading statements (Count Two); against the Individual Defendants under Section 20(a) of the Exchange Act as "controlling persons" of the Company (Count Three); and against Defendant Santos for violating Section 20A of the Exchange Act by engaging in insider stock sales (Count Four). These narrowly focused claims all arise out of the actions of the Board and senior officers, who publicly denied (or proclaimed to be addressing) Wells Fargo's discriminatory lending and hiring practices, while knowingly or recklessly failing to actually do so. These discriminatory practices have affected a significant number of borrowers and job applicants and caused Wells Fargo to endure costly regulatory scrutiny, class action litigation, and reputational harm, among other damages.

2.      Defendants' failure to cure the deficiencies in Wells Fargo's internal controls, including a failure to monitor for discriminatory impact, is a third rail for its business model and for the country. For millions of Americans, an important key to obtaining fair housing and creating lasting wealth is having an equal opportunity to apply for a mortgage. Similarly, equal access to employment requires the opportunity for a legitimate job interview. Regrettably, however, discrimination against Black Americans and other minority groups in the business world—including the market for mortgages and jobs—is nothing new. While unequal, unfair, and exclusionary practices date back centuries, laws have been on the books for more than 50 years providing for equal access to opportunities to obtain credit and employment. This includes laws like the Fair Housing Act of 1968, the Equal Credit Opportunity Act of 1974, and the Civil Rights Acts of 1866, 1964, and 1991, among others—passed to ensure that the discriminatory practices that existed for generations would no longer be tolerated.

3.      The evidence of widespread and systematic discrimination in lending by this Company has had significant repercussions. Wells Fargo is consistently ranked among the three largest mortgage lenders in the United States. In 2019, the Company was America's top lender with $201.8 billion in volume that year. Wells Fargo is also one of American's largest corporate employers, consistently

employing more than 200,000 people. As one of the nation's largest lenders and employers, Wells Fargo and its Board have an obligation to put in place and monitor internal controls to ensure that the Company operates within the boundaries of U.S. laws as they pertain to its lending and hiring practices. Its failure to do so has changed lives and fortunes of qualified and deserving individuals.

4.      Wells Fargo's Board of Directors (the "Board") and senior management have a duty to be aware of laws that govern the Company's core business—which includes lending and diverse hiring—and to ensure that the Company and its employees actually follow those laws. This duty not only arises under established federal law, but also under corporate law. As a Delaware corporation, the Board of Wells Fargo owes fiduciary duties, including a duty of oversight, to affirmatively monitor and control the Company's compliance with legal obligations—especially when it comes to "mission-critical" legal and compliance risks. This issue is particularly acute for Wells Fargo since in February 2018 the Federal Reserve placed a crippling asset cap on Wells Fargo due to its weak internal controls. To be sure, the longer Wells Fargo takes to convince the Federal Reserve that it has effective internal controls over critical enterprise risks the Federal Reserve will keep the asset cap in place.

5.      It is this area—oversight and monitoring of core legal risk related to discriminatory lending and diverse hiring—where Wells Fargo's Board has breached its duties, and why Plaintiffs, long-term Wells Fargo stockholders, have filed this action to hold the Board and senior management accountable to the Company and its stockholders. As set forth herein, the fourteen Director Defendants in this action ignored repeated red flags in these mission critical areas of compliance over a multi-year period.

6.      The failures, omissions, and misrepresentations of the Defendants in this action are framed by events of the recent past. On February 3, 2018, the Federal Reserve Board issued a Consent Order which placed a $1.93 trillion asset cap on the Company. This cap has limited the Company's development and any subsequent investigations or lawsuits, especially those with serious consequences such as those that have been filed related to discriminatory hiring and lending, will hamper the Company's future growth as well by increasing the length the Company could be subject to the asset cap, or worse still resulting in the imposition of even stricter penalties by regulators.

7.     Months after Defendant Scharf's October 21, 2019 appointment as CEO, U.S. House of Representatives Maxine Waters and Al Green submitted a detailed 74-page Report Prepared by the House Majority Staff of the Committee on Financial Services, titled "The Real Wells Fargo:  Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight" on March 4, 2020.  This report was a scathing indictment of Wells Fargo's discriminatory policies in lending and hiring. Following the report, Wells Fargo's directors and officers were on notice that preventing discriminatory hiring and lending was a mission critical issue for the Company.

8.     In direct response to this report, just twelve days later on March 16, 2020, Wells Fargo implemented its "Diverse Search Requirement," a process mandating that: (a) at least half of the candidates interviewed for open jobs with a salary over $100,000 be diverse (a "diverse slate"); and (b) an interviewer on the hiring panel represent at least one diversity dimension.  CEO and Defendant Scharf was personally in charge of the Diverse Slate program. The Board's Human Resources Committee ("HRC") had direct oversight responsibility over the program.  At the same time Wells Fargo falsely stated in its SEC filings that it was "dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions."

9.     Rather than focus its efforts on combating discrimination Defendants began a public relations campaign to make it appear the Company had actually taken meaningful steps to address its historic lending and hiring discrimination.  This public-facing campaign was not consistent with the Company's actual efforts and was intended to mollify stakeholders, not engage in meaningful reform.

10.     Management lavishly compensated themselves for these publicly-touted "DEI" efforts. For example, in the Company's March 14, 2022 Proxy, "[t]he Board determined that Mr. Scharf's individual performance achievement level [in 2021] was 121%," based on the premise that "Mr. Scharf exhibited strong leadership in driving key initiatives" including "increased diverse representation . . . . ." Ultimately, Scharf was awarded $22 million in "variable incentive compensation" in 2021.  He was not alone.  Wells Fargo's proxy statements disclose that the Company awarded tens of millions of dollars to multiple corporate insiders for their work, including their (alleged) progress on DEI initiatives.

11.     While Wells Fargo was rewarding senior management for achievements in diversity, internal reports and whistleblowers told a different story about the progress of Wells Fargo's DEI programs and efforts to ensure compliance with fair lending laws.  In 2020, for example, Wells Fargo was the *only* major lender to reject more refinancing applications from Black homeowners than it accepted.  In contrast, other lenders approved 74% of all Black refinancing applications.  In addition, Wells Fargo was the *only* major lender to approve a smaller share of refinancing applications from Black homeowners in 2020 than it did a decade earlier in 2010.

12.     On February 18, 2021, Phillip Miller, an "external job applicant," sent an "email to Wells Fargo's Board of Directors" where he "complain[ed] that he experienced discrimination in the form of racist and offensive statement[s] directed toward him by the hiring manager of a position he applied for on 9/28/20 when the Wells Fargo manager told Miller 'you don't sound black'" and after which "a white female was selected for the position."

13.     On May 6, 2021, six Wells Fargo employees with PhDs published an article titled *Bias, Fairness, and Accountability with AI and ML Algorithms* on arXiv (the "May 2021 Article").  Wells Fargo employees well-positioned to understand whether the Company's lending algorithm resulted in disparate impact towards minorities wrote the May 2021 Article and set forth the reasons lending algorithms, if not appropriately monitored, can result in digital redlining.  The Board did not even bother to discuss the article at a single board or committee meeting.

14.     On September 7, 2021, whistleblower Joseph Bruno, a former Wells Fargo executive in the wealth management division, sent an email to over 250 Wells Fargo employees, including four senior Wells Fargo officers at the time:  Scharf (CEO), Scott Powell (SVP and COO), Kleber Santos ("Santos") (then-Head of Diverse Segments, Representation and Inclusion), and Mary Mack (CEO of Consumer and Small Business Banking), raising concerns regarding Wells Fargo's practice of conducting sham interviews to comply with the Company's diverse hiring initiative.  Despite the email's obvious importance, due to Wells Fargo's weak internal controls, it was never provided to the full Board.

15.     On February 17, 2022, a class action lawsuit was against Wells Fargo in the Northern District of California on behalf of loan applicants who suffered racial and ethnic discrimination when

applying for home loans and refinancing and were either denied or received higher interest rates compared to similarly situated White borrowers (the "Mortgage Discrimination Class Action").

16. On March 11, 2022, *Bloomberg* conducted an analysis of public housing data showing that Wells Fargo—a behemoth in the mortgage world—was a significant outlier among its peers (JP Morgan Chase & Co., Citigroup Inc., and Bank of America) in terms of originating mortgages to Black and Hispanic Americans. *Bloomberg's* analysis also found that in 2020, Wells Fargo was the *only* major lender in 2020 to reject more refinancing applications from Black homeowners than it accepted: only 47% of Black and 53% of Hispanic homeowners who completed refinance applications were approved, compared with 72% of White homeowners. In contrast, other lenders approved 74% of all Black refinancing applications. Perhaps most surprising, this disparity appeared to be part of a near decade-long trend as Wells Fargo was the *only* major lender to approve a smaller share of refinancing applications from Black homeowners in 2020 than it did ten years earlier in 2010.



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

17.     *Bloomberg* also found that Wells Fargo granted a higher percentage of loans to White applicants with yearly incomes below $63,000 than to Black applicants with yearly incomes between $120,000 and $168,000**.**

18.     As set forth herein, internal Company documents produced in the Mortgage Discrimination Class Action demonstrate that *Bloomberg's* analysis was confirmed to be accurate, "***on the nose . . . like 100%***," by Wells Fargo's data analytics team.

19.     The data above is even more striking when viewed alongside internal Board-level documents that Plaintiffs have obtained, pursuant to Delaware law, prior to filing suit.  Specifically, according to the Company's April 2022 meeting minutes and presentation materials, upon learning of *Bloomberg's* March 2022 reports, Wells Fargo's Head of Home Lending admitted that the *Bloomberg* article was "***factually accurate***" and that "***mistakes were made with respect to stakeholder engagement following publication of the [Bloomberg] article***."[1]  Defendant Scharf agreed that "***mistakes . . . were made [by the Company] in the ordinary course.***" "***Scharf [also] noted the reasons the Company did not conduct sufficient stakeholder engagement early on, including because the Company did not have all necessary data until recently***."

20.     These same meeting minutes admitted Wells Fargo needed "to address" the Company's "approval gap" as to "African American (AA) approval rates" and confirmed that the "approval gap" between "African American" and "White, Non-Hispanic" applicants—which the Company also called its "Denial Rate Gap"—exceeded 24% in 2020 and 21% in 2021 and involved hundreds of thousands of applications.

21.     On March 18, 2022, Senator Sherrod Brown announced that he, joined by Senators Dick Durbin, Tina Smith, Raphael Warnock, Elizabeth Warren, Ron Wyden, Jon Ossoff, Jeff Merkley, Alex Padilla, Bernie Sanders, and Mark Warner had sent a letter to the Department of Housing & Urban Development ("HUD") and Consumer Financial Protection Bureau ("CFPB") to request a review of Wells Fargo's mortgage loan refinance processes amid concerns and reporting that suggested Black and

---

[1] All emphasis is added unless otherwise noted.

Hispanic borrowers were less likely to be approved for refinance loans in 2020 as interest rates hit record lows.

22.    Despite *Bloomberg's* "factually accurate" findings and the Company's acknowledgment of its "Denial Rate Gap," for nearly a decade Wells Fargo's Board was not monitoring this issue prior to the *Bloomberg* investigation.  Indeed, as internal documents produced in the Mortgage Discrimination Class Action show, disparate impact towards minorities has been a long-standing problem:  "***since about 2013 we have gotten progressively worse . . . . this is a systemic [Wells Fargo] policy issue . . . . [w]hen we only prioritize non confirming loans and the most affluent/profitable customers . . . . we shouldn't be overly surprised by the results***."

23.    In August 2020, following a 12-month business unit review presented to the Board's Risk Committee, in discussing "current and emerging Fair Lending Issues and Trends," the Company concluded that "monitoring activities had ***not identified any systematic fair lending risk***"; that "control effectiveness has improved"; and that "fair lending Compliance . . . provides challenge to business controls as ***isolated risks*** are identified."  But isolated discussions about fair lending risk are hardly the same as active and routine monitoring of fair lending *compliance*.  Nearly eighteen months went by before another fair lending discussion occurred at the Board level.  By then, the *Bloomberg* article was already in the works and Wells Fargo knew it because reporters contacted the Company seeking pre-publication comment.  At all times the Board should have been aware of the potential that Wells Fargo's lending policies and practices resulted in disparate impact towards minorities, and should have implemented a serious, good faith monitoring program to consistently track this issue.  For nearly a decade, they failed to do so.

24.    The Board's failure to correct these significant issues continues today.  After the *Bloomberg* article was published, on April 25-26, 2022, the Board's Corporate Responsibility Committee ("CRC") and full Board held meetings at which the Board discussed *Bloomberg's* findings.  The minutes do not reflect any consideration of whether the Company's automated lending systems or algorithm resulted in disparate impact towards minorities, despite the Company's Head of Home Lending admitting that the *Bloomberg* article was "***factually accurate.***"

25.     On May 3, 2022, shortly before the truth about the fake interviews was revealed, Defendant Santos, at the time the Head of the Diverse Segments, Representation and Inclusion, sold 22,700 shares of his Wells Fargo stock.  Given Santos' role it is inconceivable that he did not have material non-public information about the Company's discriminatory conduct when these stock sales occurred, which resulted in personal proceeds of more than $1 million.

26.     On May 19, 2022, *The New York Times* published an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interview."  The article highlighted Mr. Bruno's whistleblower allegations, which did not go to the Board.  Rather than take the issue seriously, Wells Fargo embarked on a PR campaign against *The New York Times* article.

27.     At a June 28, 2022 meeting of the HRC, which was attended by Board members Black, Hewitt, Morris and Sargent, the Directors were given a detailed update on the Company's Diverse Slate program by Santos.  During the meeting the Board members were advised that the interview progression rates for Black applicants for job positions with a salary of at least $100,000 were below that of white applicants and the Company as a whole and that Black applicants who applied for positions at Wells Fargo covered by the Diverse Slate Program were only being hired at 50% the rate of white applicants.

28.     On June 28, 2022, Congresswoman Maxine Waters (again) wrote a letter to HUD, the Federal Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation ("FDIC"), the CFPB and the Office of the Comptroller of the Currency ("OCC") regarding Wells Fargo's unchecked misconduct.  Representative Waters urged these agencies to "properly penalize Wells Fargo for its continuous wrongdoing."

29.     On December 11, 2023, *CNBC* reported that Wells Fargo was under federal investigation by the CFPB for the very same discriminatory practices that came to light years earlier in settlements with the U.S. Department of Justice ("DOJ") in 2012 and the City of Philadelphia in 2019:  offering White borrowers "pricing exceptions," or discounted interest rates and fees that were not offered to minority borrowers.  The federal investigation remains on-going.

30.     In addition to state-law breach of fiduciary duty claims, Plaintiffs have alleged violations of Sections 14(a), 10(b), 20(a) and 20(A) of the Exchange Act in connection with false and misleading

statements about Wells Fargo's lending and hiring practices. By way of example, Defendant Santos publicly denied and refuted findings from *Bloomberg* and *The New York Times*: "[w]e don't have proprietary credit-underwriting models. We follow the guidelines of the GSEs" and "[w]e researched all the specific hiring-practice allegations" and "could not corroborate these allegations as factual." These and other statements were not true.

31.     One cannot square the Company's external reporting with its internal knowledge, deliberate misstatements, and failure to monitor for and cure these endemic and serious problems. The Board's and senior management's misconduct was the result of its repeated failures to adopt and implement robust and effective internal controls over fair lending compliance and the Diverse Search Requirement, both of which were critical enterprise risks facing the Company.

32.     The Defendants breached their duty of loyalty to Wells Fargo and acted in bad faith. To date, the Board has taken no steps to hold its members or the Company's senior executives responsible for the substantial harm caused. Significantly, even though Wells Fargo has one of the broadest executive clawback policies of any publicly-traded company which was implemented in 2021 in the heat of public scrutiny, the HRC, which is responsible for enforcement of the clawback policy, the Company has not taken any action against its executives' wrongdoing.

33.     Plaintiffs did not make a pre-suit litigation demand on the Board because at least half of Wells Fargo's fourteen directors could not have exercised their independent business judgment in evaluating such a demand. Under applicable Delaware law, a director cannot adequately consider a pre-suit demand if the director faces a substantial likelihood of personal liability in connection with the challenged misconduct. Here, a majority of the Board faced such liability for, among other things, (i) consciously failing to exercise oversight concerning the Company's discriminatory lending and hiring practices, and (ii) approving false public disclosures. Numerous red flags were waived in front of the Board in the form of whistleblowers, multiple troubling reports to Board committees, congressional reports, prior settlements, news articles, the 2018 Consent Order, the 2020 pre-suit litigation demand, and even an article published by Wells Fargo PhDs. But the Board consciously failed to monitor these issues, precipitating this action.

**III.    JURISDICTION AND VENUE**

34.    This Court has jurisdiction over the subject matter of Plaintiffs' federal securities claims in accordance with 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state-law breach-of-fiduciary-duty claims in accordance with 28 U.S.C. § 1367.

35.    This Court has jurisdiction over each of the Defendants because each Defendant is either a resident of California or otherwise has sufficient minimum contacts with California (or, in the case of Plaintiffs' federal securities claims, with the United States as a whole) to render the exercise of jurisdiction by this Court permissible under California Code of Civil Procedure § 410.10 as well as the United States and California Constitutions.  Additionally, in connection with the misconduct alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

**IV.    PARTIES**

36.    **Plaintiff Pontiac** is a stockholder of nominal defendant Wells Fargo with current holdings of 8,120 shares.  Pontiac has owned Wells Fargo stock continuously since at least January 2019.  Pontiac is a citizen of Michigan.

37.    **Plaintiff Plantation** is a stockholder of nominal defendant Wells Fargo with current holdings of 14,710 shares.  Plantation has owned Wells Fargo stock continuously since at least July 2019.  Plantation is a citizen of Florida.

38.    **Plaintiff Amy Cook** is a current shareholder of Wells Fargo.  Plaintiff has continuously held Wells Fargo stock since June 17, 2008, and continues to hold such stock.  Plaintiff will hold her shares of Wells Fargo stock through the conclusion of this lawsuit.

39.    **Nominal Defendant Wells Fargo** is a Delaware corporation with its principal executive offices located in San Francisco, and thus is a citizen of Delaware and California.  Wells Fargo operates as a diversified financial services company.  The Company provides banking, insurance, investments, mortgage, leasing, credit cards, and consumer finance.  In 2022, Wells Fargo generated nearly $1.4 billion

in revenue from its mortgage banking business, nearly another $1.4 billion on lending-related fees, and $4.35 billion on card fees.

40.     **Defendant Steven D. Black** ("Black") has been a Director of Wells Fargo since April 2020 and is the Chair of the Finance Committee.  Black is currently the Board Chairman and a member of the HRC.  Black is a citizen of Utah.

41.     **Defendant Mark A. Chancy** ("Chancy") has been a Director of Wells Fargo and a Director of WF Bank since August 2020.  Chancy also is a member of Wells Fargo's Audit Committee and the Finance Committee.  Chancy is a citizen of Georgia.

42.     **Defendant Celeste A. Clark** ("Clark") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Corporate Responsibility Committee ("CRC") of the Wells Fargo Board.  Clark also is a member of the Governance & Nominating Committee of the Wells Fargo Board.  Clark is a citizen of Michigan.

43.     **Defendant Theodore F. Craver, Jr.** ("Craver") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Audit Committee of the Wells Fargo Board.  Craver also is a member of the Finance Committee and the Governance & Nominating Committee of the Board.  Craver is a citizen of California.

44.     **Richard K. Davis** ("Davis") has been a Director of Wells Fargo since April 2022.  Davis has been a member of the Risk Committee.  Davis is a citizen of Minnesota.

45.     **Defendant Wayne M. Hewett** ("Hewett") has been a Director of Wells Fargo since January 2019.  Hewett has also been member of the Risk Committee, the HRC and the Governance & Nominating Committee.  Hewett is a citizen of Florida.

46.     **Defendant Donald M. James** ("James") was a Director of Wells Fargo between 2009 and 2020.  James was a member of the HRC including during the period 2018 to 2020.  James is a citizen of California.

47.     **Defendant Cecelia G. Morken** ("Morken") has been a Director of Wells Fargo since 2022.  Morken has also been a member of the CRC.  Morken is a citizen of California.

48.     **Defendant Maria R. Morris** ("Morris") has been a Director of Wells Fargo and a Director of WF Bank since January 2018 and is the Chair of the Risk Committee of the Wells Fargo Board.  Morris also is a member of the HRC.  Morris is a citizen of New York.

49.     **Defendant Felicia F. Norwood** ("Norwood") has been a Director of Wells Fargo since April 2022.  Norwood has also been a member of the Risk Committee.  Norwood is a citizen of Indiana.

50.     **Defendant Charles H. Noski** ("Noski") was a Director of Wells Fargo between 2019 and 2021.  Noski served as Board Chairman and on the Audit Committee.  Noski is a citizen of Connecticut.

51.     **Defendant Richard B. Payne, Jr.** ("Payne") has been a Director of Wells Fargo since October 2019 and a Director of WF Bank since 2020.  Payne also is a member of the Risk Committee and the Chair of the Credit Subcommittee of the Wells Fargo Board.  Payne is a citizen of North Carolina.

52.     **Defendant Scott E. Powell** ("Powell") has been the Senior Executive Vice President and Chief Operating Officer ("COO") of Wells Fargo since 2019.   He also serves on the Wells Fargo Operating Committee.

53.     **Defendant Juan A. Pujadas** ("Pujadas") was a Director of Wells Fargo between 2017 and 2022.   Pujadas served on the Risk Committee and Finance Committee.  Pujadas is a citizen of California.

54.     **Defendant Carly Sanchez** ("Sanchez") is a Senior Executive in Human Resources at Wells Fargo.  From 2013 to 2022, Sanchez was VP, Talent Acquisition, AA/EEO, Diversity Recruiting at the Company.  Sanchez is a citizen of Texas.

55.     **Defendant Kleber R. Santos** ("Santos") has been Senior Executive Vice President and CEO of Consumer Lending and a member of the Operating Committee at Wells Fargo since July 2022. Santos is responsible for consumer lending products and services, including Home Loans, Auto Loans, Personal Lending, Credit Cards, Retail Services, and Merchant Services.  Previously, between November 2020 and July 2022, Santos was Head of the Diverse Segments, Representation and Inclusion group—a role in which Santos reported directly to CEO Charles Scharf, and served on the Company's Operating Committee.  Santos is a citizen of Washington, D.C.

56.    **Defendant Ronald L. Sargent** ("Sargent") has been a Director of Wells Fargo since February 2017 and is the Chair of the HRC.  Sargent also is a member of the Audit Committee and a member of the Governance & Nominating Committee.

57.    **Defendant Charles W. Scharf** ("Scharf") has been the CEO and President of Wells Fargo and WF Bank and a Director of Wells Fargo and WF Bank since October 2019.  The head of the Company's Diverse Segments, Representation and Inclusion Group (Defendant Santos) reported directly to Scharf.  Scharf is a citizen of New York.

58.    **Defendant Suzanne M. Vautrinot** ("Vautrinot") has been a Director of Wells Fargo since February 2015 and is a member of the CRC and a member of the Risk Committee.  Vautrinot is a citizen of Colorado.

59.    Collectively, Defendants Black, Chancy, Clark, Craver, Davis, Hewett, James, Morken, Morris, Norwood, Noski, Payne, Powell, Pujadas, Sanchez, Santos, Sargent, Scharf, Vautrinot, and are referred to herein as the "Individual Defendants."

60.    Collectively, Defendants Black, Chancey, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Sargent, Scharf, and Vautrinot are referred to herein as the "Demand Defendants."

61.    Collectively, Defendants Black, Chancy, Clark, Craver, Davis, Hewett, James, Morken, Morris, Norwood, Noski, Payne, Pujadas, Sargent, Scharf, and Vautrinot are referred to herein as the "Director Defendants."

## V.    PROCEDURAL HISTORY OF PLAINTIFFS' INVESTIGATIONS THROUGH TWO BOOKS-AND-RECORDS PROCEEDINGS

62.    As part of Plaintiffs' pre-suit investigation, Plaintiffs, through counsel, sought and obtained inspection of certain books and records of the Company in California pursuant to California Corporations Code § 1600 *et seq.* and in separate proceeding in Delaware state court pursuant to Section 220 of the Delaware General Corporation Law.  These books and records, taken together, included nearly 7,000 pages of Board-level documents, including meeting minutes and presentation materials, from the Company.  The categories of documents that Wells Fargo agreed to search and produce were described by Wells Fargo's counsel as follows:

Wells Fargo & Co. agrees to search formal Board materials for the full Board and for the [HRC] between January 1, 2020 and the date of the demand, and produce non-privileged material that concerns:

- Discrimination in home lending, including mortgage refinancing;

- Hiring and promotion practices and policies related to increasing workforce diversity, including any materials relating to the Diverse Slates Guidelines; and

- Discrimination in hiring and promotion;

Wells Fargo also agrees to produce the Diverse Slates Guidelines and conduct a reasonable search for other relevant company-wide policies.

63.    Plaintiffs' first Section 220 demand was made on August 29, 2022, by another institutional stockholder, City of Hartford Municipal Employees Retirement Fund.[2]  After producing thousands of pages of documents, on March 17, 2023, Wells Fargo's counsel sent Plaintiffs' counsel a letter representing that "[b]arring any small clean-up production(s) that may result from our final quality control checks, ***Wells Fargo's production in this matter is now complete***."[3]  On May 12, 2023, Wells Fargo's counsel again confirmed the "***Completeness of Wells Fargo's Production***."[4]  Because Wells Fargo agreed to produce Board-level materials regarding discriminatory lending and hiring practices, and has since certified its production's substantial completion, Plaintiffs are entitled to a pleading-stage inference that the Board never discussed the Company's discriminatory lending or hiring practices outside of the materials produced.[5]

---

[2] Ex. A

[3] Ex. B at 2.

[4] Ex. C at 4. On June 9, 2023, Plaintiff Plantation made a further Section 220 demand on Wells Fargo, which the Company responded to on June 26, 2023, and September 8, 2023, by producing additional documents. *See* Ex. D; Ex. E; Ex. F.

[5] *See, e.g.*, *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *4 (Del. Ch. Apr. 26, 2023) ("Walmart represented that its Section 220 production was complete, so when there are no indications of non-privileged discussions, the plaintiffs are entitled to an inference that the discussions and decisions did not occur."); *In re China Agritech, Inc. S'holder Litig.*, 2013 WL 2181514, at *58 (Del. Ch. May 21, 2013) (plaintiffs entitled to inference of bad faith due to complete lack of minutes discussing financial reporting discrepancies); *In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *32 (Del. Ch. Sept. 7, 2021) (sustaining oversight claims based on, inter alia, the "lack of…any board minutes or documents suggesting that [the Board] regularly discussed safety").

64.     On June 9, 2023, Plaintiff Plantation made a further Section 220 demand on Wells Fargo, which the Company responded to on June 26, 2023, and September 8, 2023, by producing additional documents. *See* Ex. D; Ex. E; Ex. F.  On September 8, 2023, Defendant indicated it had completed its production.

65.     Wells Fargo's books and records, along with other information obtained by Plaintiffs through their investigation, evidence the fact that Wells Fargo's Board failed to live up to its fiduciary duties to (1) engage in meaningful and effective oversight; and (2) fail to act on red flags relating to the Company's systematic discriminatory lending and hiring practices.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    Background on Wells Fargo

66.     Wells Fargo is a registered bank holding company that is incorporated in Delaware and headquartered in San Francisco, California.  The Company was founded on March 18, 1852, and, through internal growth and a variety of mergers and acquisitions, including a merger with Wachovia Corporation in 2008, has grown into one of the largest financial institutions in the U.S.

67.     Wells Fargo ranked 41st on *Fortune*'s 2022 rankings of America's largest corporations and, as of June 2023, had a market capitalization of more than $150 billion.  Wells Fargo's revenue in 2022 exceeded $74 billion.

68.     The Company consistently ranks as one of the largest employers in the U.S. and has more than 250,000 employees operating out of more than 7,000 locations.

69.     Wells Fargo wholly owns and controls WF Bank, headquartered in Sioux Falls, South Dakota.  WF Bank is the fourth largest bank in the U.S. by total assets.  Together with JPMorgan Chase, Bank of America, and Citigroup, WF Bank is one of the "Big Four Banks" of the United States, with approximately $1.9 trillion in assets as of the end of 2022.

70.     Wells Fargo has one of the largest consumer banking footprints in the country and is consistently among the three largest mortgage lenders in the United States.  It also is among the largest lenders providing auto loans and other types of consumer lending.  Overall, Wells Fargo provides some type of financial services to nearly one-third of all U.S. households.

B.    **Wells Fargo's Lending Practices Discriminate Against Minority Borrowers**

1.    **Mortgage Lenders in the United States Have a Long History of Discriminating Against Minorities**

71.    Homeownership is the primary source of wealth for American householders.[6]  A 2022 study by the National Association of Realtors found that the average homeowner who purchased a single-family home in 2012 would have built $225,000 in home-equity over the next ten years.[7]

72.    Empirical data demonstrates that homeownership confers a myriad of benefits that are passed down generationally.  Harvard University's Joint Center for Housing Studies found that "children of homeowners have better home environments, high[er] cognitive test scores, and fewer behavior problems than do children of renters."[8]  Children of owners were found to have "math scores up to nine percent higher, reading scores up to seven percent higher, and reductions in children's behavior problems of up to three percent."[9]  This was true even after controlling for a multitude of economic, social, and demographic variables.[10]  In other words, on average, children of homeowners are better off than children of renters even if their parents have similar salaries, backgrounds, and education.[11]

73.    The United States has a well-documented history of systematically denying homeownership and the benefits it confers to Black Americans through a process known as "redlining."[12]  The term "redlining" originates from federal government programs instituted in the wake of the Great Depression through which the government insured certain qualifying mortgages in an effort to lift

---

[6] Scholastica Coraton, *Single-family Homeowners Typically Accumulated $225,000 in Housing Wealth Over 10 Years*, NAT'L ASSN. OF REALTORS, (Jan. 7, 2022), https://www.nar.realtor/blogs/economists-outlook/single-family-homeowners-typically-accumulated-225K-in-housing-wealth-over-10-years.

[7] *Id.*

[8] Donald R. Haurin, Toby L. Parcel, & R. Jean Haurin, *The Impact of Homeownership on Child Outcomes*, JOINT CENTER FOR HOUSING STUDIES OF HARVARD UNIV. (Oct. 2001), https://www.jchs.harvard.edu/sites/default/files/liho01-14.pdf.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *See, e.g.*, Candace Jackson, *What is Redlining*, NEW YORK TIMES, (Aug. 17, 2021), https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

individuals out of poverty through homeownership.[13]   The federal government, in coordination with banks and local real estate agents, drew color-coded maps of neighborhoods, ranking them on a scale from least-risky to most-risky, and drawing neighborhoods deemed most-risky in red.[14]   The government used these maps to determine whether or not to guarantee loans; banks used these maps to determine whether or not to give loans.[15]   Banks typically denied credit, or extended credit on much worse terms, to applicants living in red-drawn neighborhoods.[16]   Due to an explicitly racially-discriminatory formula, neighborhoods in which Black or other minority citizens lived were virtually always drawn in red, and Black and minority American families were thus denied the benefits of homeownership while White citizens were given the opportunity to build generational wealth through homeownership.[17]

74.    In the first half of the twentieth century, racially restrictive covenants were commonly found in housing deeds that forbid the purchase, lease, or occupation of a house to Black Americans.[18] These covenants were often used as an excuse by lenders to deny mortgages to Black applicants.[19]

75.    The lasting impact of historical redlining has been documented by economists at the Federal Reserve Bank of Chicago, who found that neighborhoods drawn in red in the 1930s continue to have lower homeownership rates, lower home values, and residents with lower credit scores.[20] Economics professors Robert Margo and William Collins found that the gap in homeownership between Black and White Americans has changed very little over the last century, which helps to explain the

---

[13] *Id.*

[14] Khristopher J. Brooks, *Redlining's legacy: Maps are gone, but the problem hasn't disappeared*, CBS NEWS, (last updated June 12, 2020), https://www.cbsnews.com/news/redlining-what-is-history-mike-bloomberg-comments/.

[15] City of New York, *A brief history of redlining*, (Jan. 6, 2021), https://a816-dohbesp.nyc.gov/IndicatorPublic/beta/data-stories/redlining/.

[16] *Id.*

[17] *Id.*

[18] Russell Fowler, *The Ugly History of Redlining: A Federal Policy 'Full of Evil'*, TENN. BAR ASS'N, (Jan. 1, 2023), https://www.tba.org/?pg=Articles&blAction=showEntry&blogEntry=85873.

[19] *Id.*

[20] Emily Badger, *How Redlining's Racist Effects Lasted for Decades*, NEW YORK TIMES, (Aug. 24, 2017), https://www.nytimes.com/2017/08/24/upshot/how-redlinings-racist-effects-lasted-for-decades.html?action=click&module=RelatedLinks&pgtype=Article.

enduring wealth gap between White and Black Americans that has actually continued to widen in recent decades.[21]

76.     In 2016, according to a report commissioned by the National Association of Real Estate Brokers ("NAREB"), the homeownership rate for Black Americans today is lower than the national rate during the Great Depression years of the 1930s.[22]

77.     In addition to illegal redlining, regulators have long been focused on the practice of discriminatory pricing exceptions where discounted lending rates are offered to White borrowers but not also (or equally) extended to minority borrowers.  As the CFPB explained in December 2021, bank examiners acknowledged that this discriminatory practice exists within the banking industry:

**Examiners found fair lending violations**

CFPB examiners identified several violations of the Equal Credit Opportunity Act (ECOA) by mortgage lenders. The examination team found that mortgage lenders discriminated against African American and female borrowers in the granting of pricing exceptions, compared to non-Hispanic white and male borrowers.

Specifically, examiners found lenders lacked oversight and control over how mortgage loan officers granted pricing exceptions to customers. Examiners identified lenders with statistically significant disparities for incidences of pricing exceptions for African American and female applications compared to similar non-Hispanic white and male borrowers.

CFPB examiners also found that lenders improperly considered small business applicants' religion in their credit decisions. For religious institutions applying for small business loans, some lenders improperly utilized a questionnaire that contained explicit inquiries about an applicant's religion.[23]

78.     Notably, nearly a decade before the CFPB identified the violations referenced above, the banking industry was on notice that pricing exceptions unfairly and illegally discriminated against minority borrowers.  For example, in October 2014, Charles River Associates, an economic consulting

---

[21] *Id.*

[22] James H. Carr, *et al.*, *State of Housing in Black America* (2016), https://www.nareb.com/site-files/uploads/2016/08/NAREB-SHIBA-REPORT-2016-final.pdf.

[23] "CFPB Report Highlights Supervisory Findings of Wide-Ranging Violations of Law in 2021" (Dec. 8, 2021), https://www.consumerfinance.gov/about-us/newsroom/cfpb-report-highlights-supervisory-findings-of-wide-ranging-violations-of-law-in-2021.

firm, published the following white paper on the issue of pricing exceptions (which it referred to as "pricing discretion"):

> As advisors to mortgage lenders on operations, risk management and compliance, clients often ask us about "best practices" in various aspects of mortgage lending. Among other things, clients ask us how other mortgage lenders approach managing the fair lending risk attached to pricing discretion: how much discretion is given to loan officers versus others in the organization, what are common justifications for pricing adjustments, how should the justifications be documented, etc. Motivated by the industry's and our own interest, we performed a benchmarking survey of clients and industry acquaintances to gather some systematic information about lender approaches to this important risk issue. In this paper, we discuss the results of the survey and the conclusions we draw from it about the current state of fair lending risk management with respect to mortgage pricing.
>
> \* \* \*
>
> Our survey confirms that discretionary pricing remains pervasive in the mortgage industry, and many lenders appear to find it necessary for competing effectively in the marketplace, accommodating customer preferences and needs, and providing good customer service. We also found that pricing discretion is commonly exercised to help comply with certain regulatory requirements or regulation-driven business policies. Even though the typical reasons for discretionary pricing adjustments appear to be grounded in legitimate business needs, the pervasiveness of discretion needs to be matched with adequate controls to avoid potential fair lending issues or enhanced regulatory scrutiny.
>
> \* \* \*
>
> Discretion in consumer loan pricing has been a major focus of fair lending regulatory and enforcement attention for several years. Numerous large-dollar settlements have been reached by the U.S. Department of Justice with mortgage and other lenders based on allegations that the lenders discriminated on the basis of race or ethnicity in their loan pricing. According to the government's legal theories, the lenders' policies or practices of allowing discretion to be exercised in loan pricing had a "disparate impact" on minority borrowers, which regulatory enforcement agencies consider to constitute illegal discrimination under the Fair Housing Act and Equal Credit Opportunity Act.[24]

79.    In 2014, in a "Supervisory Highlight" to the banking industry the CFPB addressed the discriminatory nature of pricing exceptions. The highlight included the suggestion that lenders, among other things, should "define the circumstances when the institution allows exceptions to be made to its credit standards" and "require documentation appropriate to that specific exception that is, at a minimum,

---

[24]    https://media.crai.com/sites/default/files/publications/Managing-the-Fair-Lending-Risk-of-Pricing-Discretion-Whitepaper-Oct-2014.pdf

sufficient to effectively monitor compliance with the exceptions policies" in the bank's policies and procedures.[25]

80.     Thus, the practice of offering illegal pricing exceptions to select classes of borrowers has been a concern for banking regulators for more than a decade.

**2.     Congress and the Courts Have Long Recognized that Discriminatory Lending Practices, Such as Redlining and Discretionary Pricing, Are Illegal**

81.     In 1948, the U.S. Supreme Court held that racially restrictive covenants were unenforceable. *See Shelly v. Kraemer*, 334 U.S. 1 (1948).

82.     In 1968, Congress passed the Fair Housing Act ("FHA") which made it illegal for lenders to consider race in credit analyses. Lending discrimination continued, however, and zoning ordinances began to be used in an effort to stop Black Americans from living in areas adjacent to predominately White neighborhoods. In the landmark case of *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974), the Eighth Circuit struck down a racially-motivated zoning plan that involved a neighborhood of White citizens living in an unincorporated St. Louis suburb incorporating and passing zoning restrictions in an effort to stop the construction of townhouses in which a majority of the residents would be Black.[26]

83.     In 1974, Congress passed the Legal Services Corporation Act to federally fund legal-aid organizations whose mission it was to litigate FHA claims on behalf of those being discriminated against.[27] In 1975 and 1977, respectively, Congress passed the Home Mortgage Disclosure Act ("HDMA") and the Community Reinvestment Act ("CRA"), which unequivocally outlawed redlining by private banks and allowed for the imposition of penalties on banks that discriminated in lending.[28] In 2017, Congress passed the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, which makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit

---

[25] https://files.consumerfinance.gov/f/201405_cfpb_supervisory-highlights-spring-2014.pdf

[26] Russell Fowler, *supra* note 18.

[27] *Id.*

[28] *Id.*

transaction – (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program." The Equal Credit Opportunity Act ("ECOA") applies to applications for residential loans for original purchase mortgages, mortgage refinancing, and other forms of credit. This means that discrimination in any aspect of a credit decision violates the ECOA, among other fair lending laws and regulations.

### 3. Discriminatory Lending Continues Today Through Automated Underwriting Systems and "Digital Redlining"

84.     For more than 20 years, banks and other lenders have relied on what has been referred to by regulators as automated lending where banks enter information from an applicant into a computer along with information collected from credit reporting agencies. The automated underwriting system then weighs this information to determine the likelihood that a loan will be fully and timely repaid, based on the way similar mortgages with comparable borrower, property and loan characteristics have performed in the past. Automated underwriting systems (theoretically) assess the riskiness of the loan based on a comprehensive evaluation. Lenders using such systems are able to make faster and (theoretically) more accurate loan decisions, and, by consistently applying (theoretically) uniform standards of creditworthiness, automated underwriting systems can (theoretically) provide objective treatment of all borrowers.

85.     Modern automated lending practices, however, like their predecessors, have also been shown to result in discriminatory lending, including what regulators have referred to as "algorithmic" or "digital redlining." As Bankrate, a consumer services company, explains: "digital redlining can mean not just the ways technology perpetuates low property values in historically redlined neighborhoods, but also other ways that all kinds of tech can be subtly or overtly discriminatory. 'Redlining, historically, created a disparity in valuation in majority-Black neighborhoods,' says Mark Alston, public affairs chairman of the National Association of Real Estate Brokers ("NAREB"). 'If you have a perfect appraisal in a majority-Black neighborhood today with perfect comps and no bias on the part of the appraiser,' it's

likely still going to be valued lower compared to a similar property in a majority-white neighborhood because of that historical bias."[29]

86.    The NAREB in 2016 also specifically identified "sophisticated technology" and new "proprietary financial models" as a primary cause of the current disparities in lending to Black Americans as compared to non-Hispanic Whites:

> Rather than breaking the barriers of discrimination, financial firms use sophisticated technology systems, driven by proprietary financial models, to justify their limited [loan] originations to Blacks.  These proprietary models are unavailable for public scrutiny. Continued lack of access to home mortgage credit for Blacks is neither fair nor insurmountable; increasing home ownership demands only the removal of discriminatory, unfair, and deceptive barriers to credit access, including those that are programmed into the technologies and practices of our modern housing finance system.[30]

87.    The U.S. Consumer Financial Protection Bureau ("CFPB") and Department of Justice ("DOJ") have also recognized the discriminatory impact of automated or algorithmic underwriting and digital redlining. The "CFPB has prioritized digital redlining, including bias in algorithms and technologies marketed as AI.  As part of this effort, the CFPB is working with federal partners to protect homebuyers and homeowners from algorithmic bias within home valuations and appraisals through rulemaking."[31]  CFPB's Director, Rohit Chopra, further noted in 2021 that "[d]igital redlining may simply engrain old forms of discrimination."[32]

88.    In 2021, the DOJ reached "a settlement with Trustmark National Bank" that resolve[d] allegations that Trustmark engaged in lending discrimination by redlining predominantly Black and Hispanic neighborhoods in Memphis, Tennessee."[33]  In remarking on this settlement, which was the

---

[29] *See* Zach Wichter, *Appraisal Bias and digital redlining: No one-step solution* (May 9, 2022), https://www.bankrate.com/mortgages/appraisal-bias-and-digital-redlining/.

[30] *See* Carr, *et al.*, *supra* note 22.

[31] *See* https://www.justice.gov/opa/pr/justice-department-announces-new-initiative-combat-redlining.

[32] *See* https://www.cbsnews.com/news/justice-department-redlining-investigation-digital-racist-practices/.

[33] *See* https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-announcing-new-initiative-combat.

DOJ's "second redlining settlement in less than two months," U.S. Attorney General Merrick Garland discussed the harms of redlining:

> Redlining is a process by which lenders deny services to individuals in a neighborhood because of the race or national origin of the people who live in those communities.

> * * *

> Lending discrimination runs counter to fundamental promises of our economic system. When a person is denied credit simply because of their race or national origin, their ability to share in our nation's prosperity is all but eliminated.

> * * *

> Redlining contributed to the large racial wealth gap that exists in this country. The practice made it extremely difficult for people of color to accumulate wealth through the purchase, refinancing, or repair of their homes. That discrepancy in wealth is clearly reflected in current homeownership rates.

> * * *

> Today, we are committing ourselves to addressing modern-day redlining by making far more robust use of our fair lending authorities.[34]

89.     In July 2023, Michael S. Barr, Vice Chair for Supervision, Board of Governors of the Federal Reserve Bank, discussed "digital redlining" at the National Fair Housing Alliance's ("NFHA") 2023 National Conference in Washington, D.C.[35] Mr. Barr described the "risks" faced by "bank[s]" that engage in "digital redlining" and how those "risks are amplified when a [bank's] model is opaque and lacks a sufficient degree of explainability" as to how the bank's "data, variables, and other features inform [its] credit decisions":

> If we determine that a bank has engaged in a pattern or practice of discrimination, we refer the matter to the Department of Justice (DOJ). *Federal Reserve referrals have resulted in DOJ actions in critical areas, such as redlining . . . . [D]igital redlining in marketing—the use of criteria to exclude majority-minority communities or minority applications—is one risk, and it has already been the subject of several settlements, including one several years*

---

[34] *Id.*

[35] Michael S. Barr, Vice Chair for Supervision, Board of Governors of the Federal Reserve Bank, Furthering the Vision of the Fair Housing Act, at "Fair Housing at 55—Advancing a Blueprint for Equity," National Fair Housing Alliance 2023 National Conference, Washington, D.C., https://www.federalreserve.gov/newsevents/speech/barr20230718a.htm.

*ago involving the NFHA and Facebook*.[36]  Digital redlining may result if advertisers select their audiences based on a characteristic that is correlated with protected characteristics. New technologies can also result in "reverse redlining," or steering in the advertisement of more expensive or otherwise inferior products to minority communities.

\* \* \*

These risks are amplified when a model is opaque and lacks a sufficient degree of explainability—the degree to which the bank can understand how data, variables, and other features inform the credit decisions.

### 4.    Wells Fargo's Board Knew that Compliance With Fair Lending Laws Was a Mission-Critical Risk for the Company

90.    Wells Fargo has a long history of discriminatory lending practices that have cost the Company and its stockholders hundreds of millions of dollars.  For example, in July 2012, the DOJ announced a $184.3 million settlement with Wells Fargo stemming from claims that, between 2004 and 2008, the Company engaged in a pattern or practice of steering Black and Hispanic applicants into mortgages with higher interest rates and fees compared to similarly situated White applicants.[37] Specifically, the DOJ alleged that Wells Fargo "discriminat[ed] against more than 34,000 African-American and Hispanic borrows in the operation of its residential mortgage lending . . . from at least 2004 to 2009[.]"[38]  The DOJ further alleged:

- "As a result of Wells Fargo's policies and practices, between 2004 and 2008, approximately ***4,000 qualified African-American and Hispanic wholesale borrowers***, who received Wells Fargo loans through mortgage brokers, received subprime loans rather than prime loans from Wells Fargo because of their race or national origin, not based on their creditworthiness or other objective criteria related to borrower risk. ***These African-American and Hispanic borrowers were placed into subprime loans, with adverse terms and conditions such as high interest rates, excessive fees, pre-***

---

[36] *Id.* (citing NFHA, *et. al*, Summary of Settlements Between Civil Rights Advocates and Facebook (Mar. 19, 2019), https://nationalfairhousing.org/wp-content/uploads/2022/01/3.18.2019-Joint-Statement-FINAL-1.pdf).

[37] *Press Release, Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (July 12, 2012), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

[38] *United States v. Wells Fargo Bank, NA*, No. 1:12-cv-01150 (D.D.C. July 12, 2012) (COMPLAINT, ECF No. 1).

*payment penalties, and unavoidable future payment hikes, when similarly qualified non-Hispanic white . . . borrowers received prime loans*." *Id.* ¶ 1.

- "[B]etween at least 2004 and 2009, approximately **30,000 African-American and Hispanic wholesale borrowers** paid Wells Fargo higher fees and costs for their home mortgages than white borrowers because of their race or national origin, not based on their creditworthiness or other objective criteria related to borrower risk." *Id.* ¶ 3.

- "Wells Fargo had information about each borrower's race and national origin. Wells Fargo also knew or had reason to know based on its own internal monitoring and reporting that its policies of giving unguided discretion to its loan originators was resulting in discrimination. . . . Wells Fargo's internal documents reveal that senior officials were aware of the numerous tactics that subprime originators employed to keep loans in the subprime division, and that a significant percentage of borrowers were receiving subprime loans when they could have qualified for prime loans. Wells Fargo did not act to adequately compensate borrowers who were victims of discrimination nor did it take effective action to change its policies or practices to eliminate tile discrimination." *Id.* ¶ 7.

- "African-American and Hispanic customers of Wells Fargo in at least **82 geographic market across at least 36 states and the District of Columbia** were victims of Wells Fargo's discriminatory practices." *Id.* ¶ 8.

- "Between 2004 and 2008, Wells Fargo placed approximately **2,350 African-American and 1,650 Hispanic wholesale borrowers**, as well as additional retail borrowers, into subprime loans even though white borrowers who had similar credit qualifications were placed into prime loans. As a result of being placed in a subprime loan, an African-American or Hispanic borrower paid, on average, tens of thousands of dollars more for a Wells Fargo loan, and was subject to possible pre-payment penalties, increased risk of credit problems, default, and foreclosure, and the emotional distress that accompanies such economic stress." *Id.* ¶ 23.

- "For the combined time period of 2004 to 2007, in the high-volume markets with statistically significant odds ratio disparities, the odds of an African-American [or a Hispanic] borrower receiving a subprime wholesale loan in a given year were up to **8.3 times** [or **6.1 times**] as high as the odds for a similarly-situated white borrower." *Id.* ¶¶ 44-45.

- "Between 2004 and 2008, Wells Fargo charged more than **12,850 African-American** [and **more than 17,150 Hispanic**] wholesale borrowers higher fees and costs than white borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race. *Id.* ¶ 51.

- "Wells Fargo charged more than **7,660 individually identifiable African-American borrowers**" and "**17,150 individually identifiable Hispanic borrowers** in the high loan-volume markets from 2004 to 2008 higher prices of varying amounts than white

borrowers for their prime wholesale loans, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race."  *Id.* ¶¶ 70-71.

91.    In 2019, the Company settled similar fair lending claims brought by the City of Philadelphia ("Philadelphia").[39]  The *Philadelphia* Action, which was filed in May 2017, averred that beginning in 2004, Wells Fargo violated the FHA by steering African-American and Hispanic borrowers toward higher interest rate loans even when those borrowers qualified for more advantageous loans. Philadelphia claimed that the Company was not only aware of this practice but incentivized the marketing of high-cost or high-risk loans to minorities.  Without admitting liability, Wells Fargo agreed to settle the *Philadelphia* Action for $10 million, with $8.5 million allocated to grants for down payments and closing cost assistance for low- and moderate-income persons and households in Philadelphia.[40]

92.    In March 2020, Maxine Waters and Al Green submitted a detailed 74-page report prepared by the Majority Staff of the Committee on Financial Services, U.S. House of Representatives, titled "The Real Wells Fargo:  Board & Management Failures, Consumer Abuses, and Ineffective Regulatory Oversight."  The report concluded that Wells Fargo "failed to correct serious deficiencies in its infrastructure for managing consumers and complying with the law.  As a result, Wells Fargo's customers have been exposed to countless abuses, including racial discrimination . . . ."  The report further concluded that "Wells Fargo's board failed to hold senior management accountable for the Bank's lack of progress under the consent orders, despite the performance concerns raised by regulators and certain board members."[41]

---

[39] *City of Philadelphia v. Wells Fargo & Co.*, No. 17-cv-02203-AB (E.D. Pa. 2019), ECF No. 1.  *See also* Jeff Blumenthal, *Wells Fargo agrees to settle discriminatory lending lawsuit brought by City of Philadelphia*, Phila. Bus. J. (Dec. 16, 2019), https://www.bizjournals.com/philadelphia/news/2019/12/16/wells-fargo-agrees-to-settlement-discriminatory.html#:~:text=The%20City%20of%20Philadelphia%20has%20reached%20a%20settlement%20in%20its,%2D%20and%20moderate%2Dincome%20residents.

[40] *See* Press Release, City of Philadelphia and Wells Fargo Resolve Litigation (Dec. 16, 2019), https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation.

[41] The Hon. Maxine Waters & The Hon. Al Green, *The Real Wells Fargo: Board & Management Failures, Consumer Abuses, And Ineffective Regulatory Oversight*, U.S. HOUSE OF REPRESENTATIVES (March 2020), https://www.congress.gov/116/meeting/house/110719/documents/HHRG-116-BA00-20200311-SD003.pdf.

93.     In August 2020, Wells Fargo issued its 2020 ESG Report which was based on interviews with key stakeholders and stockholders, including the California State Teachers' Retirement System, that DEI issues were a top priority for the Company's stockholders.  The ESG Report stated that the topics "most significant to our internal and external stakeholder . . . [included] . . . [d]iversity and inclusion."

94.     On December 3, 2020, Wells Fargo shareholders sent a demand letter (the "December 2020 Demand") to the Board (whose members then included a majority of the Demand Directors, as defined herein).[42]  The December 2020 Demand "allege[d] breaches of fiduciary duty by over two dozen current or former directors and officers of the Company in connection with certain of the Company's business practices" and "request[ed] that the Company take action to recover damages for alleged misconduct and correct alleged deficiencies in the Company's controls relating to . . . *minority borrowing practices* . . . ."[43]  In response, on January 26, 2021, the Board delegated consideration of the December 2020 Demand to a Demand Review Committee consisting of Board members Black and Chancy.[44]

95.     While the Demand Review Committee evaluated its response to the December 2020 Demand, on May 6, 2021, six Wells Fargo employees with PhDs published an article titled *Bias, Fairness, and Accountability with AI and ML Algorithms* on arXiv, an open-access Cornell University archive of scholarly articles in the fields of computer science, quantitative finance, statistics, and economics, among others.[45]  The May 2021 Article relied on several Wells Fargo Internal Reports and was authored by Wells Fargo employees well-positioned to understand whether Wells Fargo's lending algorithm resulted in discrimination: Nengfeng Zhou (SVP, Principal Quantitative Analytics Consultant), Zach Zhang (former Wells Fargo Machine Learning and AI Research employee), Vijayan N. Nair (Head, Statistical Learning and Advanced Computing), Harsh Singhal (former Wells Fargo Head of Decision Science and AI Validation, Managing Director), Jie Chen (Head of Decision Science and Artificial Intelligence Model Validation, Corporate Model Risk), and Agus Sudjianto (EVP, Head of Corporate Model Risk).

---

[42] Ex. G, Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Co. and Wells Fargo Bank Nat'l Assoc. Held on Oct. 25-26, 2021 (WF_DS_000001943 at 1959-62).

[43] *Id*. at 1960.

[44] *Id.* at 1962.

[45] https://arxiv.org/pdf/2105.06558 (last visited May 9, 2024).

96.    The May 2021 Article stated that a "hot topic" regarding the use of artificial intelligence ("AI") and machine learning ("ML") to make financing decisions is the "potential for bias and lack of fairness."  The article explains that both the data supporting a lending algorithm and its machine learning can result in discrimination, "[h]istorical data are often skewed towards, or against, particular groups . . . . insufficient attention is being paid to inherent biases in the data collection mechanisms and lack of representation."  The article also noted that "[d]ata bias together with poor optimization of algorithms can cause severe harm to protected groups."  The article then provided proposed solutions for de-biasing and mitigating unfairness in lending algorithms.

97.    Despite the clear magnitude of the risk that discriminatory lending practices were occurring at Wells Fargo as evidenced by the May 2021 Article, the Company's history of fair lending related settlements, the Director Defendants did nothing to address or even assess whether *Wells Fargo's* automated lending programs or algorithms resulted in disparate impact towards minorities or whether the Company's lending practices included the same discriminatory pricing exceptions at issue in the DOJ action and the *Philadelphia* Action.

98.    On October 26, 2021, Defendant Chancy provided a "Demand Review Committee Report" to the Board which stated that "after weighing all of the above considerations, the [Demand Review] Committee recommends that the Board reject the [December 2020] Demand because it is not in the Company's best interests to conduct further investigation into the Demand's subject matter or the merits of the allegations, commence litigation, alter ongoing Company and Board compliance efforts or take other action as requested in the Demand at this time."[46]  In other words, after ten months of (allegedly) looking into Wells Fargo's "minority borrowing practices," including discriminatory pricing exceptions, the Board and Demand Review Committee decided that "alter[ing] its compliance efforts" in this area or commencing further investigation or action is unnecessary.  Yet, five months later, the March 11, 2022 *Bloomberg* article was published.  And late last year, in December 2023, *CNBC* reported that Well Fargo is under federal investigation (again) for not preventing discriminatory pricing exceptions from occurring at the Company.

[46] Ex. G at WF_DS_000001961.

### 5.    The Mortgage Discrimination Class Action Alleges Wells Fargo's Systematic Discrimination Against Minority Borrowers

99.    Wells Fargo is currently a defendant in the consolidated Mortgage Discrimination Class Action pending in the Northern District of California before the Hon. James Donato, which is brought by (and on behalf of) loan applicants who allege that they suffered racial and ethnic discrimination when applying for home loans and refinancing.[47]  The plaintiffs allege that in determining home loans, interest rates, and mortgage points, Wells Fargo used factors to determine eligibility for home loan rates, terms, and conditions that result in disparate impact towards minority borrowers.[48]  As a result, Wells Fargo is alleged to have violated the Equal Credit Opportunity Act (15 U.S.C. § 16901, *et seq.*), the Fair Housing Act of 1968 (42 U.S.C. § 3601, *et seq.*), the Unruh Civil Rights Act (California Civil Code § 51), the California Unfair Competition Law, and 42 U.S.C. § 1981.

100.    The automated lending systems or algorithms at banks like Wells Fargo have been described by the director of the CFPB as "black boxes behind brick walls."[49]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias."[50]  Despite this limited public information, the Mortgage

---

[47] On February 17, 2022, Christopher Williams filed a class action lawsuit against Wells Fargo for lending discrimination.  *See* No. 3:22-cv-00990 (N.D. Cal.).  Winfred Thomas and Michelle Sims filed suit on March 26, 2022 (No. 3:22-cv-01931).  On April 12, 2022, Gia Gray, Bryan Brown, and Paul Martin joined the pending *Braxton* Action (No. 3:22-cv-01748).  On April 14, 2022, Sam Albury and Shaia Beckwith Simmons joined the pending *Williams* action (No. 3:22-cv-00990).  Ifeoma Ebo filed suit on April 26, 2022 (No. 3:22-cv-02535) (the "*Ebo* Action").  Elretha Perkins and Laronica Johnson filed suit on June 10, 2022 (No. 3:22-cv-03455).  Terah Kuykendall-Montoya joined the *Ebo* Action on November 4, 2022 (No. 3:22-cv-0235).  On January 18, 2023, Judge James Donato issued an order consolidating these class actions and on March 24, 2023, Lead Counsel in the Mortgage Discrimination Class Action filed an Amended and Consolidated Class Action Complaint.  *See* No. 3:22-cv-00990 (N.D. Cal.) (ECF No. 114).

[48] According to Wells Fargo's own internal documents, the Board does not appear to have even bothered to discuss Mortgage Discrimination Class Action after it was filed.

[49] Remarks of Director Rohit Chopra at a Joint DOJ, CFPB, and OCC Press Conference on the Trustmark National Bank Enforcement Action (Oct. 22, 2021), https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action.

[50] *Id.*

Discrimination Class Action brought to light numerous ways in which Wells Fargo's lending algorithm results in digital redlining, several of which are discussed below.

101.    Among the overlays utilized by Wells Fargo—collectively known as its "CORE/ECS" system (*see* Section VI.B.7 *infra*)—are various overlays or "rules" which result in disparate (and adverse) treatment of borrowers from racial and ethnic minorities—including African-American and Hispanic borrowers—the effect of which is modern-day redlining (both geographic and demographic).  Borrowers seeking to refinance properties in Black-majority neighborhoods are deemed by the CORE/ECS system to be a greater lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority neighborhoods.  Wells Fargo's CORE/ECS system effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low- and moderate-income census tract data within Wells Fargo's internal systems, identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in White-majority neighborhoods.

102.    Before March 2020, Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans.  Following the Covid-19 pandemic, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers.  Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts.  Wells Fargo knew this policy change would have a racially disparate impact.  As explained in an April 2020 JP Morgan Chase Institute report, for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[51]  In addition, while Black families have, on average, $2,000 or less in liquid savings, the typical White family has more than four times that amount.[52]

103.    Wells Fargo's automated underwriting processes use Bayesian Improved Surname Geocoding, a method that applies Bayes' Rule to predict the race or ethnicity of an individual utilizing

---

[51] JP Morgan Chase & Co. Institute Presentation, *Racial Gaps in Financial Outcomes* (April 2020), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

[52] *Id.*

the individual's surname and geocoded location, when that information is not otherwise provided.[53]  This process requires an internal determination by the Wells Fargo algorithm of which neighborhoods are associated with which racial group.

104.    Wells Fargo considered uncorrected historical and current appraisal data from geographically differentiated locations in its refinance process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  According to a March 23, 2022 report by *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which Wells Fargo identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods—despite having similar neighborhood and property characteristics and amenities."[54]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhood came in below the contract price, compared with 7.4 percent of appraisals in White neighborhoods."[55]  The below-market appraisals intentionally skew the loan-to-value calculations against Black homeowners and prospective homeowners and serve as a tool for racial discrimination.  Wells Fargo's automated underwriting system does not correct appropriately for these racial disparities in appraisals, and instead places undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by non-White homeowners.

105.    Wells Fargo's CORE system also uses increased credit score requirements.  While it is impossible to know given the black-box nature of Wells Fargo's algorithm, Plaintiffs believe that Wells Fargo imposed a higher minimum credit score than that required for an FHA loan or a Fannie Mae-backed loan.  Accordingly, if Fannie Mae required a minimum credit score of 600, Wells Fargo would require a minimum score of 620.  In February 2021, it was reported that one in five Black consumers have FICO

---

[53]    Jie Chen, Wells Fargo Presentation, *Ethics and Bias in Algorithms* (June 4, 2020), https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation. cfm?file=309619.pdf.

[54]    Tracy Jan, *Home Values Soared During the Pandemic, Except for These Black Families*, The Washington Post (Mar. 23, 2022), https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[55]    *Id.*

SECOND AMENDED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT
CASE NUMBER: 3:22-CV-05173-TLT

scores below 620, while one out of every 19 White consumers are in the sub-620 category.[56] A study by the Board of Governors of the Federal Reserve System analyzing federal mortgage data identified no "evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[57] And after controlling for relevant underwriting factors (Debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants [like Wells Fargo] tend to have the largest unexplained excess denials of minority applicants."[58]

### 6.  *Bloomberg's* March 2022 Investigation Confirms Wells Fargo's Systematic Discrimination Against Black and Hispanic Borrowers

106.    On March 11, 2022, *Bloomberg* published the results of its analysis of nationwide data published under the Home Mortgage Disclosure Act ("HMDA") from more than eight million completed applications for conventional refinancing loans from 2020.[59] The results of the study were striking: Wells Fargo approved only 47% (and rejected 53%) of Black mortgage applicants in 2020, by far the worst record among its peers when considering refinancing for Black homeowners. Wells Fargo also rejected 47% (and approved 53%) of Hispanic mortgage applicants. In comparison, the Company approved 72% (and rejected only 28%) of all White homeowners' refinancing applications during that same year. The chart below, created by *Bloomberg*,[60] compares Wells Fargo's approval rate by race relative to its peers. While Black applicants overall had a lower approval rate than White applicants

---

[56] Natalie Campisi, *From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models*, Forbes (Feb. 26, 2021), https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[57] Neil Bhutta, et al., *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, (July 2021), at 12, n.20, https://papers.ssrn.com/sol3/papers.cfm? abstract_id=3887663.

[58] *Id.* at 12.

[59] Shawn Donnan, *et al.*, *Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom*, Bloomberg (Mar. 11, 2022), https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[60] *Id.*

1    across the board, Wells Fargo had the largest disparity between the two groups and rejected more Black

2    homeowners' applications than it accepted:



Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

107.    Moreover, the data revealed that "the highest-income Black applicants . . . had an approval rate about the same as White borrowers in the lowest-income backet."[61]    Stated differently, "Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants."

---

[61] *Id.*



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

108.    Notably, in addition to the above, Wells Fargo was the ***only*** major lender in the United States that "approved a smaller share of refinancing applications from Black homeowners in 2020" than it had in 2010.  Wells Fargo's "47% approval rate was its second lowest during the past decade."[62]

109.    While disparate treatment is a continuing problem in the banking industry, Wells Fargo is by far the worst among its peers.  Indeed, the Company was the ***only*** major U.S. lender in 2020 that rejected more Black homeowner refinancing applications than it accepted.  JPMorgan Chase & Co., for example, approved 81% of Black homeowners' refinancing applications in 2020 and 90% of White homeowners' applications.  Bank of America Corp. approved 66% of its Black applicants while approving 78% of White applicants.  Rocket Mortgage LLC approved 79% of Black applicants and 86% of White ones.  These numbers stand in stark contrast to Wells Fargo's paltry 47% approval rate for Blacks.

---

[62] *Id.*

110.     Equally troubling is that Wells Fargo was the only lender among its peers to approve a smaller share of refinancing applications from Black homeowners in 2020 when compared to 2010.  In other words, for a 10-year period Wells Fargo was the only major lender to **reduce** its overall percentage of refinancings for Black borrowers when compared to Whites.

111.     Following the *Bloomberg* publication Aaron Braxton (No. 3:22-cv-01748) (the "*Braxton* Action") and Alfred Pope (No. 3:22-cv-01793) filed class actions against Wells Fargo in the U.S. District Court for the Northern District of California alleging the Company's lending algorithm engaged in digital redlining.

112.     In addition, on March 18, 2022, Senator Sherrod Brown announced that he, joined by Senators Dick Durbin, Tina Smith, Raphael Warnock, Elizabeth Warren, Ron Wyden, Jon Ossoff, Jeff Merkley, Alex Padilla, Bernie Sanders, and Mark Warner had sent a letter to the HUD and CFPB to request a review of Wells Fargo's mortgage loan refinance processes amid concerns and reporting that suggested Black and Hispanic borrowers were less likely to be approved for refinance loans in 2020 as interest rates hit record lows.[63]

113.     On March 25, 2022, *Bloomberg* published a second article related to Wells Fargo's persistent racial gap in mortgage refinancing based on new data from loans in 2021.[64]  The article reported that while the lending rates for Black and Hispanic homeowners had improved over the prior year, Wells Fargo "continued to have the lowest approval rate for Black borrowers of any major lender."  The chart below, created by *Bloomberg*,[65] compares Wells Fargo's loan approval rate by race relative to its competitors.

---

[63] Majority Press Release, *Brown, Colleagues Call for Review of Wells Fargo Refinancing Process* (Mar. 17, 2022), https://www.banking.senate.gov/newsroom/majority/brown-colleagues-review-wells-fargo-refinancing-process.

[64] Ann Choi, *et al.*, *Wells Fargo Faces Persistent Racial Gap in Mortgage Refinancing,* Bloomberg (Mar. 25, 2022), https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

[65] *Id.*



114.    In March 2022, reacting to *Bloomberg's* article senators Elizabeth Warren and Ron Wyden, wrote separate letters to Wells Fargo's CEO, Defendant Scharf demanding that the bank produce the data and algorithms it uses to evaluate applicants and cited what they called "potentially illegal discrimination."[66]

115.    On June 28, 2022, Congresswoman and Chairwoman of the U.S. House of Representatives Committee on Financial Services, Maxine Waters, wrote a letter to HUD, the Board of Governors of the Federal Reserve System, the FDIC, the CFPB and the OCC regarding Wells Fargo's unchecked misconduct ("Congresswoman Waters' Letter").[67]   The letter stated:  "[a]s I have made clear in the past, Congress has given regulators like yourselves significant tools to properly penalize Wells Fargo for its continuous wrongdoing, and based on Wells Fargo's recent behavior, I am writing to urge you to escalate penalties in a way that is reflective of its history of repeat offenses."[68]

---

[66] Donnan, et al., *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, BLOOMBERG NEWS (Mar. 17, 2022), https://www.bnnbloomberg.ca/wells-fargo-pressed-by-senators-on-race-disparity-in-refinancing-1.1739254.

[67] *See* Letter from Maxine Waters, Chairwoman of the United States House of Representatives Committee on Financial Services, to the Hon. Marcia Fudge, *et al.* (June 28, 2022), https://democrats-financialservices.house.gov/uploadedfiles/june_28th.pdf.

[68] *Id.*

116.     Of the current abuses by Wells Fargo, Congresswoman Waters explained:

*Bloomberg* has revealed large disparities in Wells Fargo's mortgage refinancing operations.  By sheer volume, Wells Fargo was the largest bank mortgage provider to Black homeowners in 2020, and helped more Black customers refinance their homes than any other bank.  However, "only 47% of Black homeowners who completed a refinance application with Wells Fargo in 2020 were approved, compared with 72% of White homeowners…While Black applicants had lower approval rates than White ones at all major lenders, the data show, Wells Fargo had the biggest disparity and was alone in rejecting more Black homeowners than it accepted."  Consumers and homeowners deserve to be treated with respect and it is their civil right under the Fair Housing Act and Equal Credit Opportunity Act to access credit equally and fairly, regardless of the color of their skin.  Wells Fargo has continued to dismantle the little trust that the public has in it and must be held accountable to the full extent of the law.[69]

### 7.     Internal Documents Show Wells Fargo's Automated Lending Program Resulted in Widespread, Systematic Disparities for Minority Borrowers Despite Management's Knowledge of "High" "Risks" and "Control Gaps"

117.     Internal documents produced by Wells Fargo and publicly filed in the Mortgage Discrimination Class Action (*see* § VI.B.5 *supra*) show that Wells Fargo's senior executives have known for years that the Company's lending practices and policies have adversely impacted African-American, Hispanic, and other minority borrowers—but that the Company (and its Board) left those problems unaddressed, underscoring the Board's utter failure of oversight.

118.     For example, according to a March 2019 "2018 Fair Lending Risk Assessment,"[70] Wells Fargo knew the Company had "HIGH" "Inherent Risks" that were "largely driven by" its "Underwriting: Allowance of exceptions to underwriting criteria, credit decisioning judgmental tolerances, [and] geographic based credit policies"; its "Pricing: Market/geography based pricing strategy and the percentage of loans with pricing exception allowances (i.e., average of 5%)"; and its "Redlining:  [loan-to-value] restrictions for property located in distressed or severely distressed market conditions . . . ." Despite these high risks, Wells Fargo also knew that its "Control Effectiveness" "NEEDS

---

[69] *Id.*

[70] Ex. H at WF-00030807.

IMPROVEMENT"; it had various "Control Gaps" (i.e., areas where it had no controls at all); and a majority of its controls (13 of 23) were either "Weak" or "Need[ed] Improvement."[71]



119.    The same March 2019 assessment rated the Company's "Control Effectiveness" as "NEEDS IMPROVEMENT" in the "Fair Lending Risk Focal Points" of "Underwriting/Fulfillment," "Pricing," "Sales / Steering," "Redlining," and "Statistical Models."   Wells Fargo also knew it had "HIGH" "Inherent Risks Ratings" for "Pricing" and "Redlining." As a result, Wells Fargo determined that with respect to its "Control Effectiveness" for "Fair Lending Risk" its "Overall Business" "NEED[ED] IMPROVEMENT":[72]

---

[71] *Id.*

[72] *Id.* at WF-00030809.   *See also id.* at WF-00030810-0811 (identifying "control gaps" in "Underwriting/Fulfillment," "Pricing," "Sales/Steering," and "Redlining" and concluding that "control effectiveness" in each of those "Fair Lending Risk Focal Point[s]" "NEED[ED] IMPROVEMENT").

## Home Equity – 2018 Risk Assessment Results

| Fair Lending Risk Focal Points | Inherent Risk Rating | Control Effectiveness Rating | Residual Risk Rating |
|---|---|---|---|
| Overall Business | HIGH | NEEDS IMPROVEMENT | HIGH |
| General | HIGH | EFFECTIVE | MODERATE |
| Underwriting/Fulfillment | HIGH | NEEDS IMPROVEMENT | HIGH |
| Pricing | MODERATE | NEEDS IMPROVEMENT | MODERATE |
| Sales / Steering | MODERATE | NEEDS IMPROVEMENT | MODERATE |
| Redlining | HIGH | NEEDS IMPROVEMENT | HIGH |
| Marketing and Advertising | MODERATE | EFFECTIVE | LOW |
| Servicing | N/A | N/A | N/A |
| Statistical Models | MODERATE | NEEDS IMPROVEMENT | MODERATE |

\*   \*   \*

120.    Since at least 2018, the Company has used CORE to assess all of its mortgage loan applications,[73] resulting in disparate impact to minority borrowers.  As background, CORE includes a "Risk Engine" and "Enhanced Credit Score Model" or ("ECS") that places applicants into risk classes.[74] Every loan applicant is processed through Wells Fargo's CORE/ECS system,[75] which impacts an

---

[73] Ex. I at 2245:7-17.

[74] *See* Ex. J at 2-5; Ex. K at 2275; Ex. L at 1240, 1247.

[75] Ex. I at 2257 ("CORE, in broad terms, is our loan origination system that we use to originate, process, underwrite, and close first mortgages"); *id.* at. 2259-60 ("CORE's our loan origination system that we used to originate, process, underwrite, and close loans"); Ex. I at 2254 ("All first mortgage loans currently go through the CORE platform[.]"); *id.* at 2259-60 ("CORE [is] our loan origination system that we used to originate, process, underwrite, and close loans."); Ex. M at WF-00035376 (CORE is a "web-based system that allows Wells Fargo Home Lending team members to process a loan from origination to funding").

applicant's credit risk classification, thus influencing application outcomes.[76]  A lower credit risk ranking relative to other loan applicants places an applicant at a disadvantage and subjects the applicant to greater review.[77]

121.    On March 24, 2022, a presentation titled "Fair Lending Analyses of Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model- Model Number 11960" stated that the "Fair Lending Model Development team ("FLMD") within the Risk Modeling Group ("RMG") and Fair Lending Analytics ("FLA") conducted disparate impact (DI) and proxy analyses on the Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model (MN 11960)."[78]  The "Results" of that analysis were that the "FLMD [team] identified disparate impact for various protected classes in the ECS conventional model[.]"  The presentation concluded that these "disparities" were "practically significant (AIR < .90) disparities for multiple protected classes[.]"[79]

122.    The presentation noted that the "[ECS] Model is currently in production"; "ECS score is used to establish the associated credit risk and underwriter level required to evaluate a mortgage application"; and "the higher the score the lower the risk; the lower the score, the higher the risk"; and "ECS score is binned into the following credit risk classes" including C2 (ESC Scores of 76-199), C1 (200-219), A2 (220-249), and A1 (250-333):[80]

---

[76] Ex. K at 2275 (testifying that the ECS model impacts whether or not a borrower's credit risk class is A1, A2, C1, or C2).

[77] Ex. N at WF-00079830 ("ECS Score" is "used to establish the associated credit risk and underwriter level required to evaluate the application").

[78] Ex. J at 2.

[79] *Id.* at 4.  Wells Fargo circumvents otherwise statistically significant approval rate disparities based on its internal policy that an AIR of .90 or greater is not "practically significant."  Ex. M at 915 (Wells Fargo's "Statistical Approach" to "quantify[ing] levels of fair lending risk" included that "*[a]n AIR below 90%* with an adjusted p-value at the 5% level from a statistical test of the differences in approval rates between the test and control classes *indicates a practically significant fair lending risk*"—or in other words, that any AIR *above 90%* was *not* "practically significant" for Wells Fargo).

[80] Ex. J at 5.

| ECS Score | Credit Risk Class |
|-----------|-------------------|
| 76-199 | C2 |
| 200-219 | C1 |
| 220-249 | A2 |
| 250-333 | A1 |

123.    The presentation explained that it performed a "Fair Lending Analysis" to "[a]ssess[] whether there were practically significant disparities associated with these models."[81] To do so, "[n]ine cutoffs were identified that separate the population into [ten] deciles.  Based on these cutoffs, the EOD [expected outcome disparities] tables were generated which presented the Adverse Impact Ratio (AIR)[82] at each of the 9 cutoffs[.]"[83]

124.    Next, the presentation performed an "EOD [i.e., Expected Outcome Disparities] Analysis" of "ECS Score Cutoffs" for (i) "2020 and 2021 Combined"; (ii) 2020; and (iii) 2021, each of which set forth in a separate table which "present[ed] the [AIR] at 9 cutoffs, defined by deciles of scored observations[.]"[84]  In each table, "AIRs < .9" [were deemed] practically significant and highlighted in red[.]"[85]

125.    For "2020 and 2021 Combined," the "EOD table show[ed] practically significant disparities for 4 protected classes"; found that for "classes 2 and 4, the disparities span all 9 cutoffs" and for "the remaining classes, the disparities range from 5 cutoffs to 4 cutoffs":[86]

---

[81] Ex. J at 7.

[82] Wells Fargo calculated the AIR by comparing a "fair lending test class" with a "fair lending control class."  Ex. J at 7.  "When the AIR = 1, the test and control class are equally receiving the favorable outcome."  *Id.*  "When the AIR < .9, the test class is proportionally more often receiving the unfavorable outcome, with the AIR denoting a practically significant disparity."  *Id.*  "Those applicants with AIRs above the cutoff [were] considered to receive the favorable outcome, and those below the cutoff receive the unfavorable outcome[.]"  *Id.*

[83] *Id.* at 7.

[84] *Id.* at 9-11.

[85] *Id.* at 9-11.

[86] *Id.* at 9.

| Class | Cutoff 1: 205 | Cutoff 2: 224 | Cutoff 3: 237 | Cutoff 4: 247 | Cutoff 5: 256 | Cutoff 6: 265 | Cutoff 7: 274 | Cutoff 8: 283 | Cutoff 9: 294 |
|---|---|---|---|---|---|---|---|---|---|
| Class 1 | 102.5% | 103.1% | 101.7% | 99.0% | 94.8% | 89.3% | 82.4% | 76.5% | 68.5% |
| Class 2 | 82.1% | 71.4% | 63.9% | 58.0% | 53.7% | 49.5% | 46.1% | 42.8% | 38.3% |
| Class 3 | 95.7% | 93.6% | 92.3% | 91.2% | 89.8% | 88.6% | 87.1% | 85.9% | 82.1% |
| Class 4 | 89.4% | 80.1% | 72.5% | 66.4% | 61.1% | 56.2% | 51.3% | 46.9% | 42.3% |
| Class 5 | 101.5% | 103.2% | 104.1% | 103.5% | 101.4% | 98.9% | 96.9% | 95.6% | 94.9% |

126.    For "2020 data," the "EOD table show[ed] practically significant disparities for 4 protected classes"; found that for "classes 2 and 4, the disparities span all 9 cutoffs" and for "the remaining classes, the disparities range from 5 cutoffs to 4 cutoffs":[87]

| Class | Cutoff 1: 206 | Cutoff 2: 224 | Cutoff 3: 237 | Cutoff 4: 247 | Cutoff 5: 256 | Cutoff 6: 264 | Cutoff 7: 273 | Cutoff 8: 282 | Cutoff 9: 293 |
|---|---|---|---|---|---|---|---|---|---|
| Class 1 | 102.2% | 102.5% | 100.8% | 97.8% | 93.6% | 88.8% | 82.0% | 76.4% | 68.2% |
| Class 2 | 81.5% | 70.9% | 63.3% | 57.2% | 52.9% | 48.8% | 46.0% | 42.0% | 37.5% |
| Class 3 | 95.6% | 93.2% | 91.5% | 90.5% | 88.8% | 87.7% | 86.5% | 85.4% | 81.3% |
| Class 4 | 88.6% | 79.6% | 71.7% | 65.4% | 60.0% | 55.8% | 51.0% | 46.0% | 42.4% |
| Class 5 | 101.2% | 102.5% | 103.4% | 102.5% | 100.3% | 98.3% | 96.2% | 94.8% | 95.8% |

127.    For "2021 data," the "EOD table show[ed] practically significant disparities for 4 protected classes"; found that for "class 2, the disparities span all 9 cutoffs" and for "the remaining classes, the disparities range from 8 cutoffs to 3 cutoffs":[88]

| Class | Cutoff 1: 204 | Cutoff 2: 224 | Cutoff 3: 237 | Cutoff 4: 247 | Cutoff 5: 257 | Cutoff 6: 265 | Cutoff 7: 274 | Cutoff 8: 284 | Cutoff 9: 295 |
|---|---|---|---|---|---|---|---|---|---|
| Class 1 | 102.7% | 103.8% | 102.7% | 100.4% | 95.5% | 90.7% | 83.8% | 77.0% | 69.8% |
| Class 2 | 82.9% | 71.8% | 64.3% | 58.5% | 53.7% | 50.2% | 46.0% | 43.1% | 38.3% |
| Class 3 | 95.9% | 93.9% | 92.8% | 91.6% | 90.2% | 89.1% | 87.4% | 86.0% | 82.9% |
| Class 4 | 90.0% | 80.6% | 73.2% | 67.2% | 61.5% | 57.2% | 52.0% | 47.2% | 42.3% |
| Class 5 | 101.8% | 103.8% | 104.7% | 104.2% | 102.0% | 99.3% | 97.0% | 95.2% | 93.0% |

128.    Agus Sudjianto, EVP, Head of Corporate Model Risk and co-author of the May 2021 Article, confirmed in his sworn testimony that the FLMD team had "identified disparate impact for various protected classes in relationship to ECS Model 11960 and that Wells Fargo currently still uses that same model."[89]

---

[87] *Id.* at 10.

[88] *Id.* at 11.

[89] *See* Ex. K at 2272-73, 2277 ("[Question:] The fair lending model development department identified disparate impact for various protected classes in relationship to Model 11960 that is currently in use at Wells Fargo. True? . . . [Answer:] Yes."); *see also id.* at 2279-80 ("[Question:] Your department assesses the deterioration of models in use at Wells Fargo in the mortgage lending business, correct? [Answer:]

129.    Yet, despite the fact that the "FLMD [team] identified disparate impact" and "practically significant disparities" that the "(ECS) Model (MN 11960)" causes "various protected classes" of individuals to experience when they apply for a loan from Wells Fargo—today the Company still uses the CORE/ECS system and model 11960, which is still "*currently in production*."[90]

*    *    *

130.    Internal documents produced in the Mortgage Discrimination Class Action further detail the reactions of Wells Fargo employees to *Bloomberg's* investigation and how *Bloomberg's* findings were, in one employee's words, not "a recent anomaly" but "a long-term systemic issue" at Wells Fargo.[91] In response to *Bloomberg's* analysis, Wells Fargo tasked employees in its data analytics team with analyzing the data underlying *Bloomberg's* analysis in order to validate the article's claim of disparate impact.[92]    Saba Dossani, the head of Wells Fargo's Business Insights & Analytics ("BIA") team and Deborah Knutson-Smith, one of Dossani's direct reports, both testified that their BIA team was able to validate *Bloomberg's* analysis as accurate.[93]

131.    On March 12, 2022, as part of that analysis, Saba Dossani, the head of Wells Fargo's BIA team, emailed with Tim Seagren and Debbie Knutson-Smith, both members of the BIA team.[94]    Mr.

---

Yes. [Question:] You have, over time, discovered the deterioration of models in use by Wells Fargo, correct? [Answer:] Yes. . . . [Question:] And with respect to Model 11960, you have seen a deterioration of the performance of that model over time? [Answer:] Yes.").

[90] Ex. J at 2, 5, 10; Ex. I at 2255 ("[Question:] But every loan that is a mortgage loan that Wells Fargo processed from 2021 to the present went through CORE; correct?" [Answer:] Yes."); Ex. K at 2272-73 ("[Question:] The fair lending model development department identified disparate impact for various protected classes in relationship to Model 11960 that is currently in use at Wells Fargo. True? . . . [Answer:] Yes.").

[91] Ex. O at 1199.

[92] "Wells Fargo knew as early as December 10, 2021, that *Bloomberg* planned to publish an article regarding racial disparities in the Company's refinancing approval rates.  *See* Ex. P.

[93] *See* Ex. Q at 2289 ("[Answer:] The numbers that Bloomberg had come out with prior to the publishing, we were asked to validate the methodology and if our internal data is showing the same. [Question:] And you were able to, as you say, validate Bloomberg's statistical findings, correct?  [Answer:] That's correct."); *see also* Ex. R at 2312 ("[Question:] And so using the Bloomberg methodology, you were able to match their data results directly on the nose 100 percent; agreed?  [Answer:] Yes.").

[94] *See* Ex. O.

Dossani asked "can we also take a look at denials in 2020 that we[re] due to customer being in forbearance [i.e., related to Covid]?"[95]  In response, Mr. Seagren wrote, "I'm going to embrace candor . . . I don't believe this has anything to do with a COVID impact or forbearance impact. This is something we've been noticing and raising our hand on for awhile and no one seems to listen or we all continue to ignore." Mr. Seagren continued:

> ***Overall our refi rates are now worse than our other big bank peers and we used to be better than all or most, but you can see since about 2013 we have gotten progressively worse; mostly since 2016 and then again in 2018.  This is not a COVID related issue, this is a systemic [Wells Fargo] policy issue.  If we don't start asking ourselves what our policies and business decisions are resulting in, then we will continue to have these results***.  In those timeframes ***we made significant changes to policies*** as it relates to FHA and the launch of Non Conforming portfolio loans . . .  [w]hen we were #1 overall lender, we were balanced amongst all of these things.  ***When we only prioritize non conforming loans and the most affluent/profitable customers  . . . we shouldn't be overly surprised by the results***.

*Id.* at 1198.  Mr. Seagren concluded:  "***I do not believe this is a recent anomaly. This is a long-term systemic issue at [Wells Fargo]*** . . . ."  *Id.* at 1199.  The substance of this exchange is an admission of the disparate impact that Wells Fargo's practice has had on non-white creditors and applicants; an admission that *Bloomberg* correctly analyzed the data; and an admission that if Wells Fargo had consistently monitored its lending practices (it clearly did not), it would have reached the same conclusion as the *Bloomberg* reporters.

132.    Beginning on March 14, 2022, and over several days, Saba Dossani and Debora Knutson-Smith exchanged a series of "instant messages" on the "Wells Fargo Network."[96]  Both individuals were part of the "core team" within Wells Fargo's BIA group who were assembled in response to inquiries by *Bloomberg*.  Senior management had asked them "to review the data and work on recommendations for a response [to Bloomberg] strategy and messaging, and engage with key leaders for input and direction as we move forward."[97]  Their response was thus reactionary and not proactive, exemplifying precisely why the Company should have had internal controls to identify the problems the Company only identified

---

[95] *Id.* at 1199-1200.

[96] Ex. S.

[97] Ex. P at 2547.

while in crisis. Their conclusions were later communicated to the Board by Kristy Fercho, EVP and Head of Home Lending.[98]  First, Ms. Knutson-Smith explaining the goals of their project:

[**Ms. Knutson-Smith:**]

- Using the Bloomberg data, put together denial rate story. Start with all-in, then do non-conforming/conventional conforming. The fact of the matter is our non-conforming denial rate is higher than the industry and some of our peers.
- Show the denial reasons — credit policy needs to explain why we're doing some of what we're doing.
- Show the trends — we used to be aligned, now we aren't
- Show denial disparity — WNH vs. underserved. We are not far off the industry when we look at it this way, and in some cuts we are better. β this is likely our only combat to the Bloomberg story
- Show our rate of lending to African Americans has improved, and we're the largest bank lender in this space

133.   As Ms. Knutson-Smith and Mr. Dossani analyzed Wells Fargo's lending data, compared it to *Bloomberg*'s analysis, and prepared presentation materials for Kristy Fercho, they shared their unvarnished views on the Company's instant messaging platform, including that "none of the[] [Company's] leaders were paying attention" despite having "plenty [sic] of opportunity to understand this before"; "it is" a "fact" that "we are not helping customers at [the] same rate across race"; "our approval rate gap between us and the industry is bad and the gap there got worse . . . because everyone else improved more than us"; and this "failure" was a "collective miss."  Specifically:

[**Ms. Knutson-Smith:**]  i don't know why ***none of these leaders were paying attention*** when the bloomberg conversations were happening

[**Mr. Dossani:**] ***we had plently [sic] of opportunity to understand this before***

\* \* \*

[**Ms. Knutson-Smith:**]  ***I am able to match Bloomberg['s] data on the nose***.

[**Ms. Knutson-Smith:**]  ***Like 100%***.

\* \* \*

[**Ms. Knutson-Smith:**]  ***BTW - this story just sucks anyway I do it. :(***

---

[98] *See* Ex. T, Ex. U.

[**Ms. Dossani:**] *we just need to state facts for her [i.e., Kristi Fercho],*[99] *and if the fact is we are not helping customers at same rate across race than we just need to tell her that*

[**Ms. Knutson-Smith:**] *it is*[100]

\* \* \*

[**Ms. Knutson-Smith:**]  can you take a look tomorrow morning and add, I'll send what we have right now to Kristy [Fercho], just changed a bullet in the summary

\* \* \*

[**Ms. Knutson-Smith:**]  Ok - per Mary Dee [LeMaire, Fair Lending Compliance Director, 2015-2023], what she was saying is *our approval rate gap between us and the industry is bad and the gap there got worse. It got worse because everyone else improved more than us*.

\* \* \*

[**Ms. Dossani:**] i feel this was my miss

[**Ms. Knutson-Smith:**]  well - *collective miss*. I should have too.

[**Ms. Knutson-Smith:**]  we don't do a good job of rates on OMA.

[**Ms. Knutson-Smith:**]  We're going to try

[**Ms. Dossani:**] *we have been talking about withdrawal and denial being higher but we did[n't] do our part to understand them*

[**Ms. Dossani:**] *it's a collective miss*, but i lead this team

[**Ms. Dossani:**] i feel my failure

[**Ms. Dossani:**] I feel like I let you down.

134.    Ms. Knutson-Smith also testified that she believed Wells Fargo's "leadership had not done enough to be prepared to deal with the reporting by Bloomberg of Wells Fargo's approval and denial rates" and that she "believe[d] that [her] supervisor, Ms. Dossani, shared that viewpoint[.]"[101]  In sum, to

---

[99] Ms. Knutson-Smith testified that by "her" Mr. Dossani meant "Kristy Fercho," Wells Fargo's then-head of home lending. Ex. R at 2313.

[100] Ms. Knutson-Smith testified that in responding to Mr. Dossani by writing "it is" she was agreeing with his suggestion that "*the fact is* we are not helping customers at the same rate across race." *Id.* at 2314.

[101] Ex. R at 2309.  In contrast, Scharf told the Board that "the reasons the Company did not conduct sufficient stakeholder engagement early on, including *because the Company did not have all the necessary data until recently*." *See* ¶¶ 19, 147 *supra*.  That Wells Fargo's leadership "had not done enough to be prepared" and failed to receive "all the necessary data until recently" (i.e., until after the *Bloomberg* investigation) regarding the Company's rate of denying loans to individuals of racial and ethnic minority demonstrates that the Board that was not routinely engaged in these issues, despite the fact that this was a "systemic WF policy issue."  Ex. O.  His statements are belied by the data team's analysis following the *Bloomberg* article.

support its publicly-proclaimed "significant" policy and business changes since 2013 that "prioritize[ed]" the "most affluent/profitable customers"—changes that Defendants knew or should have known would skew in favor of White customers and negatively impact minorities—the Board was required to and should have implemented systems to ensure that Wells Fargo's lending practices were fair and equitable. The Company's inquiry, arising only after the Bloomberg investigation analyzed data Wells Fargo itself reported under the HMDA – starkly identifies the failure of the current Board.[102]

135.    Finally, an analysis of Plaintiffs' expert in the Mortgage Discrimination Class Action provides further evidence that had Wells Fargo actually analyzed the lending data it would have learned that the Company's automated lending model discriminates against minority customers.  Plaintiffs retained Dr. Amanda Kurzendoerfer, a statistical and economic expert.  Dr Kuzendoerfer analyzed 2.7 million home loan applications from 2018 to 2022.

136.    Dr. Kuzendoerfer found:  (1) statistically significant disparities in approval rates between minority applicants and white applicants that cannot be explained by key underwriting factors; (2) the CORE/ECS underwriting system disproportionately assigned minority applicants to credit risk classes with higher denial rates, which, in turn, contributed to higher denial rates for minority applicants overall; and (3) property location (which historically has been associated with redlining) is one of the drivers of the disparity between minority applicants and white applicants.  Dr. Kurzendoerfer's regression analysis found disparities between minority applicants and similarly situated white applicants of greater than 5 standard deviations from zero (at a minimum) for each subclass that cannot be explained by key underwriting factors.

137.    Dr. Kurzendoerfer's analysis reached its conclusion after controlling the data for non-discriminatory reasons for loan denials.  For example, Dr. Kurzendoerfer controlled for the underwriting factors identified and collected by the Consumer Financial Protection Bureau pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. § 2801, *et seq.*—i.e. the factors the government collects to "assist in identifying possible discriminatory lending practices and enforcing antidiscrimination statutes" (12 CFR § 1003.1(b)(1)(iii))—such as credit scores, combined loan to value, debt to income ratio, whether the

---

[102] Ex. H.

applicant was approved by an external AUS, and information about the loan terms, among other information. Dr. Kurzendoerfer also controlled for non-public data about the applicants' loan payment histories that was produced by Wells Fargo in the lawsuit, such as the applicant's bankruptcy and foreclosure history, whether they had payments that were more than 90 days late in the last 24 months, prior deed-in-lieu and short sale indicators, the applicant's principal, interest, taxes and insurance reserves to measure the applicant's post-closing liquidity, and a qualifying housing ratio to measure the applicant's housing payments to their monthly income, among other information. She further controlled for factors internally used by Wells Fargo as part of its fair lending analytics to inform its business leaders and legal counsel about fair lending risks. She also performed additional sensitivity testing such as removing applications denied for incompleteness and using controls based on the applicant's metropolitan area or date of the application to ensure that broad differences in market conditions and time frames do not affect the results. With very few exceptions, she found statistically significant disparities for minority applicants across all sensitivities.

### 8. Board-Level Documents Confirm the Board's Failure to Implement a Mission-Critical Reporting Structure to Monitor Fair Lending Compliance and Discriminatory Pricing

138.    Wells Fargo's Board has repeatedly recognized that fair lending is an area of risk, making it a "mission-critical" legal and regulatory compliance issue for the Company. For example, during the Board's August 11, 2020 CRC meeting, the Committee identified "minority lending distribution as an emerging risk" and Eric Brooks, Wells Fargo's Head of Fair Lending, HDMA and CRA Compliance stated that "residential mortgage redlining continues to be a priority issue for regulators and the [DOJ] and discussed information regulators and the DOJ review for redlining, including comparisons of the Company's performance against peers."[103] During this same meeting, however, in discussing "current and emerging Fair Lending Issues and Trends," Mr. Brooks concluded that "monitoring activities had *not identified any systematic fair lending risk*"; that "*control effectiveness has improved*"; and that "*fair*

---

[103] Ex. V, Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Co. Held on August 11, 2020 (WF_DS_000003600 at 3605).

*lending Compliance* . . . provides challenge to business controls as *isolated risks* are identified."[104]  As explained above, public mortgage data reviewed by *Bloomberg* demonstrated that the risk Wells Fargo was discriminating against Black Americans was far from "isolated" (or that its controls had "improved") but involved hundreds of thousands of applications—and hence, was in fact a systemic issue. Additionally, internal documents produced in the Mortgage Discrimination Class Action make clear that (1) Wells Fargo's automated underwriting system, or CORE, in fact, resulted in disparate impacts towards minorities; and (2) the Company had significant gaps and weaknesses in Company-level controls related to fair lending compliance.  *See* § VI.B.7.

139.    During the same "August 11, 2020 Corporate Responsibility Committee Meeting" the "Key Highlights" included a "Fair Lending and CRA Update" which stated:

- *Fair Lending Oversight monitoring has not detected systemic fair lending risk for the enterprise*.

- *Emerging residential mortgage minority lending distribution (redlining) risk – efforts are underway to strengthen minority lending distribution in identified markets*."

140.    Yet, nothing was done.  Indeed, according to the meeting minutes produced in response to Plaintiffs' 220 Section investigation, between August 2020 and April 2022 (i.e., *after* the *Bloomberg* publication) the Board never discussed fair lending, mortgage discrimination, or disparate impact at all during any Board or Committee meeting during this time period.  Hence, there was no routine monitoring of these issues at all *at the Board level*.    At best, the internal Board documents show the Director Defendants received infrequent and *ad hoc* "updates" (like the August 11, 2020 "Update") on fair lending risk at management's discretion.  This falls far short of the standard of oversight required under Delaware law—particularly for a Company with a history of violations.

141.    Other internal documents similarly demonstrate that prior to the *Bloomberg* investigation, Wells Fargo's Board failed to have a mission-critical reporting structure in place to monitor the risk that the Company's automated underwriting system or algorithm resulted in disparate impact towards minorities or whether discriminatory pricing exceptions were continuing to occur.  For example, an April

---

[104] *Id.*

25-26, 2022 "Enterprise Risk Report" (the "April 2022 Risk Report") that was "Prepared for [the] Wells Fargo Board of Directors" stated under the bullet point "Mortgage Fair Lending" that "[m]anagement will provide data to illustrate why the company's approval rates for Black and White mortgage refinance rates substantially differ in response to a recent article involving MHDA data[.]"[105]  In other words, the Director Defendants apparently failed to take steps—prior to the public release of the *Bloomberg* investigation—to obtain and review relevant lending data, including data comparing Wells Fargo's lending statistics to its peers, in order to understand "why" the Company's approval rates for Black applicants was significantly lower than White applicants.

142.    Indeed, this April 2022 Risk Report was the first time the Board was presented with actual fair lending data to assess (either way) whether (1) there were significant disparities in lending practices at the Company between Black and White applicants; and relatedly (2) how Wells Fargo compared to its peers.  By any measure, had the Board had effective controls in place to routinely monitor the potential for disparate impact on Black applicants, they would have requested the same or similar data that *Bloomberg* reviewed much sooner than April 2022.

143.    While the April 25, 2022 presentation to the Board's Risk Committee did state that "[i]n February 2022, Wells Fargo Fair Lending Compliance completed its annual review confirming differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit factors.  The review concluded that decisioning consistency processes and controls appear effective in limiting practically significant results for confirming Non-Hispanic Black applicants compared to Non-Hispanic White"—the remaining discussion of that "annual review" was redacted and withheld by Wells Fargo:[106]  In any event, by this time Wells Fargo was already aware that *Bloomberg* preparing the article because reporters for the publication emailed questions to the Company in December 2021.[107]

---

[105] *See* Ex. W, Wells Fargo's April 25-26, 2022 Enterprise Risk Report prepared for the Board of Directors (WF_DS_Supp000001119-1121).

[106] *See* Ex. X, Wells Fargo's Apr. 25, 2022 Bloomberg HMDA Discussion prepared for the Board of Directors (WF_DS_ Supp000001105 at 1106).

[107] Ex. P.

- In February 2022, Wells Fargo Fair Lending Compliance completed its annual review confirming differences in approval rates between Non-Hispanic Black applicants and Non-Hispanic White applicants were based on loan and credit factors. The review concluded that decisioning consistency processes and controls appear effective in limiting practically significant results for conforming Non-Hispanic Black applicants compared to Non-Hispanic White

REDACTED-BEP-CFPB

144.    The results of any such review were not produced to Plaintiffs pursuant to § 220 suggesting they were never reviewed or discussed at the **Board** level.  And even if they had been, the annual review's apparently conclusion that "decisioning consistency processes and controls appear effective in limiting practically significant results for conforming Non-Hispanic Black applicants compared to Non-Hispanic White" is utterly contradicted by *Bloomberg's* "factually accurate" findings and documents produced in the Mortgage Discrimination Class Action (*see supra* § VI.B.7 ).[108]

145.    With the publication of the March 2022 *Bloomberg* articles, Wells Fargo's discriminatory lending practices were brought into the public spotlight.  On April 25, 2022, the Company's CRC met[109] and full Board separately met on April 25-26, 2022,[110] to discuss the *Bloomberg* articles.  Notably, these appear to be the only meetings at which the Board discussed the *Bloomberg* articles.  Critically, the minutes of this meeting do not reflect any consideration of whether the Company's lending algorithm resulted in disparate impacts towards minorities.  During the same meeting, Kristy Fercho, EVP and Head of Home Lending, "provide[d] an update with respect to the Bloomberg article regarding the Company's 2020 Home Lending approval rates."[111]  Ms. Fercho confirmed "the gap in African-American home lending approval rates" relative to Wells Fargo's "peers" and "commented on the root causes of the differences in approval rates for minority borrowers against Caucasian borrowers."[112]  Ms. Fercho also told the Board that the *Bloomberg* article was "***factually accurate***" and that "***mistakes were made with respect to stakeholder engagement following publication of the [Bloomberg] article***."[113]  In response to

---

[108] *Id.*

[109] Ex. T, Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Co. Held on April 25, 2022 (WF_DS_000005814 at 5814-5815).

[110] Ex. U, Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Co. and Wells Fargo Bank, National Association Held on April 25-26, 2022 (WF_DS_000005818 at 5834-5835).

[111] Ex. T at 5814.

[112] *Id.*; *see also* Ex. U at 5835.

[113] Ex. T at 5814.

this observation, "***Scharf noted the reasons the Company did not conduct sufficient stakeholder engagement early on, including because the Company did not have all necessary data until recently***."[114]

146.    Ms. Fercho's preparation to update the Board on Wells Fargo's response to *Bloomberg's* report reflected by the fact that she was listed as the "Accountable Executive" for the Company's February 18, 2022 "Fair Lending Analysis of Wells Fargo Home Mortgage (WFHM) 2020 Credit Decisions," which concluded that "NH [new home] Black borrowers applying for conforming loan applications were denied more frequently compared to White borrowers for DTI [debt-to-income], incomplete credit applications, forbearance, or credit scores not meeting minimum requirements[.]"[115] The analysis further confirmed that "adverse impact ratios (AIRs)" for "NH Black borrowers trended below 90%" during 2020-2021.[116]  For example, "NH Black" borrowers seeking "Conforming" "loan applications" experienced AIRs of 83.90% during Q4 2019 and 76.7% during Q3 2020.[117]

147.    The Board's conclusion that the *Bloomberg* article was "***factually accurate***" is corroborated by an April 25, 2022 presentation "Prepared for [the] Risk Committee of Wells Fargo Board of Directors" titled "*Bloomberg* HMDA Discussion" which discussed that "[i]n early March 2022, *Bloomberg* posted an article using raw public HMDA data stating Wells Fargo's 2020 approval rates for Home Lending Conforming Conventional Refinance applications for Non-Hispanic Black customers were ***significantly below industry peers***.

148.    In late March 2022, *Bloomberg* published posted another article using the same raw public HMDA data stating while 2021 approval rates were better than 2020, they were still ***below industry peers***."[118]  The presentation concluded that "[t]he *Bloomberg* story" was "***factually accurate***" and acknowledged the Company's "***approval gap***" and "***difference in approval rates***" and in particular

---

[114] *Id.*

[115] Ex. M at 5342.

[116] *Id.*

[117] *Id.* at 5370.

[118] *See* Ex. X, Wells Fargo's Apr. 25, 2022 *Bloomberg* HMDA Discussion prepared for the Board of Directors (WF_DS_ Supp000001105 at 1106).

"***African American (AA) approval rates***."[119]  The presentation also recognized the need to "[w]ork . . . to address the *Bloomberg* assertions and the approval gap . . . ."[120]  In fact, the presentation confirmed that in 2020, whereas Wells Fargo "Denied for Credit" only ***7%*** of "White, Non Hispanic Refinance Applications," it denied ***19%*** of "African American Refinance Application[s]" and that this disparity of 7%-19% (nearly three-to-one) was vastly different from competitors such as JP Morgan Chase & Co. ("Chase"), Bank of America ("BOA"), and Quicken, where the comparable percentage disparities were 1%-2%, 4%-10%, and 1%-1%, respectively:

2020 Conforming Refinance, Primary Residence, 1st Lien only - Sourced from Public HMDA Data (no adjustments)

African American Refinance Application Volume

|  | WF | | Chase | | BOA | | Quicken | |
|---|---|---|---|---|---|---|---|---|
| Apps | **14,048** | **100%** | 6,339 | **100%** | 4,276 | 100% | 36,538 | **100%** |
| Denied for Credit | 2,694 | 19% | 141 | 2% | 409 | 10% | 419 | 1% |
| All Other Denial Reasons | 4,554 | 32% | 800 | 13% | 691 | 16% | 5,988 | 16% |
| Approved | 6,800 | 48% | 5,398 | 85% | 3,176 | 74% | 30,131 | 82% |

White, Non Hispanic Refinance Application Volume

|  | WF | | Chase | | BOA | | Quicken | |
|---|---|---|---|---|---|---|---|---|
| Apps | **134,739** | **100%** | 98,711 | 100% | 49,514 | **100%** | 443,613 | **100%** |
| Denied for Credit | **8,816** | 7% | 678 | 1% | 1,859 | 4% | 2,358 | 1% |
| All Other Denial Reasons | **28,160** | 21% | 6,944 | 7% | 5,445 | 11% | 48,493 | 11% |
| Approved | 97,763 | 73% | 91,089 | 92% | 42,210 | 85% | 392,762 | 89% |

149.    As the percentages above confirm, Wells Fargo's 19% denial rate for Black refinance applications was nearly ***twice*** BOA's, ***ten times*** that of Chase, and ***19 times*** that of Quicken.

150.    The same presentation confirmed a massive "Denial Rate Gap" between "African American" and "White, Non-Hispanic" borrowers that submitted "Refinance Applications" to Wells Fargo during 2020 and 2021.  During 2020, the "African American" "Denial Rate" was 52% compared to 28% for White, Non-Hispanic" applicants, resulting in a "Denial Rate Gap" of 24%:

---

[119] *Id.*

[120] *Id.*

**2020 Conventional Conforming (1st Lien, Primary Residence) Refinance Applications – Denial Analysis**
22 percentage points of the 24 percentage points between Black and White customers were due to application of the GSE guidelines or incomplete applications

| 2020 | Reported Results | | Adjusted (removed FHA denials)[1] | |
|---|---|---|---|---|
| | African American | White, Non- | African American | White, Non-Hispanic |
| Total Applications | 19,604 | 180,557 | 17,608 | 174,906 |
| | | | | |
| Denial Rate | 52% | 28% | 44% | 24% |
| **Denial Rate Gap** | 24% | | 20% | |
| Drivers of the gap | | | | |
| Application of GSE guidelines | 20% | | 16% | |
| Incomplete applications | 2% | | 1% | |
| **subtotal** | 22% | | 18% | |
| Cashout refi not available | 1% | | 1% | |
| Post forbearance exit perf | 1% | | 1% | |

151.    During 2021, the "African American" "Denial Rate" was 42% compared to 20% for White, Non-Hispanic" applicants, resulting in a "Denial Rate Gap" of 22%:

**2021 Conventional Conforming (1st Lien, Primary Residence) Refinance Applications – Denial Analysis**
21 percentage points of the 22 percentage points between Black and White customers were due to application of the GSE guidelines or incomplete applications

| 2021 | Reported Results | | Adjusted (removed FHA denials)[1] | |
|---|---|---|---|---|
| | African American | White, Non- | African American | White, Non-Hispanic |
| Total Applications | 32,583 | 233,031 | 28,710 | 225,260 |
| | | | | |
| Denial Rate | 42% | 20% | 32% | 17% |
| **Denial Rate Gap** | 22% | | 15% | |
| Drivers of the gap | | | | |
| Application of GSE guidelines | 19% | | 13% | |
| Incomplete applications | 2% | | 1% | |
| **subtotal** | 21% | | 14% | |
| Cashout refi not available | 1% | | 1% | |
| Post forbearance exit perf | <1 | | <1 | |

### 9.    Former Wells Fargo Employees Independently Corroborate Wells Fargo's Racially Discriminatory Lending and Hiring Practices

152.    In addition to the books and records actions, counsel has pursued its own independent investigation.  Information revealed through conversations with former employees support the claim that discrimination was systematic at Wells Fargo, despite officers' statements to the contrary during 2020 to present time period.

153.    Plaintiffs' private investigator spoke to a former Executive Office Case Specialist Head at Wells Fargo based in Orlando, Florida, who worked at Wells Fargo during 2020 and 2021 ("**Former Employee 1**" or "**FE 1**").

154.    FE 1's job was to investigate complaints from customers, which were mostly small businesses seeking a Small Business Administration loan or Paycheck Protection Program benefits or even credit cards via Wells Fargo and had been turned down.

155.    FE 1 investigated between 450-500 cases per year and about 30 to 40 percent of those involved some form of discrimination, mostly racial.  In about 50 percent of those cases, FE 1 found the discrimination allegations were founded.

156.    According to FE 1, "Really what it would come down to is the customer would feel they were racially discriminated against and it would come down to what the policies were at the time and judgments of character". FE 1 said, "It was really my determination as to whether they were discriminated against and I would say about half the time I felt they were."

157.    Based on FE 1's work as an Executive Office Case Specialist Head, FE 1 believed Wells Fargo had discriminatory practices in lending: "In actuality I do think so," FE 1 said. "At first, I was a little skeptical.  I've been banking with Wells Fargo since I was a teenager.  I wasn't aware of the news stories about this until I started at the company.  I'd get a lot of complaints about discrimination. *As time went on, after speaking to multiple people in different levels of positions, I did come to the conclusion that yes it was going on quite a bit.  It's the culture at the root of the company*."

158.    Plaintiffs' investigator also interviewed a former Senior Executive Escalations Representative ("**Former Employee 2**" or "**FE 2**") who worked at Wells Fargo from June 2020 through early 2022, and whose job responsibilities included resolving escalated complaints from small-business customers including complaints about discrimination.  FE 2's "job [was] to make [complaints about discrimination] go away" and keep the customer from escalating the complaint into a "formal discrimination complaint."  To do this, FE 2 was instructed by FE 2's supervisors to offer $200 to customers complaining of discrimination. FE 2 explained that "when it got really hostile we were allowed

to give them $200" and that "the goal is to deescalate by offering them money, especially if it was discrimination."

159.    Plaintiffs' investigator also spoke with a former Wells Fargo employee who was a Market Manager for New England, Upstate New York and New Jersey for Wells Fargo from May 2019 to April 2023, and who had previously worked as a Sales Manager at Wells Fargo since 2006 ("**Former Employee 3**" or "**FE 3**").  FE 3's job was to oversee the sales aspect of mortgage origination.  Branch Managers, an Administrator, Customer Service Reps, and other individuals involved mortgage sales reported to FE 3.

160.    FE 3 confirmed that in 2020, Wells Fargo adopted a policy requiring Hiring Managers to interview at least one woman and one person of color for job openings, particularly where the salary would be $100,000 or more.  FE 3 was aware of The New York Times' reports that managers in Wells Fargo's Wealth Management Division were conducting sham interviews with minorities to meet internal diversity mandates.  Based on what FE 3 saw firsthand while serving on job interview panels, FE 3 said it seemed like the same thing was happening in Wells Fargo's Mortgage Group.  "I know they did have folks that, for various reasons, would just stick someone in there to stick someone in there."  FE 3 confirmed that FE 3 had "seen it happen" when serving on interview panels and wondered "Was this a favor to someone?"  FE 3 "felt that was wrong."

161.    FE 3 further stated, "I think sometimes they brought in people who were underqualified so they could say, 'Ok, well we interviewed this Latino candidate.  He didn't get this job but we gave it to this other person because they were more qualified,'" FE 3 said.  "I can say I've seen that."

162.    FE 3 said there were times FE 3 would ask, "Why are we interviewing this person?  They don't even have the qualifications to be in that role," but did not get a reply.  "We would have to write notes after being on the panels so that would be in the notes we did," FE 3 said.  According to FE 3, "The recruiters should know but they will deny it to the grave."

163.    Plaintiffs' investigator also interviewed a former Vice Present ("**Former Employee 4**" or "**FE 4**") who worked at Wells Fargo from 2014 to 2021 and who oversaw several hundred employees,

most of whom were mortgage loan consultants and loan originators who roles were to answer telephone calls and answer questions from individuals interested in applying for mortgage loans.

164.    Although FE 4 was not involved with how Wells Fargo developed its algorithms for mortgages, FE 4 did know how those algorithms work to a certain extent.  One of the systems that Wells Fargo uses is Desktop Underwriter (or "DU"), which is an upfront underwriting engine provided by Fannie Mae.  Another system is Loan Product Advisor (or "LPA"), which is Freddie Mac's automated underwriting system.  "Once an application is complete our loan officers would hit a button to run it through those decision-making engines," FE 4 said.  "A bank like Wells Fargo can build overlays off of Fannie Mae and Freddie rules," FE 4 said.

165.    FE 4 had worked in the mortgage business since the late 1990s.  FE 4 said that what was different about Wells Fargo from other places where FE 4 had worked was that Wells Fargo had "a ton" of overlays to the rules that Fannie Mae and Freddie Mac had.  "My experience is there was an increase in overlays year after year after year," FE 4 said.

166.    For example, FE 4 said, one overlay had to do with Down Payment Assistance programs.  "A Down Payment Assistance program can be from the county or state or national but what was great about these programs was there were all these grants to get access to money for a down payment if they were a first-time home buyer and in a part of the community where the FHA was trying to promote home ownership," FE 4 said.  However, Wells Fargo instituted a rule in sales that if they got a call inquiring about Down Payment Assistance programs, they had to refer the caller to somebody that was located in a branch.  "We'd go to see if anything happened and discovered hardly any clients got helped," FE 4 said.  "There was very little to no effort to understand how to do these programs; teach people responsible for helping clients with these programs.  They just ignored it the whole time I was there."

   **10.    Covington & Burling's Report to Wells Fargo on Racial Equity
Reflects Wells Fargo's Failure to Address Discrimination Issues**

167.    In December, 2023, the law firm Covington & Burling LLP delivered a report to Wells Fargo "On its Efforts to Promote Racial Equity."

168.    Among other recommendations, Covington advised that "Wells Fargo could enhance its home lending efforts by tailoring its unconscious bias trainings to focus on how these issues may arise in the home lending and real estate appraisal contexts, and conducting regular independent audits of any AI tools it plans to use in the mortgage approval process." Covington further advised that Wells Fargo should "[e]valuate any new AI tools under consideration for use in the mortgage application process for racial bias and potential racial impacts."

169.    Indeed, the report reflects that Wells Fargo's appraisal system at the outset of Covington's evaluation did not consist of a sophisticated computerized analysis of appraisal reports—it was merely a model that "tags potentially inappropriate language used in appraisal reports, which Bank personnel then review and evaluate. The model currently relies on a list of inappropriate words that Wells Fargo developed based on its internal subject matter experts and public research from regulatory entities and GSEs, including Fannie Mae and Freddie Mac." Key word identification is the whole of the appraisal bias detection, the model does not score reports on any semantic scale—it just identifies whether certain words were used.

**11.    In December 2023, the CFPB Issues an MRA Notice to Wells Fargo Concerning Discriminatory "Pricing Exceptions"**

170.    On December 11, 2023, *CNBC* reported that Wells Fargo had received an official notice from the CFPB concerning its compliance with fair lending. Specifically, *CNBC* reported that the "Wells Fargo received an official notice from the [CFPB] on problems with its use of mortgage rate discounts" or "pricing exceptions" for White borrowers at higher rates than Black and female borrowers after "regulators found 'statistically significant disparities' in the rates in which Black and female borrowers got pricing exceptions compared with other customers."[121] *CNBC*'s article stated:

> The discounts, known as pricing exceptions, are used by mortgage personnel to help secure deals in competitive markets. At Wells Fargo, for instance, bankers could request pricing exceptions that typically lowered a customer's APR by between 25 and 75 basis points.

---

[121] Hugh Son, "Regulators caught Wells Fargo, other banks in probe over mortgage pricing discrimination," CNBC (Dec. 11, 2023), https://www.cnbc.com/2023/12/11/wells-fargo-mortgage-lenders-probed-over-racial-discrimination.html.

The practice, used for decades across the home loan industry, has triggered regulators' interest in recent years over possible violations of U.S. fair lending laws.  Black and female borrowers got fewer pricing exceptions than other customers, the [CFPB] has found.

"As long as pricing exceptions exist, pricing disparities exist," said Ken Perry, founder of a Washington-based compliance firm for the mortgage industry.  "They're the easiest way to discriminate against a client."

Wells Fargo received an official notice from the CFPB called an MRA, or Matter Requiring Attention, on problems with its discounts, said people with knowledge of the situation.  It's unclear if regulators accused the bank of discrimination or sloppy oversight. The bank's internal investigation on the matter extended into late this year, said the people.

171.    Thus, following Wells Fargo's $184.3 million settlement in 2012 with the DOJ, the Company's $10 million settlement in 2019 in the *Philadelphia* Action, and after the Board refused to investigate similar discriminatory pricing allegations referenced in the December 2020 demand by two Wells Fargo stockholders—the Director Defendants still had not addressed what *CNBC* characterized as "problems with [Wells Fargo's] use of mortgage rate discounts" that led to "statistically significant disparities" in the rates that Black and female customers receive pricing exceptions when compared White/male customers, resulting in the CFPB's MRA notice.

**C.    Wells Fargo's Hiring Practices Discriminate Against Diverse Candidates**

**1.    Joe Bruno, a Former Wells Fargo Executive in the Company's Wealth Management Division, Reported the Practice of Conducting Sham Interviews to Senior Management**

172.    On September 7, 2021, whistleblower Joseph Bruno, a former Wells Fargo executive in the wealth management division, sent an email to over 250 Wells Fargo employees, including four senior Wells Fargo officers at the time:  Charles Scharf (CEO), Scott Powell (SVP and COO), Kleber Santos (then-Head of Diverse Segments, Representation and Inclusion; Scott Powell (Chief Operating Officer); and Mary Mack (CEO of Consumer and Small Business Banking) raising concerns regarding Wells Fargo's practice of conducting sham interviews to comply with the Company's diverse hiring initiative.

173.    The email described "fake interviews [Wells Fargo] managers do that [are] directed by HR."  It further explained that when the whistleblower "brought up the fake interviews, and [that the whistleblower] wasn't comfortable doing them, [Keith] Venderveen [one of eight regional directors overseeing Wells Fargo's core private client group] said put your head down and focus on recruiting."

Bruno further reported that he "wasn't allowed to have a 50/50 pool of diverse candidate in [his] market. . . . I was told that I was too aggressive in creating pools and benches of Black people. I'm ready to name names."

174.    Due to Wells Fargo's ineffective internal controls, Mr. Bruno's email was never provided to the Board.

### 2.    Wells Fargo's Practice of Conducting Sham Interviews Was Reported in an "Email to Wells Fargo's Board of Directors"

175.    According to an "Employment Investigation Report" written by "Wanda Conway, Sr. Employment Investigator," on February 18, 2021, Phillip Miller, an "external job applicant," sent an "email to Wells Fargo's Board of Directors" in which Miller "complain[ed] that he experienced discrimination in the form of racist and offensive statement[s] directed toward him by the hiring manager of a position he applied for on 9/28/20 when the Wells Fargo manager told Miller 'you don't sound black'" and after which "a white female was selected for the position."[122]  According to the report, based on what he experienced, Miller questioned Wells Fargo's commitment to hiring Black candidates or whether "his race and ethnicity were being used to reach the newly established goal to consider diverse candidates" and not an actual "commitment to hire qualified black candidates."[123]

176.    Regarding Mr. Miller's February 18, 2021 "email to Wells Fargo's Board of Directors," as of February 16, 2022, Wells Fargo's corporate website stated that "Stockholders and other interested parties who wish to communicate with the Company's non-management directors may direct correspondence to . . . boardcommunications@wellsfargo.com[.]"[124]  Wells Fargo's website stated that communications sent to this website are handled differently depending on whether they are considered to concern "an ordinary business matter" or "not involving an ordinary business matter."  On one hand, "[c]ommunications involving the following will be considered an *ordinary business matter* and will be

---

[122] Ex. Y, WF_DS_Supp_000000004.

[123] *Id.*

[124] *See* https://web.archive.org/web/20210216141028/https://www.wellsfargo.com/about/corporate/governance/contact/.

forwarded to management to research and respond, if appropriate"; on the other hand, "[c]ommunications *not involving an ordinary business matter* will be forwarded by the Company":

> To an individual director, only if the communication names a specific director
>
> To the Chair of the Audit and Examination, Corporate Responsibility, Credit, Finance, Governance and Nominating, Human Resources, or Risk Committee depending on the subject matter and if the communication does not name a specific director
>
> To the Chair of the Audit and Examination Committee if the communication is a complaint or concern involving accounting, internal accounting controls, or auditing matters, whether or not it's specifically addressed to the Audit and Examination Committee.[125]

177.    On December 13, 2021, the Board's Governance and Nominating Committee received a presentation from Michael Cleary, Head of Sales Practices and Conduct Management, which was titled "Board of Directors Communications" and whose "Purpose [was to] [p]rovide an update on monitoring, routing, and escalation of Board communications in accordance with the Board Communications Policy and Procedures."[126]  The presentation categorized Mr. Miller's "2/18/21" email to the Board as a "*Non-Ordinary*" communication, and noted that Mr. Miller asked whether "he was interviewed only as a means for the hiring executives to appear as if they are pursuing diverse candidates":[127]

---

[125] *Id.*

[126] Ex. Z, Michael Cleary (Head of Sales Practices and Conduct Management), Board of Directors Communications prepared for Governance and Nominating Comm. of Wells Fargo (Dec. 13, 2021) (WF_DS_000004661 at 4666).

[127] *Id.*

SECOND AMENDED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT
CASE NUMBER: 3:22-CV-05173-TLT

Non-Ordinary communications detail (January through October 2021)

| Date Received | EAP Case # | Executive Summary | Conduct Management Intake Status |
|---|---|---|---|
| | | **REDACTED-NON-RESPONSIVE CONTENT POTENTIALLY INCLUDING PRIVILEGE, WORK PRODUCT, CSI, AND/OR SAR MATERIAL** | |
| 2/25/2021 | 474478 | Allegation in which a former employee shares concerns regarding a former Management Committee member's behavior. Former employee provides links to social media posts that he believes are discriminatory and include disparaging comments towards senior leadership and Wells Fargo. He feels that the employee's actions pose a risk to the bank and its shareholders. | Closed 07/22/2021; Unsubstantiated. The allegations of racial discrimination, inappropriate social media postings, account fraud, and other misconduct in violation of Wells Fargo's policies and procedures were handled by Wells Fargo's legal department and outside counsel. The investigation found no evidence to substantiate the allegations |
| 2/18/2021 | 469803 | Allegation of race discrimination during an interview process for a Head of Merchant Services position conducted by Head of Small Business Banking and Consumer Lending Shared Services Leader. The applicant shares concerns about his interview process as it relates to comments made by the Chief Executive Officer (CEO) pertaining to Wells Fargo's commitment to diversity. He speculates that he was interviewed only as means for the hiring executives to appear as if they are pursuing diverse candidates. | Closed 5/13/21; Unsubstantiated. Employment Investigations found that allegations of discrimination related to race in violation of the following policies were unsubstantiated: Anti-Harassment, Employment and Hiring, Affirmative Action, Equal Employment Opportunity (EEO), and Diversity & Inclusion. |

178.    Under the Company's above policy concerning emails to the Board, how Mr. Miller's February 18, 2021 email to the Board should have been handled depended on whether the Company categorized it as an "ordinary" or "non-ordinary" business matter.[128]  Because the Company categorized Mr. Miller's February 18, 2021 email as "[n]on-ordinary," under Company policy, that email would have been "forwarded by the Company" to "the Chair of the Audit and Examination, Corporate Responsibility, Credit, Finance, Governance and Nominating, Human Resources, or Risk Committee depending on the subject matter and if the communication does not name a specific director[.]"  Considering the fact that Mr. Miller's email was described in the December 13, 2021 presentation to the Board's Governance and Nominating Committee, together with the "Board Communications Policy and Procedures" as described on the Company's website, it is logical that the Board Committee Chair to whom Mr. Miller's email was

---

[128] For example, if Mr. Miller's email "name[d] a specific director" or concerned "accounting, internal accounting controls, or auditing matters" it would be sent to that specific director or to "the Chair of the Audit and Examination Committee."  *See* https://web.archive.org/web/20210216141028/https://www.wellsfargo.com/about/corporate/governance/contact/.

forwarded was the Chair of the Governance and Nominating Committee, which at the time was Donald M. James.[129]

179.    According to the minutes from the December 13, 2021, Governance and Nominating Committee meeting, committee members discussed the Company's diversity programs, and how the Company intended to report on the progress of those programs.

### 3.    *The New York Times* Publishes Its Investigation

180.    On May 19, 2022, *The New York Times* published an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interview."[130]  The article reported that Mr. Bruno, who had previously sent a whistleblower email to 250 Wells Fargo employees regarding, among other things, Wells Fargo's practice of conducting sham interviews, had "long been troubled by the way his unit handled certain job interviews."[131]  Bruno alleged that for many open positions, employees would interview a "diverse" candidate (a woman or person of color, according to Wells Fargo) in keeping with the bank's yearslong informal policy.[132]  However, Bruno noticed that often, the diverse candidate would be interviewed for a job that had already been promised to someone else.[133]  Bruno said that when he complained to his bosses about the behavior, his claims were dismissed.[134]  Bruno believes he was later fired in retaliation for telling his superiors that the fake interviews were "inappropriate, morally wrong, ethically wrong."[135]

181.    *The New York Times'* May 19, 2022 article stated that Bruno was one of seven current and former Wells Fargo employees who asserted they were instructed in the bank's wealth management unit

---

[129] Mr. James resigned from the Wells Fargo Board in April 2021.

[130] Emily Flitter, *At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews,* THE N.Y. TIMES (May 19, 2022), https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Id.*

SECOND AMENDED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT
CASE NUMBER: 3:22-cv-05173-TLT

to interview diverse candidates for jobs that no longer existed.[136]  Five others said they were aware of the practice or helped to arrange it.[137]  The current and former employees said that the interviews were more about helping Wells Fargo create a record of its diversity efforts (in anticipation of potential regulatory audits) rather than actually hiring more women or people of color.[138]

182.    The Company issued a statement for the May 19, 2022 article stating that Wells Fargo expected all employees to follow its hiring policies and guidelines and that "to the extent that individual employees are engaging in the behavior as described by *The New York Times*, we do not tolerate it."[139] The spokeswoman did state that she was aware of "informal directives" about hiring diverse candidates, but stated those rules were from an earlier era that Wells Fargo's current leaders "had nothing to do with."[140]

183.    *The New York Times* article also discussed the *Slaughter* Action, which was a case filed in 2013 by a group of Black financial advisers at Wells Fargo accusing Wells Fargo of "systemic, intentional race discrimination" through the implementation of policies that segregated its workforce and disparately impacted its African-American employees.[141]  In May 2017, an Illinois federal judge approved a $35.5 million settlement between Wells Fargo Advisors LLC and a class of the Company's African-American Employees, ending the class's claims of discriminatory treatment with changes to programs they said encouraged racial disparities.[142]  The agreement instructed bank executives to examine their demographic data and initiate opportunities for African-American financial advisers, as well as designate specific recruiters and coaches for African-American employees.[143]  Under the

---

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] Vin Gurrieri, *Wells Fargo Workers Seek Final OK for $35M Race Bias Deal*, Law360 (May 1, 2017), https://www.law360.com/articles/918990/wells-fargo-workers-seek-final-ok-for-35m-race-bias-deal.

[142] *See* Diana Novak Jones, *Wells Fargo Exits Race Bias Suit With $35.5M Settlement*, Law360 (May 4, 2017), http://stowellfriedman.com/files/images/stories/Wells_Fargo_Race_Settlement.pdf.

[143] *Id.*

settlement, Wells Fargo's senior executives were also supposed to collaborate with the Company's African-American employees to get feedback on its diversity efforts. [144]

184.    On May 27, 2022, *Business Insider* published an article following up on *The New York Times* article, based on an interview it conducted with Kleber Santos, Wells Fargo's Head of Diverse Segments.[145]   The article reported that *Business Insider* attempted to confirm whether *The New York Times* continued to stand by its reporting:  "As is standard journalistic practice, we sought comment from Wells Fargo, and included it in the story.  This comment did not refute our findings.  *The New York Times* stands behind our May 19 article."

185.    On May 31, 2022, Senator Sherrod Brown, Chairman of the U.S. Senate Committee on Banking, Housing, and Urban Affairs, sent a letter to the Company's President & CEO, Charles Scharf, noting, *inter alia*, that "[r]ecent revelations of racial disparities in mortgage lending, [and] fake job interviews for minority and female candidates . . . are troubling as Wells Fargo, unfortunately, continues to demonstrate its inability to address its longstanding risk management failures." [146]   Senator Brown added that "Wells Fargo's ongoing, failed efforts to combat lending discrimination and increase diversity within its ranks raise questions about your ability to fix the myriad internal controls, risk management, and general governance issues that have been a problem for nearly a decade." [147]

186.    In June 2022, U.S. Representative Maxine Waters urged several federal agencies, including the OCC and the FDIC, to "properly penalize Wells Fargo for its continuous wrongdoing," noting "commitments to diversity, equity, and inclusion are not stunts to be taken advantage of by megabanks; diversity, equity, and inclusion encompass aspects of both moral and legal obligations that

---

[144] *Id.*

[145] *See* Marguerite Ward, *Wells Fargo Exec Responds to Reports That it Denied Mortgages to Black Applicants and Held Sham Job Interviews* (May 27, 2022), https://www.businessinsider.com/wells-fargo-exec-black-mortgage-applicants-diversity-controversies-2022-5.

[146] Letter from Chairman Sherrod Brown to Charles W. Scharf (May 31, 2022), https://www.banking.senate.gov/imo/media/doc/Brown%20WF%20Scharf%20Letter%2005312022.pdf.

[147] *Id.* at 2.

financial institutions hold.  It is unacceptable that Wells Fargo would mislead applicants and the public."[148]

187.    On June 6, 2022, whistleblower Bruno posted an article he wrote on LinkedIn which stated that the "fake interviews" were "an open secret at Wells Fargo, and it has gone on for years."[149]

188.    On June 9, 2022, *The New York Times* published an article titled "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices."[150]  The June 9, 2022 article noted that Federal prosecutors in New York opened a criminal investigation into whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates. [151]  The investigation was being conducted by members of a newly created civil rights unit inside the criminal division of the Manhattan U.S. attorney's office.  The article stated that the investigation was spurred by the May 19 report in *The New York Times* that centered on whistleblower Joe Bruno. [152]

189.    Also on June 9, 2022, *Forbes* published an article regarding the federal investigation.[153] That same day, Wells Fargo issued a press release confirming that "[e]arlier this week, the company temporarily paused the use of its diverse slate guidelines," and that "[d]uring this pause, the company is conducting a review so that hiring managers, senior leaders and recruiters fully understand how the

---

[148] Press Release, Chairwoman Waters calls on Regulators to Hold Wells Fargo Accountable for Continued Troubling Patterns and Practices of Anti-Consumer Behavior (June 29, 2022), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=409612.

[149] https://www.linkedin.com/pulse/fake-interviews-dei-joe-bruno/?trk=public postcontentshare-article.

[150] *See* Emily Flitter, *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*, The N.Y. Times, (June 9, 2022), https://www.nytimes.com/2022/06/09/business/wells-fargo-fake-interviews-investigation.html.

[151] *Id.*

[152] *Id.*

[153] Joe Walsh, *Feds Reportedly Launch Criminal Probe Into Wells Fargo Following Allegations Of Sham Job Interviews*, Forbes (June 9, 2022), https://www.forbes.com/sites/joewalsh/2022/06/09/feds-reportedly-launch-criminal-probe-into-wells-fargo-following-allegations-of-sham-job-inte views/?sh=41c6ea2954f7.

guidelines should be implemented—and so we can have confidence that our guidelines live up to their promise."[154]

190.    On June 14, 2022, Joe Bruno published a video discussing the reaction to *The New York Times* report.[155]  In this video, Mr. Bruno explained that "fake interviews" were "an open secret at Wells Fargo and it has gone on for years."[156]

191.    Mr. Bruno proceeded to give "recent examples of fake interviews" including (1) an example from 2021 where a Wells Fargo team internally selected a candidate for a financial consultant position, but was obliged by HR to conduct interviews which under their best practices would include at least one diverse candidate; (2) another example from 2021 where a Wells Fargo team was changing an existing role from "Financial Advisor" to a "Financial Consultant" where HR required interviews to be conducted which under their best practices would include at least one diverse candidate; and (3) the "market leader" position for the combination of the Ford Lauderdale market and the Miami market, where Wells Fargo conducted fake interviews for the prior leaders of the Fort Lauderdale and Miami Markets— where the preselected candidate was an unqualified employee from the Wells Fargo corporate office with no relevant experience.

192.    In addition, Bruno explained that if a candidate is brought in for a sham interview, they will be assigned an artificially deflated score based on their interview performance so that the pre-selected candidate would get hired.  This score permanently followed the applicant should they seek subsequent employment with Wells Fargo at any time and therefore harmed the candidate prospectively.

193.    Bruno's video led to several former Wells Fargo employees coming forward.  The comment section below his YouTube video reflects the opinions of several former Wells Fargo

---

[154]  Press Release, Wells Fargo response to New York Times article (June 9, 2022), https://newsroom.wf.com/English/news-releases/news-release-details/2022/Wells-Fargo-response-to-New-York-Times-article/default.aspx.

[155]  Joe Bruno, *FAKE INTERVIEWS at Wells Fargo*, YOUTUBE (June 14, 2022), https://www.youtube.com/watch?v=jopIT8m6-Rk.

[156]  *See Wells Fargo pauses diverse slate hiring policy after reports of fake job interviews*, REUTERS (June 6, 2022), https://www.reuters.com/business/wells-fargo-pauses-diverse-slate-hiring-policy-after-reports-fake-job-interviews-2022-06-06/.

employees. Three in particular (from users @tecben, @johnthesavage-ufc8182, and Dawn G) purport to have insider knowledge validating Joe Bruno's assertions. @johnthesavage-ufc8182 commented that "I worked at Wells Fargo and Joe is correct about what's happening with interviews. . . ." Dawn G commented: "Thank you for speaking on this I was with Wells Fargo Advisors for 18 years, I can attest to these practices and am available for comments if needed."

194.    Upon information and belief, "Dawn G" may be Dawn Gray of Plainfield, New Jersey.[157] Another former Wells Fargo employee, @tecben commented "When I worked for WF it was an unwritten rule that the regional manager already filled job openings and we would have to ask around if it was a 'real' open position."   Other information on @tecben's profile suggests that @tecben is Benjamin Paniagua[158] who worked at Wells Fargo for over six years.

195.    On June 22, 2022, *Business Insider* reported that Don Banks was a victim of Wells Fargo's sham interviews, during two separate interviews conducted in 2016 and 2017.[159]

196.    Following the May 2022 *New York Times* report, a securities fraud class action was filed against Wells Fargo accusing the Company of damaging its stock value and thereby harming its stockholders by conducting alleged fake interviews to falsely appear that it was complying with an internal policy mandating diverse pools of job candidates.[160]   The complaint alleges that, throughout the class period,  the Company made materially false and misleading statements or omissions regarding its commitment to diversity in the workplace and that when the truth was ultimately revealed, class members suffered significant losses.[161]   The U.S. Attorney's Office for the Southern District of New York also launched a criminal investigation into the Company's diversity hiring and practices.[162]   Furthermore, in

---

[157] https://www.linkedin.com/in/dawn-gray-28316b142.

[158] https://www.linkedin.com/in/benpaniagua.

[159] Urooba Jamal, *Wells Fargo Interviewed me just to meet its diversity criteria. I felt less than human when I found out*, INSIDER (June 22, 2022), https://www.businessinsider.com/wells-fargo-fake-job-interviews-diversity-feel-less-than-human-2022-6.

[160] *Ardalan v. Wells Fargo & Co.*, No. 3:22-cv-03811 (N.D. Cal.).

[161] *Id.*

[162] *See* Ex. AA,  Minutes of the Special Meeting of the Boards of Directors of Wells Fargo & Co. and Wells Fargo Bank, National Association Held on May 22, 2022 (WF_DS_000002863).

August 2022, in its Form 10-Q for the quarterly period ended June 30, 2022, Wells Fargo announced that the U.S. Department of Labor and other government agencies had initiated an inquiry and investigation into the Company's hiring practices related to diversity.[163]

197.    Following the suspension of Wells Fargo's diverse slate hiring policy in June 2022, the Company announced on August 1, 2022 that its hiring policy will be reinstated effective August 19, 2022.[164]  According to *Reuters*, the Company expects 50% diversity in both the candidates interviewed, as well as in the panel of interviewers.[165]  For its part, rather than conducting an investigation into the sham interview scandal, the Board simply "discussed conclusions that may be drawn from the data," decided without speaking to any interview candidates that the Company lacked a systemic problem and discussed the importance of pursuing a public-relations campaign "proactively engaging on the issue and communicating the Company's position that the data does not support the allegations."[166]

> **4.    The Board Knew Wells Fargo's Hiring and Promotion of Diverse Candidates Were Mission-Critical Risks, But Failed To Put in Place Appropriate Internal Controls to Ensure that Fake Interviews of Minority Candidates Did Not Occur**

198.    As explained above, Wells Fargo has a history of discriminatory practices in its hiring and promoting of monitories.  For example, on December 9, 2019, the Wells Fargo Board received a "Monitoring Company Culture Report" that highlighted the Company's weak internal controls related to hiring discrimination prevention.  The presentation noted Wells Fargo had "Ineffective Team Member Diversity Management."[167]  It further concluded that "[t]he number of substantiated allegations related to [discrimination, harassment and retaliation] behaviors could indicate ineffective human capital

---

[163] Wells Fargo & Co., Quarterly Report (Form 10-Q), at 110 (Aug. 1, 2022).

[164] *Wells Fargo Reinstates Diverse Slate Hiring Policy Following June Pause*, REUTERS (Aug. 1, 2022 3:39PM),  https://www.reuters.com/business/finance/wells-fargo-reinstates-diverse-slate-hiring-policy-following-june-pause-2022-08-01/.

[165] *Id.*

[166] Ex. BB, Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Co. and Wells Fargo Bank, National Association Held on June 27-28, 2022 (WF_DS_000003136 at 3164-65).

[167] Ex. CC, Sophie Sharp (Human Resources Chief Operating Officer), Monitoring Company Culture Report (Q3 2019) (WF_DS_0000024 at 80).

management in areas including poor hiring/selection decisions . . . that may need to be addressed" and "expose WF to significant . . . legal and reputational risk and potentially reflect unsafe and unsound management practices."[168] Days after the Board received the report, Stanford Graduate School's Corporate Governance Research Initiative issued a report indicating that not only did Wells Fargo's CEO lack racial or ethnic diversity, but his 12 direct reports lacked racial or ethnic diversity as well.

199.    To address the issue of lack of hiring diversity in March 2020, Wells Fargo's CEO, Charles Scharf, "announced that diverse candidate slates and interview panels will be required for all Wells Fargo positions with total direct compensation of more than $100,000."[169] From the start, Wells Fargo did not take the program seriously. On June 16, 2020, Wells Fargo's CEO, Charles Scharf, wrote a memo to the Company's employees discussing its hiring practices in which he said the bank's regulatory troubles have made it harder to cast a wide net for top jobs and concluded that "[t]he unfortunate reality is that there is a very limited pool of Black talent to recruit from . . . ."[170] "Many workers were upset by his comments at the time, particularly Black employees who were rising through the ranks. When the comments resurfaced in a Reuters story in September, Mr. Scharf was widely criticized."[171] In response to Mr. Scharf's comments, Ken Bacon, a former mortgage industry executive and board member at Comcast, Ally Financial, and Welltower, said, "If people say they can't find the talent, they either aren't looking hard enough or don't want to find it."[172]

---

[168] *Id.* at 0094.

[169] Ex. DD, Excerpt from Nov. 16, 2020 Governance and Nominating Committee Materials (WF_DS_000001401 at 1405).

[170] Liz Hoffman & Susan Pulliam, *Wall Street Knows It's Too White. Fixing It Will Be Hard*, WALL ST. J. (July 2, 2020), https://www.wsj.com/articles/wall-street-knows-its-too-white-fixing-it-will-be-hard-11593687600?mod=article_inline.

[171] Ben Eisen, *Wells Fargo CEO Finds Himself on Defense After a Tough First Year*, WALL ST. J. (Oct. 8, 2020), https://www.wsj.com/articles/wells-fargo-ceo-finds-himself-on-defense-after-a-tough-first-year-11602149402?mod=hp_lead_pos5.

[172] Rachel Sandler, *Wells Fargo CEO Reportedly Blames Limited Pool of Black Talent for Trouble Reaching Diversity Goals*, FORBES (Sept. 22, 2020), https://www.forbes.com/sites/rachelsandler/2020/09/22/wells-fargo-ceo-reportedly-blames-limited-pool-of-Black-talent-for-trouble-reaching-diversity-goals/.

200.    In a June 18, 2020, HRC Meeting, the committee was presented with a slide entitled "Why are people leaving the company?"[173]  According to the presentation, "Diversity & Inclusion (D&I) and Customer Facing voluntary turnover *continue trending higher* than the enterprise level turnover rate.  The differences have been widening over time, warranting additional review." (emphasis added).

201.    In August 2020, Wells Fargo paid nearly $8 million to settle claims brought by the Department of Labor that it had discriminated against more than ***34,000*** Black applicants during the hiring process.[174]  Wells Fargo pledged to do better and, in 2020, the Company expanded its policy requiring that at least 50% of the interview candidates represent a historically underrepresented group with respect to at least one diversity dimension.[175]  Throughout 2020 and 2021, the Company touted its diversity and inclusion efforts.[176]

202.    Around the same time, on August 13, 2020, the 2Q 2020 "Enterprise Risk Report" was presented to the Risk Committee.  The report, which identified significant risks the Company was facing identified "Sustained Team Member Allegations of Harassment, Discrimination, and Retaliation" as a "reoccurring trigger."  The presentation also stated that "Continued work to tackle the backlog of allegations is resulting in elevated levels of confirmed allegations."[177]

---

[173] Ex. EE, Appendix G: HR Risk and Regulatory Update; Company Culture continued (WF_DS_000000179 at 189).

[174] *See* News Release, U.S. Dep't of Labor, Wells Fargo Agrees to Pay $7.8 Million in Back Wages After U.S. Department of Labor Alleges Hiring Discrimination (Aug. 24, 2020), https://www.dol.gov/newsroom/releases/ofccp/ofccp20200824.

[175] Emily Flitter, *Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices*, N.Y. Times (June 9, 2022 11:45 EST), https://www.nytimes.com/2022/06/09/business/wells-fargo-fake-interviews-investigation.html (noting Wells Fargo implemented a "diverse slate" policy in mid-2020 "which stipulated at least half of the candidates interviewed for jobs paying $100,000 or more needed to be 'diverse'.").

[176] *See, e.g.*, Wells Fargo & Co., Annual Report (Form 10-K), at 1 (Feb. 22, 2022) ("Wells Fargo values and promotes diversity, equity and inclusion (DE&I) in every aspect of our business.  We are dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions.  We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase diverse representation in leadership roles.").

[177] Ex. FF, WF_DS_000000590 at 616.

203.    On September 30, 2020, *The Charlotte Observer* reported that "[a]t least seven Black female senior executives have left Wells Fargo in the past 12 months, depleting the pipeline of women executives of color to the bank's most senior positions."[178]  "Two people with direct knowledge of the matter say the bank's culture around race and gender was a factor in why some of the Black women left."[179]  "Sharon Goodwine, Wells Fargo's head of enterprise talent," was quoted as saying "we need to do more to recruit, promote and retain diverse talent" and "[w]e have put new programs in place this year to hold our leaders accountable to increase diverse representation at all levels of the company."[180]  Similarly, "Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion," stated that "[t]here definitely is a sense that bias lives vibrantly at Wells Fargo.  And I think it is around gender, gender identity, as well as race and ethnicity."[181]

204.    Following the negative publicity, Wells Fargo internally recognized the importance of addressing the Company's diversity and inclusion hiring efforts.  On October 26, 2020, the Board's Risk Committee received a presentation noting that "[t]here is increased risk[] of negative reputation impacts following media coverage referenc[ing] a comment on diverse talent from the chief executive officer's June 'Our commitment to change' memo, which generated significant social media conversation and a ***critical social conversation risk advisory rating (highest level)*** . . . Mr. Scharf discussed the importance of bringing real focus to D&I across the enterprise, and Ms. Clark encouraged directors to participate in stakeholder engagement efforts when possible."[182]  Similarly, during a board meeting the same and following day Wells Fargo's Vice Chairman of Public Affairs, William Daley, "noted that D&I is an

---

[178] Austin Weinstein, *"We need to do more": Seven high-ranking Black women leave Wells Fargo*, CHARLOTTE OBSERVER (Sept. 30, 2020), https://amp.charlotteobserver.com/news/business/banking/article246012155.html ("Two went to work at Citigroup, which just announced the first female CEO of a major U.S. bank.  One went to work at American Express, reporting to one of the most senior Black men in finance.  Another left for Equifax.").

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] Ex. GG, Mandy Norton (Chief Risk Officer) and Price Sloan (Chief Strategic Enterprise Risk Management Officer), *IRM Update* (inc. Notable Risk Updates and Emerging Risks Presentation) (Oct. 26, 2020) (WF_DS_000001325 at 1338 & 1387).

imperative of the Company's senior management team."[183]  Scharf and Daley's comments would prove to serve as mere lip service as the Board took no practical action.

205.    In November 2020, the HRC highlighted that "[s]ubstantiated cases [of racial discrimination] were characterized by: Derogatory/racist statements and unfair treatment towards customers and employees."[184]  Indeed, Mr. Scharf attributed his own "insensitive comment" about a supposed shortage of minority talent as "reflecting my own unconscious bias."[185]

206.    Over the ensuing months, the Wells Fargo Board and Senior Management would repeatedly highlight the importance of addressing diversity in hiring, yet the Board took no meaningful steps to address the issue.  For example:

> On November 16, 2020, the Board's Corporate Responsibility Committee received a presentation stating that "Wells Fargo is at a pivotal moment in re-establishing and advancing its leadership on diversity and inclusion issues, particularly as an employer and a bank of choice."[186]

> On November 17, 2020, HRC received a presentation stating that "Ongoing impacts of social justice movements, coupled with negative diversity related media attention in Q3, may contribute to emerging HCR [Human Capital Risk] tied to insufficient diversity in the workforce by making it more difficult to retain and hire diverse talent."[187]

> On April 27, 2021, a Diverse Segments presentation to the Board characterized the diverse interview slates and teams initiative as one of the Company's "critical initiatives and actions supporting diversity, equity & inclusion."[188]

---

[183] Ex. HH, Minutes of the Regular Meetings of the Boards of Directors of Wells Fargo & Co. and Wells Fargo Bank, National Association Held on October 26-27, 2020 (WF_DS_000000640 at 651).

[184] Ex. II, Human Resource Committee Meeting "Tab F:  HR Risk, Regulatory, and Other Updates" (Nov. 17, 2020) (WF_DS_000001228 at 1245).

[185] *Wells Fargo CEO apologizes for remark about diverse talent*, REUTERS (Sept. 23, 2020), https://www.reuters.com/article/global-race-wells-fargo/wells-fargo-ceo-apologizes-for-remark-about-diverse-talent-idUSL3N2GK37W.

[186] Ex. JJ, Barri Rafferty (Head of Communications), *Reputation Update*, (Nov. 16, 2020) (WF_DS_000003610 at 3611).

[187] Ex. II, Human Resource Committee Meeting "Tab F:  HR Risk, Regulatory, and Other Updates" (Nov. 17, 2020) (WF_DS_000001228 at 1238).

[188] Ex. KK, Kieber Santos (Head of Diverse Segments, Representation and Inclusion), *Diverse Segments, Representation and Inclusion:  Status* Update (Apr. 27, 2021) (WF_DS_000000754).

On June 29, 2021, the HRC received a presentation noting "Emerging diversity and inclusion risks" and that "YTD-2021 Insufficient Diversity in the Workforce has accounted for $10MM or 88% of internal losses-primarily attributed to alleged discrimination and retaliation."[189]

On December 14, 2021, the HRC received a presentation noting that "Q3 HCR losses without COVID are estimated at 1.4MM, where insufficient diversity in the workforce has accounted for $11MM or 86% of YTD internal losses-primarily within branch banking."[190]

### D.  Wells Fargo Issued False and Misleading Statements and Omissions Concerning the Company's Discriminatory Hiring and Lending Practices

207.    From January 1, 2019 to the present (the "Relevant Period"), Wells Fargo and its officers and directors made numerous materially false and misleading public statements to stockholders in proxy materials and other public filings denying, downplaying and concealing the Company's discriminatory practices, including statements concerning its Diverse Search Requirement and lending practices. These statements appeared in Wells Fargo's publicly-filed documents statements and annual reports, in interviews with journalists, in Scharf's Senate testimony, and in various official reports published by the Company.

208.    Defendants' numerous false or misleading statements are identified below. With respect to the various public filings or other sources, Plaintiffs identify: (1) the materially false or misleading statements in those representations (which is **_bolded and italicized_**); and (2) why those statements were false or misleading when made, including the information Defendants either misstated and/or failed to disclose.

### 1.    March 16, 2020 – 2020 Proxy

209.    On March 16, 2020, Wells Fargo Wells Fargo filed its 2021 proxy statement on Form DEF 14A (the "2020 Proxy"), which included at the front a letter signed by Scharf and Noski. Wells Fargo stockholders were notified of the 2020 Proxy "[b]y Order of our Board of Directors." The Proxy told stockholders that the Company's "**_performance assessment framework for our executives officers and_**

---

[189] Ex. LL, Human Resource Committee Meeting "Tab E:  Risk, Regulatory, and Other Updates" (Jun. 29, 2021) (WF_DS_0000000914-15).

[190] Ex. MM, HRC Meeting "Appendix E: Risk, Regulatory, and Other Updates) (Dec. 14, 2021) (WF_DS_000001450).

*other senior leaders to drive outcomes of both annual and long-term incentive awards*" had been "*enhanced*" in "*2020*."[191]  The 2020 Proxy further stated that this performance assessment framework was "*robust*" and "*overseen by our Board's [HRC]*," and that it considered "*progress against diversity initiatives*."[192]  It stated that the Board members responsible for D&I initiatives and results are Ronald Sargent, Chair of the HRC Committee, as well as fellow members Hewitt, James and Morris.[193]

210.    The 2020 Proxy also represented under the heading HUMAN CAPITAL MANAGEMENT that "We Are Responsible for Leading Our Transformation" and that the Board acknowledged that "we ALL have responsibility for managing risk EVERY DAY."[194]

211.    In August 2020, Wells Fargo issued an ESG Report which reiterated that DEI issues were a mission critical issue for the Company.

212.    DEI issues at this time were highly material to Wells Fargo's stockholders because of the huge reputational hits Wells Fargo had already taken regarding its very public scandals regarding racist policies.  In the 2020 Proxy, Wells Fargo announced a slate of DEI initiatives, including programs to increase diverse representation in senior-level job positions.  In the 2020 Proxy, the Director Defendants represented that Wells Fargo was "*dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions*."

213.    The 2020 Proxy also contained a section entitled, "Our Commitment to Do More to Increase Diversity in More Senior Roles," in which the Company represented that:

> "Under the leadership of our CEO, Charlie Scharf, the following are some specific actions we are taking . . . . *We are requiring diverse candidate slates and interview teams for all roles at Wells Fargo with total direct compensation of more than $100,000*," a reference to the Diverse Search Requirement."[195]

---

[191] 2020 Proxy at iii.

[192] 2020 Proxy at v.

[193] 2020 Proxy at 39.

[194] 2020 Proxy at 51.

[195] 2020 Proxy at 60.

214.    The 2020 Proxy also responded to a "Shareholder Proposal" for a "Report on Global Median Pay Gap" by "recommend[ing] a vote AGAINST th[at] proposal" because, among other things:

**Promoting Diversity and Inclusion in our Workforce**

In addition to our commitment to deliver equal pay for equal work, we recognize the importance of the structural issue raised by this proposal and the industry- wide gap in the representation of women and people of color in senior leader roles. ***We are committed to advancing the diversity of leadership across the Company and preparing these leaders for success through career development, training, and mentoring. We have a strong record of recruiting, promoting, and rewarding gender and racially/ethnically diverse employees at all levels of our Company, which reflects our commitment to increasing diversity in leadership roles.***

\* \* \*

***Hiring and Talent Mobility Strategy. We employ a selection and assessment program that ensures our hiring process is fair and equitable.***

***Wells Fargo has a three-prong talent strategy where all employees are expected to focus on attracting, hiring, and supporting diverse talent.***

215.    The above statements in the 2020 Proxy were materially false and misleading when made because they emphasized that "we have a strong record of recruiting, promoting, and rewarding gender and racially/ethnically diverse employees"; that "we have a strong record of recruiting . . . diverse employees at all levels of our Company, which reflects our commitment to increasing diversity in leadership roles: and that "our hiring process is fair and equitable"  when, in fact, Wells Fargo did not have a "strong record" hiring diverse candidates and instead was engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement.  Indeed, many of the diverse candidates did not have "fair and equitable" chance of obtaining the position for which they were interviewing because often another candidate had already been selected for the position.

216.    In addition, the 2020 Proxy omitted highly material information—including the fact that the "interview teams" would be conducting fake interviews of minority candidates for positions that had already been filled in order to give the appearance, not reality, of progress towards diversity.

## 2. February 23, 2021 – 2020 Annual Report

217.    On February 23, 2021, Wells Fargo published its 2020 annual report (the "2020 Annual Report"). The 2020 Annual Report contained a "[l]etter from CEO," which included a section entitled "Diversity, Equity, and Inclusion." In that section, Scharf stated that, "[t]hroughout 2020, we also announced our expanded commitments to diversity, equity, and inclusion," which included, among other measures, "[i]n the U.S., we are requiring a diverse slate of candidates — and a diverse interview team — for most roles with total direct compensation of more than $100,000 per year."[196]

218.    Also on February 23, 2021, Wells Fargo filed its 2020 Annual Report with the SEC on Form 10-K (the "2020 Form 10-K), which was signed by Defendants Black, Chancy, Clark, Craver, Hewett, James, Morris, Noski, Payne, Pujadas, Sargent, Scharf, and Vautrinot. The 2020 Form 10-K stated:

> ***Promoting Diversity, Equity and Inclusion. Meeting the increasingly diverse needs of Wells Fargo's global customer base is critical to our company's long-term growth and success. Wells Fargo values and promotes diversity, equity and inclusion (DE&I) in every aspect of our business. We are dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our Company, including leadership positions. We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase diverse representation in leadership roles.*** In November 2020, a new Operating Committee-level role reporting directly to our CEO was created to lead DE&I efforts. In this role, our Head of Diverse Segments, Representation and Inclusion is responsible for driving a Company-wide DE&I strategy.[197]

219.    The above statements in the 2020 Annual Report and 2020 Form 10-K were materially false and misleading because while Defendants claimed to promote "Diversity, Equity and Inclusion" in its "recruitment and career development practices" and to "have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company," in fact, Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement. Indeed, diverse candidates

---

[196]    *See* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2020-annual-report.pdf.

[197] 2020 Form 10-K at 1.

did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

### 3.    March 16, 2021 – 2021 Proxy

220.    On March 16, 2021, Wells Fargo filed its 2021 proxy statement on Form DEF 14A (the "2021 Proxy"), which included at the front a letter signed by Scharf and a letter signed by Noski.  Wells Fargo shareholders were notified of the 2021 Proxy "[b]y Order of our Board of Directors."  The 2021 Proxy stated, "*We Are Advancing Diversity, Equity, and Inclusion*";[198] "*Wells Fargo values and promotes DE&I in every aspect of our business*";[199] and that "*We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase representation in leadership roles*."[200]  Under a sub-heading entitled, "*Improving Diverse Representation and Inclusion within the Company*," Defendants stated, "*[w]e are expanding our diversity and inclusion commitments with a focus on hiring, promotions, and turnover, with increased accountability across all of those areas and are taking specific actions in support of these commitments*."[201]  In particular, Defendants stated, "*[i]n the U.S., we are requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year*."[202]  The 2021 Proxy described the Diverse Search Requirement as follows:

> Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement). Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part

---

[198] 2021 Proxy at 52.

[199] 2021 Proxy at 52.

[200] 2021 Proxy at 54.

[201] 2021 Proxy at 54.

[202] 2021 Proxy at 54.

of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000:

- ***At least 50% of interview candidates must be diverse with respect to at least one diversity dimension***; and

- ***At least one interviewer on the hiring panel must represent at least one diversity dimension***.[203]

221.    The above statements in the 2021 Proxy were materially false and misleading because while it extolled "our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity" through "the Diverse Search Requirement," in fact, Wells Fargo had been engaging in widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement.  In reality, diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

222.    The above statements in the 2021 Proxy were also materially false and misleading when made and/or omitted material information because, in fact, Wells Fargo <u>did not</u> have a "strong record of recruiting, promoting and rewarding racially and ethnically diverse employees as evidenced by various lawsuits and settlements with the Company, including the settlement in August 2020 where ***34,000*** Black applicants had alleged discriminatory hiring practices.

223.    The 2021 Proxy also contained a "Shareholder Proposal" that the Board "Conduct a Racial Equity Audit."  Specifically, the proposal "urge[d] the Board of Directors to oversee a racial equity audit analyzing [Wells Fargo's] adverse impacts on nonwhite stakeholders and communities of color. Input from civil rights organizations, employees, and customers should be considered in determining the specific matters to be analyzed. A report on the audit, prepared at reasonable cost and omitting confidential or proprietary information, should be publicly disclosed on [Wells Fargo's] website.

---

[203] 2021 Proxy at 57.

224.    The shareholder proposal further stated:

High-profile police killings of black people – most recently George Floyd – have galvanized the movement for racial justice.  That movement, together with the disproportionate impacts of the COVID-19 pandemic have focused the attention of the media, the public and policy makers on systemic racism, racialized violence and inequities in employment, health care, and the criminal justice system.  This has further raised the importance of addressing the mission critical issue of ensuring the Company has sufficient internal controls to prevent hiring and lending discrimination.

In June 2020, [Wells Fargo] CEO Charles Scharf urged that "the inequality and discrimination that has been so clearly exposed . . . must not continue," and [Wells Fargo] announced initiatives to improve workforce diversity and inclusion and invest in black-owned businesses.[204]  Those actions followed some missteps: Scharf previously stated that the reason [Wells Fargo] had difficulty hiring diverse candidates was due to the "very limited pool of Black talent, demoralizing black employees, and the loss of black female top managers.[205]

[Wells Fargo's] problems predate Scharf's 2019 arrival.  [Wells Fargo] has settled employment discrimination claims on several recent occasions, including incidents of race discrimination in 2014 uncovered through a Labor Department audit.  In 2019, Wells Fargo settled a lawsuit by the City of Philadelphia alleging that Wells Fargo targeted nonwhite neighborhoods for high-fee and high-interest rate loans.[206]  In 2012, the same practices led to a $184 million Department of Justice settlement.  A 2021 investigation found racial disparities in Wells Fargo's lending under the Paycheck Protection Program in Los Angeles: businesses in majority-white neighborhoods were more than twice as likely to receive funding as businesses in majority-nonwhite neighborhoods.[207]

[Wells Fargo's] activities with potential adverse impacts are not limited to the employment and lending contexts.  [Wells Fargo] has supported numerous police foundations, which bypass normal procurement processes to buy equipment for police departments, including surveillance technology that has been used to target communities of color and nonviolent protestors.  In the 2020 election cycle, [Wells Fargo] gave $135,000 to members of Congress who objected to certifying the election results,[208] an action some viewed as "a

---

[204] *See* https://stories.wf.com/wells-fargo-ceo-a-watershed-moment/.

[205] https://www.wsj.com/articles/wells-fargo-ceo-finds-himself-on-defense-after-a-tough-first-year-11602149402?mod=hp_lead_pos5.

[206] https://whyy.org/articles/wells-fargo-will-pay-philadelphia-10m-to-settle-citys-discriminatory-lending-lawsuit/.

[207] https://www.latimes.com/california/story/2021-05-01/ppp-loans-coronavirus-pandemic-businesses-trump.

[208] https://edition.cnn.com/interactive/2021/01/business/corporate-pac-suspensions/.

direct attack on the voting rights of people of color."[209]  Although Wells Fargo paused PAC contributions after the insurrection, it resumed them following a review of its criteria. Wells Fargo is a member of the American Bankers Association, which continues to donate to objecting members.[210]

A racial equity audit would help [Wells Fargo] identify, prioritize, remedy and avoid adverse impacts on nonwhite stakeholders and communities of color.  We urge Wells Fargo to assess its behavior through a racial equity lens in order to obtain a complete picture of how it contributes to, and could help dismantle, systemic racism.

225.    In response, the Board recommended voting against the proposal:

Our Board recommends a vote AGAINST this proposal, which is identified as Item 7 on the proxy card, for the following reasons:

\* \* \*

- *Wells Fargo has taken a number of actions to promote and enhance diversity, equity, and inclusion goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership), accountability of senior management for progress in improving diverse representation and inclusion, unconscious bias education and training for employees, and new business initiatives and investments focused on support for diverse communities*.

- *Wells Fargo is providing updates on its diversity, equity, and inclusion initiatives and actions to promote racial equity in our public disclosures such as the Company's Environmental, Social, and Governance (ESG) reporting, our website, and this proxy statement*.

- *The Board believes that the Company's significant and ongoing diversity, equity, and inclusion initiatives and its existing and planned future disclosures about its diversity, equity, and inclusion initiatives, including to report on the results of its Human Rights Impact Assessment which is being conducted by a third party and includes a focus on racial equity, are fully responsive to the proposal*.

226.    The Board further stated that "***Wells Fargo supports the communities in which it does business through our products and services***, community engagement, philanthropy, and employee

---

[209] *See* https://www.nytimes.com/2021/01/15/us/politics/lankford-apology-election-biden.html.

https://www.marketwatch.com/story/business-leaders-call-for-action-on-trump-after-mob-siege-at-capitol-11609976655.

[210]    https://www.citizensforethics.org/reports-investigations/crew-reports/corporations-have-given-10-million-to-the-sedition-caucus/.

volunteerism. ***We play a significant role in both supporting diverse communities across the nation and helping foster a more inclusive society***. ***Wells Fargo has long believed that focusing on the needs of all of our stakeholders, including customers, employees***, regulators, suppliers, communities, and shareholders, drives long-term value creation."

227.    The Board concluded that "[t]he Board believes that the Company's significant and ongoing DE&I initiatives and its existing and planned future disclosures about its DE&I initiatives, including to report on the results of its [Human Rights Impact Assessment] which is being conducted by a third party and includes a focus on racial equity, are fully responsive to the proposal."

228.    Wells Fargo's and the Board's statements in opposing this shareholder proposal were materially false and misleading because, at the same time the Board claimed that Wells Fargo was "helping to remove barriers to financial inclusion" for Blacks and Hispanics, the Company's lending algorithms were systematically resulting in disparate impact towards Black and Hispanic credit applicants and systematically failing to offer minority borrowers the same interest rate discounts—often referred to as "pricing exceptions"—as White borrowers.

229.    The 2022 Proxy's statements opposing the shareholder proposal were also materially false and misleading because as a result of the Diverse Search Requirement Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

**4.    April 26, 2021 – 2020 Social Impact and Sustainability Highlights**

230.    On April 26, 2021, Wells Fargo published a report entitled, "2020 Social Impact and Sustainability Highlights."  A section entitled "Elevating diversity, equity, and inclusion" outlined the Company's Diverse Search Requirement:

> To be successful, we must continue to create a truly diverse and inclusive workforce that brings a wide range of insights and perspectives to all levels of our company. ***Our Diverse Search Requirement requires that for most U.S. roles with total direct compensation***

*greater than $100,000, at least 50% of interview candidates must be diverse with respect to at least one diversity dimension. Further, at least one interviewer on the hiring panel must represent at least one diversity dimension.* For these purposes, our definition of diversity includes race/ethnicity, gender, LGBTQ, veterans, and people with disabilities. We're expanding this program internationally. *As of December 31, 2020, the Diverse Search Requirement:*

*Applied to approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and*

*Applied to approximately 48% of all active U.S. employees irrespective of their total direct compensation*

- *91% of applicable requisitions had a diverse interview slate [and]*

- *94% of applicable requisitions had a diverse interview team.*

231.    The above statements in the 2020 Social Impact and Sustainability Highlights were materially false and misleading because while it claimed that the Company "must continue to create a truly diverse and inclusive workforce" through "our Diverse Search Requirement," in fact, Wells Fargo had been engaging in widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

**5.    May 26, 2021 – Defendant Scharf's Testimony to the United States Senate Committee on Banking, Housing, and Urban Affairs**

232.    On May 26, 2021, Defendant Scharf provided testimony during a hearing before the United States Senate Committee on Banking, Housing, and Urban Affairs.  In a portion of his testimony under a heading entitled, Our Commitment to Diversity, Equity, and Inclusion, Scharf stated, among other things, "for the hiring of many senior roles, we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel."

233.    Defendant Scharf's testimony to the Committee on Banking, Housing, and Urban Affairs was materially false and misleading because while Sharf claimed that "we have implemented guidelines that require a diverse slate of candidates (at least 50 percent) and a diverse interview panel," in fact, as a

result of the Diverse Search Requirement, Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

### 6.    July 15, 2021 – 2021 ESG Report

234.    On July 15, 2021, Wells Fargo published its 2021 ESG Report, which began with a letter signed by Scharf. In the 2021 ESG Report, Defendants provided an "[u]pdate on Wells Fargo's DE&I commitments," stating that the Company "[r]equire[s] diverse candidate slates and interview teams for key roles with total direct compensation of more than $100,000."  In this same portion of the 2021 ESG Report, Wells Fargo also stated:

> In the U.S., we now require that at least 50% of interview candidates identify with at least one diversity dimension — and we require a diverse team of interviewers — for most roles with total direct compensation of more than $100,000. Outside the U.S., we have country-specific strategies in place to ensure that we're considering diverse candidate slates for executive-level roles.

235.    The above statements in the 2021 ESG Report were materially false and misleading because despite lauding the Company's policy requiring it to interview "diverse candidate slates," in fact, Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

236.    The 2021 ESG report was also false and misleading because it stated that Wells Fargo sought to achieve "homeownership goals" while "maintaining our focus on fair and responsible lending" including by among other things "[d]evelop[ing] products, programs, and polices intended to promote growth in traditionally underserved markets."  Yet, as set forth herein (*see* § VI.B.7), the Company's automated CORE underwriting system resulted in disparate impact towards minorities, depriving a large

percentage of "traditionally underserved" minorities of the ability to obtain a mortgage. And even when many of these underserved borrowers *did* qualify for a mortgage, they were often required to pay more than similarly situated White borrowers due to discriminatory pricing exceptions.

**7.    October 7, 2021 – Defendant Sanchez's Virtual Interview with the Institute for Corporate Productivity**

237.    On October 7, 2021, Defendant Sanchez participated in a virtual interview with the Institute for Corporate Productivity ("i4cp")[211] during an installment of its Talent Acquisition Next Practices Monthly series. As an organization dedicated to "discover[ing] next practices in human capital," i4cp's "Talent Acquisition Next Practices Monthly series provides a forum for the [talent acquisition] leadership community to come together to discover and advance next practices" in the industry. During the interview, i4cp host Lorrie Lykins asked Sanchez to "talk a little bit about building diverse candidate slates and increasing opportunities" for diverse job candidates at Wells Fargo. As part of her response, Sanchez stated, in relevant part, that:

> *[W]e have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates*. . . .
>
> *[W]e formalized the candidate slate requirement for roles $100K and above. It's probably about a year and a half or two years ago to say that you have to have 50% of the slate – of the candidate slate that will be interviewed needs to be diverse in one dimension or another. Also, the interview team has to be diverse, and so that's very important as well.*
>
> But I think the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates. And we'll identify with the recruiters who work hand-in-hand with our diversity sourcing group.
>
> Sanchez added that, in trying to build a pool of diverse candidates, Wells Fargo's "recruiters can say look, I have a really tough role to fill. I'm having a hard time pipelining that, and so the diversity sourcing group can step in and also do a targeted effort to make sure that they've filled that pipeline adequately and found where they can find diverse groups."

---

[211] i4cp describes itself as "a leading research organization and network of HR executives that discovers next practices in human capital." *See* https://www.i4cp.com/library/next-practice.

238.    Defendant Sanchez's statements during her virtual interview with *i4cp* were materially false and misleading because while she claimed that Wells Fargo was "proactively sourcing for building diverse candidate slates" through "the candidate slate requirement" which required that "50% . . . of the candidate slate that will be interviewed needs to be diverse," in fact, as a result of the Diverse Search Requirement, Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the company had no intention of hiring the diverse candidates it was interviewing.

239.    In addition, Defendant Sanchez's statements in ¶ 239 that "we have really focused a lot on the external sourcing and making sure that we are proactively sourcing for building diverse candidate slates," "the core for us and what's key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates," and "the diversity sourcing group can step in and also do a targeted effort to make sure that they've filled that pipeline adequately and found where they can find diverse groups" were materially false and misleading and omitted material facts when made because, in reality, Wells Fargo was building slates of diverse candidates simply to claim compliance with its Diverse Search Requirement when, in truth, diverse candidates did not have a legitimate and fair shot at obtaining the job or another candidate was already previously selected for the job and the Company had no intention of hiring the diverse candidates it was interviewing.

**8.    March 14, 2022 – 2022 Proxy**

240.    On March 14, 2022, Wells Fargo Wells Fargo filed its 2022 proxy statement on Form DEF 14A (the "2022 Proxy"), which included at the front a letter signed by Scharf and a letter signed by Black. Wells Fargo stockholders were notified of the 2022 Proxy "[b]y Order of our Board of Directors."  The 2022 Proxy stated that "Wells Fargo values and promotes DE&I across out business."  In the 2022 Proxy, in a section entitled, "Our Approach to Advancing Diversity, Equity, and Inclusion," Wells Fargo made various representations regarding the Company's Diverse Search Requirement, including, *inter alia*, that:

*Our DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas. These include*:

**Diverse Candidates[:]** *Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions*. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

* * *

**Our Affirmative Action Team[:]** We conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups.

**Our Diversity Sourcing Group[:]** *We seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles*. They pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants.[212]

241.    The above statements in the 2022 Proxy were materially false and misleading because while it claimed that Wells Fargo's "DE&I commitments include . . . Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions" in order "to recruit the best and brightest talent with a keen focus on diversity for senior-level roles," in fact, as a result of the Diverse Search Requirement, Wells Fargo had been engaging in widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

242.    The 2022 Proxy also contained a "Shareholder Proposal" that the Board "Conduct a Racial Equity Audit." The proposal was substantially identical to the similar proposal in the 2021 Proxy. ¶¶ 222-31 above. In response, the Board recommended voting against the proposal:

Our Board recommends a vote AGAINST this proposal, which is identified as Item 10 on the proxy card, for the following reasons:

---

[212] 2022 Proxy at 35.

- Our Board believes that the Company's significant and ***ongoing diversity, equity, and inclusion (DE&I) initiatives*** and its existing and planned future disclosures of these efforts are responsive to the proposal. Additionally, consistent with our commitment in 2021, we expect to provide a disclosure, prior to the filing of this proxy statement, related to the Human Rights Impact Assessment, which includes a DE&I focus.

- The Company has worked to integrate DE&I across the enterprise. In 2021, the Company added dedicated Diverse Segment Leader roles in each customer-facing line of business. Beginning in 2020, the Company launched forums in which executives from underrepresented groups share, on a regular basis, their perspectives and ideas with our CEO and other senior leaders on how to improve the experience of diverse employees and customers. Initiatives that result from these forum discussions are tracked and reviewed regularly.

- The Company has focused on increasing executive accountability by linking DE&I outcomes to compensation.

- Additionally, Wells Fargo has launched a number of new initiatives aimed at supporting communities of color and addressing systemic economic inequities including its Banking Inclusion Initiative, a 10-year commitment to help unbanked individuals gain access to affordable, mainstream, digitally-enabled transactional accounts, its investment in Minority Depository Institutions, and its commitment to the Black Economic Alliance Entrepreneurs Fund, among others.

243.    The Board further stated that "***We have significantly increased our focus on our DE&I strategy, which we believe enables the Company to play a positive role in supporting diverse stakeholders including its employees, customers***, suppliers, and communities."

244.    The Board concluded that "***[g]iven our comprehensive approach to DE&I, with continued oversight from our Board, management accountability, and our robust DE&I disclosures, we do not believe that performing a Racial Equity Audit ultimately serves the best interests of our shareholders***."

245.    The 2022 Proxy also stated that, when awarding executive compensation, the Board and HRC took into account the progress made by the CEO "on key Company-wide DE&I priorities" and by other named executive officers ("NEO") on "diverse representation and inclusion" and that the HRC could "reduce an individual NEO's performance achievement level to zero for failures in risk management, including misconduct," which the 2020 Proxy claimed "aligns incentive compensation determinations with performance":

In determining NEO performance, the HRC utilizes a performance assessment and variable incentive determination process that provides the HRC with the ability to assess performance through the evaluation of pre-established financial and nonfinancial goals, including risk and DE&I. For DE&I, the HRC evaluates the CEO's progress on key Company-wide DE&I priorities, and for other NEOs, the HRC uses progress on diverse representation and inclusion across specific diversity dimensions of NEO leadership teams with potential adjustments to variable incentive compensation based on a holistic assessment of progress in one or more diversity dimensions. The performance assessment and variable incentive determination process aligns incentive compensation determinations with performance against long-term value drivers of the Company and prudent risk oversight, and provides the HRC with the ability to reduce an individual NEO's performance achievement level to zero for failures in risk management, including misconduct.

246.    The above statements in the 2022 Proxy were materially false and misleading because while they claim that Wells Fargo was "Advancing Diversity, Equity, and Inclusion" through "diverse candidate slates"; and emphasized "ongoing diversity, equity, and inclusion (DE&I) initiatives," "our comprehensive approach to DE&I," and "robust DE&I disclosures"—in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

247.    Finally, the 2022 Proxy was misleading because it told investors that Wells Fargo tied executives' compensation to its DE&I and diversity initiatives as a way to incentivize these initiatives, including by clawing such compensation in the event of failures or mismanagement—the 2022 Proxy omitted that, in fact, the Company was engaging in the precise misconduct that justified clawing back that compensation, but the HRC had no intention of reducing executives' compensation tied to diversity.

### 9.    February 15, 2022 – Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response

248.    On February 15, 2022, Wells Fargo published its "Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response."  In the "Diversity, equity, and inclusion" section of this document, under the "Sourcing of diverse talent" sub-heading, the Company stated:

In 2021, we increased our partnerships with colleges, universities, and other organizations spotlighting diverse talent recruitment. For example, by expanding our engagement we

increased our hiring of candidates from Historically Black Colleges and Universities and Hispanic- Serving Institutions. ***We also instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation***. We are in the process of eliminating education requirements in certain job categories to increase equity in hiring. Programs such as Glide-Relaunch (an in-house returnship program) and our Career Development Cohort program (an in-house diversity focused program that supports our partnership with the OneTen Coalition) further support our DE&I recruiting efforts.

249.    The above statements in the Priority Recommendations of the Wells Fargo Human Rights Impact Assessment and Actions in Response were materially false and misleading because while claiming that "[w]e . . . instituted diverse candidate slates and interview teams on most jobs of over $100,000 in total compensation," in fact, as a result of the Diverse Search Requirement, Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

### 10.    March 18, 2022 – Wells Fargo's Statements to *WCNC Charlotte*

250.    On March 18, 2022, *WCNC Charlotte* published an article titled "In light of disparities, senators call for review of Wells Fargo refinancing practices" which reported that members of the U.S. Senate Committee on Banking, Housing, and Urban Affairs had "requested a federal review of Wells Fargo's lending practices amid concerns of disparities."[213]  The article quoted a written statement that Wells Fargo provided to *WCNC Charlotte* in connection with the article:

> ***"We will review the letter and provide our perspective on the analysis reflected in the recent story, which ignored critical information about Wells Fargo's lending to Black homeowners and the full range of our efforts to help meet the homeownership needs of diverse customers,"*** Wells Fargo told WCNC Charlotte in a statement Friday. "***We are confident that our underwriting practices are consistently applied regardless of the customer's race or ethnicity. Our analysis shows that additional, legitimate, credit-related factors that are not available in HMDA data were responsible for the differences in our refinance approval rate for Black homeowners***."

---

[213] Nate Morabito, "In light of disparities, senators call for review of Wells Fargo refinancing practices," WCNC CHARLOTTE (Mar. 18, 2022), https://www.wcnc.com/article/money/disparities-senators-review-of-wells-fargo-refinancing-practices/275-df6a654d-c6c7-41e7-8011-12de2f9eea69.

***In the statement, Wells Fargo defended their operations***.

"The fact is, Wells Fargo helped more Black homeowners refinance their mortgages in 2020 than any of the other largest bank lenders and the 83% increase in our refinance loans to Black homeowners in 2020 compared with 2019 was by far the biggest gain among those banks," the statement continued. "In 2021, we increased that total by 88%. What's more, over the most recent decade (2011 – 2020), Wells Fargo helped as many Black families purchase homes as the next three largest bank lenders combined."

251.    The Company's above statements to *WCNC Charlotte* were materially false and misleading because contrary to the claims that "underwriting practices are consistently applied regardless of the customer's race or ethnicity" and are the results of "legitimate, credit-related factors," in reality Wells Fargo's automated underwriting system was systematically discriminating against Black and Hispanic credit applicants and the Company was failing to offer minority borrowers the same interest rate discounts—in the form of "pricing exceptions"—as White borrowers. *See* § VI.B.11.

## 11.    May 27, 2022 – Defendant Santos's Statements to *Business Insider*

252.    On May 27, 2022, *Business Insider* published an article entitled, "Wells Fargo exec responds to reports that it denied mortgages to Black applicants and held sham job interviews," which reported that "Wells Fargo is also dealing with the fallout from a New York Times report in which several current and former employees said that the bank conducted sham interviews to meet requirements for interviewing diverse job applicants."  According to the article, Santos told *Business Insider*, "We researched all the specific hiring-practice allegations the reporter shared prior to the story's publication and we could not corroborate these allegations as factual."  Santos further stated, "[i]f we believe that any manager has conducted an interview with a predetermined outcome in mind, we believe we should investigate and punish if we find wrongdoing."

253.    In speaking with *Business Insider*, Defendant Santos also responded to Bloomberg's allegations that "Wells Fargo was the sole lender that rejected more Black applicants than it accepted" by stating that he "'vehemently' disagrees that that's what's going on in this instance."  According to the article:

Bloomberg's recent report found that Wells Fargo was the sole lender that rejected more Black applicants than it accepted. But Santos said the report "oversimplified" how the approval process works. The bank has to deny applicants who don't meet certain criteria

outlined by Fannie Mae and Freddie Mac, he said, not by rules it sets itself. Fannie Mae and Freddie Mac are federally backed mortgage companies created by Congress that are designed to foster homebuying and make it more affordable.

"I think that article, in some ways, oversimplified something. The mortgage market is mostly what we call 'conforming.' It's Fannie and Freddie," he said. "***We don't have proprietary credit-underwriting models. We follow the guidelines of the GSEs***."

A government-sponsored enterprise, or GSE, is a quasi-governmental, privately held agency established by Congress to help more people get credit in certain areas of the economy. Fannie Mae and Freddie Mac are GSEs.

"We don't try to play any type of game to manage a certain approval rate. Therefore we take a lot more applicants — a lot more diverse applicants than other institutions — and that results in a lower approval rate," he said.

A Bloomberg spokesperson said the news organization stood by its reporting.

***Santos acknowledged that the banking industry has long participated in damaging practices that marginalized Black Americans, but said he "vehemently" disagrees that that's what's going on in this instance***. He suggested the bank is interested in speaking with industry leaders to change the current criteria for accepting mortgage applicants.

254.    Defendant Santos's statements to *Business Insider* vehemently denying *Bloomberg's* allegations of mortgage discrimination and claiming "We don't have proprietary credit-underwriting models" and instead merely "follow the guidelines of the GSEs" were materially false and misleading because, in fact, Wells Fargo's lending algorithms were systematically discriminating against Black and Hispanic credit applicants and the Company was systematically failing to offer minority borrowers the same interest rate discounts—in the form of "pricing exceptions"—as White borrowers. Indeed, contrary to Santos's claim that Wells Fargo did not "have proprietary credit-underwriting models" and merely "follow[ed] the guidelines of the GSEs," FE 4 confirmed that Wells Fargo built a "ton" of overlays off of Fannie Mae and Freddie Mac's rules and that those overlays (which essentially constituted the Company's underwriting algorithm) increased "year after year after year." ¶¶ 165-68.

### 12.    June 1, 2022 – 2022 DE&I Report

255.    On June 1, 2022, Wells Fargo published its 2022 DE&I Report.[214]  The report contained two "Messages" in the front, one from Scharf (which he signed) and one from Santos (which he signed). In a section of that report entitled, Diverse candidate slates and interview teams, Wells Fargo stated:

> For most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension and at least one interviewer on the hiring panel must also represent a historically under-represented group with respect to at least one diversity dimension.[215]

256.    The above statements in the 2022 DE&I Report were materially false and misleading because while the report claimed that the Company's policies required that "at least 50% of the interview candidates must represent a historically under-represented group with respect to at least one diversity dimension," in fact, as a result of the Diverse Search Requirement, Wells Fargo had been engaging in widespread scheme of "fake" or "sham" interviews of diverse candidates merely to claim compliance with its Diverse Search Requirement when, in reality, those diverse candidates did not have a legitimate and fair chance of obtaining the position for which they were interviewing and often another candidate had already been selected for that position and, as a result, the Company had no intention of hiring the diverse candidates it was interviewing.

### 13.    June 3, 2022 – Defendant Santo's Further Statements to Business Insider

257.    On June 3, 2022, *Business Insider* published an article entitled, "Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street."[216] While the article broadly concerned Wells Fargo's recently published 2022 DE&I Report, it

---

[214] Wells Fargo, 2022 Diversity, Equity, and Inclusion Report:  Diversity, Equity, and Inclusion at Wells Fargo:  Colleagues,  Customers,  Communities," https://www08.wellsfargomedia.com/assets/pdf/about/corporate/2022-diversity-equity-inclusion-report.pdf.

[215] 2022 DE&I Report at 13.

[216] Marguerite Ward, "Wells Fargo's first diversity report shows progress but also that work remains to make Wall Street look more like Main Street," BUSINESS INSIDER (June 3, 2022), https://www.businessinsider.com/wells-fargo-diversity-report-shows-gains-but-that-challenges-remain-

focused specifically on the Diverse Search Requirement. Indeed, under a heading titled "Diversity in banking is a work in progress," the article reported that:

> ***Wells Fargo's Santos said the bank was focused on improving diversity among leaders***. In 2020, the banking giant instituted a rule that for all posted roles in the US with annual compensation greater than $100,000, at least half of interview candidates must be from a historically underrepresented group.
>
> ***The rule is working, Santos said***.

258.    *Business Insider* also cited several statistics provided by Wells Fargo as evidence that the Diverse Search Requirement was working, stating: "In 2019, before the implementation of the rule, 36.9% of hires for people making $100,000 or more were racially or ethnically diverse — Black, Latino, Asian American, Pacific Islander, Native American, or Alaska Native. By 2021, that rose to 42.3% of leaders, according to Wells Fargo."

259.    Defendant Santos's statements to *Business Insider*—and particularly that the Company was "focused on improving diversity among leaders" and that the Diverse Search Requirement was "working"—were materially false and misleading because, in fact, fake interviews were a widespread problem at Wells Fargo and the Board had received an email complaint about a fake interview in February 2021, had previously been briefed on the issue of fake interviews in December 2021, and only 12 days earlier had discussed the nonpublic criminal subpoena Wells Fargo received regarding its diversity hiring practices.    Indeed, numerous presentations to the HRC showed that substantiated allegations of harassment, discrimination, and retaliation increased during 2020—i.e., the year that the Diverse Search Requirement was formalized.  *See* ¶¶ 27, 202, 207-08 above.  Also, on June 28, 2022, the HRC received a presentation showing that the Company had received approximately 16,000 employee-reported allegations of harassment, discrimination, and retaliation over the previous year, which was characterized as "a high number given the employee base."  *See* ¶¶ 202, 207-08 above.

---

2022-6#:~:text=In%202020%2C%20the%20banking%20giant,rule%20is%20working%2C%20Santos%20said.

**14.    March 15, 2023 – 2023 Proxy**

260.    On March 15, 2023, Wells Fargo filed its 2023 proxy statement on Form DEF 14A (the "2023 Proxy"), which included at the front letters to shareholders signed by Defendants Scharf and Black. Among other statements the 2023 Proxy made the following representations:

- Our Board, along with the CEO and the Operating Committee, will continue to set the tone from the top regarding our expectations for the highest standards of integrity, excellence, and sound risk management as we continue to focus on building Wells Fargo for the future.

- As a leading financial services company, we believe we have a role to play in addressing social, economic, and environmental sustainability. We have a governance structure that allows for robust Board oversight and senior management leadership over environmental sustainability, social, and DE&I strategies.

- To reduce the risk in the mortgage business, we are reducing the size of our mortgage servicing portfolio and exiting our correspondent business, while continuing our goal to be the primary mortgage lender to our customers and minority homebuyers.

- We are guided by "doing what is right for our customers" at the center of everything we do; [w]e are focused on actions, not words[.]

- 2022-2023 Sustainability, Social, and DE&I Highlights:  [p]ublished our inaugural Diversity, Equity, and Inclusion Report (available on the Corporate Responsibility Goals and Reporting page on our website); [and] [a]nnounced strategic plans to create a more focused Home Lending business aimed at serving bank customers, as well as individuals and families in minority communities, including investing an additional $100 million to advance racial equity in homeownership[.]

- In the communities we serve, the Company focuses its social impact on building a sustainable, inclusive future for all by supporting housing affordability, small business growth, financial health, and a low-carbon economy.

- Launched $60 million Wealth Opportunities Restored through Homeownership ("WORTH") program, which aims to create 40,000 homebuyers of color in eight markets across the U.S.

- We partner with our customers to help them achieve their financial goals and with our communities to make a positive impact.

- We believe that meeting the increasingly diverse needs of our global customer base is critical to our Company's long-term growth and success. We invest in employee learning and development and believe that when our employees are properly supported, engaged, and confident in their skills, they are more effective leaders and

can provide a better customer experience. We continue to remain focused on customer experience and customer fairness.

261.    The statements above from the 2023 Proxy that the Board "will continue to set the tone from the top regarding our expectations for the highest standards of integrity, excellence, and sound risk management; that "[w]e have a governance structure that allows for robust Board oversight and senior management leadership over environmental sustainability, social, and DE&I strategies"; that "we are reducing the size of our mortgage servicing portfolio and exiting our correspondent business, while continuing our goal to be the primary mortgage lender to our customers and minority homebuyers"; and that "we are guided by 'doing what is right for our customers' at the center of everything we do" were false and misleading when made or otherwise omitted material information because the Board was not, in fact, setting the appropriate "tone from the top" or providing "robust Board oversight" or "guided by 'doing what is right.'"    As set forth herein, the Board failed to faithfully oversee Wells Fargo's compliance with fair lending laws, which resulted in (1) the Company using automated underwriting systems or algorithms that had a disparate impact on minority borrowers (§ VI.B.7), and (2) Wells Fargo's continued practice of turning a blind eye to discriminatory pricing exceptions (§ VI.B.11).

262.    Additionally, the statements fail to disclose the true story:  that for years the Board's supposed "robust governance structure" failed to have in place systems and controls that monitor compliance with fair lending laws.

## E.    The Individual Defendants Made Their Misrepresentations Knowingly or with Reckless Disregard for the Truth

263.    When Wells Fargo and the Officer and Director Defendants made the public statements detailed in Section VI.D above, they knew, or with extreme recklessness disregarded, that those statements were materially false and misleading, including by omitting material facts.  These Defendants knew their statements would be issued and disseminated to the investing public, knew analysts and investors were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of those statements.  Indeed, the ongoing fraud as detailed herein could not have been perpetrated without the knowledge or recklessness of personnel at the highest level of the Company, including the Officer and Director Defendants.

264. The facts detailed above, in conjunction with the additional indicia of scienter discussed below, collectively demonstrate that throughout the Relevant Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading when made.

265. *First*, Scharf and other members of the Company's Board were repeatedly made aware of information concerning fake interviews that undermined Defendants' public statements touting the Diverse Search Requirement. For example, on February 18, 2021—just days before the start of the Relevant Period—Miller submitted a complaint to Wells Fargo's Board via an email to Wells Fargo's Board Communications email address with allegations about a sham interview he experienced at Wells Fargo. *See* ¶¶ 177-80 *supra*. On September 7, 2021, Bruno sent a 4,500-word email critical of Vanderveen to nearly 250 Wells employees, including Scharf, Powell, Santos, Mary Mack, and other senior executives informing them of the Company's practice of holding fake interviews. *See* § VI.C.1 *supra*. On December 13, 2021, the Board's Governance and Nominating Committee received an "update on monitoring, routing, and escalation of Board communications in accordance with the Board Communications Policy and Procedures" which categorized Mr. Miller's "2/18/21" email to the Board as a "Non-Ordinary" communication, and noted that Mr. Miller asked whether "he was interviewed only as a means for the hiring executives to appear as if they are pursuing diverse candidates." *See* ¶ 179 *supra*. Collectively, these facts corroborate one another and combine to create the plausible, compelling inference that the Board was aware of the issue of fake interviews as early as February 18, 2021.

266. *Second*, Defendants publicly claimed to have unfettered access to a trove of information concerning the Company's DEI initiatives. For example, Scharf stated in sworn testimony before the United States House Financial Services Committee in March 2020, that "[t]he CFO and I hold monthly business reviews that were not held in the past where we meet with every business along with their senior folks and we review their financial results, their risk controls, progress they are making on people including the diversity component of that on a going-forward basis."[217] Similarly, Wells Fargo's then-Chairman of the Board, Charles H. Noski, stated in a signed letter at the beginning of Wells Fargo's

---

[217] *See* Hearing Before the Committee on Financial Services: "Holding Wells Fargo Accountable: CEO Perspectives on Next Steps for the Bank that Broke America's Trust" (Mar. 10, 2020), https://www.govinfo.gov/content/pkg/CHRG-116hhrg42866/html/CHRG-116hhrg42866.htm.

March 2021 Proxy that "[t]he Board and its Human Resources Committee are fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital management to support management in its efforts to drive meaningful change."

267. **Third**, Defendants frequently spoke about the Diverse Search Requirement, recruiting diverse individuals at all levels of the Company, and Wells Fargo's intense focus on tracking and evaluating data concerning its DE&I initiatives. Defendants' repeated statements strongly and plausibly suggest they each had access to negative material undisclosed information. Defendants' statements also demonstrate they knew of and had access to information about these topics or, at a minimum, they were deliberately reckless in failing to investigate the very issues on which they publicly spoke during the Relevant Period.

268. **Fourth**, Wells Fargo had for years engaged in a series of misconduct, including numerous settlements with regulators and private plaintiffs that involved discriminatory conduct against diverse individuals. The consequences of those scandals had a significant negative impact on the Company's business. As a result, leading up to and during the Relevant Period, Defendants were focused on ensuring that the Company had adequate controls and risk management processes in place to ensure that it was not engaging in additional misconduct. As Scharf admitted in sworn testimony before the United States House Financial Services Committee in March 2020, "the most important thing that I did when I arrived at the company, when I talked about setting the clear priorities, is making sure that everyone understands that our first priority, by far, is to do all of the regulatory work that is required."[218] Scharf further admitted: "The amount of time that I am spending on these activities is 70 to 80 percent of my time. We brought in a new chief operating officer [i.e., Powell] under whom all of the responsibility for driving the work across the company on the remediation now sits. [Powell] is probably spending 90 percent of his time on these activities."[219] Defendants' persistent messaging about the importance of, and their focus on, resolving Wells Fargo's regulatory issues and implementing adequate controls supports the strong inference that they knew, or were deliberately reckless in not knowing, of the false and misleading nature

---

[218] *Id.*

[219] *Id.*

of their statements about the Company's diverse hiring efforts and the Diverse Search Requirement during the Relevant Period.

269.    **Fifth**, the temporal proximity of Defendants' False and Misleading statements to the announcement that the Company would pause its Diverse Search Requirement and the revelation of the truth further supports a strong inference that they knew, or recklessly disregarded, that their statements were untrue or at least misleading.  As described above, on March 11, 2022, *Bloomberg* published its analysis revealing, among other things, that Wells Fargo had the largest racial disparity in approval rates of any major U.S. bank and rejected more Black homeowners' applications than it accepted.  Then, on May 19, 2022, *The New York Times* reported that current and former Wells Fargo employees confirmed that the Wealth Management business within Wells Fargo regularly conducted "fake" interviews of diverse candidates for positions that had already been filled.  Yet, just five days later, on May 27, 2022, Defendant Santos gave an interview with Business Insider during which he denied and refuted the reports of both *Bloomberg* and *The New York Times* by stating that he "vehemently' disagree[d]" with *Bloomberg's* allegations regarding Wells Fargo's lending practices; claimed that "[w]e don't have proprietary credit-underwriting models. We follow the guidelines of the GSEs"; and "We researched all the specific hiring-practice allegations the [*New York Times*] reporter shared prior to the story's publication and we could not corroborate these allegations as factual."  Then, on June 9, 2022, *The New York Times* published an article disclosing that it had spoken with ten additional current and former Wells Fargo employees who confirmed that "fake" interviews were prevalent throughout the Company, and also occurred in many of the Company's other business lines, including the mortgage servicing, home lending, and retail banking businesses.  The close temporal proximity between Defendant Santos's May 27 statements (§ VI.D.11) and the Company's June 9, 2022 corrective disclosure also supports a strong inference of scienter.  This inference is compounded by the temporal proximity of Santo's May 27 statements and the Company's March 24, 2022 "Fair Lending Analyses" of its ECS Model 11960 which found "practically significant disparities for 4 protected classes" during "2021 and 2021" (¶¶ 123-29) through which the Corporate Model Risk and FLMD team "identified disparate impact for various protected classes in relationship to ECS Model 11960" (¶ 123).

**F.    Wells Fargo's Discriminatory Practices Have Damaged the Company Financially and Reputationally**

270.    As discussed above, the Director Defendants' failure to act has resulted in greater risk that the Federal Government will impose additional penalties on Wells Fargo.  Wells Fargo is currently subject to a number of consent orders resulting from misconduct at the Company.[220]  The most significant of which is a February 3, 2018 Consent Order by the Federal Reserve Board which placed a $1.93 trillion asset cap on the Company (the "Asset Cap" or the "2018 Consent Order").[221]  Market commentators have referred to the 2018 Consent Order as the Federal Reserve's "Fear of God" penalty.[222]  Market commentators have estimated that the Asset Cap cost Wells Fargo billions of dollars.  Even worse, on May 16, 2023, the U.S. District Court for the Southern District of New York preliminarily approved a $1 billion settlement related to Wells Fargo's materially false and misleading statements about its compliance with the 2018 Consent Order.[223]  Wells Fargo will continue to be subject to the Asset Cap until regulators are satisfied with the Company's internal controls, or if Wells Fargo fails to satisfy regulators they could decide to break up the bank.

---

[220] *See, e.g.*, Bram Berkowitz, *A Guide to All of Wells Fargo's Consent Orders*, The Motley Fool (Oct. 10, 2021)*,* https://www.fool.com/investing/2021/10/10/a-guide-to-all-of-wells-fargos-consent-orders/. Ken Sweet, *US eases restrictions on Wells Fargo after years of strict oversight following scandal*, AP News (Feb. 15, 2024), (". . .Wells Fargo still has eight consent orders that govern its operations.") Wells Fargo was also fined $3.7 billion in a consent order issued by CFPB for violations of the law with respect to auto loan servicing, Respondent incorrectly applied loan payments, erroneously imposed certain fees and charges, incorrectly repossessed customers' vehicles, and failed to refund certain unearned fees on debt cancellation products; (ii) with respect to home mortgage servicing, Respondent incorrectly denied mortgage loan modifications to certain qualified borrowers; and (iii) with respect to consumer deposit accounts, Respondent improperly froze or closed customer accounts, improperly charged certain overdraft fees, and did not always waive monthly account service fees consistent with its disclosures. The fine is the largest penalty ever levied by the CFPB. *See* https://www.sec.gov/Archives/edgar/data/72971/000007297118000229/exhibit993consentorder.htm.

[221] *See* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a1.pdf.

[222] Felice Maranz, *Fed's 'Fear of God' Penalty Sours Wall Street on Wells Fargo*, Bloomberg (Feb. 5, 2018), https://www.bloomberg.com/news/articles/2018-02-05/fed-s-fear-of-god-penalty-sours-wall-street-on-wells-fargo#xj4y7vzkg.

[223] *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-cv-04494-GHW-SN, Order Preliminarily Approving Settlement And Authorizing Dissemination Of Notice Of Settlement (S.D.N.Y. May 16, 2023).

271.    In February 2024, the OCC removed one of Wells Fargo's Consent Orders, bringing the total currently active down to eight.  The mere news of this relatively minor easing is reported to have buoyed Wells Fargo's stock price by 7.2%. Pursuant to the 2018 Consent Order, Wells Fargo was required to "adopt an improved firmwide risk management program designed to identify and manage risks across the consolidated organization."  The 2018 Consent Order required that the Board evaluate the Firm's risk management capacity.  Within 60 days of the order, the Board was required to submit a written plan to further enhance the Board's effectiveness in carrying out its oversight and governance of Wells Fargo, acceptable to the Reserve Bank.  The 2018 Consent Order also provided that within 30 days after the end of each calendar quarter, the Board or an authorized committee thereof shall submit to the Reserve Bank written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The order specifically provides that "[i]f Wells Fargo does not make progress satisfactory to the Board of Governors in addressing the deficiencies cited in this Order, the Board of Governors may impose additional restrictions or limits, or take other action as permitted under applicable law."  Because the Board failed to ensure the Company had sufficient internal controls related to discrimination in lending and hiring, the Federal Reserve may take further action against the Company as advocated for by Congresswoman Maxine Waters.  For this reason alone, ensuring fair lending and hiring is a mission-critical issue for Wells Fargo.

272.    As a result of the Board's failure of oversight, Wells Fargo has suffered significant financial and reputational harm.  For example, Wells Fargo and certain of its executives are currently defendants in a federal securities fraud class action pending before this Court titled *SEB Investment Management AG v. Wells Fargo & Company*, No. 3:22-cv-03811-TLT (N.D. Cal.) ("the *SEB Action*"). This securities fraud class action alleges that between February 24, 2021 and June 9, 2022, the Company and its senior executives misrepresented Wells Fargo's diversity hiring policy, and in particular, its Diverse Search Requirement in violation of Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5.  The securities-fraud plaintiffs' allegations are set forth in their September 8, 2023 Amended Complaint for Violations of the Federal Securities Laws (ECF No. 116), which alleges that:

> "despite publicly lauding the Diverse Search Requirement, in reality, Wells Fargo was conducting "fake" interviews of diverse candidates simply to claim compliance with the

Diverse Search Requirement since it was first implemented in 2020. These fake interviews were systemic, and occurred across many of Wells Fargo's business lines both prior to and throughout the Class Period." *Id.* ¶ 11. The Amended Complaint further alleged that "[o]n June 9, 2022, the relevant truth was revealed" when "The New York Times published an article disclosing that . . . it had spoken with ten additional current and former Wells Fargo employees who confirmed that 'fake' interviews were prevalent throughout the Company, and also occurred in many of the Company's other business lines, including the mortgage servicing, home lending, and retail banking businesses." *Id.* ¶ 22. The Amended Complaint corroborated The New York Times' investigation with "additional accounts of 11 former Wells Fargo employees and contractors, who worked in six different divisions of the Company, which were developed through Plaintiffs' Counsel's independent investigation, corroborate the widespread nature of these fake interviews. *Id.* "In response to these revelations, Wells Fargo's common stock price fell more than 10% over two days, declining from a close of $44.63 per share on June 8, 2022, to a close of $40.08 on June 10, 2022—wiping out an astonishing $17 billion in market capitalization." *Id.* ¶ 23.

273.     Thus, the Board's failures of oversight caused the Company to issue false and misleading statements to investors in violation of the anti-fraud provisions of the Exchange Act, thereby exposing the Company to a substantial risk of liability in the *SEB Action*.

274.     Wells Fargo also faces significant liability related to discriminatory lending from applicants who were denied credit due to digital redlining.  Specifically, the Mortgage Discrimination Class Action,[224] a putative class of non-White plaintiffs who alleged that they were denied home mortgages or the ability to refinance, alleges that "[t]ens of thousands [of credit applicants] have been victimized both by Wells Fargo's intentional, knowing, and systematic race discrimination and the disparate impact of its practices, violating the contractual, commercial, and civil rights of Class members and causing millions (and perhaps billions) of dollars in damages to the Class."

275.     According to an April 25, 2022 internal presentation "Prepared for [the Company's] Risk Committee of Wells Fargo's Board of Directors"[225] in response to *Bloomberg's* March 2022 article revealing Well Fargo's discriminatory approval rates for home lending to minorities, "the New York City Mayor and Comptroller sent a letter to the company informing us the City of NY will not be opening any

---

[224] *In re Wells Fargo Mortgage Discrimination Litig.*, Civ. No. 3:22-cv-00990-JD (N.D. Cal.).

[225] *See* Ex. X, Wells Fargo's Apr. 25, 2022 Bloomberg HMDA Discussion prepared for the Board of Directors (WF_DS_ Supp000001105 at 1106).

new depository accounts."[226]  Thus, Wells Fargo has already begun losing customers as a result of its discriminatory lending practices.

276.    Finally, on September 23, 2022, the Board received a "Communications & Brand Management Update" from the Board's "Corporate Responsibility Committee" which stated that "negative storylines regarding allegations of racial discrimination in mortgage refinancing and hiring emerged in March and April and remained a headwind through June."[227]  The update noted that these "negative storylines" had been "kicked off by reporting in far reaching outlets like Bloomberg and the New York Times . . . ."[228]  The update further noted that "Negative" "News Stories" that created "Headwinds" for the Company included "Lawsuits due to alleged race discrimination in its mortgage lending practices" and "Accusations of staged job interviews for minorities as part of diversity slate[.]"  Also on September 23, 2023, the Board received an Enterprise Risk Report stating:  "**Reputation Risk** – *At Risk* after exceeding last quarter driven by two Bloomberg articles."[229]

### G.    The Board Caused Wells Fargo to Repurchase Its Stock at Inflated Prices, Causing Over $7.14 Billion in Damages

277.    Beyond the *SEB Action*, Wells Fargo's securities violations also directly damaged the Company in another way.  During 2021 and 2022, the Board authorized the Company to repurchase a massive quantity of its own shares of common stock.  The Board's Finance Committee is responsible for recommending whether to repurchase securities to the Board.  As members of the Finance Committee during 2021 and 2022, Defendants Black, Chancy, Craver, and Pujadas recommended share repurchases, and the Board approved them.  Specifically, the Company repurchased 306 million shares during 2021 at a cost of $14.5 billion and 110 million shares during the first quarter of 2022 at a cost of $6 billion—which altogether totaled at least 416 million shares at a cost of at least $20.5 billion.[230]

---

[226] *Id*.

[227] *See* Ex. NN, WF_DS_000005058 at 5062, 5064.

[228] *Id*.

[229] *See* Ex. OO, WF_DS_000005071 (emphasis in original).

[230] Wells Fargo's SEC filings listed its stock repurchases during 2021 and 2022.  *See* Wells Fargo & Co., Quarterly Report (Form 10-Q) at 47 (May 5, 2021) ("During first quarter 2021, [the Company] repurchased 17 million shares of common stock at a cost of $596 million."); Wells Fargo & Co., Quarterly

278.    In July 2019, the Board authorized the repurchase of 350 million shares of WFC common stock.

279.    In January 2021, the Board authorized the repurchase of an additional 500 million shares of WFC common stock.

280.    On December 31, 2021, Wells Fargo had remaining Board authority to repurchase approximately 361 million shares of common stock. The following table shows Company repurchases of its common stock for each calendar month in the quarter ended June 30, 2021:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorizations |
|---|---|---|---|
| April | 20,075,596 | $      43.60 | 629,954,518 |
| May | 10,893,389 | 46.11 | 619,061,129 |
| June | 4,354,796 | 43.08 | 614,706,333 |
| Total | 35,323,781 | | |

281.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended September 30, 2021:

Report (Form 10-Q) at 51 (July 28, 2021) ("During the first half of 2021, [the Company] repurchased 53 million shares of common stock at a cost of $2.2 billion."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 51 (Nov. 1, 2021) ("During the first nine months of 2021, [the Company] repurchased 167 million shares of common stock at a cost of $7.5 billion."); Wells Fargo & Co., Annual Report (Form 10-K) at 56 (Feb. 22, 2022) ("In 2021, [the Company] repurchased 306 million shares of common stock at a cost of $14.5 billion."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 46 (May 3, 2022) ("In first quarter 2022, [the Company] repurchased 110 million shares of common stock at a cost of $6 billion."); Wells Fargo & Co., Quarterly Report (Form 10-Q) at 48 (Aug. 1, 2022) ("[i]n the first half of 2022, [the Company] repurchased 110 million shares of common stock at a cost of $6 billion.").

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| July | 34,420,000 | $  41.37 | 250,601,709 |
| August | 45,950,000 | 44.58 | 250,555,759 |
| September | 36,667,000 | 43.40 | 250,519,092 |
| Total | 117,037,000 | | |

282.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended December 31, 2021:

| Calendar month | Total number of shares repurchased (1) | Weighted-average price paid per share | Maximum number of shares that may yet be repurchased under the authorizations |
|---|---|---|---|
| October | 36,092,310 | 50.07 | 464,405,588 |
| November | 80,585,475 | 50.66 | 383,820,113 |
| December | 23,001,846 | 48.79 | 360,818,267 |
| Total | 139,679,631 | | |

283.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended March 31, 2022:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| January | 33,687,433 | $ 54.55 | 327,130,834 |
| February | 55,819,880 | 56.79 | 271,310,954 |
| March | 20,586,039 | 49.07 | 250,724,915 |
| Total | 110,093,352 | | |

284.   The following table shows Company repurchases of its common stock for each calendar month in the quarter ended June 30, 2022:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| April | 24,862,000 | $ 47.54 | 250,700,053 |
| May | 25,465,000 | 43.63 | 250,674,588 |
| June | 38,459,000 | 42.45 | 250,636,129 |
| Total | 88,786,000 | | |

285.   The following table shows Company repurchases of its common stock for each calendar month in the quarter ended September 30, 2022:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| July | 34,420,000 | $ 41.37 | 250,601,709 |
| August | 45,950,000 | 44.58 | 250,555,759 |
| September | 36,667,000 | 43.40 | 250,519,092 |
| Total | 117,037,000 | | |

286.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended December 31, 2022:

| Calendar month | Total number of shares repurchased (1) | Weighted-average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| October | 52,876,000 | $ 43.67 | 250,466,216 |
| November | 43,423,000 | 46.77 | 250,422,793 |
| December | 32,959,000 | 42.94 | 250,389,834 |
| Total | 129,258,000 | | |

287.    All shares were repurchased under an authorization covering up to 500 million shares of common stock approved by the Board and publicly announced by the Company on January 15, 2021.

288.    The following table shows Company repurchases of its common stock for each calendar month in the quarter ended March 31, 2023:

| Calendar month | Total number of shares repurchased (1) | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| January | 22,215,680 | $ 44.47 | 228,174,154 |
| February | 47,552,452 | 47.47 | 180,621,702 |
| March | 16,617,428 | 46.36 | 164,004,274 |
| Total | 86,385,560 | | |

289.    Since the time Wells Fargo spent billions of dollars repurchasing such shares, Wells Fargo's stock has declined substantially in response to the adverse news regarding Wells Fargo's fake interviews of minority candidates.  On May 5, 2023, Wells Fargo's stock closed at $37.94 per share. Wells Fargo has thus been substantially harmed by repurchasing its shares at inflated prices. The damages total approximately $7.148 billion, as follows:

a.    Q2 2021: Using the weighted average price paid by Wells Fargo for the Q2 2021 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $225,010,512 in Q2 2021.

b.    Q3 2021:  Using the weighted average price paid by Wells Fargo for the Q3 2021 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $623,370,420 in Q3 2021.

c.    Q4 2021: Using the weighted average price paid by Wells Fargo for the Q4 2021 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $1.69 billion in Q4 2021.

d.    Q1 2022:  Using the weighted average price paid by Wells Fargo for the Q1 2022 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $1.84 billion in Q1 2022.

e.   Q2 2022: Using the weighted average price paid by Wells Fargo for the Q2 2022 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $557,021,140 in Q2 2022.

f.   Q3 2022:  Using the weighted average price paid by Wells Fargo for the Q3 2022 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $623,370,420 in Q3 2022.

g.   Q4 2022:  Using the weighted average price paid by Wells Fargo for the Q4 2022 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $851,199,570  in Q4 2022.

h.   Q1 2023:  Using the weighted average price paid by Wells Fargo for the Q1 2023 repurchases from the chart above, compared to the May 5, 2023 closing price of Wells Fargo stock of $37.94, Wells Fargo was harmed in the amount of over $738,162,002  in Q1 2023.

290.   Wells Fargo's share repurchases from January 2021 through June 2022 were reported in the Company's Forms 10-Q and 10-K and are summarized as follows:

| Calendar Month | Total number of shares repurchased | Weighted average price paid per share | Maximum number of shares that may yet be repurchased under the authorization |
|---|---|---|---|
| January 2021 | 11,558,076 | $32.15 | 655,683,183 |
| February 2021 | 53,726 | $34.67 | 655,629,457 |
| March 2021 | 5,599,343 | $39.71 | 650,030,114 |
| April 2021 | 20,075,596 | $43.60 | 629,954,518 |
| May 2021 | 10,893,389 | $46.11 | 619,061,129 |
| June 2021 | 4,354,796 | $43.08 | 614,706,333 |
| July 2021 | 36,810,627 | $44.76 | 577,895,706 |
| August 2021 | 41,340,615 | $47.85 | 536,555,091 |
| September 2021 | 36,057,193 | $46.18 | 500,497,898 |
| October 2021 | 36,092,310 | $50.07 | 464,405,588 |
| November 2021 | 80,585,475 | $50.66 | 383,820,113 |
| December 2021 | 23,001,846 | $48.79 | 360,818,267 |
| January 2022 | 33,687,433 | $54.55 | 327,130,834 |
| February 2022 | 55,819,880 | $56.79 | 271,310,954 |
| March 2022 | 20,586,039 | $49.07 | 250,724,915 |
| April 2022 | 24,862 | $47.54 | 250,700,053 |
| May 2022 | 25,465 | $43.63 | 250,674,588 |
| June 2022 | 38,459 | $42.45 | 250,636,129 |
| Total Shares: | 416,605,130 | | |

291.    By causing Wells Fargo to conduct these massive share repurchases, Defendants falsely signaled to investors their purported belief that Wells Fargo shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.    Relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share and return on stockholder equity, as the repurchases resulted in fewer outstanding shares.    The combined effect was to further artificially inflate Wells Fargo's share price, which had already been inflated by the concealment of Wells Fargo's discriminatory hiring and lending practices.    The result of this was that the Board's share repurchases during 2021 and 2022 caused the Company to purchase more than $20 billion of its own stock at inflated prices, thereby damaging the Company.

## H.    The Individual Defendants Were Awarded Improper Compensation Based on Alleged Success in Increasing Diversity

292.    During the Relevant Period, Defendant Scharf was compensated in part based on his alleged success in increasing diversity at Wells Fargo.    Scharf claimed success in this area despite the fact that the alleged success was predicated on misrepresented facts, such as the alleged success of the Diverse Search Requirement program.    These representations were false because, as noted herein, Wells Fargo was interviewing diverse candidates for jobs that had already been filled; as a result, the sham interviews had no chance of increasing diversity.    Scharf, who directly oversaw the program, nonetheless claimed victory so that he could line his pocket with additional unmerited compensation.    For example, in advance of the 2022 Proxy, the HRC prepared materials assessing Scharf's compensation.    Those materials included an "Illustrative Annual Performance Scorecard" for Scharf which included alleged progress on DEI initiatives, including the Diverse Search Requirement program.[231] Scharf's performance on such issues was rated as "Meets All Expectations."[232]   Scharf was described in the Board's description of his job responsibilities as being "accountable for the cultural and organizational transformation of the

---

[231] Ex. PP, WF_DS_000000906.

[232] Ex. QQ, WF_DS_000000946.

Company as it strives to regain trust and credibility with its customers, investors, regulators, community leaders, public officials, the media, and other key stakeholders."[233]

293.     According to the 2022 Proxy, "[t]he Board determined that Mr. Scharf's individual performance achievement level was 121%," which was based in part on the Board's finding that "Mr. Scharf exhibited strong leadership in driving key initiatives to advance the Company's strategic priorities, which resulted in significant progress on . . . increased diverse representation . . . . ."[234] As a result of his supposed extraordinary success in leading DEI initiatives, including the Diverse Search Requirement program, in 2021, Scharf was awarded "total variable incentive compensation" of $22 million and "2021 Total Compensation" of $24.5 million.[235]  From 2019 to 2021, Scharf was awarded total compensation by Wells Fargo of more than $76 million.[236]

294.     Scharf hardly restored credibility with investors, employees, regulators and the community by making statements that the Company's failure to meaningfully increase diversity was due to the "very limited pool of Black talent" and by orchestrating fake interviews of minority candidates in an effort to create a false impression of success with the Diverse Search Requirement program.

295.     Those senior Wells Fargo executives who reported directly to Scharf were also awarded incentive compensation based on the supposed success of the Diverse Search Requirement achieved by widespread fake interviews.  For example, "[i]n determining Santomassimo's 2021 variable incentive award, the HRC focused on" the fact that Santomassimo supposedly "[m]ade progress towards improving representation in two diversity dimensions across senior leaders in Finance . . . ."[237]  On January 25, 2022, the HRC found that Santomassimo had achieved "[i]mprovement in two areas of underutilization: Black/African American and Female," which the HRC quantified as "Black/African American (3.1% to 5.9%; 3 Ees), and Female (26.0% to 26.7%; 2 Ees)".[238]  Based in part on Santomassimo's supposed

[233] Ex. RR, WF_DS_000000957.

[234] 2022 Proxy at 77-78.

[235] 2022 Proxy at 78.

[236] 2022 Proxy at 88.

[237] 2022 Proxy at 79.

[238] Ex. SS, WF_DS_000001541.

"progress" and "improvements" in diversity, the 2021 Proxy stated that "Mr. Santomassimo's individual performance achievement level was 110%" and that he had received "Total Variable Incentive Compensation" of $9.71 million.

296.    Defendant Scott Powell was rewarded for achieving favorable results on DEI initiatives, one of which was the Diverse Search Requirement program.  Powell's 2021 evaluation contained a finding that he had achieved "[a]t or Above Company results for Level 3-6 diverse interview slate (79.8% vs. 79.4%) and teams (87.7% vs. 87.0%)."[239]  The 2022 Proxy stated that Powell had "[m]ade progress towards improving representation in three diversity dimensions across senior leaders in COO"; stated that "[t]he HRC determined that Mr. Powell's individual performance achievement level was 125%"; and that this "result[ed] in total variable incentive compensation of $8.16M[.]"[240]

297.    Jonathan Weiss, the Company's Senior Executive Vice President of Corporate and Investment Banking, was also well below target for the Diverse Search Requirement Program, thus imperiling some of his incentive compensation and giving him a strong motive and incentive to orchestrate the fake interviews to try to boost his lagging numbers.  In 2021, Weiss received a sub-par grade for his work on DEI initiatives, including a rating of "Below Company results for Leader Level 3-6 Diverse Interview Slate (63.5% vs. 79.4%)."[241]  During 2021, Weiss was the only Section 16 officer[242] at Wells Fargo who did not receive a bonus.  Nonetheless, the 2022 Proxy stated that Weiss "[m]ade progress towards improving representation in three diversity dimensions across senior leaders in CIB"; graded "Weiss's individual. . .  performance" as "120%"; and as a result, stated that "Mr. Weiss's total variable incentive compensation was awarded at 110% of target for 2021, resulting in total variable incentive compensation of $10.18M."[243]

---

[239] Ex. TT, WF_DS_000000340.

[240] 2022 Proxy at 80.

[241] Ex. TT, WF_DS_000000352.

[242] Defendants Scharf and Powell were senior officers of the Company that Section 16 of the Exchange Act defines as insiders for SEC reporting purposes.  15 U.S.C. § 78p.

[243] 2022 Proxy at 81.

298.    Notably, despite receiving substantial incentive compensation based on 100%+ evaluations, Defendant Powell and Johnathan Weiss did not meet their numbers, which subjected them to a monthly monitoring process, thus giving them a motive and incentive to orchestrate additional fake interviews.[244]

299.    David Galloreese, a member of the Operating Committee, was rewarded for achieving favorable results on DEI initiatives, one of which was the Diverse Search Requirement program. Galloreese's 2021 evaluation contained a finding that he had achieved "Above Company results for Level 3-6 diverse interview Slate (88.9% vs. 79.4%) and teams (92.6% vs. 87.0%)."[245]

300.    Similarly, Mary Mack, who was also a member of the Operating Committee, was rewarded for achieving favorable results on DEI initiatives, one of which was the Diverse Search Requirement program.  Mack's 2021 evaluation contained a finding that she had achieved "Above Company results for Leader Level 3-6 diverse interview slate (88.9% vs. 79.4%) and teams (90.3% vs. 87.0%)."[246]

301.    Meanwhile, some key Wells Fargo employees who were members of the Operating Committee were falling short of their Diverse Search Requirement interview goals, which gave them the motive and opportunity to set up the fake interviews.  For example, Lester Owens, a member of the Operating Committee, received a "Below Company results" evaluation on Diversity & Inclusion for coming in below target for Leader Level 3-6 Diverse Slate job interviews (73% vs. 79%).[247]

302.    Similarly, Operating Committee member Petros Pelos also came in below target for Leader Level 3-6 Diverse Slate job interviews (77.8% vs. 79.4%).[248]  Julie Scammahorn came in well below target for Leader Level 3-6 Diverse Slate interviews:  66.7% vs. 79.4%.[249]

---

[244] Ex. UU, WF_DS_000002746.

[245] Ex. TT, WF_DS_000000328.

[246] Ex. TT, WF_DS_000000330.

[247] Ex. TT, WF_DS_000000334.

[248] Ex. TT, WF_DS_000000338.

[249] Ex. TT, WF_DS_000000342.

303.    John Shrewsberry also came in well below target for Leader Level 3-6 Diverse Slate interviews: 70.8% vs. 79.4%.[250]  Barry Sommers also "lagged the Company results for Level 3-6 diverse interview Slate (68.4% vs. 79.4%)."[251]

304.    Throughout the Relevant Period, the compensation of Wells Fargo's senior executives was tied to their success in achieving DEI initiatives, including the Diverse Search Requirement program. Minutes from a meeting of the Board held on January 24-25, 2022 reflect a report to the Board from Director Sargent on behalf of the HRC.  "Mr. Sargent reported that the HRC reviewed and discussed the 2021 performance and incentive compensation recommendations for members of the Operating Committee other than the CEO.  He noted the review and discussion of the Operating Committee member performance included consideration of each member's risk performance and progress on DEI."[252]

305.    The following tables summarize the 2020-2022 "Pay-for-Performance" compensation outcomes for Wells Fargo's most senior executives as disclosed in the Company's 2021-2023 Proxies.

### 2020 Pay-for-Performance Outcome[253]

| Executive | Base Salary Rate | Cash Bonus | PSAs | RSRs | Total Compensation | Target Total Compensation |
|---|---|---|---|---|---|---|
| Scharf | 2,500,000 | 4,350,000 | 6,742,500 | 6,742,500 | 20,335,000 | 23,000,000 |
| Santomassimo | 1,750,000 | 1,750,000 | 3,750,000 | 3,750,000 | 11,000,000 | 11,000,000 |
| Shrewsberry | 2,000,000 | 1,282,563 | 2,965,750 | 2,965,750 | 9,214,063 | 13,250,000 |
| Mack | 1,750,000 | 1,672,250 | 2,324,500 | 2,324,500 | 8,071,250 | 10,750,000 |
| Owens | 1,500,000 | 1,500,000 | 1,600,000 | 1,600,000 | 6,200,000 | 6,200,000 |
| Powell | 1,750,000 | 1,771,925 | 2,784,350 | 2,784,350 | 9,090,625 | 9,000,000 |

---

[250] Ex. TT, WF_DS_000000344.

[251] Ex. TT, WF_DS_000000346.

[252] *See* Ex. VV, WF_DS_000002004 & WF_DS_000002022-23.

[253] 2021 Proxy at 75.

### 2021 Pay-for-Performance Outcome[254]

| Executive | Base Salary Rate | Cash Bonus | PSAs | RSRs | Total Compensation | Target Total Compensation |
|---|---|---|---|---|---|---|
| Scharf | 2,500,000 | 5,365,854 | 10,812,195 | 5,821,951 | 24,500,000 | 23,000,000 |
| Santomassimo | 1,750,000 | 1,837,500 | 3,937,500 | 3,937,500 | 11,462,500 | 11,000,000 |
| Powell | 1,750,000 | 1,968,750 | 3,093,750 | 3,093,750 | 9,906,250 | 9,000,000 |
| Weiss | 1,750,000 | 1,925,000 | 4,125,000 | 4,125,000 | 11,925,000 | 11,000,000 |

### 2022 Pay-for-Performance Outcome[255]

| Executive | Base Salary Rate | Cash Bonus | PSAs | RSRs | Total Compensation | Target Total Compensation |
|---|---|---|---|---|---|---|
| Scharf | 2,500,000 | 5,365,854 | 10,812,195 | 5,821,951 | 24,500,500 | 27,000,000 |
| Santomassimo | 1,750,000 | 3,149,625 | 3,674,563 | 3,674,563 | 12,248,750 | 11,000,000 |
| Weiss | 1,750,000 | 3,825,675 | 4,463,288 | 4,463,288 | 14,502,250 | 14,000,000 |
| Mack | 1,750,000 | 2,527,200 | 2,948,400 | 2,948,400 | 10,174,000 | 10,750,000 |
| Powell | 1,750,000 | 2,476,875 | 2,889,688 | 2,889,688 | 10,006,250 | 10,000,000 |

**I.      Defendants Failed to Perform Any Investigation of Whether Executive Compensation Should be Clawed Back Because of the DEI Fraud**

306.    In 2021, Wells Fargo implemented a major and material amendment of its executive compensation Clawback Policy in an attempt to protect the Company and its stockholders and stakeholders from the avaricious, greedy misconduct of its executives.  The primary impetus was the huge financial and reputational harm caused to Wells Fargo by the now infamous "fake account" scandal, pursuant to which the Company's senior executives had made substantial incentive compensation from pressuring lower-level employees to open fake accounts without customer knowledge or authorization.  The senior executives made more money based on the reported increased number of opened accounts, but the Company and its stockholders were left to pay for the billions of dollars in fines, penalties, reputational harm, and continued imposition of the Asset Cap.  *See, e.g.*, Jack Kelly, "Wells Fargo Forced to Pay $3 Billion For The Bank's Fake Account Scandal," FORBES, Feb. 24, 2020 ("Wells Fargo, the

---

[254] 2022 Proxy at 67.

[255] 2023 Proxy at 57.

SECOND AMENDED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT
CASE NUMBER: 3:22-CV-05173-TLT

fourth largest bank in the United States, agreed on Friday to pay $3 billion to settle its long-running civil and criminal probes into the heinous accusations of rampant fraudulent sales practices.").[256]

307.    Wells Fargo touted its vastly expanded Clawback Policy in its subsequent Proxy Statements as a tool that it was actively enforcing in order to improve its risk management procedures and internal controls.  For example, the 2021 Proxy stated that:

> We discouraged excessive risk-taking through risk-balancing features and an enhanced Clawback and Forfeiture Policy that expands the individuals and compensation subject to forfeiture or recovery and maintains an expansive set of circumstances that can trigger forfeiture or recovery.[257]

308.    The Proxy further stated that Wells Fargo:[258]

| **Adopted New Clawback and Forfeiture Policy** | Adopted a Clawback and Forfeiture Policy that significantly strengthens the Company's ability to hold named executives and other employees accountable for misconduct or risk events through forfeiture or recovery of compensation under appropriate circumstances. See *5. Risk Management and Accountability* for further detail. |

309.    The 2021 Proxy also included additional detailed statements and graphs touting the enhanced, expanded Clawback Policy as a key part of the Company's enhanced "Risk Management and Accountability," as reflected in the following chart:

**5   Risk Management and Accountability**

- Risk-balancing features discourage excessive risk-taking, such as a majority of variable compensation in long-term equity
- Enhanced Clawback and Forfeiture Policy to strengthen our ability to forfeit and recover compensation under appropriate circumstances

| Compensation Subject to Forfeiture or Recovery | | |
|---|---|---|
| Cash Bonus | Unvested Equity | Vested Equity |
| ✓ | ✓ | ✓ |

310.    The 2021 Proxy further took pains to emphasize and stress that the new, enhanced Clawback Policy would result in clawback and forfeiture of all three major types of compensation

---

[256] Available at https://www.forbes.com/sites/jackkelly/2020/02/24/wells-fargo-forced-to-pay-3-billion-for-the-banks-fake-account-scandal/?sh=70ba5e642d26, last visited May 6, 2023.

[257] *See* 2021 Proxy Statement at 65.

[258] *Id*. at 68.

awarded to its senior executives and Operating Committee members, as reflected in the following detailed chart from the Proxy:

| Pay Element | | Purpose & Design Features | Performance Metrics |
|---|---|---|---|
| Fixed | Base Salary | • Intended to provide market-competitive pay to attract and retain named executives<br><br>• Reflects each executive's experience and level of responsibility | |
| Performance-Based Variable Compensation | Cash Bonus | • Rewards executives for achievement of annual goals (see _2. Performance Assessment and Compensation Determination Framework_)<br><br>• 2020 target and maximum award opportunities of 200% and 300% of salary for Mr. Scharf and 100% and 150% of salary for other executives<br><br>• Award paid in cash, in first quarter of following year | _Award level_ based on achievement of annual objectives, including:<br><br>• Company Performance;<br><br>• Individual Performance; and<br><br>• Risk Accountability<br><br>• **Subject to Clawback and Forfeiture Policy** |
| | Performance Shares | • Reinforces a shared success culture and encourages executives to deliver sustained shareholder value<br><br>• _Grant value_ based on achievement of annual objectives (same objectives as annual cash bonus)<br><br>• _Payout level_ based on absolute performance over a three-year performance period, with HRC consideration of other factors set forth in the adjustment provision<br><br>• Number of shares earned based on achievement level, with payout ranging from 0% to 150% of target<br><br>• Subject to robust holding requirements (updated in 2020) while an Operating Committee member until one year after retirement[2]<br><br>• Dividends are accumulated and paid at vesting | • _Grant value_ based on achievement of annual objectives<br><br>• _Payout level_ based on ROTCE<br><br>• Subject to reduction for:<br><br>ᵢ Total Shareholder Return<br><br>ᵢ Net Operating Loss (NOL)[1]<br><br>ᵢ Subject to **Clawback and Forfeiture Policy** |
| | RSRs | • Promotes retention and alignment with shareholders with three year ratable vesting<br><br>• _Grant value_ based on achievement of annual objectives (same objectives as annual cash bonus)<br><br>• Subject to robust holding requirements (updated in 2020) while an Operating Committee member until one year after retirement[2]<br><br>• Dividends are accumulated and paid at vesting | • _Grant value_ based on achievement of annual objectives<br><br>• _Payout level_ fixed with ultimate value tied to stock price<br><br>• **Subject to Clawback and Forfeiture Policy** |

**Our executive compensation program reinforces effective risk management through risk-balancing features that discourage and mitigate excessive risk-taking; _See 5. Risk Management and Accountability_**

311.    The Proxy included the following discussion and chart detailing the conditions under which the Board/HRC will pursue clawback and/or forfeiture of the different elements of executive

compensation:[259]

### Clawback and Forfeiture Policy

To further strengthen the Company's risk and control practices, we undertook a holistic review of our clawback policies and forfeiture provisions during 2020. As part of this review, we engaged an external compensation consultant to complete a market review of peer practices and obtained feedback from key internal stakeholders. ***This resulted in the HRC implementing a new, holistic Clawback and Forfeiture Policy (Policy)*** to replace two separate recoupment and clawback policies and performance-based vesting provisions maintained within award agreements. The new Policy is applicable for compensation awarded on or after January 1, 2021. ***By expanding the population of employees and types of incentive compensation awards subject to the Policy, as well as clawback triggers, the new Policy strengthens the HRC's and Board's ability to forfeit and recover compensation*** (as appropriate). The Policy is designed to discourage employees (including our named executives) from taking unnecessary or inappropriate risks that would adversely impact our Company or harm our customers. ***<u>The new Policy provides the HRC and the Board with important tools they need to hold employees accountable.</u>***

A summary of the compensation-related actions the Company can take under the Policy is set forth below.

| Trigger | Description | Compensation Impacted | Clawback | Forfeit |
|---|---|---|---|---|
| Financial Restatement / Inaccurate Performance Metrics | • Amount of the award was based upon the achievement of certain financial results that were subsequently reduced due to a financial restatement (public restatement) | Equity/Cash | ✓ | ✓ |
| | • Amount of the award was based upon one or more materially inaccurate performance metrics | Equity/Cash | ✓ | ✓ |
| Misconduct | • Employee engages in misconduct or commits an error that causes material financial or reputational harm | Equity/Cash | ✓ | ✓ |
| | • Any conduct that constitutes Cause | Equity | | ✓ |
| Risk Management Failure | • Failure through willful misconduct/gross negligence to identify, escalate, monitor, or manage, risks | Equity | ✓ | ✓ |
| Resolution of Outstanding Regulatory Matters *(Performance Shares granted in 2019 and later)* | • Failure of the employee to achieve progress on resolving outstanding consent orders and/or other regulatory matters | Equity | | ✓ |

Clawback applies to the most recent incentive compensation that has been vested and/or paid, so long as such payment(s) have taken place within five years from when the Committee approves a clawback.

---

[259] *Id.* at 87.

312.    As the discussion and chart above demonstrate, the vastly enhanced and broad Clawback Policy that Wells Fargo adopted and implemented, effective January 1, 2021, applies to a very wide range of employee misconduct, not just a financial restatement.    Misconduct that will result in clawback/forfeiture includes "any conduct that causes harm," including but not limited to reputational harm to Wells Fargo, the "failure through willful misconduct/gross negligence to identify, escalate, monitor, or manage risks," and failure of an employee "to achieve progress on resolving outstanding consent orders and/or other regulatory matters."

313.    The Proxy also disclosed that the HRC members are responsible for making Clawback decisions.    Their role in doing so was again touted in the Proxy as a major part of what supposedly had caused Wells Fargo to remediate its dismal risk management and internal controls that previously existed and which had allowed the "fake account" scandal to occur.    The 2021 Proxy stated: "The HRC has made significant changes to our executive compensation program over the last few years to . . . discourage imprudent risk-taking and hold individuals accountable, as appropriate."[260]

314.    The Board and HRC represented to stockholders in the Proxy that "The new Policy provides the HRC and the Board with important tools they need to hold employees accountable."

315.    Therefore, as members of the HRC, Directors Black, Hewett, Morris, and Sargent had decision-making authority and responsibility with respect to the Company's executive Clawback Policy. That policy, as demonstrated above, allows Wells Fargo to clawback the executive compensation of all senior executives and members of its Operating Committee for "any conduct that causes harm."    The Clawback Policy is strictly NOT LIMITED to instances of financial misconduct relating to an accounting restatement, as many corporations' clawback policies are.

316.    Wells Fargo's Clawback Policy thus specifically and expressly applies to the severe financial and reputational damage to Wells Fargo, failures of risk management, and false statements and/or SEC filings issued and/or approved by the Individual Defendants related to the Company's DEI initiatives and Diverse Slate Program, as detailed *supra*.    As a result, the Board as a whole, as well as Directors Black, Hewett, Morris, and Sargent (as members of the HRC) were required to perform an

---

[260] *Id*. at 68.

investigation of whether the compensation of the Company's senior executives and Operating Committee members should be clawed back/forfeited.

317.    In a September 23, 2022, "Communications & Brand Management Update," prepared for the Corporate Responsibility Committee of Wells Fargo Board of Directors, members of the board were presented with updates on Wells Fargo's media coverage.  According to the report, sentiment for Wells Fargo declined 33% in Q1 and 24% in Q2 of 2022, "**driven by alleged discriminatory practices in home lending and job interview**." (emphasis added)[261]  The report also identified the "Top 5 Negative Social Media Themes" with number one being "NY Times article on alleged false/staged diverse interview with comments from politicians."[262]  That topic received 17,109 mentions and more than **1.2 billion** impressions.[263]

318.    Despite these and other examples of known harm to the Company, the HRC board minutes and packages produced by Wells Fargo in response to Plaintiff's stockholder inspection demand, however, reveal that *no such investigation whatsoever was performed by Defendants Directors Black, Hewett, Morris, and Sargent*.  As a result, the Board as a whole and Directors Black, Hewett, Morris, and Sargent abdicated their duties as members of the HRC and acted in bad faith.

**J.    Defendant Santos, Who Was in Charge of the Diverse Slate Program, Engaged in Insider Selling Shortly Before the Truth Was Announced**

319.    On May 3, 2022, shortly before the truth about the fake interviews began to be disclosed, Defendant Santos sold 22,700 shares of his Wells Fargo stock while in possession of material non-public information for proceeds of approximately $1,008,788.

320.    The insider selling by Santos was highly unusual in timing and amount.  First, Santos did not sell his stock pursuant to a Rule 10b5-1 plan.  Second, Santos sold a highly unusual amount of his Wells Fargo stock:  51.4% of all his overall holdings.  After his sale, Santos only retained 21,478 shares.  Third, the timing of the sale—coming just two weeks before *The New York Times* published its first

---

[261] Ex. NN, WF_DS_000005058 – 5065.

[262] *Id.*

[263] *Id.*

explosive story which began to expose the truth about the fake account scandal based on reports from Wells Fargo employees—constitutes strong indicia of scienter.  Third, Santos had not engaged in any major sales of his Wells Fargo stock in the two years prior to his May 3, 2022 sale.

## VII.    FIDUCIARY DUTIES OF THE DEFENDANTS

### A.    Duties of All Defendants

321.    By reason of their positions as officers or directors of Wells Fargo and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed Wells Fargo and its stockholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Wells Fargo operated in compliance with all applicable federal and state laws, rules, and regulations.  This included ensuring that Wells Fargo did not violate laws and regulations designed to prevent and deter discriminatory lending practices—such as any form of illegal redlining.

322.    Defendants were required to act in furtherance of the best interests of Wells Fargo and its stockholders so as to benefit all stockholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owed to Wells Fargo and its stockholders the fiduciary duty of loyalty, which includes (i) the obligation to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and (ii) the highest obligations of fair dealing.

323.    Because of their positions of control and authority as directors or officers of Wells Fargo, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Second Amended Complaint.  Due to their positions with Wells Fargo, Defendants had knowledge of material non-public information regarding the Company.

324.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company.  By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

1.    Manage, conduct, supervise, and direct the employees' businesses, and affairs of Wells Fargo in accordance with existing laws, rules, and regulations, as well as the charter and by-laws of Wells Fargo;

2.    Ensure that Wells Fargo did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

3.    Remain informed as to how Wells Fargo was, in fact, operating, and, upon receiving notice or information of imprudent, unsound or illegal business practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

4.    Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Wells Fargo, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of Company officers; and

5.    Preserve and enhance Wells Fargo's reputation as befits a public corporation and; exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business.

**B.    Fiduciary Duties of Directors of Federal Banking Institutions**

325.    The Board has a responsibility, as part of its fiduciary duties to Wells Fargo and its stockholders, to oversee the operations of the Company and to maintain sufficient systems or controls to be reasonably certain that misconduct at the operational level would be elevated to the Board and executive management for remediation. The Board fails in that responsibility if it (i) fails to implement appropriate reporting systems or controls to identify potential imprudent, unsound, or illegal business practices, or (ii) consciously fails to monitor or oversee the systems and controls it put in place for this purpose.

326.    While all directors of Delaware corporations have this oversight duty, federal regulatory bodies place special emphasis on the oversight function of boards of banking institutions. Indeed, following the 2007-2008 global financial crisis that threw a spotlight on imprudent, unsound, and illegal

banking practices, the federal government enacted regulations and issued guidance on the duties of banks and, in particular, their boards of directors, to oversee their Companies' operations. Each of these regulatory schemes is meant to drive home the core principle that banks must employ systems and controls designed to monitor policies and procedures required by statutes or regulations. By any measure, this includes statutes and regulations ensuring that Wells Fargo does not violate laws and regulations that pertain to the banking industry, including laws and regulations prohibiting discriminatory lending practices such as redlining.

327.    The FDIC has enumerated the duties of bank directors as follows:

Th[e] [fiduciary duties of care and loyalty mean] that **directors are responsible** for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; **monitoring and assessing the progress of business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; and for making business decisions on the basis of fully informed and meaningful deliberation.**[264]

328.    Similarly, the Office of Comptroller of the Currency ("OCC"), another banking regulator, describes the primary fiduciary duties of bank directors as follows:

While holding companies of large banks are typically managed on a line of business basis, directors at the bank level are responsible for oversight of the bank's charter—the legal entity. Such responsibility requires separate and focused governance. **We have reminded the boards of banks that their primary fiduciary duty is to ensure the safety and soundness of the national bank or federal savings association. Execution of this responsibility involves focus on the risk and control infrastructure necessary to maintain it. Directors must be certain that appropriate personnel, strategic planning, risk tolerance, operating processes, delegations of authority, controls, and reports are in place to effectively oversee the performance of the bank. The bank should not simply function as a booking entity for the holding company. It is incumbent upon bank directors to be mindful of this primary fiduciary duty as they execute their responsibilities.**[265]

---

[264] Financial Institution Letter FIL–87–92 (FDIC dated December 3, 1992) (emphasis added), https://www.fdic.gov/regulations/laws/rules/responsibilities-bank-directors-officers.pdf.

[265] Testimony of Thomas J. Curry, Comptroller of the Currency, before the Financial Services Committee, U.S. House of Representatives (June 19, 2012), (emphasis added) https://occ.gov/news-issuances/congressional-testimony/2012/pub-test-2012-91-written.pdf.

329.    In November 2020, the OCC updated its "Director's Book: Role of Directors for National Banks and Federal Savings Association." (the "November 2020 Director's Book"),[266] a guidance document that describes the role of duties of directors of national banks.  The November 2020 Director's Book makes it clear that boards of banks like Wells Fargo must among other things:

- provide effective oversight;
- exercised independent judgment;
- provide a credible challenge to management;
- establish an appropriate culture and set the tone at the top;
- understand the legal and regulatory framework applicable to the bank's activities; and
- comply with fiduciary duties and all applicable laws and regulations.[267]

330.    In addition to the above, the November 2020 Director's Book states that the board must set an appropriate corporate culture at the bank, including a culture that "does not condone or encourage imprudent risk taking, unethical behavior, or the circumvention of laws, regulations, or safe and sound policies and procedures in pursuit of profits or business objectives."[268]

331.    The November 2020 Director's Book also recognizes that "[b]anking laws and regulations cover a wide range of areas . . . [and] [t]he board and management should recognize the scope and implications of laws and regulations that apply to the bank and its activities."[269]  Additionally, it states that "the board and management should understand the potential consequences of violations of law and regulations that could result in financial losses, reputational and legal risks, and enforcement actions."[270]

---

[266]    https://www.occ.gov/publications-and-resources/publications/banker-education/files/pub-directors-book.pdf.

[267] *Id.* at 22-23.

[268] *Id.* at 25.

[269] *Id.* at 62.

[270] *Id.* at 62.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.    The Board's Committees Were Expressly Charged with Overseeing and Monitoring Risk to Wells Fargo

332.    Among the Board's most-critical duties is overseeing the Company's risk management structure.[271]  Wells Fargo's 2022 Annual Report to stockholders, for example, states:

> The Board carries out its risk oversight responsibilities directly and through its committees.  The Risk Committee reviews and approves the Company's risk management framework and oversees management's implementation of the framework, including how the Company manages and governs risk.  The Risk Committee also oversees the Company's adherence to its risk appetite.  In addition, the Risk Committee supports the stature, authority and independence of IRM and oversees and receives reports on its operation.  The Chief Risk Officer (CRO) reports functionally to the Risk Committee and administratively to the CEO."[272]

333.    Further, the Board's standing committees are charged with monitoring specific aspects of Wells Fargo's business.  Among these are the Risk Committee, the Audit and Examination Committee, the CRC, the HRC, and the Governance and Nominations Committee.  Each committee has its own charter setting forth duties for their respective members, in addition to the duties of board members generally.

334.    During the Relevant Period (from January 1, 2019 to the present) the members of the Board's standing committees were:

| Director Defendant | Risk | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources |
|---|---|---|---|---|---|
| Black | | | | | 2020, 2021 |
| Chancy | 2020, 2021 | 2020, 2021, 2022 | | | |
| Clark | | | 2019, 2020, 2021, 2022 | 2019, 2020, 2021, 2022 | |
| Craver | | 2019, 2020, 2021, 2022 | | 2021, 2022 | |
| Davis | 2022 | | | | |

[271] *See* Wells Fargo & Co., Annual Report, at 28 (Form 10-K) (2022).

[272] *Id.*

| Director Defendant | Risk | Audit and Examination | Corporate Responsibility | Governance and Nominating | Human Resources |
|---|---|---|---|---|---|
| Hewett | 2019, 2020, 2021, 2022 | | 2019, 2020, 2021, 2022 | 2021, 2022 | 2019, 2020, 2021, 2022 |
| James | | | | 2019, 2020 | 2019, 2020 |
| Morken | | 2022 | 2022 | | |
| Morris | 2019, 2020, 2021, 2022 | | | | 2019, 2020, 2021, 2022 |
| Norwood | 2022 | | | | |
| Noski | | 2019, 2020 | | 2019, 2020 | |
| Payne | 2020, 2021, 2022 | | | | |
| Pujadas | | 2019, 2020, 2021 | | | |
| Sargent | | 2019, 2020, 2021, 2022 | | 2019, 2020, 2021, 2022 | 2019, 2020, 2021, 2022 |
| Vautrinot | 2019, 2020, 2021, 2022 | | 2019, 2020, 2021, 2022 | | |

### 1.    Duties of Risk Committee Members

335.    According to its charter, the purpose of the Board's Risk Committee is to "assist the Board of Directors in fulfilling its responsibilities to oversee the Company's company-wide risk management framework and Independent Risk Management function, including the significant programs, policies, and plans established by management to identify, assess, measure, monitor, and manage the material risks facing the Company, including compliance risk . . . credit risk, interest rate risk, liquidity risk, market risk, reputation risk, and strategic risk."

336.    Regarding the Risk Committee's expected communications with management, the charter states that "the Committee chair, or other individual Committee member designated by the Committee, is expected to have regular communication between Committee meetings with the Chief Risk Officer

and, as needed, other members of management. The Chief Risk Officer and, as needed, other members of management are expected to communicate with the Chair on any significant risk issues that arise between Committee meetings, including issues raised or escalated by management's Enterprise Risk & Control Committee."

337. The Risk Committee charter states that the committee shall, among other things:

- Approve and periodically review the Company's risk management framework and oversee management's establishment and implementation of the framework, including how the Company supports a strong risk management culture, manages and governs its risk, and defines the risk roles and responsibilities of the Company's three lines of defense;

- Oversee and receive reports from management on the operation of the Company's company-wide risk management framework, including policies, procedures, processes, controls, systems, and governance structures for the identification, measurement, assessment, control, mitigation, reporting, and monitoring of risks facing the Company;

- Periodically review and, as appropriate or unless otherwise reviewed or approved by another Board committee with primary oversight of the specific risk type, approve significant risk management policies relating to the material risk types identified through the Company's enterprise risk identification and assessment program;

- Review regular reports from the Chief Risk Officer and other members of management regarding emerging risks, escalated risks or issues, and other selected company-wide risks and issues and/or risk topics; and

- Review and receive regular reports from the Chief Risk Officer and other members of management regarding management's assessment of the effectiveness of the Company's risk management program, including risk management effectiveness and actions taken by management to address risk matters and the implementation of risk management enhancements.

338. In order to comply with these enumerated responsibilities, the charter states that the Risk Committee shall oversee and periodically review and receive reports from management on:

- compliance risk and general condition of compliance risk management, including the effectiveness of the Company's compliance program, the annual compliance plan, and the related annual Compliance function staffing plan (including the Compliance financial forecast, staffing, and resource needs);

- conduct risk, including conduct management activities and Independent Risk Management's conduct risk oversight; financial crimes risk and general condition of financial crimes risk management and internal controls, including the effectiveness of

the Company's financial crimes program and suspicious activity monitoring and reporting;

- model risk and the general condition of model risk management, including model governance;

- operational risk and general condition of operational risk management, including the Company's operational risk program, operational risk profile, and the effectiveness of the Company's operational risk program and control environment;

- reputation risk, including periodic reporting on reputation risk through enterprise risk reporting; and

- strategic risk, including the alignment of the risk profile and risk management effectiveness with the Company's strategic plan and risk appetite, and risks that may be associated with significant new business or strategic initiatives (including any acquisition activities) as it may deem appropriate.

339.    During the Relevant Period, and as set forth in ¶ 336, Defendants Chancy, Davis, Hewett, Morris, Norwood, Payne, and Vautrinot served on the Risk Committee.  In light of the duties described above as set forth in Wells Fargo's Risk Committee charter, these individuals should have received and reviewed data consistent with the data described in the *Bloomberg* publication showing how Wells Fargo's minority lending practices, and specifically the Company's approval/denial gap for Blacks and other minority groups, compared with other large banking institutions like JPMorgan Chase, Citi, and Bank of America.

340.    Moreover, after reviewing such data, the Risk Committee should have immediately taken steps to prevent and correct the problem as it placed Wells Fargo at risk of violating laws and regulations prohibiting redlining.  Yet, based on documents produced by Wells Fargo during Plaintiffs' § 220 investigation, the Risk Committee failed to discuss or consider, prior to the *Bloomberg* publication, fair lending risks at all, much less the approval/denial gap for Blacks and other minority groups, including the fact that Wells Fargo's approval rates were far lower than its banking peers.  Additionally, the Risk Committee never discussed discriminatory pricing exceptions even though Wells Fargo had a long history of settlements related to this issue.

### 2.     Duties of Audit and Examination Committee Members

341.     According to its charter, the Board's Audit and Examination Committee (the "Audit Committee") is responsible for ensuring that the Company has "appropriate oversight of risk and other issues, including the Company's allowance for credit losses and compliance with legal and regulatory requirements, without unnecessary duplication, the Chairs of the Audit Committee and each of the other Board committees communicate as they deem advisable.   In addition, the Committee shall share information of common interest with the Risk Committee as determined appropriate by the committees. The Audit Committee Chair and other members of the Audit Committee, as appropriate, are expected to bring to the attention of the Risk Committee Chair any risks that such committee members believe should be discussed by the Risk Committee."

342.     Specifically, the Audit Committee is responsible to:

- Review and discuss, prior to filing, the Company's annual audited financial statements (and Form 10-K) and quarterly unaudited financial statements (and Form 10-Q) with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Review at least annually, and receive on a timely basis from the independent auditor their report regarding, all critical accounting policies used by management in the preparation of the financial statements as well as any critical audit matters. Discuss with the independent auditor their judgments about the quality and acceptability of the Company's accounting principles as applied to its financial reporting.

- Review and discuss with management and the independent auditor any major issues regarding accounting principles and financial statement presentations, including any significant changes in the selection or application of accounting principles, as well as the financial effects of regulatory and accounting initiatives and off-balance sheet structures.

- Review disclosures to the Committee by the CEO and CFO in connection with their certification of the Company's Forms 10-K and 10-Q regarding any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting and any fraud involving any employees who have a significant role in the Company's internal controls over financial reporting.

- Periodically review and approve the Company's policy establishing its disclosure framework for financial and regulatory reports prepared for the Board, management, and bank regulatory agencies.

- Periodically review updates from management regarding the Company's data environment impacting regulatory reporting and compliance with its regulatory reporting governance and oversight policy.

- Monitor the Company's progress in appropriately and promptly addressing, correcting, and resolving any matters reported to the Committee that in the Committee's judgment could materially jeopardize the Company's financial condition, results of operations and accuracy of the Company's financial statements.

- Review reports on significant changes in staffing, processes, and industry trends as needed, and review results of the quality assessment review required by the Institute of Internal Auditors every five years.

- Review the audit results prepared annually by the internal audit function, and reported to both the Risk Committee and the Audit Committee, assessing the effectiveness of the Company's risk management framework and capabilities.

- Review and discuss with management, at least annually, the implementation and effectiveness of the Company's compliance risk management program.

- Periodically review updates and reports from management, including the Chief Compliance Officer, Chief Risk Officer, General Counsel and Chief Auditor, regarding compliance and legal matters that may have a significant impact on the Company's compliance risk management or financial statements.

- In accordance with NYSE rules and taking into consideration the Risk Committee's oversight of the Company's company-wide risk management framework and oversight of all of the Company's major risks and the allocation of certain risk oversight responsibilities to other committees of the Board, discuss at least annually the Company's guidelines and policies for assessing and managing risk, including reputation risk, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

343. During the Relevant Period, and as set forth in ¶ 336, Defendants Chancy, Craver, Morken, Noski, Pujadas, and Sargent served on the Audit Committee. In light of the duties described above and as set forth in the Audit Committee's charter, members of the Audit Committee should have known, through reports from management "regarding compliance and legal matters that may have a significant impact on the Company's compliance risk management," that they were not receiving reports concerning Wells Fargo's approval/denial gap, data that would allowed Audit Committee members to take action and otherwise ensure that the Company's lending practices did not violate laws and regulations prohibiting redlining.

### 3. Duties of Corporate Responsibility Committee Members

344.    According to its charter, the purpose of the Board's Corporate Responsibility Committee ("CRC") is to "assist the Board of Directors in fulfilling its responsibilities to oversee the Company's significant strategies, policies, and programs on social and public responsibility matters and the Company's relationships and enterprise reputation with external stakeholders on those matters." This includes the following:

- Overseeing the Company's significant strategies, policies, and programs on social and public responsibility matters, including environmental sustainability and climate change, human rights, and supplier diversity;

- Overseeing the Company's community development and reinvestment activities and performance;

- Overseeing the Company's social impact and sustainability strategy and impacts through the support of non-profit organizations by the Company or a Company sponsored charitable foundation;

- Monitoring the state of the Company's relationships and enterprise reputation with external stakeholders on social and public responsibility matters; and

- Reviewing stockholder proposals related to social and public responsibility matters.

345.    During the Relevant Period, and as set forth in ¶ 336, Defendants Clark, Hewett, Morken, and Vautrinot served as members of Wells Fargo's CRC. In light of the duties described above and as set forth in the Committee's charter, including that members of the CRC "shall oversee significant strategies, policies, and programs on social and public responsibility matters," these individuals should have received and reviewed the same or similar approval/denial gap data described in the *Bloomberg* investigation, data that showed Wells Fargo's approval rates for Black and other minorities was far below that of its peers. After reviewing such data, the CRC should have immediately taken steps to prevent and correct the problem.

346.    According to documents produced during Plaintiffs' § 220 investigation, on August 11, 2020, the CRC received *one* report that "minority lending distribution" was an "emerging risk" to the

Company and that regulators considered redlining a "priority issue."[273]    After receiving the report, the CRC did nothing.  At a minimum, the CRC should have provided the August 11, 2020 report to the Risk Committee so that it could further evaluate this "priority" "emerging risk."  However, it was not until April 2022, *after* the *Bloomberg* report was published, that the Risk Committee was made aware of this issue and received reporting on Wells Fargo's approval/denial gap data.

347.    In order to comply with their fiduciary duties of oversight, at a minimum, the CRC members should have provided information on the "emerging risk" of redlining to the Risk Committee for further evaluation and action if necessary.  However, according to Plaintiffs' § 220 investigation, made prior to the publication of the *Bloomberg* article, the Risk Committee was unaware that this was an "emerging risk" for the Company.

348.    Because the CRC failed to take action regarding this "priority" risk—and failed to follow up regarding managements' (incorrect) report that Wells Fargo did not have a "systematic fair lending risk," the CRC members failed to faithfully exercise their fiduciary duties as directors of Wells Fargo.

### 4.    Duties of Human Resource Committee Members

349.    According to its charter, the Board's Human Resource Committee ("HRC"), among other responsibilities, oversees the following:

- approval of the Company's compensation philosophy and principles;
- executive compensation, including conducting the annual CEO performance evaluation process;
- the Company's incentive compensation risk management program, human capital risk, and human capital management;
- the Company's culture and Code of Conduct; and
- reputational risk related to the HRC's responsibilities described in this Charter.

350.    Additionally, the HRC was responsible for Wells Fargo's Diverse Search Requirement Program, an initiative that required hiring managers to interview (rather than hire) at least one woman

---

[273] Ex. V, Minutes of the Meeting of the Corporate Responsibility Committee of the Board of Directors of Wells Fargo & Co. Held on August 11, 2020 (WF_DS_000003600 at 3605).

and one person of color for job openings with salaries of $100,000 or more. According to *The New York Times* investigation, *see supra* ¶¶ 182-99, the Company's diverse hiring program was merely a check-the-box step in the hiring process, rather than a meaningful effort to hire diverse candidates.

351. Members of the HRC, in order to comply with their fiduciary duties as directors, should have ensured that the diverse hiring program was not implemented in a way that was abused or mere window dressing. Additionally, they should have known that the "interview" program could easily be implemented as a checking-the-box program. Yet, prior to *The New York Times* investigation, none of the materials produced by Wells Fargo in response to Plaintiffs' § 220 investigation demonstrates that the HRC was engaged on this issue—or even discussed the likelihood that the diverse interview requirement could be abused or implemented in a way that would not result in Wells Fargo actually increasing diversity among its workforce.

352. Two months after the May 2022 *New York Times* report, on June 28, 2022, the HRC held a meeting at which it received a "Conduct Update" regarding "Allegations from Employees" stating that the "[v]olume of allegations by employees remains high" and noting "16,000 employee-reported allegations over the past year" of "harassment and discrimination," which were a "high number given the employee base." The report also noted a 17% "substantiation rate across all employee allegations" with "Retaliation (subcategory within Harassment)" being "the largest allegation subcategory (over 1,600) . . . ."

**D.    Defendants' Fiduciary Duties Under *Caremark* and *Marchand***

353. As directors, officers, and/or senior employees, Defendants owed fiduciary duties to Wells Fargo and its stockholders, including the duty of care and the duty of loyalty.

354. Under the relevant line of Delaware Supreme Court cases, including *Caremark*,[274] *Marchard*,[275] and their progeny, a board of directors of a Delaware corporation, as well as its officers, have specific duties to: (a) implement a reasonable information and reporting system and controls of compliance particularly as it relates to mission-critical issues; and (b) oversee and monitor the operations

---

[274] *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).

[275] *Marchand v. Barnhill*, 212 A.3d 805, 807 (Del. 2019).

of that information and reporting system. Under the second prong of *Caremark*, directors and officers breach their fiduciary duty of loyalty if, having implemented a regular reporting and information system and controls, they consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.[276]

355.    The *Caremark* duty focuses on monitoring fraudulent or illegal conduct, as opposed to other, more general business risks. As the Delaware Court of Chancery has stated, "[d]irectors should, indeed must under Delaware law, ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct."[277]

356.    Moreover, the Delaware Court of Chancery has recently confirmed that *Caremark* duties extend to corporate officers. As Vice Chancellor Laster noted, "[t]he same policies that motivated Chancellor Allen to recognize the duty of oversight for directors apply equally, if not to a greater degree, to officers. The Delaware Supreme Court has held that under Delaware law, corporate officers owe the same fiduciary duties as corporate directors, which logically include a duty of oversight."[278]

357.    As noted above, it is an axiomatic tenet of Delaware corporate law that Delaware corporations may only pursue "lawful business" by "lawful acts." 8 *Del. C.* §§ 101(b), 102(a)(3). "Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.' As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law."[279]

---

[276] *Stone v. Ritter*, 2006 WL 302558, at *1-2 (Del. Ch. 2006), *aff'd sub nom. Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[277] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 131 (Del. Ch. 2009).

[278] *In re McDonald's Corp. S'holder Deriv. Litig.*, 289 A.3d 343, 349 (Del. Ch. 2023).

[279] *In re Massey Energy Co. Deriv. & Class Action Litig.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) (quoting 8 *Del. C.* §§ 101(b), 102(a)(3), 102(b)(7)).

358.     Here, Wells Fargo's pattern of discriminatory practices against minority groups in mortgage lending and hiring, is a mission-critical risk that exposes the Company to civil (and potentially criminal) liability under various federal and state statutes, including those referenced below.

359.     ***First***, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*, makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program."  15 U.S.C § 1691(a).  The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages, mortgage refinancing, and other forms of credit.  Here, Wells Fargo is a creditor because it regularly issues, extends, and renews credit to borrowers.  The Company's systematic and discriminatory denials of loan applications—including residential, small business, and/or personal loans or lines of credit—submitted by minority applicants constituted race-based discrimination forbidden by the Equal Credit Opportunity Act.

360.     ***Second***, the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, prohibits discrimination by direct providers of housing, such as landlords and real estate companies as well as other entities, such as municipalities, banks or other lending institutions and homeowners insurance companies whose discriminatory practices make housing unavailable to persons because of race or color, religion, sex, national origin, familial status, or disability.  The Fair Housing Act makes it unlawful to discriminate against designated classes of individuals in residential real estate transactions, including residential lending.  Here, Wells Fargo discriminated against minority borrowers by denying residential and other loan applications, or by not approving residential loan applications on the same terms and timelines as those of similarly qualified applicants who were not members of a protected class, or by causing applicants to withdraw their applications due to roadblocks and feigned difficulties.

361.     ***Third***, 42 U.S.C. § 1981 (§ 1 of the Civil Rights Act of 1866 as revised and amended by subsequent Acts of Congress, including the Civil Rights Acts of 1964 and 1991) guarantees persons "[e]qual rights under the law" to "make and enforce contracts," regardless of race.  The term "make and enforce" contracts including "making, performance, modification, and termination of contracts, and the

enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.*  Section 1981 creates a federal cause of action for individuals claiming intentional racial discrimination.  Here, Wells Fargo's discrimination—including its lending, refinancing, hiring, and promotion practices— violated minorities rights to make and enforce contracts and exposes the Company and its employees to liability under Section 1981.

362.    ***Fourth***, the Unruh Civil Rights Act (California Civil Code Section 51) provides that "[a]ll persons within the jurisdiction of [the State of California] are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  The Unruh Civil Rights Act provides that all persons within the State of California are free and equal no Matter their race and are entitled to full and equal treatment in all business establishments and thus prohibits discrimination of any kind against any person in any business establishment.  Here, Wells Fargo's discrimination—including its discriminatory lending, refinancing, hiring, and promotion practices— harmed minority loan applicants by the Company's refusal to transact business with them and therefore denied these applicants full and equal treatment as required by the Unruh Civil Rights.

363.    ***Fifth***, the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, prohibits "unfair competition" including "any unlawful, unfair or fraudulent business act or practice."  "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction" and that "[t]he court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.  The UCL confers standing on both private parties and public prosecutors.  *Id.*  Here, Wells Fargo's discrimination— including its lending, refinancing, hiring, and promotion practices—constituted an unlawful, unfair, and/or fraudulent business act or practice as defined by the UCL.

364.    Thus, given the liability Wells Fargo faces under these and other statutes, the Board should have been especially vigilant in ensuring that the proper reporting systems and internal controls were in place to monitor, detect, and prevent discriminatory lending and hiring.

365.    As set forth herein, Defendants breached their fiduciary duties by both failing to implement reporting systems or controls to detect, prevent and address (under the first prong of *Caremark*):  (1) redlining in any form, including digital or algorithmic redlining; (2) pricing exceptions in any form; and (3) discriminatory hiring practices.  When evidence of these illegal practices finally trickled up to the Board,  Defendants breached their fiduciary duties by ignoring the red flags (under the second prong of *Caremark*).

366.    As alleged herein, Defendants owed very specific responsibilities to monitor reporting systems (to the extent they existed) to ensure that Company's business practices complied with all legal and regulatory requirements, including laws and regulations prohibiting discrimination in lending and hiring.  These were especially salient issues for Wells Fargo given the Company's prior settlements in these areas.

367.    Moreover, Defendants indisputably knew about these responsibilities.  In conscious disregard of these responsibilities, Defendants failed to monitor or oversee the operations of Wells Fargo's information and reporting system (or even ensure that a meaningful a reporting structure was in place), thereby disabling themselves from being informed of non-compliance and unlawful practices.  By failing to act in the face of a known duty to act, and by demonstrating a conscious disregard for their responsibilities, Defendants failed to act in good faith and breached their fiduciary duty of loyalty.

## VIII.    IN EXCHANGE FOR TAKING ON THE FIDUCIARY DUTIES DESCRIBED HEREIN, DEFENDANTS ARE HIGHLY PAID

368.    While Defendants agree to take on a myriad of duties and responsibilities to serve on Wells Fargo's Board, these individuals are paid handsomely for their service.  For example, in 2021, the year before the *Bloomberg* expose was published, Wells Fargo's board members received, on average, $354,519.58 in compensation.  This calculation does not include Defendant Scharf's 2021 compensation

which was $24,500,000.00.  Below is a chart showing how much each Board member was compensated during the years 2019-2022.

| Wells Fargo Director Compensation Totals | | | | | |
|---|---|---|---|---|---|
| **Member** | **2019** | **2020** | **2021** | **2022** | **Total** |
| Baker* | $353,025.00 | $72,542.00 | | | $425,567.00 |
| Clark | $337,858.00 | $358,004.00 | $342,044.00 | $370,769.00 | $1,408,675.00 |
| Craver | $360,025.00 | $372,004.00 | $378,211.00 | $411,269.00 | $1,521,509.00 |
| Duke* | $635,025.00 | $94,282.00 | | | $729,307.00 |
| Hewett | $423,841.00 | $373,004.00 | $354,923.00 | $380,769.00 | $1,532,537.00 |
| James | $376,025.00 | $374,004.00 | $66,222.00 | | $816,251.00 |
| Morris | $453,358.00 | $478,004.00 | $440,044.00 | $425,019.00 | $1,796,425.00 |
| Noski | $232,786.00 | $534,633.00 | $443,504.00 | | $1,210,923.00 |
| Payne | $128,871.00 | $365,837.00 | $349,211.00 | $367,269.00 | $1,211,188.00 |
| Peetz* | $67,111.00 | | | | $67,111.00 |
| Pujadas | $381,089.00 | $421,004.00 | $383,044.00 | $367,769.00 | $1,552,906.00 |
| Quigley* | $425,025.00 | $55,185.00 | | | $480,210.00 |
| Sargent | $394,025.00 | $382,004.00 | $374,044.00 | $397,519.00 | $1,547,592.00 |
| Vautrinot | $349,191.00 | $379,004.00 | $337,044.00 | $355,269.00 | $1,420,508.00 |
| Black | | $258,629.00 | $428,900.00 | $599,769.00 | $1,287,298.00 |
| Chancy | | $190,094.00 | $357,044.00 | $372,311.00 | $919,449.00 |
| Davis | | | | $313,866.00 | $313,866.00 |
| Morken | | | | $308,075.00 | $308,075.00 |
| Norwood | | | | $308,075.00 | $308,075.00 |
| **Average** | | | $354,519.58 | | |
| The asterisk (*) denotes non-party. | | | | | |

## IX.    DERIVATIVE ALLEGATIONS

369.    Plaintiffs bring this action derivatively in the right and for the benefit of Wells Fargo to redress injuries suffered by the Company as a direct result of Defendants' breaches of fiduciary duty and other wrongful acts.

370.    Wells Fargo is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

371.    Plaintiffs have owned Wells Fargo stock continuously during Defendants' wrongful course of conduct as alleged herein, and they continue to hold Wells Fargo stock.

372.    Plaintiffs will adequately and fairly represent the interests of Wells Fargo and its stockholders in enforcing and prosecuting the Company's rights.  Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.

373.    Plaintiffs did not make any demand on the Wells Fargo Board to institute this action because such a demand would be a futile, wasteful, and useless act for the reasons set forth herein and below.

## X.    DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE

### A.    Demand Is Futile Because at Least Half of the Demand Board Has Disabling Conflicts of Interest

374.    There were fourteen directors on the Wells Fargo Board when this action was initiated: Defendants Black; Chancy; Clark; Craver; Davis; Hewett; Morken; Morris; Norwood; Payne; Pujadas; Sargent; Scharf; and Vautrinot (the "Demand Board," and each director on the Demand Board, a "Demand Director").[280]

375.    Delaware law applies a director-by-director "three-part test as the universal test for assessing whether demand should be futile."  *United Food & Com. Workers Union and Participating Food Indus. Emps. Tr-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1057-58 (Del. 2021).  The three-part test asks with respect to each Demand Director:  "(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who

---

[280] Although Defendant Pujadas resigned from the Board in April 2023—before Pontiac and Plantation filed their initial complaint in July 2023—this consolidated action relates back to the initial complaint filed on September 9, 2022 (*see* ECF No. 1).  Thus, Pujadas should be counted among the 14 Demand Directors who make up the Demand Board.  However, whether or not Pujadas is counted as a Demand Director, the numerical demand-futility analysis is the same because the Demand Board will have either 14 members (with Pujadas) or 13 members (without Pujadas) and in either case at least half—seven members—have a disabling conflict of interest and faces a substantial likelihood of personal liability that renders them incapable of fairly and impartially considering demand to pursue this litigation on the Company's behalf.

would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.*

376.    When a demand board is comprised of an even number of directors, a stockholder must demonstrate demand futility for at least half the directors. *See id.* at 1059 ("If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile.") Here, since the Demand Board has fourteen members, demand is futile because seven, or at least half of the Demand Board, have a disabling conflict of interest.

## B.    Each Demand Director Faces a Substantial Likelihood of Personal Liability for Lack of Oversight

377.    The second inquiry in the demand futility test under Delaware law is whether a director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. Here, each Demand Director faces a substantial likelihood of liability for breaching his or her oversight duties in bad faith.

378.    Preventing lending discrimination and hiring discrimination are mission-critical issues for a company like Wells Fargo. As detailed above, these were priority issues for lawmakers, regulators, and the Company's internal and external stakeholders. The Board knew that. In fact, an April 27, 2021 presentation to the full Board described certain diversity initiatives as "critical."[281]

379.    The Wells Fargo directors had a duty to ensure the Company had internal controls to prevent discrimination. They had a duty to fix any internal controls that they learned were inadequate. They also had a duty to act in response to red flags of lending and hiring discrimination. They failed in those duties.

380.    Seven of the Demand Directors—Clark, Craver, Davis, Morris, Pujadas, Sargent, and Vautrinot—were on the Board when the Company signed the 2018 Consent Order. Five of the Demand Directors—Clark, Craver, Davis, Morris, and Pujadas—personally signed the 2018 Consent Order. Accordingly, the Demand Directors understood the critical importance of establishing reporting systems

---

[281] Ex. KK, Kieber Santos (Head of Diverse Segments, Representation and Inclusion), *Diverse Segments, Representation and Inclusion: Status* Update (Apr. 27, 2021) (WF_DS_000000754)

that would automatically alert the Board of problems in mission-critical areas.  Nevertheless, the Demand Board established no internal controls or reporting systems that would automatically alert the Board of the risk that Wells Fargo's lending practices resulted in disparate impact towards minorities.  At best, the Company's internal documents demonstrate that the Board received isolated or discretionary reports from Wells Fargo management about the inherent risk of fair lending.  But receiving isolated reports about a risk is not the same as receiving consistent reporting about the then-current state of compliance.  Any fair reading of the Section 220 materials is that the Demand Directors never received consistent reports on the issue of fair lending, despite the fact that for years the Company was utterly failing to prevent disparate impacts that resulted from Wells Fargo lending practices, as demonstrated by documents produced in the Mortgage Discrimination Class Action.  *See supra* § VI.B.7.

381.    The Demand Directors also failed to act on numerous red flags related to discriminatory lending.  To recount just a few of the red flags alleged above, in 2012 and 2019, respectively, Wells Fargo settled the DOJ and *Philadelphia* Actions, which alleged that the Company charged minority borrowers higher interest rates than White borrowers for similar loan products, resulting in discriminatory pricing exceptions.  This prompted two stockholders from Wells Fargo to send a demand letter to the Board seeking action related to, among other things, the Company's "controls relating to[] minority borrowing practices."  ¶ 96.  The Board summarily dismissed the demand ten later months, somehow missing the trove of information produced in the Mortgage Discrimination Class Action, which identified significant gaps and weaknesses in Company-level controls related to fair lending, and confirm that Wells Fargo's automated underwriting systems, in fact, resulted in disparate impact towards minorities.  § VI.B.7.  That the Board (allegedly) investigated these same issues — and determined no action was required — months before the *Bloomberg* article (¶ 100), speaks volumes about whether the Demand Directors exercised good faith in evaluating these mission critical compliance issues.  And, internal documents produced in the Mortgage Discrimination Class Action show that for ***nearly ten years*** the Company's lending policies were having a disparate impact on minorities.  ¶¶ 132-33.  Had the Director Defendants, in fact, ensured that the Board had in place consistent monitoring of these issues they would have identified the problem much sooner, and long before *Bloomberg* in 2022.

382.    Other red flags were also missed.  On May 6, 2021, **Wells Fargo** managers and employees published a whitepaper on the issue of underwriting algorithms and the likelihood that they result in discriminatory or disparate impact.  ¶¶ 97-99.  On February 17, 2022, the first of fourteen stockholders filed a class action challenging the Company's discriminatory lending practices, including redlining.

383.    These events have proven to be prescient.  In March 2022, *Bloomberg* published two articles exposing the Company's discriminatory lending practices.  Also, on December 11, 2023, *CNBC* reported that Wells Fargo is (again) under a federal investigation by the CFPB related to discriminatory pricing exceptions (the investigation remains on-going).

384.    The books and records Plaintiffs received confirm that the Board was aware that fair lending was a risk at Wells Fargo.  Yet, there is no indication the Board did *anything* to ensure the Company's underwriting algorithms were changed to address the risk that disparate impact was occurring or that discriminatory pricing exceptions continued unabated.  Indeed, the Section 220 documents confirm that the Board failed to consistently monitor either of these issues.  *See* § VI.B.8 above.  The conscious decision not to monitor for these widely known and publicized discriminatory lending risks—risks that materialized at Wells Fargo in the past – was bad faith.

385.    In addition, the Demand Directors acted in bad faith regarding the Company's discriminatory hiring practices.  Through most of the Relevant Period, the Board had established no reporting system that required management to alert the Board of potential violations or abuses regarding the DEI policy and the Guidelines.  As a result, the Board did not learn about the whistleblower's disclosures until *The New York Times* contacted the Company shortly before the May 19, 2022 article.  Likewise, the Board did not learn of the February 18, 2021 Miller email, which disclosed the discrimination one interviewee experienced in September 2020.  That was so despite the fact that the Miller email was sent to the Board's email "inbox."  Given management's long track record of failing to comply with the law or make progress under the consent orders, no reasonable director acting in good faith would have left such important issues solely to management's discretion.

386.    Once the Board finally learned about the hiring discrimination problem, the Demand Directors consciously ignored the red flags.  One red flag was when the Governance & Nominating

Committee—consisting of Clark, Craver, Hewett, and Sargent—learned about the Miller email on December 13, 2021. Another red flag was the May 19, 2022 *New York Times* article detailing allegations by certain bank managers that they were directed by the Company to conduct sham interviews. An additional red flag was the June 9, 2022 *New York Times* article that referenced ten more current and former employees who confirmed the Company's practice of sham interviews.

387.    Despite the clear evidence of discriminatory hiring practices, the Demand Directors supposedly determined at the June 27-28, 2022 Board meeting the Company lacked a systematic problem with its hiring practices and policies. In other words, rather than address the issues raised by these red flags, the Demand Directors pretended Wells Fargo lacked any issues with its diverse hiring initiative. Given the overwhelming evidence to the contrary, no reasonable director acting in good faith could have reached this conclusion. The Board continued to bury its head in the sand, even after the SEC opened an investigation into the Company's hiring practices related to diversity.

### C.    Additional Red Flags Waved in Front of the Pre-2022 Directors—Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, Scharf, and Vautrinot

388.    Additional red flags arose prior to Davis, Morken, and Norwood joining the Board. These red flags waived in front of Defendants Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Pujadas, Sargent, Scharf, and Vautrinot (the "Pre-2022 Directors").

389.    For example, in December 2020, the Pre-2022 Directors received the December 2020 Demand, which alleged that Wells Fargo was engaging in discriminatory lending practices. That demand requested that the Board "take action to recover damages for alleged misconduct and correct alleged deficiencies in the Company's controls relating to: (i) minority borrowing practices." Rather than take substantive action in response to this red flag, the Pre-2022 Directors took ten months to reject the demand and decide that no further investigation was warranted into the alleged practices. *See* ¶ 100 above.

390.    On May 6, 2021, the Pre-2022 Directors received another red flag when six Wells Fargo PhDs published the May 2021 Article highlighting the potential discriminatory effects of lending algorithms like those at Wells Fargo.

391.     In March 2022, *Bloomberg* published its articles discussing the HMDA data from 2020 and 2021.   Those articles provided two additional red flags related to Wells Fargo's discriminatory lending practices.

392.     Rather than take action in response to the *Bloomberg* articles, the Pre-2022 Directors participated in the April 25-26, 2022 Board meeting where the Board discussed the *Bloomberg* articles, but failed to investigate (either way) whether Wells Fargo's lending algorithms resulted in redlining.

### D.     Additional Red Flags Waved in Front of the Corporate Responsibility Committee Members—Clark, Hewett, Morken, and Vautrinot

393.     Clark, Hewett, Morken, and Vautrinot served on the Board's Corporate Responsibility Committee (previously defined as the "CRC").   According to its charter, the CRC was responsible to assist the Board in fulfilling its responsibilities to oversee the Company's significant strategies, policies, and programs on social and public responsibility matters and the Company's relationships and enterprise reputation with external stakeholders on those matters."   Among other things, that included "oversee[ing] the Company's significant strategies, policies, and programs on social and public responsibility matters, including environmental sustainability and climate change, human rights, and supplier diversity.

394.     In August 2020, the CRC members were told that "minority lending distribution" and "residential mortgage redlining" "continues to be a priority" for regulators and that "(redlining)" was an "emerging risk."[282]   This information and the CRC's mandate should have led the CRC members to seek sufficient information from Wells Fargo management to confirm that the Company (and its underwriting algorithm) did not result in disparate impact towards minorities.   They completely failed to do so.

395.     The CRC should have acted in response to the *Bloomberg* articles.   Other directors understood that the discrimination described in the *Bloomberg* articles fell with the CRC's jurisdiction. Non-CRC members Clark, Hewett, and Vautrinot attended the meeting of the CRC on April 25, 2022, just before the April 25-26, 2022 meeting at which the Board discussed the articles.   Nevertheless, neither the CRC members nor the Board as a whole took action to address the discrimination described in the *Bloomberg* articles.   *See* ¶ 147.

---

[282] Ex. V, Minutes of the Meeting of the CRC of the Board of Directors of Wells Fargo & Co. Held on August 11, 2020 (WF_DS_000003600 at 3605).

1

2

**E.    Additional Red Flags Waved in Front of the Human Resource Committee Members—Black, Hewett, Morris, and Sargent—Who Failed to Investigate Whether Executives' Compensation Should Be Clawed Back**

3

4

5

6

396.    Black, Hewett, Morris, and Sargent served on the Board's Human Resource Committee (previously defined as the "HRC") during the Relevant Period.  As detailed above and summarized below, the HRC Committee was directly responsible for the Diverse Search Requirement Program and received regular updates and detailed information about the program.  *See* ¶¶ 8, 208, 211 *supra*.

7

8

9

10

11

12

13

397.    The HRC's charter provides that the members of the HRC "shall oversee the Company's human capital risk and human capital management, including . . . diversity, equity, and inclusion."  The charter also required that the members of the HRC "oversee the Company's culture, including management's efforts to foster ethical behavior and decision-making throughout the Company and the Company's Code of Ethics and Business Conduct and any significant changes or exceptions thereto."[283]  Due to the breaches of duty alleged herein, the directors who served on the HRC abdicated their duties under the HRC's charter.

14

15

16

17

18

19

398.    On October 8, 2020, the HRC (comprised at the time by Directors Hewett, James, Morris, and Sargent) received a report entitled "Wells Fargo Human Resources Risk and Regulatory Update: Culture-Monitoring Company Culture Report (MCCR)."  The report found that, even though remote work was likely driving the numbers *down*, harassment, discrimination, and retaliation allegations were rising.  The report also found that fewer Wells Fargo employees believed Wells Fargo champions diversity and inclusion in the workplace.

20

21

22

23

399.    On June 29, 2021, the HRC received a presentation noting that "Diversity and inclusion opportunities create emerging risks" and that "YTD-2021 Insufficient Diversity in the Workforce has accounted for $330K or 89% of Internal Losses; losses primarily attributed for settlements for alleged discrimination."  But the HRC failed to act.

24

25

400.    In addition, as members of the HRC, Directors Black, Hewett, Morris, and Sargent had decision-making authority and responsibility with respect to the Company's executive Clawback Policy.

26

27

28

---

[283] The 2022 Proxy disclosed that the "Board and its HRC oversee the Company's DE&I strategy and monitor its activities and progress."

That policy allows Wells Fargo to claw back the executive compensation of all senior executives and members of its Operating Committee for any serious misconduct. The Clawback Policy is strictly NOT LIMITED to instances of financial misconduct relating to an accounting restatement, as many corporate clawback policies are. Instead, as detailed above, the policy *specifically and expressly applies to any serious misconduct, including but not limited to reputational damage to Wells Fargo and failures or risk management*. Given the major reputational damage to Wells Fargo and the material failures of risk management at the Company were caused by the Individual Defendants' wrongdoing, Directors Black, Hewett, Morris, and Sargent were responsible for clawing back a portion of the compensation of the Company's senior executives and Operating Committee members. The HRC's meeting minutes and packages produced by Wells Fargo in response to Plaintiffs' stockholder inspection demands reveal that the HRC members even considered doing so. That failure to take any remedial action was a bad faith abdication of the HRC members' duties.

401. Here, Plaintiffs seek to recover the executive compensation unjustly received/retained by Defendants Scharf and Powell. Because the HRC members abdicated their duties to apply the Company's Clawback Policy, Directors Black, Hewett, Morris, and Sargent face a substantial likelihood of liability and cannot impartially evaluate whether to pursue Plaintiffs' claims.

402. Due to their membership on the HRC, Black, Hewett, Morris, and Sargent knew or recklessly disregarded the fact that discriminatory lending and hiring was rampant at Wells Fargo. Due to their failure to take any actions to stop this practice, to recover executive compensation under the Clawback Policy, and to prevent the dissemination of disclosures about the Diverse Search Requirement Program they knew were false, they face a substantial likelihood of liability, and demand is futile as to them.

**F.    Additional Red Flags Waved in Front of the Risk Committee Members—Chancy, Hewett, Morris, Payne, Norwood, and Vautrinot**

403. Directors Chancy, Hewett, Morris, Payne, Norwood, and Vautrinot served on the Risk Committee during the Relevant Period. According to the Risk Committee's charter, the committee's purpose "is to assist the Board of Directors in fulfilling its responsibilities to oversee the Company's

company-wide risk management framework. This includes reviewing and approving significant programs and/or policies relating to the following risks: "compliance risk, financial crimes risk (including Bank Secrecy Act and anti-money laundering risk), model risk, operational risk, information security risk (including cybersecurity risk), technology risk, data management risk, credit risk, liquidity and funding risks, market risk, interest rate risk, and investment risk, including the Company's business resiliency program, compliance program policy, technology and data management strategies, financial crimes program, and third-party risk management policy."

404.    On August 13, 2020, the Company's Chief Risk Officer reported to the Risk Committee (comprised at the time by Directors Hewett, Morris, Pujadas, and Vautrinot) that the number of substantiated reports of harassment, discrimination, and retaliation in Q2 2020 was 201, well above the "upper bound" that Wells Fargo had set of 116. The report noted that the "backlog of allegations is resulting in elevated levels of confirmed allegations."

405.    On October 26, 2020, the Risk Committee (comprised at the time of Directors Hewett, Morris, Pujadas and Vautrinot) received a report entitled "IRM Update (incl. Notable Risk Updates and Emerging Risks," noted that the Company's social conversation risk advisory was "Critical," which was the "Highest Level."

406.    Given their mandate and the information they received, the Risk Committee members had a duty to act to address Wells Fargo's discrimination related to the approval/denial gap for Blacks and other minority groups. Based on Plaintiffs' Section 220 investigation, the Risk Committee members did nothing.

### G.    Each Demand Director Faces a Substantial Likelihood of Liability for Approving the Issuance of False and Misleading Public Statements

407.    As explained above, Wells Fargo issued numerous false and misleading disclosures about its discriminatory practices during the Relevant Period. The securities-fraud plaintiffs address these wrongful disclosures in their September 8, 2023 Amended Complaint for Violations of the Federal Securities Laws (ECF No. 116), which alleges that:

"despite publicly lauding the Diverse Search Requirement, in reality, Wells Fargo was conducting "fake" interviews of diverse candidates simply to claim compliance with the

Diverse Search Requirement since it was first implemented in 2020. These fake interviews were systemic, and occurred across many of Wells Fargo's business lines both prior to and throughout the Class Period." *Id.* ¶ 11. The Amended Complaint further alleged that "[o]n June 9, 2022, the relevant truth was revealed" when "The New York Times published an article disclosing that . . . it had spoken with ten additional current and former Wells Fargo employees who confirmed that 'fake' interviews were prevalent throughout the Company, and also occurred in many of the Company's other business lines, including the mortgage servicing, home lending, and retail banking businesses." *Id.* ¶ 22. The Amended Complaint corroborated The New York Times' investigation with "additional accounts of 11 former Wells Fargo employees and contractors, who worked in six different divisions of the Company, which were developed through Plaintiffs' Counsel's independent investigation, corroborate the widespread nature of these fake interviews. *Id.* "In response to these revelations, Wells Fargo's common stock price fell more than 10% over two days, declining from a close of $44.63 per share on June 8, 2022, to a close of $40.08 on June 10, 2022—wiping out an astonishing $17 billion in market capitalization." [*Id.* ¶ 23.]

408.    The Wells Fargo directors were ultimately responsible for the Company's public disclosures. Each Demand Director approved one or more of the false and misleading statements alleged herein.

409.    Each Demand Director had actual knowledge of the undisclosed material facts alleged herein and knowingly or consciously disregarded them in bad faith when approving the false and misleading statements. A reasonable inference of the Demand Directors' actual knowledge can be drawn from the Company's admission that Wells Fargo directors were provided with detailed and frequent updates regarding the Company's Diverse Search Requirement program and DEI operations. The Company's Corporate Governance Guidelines state:

> Board members have complete access to the Company's management. In addition, the Company's management is expected to update the Board on any significant Company or competitive developments or matters between Board meetings. Non-Board members who are members of the Company's Operating Committee regularly attend Board and most committee meetings.[284]

410.    In its March 2020 Proxy, March 2021 Proxy, and March 2022 Proxy, Wells Fargo admitted that it monitored its progress on enhancing diversity at all levels of the Company using numerous internal and external metrics. Indeed, Wells Fargo's then-Chairman of the Board, Charles H.

---

[284] *See* Wells Fargo Corporate Governance Guidelines, available at https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-guidelines.pdf.

Noski, stated in a signed letter at the front of the March 2021 Proxy that "[t]he Board and its [HRC] are fully engaged in overseeing Wells Fargo's diversity, equity, and inclusion initiatives and human capital management to support management in its efforts to drive meaningful change."

411.    DEI metrics and activities were also included in all regular business reviews to gauge whether the Company was meeting its DEI goals.  Wells Fargo's Board and the HRC received regular reporting on the Company's DEI initiatives, including updates on the Company's progress and accomplishments across its DEI commitments and information related to talent acquisition and development and diversity reporting.  Beginning in the fall of 2020, the full Board received DEI updates at each regularly scheduled Board meeting, including regarding the Company's progress on its DEI commitments.  As demonstrated by the detailed allegations from Wells Fargo's Board and Board committee minutes, *see supra* § VI.B.8, each Demand Director knew or recklessly disregarded the true facts in approving the false and misleading disclosures.  The Demand Directors' conscious disregard with respect to the Company's disclosures was bad faith, disloyal conduct.  Such conduct cannot be exculpated under Delaware law.  Accordingly, the Demand Directors' conscious dissemination of false and misleading disclosures creates a substantial likelihood of liability and a pre-suit litigation demand on the Demand Board would have been a futile and useless act.

## H.    Each Demand Director Has a Disabling Personal Interest Based on the Operation of Wells Fargo's D&O Insurance Policy

412.    Wells Fargo's annual report discloses that the Company maintains insurance coverage for legal actions.  Given its size and frequent participation in litigation, Wells Fargo undoubtedly has D&O insurance that applies to the Demand Directors for the claims in this action.  Standard D&O insurance policies contain provisions that eliminate coverage for any action brought by Wells Fargo against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Demand Directors were to sue themselves or certain of the officers of Wells Fargo, there would be no D&O insurance protection.  By contrast, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore,

the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under Wells Fargo's D&O insurance policy.

## I.    Demand Is Futile as to Scharf for Additional Reasons

413.    Defendant Scharf has been Wells Fargo's CEO and President and a member of the Board since October 2019. Demand is futile as to him under each of the three subparts of Delaware's universal demand futility test.

414.    First, Scharf received a personal benefit from the wrongful actions Plaintiffs challenge. His compensation was tied in part to the success of the Company's diversity and inclusion efforts. As the 2022 Proxy reported at page 72: "In determining [Named Executive Officer] performance, the HRC utilizes a performance assessment and variable incentive determination process that provides the HRC with the ability to assess performance through the evaluation of pre-established financial and nonfinancial goals, including risk and DE&I. For DE&I, the HRC evaluates the CEO's progress on key Company-wide DE&I priorities, and for other NEOs, the HRC uses progress on diverse representation and inclusion across specific diversity dimensions of NEO leadership teams with potential adjustments to variable incentive compensation based on a holistic assessment of progress in one or more diversity dimensions." Likewise, the 2021 Proxy reported at page 125 that, "[i]n assessing Mr. Scharf's individual performance, the Board considered, among other factors, his increased focus on advancing diversity, equity, and inclusion, and his prioritization of progress on regulatory work." As a result of his supposed extraordinary success in leading DEI initiatives, including the Diverse Search Requirement program, Scharf received $5,365,854 in incentive-based compensation for 2021, and total compensation of $21,350,906. From 2019 to 2021, Scharf received total compensation from Wells Fargo of $76,029,526. The 2023 Proxy Statement identifies "ESG (including DE&I and Community Engagement)" as "a key non-financial goal[]" in evaluating Scharf's performance.

415.    Notably, in 2021, Wells Fargo implemented an extremely broad compensation clawback policy. Pursuant to this policy, Wells Fargo can recoup compensation based on merely reputational damage to the Company and/or failures of risk management. The clawback policy applies to all senior executives and members of the Company's Operating Committee, and thus applies to at least Defendants

Scharf and Powell. Demand is futile as to Scharf because instituting any action would jeopardize the lavish compensation Scharf received during the time of the discriminatory lending and hiring.

416. Second, Scharf faces a substantial likelihood of liability for breaching his duty of loyalty as a director. Among other things, and as described herein, he abdicated his responsibility to exercise proper oversight of Wells Fargo's hiring and lending policies and practices and failed to implement adequate remedial measures and risk and compliance management programs related to those policies and practices. He also faces a substantial likelihood of liability for breaching his duty of loyalty **and** care as an officer.[285] As Company CEO, Scharf had direct oversight of the DEI programs that are at issue in this case. He was also responsible for ensuring that the Company's disclosures were accurate. Scharf was one of the Wells Fargo officers who received the September 7, 2021 Bruno email confirming the HR practice of sham interviews. Scharf is a named defendant in the *SEB Action*, which alleges that he violated Section 10(b) of the Exchange Act and Rule 10b-5 when he disseminated or approved the false and misleading statements set forth above. Because pursuing Plaintiffs' derivative claims would expose his violations of the federal securities laws, Scharf is fatally conflicted and cannot render a disinterested decision regarding these derivative claims.

417. Third, Scharf lacks independence from others who have disabling conflicts concerning these derivative claims. As explained in more detail herein Defendants Black, Chancy, Clark, Craver, Davis, Hewett, Morken, Morris, Norwood, Payne, Sargent, and Vautrinot face a substantial likelihood of liability for breaching their duty of loyalty. These Defendants are a supermajority of the Board. They control Scharf's compensation and can remove him from his position at the Company. Given his lavish compensation—$24,500,000 in 2022 alone—Scharf lacks independence from the current Wells Fargo Board. Unsurprisingly, Wells Fargo's annual proxy statement filed on Form DEF 14A with the SEC on March 15, 2023, admits Scharf lacks independence due to his employment with Wells Fargo. That decision as to Scharf's lack of independence was made by the Board itself.

---

[285] Wells Fargo's certificate of incorporation exculpates directors from breaches of the duty of care, but it does not exculpate officers from breaches of the duty of care.

**J.    Prior Courts Have Already Determined that Demand Is Futile Against Certain of the Director Defendants on Related Issues**

418.    Judge Andrew Y.S. Cheng of the Superior Court of California, County of San Francisco Department 613, previously found demand on the Wells Fargo Board (which at the time included Defendants Scharf, Vautrinot, Clark, Sargent, Craver, Morris, Payne, and Hewett) excused because the Board faced a substantial likelihood of liability for their alleged breaches of fiduciary duty for abdicating their responsibility to exercise proper oversight to ensure the Company complied with the consent orders including by engaging in sustained, knowing inaction and ignoring red flags (the "2022 Consent Order Demand Futility Ruling"). *Timothy Himstreet and Montini Family Trust v. Scharf, et. al.*, Case No. CGC-22-599223 (Cal. Super. Ct. Oct. 5, 2022).

419.    Moreover, Judge Jon S. Tigar, United States District Judge for the Northern District of California, previously found demand excused on the Wells Fargo Board, which at the time included Defendant Vautrinot related to derivative allegations that the Wells Fargo Board "knew or consciously disregarded that Wells Fargo employees were illicitly creating millions of deposit and credit card accounts for their customers, without those customers' knowledge or consent." *Shaev v. Baker*, No. 16-cv-05541-JST (N.D. Cal. May 4, 2017).  In finding demand on the Wells Fargo Board futile, Judge Tigar explained that:  "the abundance of particularized allegations in the Consolidated Complaint support an inference that a majority of the Director Defendants—and in particular those Director Defendants who were on the risk committee, audit and examination committee [which included Defendant Vautrinot], and corporate responsibility committee—knew about widespread illegal activity and consciously disregarded their fiduciary duties to oversee and monitor the company."

**K.    Demand on the Board Is Futile for the Securities Claims Against the Officer Defendants Because Such Investigation or Litigation Would Implicate the Director Defendants' Own Wrongdoing**

420.    As explained above, Wells Fargo issued numerous false and misleading disclosures about its discriminatory practices during the Relevant Period.

421.    The Wells Fargo Directors were responsible for the Company's public disclosures.  Each Demand Director had control over or approved one or more of the false and misleading statements

concerning the discriminatory hiring practices alleged herein, including the false statements that implicate or were made by the Officer Defendants.  For example, Defendant Powell signed a letter that was included in Wells Fargo's 2020 Social Impact and Sustainability Highlights, which included false statements.  *See* ¶¶ 230-231.  Defendant Sanchez gave an October 7, 2021 interview describing the Company's diverse hiring programs, which included false statements.  *See* ¶¶237-239.  Defendant Santos provided *Business Insider* with false statements in May of 2022 that related to the Company's diverse hiring programs.  *See* ¶¶252-254.  Defendant Santos made additional false statements related to the Company's diverse hiring programs in the 2022 DE&I Report (¶¶255-257) and on June 3, 2022 in a *Business Insider* article.  *See* ¶¶259-261.  The Court has found that each of the statements referenced above are actionable. *See* ECF No. 176 at 40.

422.    Each of these false statements, made by Officer Defendants, implicates and is intertwined with the same facts and allegations concerning the Director Defendants' liability for false and misleading statements concerning the Company's diverse hiring programs.  Therefore, the factual allegations and false statements are congruous, and the analysis of the claims against the Officer Defendants tread the same path as the claims against the Director Defendants.  As such, the false and misleading statements alleged above create a substantial likelihood of liability for the Officer Defendants who made or were responsible for the statements and the Director Defendants who were responsible for the Company's public disclosures.

423.    Accordingly, each Demand Director cannot impartially consider a demand to investigate the securities claims asserted against the Officer Defendants in Counts II, III, and IV.  In other words, the Director Defendants could not bring their business judgment to bear on a demand to investigate or prosecute any securities claims against the Officer Defendants because such litigation would implicate their own wrongdoing.  Therefore, a conflict exists, and a pre-suit litigation demand on the Demand Board would have been futile and useless.

**XI.    CLAIMS FOR RELIEF**

<u>COUNT I</u>
**BREACH OF FIDUCIARY DUTY**
**(AGAINST THE INDIVIDUAL DEFENDANTS)**

424.    Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth in this paragraph.

425.    As Wells Fargo's directors and/or officers, the Individual Defendants owed Wells Fargo the fiduciary duties of loyalty and care.

426.    The fiduciary duties the Individual Defendants owed to Wells Fargo included, without limitation, implementing and overseeing a system of internal controls to monitor, detect and prevent the illegal redlining and discriminatory hiring practices alleged herein.  The Individual Defendants duty of loyalty required them to make good faith efforts to ensure that the Company's policies, procedures, and practices did not systematically discriminate against or otherwise result in unfair treatment of minority customers, prospective customers, company employees and applicants for hire.

427.    The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a.    despite knowing that racial discrimination, particularly in the areas of lending and hiring, is and has been illegal, harmful, and financially devasting to Black Americans and other minority groups, they consciously and repeatedly failed to ensure that the Company's reporting systems were adequately designed to detect systemic discriminatory practices such as redlining and sham interviews thus disabling them from being informed of risks or problems requiring their attention;

b.    consciously disregarding their duty to investigate red flags and to remedy any misconduct uncovered; and

c.    consciously issuing false and misleading statements to stockholders, including in the Company's 2021 and 2022 Proxy Statements.

428.    The conduct of the Individual Defendants, individually and collectively, as set forth herein, was due to their conscious intentional, knowing, and/or reckless disregard for the fiduciary duties owed to the Company.

429.    The Individual Defendants consciously turned a blind eye to the fact that they were not receiving relevant data or reports that would have placed them on notice of the Company's discriminatory practices in lending and hiring.  The Individual Defendants, consistent with their fiduciary duties, were required to implement and monitor policies and systems to monitor such illegal conduct.

430.    The Individual Defendants had actual or constructive knowledge that they caused the Company to fail to maintain adequate internal controls and failed to provide adequate oversight to protect the Company from liability related to the Company's unlawful discriminatory practices.

431.    These actions were not good-faith exercises of prudent business judgment to protect and promote the Company's corporate interests and those of its stockholders.

432.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary duties, Wells Fargo has sustained significant damages, both financially and to its corporate image and goodwill.  Such damages to Wells Fargo include, and will include, substantial risk of liability, legal costs, increased regulatory scrutiny, reputational damages, declining customer base, declining revenue, declining stock price, increased cost of capital, and other costs, damages and liabilities.

433.    For their conscious and bad faith misconduct alleged herein, the Individual Defendants are liable to the Company.

434.    In addition, the Director Defendants have further breached their fiduciary duties by deciding not to exercise the HRC's and Board's authorities and responsibilities under the Clawback Policy to claw back, forfeit, and recover the executive compensation of Defendants Scharf, Santos, Mack, Powell, and others—to the extent that compensation was earned as a result of misconduct and failures in risk management resulting in discriminatory hiring practices and sham interviews—the Director Defendants have caused the Company to waste its valuable corporate assets by paying Scharf, Santos, Mack, Powell, and others highly wasteful executive compensation and allowing them to retain that compensation despite the misconduct and failures in risk management that led to the Company's discriminatory hiring practices, including sham interviews.

## COUNT II
### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
### SEC RULE 10B-5 PROMULGATED THEREUNDER
### (AGAINST DEFENDANTS)

435.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

436.    During the Relevant Period, Defendants disseminated or approved false or misleading statements about Wells Fargo related to its discriminatory practices, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

437.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase more than $7 billion of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.

438.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Wells Fargo in connection with the Company's purchases of its stock during the Relevant Period.

439.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails; (a) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (b) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (c) made the above statements intentionally or with a severely reckless disregard for the truth; and  (d) employed devices and artifices to defraud in connection with the purchase and sale of Wells Fargo stock, which were intended to, and did, (a) deceive Wells Fargo regarding, among other things, the Company's lack

of internal controls to monitor, detect and prevent illegal redlining and hiring practices; (b) artificially inflate and maintain the market price of Wells Fargo stock.

440.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

441.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness.    The misstatements and omissions of material facts set forth in this Second Amended Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them.    Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

442.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Wells Fargo stock during the Relevant Period.    By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

443.    Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

### COUNT III
### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

444.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

445.    During their tenures as officers and/or directors of Wells Fargo, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.    By reason of their positions of control and authority as officers and/or directors of Wells Fargo, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.    These Defendants were able to and did control, directly and indirectly, the content of the public statements made

by Wells Fargo, including its materially misleading 2021 and 2022 proxy statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

446.    As set forth above, Wells Fargo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Second Amended Complaint.  By virtue of their positions as controlling persons of Wells Fargo and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Wells Fargo, each of these Defendants was culpable for the material misstatements and omissions made by Wells Fargo, including such misstatements as the Company's misleading 2021 and 2022 proxy statements, as set forth above.

## <u>COUNT IV</u>
### VIOLATION OF § 20A OF THE 1934 ACT
### (AGAINST SANTOS)

447.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

448.    While Wells Fargo securities traded at artificially inflated and distorted prices, Defendant Santos personally profited by selling 22,700 shares of Wells Fargo common stock on May 3, 2022—while he was in possession adverse, material non-public information about the Company—for proceeds of more than $1 million.

449.    By contrast, Wells Fargo was contemporaneously repurchasing shares during this same period.  According to public filings, during May 2022 the Company repurchased 25,465,000 shares of Wells Fargo common stock.

450.    Wells Fargo suffered damages because:  (a) in reliance on the integrity of the market, Wells Fargo paid artificially inflated prices as a result of Defendants' violations of §§ 10(b) and 20 (a) of the 1934 Act as alleged herein; and (b) Wells Fargo would not have repurchased its shares at the same prices if had been aware that the market for Wells Fargo stock had been artificially inflated by the false and misleading statements and omissions alleged herein.

451.    By reason of the foregoing, Defendant Santos violated §20A of the 1934 Act and is liable to Wells Fargo for the substantial damages the Company sustained in connection with its purchases of Wells Fargo common stock during the Relevant Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in the form of an order:

A.    Declaring that Plaintiffs may maintain this action on behalf of Wells Fargo and that Plaintiffs are adequate representatives of the Company;

B.    Declaring that Defendants have breached their fiduciary duties to Wells Fargo;

C.    Determining and awarding to Wells Fargo the damages sustained as a result of the violations set forth above by all Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Directing Wells Fargo to take all necessary actions to reform and improve its corporate governance, internal controls, and policies by implementing a Board-level reporting and information system—and to monitor that system—to ensure that the Company addresses redlining in any form, including digital or algorithmic redlining, and the discriminatory hiring practices alleged herein, and any other civil and criminal laws relating to racial discrimination in lending and hiring;

E.    Awarding against all Defendants and in favor of the Company extraordinary equitable and injunctive relief as permitted by law and/or equity as this Court deems just and appropriate;

F.    Awarding Plaintiffs' costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

G.    Granting such other relief as this Court deems just and appropriate.

\*    \*    \*

1

## XIII. JURY DEMAND

2

Plaintiffs demand a trial by jury of all issues so triable.

3

4    Dated:  October 3, 2024                    Respectfully submitted,

5                                              **COTCHETT, PITRE & MCCARTHY LLP**

6                                              */s/ Mark C. Molumphy*
                                               Mark C. Molumphy (SBN 168009)
7                                              Tyson Redenbarger (SBN 294424)
                                               Gia Jung (SBN 340160)
8                                              San Francisco Airport Office Center
                                               840 Malcolm Road Burlingame, CA 94010
9                                              Telephone:    (650) 697-6000
                                               E-mail:       mmolumphy@cpmlegal.com
10                                                           tredenbarger@cpmlegal.com
11                                                           gjung@cpmlegal.com

12                                             Lesley Weaver (SBN 191305)
                                               **BLEICHMAR FONTI & AULD LLP**
13                                             1330 Broadway, Suite 630
                                               Oakland, California 94612
14                                             Telephone:    (415) 445-4004
                                               E-mail:       lweaver@bfalaw.com
15

16                                             Nancy A. Kulesa (*pro hac vice*)
                                               **BLEICHMAR FONTI & AULD LLP**
17                                             300 Park Ave, Suite 1301
                                               New York, New York 10022
18                                             Telephone:    (212) 789-1343
                                               E-mail:       nkulesa@bfalaw.com
19

20                                             Derrick B. Farrell (*pro hac vice*)
                                               **BLEICHMAR FONTI & AULD LLP**
21                                             3411 Silverside Rd.
                                               Baynard Building, Suite 104
22                                             Wilmington, DE 19810
                                               Telephone:    (302) 499-2158
23                                             E-mail:       dfarrell@bfalaw.com

24
                                               **MOTLEY RICE LLC**
25                                             Marlon E. Kimpson (*pro hac vice*)
                                               William S. Norton (*pro hac vice*)
26                                             Joshua C. Littlejohn (*pro hac vice*)
                                               Meredith B. Weatherby
27                                             Vanessa A. Davis

28

---

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
E-mail:      mkimpson@motleyrice.com
             bnorton@motleyrice.com
             jlittlejohn@motleyrice.com
             mweatherby@motleyrice.com
             vdavis@motleyrice.com
             mazingo@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne B. Beste (SBN 326881)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
E-mail:        fbottini@bottinilaw.com
               achang@bottinilaw.com
               abeste@bottinilaw.com

*Counsel for Plaintiff Amy Cook*

## <u>VERIFICATION</u>

*City of Pontiac Reestablished General Employees' Retirement System*

I, Sheldon Albritton, do hereby declare:

      1.     I am the Chairman and a duly recognized agent and representative for City of Pontiac Reestablished General Employees' Retirement System (the "Fund"), located in Auburn Hills, MI.

      2.     I verify that I have reviewed the Second Amended Consolidated Stockholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern the Fund, are true to my personal knowledge. I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

      3.     The Fund has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Fund; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

      I declare under penalty of perjury that the foregoing is true and correct.

      Executed on the __2__ day of October, 2024

DocuSigned by:

_____
— 3A9D7B968D7247C...

Sheldon Albritton
Chairman
City of Pontiac Reestablished General Employees'
Retirement System

**VERIFICATION**
City of Plantation Police Officers' Retirement Fund

*In re Wells Fargo & Co. Consolidated Derivative Shareholder Litigation,*
Case No. 3:22-cv-05173-TLT (N.D. Cal.)

I, Brian Kendall, do hereby declare:

1.       I am the Chairman of the Board of Directors of the City of Plantation Police Officers' Retirement Fund (the "Fund"), which is a beneficial owner of Wells Fargo & Company common stock. As the Chairman of the Fund, I have authority to act on its behalf.

2.       The Fund has been appointed as one of the co-lead derivative plaintiffs in the above-titled action. I verify that I have reviewed the Second Consolidated Amended Stockholder Derivative Complaint (the "Second Amended Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Second Amended Complaint and reviewed it with counsel, I authorize its filing.

3.       The Fund has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to the Fund; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 09/30/2024

Brian Kendall
Chairman

## **VERIFICATION**

I, Amy J. Cook, verify that I am a shareholder of record of nominal defendant Wells Fargo & Company ("Wells Fargo"), and that I have continuously owned Wells Fargo stock since June 17, 2008. I have reviewed the allegations in this Second Amended Consolidated Stockholder Derivative Complaint (the "Second Amended Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Second Amended Complaint and reviewed it with counsel, I authorize its filing.

I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid; or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 10/2/24

_____
Amy J. Cook