Lesley E. Weaver (SBN 191305)
Nancy A. Kulesa (*pro hac vice*)
Derrick B. Farrell (*pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
E-mail:    lweaver@bfalaw.com
           nkulesa@bfalaw.com
           dfarrell@bfalaw.com

Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
E-mail:    mmolumphy@cpmlegal.com
           tredenbarger@cpmlegal.com
           gjung@cpmlegal.com

Marlon E. Kimpson (*pro hac vice*)
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
E-mail:    mkimpson@motleyrice.com
           bnorton@motleyrice.com
           jlittlejohn@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

*[Additional counsel on signature page]*

# IN THE UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY HIRING PRACTICES DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS | Case No. 3:22-cv-05173-TLT<br><br>**PLAINTIFFS' OPPOSITION TO OFFICER DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Hearing:   January 14, 2025<br>Time:       2:00 p.m.<br>Courtroom 9, 19th Floor<br>The Honorable Trina L. Thompson |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

ISSUES TO BE DECIDED ............................................................................................. 2

STATEMENT OF FACTS .............................................................................................. 2

    A.    Procedural Background.......................................................................... 2

    B.    Relevant Factual Background Concerning the Discriminatory Hiring Practices ............. 4

ARGUMENT .................................................................................................................. 9

    A.    Plaintiffs Are Entitled to All Reasonable Inferences ....................................... 9

    B.    Demand Was Futile Because an Investigation of the Officers Would Implicate the Directors' Wrongdoing ................................................ 9

    C.    Plaintiffs Have Adequately Alleged Section 10(b) Claims Against the Officer Defendants ................................................ 11

    D.    Plaintiffs Have Adequately Alleged Section 20(a) Claims Against the Officer Defendants ................................................ 14

    E.    Plaintiffs Have Adequately Alleged a Section 20A Claim Against Santos ................... 16

CONCLUSION.............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buban v. O'Brien*
  1994 WL 324093 (N.D. Cal. June 22, 1994) ..........................................................17

*Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*
  2024 WL 390890 (Del. Ch. Feb. 1, 2024) ..........................................................11

*Countrywide Fin. Corp. Derivative Litig.*
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ..........................................................17, 18

*In re Cylink Sec. Litig.*
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..........................................................13

*Del. Cnty. Empls. Ret. Fund v. Sanchez*
  124 A.3d 1017 (Del. 2015) ..........................................................9

*In re Energy Recovery Inc. Sec. Litig.*
  2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ..........................................................13

*In re EZCORP Inc. Consulting Agreement Derivative Litig.*
  2016 WL 301245 (Del. Ch. Jan. 25, 2016) ..........................................................9

*In re Finisar Corp. Derivative Litig.*
  2012 WL 2873844 (N.D. Cal. July 12, 2012) ..........................................................16

*Hefler v. Wells Fargo & Co.*
  2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ..........................................................2, 13, 14, 16

*Janus Cap. Grp., Inc. v. First Derivative Traders*
  564 U.S. 135 (2011) ..........................................................12

*In re Maxim Integrated Prod., Inc., Derivative Lit.*
  574 F. Supp. 2d 1046 (N.D. Cal. 2008) ..........................................................15

*In re Maxim Integrated Prod., Inc. Sec. Litig.*
  639 F. Supp. 2d 1038 (N.D. Cal. 2009) ..........................................................14, 15

*Murphy v. Precision Castparts Corp.*
  2020 WL 4040827 (D. Or. July 17, 2020) ..........................................................16

*Rosenbloom v. Pyott*
  765 F.3d 1137 (9th Cir. 2014) ..........................................................9

*SEB Investment Management AB v. Align Technolody, Inc.*
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........................................................................17

*Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*
   2020 WL 5028065 (Del. Ch. Aug. 24, 2020) ............................................................11

*United Food and Commercial Workers Union and Participating Food Indus.*
   *Emp'rs Tri-State Pension Fund v. Zuckerberg*
   262 A.3d 1034 (Del. 2021) ....................................................................................9, 10

*In re Verisign, Inc., Derivative Litig.*
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ..................................................................15

*In re Wells Fargo & Co. S'holder Derivative Litig.*
   282 F. Supp. 3d 1074 (N.D. Cal. 2017) ..............................................2, 15, 17, 18

## Statutes

8 *Del. C.* § 220 ..............................................................................................................2, 3

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b) ..................................... *passim*

Securities Exchange Act Section 20(a), 15 U.S.C. § 78t(a) ................................2, 4, 14

Securities Exchange Act Section 20A, 15 U.S. Code § 78t–1................................2, 16

## Rules

Fed. R. Civ. P. 12(b)(6)......................................................................................................11

Fed. R. Civ. P. 23.1........................................................................................................9, 11

## PRELIMINARY STATEMENT

Plaintiffs' Second Amended Complaint ("SAC") succinctly addresses the pleading deficiencies addressed in this Court's Order[1] and explains why the same facts this Court found adequately pled securities claims against the Director Defendants also establish liability against the Officers.  ¶¶420-422.[2]  The SAC also addresses the Court's concern that it was "unclear from the pleadings whether the set of facts" establishing liability against the Board "would be congruous for the Section 10(b), Rule 10b-5, and Section 20(a) claims" against the Officer Defendants.  *See* Order at 48.  Specifically, the SAC explains that "each Demand Director cannot impartially consider a demand to investigate the securities claims asserted against the Officer Defendants . . . <u>because such litigation would implicate their own wrongdoing</u>."  ¶423 (emphasis added).

Despite the amendments, Defendants Scott Powell, Carly Sanchez, and Kleber Santos (the "Officer Defendants") falsely assert that nothing has changed since the last round of pleadings.  That is plainly incorrect.  The SAC now clarifies how "the claims against the Officer Defendants tread the same path as the claims against the Director Defendants," (¶422) and, therefore, "the Director Defendants could not bring their business judgment to bear . . . because a conflict exists."  ¶423.  The amendment thus clearly and concisely confirms demand futility.

Defendants' challenges to the sufficiency of Plaintiffs' securities claims fare no better.  Importantly, the Officer Defendants concede that the Section 10(b) allegations against Defendants Sanchez and Santos are sufficient.  The Officer Defendants instead focus on whether Defendant Powell personally made any of the false and misleading statements.  But that argument ignores the law, which attaches liability to anyone who makes, controls, or has influence over false and misleading statements.  Here, the SAC sufficiently pleads that Powell, a Senior Executive Vice President and the Chief Operating Officer of Wells Fargo, had insight and control over the discriminatory hiring statements, especially given his involvement in board meetings (¶409), spending "90 percent of his time" working on initiatives aimed at curbing Wells Fargo's misconduct

---

[1] "Order" refers to the Court's order grating-in-part and denying-in-part Defendants' prior motion to dismiss.  ECF No. 176.

[2] All "¶___" references refer to paragraphs in the SAC.  ECF No. 177.

(¶268), and ***signing*** a letter in Wells Fargo's 2020 Social Impact and Sustainability Highlights, which included false statements concerning discriminatory hiring practices. *See* ¶¶230-231. When viewed holistically, these allegations are sufficient to plead a Section 10(b) claim against Powell.

Finally, Plaintiffs' allegations concerning the Section 20(a) and Section 20A claims are more than adequate. Plaintiffs have alleged in detail each Officer Defendant's role and responsibilities, which, at this stage, sufficiently establishes control under Section 20(a). *See Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *13 (N.D. Cal. Feb. 27, 2018). Similarly, for the Section 20A claim, Plaintiffs have adequately alleged contemporaneous trading by showing "that Wells Fargo engaged in a share repurchase program and provided the general time frame of the repurchases." *See In re Wells Fargo & Co. S'holder Derivative Litig.,* 282 F. Supp. 3d 1074, 1106 (N.D. Cal. 2017). The Court should deny the motion to dismiss in its entirety.

## ISSUES TO BE DECIDED

1.     Whether Plaintiffs have adequately alleged demand futility with respect to the securities claims against the Officer Defendants.

2.     Whether Plaintiffs have adequately alleged a claim against the Officer Defendants under Section 10(b) of the Exchange Act and Rule 10b-5.

3.     Whether Plaintiffs have adequately alleged a claim against the Officer Defendants under Section 20(a) of the Exchange Act.

4.     Whether Plaintiffs have adequately alleged a claim against Defendant Santos under Section 20A of the Exchange Act.

## STATEMENT OF FACTS

### A.    Procedural Background

Before filing suit, Plaintiffs served demands on Wells Fargo for Board-level books and records pursuant to 8 *Del. C.* § 220, a Delaware statute that permits stockholders of Delaware corporations to inspect corporate books and records upon showing a proper purpose. ¶¶62-64. In response, Wells Fargo produced documents concerning "[d]iscrimination in home lending, including mortgage discrimination," "materials relating to the Diverse Slate Guidelines," and "[d]iscrimination in hiring and promotion." ¶62. Plaintiffs relied on these Board-level documents to support their

allegations.  *Id.*

On May 10, 2024, Plaintiffs filed their Consolidated Amended Stockholder Derivative Complaint ("FAC"), asserting claims based on two broad categories of misconduct: (a) discriminatory hiring practices and (b) discriminatory lending practices.  *See* ECF No. 147.  Wells Fargo and the Officer Defendants each filed a motion to dismiss the FAC.  ECF Nos. 153, 153.

On September 20, 2024, the Court granted-in-part and denied-in-part the motions to dismiss the FAC.  *See* Order at 48-49.  As to the discriminatory lending practices theory, the Court denied the motion to dismiss Plaintiffs' *Caremark* prong one claim against the Director Defendants.  *Id.* at 49.  As to the discriminatory hiring practices theory, the Court denied the motion to dismiss Plaintiffs' securities claims under Section 10(b), Rule 10b-5, and Section 20(a) against Wells Fargo and the Director Defendants.  *Id.*

Regarding the securities claims, Plaintiffs alleged that 14 statements were false and misleading.  *See* Order at 40.  The Court found all 14 statements actionable.  *Id.* at 40-41.  Those actionable statements include the following statements personally made by or involving the Officer Defendants:

- Defendant Sanchez made false statements during an October 7, 2021, interview describing the Company's diverse hiring programs, which included false statements that Wells Fargo was "proactively sourcing for building diverse candidate slates" through "the candidate slate requirement" which required that "50% . . . of the candidate slate that will be interviewed needs to be diverse"—although, in fact, as a result of the Diverse Search Requirement, Wells Fargo had been engaging in a widespread scheme of "fake" or "sham" interviews.  ¶¶237-238; *see also* Order at 12.

- Defendant Santos made false and misleading comments to *Business Insider* in May of 2022 relating to the Company's diverse hiring programs. *See* ¶¶252-254; Order at 14.

- Defendant Santos also made false statements about the Company's diverse hiring programs in the 2022 DE&I Report.  *See* ¶¶255-256; Order at 14-15.

- Defendant Santos again made false statements on June 3, 2022, in a *Business Insider* article.  *See* ¶¶257-259; Order at 15; and

- Defendant Powell signed a letter included in Wells Fargo's 2020 Social Impact and

Sustainability Highlights, which contained false statements. *See* ¶¶230-231, 421; Order at 11-12.

Regarding demand futility, the Court found demand excused as to the claims against the Director Defendants because the "Director Defendants face a substantial likelihood of personal liability for violations of Section 10(b) and Rule 10b-5." Order at 45. The Court also found demand futile for the Section 20(a) "control" claims against the Director Defendants. *Id*. at 46.

With respect to the claims against the Officers, the Court granted "Plaintiffs leave to amend to include allegations—such as congruency of facts—that plead demand futility for claims asserted against Officer Defendants." *Id*. at 48.

On October 3, 2024, Plaintiffs filed their Second Amended Complaint, amending:

a sub-section in the Demand Futility section alleging that a demand on the Director Defendants would have been futile with respect to claims against Officer Defendants Scott Powell, Carly Sanchez, and Kleber Santos under Section 10(b), Rule 10b-5, and Section 20(a) for misstatements relating to discriminatory hiring practices (*see* [Order] at 49, §(6)), and [ ] remov[ing] all other claims that the Court dismissed with or without prejudice.

*See* SAC preamble, at p. 1. As explained herein, Plaintiffs' amendments address the Court's comments by establishing demand futility and a congruency of facts relating to the Section 10(b), Rule 10b-5, and Section 20(a) claims against the Officer Defendants relating to the Company's discriminatory hiring practices.

### B.    Relevant Factual Background Concerning the Discriminatory Hiring Practices[3]

Wells Fargo has a long history of discriminatory hiring practices. In 2013, a group of Black financial advisors at Wells Fargo filed a complaint accusing Wells Fargo of "systemic, intentional race discrimination" through the implementation of policies that segregated its workforce and disparately impacted its African American employees (the "*Slaughter* Action"). ¶183. Wells Fargo settled the case for $35.5 million in May 2017. ¶183. Among other things, the settlement required the Company to instruct its executives to examine their demographic data and initiate opportunities for African American financial advisors, as well as designate specific recruiters and coaches for

---

[3] Plaintiffs refer the Court to their prior opposition to Defendants' motion to dismiss for a more detailed background of the case. *See* ECF No. 165.

African American employees.  ¶183.  Additionally, on December 9, 2019, the Wells Fargo Board received a "Monitoring Company Culture Report" which concluded that "[t]he number of substantiated allegations related to [discrimination, harassment and retaliation] behaviors could indicate ineffective human capital management in areas including poor hiring/selection decisions" and that this "expose[d] WF to significant . . . legal and reputational risk."  ¶198.

In response to the *Slaughter* Action and the Monitoring Company Culture Report, in March 2020, Wells Fargo's CEO Charles Scharf announced the "Diverse Search Requirement" program. That program mandated that (i) at least 50% of the interview candidates for jobs paying at least $100,000 come from a historically underrepresented group with respect to at least one diversity dimension and (ii) at least one diverse interviewer participate in the hiring panel.  ¶¶8, 220. Significantly, Wells Fargo tied executive compensation awards to the Diverse Search Requirement such that if employees failed to comply, it could negatively affect their compensation.  ¶242; *see also* ¶¶292-305.  The Board tasked its Human Resource Committee ("HRC") with direct oversight of the Diverse Search Requirement program and responsibility for overseeing "approval of the Company's compensation philosophy and principles" and "executive compensation."  ¶¶8, 349-350.  Between 2020 and 2022, Defendants Black, Hewett, James, Morris, and Sargent served on this committee. ¶334.  Additionally, Defendant Powell, "the new chief operating officer under whom all of the responsibility for driving the work across the company on the remediation now sits is probably spending 90 percent of his time on these activities."  ¶268.

However, Wells Fargo never took the Diverse Search Requirement seriously.  ¶199.  On June 16, 2020, Wells Fargo CEO Scharf wrote a memo to Company employees discussing the Company's hiring practices and claiming that "[t]he unfortunate reality is that there is a very limited pool of Black talent to recruit from."  ¶199.  Many workers were upset by Scharf's comments, particularly Black employees successfully rising through the ranks.  ¶199.  When the comments resurfaced in a *Reuters* story in September 2020, Scharf was widely criticized.  ¶199.

In the months following Scharf's memo, numerous facts came to light that reiterated the importance of the Diverse Search Requirement and how Wells Fargo was failing to curb discrimination.  In particular, in August 2020, Wells Fargo paid nearly $8 million to settle Department

of Labor claims it had discriminated against **34,000** Black applicants during the hiring process.  ¶201.
An August 2020 "Enterprise Risk Report" received by the Board's Risk Committee, identified
"[s]ustained Team Member Allegations of Harassment, Discrimination, and Retaliation" as a
"reoccurring trigger."  ¶202.  Because Wells Fargo failed to devote sufficient resources to reports of
discrimination, the report noted Wells Fargo needed to "work to tackle the backlog of allegations."
¶202.

Wells Fargo's discriminatory hiring practices adversely affected the Company.  For example,
on September 30, 2020*, The Charlotte Observer* reported that "[a]t least seven Black female senior
executives have left Wells Fargo in the past 12 months, depleting the pipeline of women executives
of color to the bank's most senior positions" and that "[t]wo people with direct knowledge of the
matter say the bank's culture around race and gender was a factor in why some of the Black women
left."  ¶203.

Throughout the remainder of 2020 and into 2021, Wells Fargo recognized the risks it faced
from hiring discrimination and lack of diversity:

- At an October 26, 2020 Board meeting, Wells Fargo's Vice Chairman of Public Affairs
  claimed "that D&I is an imperative of the Company's senior management team."  ¶206.

- In November 2020, the HRC highlighted that "[s]ubstantiated cases [of racial
  discrimination] were characterized by:  Derogatory/racist statements and unfair
  treatment towards customers and employees."  ¶205.

- On November 17, 2020, the HRC received a presentation stating that "[o]ngoing
  impacts of social justice movements, coupled with negative diversity related media
  attention in Q3, may contribute to emerging [Human Capital Risk] tied to insufficient
  diversity in the workforce by making it more difficult to retain and hire diverse talent."
  ¶206.

On February 18, 2021, Phillip Miller, an "external job applicant," sent an email to Wells
Fargo's Board stating that he experienced "discrimination in the form of racist and offensive
statement[s]" by the hiring manager, including that the manager told Miller that "you don't sound
black" and after which "a white female was selected for the position."  ¶¶12, 175-176.  The

communication from Mr. Miller was considered a "Non-Ordinary" Board-level communication and sent to the Board's email "inbox," which means it should have been shared with one or more Board committees immediately.    ¶¶176-178, 385-386.    Instead, approximately **ten months later** the Governance and Nominating Committee (not the full Board), including Defendants Clark, Craver, Hewett, and Sargent, received the email and were told that Mr. Miller was asked whether "he was interviewed only as a means for the hiring executives to appear as if they were pursuing diverse candidates."  ¶¶176-178, 385-386.  This was telling, given that news reports had not yet surfaced about the abuses in the Diverse Search Requirement program.

The Company's lack of internal controls resulted in another whistleblower's email regarding sham interviews not reaching the full Board.  On September 7, 2021, Joseph Bruno, a former Wells Fargo executive, sent an email to over 250 Wells Fargo employees—including Defendants Powell and Santos—raising concerns over Wells Fargo's practice of conducting what Bruno believed were fake interviews of diverse candidates designed to comply with the Diverse Search Requirement program.  ¶¶14, 172, 416.  The email described "fake interviews [Wells Fargo] managers do that [are] directed by HR."  ¶173.  Due to the lack of any controls **requiring** management to report these issues to the Board, Scharf never reported the email to the Board.  ¶174.  As a result, the Board did not learn of Bruno's allegations until over **eight months later** when the *NYT* published an article discussing Bruno's whistleblower allegations.  ¶26, 180-181.

Instead of taking action to establish the necessary internal controls, the Company sought to hide the facts.  On March 16, 2021 and March 14, 2022, the Board recommended that its stockholders "vote AGAINST" a stockholder proposal that would require reporting and oversight on racial and gender equity by touting "the Company's significant and ongoing diversity, equity, and inclusion initiatives . . . .  ¶¶223-225, 242-244.  Meanwhile, on October 7, 2021, Defendant Sanchez stated during an interview that Wells Fargo was "proactively sourcing for building diverse candidate slates." ¶237.  Sanchez went on to claim that the "key is not to sit back and wait and see who arrives in that candidate pool, but to be constantly targeting external as well as internal sourcing to make sure that the pipeline is filled with great candidates.  ¶237.  These statements were false and misleading because Wells Fargo was not ensuring a diverse slate of candidates, instead faking the interviews.

¶¶238-239.

On May 19, 2022, the *NYT* published an investigative report based on allegations by Bruno and ***seven other*** current and former Wells Fargo employees who alleged that, for years, the Company had conducted fake interviews to meet their "Diverse Search Requirement."  ¶¶180-182.  The Board never discussed the article and Wells Fargo's management continued to marginalize the allegations. ¶182.  Specifically, on May 27, 2022, in an interview with *Business Insider*, Defendant Santos publicly denied the findings.  ¶¶184, 252-254.  Only days before the *NYT* article, Santos, then Head of the Diverse Segments, Representation and Inclusion, sold 22,700 shares of Wells Fargo stock for proceeds of more than $1 million.  ¶¶25, 319.

Following the *NYT* article and Santo's denial that Wells Fargo had a problem, more facts substantiating the sham interview claims came to light.  On June 6, 2022, whistleblower Bruno posted an article on LinkedIn which stated that the "fake interviews" were "an open secret at Wells Fargo, and it has gone on for years."  ¶187.  On June, 9, 2022, the *NYT* published a second article that referenced ***ten more*** employees who confirmed the Company's practice of sham interviews, bringing the number of employees raising concerns about sham interviews to at least ***19***.  ¶386.

On June 14, 2022, whistleblower Bruno published a video discussing in detail "recent examples of fake interviews."  ¶190-192.  Bruno further explained that if a candidate is brought in for a sham interview, they are assigned an artificially deflated score for their interview performance so that the pre-selected candidate would get hired.  ¶190-192.  Several Wells Fargo employees commented on the video and confirmed the accuracy of Bruno's whistleblower allegations.  ¶¶193-194.  Plaintiffs likewise directly confirmed Bruno's allegations, with former Wells Fargo employees who confirmed they had direct knowledge of the sham interviews.  ¶161.  Despite the extensive evidence of discriminatory hiring and without even discussing Bruno's LinkedIn article or video, including the employee comments on the video, the Board determined at its June 27-28, 2022 meeting that the Company did not have a systematic problem.  ¶387.

///

1

## ARGUMENT

2

### A.    Plaintiffs Are Entitled to All Reasonable Inferences

3

On a motion to dismiss, Plaintiffs "need not 'plead particularized facts sufficient to sustain a

4

'judicial finding' either of director interest or lack of director independence' or of another disabling

5

factor." *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *33 (Del.

6

Ch. Jan. 25, 2016). When considering the particularity requirement, "the Court does not weigh the

7

evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and

8

must draw all reasonable inferences in the plaintiff's favor." *United Food and Commercial Workers*

9

*Union and Participating Food Indus. Emp'rs Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034,

10

1048 (Del. 2021); *see also Rosenbloom v. Pyott*, 765 F.3d 1137, 1159 (9th Cir. 2014) (Rule 23.1

11

requires reasonable inferences be drawn in Plaintiffs' favor). Smoking-gun evidence of board

12

knowledge is not required. *Id.* at 1156 (demand futility can be shown by "an *inference* of conscious

13

inaction") (emphasis in original). The trial court must "consider all the particularized facts . . . in

14

their totality and not in isolation from each other." *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 124 A.3d

15

1017, 1019 (Del. 2015).

16

### B.    Demand Was Futile Because an Investigation of the Officers Would Implicate the Directors' Wrongdoing

17

18

When "evaluating allegations of demand futility," courts ask three questions on a director-

19

by-director basis: (i) "whether the director received a material personal benefit from the alleged

20

misconduct"; (ii) "whether the director faces a substantial likelihood of liability"; and (iii) "whether

21

the director lacks independence from someone [who meets one of the two prior criteria]."

22

*Zuckerberg*, 262 A.3d at 1059. "If the answer to any of the questions is 'yes' for *at least half* of the

23

members of the demand board"—here seven out of 14 Demand Directors—"then demand is excused

24

as futile." *Id.*

25

The Officer Defendants make three arguments in support of the contention that Plaintiffs have

26

not adequately alleged demand futility: (i) Plaintiffs have offered no new facts (ECF No. 178 at 12);

27

(ii) the false statements are not attributable to Santos, Sanchez, or Powell (*id.*); and (iii) there is no

28

congruency of facts that would excuse making a demand on the Board. *Id.* at 13. All three arguments

1   are meritless.

2       Contrary to the Officer Defendants' assertion, Plaintiffs did add new facts to the SAC,

3   including that (i) each false statement "made by Officer Defendants implicates and is intertwined

4   with the same facts and allegations concerning the Director Defendants' liability for false and

5   misleading statements," (¶422); (ii) "the factual allegations and false statements are congruous, and

6   the analysis of the claims against the Officer Defendants tread the same path as the claims against

7   the Director Defendants," (¶422); and, therefore, (iii) "the Director Defendants could not bring their

8   business judgment to bear on a demand to investigate or prosecute any securities claims against the

9   Officer Defendants because such litigation would implicate their own wrongdoing." ¶423.

10      The new allegations confirm that the same facts underlying the securities claims against the

11  Officer Defendants underlie the claims against the Director Defendants. In its Order, the Court

12  accepted Plaintiffs' "particularized facts showing that the sham interviews were widespread[.]"

13  Order at 40. These facts supported a plausible pleading-stage inference that "Defendants

14  misleadingly state[d] their record and process of providing robust oversight and hiring diverse

15  employees." Order at 41. The Officer Defendants and the Director Defendants made similar

16  statements about the Company's supposed hiring practices. *See* Order at 9-15 (listing statements);

17  *compare, e.g.*, *id.* at 10 (2021 Proxy: "we are requiring a diverse slate of candidates—and a diverse

18  interview team—for most roles with total direct compensation of more than $100,000 per year"),

19  *with, e.g.*, *id.* at 15 (Santos: "In 2020, [Wells Fargo] instituted a rule that for all posted roles in the

20  US with annual compensation greater than $100,000, at least half of interview candidates must be

21  from a historically underrepresented group."). In fact, the record confirms that an Officer Defendant

22  collaborated with a Director Defendant on one of the actionable statements. *See* Order at 14-15

23  (addressing DE&I Report with statements signed by Scharf and Santos). Determining that the

24  Officer Defendants' statements were false would necessarily mean the Director Defendants'

25  statements were false. For this reason, "the Director Defendants could not bring their business

26  judgment to bear on a demand to investigate or prosecute any securities claims against the Officer

27  Defendants[.]" ¶423.

28      These congruous factual allegations are more than sufficient to establish demand futility

against the Directors for claims against the Officers. *See Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *26 (Del. Ch. Aug. 24, 2020). In *Teamsters*, the court found demand futile because "[a]n investigation of the alleged officer breaches of duty would necessarily implicate the same set of facts" establishing wrongdoing against the directors. Similarly, here, the statements at issue directly concern both the Officers and the Directors, who either made the statements or had control over the statements. Therefore, because "the analysis of the claims against the Officer Defendants 'tread the same path' as the claims against the Director Defendants" and "[g]iven the near-total overlap in allegations, the conclusion that the Director Defendants face a substantial likelihood of liability . . . renders demand futile under Rule 23.1 as to the claims against the Officer Defendants." *Grabski ex rel. Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890, at *12 (Del. Ch. Feb. 1, 2024).

Accordingly, the Officer Defendants' argument that "there is no overlap between the alleged misstatements alleged to have been made by the Officer Defendants and any misstatements or other misconduct attributed to the Board, so there is no 'congruency of facts'" is false. ECF No. 178 at 8. Plaintiffs have adequately alleged demand futility as to the securities claims against the Officer Defendants.

### C.    Plaintiffs Have Adequately Alleged Section 10(b) Claims Against the Officer Defendants

The Officer Defendants argue that Plaintiffs have failed to state a Section 10(b) claim under Rule 12(b)(6), focusing their argument exclusively on Defendant Powell. *See* ECF No. 178 at 8-9. Defendants do not contest, and thus concede, Plaintiffs stated claims against Defendants Sanchez and Santos. *Id*. This should come as no surprise since Sanchez and Santos *personally* made the statements the Court found false and misleading. *See* Order at 40 (false and misleading statements numbered 7, 11, 12 and 13, which Sanchez or Santos made.) Additionally, Defendants also do not contest scienter as to Sanchez and Santos, admitting that the Court held "a plausible inference of scienter has been raised against the Director Defendants and against Santos and Sanchez." ECF No. 178 at 10 (citing Order at 45). For these reasons, the Court should deny the motion to dismiss the Section 10(b) claims against Sanchez and Santos.

Regarding Defendant Powell, Defendants argue that he was not the "maker" of any of the

false statements. *See* ECF No. 178 at 8-9. But the law does not limit liability to just the speaker. "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Here, Plaintiffs have sufficiently alleged Powell had authority and control over false statements by virtue of his position and title, as well as his involvement in overseeing initiatives aimed at ending Wells Fargo's misconduct. Specifically, Plaintiffs allege that:

- Powell served as a Senior Executive Vice President and the Chief Operating Officer of Wells Fargo since 2019. He also served on the Wells Fargo Operating Committee. ¶52.

- The Operating Committee had responsibility for, among other things, leading DE&I efforts and "reporting directly to our CEO" (who made false statements). ¶218.

- Operating Committee members regularly attend Board and most Board committee meetings, where they would have received Board-level reporting. ¶409.

- Powell received the September 7, 2021, whistleblower email from Joseph Bruno highlighting Wells Fargo's discriminatory hiring practices. ¶172.

- Powell spent "90 percent of his time" working on initiatives aimed at curbing Wells Fargo's misconduct, which at that time included discriminatory hiring practices. ¶268.

- Powell signed a letter included in Wells Fargo's 2020 Social Impact and Sustainability Highlights, which included false statements, including that "91% of applicable requisitions had a diverse interview slate" and that "94% of applicable requisitions had a diverse interview team." *See* ¶¶230-231, 421.

These allegations adequately allege, at the pleading stage, that Powell had control over false and misleading statements. "Courts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control at the motion to dismiss stage." *In re Energy Recovery Inc. Sec. Litig.*, 2016 WL 324150, at *25 (N.D. Cal. Jan. 27, 2016) (internal citations and

quotation marks omitted); *see also In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) (finding Plaintiffs sufficiently alleged control by alleging the defendants had "executive and managerial positions [which] had the power to control and influence"); *Hefler,* 2018 WL 1070116, at *13.

Plaintiffs' allegations also adequately plead scienter as to Powell.  Under the core operations doctrine, "[a]llegations regarding management's role may help satisfy the PSLRA scienter requirement in three circumstances."  *Id.* at *10.

> First, the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the *Tellabs* standard.  Second, the allegations "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," . . . .  Third, in rare circumstances, such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter.

*Id.* (citations omitted).

Here, Defendant Powell had actual access to the relevant information.  ¶¶172, 218, 268, 409. In particular, Powell received Bruno's email and attended Board and committee meetings where the diverse slate initiave was discussed.  ¶¶172, 409.  Powell also personally signed a letter included in Wells Fargo's 2020 Social Impact and Sustainability Highlights report, which included false statements, including 91% of applicable requisitions had a diverse interview slate" and "94% of applicable requisitions had a diverse interview team."  *See* ¶¶230-231, 421.  Thus, it is "absurd" to suggest that Powell, Wells Fargo's Chief Operating Officer who also served on the Company's Operating Committee, lacked knowledge of the issues in this case.  *Hefler,* 2018 WL 1070116, at *10; ¶52.

Powell also had personal responsibility for diverse hiring on his team—including ensuring that he "improv[ed] representation in three diversity dimensions across senior leaders in COO." ¶296.  However, Powell did not meet his numbers, "which subjected [him] to a monthly monitoring process, thus giving [him] a motive and incentive to orchestrate additional fake interviews."  ¶298. Viewed holistically, "it is implausible that Wells Fargo's senior management [including Powell],

involved in the day-to-day operations of the bank and with greater access to the underlying [] metrics and employee whistleblower complaints than independent board members, was unaware of the alleged fraud." *Hefler,* 2018 WL 1070116, at *10. Accordingly, the Court should deny the motion to dismiss the Section 10(b) claim against Powell.

### D. Plaintiffs Have Adequately Alleged Section 20(a) Claims Against the Officer Defendants

"In order to prove a prima facie case under section 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws, and (2) that the defendant exercised 'actual power or control' over the primary violator." *Hefler*, 2018 WL 1070116, at *13. This Court has found "that the heightened pleading standard does not apply to allegations of control or power." Order at 46.

As to Section 20(a)'s first element, because Plaintiffs adequately state a primary violation of Section 10(b), this element is met as to all the Officer Defendants. *See* Order at 46; Section III *supra*. As to Section 20(a)'s second element, at the pleading stage, "general allegations concerning an individual [defendant]'s title and responsibilities [are] sufficient to establish control." *Hefler*, 2018 WL 1070116, at *13.

Here, as in *Hefler*, Plaintiffs have sufficiently alleged "a prima facie case" that Powell, Sanchez, and Santos, "possess[ed], direct[ly] or indirect[ly] . . . the power to direct or cause the direction of the management" of Wells Fargo. *See In re Maxim Integrated Prod., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1050 (N.D. Cal. 2009) (quoting 17 C.F.R. § 230.405, defining "control"). For example:

- Powell has been the Senior Executive Vice President and Chief Operating Officer of Wells Fargo since 2019, a position in which he had "all of the responsibility for driving the work across the company on the remediation." ¶¶52, 268; *see also* ¶¶14, 172-174, 265, 296, 298, 305, 421, 434.

- Sanchez was the Vice President of Talent Acquisition, Affirmative Action and Equal Employment Opportunity, and Diversity Recruiting from 2013, in which she was responsible for Wells Fargo's overall recruitment strategy, including "sourcing" and "building diverse candidate slates." ¶¶54, 237-241, & 421.

- Santos was the Senior Executive Vice President and CEO of Consumer Lending, a

member of the Operating Committee, and was Head of the Diverse Segments, Representation and Inclusion group, in which he reported directly to CEO Charles Scharf, served on the Company's Operating Committee, and gave updates to the Board on the Diverse Slate Program, which he was in charge of.  ¶¶27, 55; *see also* ¶¶14, 30, 57, 172-174, 184, 252-259, 265, 269, 421, 434.

"Such allegations are sufficient at the pleading stage."  *Maxim Sec. Litig.*, 639 F. Supp. 2d at 1051 (allegations regarding participation in alleged misconduct through their managerial position, control over the design of the improper program, and relationship with other defendants was sufficient to establish control.)

In their motion, the Officer Defendants argue that the 20(a) claim fails because the SAC alleges that Wells Fargo is the "primary violator" for control-person purposes.  ECF No. 178 at 16. This mischaracterizes the SAC.  The SAC alleges that the Officers and Directors were "culpable for the material misstatements and omissions made by Wells Fargo."  ¶446 (emphasis added).  Contrary to Defendants' arguments, Plaintiffs in this *derivative* case do not allege that Wells Fargo was the primary violator.

The cases cited by Defendants are inapplicable because, unlike here, the plaintiffs in those cases failed to allege that the individual defendants were the primary violators.  *See In re Maxim Integrated Prod., Inc., Derivative Lit.*, 574 F. Supp. 2d 1046, 1067 (N.D. Cal. 2008) ("complaint fails to identify the primary violator"); *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007) (plaintiffs did not allege that the defendant officers and directors controlled a primary violator); *In re Finisar Corp. Derivative Litig.*, 2012 WL 2873844, at *19 (N.D. Cal. July 12, 2012) (same); *see also Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, at *24 (D. Or. July 17, 2020) (non-derivative case, deciding summary judgment).  The Court should, therefore, reject Defendants' "primary violator" argument.

The Officer Defendants next argue that "the Second Amended Complaint pleads nothing to explain how any of the Officer Defendants had 'specific control over the preparation and release of' any of the challenged statements."  ECF No. 178 at 11.  This argument misstates the pleading requirements and ignores the SAC's detailed allegations.  As stated above, at the pleading stage,

"general allegations concerning an individual [defendant]'s title and responsibilities [are] sufficient to establish control." *Hefler*, 2018 WL 1070116, at *13. Moreover, the SAC includes specific allegations explaining how the Officer Defendants had control over the challenged statements, including statements they made. *See, e.g.*, Powell: ¶¶14, 52 (Senior Executive Vice President and Chief Operating Officer; served on Operating Committee), *see also* ¶¶172-174, 265, 268, 296, 298, 305, 421, & 434; Sanchez: ¶54 (VP, Talent Acquisition, AA/EEO, Diversity Recruiting at Wells Fargo), *see also* ¶¶237-241, 421; Santos: ¶¶14, 27, 30, 55 ("Santos was Head of the Diverse Segments, Representation and Inclusion group—a role in which Santos reported directly to CEO Charles Scharf, and served on the Company's Operating Committee"); *see also* ¶¶57, 172-174, 184, 252-259, 265, 269, 421, 434.

The Court should find, as it did for the Director Defendants, that Plaintiffs have sufficiently stated a 20(a) claim against the Officer Defendants. *See* Order at 46.

### E.    Plaintiffs Have Adequately Alleged a Section 20A Claim Against Santos

Defendant Santos contends that (i) Plaintiffs failed to plead that Wells Fargo's trades were "contemporaneous" with Santos's and (ii) Wells Fargo's purchase price was at or above the price Santo allegedly sold his shares. ECF No. 178 at 12. Both arguments lack merit.

First, this Court should reject Santos's "contemporaneous" argument because it relies on a standard inapplicable to derivative cases. In a derivative stockholder case, a plaintiff only needs to allege that the Company consistently repurchased shares during the defendant's selling period to show that the trading activity occurred contemporaneously. *See In re Wells Fargo & Co. S'holder Derivative Litig.,* 282 F. Supp. 3d at 1075; *Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008). In *Countrywide*, as in this case, the company purchased shares continually during the period when an insider sold. *Id.* at 1075. The *Countrywide* court rejected the defendants' "object[ion] that Plaintiffs have not pled with specificity the actual days on which Countrywide repurchased its own stock" and found allegations of continuous repurchasing sufficient and allowed the plaintiffs to proceed with discovery. *Id.* ("A narrow interpretation of "contemporaneously" is not warranted here . . . the fact that the repurchase program was conducted during [the same months] is sufficiently specific."). Judge Tigar's decision in *In re Wells Fargo & Co. Shareholder Derivative*

1  *Litigation* follows the same rule. 282 F. Supp. 3d at 1106–07 ("[T]he duration of the period in which

2  an insider defendant's trade can be considered 'contemporaneous' with the plaintiff's is 'not fixed,'

3  and the Ninth Circuit [has]…expressly declined to elaborate on its 'exact contours." (quoting

4  *Countrywide*, 554 F. Supp. 2d at 1074-75)).

5     Santos cites *SEB Investment Management AB v. Align Technolody, Inc.*, 485 F. Supp. 3d 1113

6  (N.D. Cal. 2020) and *Buban v. O'Brien*, 1994 WL 324093 (N.D. Cal. June 22, 1994), to support his

7  incorrect argument that Plaintiffs failed to plead contemporaneous share repurchase at or above the

8  price that Santos sold his shares. ECF No. 178 at 12. However, *SEB*, a class action, did not apply

9  the standard applicable in a derivative case. *See SEB Inv. Mgmt. AB*, 485 F. Supp. 3d at 1119, 1135.

10  Here, Plaintiffs need only show "that Wells Fargo engaged in a share repurchase program and

11  provided the general time frame of the repurchases." *See In re Wells Fargo & Co. S'holder*

12  *Derivative Litig.,* 282 F. Supp. 3d at 1106. *Buban* is also distinguishable as that was a shareholder

13  class action, not a derivative case. *Buban*, 1994 WL 324093 at *1.

14     Defendants further argue that Santos sold his shares at an ***average*** sale price greater than the

15  weighted ***average*** price paid by Wells Fargo during the month of May 2022. Without support, the

16  Officer Defendants then argue that Wells Fargo must have repurchased shares at a lower price than

17  Santos's average sales price. But that conclusion is unfounded speculation. The allegations in the

18  SAC, which are based on public information, show that it is impossible to tell what Wells Fargo paid

19  on any given day (including May 3, 2022) for the 25,465 shares the Company repurchased in May

20  of 2022. *See* ¶290. More importantly, at this stage, Plaintiffs do not need to identify the exact date

21  of the repurchase and "can proceed to discovery to identify the timing of Wells Fargo's share

22  repurchases." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d at 1107 (rejecting

23  substantially identical arguments made in support of a motion to dismiss 20A claims and allowed

24  plaintiffs to proceed to discovery); *see also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F.

25  Supp. 2d at 1075 ("[T]he fact that the repurchase program was conducted during November and the

26  following May is sufficiently specific.").

27     ///

28

## CONCLUSION

Plaintiffs respectfully request that the Court deny the Officer Defendants' motion to dismiss in its entirety.

Dated:  November 14, 2024                      Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY LLP**

*/s/ Mark C. Molumphy*

Mark C. Molumphy (SBN 168009)
Tyson Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
San Francisco Airport Office Center
840 Malcolm Road Burlingame, CA 94010
Telephone:  (650) 697-6000
E-mail:        molumphy@cpmlegal.com
                   tredenbarger@cpmlegal.com
                   gjung@cpmlegal.com

Lesley E. Weaver (SBN 191305)
Nancy A. Kulesa *(pro hac vice)*
Derrick B. Farrell *(pro hac vice)*
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone:  (415) 445-4003
E-mail:        lweaver@bfalaw.com
                   nkulesa@bfalaw.com
                   dfarrell@bfalaw.com

**MOTLEY RICE LLC**
Marlon E. Kimpson *(pro hac vice)*
William S. Norton *(pro hac vice)*
Joshua C. Littlejohn *(pro hac vice)*
Meredith B. Weatherby
Vanessa A. Davis
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
E-mail:        mkimpson@motleyrice.com
                   bnorton@motleyrice.com
                   jlittlejohn@motleyrice.com
                   mweatherby@motleyrice.com
                   vdavis@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne B. Beste (SBN 326881)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
E-mail:       fbottini@bottinilaw.com
              achang@bottinilaw.com
              abeste@bottinilaw.com

*Counsel for Plaintiff Amy Cook*