Mark C. Molumphy (SBN 168009)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
mmolumphy@cpmlegal.com

Marlon E. Kimpson (*pro hac vice*)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone:  (843) 216-9000
Facsimile:  (843) 216-9450
mkimpson@motleyrice.com

Derrick B. Farrell (*pro hac vice*)
**BLEICHMAR FONTI & AULD LLP**
3411 Silverside Rd.
Baynard Building, Ste. 104
Wilmington, DE 19810
Telephone: (302) 499-2158
dfarrell@bfalaw.com

*Lead Counsel for Lead Plaintiffs*

*[Additional Counsel on Signature Pages]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE WELLS FARGO & COMPANY HIRING PRACTICES DERIVATIVE LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 3:22-cv-05173-TLT<br><br>**LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND MEMORANDUM IN SUPPORT**<br><br>Date:  May 5, 2026<br>Time:  2:00 p.m.<br>The Honorable Trina L. Thompson<br>Courtroom 9, 19th Floor |

## TABLE OF CONTENTS

ISSUES TO BE DECIDED ............................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................. 1

I.          INTRODUCTION ............................................................................................ 1

II.         FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................ 3

   A.     Factual Background ............................................................................... 3

   B.     Procedural History ................................................................................. 5

      1.     Lead Plaintiffs' Pre-Suit Books-and-Records Investigations .................... 5

      2.     History of the Litigation............................................................. 6

      3.     The Mediation and Subsequent Settlement Negotiations ........................... 9

      4.     Preliminarily Settlement Approval and Notice to Shareholders .............. 10

III.        THE TERMS OF THE PROPOSED SETTLEMENT ....................................... 10

IV.         THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
          ADEQUATE AND WARRANTS FINAL APPROVAL ..................................... 12

   A.     Legal Standard ..................................................................................... 12

   B.     The Settlement Confers Substantial Benefits on Wells Fargo .............................. 13

      1.     The Lending Programs Substantially Benefit Wells Fargo....................... 14

      2.     The $10 Million Cash Payment Substantially Benefits Wells Fargo........ 16

   C.     The Stage of the Proceedings, Amount of Discovery Completed, and the
       Vigorous Prosecution of this Action by Lead Plaintiffs and Lead Counsel
       Supports Final Approval of the Settlement............................................................. 17

   D.     The Complexity, Expense, Duration, and Risks of Continued Litigation
       Support Final Approval of the Settlement ............................................................. 19

   E.     The Settlement Was Negotiated at Arm's-Length by Experienced and
       Well-Informed Counsel with the Assistance and Oversight of an
       Independent, Renowned Mediator ....................................................................... 21

   F.     After a Robust Court-Approved Notice Program, Wells Fargo Shareholders
       Overwhelmingly Favor Final Approval of the Settlement .................................... 23

V.          CONCLUSION ............................................................................................... 24

## TABLE OF AUTHORITIES

**CASES**

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) ................................................................................ 17

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ........................................................................................ 13

*Cicero v. DirecTV, Inc.*,
2010 WL 2991486 (C.D. Cal. July 27, 2010) ............................................................... 17

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ........................................................................... 19

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ....................................................................................... 21

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ............................................................... 21

*Hefler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ......................................................... 19, 24

*Hopson v. Hanesbrands Inc.*,
2009 WL 928133 (N.D. Cal. Apr. 3, 2009) .................................................................. 18

*Hu v. Baker*,
2025 WL 2419265 (N.D. Cal. Aug. 21, 2025) .............................................................. 21

*In re Apple Comput., Inc. Derivative Litig.*,
2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ................................................................ 13

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ........................................................................... 22

*In re Caremark Int'l Inc. Derivative Litig.*
698 A.2d 959 (Del. Ch. 1996).......................................................................................... 19

*In re Carvana Co. S'holders Litig.*,
2024 WL 1300199 (Del. Ch. Mar. 27, 2024)................................................................. 20

*In re Ceradyne, Inc.*,
2009 WL 10671494 (C.D. Cal. June 9, 2009)............................................................... 13

*In re Citigroup Inc. Sec. Litig.*, s
965 F. Supp. 2d 369 (S.D.N.Y. 2013) ........................................................................... 23

*In re Healthcare Servs. Grp., Inc. Derivative Litig.*,
2022 WL 2985634 (E.D. Pa. July 28, 2022).................................................................. 18

*In re Johnson & Johnson Derivative Litig.*,
900 F. Supp. 2d 467 (D.N.J. 2012) ............................................................................... 18

*In re MRV Commc'ns, Inc. Derivative Litig.*,
2013 WL 2897874 (C.D. Cal. June 6, 2013).......................................................... 13, 21

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED                    LEAD CASE NO. 3:22-CV-05173-TLT
MOTION FOR FINAL APPROVAL OF PROPOSED
SETTLEMENT AND MEMORANDUM IN SUPPORT

*In re NVIDIA Corp. Derivative Litig.*,
2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ................................................................ 19

*In re Oclaro, Inc. Derivative Litig.*,
2014 WL 4684993 (N.D. Cal. Sept. 19, 2014) .............................................................. 19

*In re Oracle Corp. Derivative Litig.*,
2011 WL 5444262 (N.D. Cal. Nov. 9, 2011).................................................................. 19

*In re OSI Sys., Inc. Deriv. Litig.*,
2017 WL 5642304 (C.D. Cal. May 2, 2017) .................................................................. 24

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995)................................................................................... 12, 20

*In re Rambus Inc. Derivative Litig.*,
2009 WL 166689 (N.D. Cal. Jan. 20, 2009) ................................................................. 13

*Kim v. Allison*,
8 F.4th 1170, (9th Cir. 2021) .............................................................................. 9, 13

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998)..................................................................................... 18

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983)................................................................................. 12, 20

*Officers for Just. v. Civil Serv. Comm'n of City and Cnty. of S.F.*,
688 F.2d 615 (9th Cir. 1982)................................................................ 12, 13, 17, 19

*Schimmel v. Goldman*,
57 F.R.D. 481 (S.D.N.Y. 1973) ................................................................................... 20

*Seinfeld v. Verizon Commc'ns, Inc.*,
909 A.2d 117 (Del. 2006) .............................................................................................. 5

*TBK Partners, Ltd v. W. Union Corp.*,
675 F.2d 456, (2d Cir. 1982)....................................................................................... 19

*U.S. v. McInnes*,
556 F.2d 436 (9th Cir. 1977)....................................................................................... 12

*Weaver v. Moen*,
2024 WL 4040355 (D. Del. Sep. 4, 2024) ......................................................... 2, 18, 26

*Williams v. First Nat'l Bank*,
216 U.S. 582 (1910)..................................................................................................... 12

**STATUTES**

Securities Exchange Act Section 10(b)............................................................................. 4

Securities Exchange Act Section 14(a)............................................................................. 4

Securities Exchange Act Section 20(a)............................................................................. 5

**RULES**

Fed. R. Civ. P. 23.1(c) ................................................................................................... 13

SEC Rule 10b-5 ................................................................................................................ 6

**NOTICE OF MOTION AND MOTION FOR
FINAL APPROVAL OF SETTLEMENT**

PLEASE TAKE NOTICE that, pursuant to the Order Granting Unopposed Motion for Preliminary Approval of Settlement (ECF 276), on Tuesday, May 5, 2026 at 2:00 p.m. or as soon as counsel may be heard by the Honorable Trina L. Thompson, United States District Judge, of the United States Court for the Northern District of California, Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, the City of Pontiac Reestablished General Employees Retirement System ("Pontiac"), the City of Plantation Police Officers' Retirement Fund ("Plantation"), and Amy Isenberg[1] ("Isenberg") (collectively, the "Lead Plaintiffs"), Court-appointed Lead Plaintiffs in this shareholder derivative action (the "Action"), will and hereby do move for an order granting final approval of Joint Stipulation and Agreement of Settlement (ECF 269-2) (the "Settlement," "Stipulation" or "Stip.") entered between and among the Settling Parties in this Action.[2]

Lead Plaintiffs hereby apply for entry of the [Proposed] Order and Final Judgment (the "Judgment"), previously submitted to the Court (ECF 269-2, Ex. D), and resubmitted here, requesting the Court to determine: (i) whether the proposed Settlement on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate and in the best interest of Wells Fargo & Company ("Wells Fargo" or the "Company") and its stockholders; (ii) whether the Court should finally approve the Settlement and enter the Judgment, dismissing the Action with prejudice and extinguishing and releasing the Released Claims; (iii) hear and determine any objections to the proposed Settlement; and (iv) rule on such other matters as the Court may deem appropriate.

This Motion is made pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and is supported by the attached Memorandum of Points and Authorities, the Stipulation and all exhibits

---

[1] Amy Isenberg was previously known as, and made prior filings as, Amy Cook.

[2] Unless otherwise defined, capitalized terms appearing in this Motion shall be defined as provided for in the Joint Stipulation and Agreement of Settlement dated October 13, 2025 (the "Stipulation") (ECF 269-2).

thereto, the accompanying declarations and exhibits thereto, the Court's file, and such other matters as may be considered at the hearing.

**ISSUES TO BE DECIDED**

1.     Should the Court finally approve the proposed Settlement set forth in the Stipulation as fair, reasonable, and adequate, and enter Judgment dismissing the Action?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Lead Plaintiffs Pontiac Reestablished General Employees Retirement System ("Pontiac"), the City of Plantation Police Officers' Retirement Fund ("Plantation"), and Amy Isenberg[3] ("Isenberg") (collectively, the  "Lead Plaintiffs") achieved the $110 million Settlement of this consolidated shareholder derivative action on behalf of Wells Fargo & Company ("Wells Fargo" or the "Company") after more than three years of hard-fought litigation, including pre-suit books-and-records demands, pleadings, motions, hearings, substantial fact and expert discovery, and mediation.

The Settlement is comprised of two categories of benefits to the Company:  *First*, Wells Fargo will create a new $100 million borrower assistance fund for low- and moderate-income borrowers and communities to assist with mortgage downpayment and closing costs (the "Borrower Programs").  The Borrower Programs will remain in existence for a minimum of three (3) years after final approval and the entire $100 million will be used to provide mortgage assistance to low- and moderate-income borrowers or borrowers currently residing in or purchasing property in low-and moderate-income census tracts.  *Second*, Wells Fargo will receive monetary consideration of $10 million from the Director Defendants' directors and officers liability ("D&O") Insurer.

On January 13, 2026, the Court granted preliminary approval of the Settlement, finding that the Settlement appears "Fair, Reasonable and Adequate"; "Satisfies the Requirements of Fed. R. Civ. P. 23(e)(2)(A)-(B)"; and that "the Parties Propose an Adequate Plan of Notice to Shareholders". ECF 276 at 7, 9 (the "Preliminary Approval Order").  After complying with the Court-approved Notice Plan, Lead Plaintiffs now respectfully request that the Court grant final approval of the

---

[3] Amy Isenberg was previously known as, and made prior filings as, Amy Cook.

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED
MOTION FOR FINAL APPROVAL OF PROPOSED
SETTLEMENT AND MEMORANDUM IN SUPPORT

LEAD CASE NO. 3:22-CV-05173-TLT

Settlement as fair, reasonable, and adequate.  Final approval of the Settlement is appropriate in light of the following factors:

*First*, the Settlement's substantial benefits to Wells Fargo and its shareholders supports final approval.  *See* § IV.B *infra*.  At the core of the Settlement is Wells Fargo's agreement to create a new $100 million borrower assistance fund for low- and moderate-income borrowers and communities to assist with mortgage downpayment and closing costs.  ECF 269 at 2.  As noted in the Parties' Joint Response (ECF 273) to the Court's questions (ECF 272), homeownership is a key pillar of the American Dream, bringing financial opportunity for consumers and stability for communities nationwide.  *Id.* at 1.  By empowering Americans to achieve their dreams, the Borrower Programs will bring prospective mortgage customers to Wells Fargo and strengthen the Company's relationships with its existing customers.  *Id.*  By expanding and deepening Wells Fargo's presence in the communities benefited by the Borrower Programs, and by strengthening Wells Fargo's reputation and relationships with current and prospective customers in those communities, the Borrower Programs will substantially benefit Wells Fargo's long-term growth and success.  *Id.*

Columbia University Law School Professor Jeffrey N. Gordon has analyzed the Borrower Programs and sets forth his opinions of their benefits to Wells Fargo in his expert declaration, filed herewith.  *See* Declaration of Jeffrey N. Gordon in Support of Lead Plaintiffs' Motion for Final Approval of Proposed Settlement ("Gordon Decl."), attached as Exhibit E to the Joint Declaration of Marlon E. Kimpson, Lesley E. Weaver, Derrick B. Farrell, and Mark C. Molumphy in Support of Motions for (I) Final Approval of Proposed Settlement and (II) Attorney' Fees and Expenses ("Joint Decl.").  As Professor Gordon explains, "the Borrower Programs in the Settlement will generate many specific benefits for Wells Fargo: satisfying regulatory objectives under the Community Reinvestment Act, bringing additional, profitable mortgage origination business to Wells Fargo, enhancing Wells Fargo's reputation in the communities in which it does business, attracting new customers for Wells Fargo's products and financial services, and enhancing the stability of Wells

Fargo through enhancing the 'stickiness' of deposits." *Id.* ¶58. Professor Gordon concludes that "the Borrower Programs will have substantial strategic value" for Wells Fargo and "generate substantial profits for Wells Fargo in its operations." *Id.* ¶1. Indeed, Professor Gordon estimates that "full utilization of the Borrower Programs is highly profitable for the bank, generating income streams with approximate present value between $1.1 billion (high) and $550 million (low) against a subsidy amount of $100 million." *Id.* ¶46.

*Second*, the stage of the proceedings, the substantial amount of formal discovery completed—including taking 16 depositions and the production and review of more than 314,000 documents (~1.5 million pages)—and the vigorous prosecution of this Action by Lead Plaintiffs and Lead Counsel supports final approval. *See* § IV.C *infra*.

*Third*, the complexity, expense, likely continued duration—and hence, the overall risks—of continued litigation (through summary judgment, trial, and beyond) weigh in favor of settlement. *See* § IV.D *infra*.

*Fourth*, the fact that the Settlement was negotiated at arm's length by experienced and well-informed counsel through a mediation process overseen by an independent, renowned mediator—the Hon. Layn R. Phillips, Chief Judge of the Western District of Oklahoma (Fmr.)—further supports final approval of the Settlement. *See* § IV.E *infra*.

*Finally*, the fact that after notice of the settlement was published through multiple means as approved by the Court, Wells Fargo shareholders have overwhelmingly approved the settlement—and no shareholder has submitted an objection—further weighs in favor of final approval. *See* § IV.F *infra*.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Background

As detailed in Lead Plaintiffs' Second Amended Consolidated Complaint ("Complaint") (ECF 177), this shareholder derivative action alleges that the board of Wells Fargo, one of the largest financial institutions in the United States, failed to oversee and respond to two broad

categories of alleged misconduct: (i) discriminatory lending practices; and (ii) discriminatory hiring practices. ECF 177 ¶1.

Regarding Wells Fargo's alleged discriminatory lending practices, the Complaint asserted that the Company used factors in determining loan applicants' eligibility for home loans and refinancings, and in determining loan pricing and other terms and conditions, that resulted in disparate impact towards minority borrowers. *Id.* ¶99. These alleged practices were revealed when, on March 11, 2022, *Bloomberg* published an article titled "Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom," which described racial disparities in Wells Fargo's mortgage refinancing rates during 2020. *Id.* ¶16. The Complaint further alleged that Wells Fargo's discriminatory lending practices exposed the Company to damages, including investigative expenses, harm to the Bank's reputation, and potential liability in a pending consumer action titled *In re Wells Fargo Mortgage Discrimination Litig.*, No. 3:22-cv-00990-JD (N.D. Cal.).

Regarding Wells Fargo's alleged discriminatory hiring practices, the Complaint avers that after Wells Fargo announced, in March 2020, that it was expanding a policy requiring that at least half of all candidates interviewed for certain positions be diverse, the Company engaged in a practice of conducting sham interviews to comply with its diverse hiring initiative. *Id.* ¶172. These alleged practices began to be revealed when, on May 19, 2022, *The New York Times* published an article titled "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews." *Id.* ¶26. The Complaint alleged that, as a result of Wells Fargo's alleged discriminatory hiring practices, the board and/or executive management caused various false and misleading statements to be issued to stockholders, and approved repurchases of the Company's stock at inflated prices, which has damaged Wells Fargo and exposed it to liability in a securities fraud class action titled *SEB Inv. Mgmt. AB, et al. v. Wells Fargo & Co., et al.*, No. 3:22-cv-03811-TLT (N.D. Cal.).

The Complaint alleged five causes of action: (1) breach of fiduciary duty of oversight against Director Defendants and Officer Defendants, (2) violation of Section 14(a) of the Exchange

-4-

Act based on negligence against Director Defendants, (3) violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Wells Fargo, Director Defendants, and Officer Defendants, (4) violation of Section 20(a) of the Exchange Act against Director Defendants and Officer Defendants, and (5) violation of Section 20A of the Exchange Act against Officer Defendant Santos. *Id.* ¶¶424–51. Each of these causes of action relates to the Board's and/or executive management's alleged failure to meaningfully monitor Wells Fargo's discriminatory lending and hiring practices, which the Complaint alleged "have affected a significant number of borrowers and job applicants and caused Wells Fargo to endure costly regulatory scrutiny, class action litigation, and reputational harm, among other damages." *Id.* ¶1.

### B.    Procedural History

#### 1.    Lead Plaintiffs' Pre-Suit Books-and-Records Investigations

Prior to filing suit and intervening in this Action, each of Lead Plaintiffs pursued their rights as Wells Fargo shareholders to seek Board-level books and records from Wells Fargo. *See Seinfeld v. Verizon Commc'ns, Inc.,* 909 A.2d 117, 120 (Del. 2006) (encouraging stockholders "to use the 'tools at hand' to obtain the necessary information before filing a derivative action"). *See* Joint Decl. ¶¶11–13.

Lead Plaintiffs' first Section 220 demand was made on August 29, 2022, by another institutional stockholder, City of Hartford Municipal Employees Retirement Fund ("Hartford"), which Plaintiff Pontiac subsequently joined in June 2023 by executing a confidentially agreement, permitting Pontiac to obtain and review the documents Wells Fargo had produced to Hartford. *Id.* ¶11.

On October 3, 2022, Plaintiff Isenberg made her written demand on Wells Fargo to inspect certain books and records pursuant to Section 220 of the Delaware General Corporation Law, the common law of California, and Section 1601 of the California Corporations Code. The Company responded to Plaintiff Isenberg's Demand on October 12, 2022. *Id.* ¶12.

On June 9, 2023, Plaintiff Plantation made a further Section 220 demand on Wells Fargo, which the Company responded to on June 26, 2023, and September 8, 2023, by producing additional documents. *Id.* ¶13.

### 2.    History of the Litigation

On September 9, 2022, a Wells Fargo shareholder, Hugues Gervat, filed the first derivative lawsuit asserting claims against certain Wells Fargo officers and directors related to the Company's alleged discriminatory hiring practices. ECF 1. On September 26, 2022, Plaintiff Charles Rogers filed a second derivative action alleging breach of fiduciary duties related to discriminatory hiring and lending practices. *See* No. 3:22-cv-05473-TLT (N.D. Cal.) (ECF 1). On October 31, 2022, the Court consolidated the two actions as *In re Wells Fargo & Co. Hiring Practices Derivative Litig.*, No. 3:22-cv-05173-TLT and appointed their counsel as co-lead counsel. ECF 15. Plaintiffs Gervat and Rogers later filed an amended complaint. ECF 37.

On March 2, 2023, Plaintiff Isenberg filed a motion to intervene and stay the proceedings pending the completion of her investigation. ECF 38.

On July 5, 2023, Plaintiff Pontiac filed its Verified Shareholder Derivative Complaint, *City of Pontiac Reestablished General Employees' Retirement System v. Black et al.*, (No. 3:23-cv-03366) (N.D. Cal.) (the "*Pontiac* action"), and Motion to Intervene in this Action. ECF 65.

On July 13, 2023, the Court granted Plaintiff Isenberg's motion to intervene, and by separate order agreed to reconsider its prior order appointing lead counsel, setting a new briefing schedule for the appointment of lead counsel. ECFs 55, 68.

On August 14, 2023, Plaintiff Isenberg filed a petition for writ of mandate in San Francisco Superior Court, *Cook v. Wells Fargo & Co.*, Case No. CPF-23-518272, to compel Wells Fargo to produce additional documents pursuant to her California state court inspection demand (the "State Court Action"). Joint Decl. ¶14.

On September 26, 2023, Plaintiff Isenberg filed her Verified Shareholder Derivative Complaint, *Cook v. Black, et al.*, No. 3:23-cv-04934 (N.D. Cal.) (the "*Cook* action"). *Id.* ¶22.

-6-

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND MEMORANDUM IN SUPPORT                    LEAD CASE NO. 3:22-CV-05173-TLT

On September 28, 2023 and October 12, 2023, the Court issued separate orders consolidating the *Pontiac* and *Cook* actions with the other actions in this Litigation.  ECFs. 78, 93.

On October 23, 2023, Plaintiff Pontiac, along with Plaintiff Plantation, filed their Verified Amended Stockholder Derivative Complaint.  ECF 95.  That same day, Plaintiffs Pontiac, Plantation and Isenberg filed motions seeking appointment of lead plaintiffs and lead counsel.  ECFs 99, 101.

On November 13, 2023, Wells Fargo demurred to Plaintiff Isenberg's writ petition in the State Court Action.  On January 16, 2024, following briefing and oral argument, the San Francisco Superior Court issued an order sustaining Wells Fargo's demurrer as to Plaintiff Isenberg's inspection rights under Delaware law and overruling Wells Fargo's demurrer as to her inspection rights under California law.  Joint Decl. ¶15.

On February 12, 2024, the Court appointed Plaintiffs Pontiac, Isenberg, and Plantation as Lead Plaintiffs and the law firms Cotchett, Pitre & McCarthy LLP, Motley Rice LLC and Bleichmar Fonti & Auld LLP as Plaintiffs' Lead Counsel.  ECF 125.

On April 11, 2024, the Court issued an order consolidating the four related cases under the caption *In re Wells Fargo & Company Hiring Practices Derivative Litigation*.  ECF 139.

On May 10, 2024, Lead Plaintiffs filed their Consolidated Amended Complaint (ECF 147), alleging claims for breach of fiduciary duty, violation of Section 14(a) of the Exchange Act, violation of Section 10(b) of the Exchange Act, and violation of Section 20(a) of the Exchange Act.

On June 11, 2024, Wells Fargo, and Scott Powell, Michael Santomassimo, Carly Sanchez, Kleber Santos and Johnathan Weiss (the "Officer Defendants") filed motions to dismiss the Consolidated Amended Complaint.  ECFs 152, 153.  The Director Defendants filed joinders with respect to Wells Fargo's motion to dismiss.  ECFs 154, 155.

On September 20, 2024, the Court issued an Order granting-in-part and denying-in-part the Defendants' motions to dismiss.  ECF 176.  Notably, the Court granted the motion to dismiss Lead

Plaintiffs' claim for breach of fiduciary duty as to discriminatory hiring practices, substantially limiting Lead Plaintiffs' hiring claims. The Court also dismissed Lead Plaintiffs' Section 14(a) claim as to discriminatory hiring and lending practices, and Section 10(b) and Section 20(a) claims as to discriminatory lending practices. The Court denied the motions to dismiss Lead Plaintiffs' claim for breach of fiduciary duty as to discriminatory lending practices and Section 10(b) and Section 20(a) claims as to discriminatory hiring practices. The Court granted leave to amend Lead Plaintiffs' demand futility allegations for claims against the Officer Defendants. *Id.*

On October 3, 2024, Lead Plaintiffs filed their Second Amended Consolidated Complaint. ECF 177.

On October 17, 2024, the remaining Officer Defendants filed a motion to dismiss the Second Amended Consolidated Complaint. ECF 178.

On November 1, 2024, the Court issued a revised Case Management and Scheduling Order, setting new deadlines for discovery, dispositive motions, mediation and trial. ECF 192. Trial was set for April 27, 2026. *Id.*

On January 16, 2025, the Court issued an Order granting the motion to dismiss for failure to plead demand futility on the amended claims against the Officer Defendants. ECF 198.

Following the Court's order on the motion to dismiss, formal discovery commenced. The Settling Parties engaged in significant fact discovery, including requests for and production of approximately 314,000 documents in total (amounting to approximately 1.5 million pages), interrogatories, requests for admission, taking 16 depositions of party and non-party witnesses, and preparing for 12 additional calendared depositions. Defendants produced approximately 313,000 documents (amounting to approximately 1.5 million pages), Plaintiffs produced approximately 13 documents (amounting to approximately 62 pages), and non-parties produced approximately 72 documents (amounting to approximately 1,197 pages). Plaintiffs took 11 merits depositions of current and former Wells Fargo employees and Director Defendants and Defendants took 4 merits depositions of former Wells Fargo employees and 1 Lead Plaintiff deposition. The

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND MEMORANDUM IN SUPPORT

LEAD CASE NO. 3:22-CV-05173-TLT

Settling Parties also engaged in substantial motion practice before Magistrate Judge Sallie Kim to resolve hotly contested discovery disputes. *See, e.g.*, ECFs. 246, 255, 256 (orders granting and denying relief requested in the Parties' discovery letter briefs). In August 2025, the Settling Parties exchanged six opening expert reports. Joint Decl. ¶47.

### 3.     The Mediation and Subsequent Settlement Negotiations

In June 2025, the Settling Parties engaged Judge Layn R. Phillips, formerly the Chief Judge of the United States District Court for the Western District of Oklahoma, to serve as mediator. *See* Declaration of Hon. Layn R. Phillips (Fmr.) in Support of Co-Lead Plaintiffs' Motion for Final Approval of Proposed Settlement (Joint Decl. Ex. D) ("Phillips Decl.") at ¶8. On July 24 and August 7, 2025, the Settling Parties exchanged two rounds of detailed mediation briefs. Joint Decl. ¶50.

On August 21, 2025, the Settling Parties held a full-day, in-person mediation session in New York, New York, which included participation by Lead Plaintiffs, Plaintiffs' Lead Counsel, Defendants' counsel, and representatives from Wells Fargo and its insurers. Joint Decl. ¶51; Phillips Decl. ¶12. As noted above, these discussions commenced after completion of shareholder books-and-records demands, resolution of motions relating to the pleadings and discovery matters, substantial factual discovery, both in this case and in the parallel *Mortgage Discrimination* and *SEB* actions,[4] and expert disclosures, including the exchange of expert reports addressing Wells Fargo's lending practices, corporate governance, and damages, amongst other subject matters. *See id.* ¶¶17–48.

While the mediation did not result in a settlement, the Settling Parties continued to engage in further discussions of the merits of Lead Plaintiffs' claims and the Settling Parties' proposals with the assistance of Judge Phillips. Following extensive post-mediation negotiations, the

---

[4] *See In re Wells Fargo Mortgage Discrimination Litig.*, No. 3:22-cv-00990 (N.D. Cal.); *SEB Inv. Mgmt. AB, et al. v. Wells Fargo & Co., et al.*, No. 3:22-cv-03811 (N.D. Cal.).

-9-

Settling Parties reached agreement on, and memorialized in a term sheet, all substantive terms of the settlement, including the Borrower Programs.  Joint Decl. ¶52.

After the Settling Parties reached agreement on all substantive terms of the proposed settlement, Judge Phillips facilitated negotiations between the Settling Parties concerning the amount of any Fee and Expense Award and Service Award.  Joint Decl. ¶54. On October 7, 2025, the Settling Parties reached agreement on a Fee and Expense Award of up to $27,500,000, subject to the Court's approval.  *Id.*

The Settling Parties' agreement to settle the Action, and the agreement on the Fee and Expense Award, are set forth in the Stipulation.  ECF 269-2.  Wells Fargo's Board has also reviewed the terms and conditions in the Settlement and believes that the Settlement is in the best interests of Wells Fargo and its shareholders.  Joint Decl. ¶55.

### 4.     Preliminarily Settlement Approval and Notice to Shareholders

On October 13, 2025, Lead Plaintiffs moved for preliminary settlement approval.  ECF 269.  Defendants filed a Statement of Non-Opposition on October 17, 2025.  ECF 269.

On November 4, 2025, the Court issued a set of Questions for the Parties Regarding Preliminary Approval of Settlement (ECF 272) to which the Parties submitted a Joint Response on November 14, 2025 (ECF 273).

On January 13, 2026, the Court entered the Preliminary Approval Order in which the Court found that the "the terms of the Settlement Agreement will benefit Wells Fargo"; the Settlement appears "Fair, Reasonable and Adequate"; the Settlement "Satisfies the Requirements of Fed. R. Civ. P. 23(e)(2)(A)-(B)"; and that "the Parties Propose an Adequate Plan of Notice to Shareholders." ECF 276 at 7–9.

### III.    THE TERMS OF THE PROPOSED SETTLEMENT

On September 12, 2025, Lead Plaintiffs and Defendants reached a settlement providing significant benefits to Wells Fargo and its shareholders, including Wells Fargo's commitment to provide $100 million in new funding for mortgage assistance.  Stipulation ¶1.2.  The $100 million

-10-

will be used by Wells Fargo to fund mortgage (downpayment and closing cost) assistance programs to benefit low- and moderate-income borrowers or borrowers currently residing in or purchasing property in low- and moderate-income census tracts in certain geographic regions in the United States. *Id.* The Borrower Programs will remain in existence for a minimum of three years after Final Approval of the Settlement, and the entire $100 million will be used to provide mortgage assistance to low- and moderate-income borrowers. *Id.* Wells Fargo agrees that the commitment to fund the Borrower Programs for three years is a result of the Action and confers substantial benefits to Wells Fargo. *Id.* ¶4.1

In addition, the Settlement provides for monetary consideration of $10 million from the Director Defendants' D&O Insurer to Wells Fargo. *Id.* ¶1.3.

In exchange for the consideration described above, the Settlement provides that Lead Plaintiffs (acting on their own behalf and derivatively on behalf of Wells Fargo), Wells Fargo, and any Person acting derivatively on behalf of Wells Fargo shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, discharged and dismissed with prejudice the Released Shareholder Claims (including Unknown Claims) against the Released Defendant Persons, regardless of the jurisdiction in which such claims were or could have been alleged or where the claims had impact. *Id.* ¶5.1. The Settlement also provides that each of the Director Defendants and Wells Fargo shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged the Released Defendant Claims (including Unknown Claims) against the Released Shareholder Persons, and shall be forever barred and enjoined from asserting any Released Defendant Claims against any Released Shareholder Persons. *Id.* ¶5.3.

Wells Fargo also agreed to pay a Fee and Expense Award of $27,500,000 to Lead Plaintiffs' Counsel, subject to the Court's approval, in recognition of the benefits conferred by the Settlement. *Id.* ¶4.2. The Fee and Expense Award is separate from and in addition to the $100 million spend amount for the Borrower Programs and the $10 million D&O insurance

-11-

payment to Wells Fargo, and includes litigation expenses and the Service Awards to the Lead Plaintiffs. *Id.* The Fee and Expense Award was negotiated at arm's length with the assistance of the mediator, Judge Phillips. *Id.*; *see also See* Joint Decl. Ex. D (Phillips Decl.).

## IV. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND WARRANTS FINAL APPROVAL

### A. Legal Standard

Under Federal Rule of Civil Procedure 23.1, court approval is required for any settlement, voluntary dismissal, or compromise of the claims by the parties. Fed. R. Civ. P. 23.1(c). While the district court exercises its "sound discretion" in evaluating a settlement, in exercising its discretion "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Just. v. Civil Serv. Comm'n of City and Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982); *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 377–78 (9th Cir. 1995) (affirming ruling that shareholder derivative settlement was "fair, reasonable and adequate to [the company]'").

It is well settled that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Officers for Justice*, 688 F.2d at 635 (recognizing that the "settlement process [is] favored in the law"); *U.S. v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977) (explaining that "there is an overriding public interest in settling and quieting litigation"). This is particularly true with respect to shareholder derivative litigation, "because such litigation is notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) (citation modified).

In reviewing the proposed settlement of derivative litigation, "the district court determines whether a proposed settlement is fundamentally fair, adequate, and reasonable." *In re Pac. Enters.*, 47 F.3d at 377 (citation modified); *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *3 (N.D.

-12-

Cal. Jan. 20, 2009). "Circuit law teaches that . . . , the Court must balance the following factors to determine whether a settlement is fair, adequate, and reasonable: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the amount offered in settlement; (4) the extent of discovery completed and the stage of the proceedings; (5) the experience and views of counsel; and (6) the reaction of the [stockholders] to the proposed settlement." *In re MRV Commc'ns, Inc. Derivative Litig.*, 2013 WL 2897874, at *2 (C.D. Cal. June 6, 2013); *see also Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575–76 (9th Cir. 2004); *Kim v. Allison*, 8 F.4th 1170, 1178–79 (9th Cir. 2021); *Officers for Justice*, 688 F.2d at 625. The Ninth Circuit, however, has cautioned that "the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Id.*

The court also "must conclude that the Proposed Settlement is not the product of collusion [between] the parties." *MRV Commc'ns*, 2013 WL 2897874, at *2 (citation modified). "The involvement of experienced counsel and the fact that the settlement agreement was reached in arm's-length negotiations, after relevant discovery has taken place create a presumption that the agreement is fair." *Id.* (citation modified). The "principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re Ceradyne, Inc.*, 2009 WL 10671494, at *2 (C.D. Cal. June 9, 2009) (citation modified).

**B.    The Settlement Confers Substantial Benefits on Wells Fargo**

The principal factor to be considered in determining the fairness of a proposed settlement of a stockholder derivative action is the benefit to the nominal defendant company, as compared to the risks posed by the derivative litigation. *See In re Apple Comput., Inc. Derivative Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008).

Here, the Settlement creates significant real-world benefits for Wells Fargo and its shareholders. As a result of the filing, prosecution, and settlement of the Action, Defendants have agreed to implement and fund the $100 million Borrower Programs and cause to be paid to the

-13-

Company an additional $10 million cash payment from its directors and officers liability insurer. ECF 269 at 2.

### 1.    The Lending Programs Substantially Benefit Wells Fargo

As noted in the Parties' Joint Response (ECF 273) to the Court's questions (ECF 272), homeownership is a key pillar of the American Dream, bringing financial opportunity for consumers and stability for communities nationwide. *Id.* at 1. Owning a home is also one of the most important pathways to wealth creation, providing families with a foundation for improving their financial standing across generations. *Id.* There is a shortage of affordable housing for low- and moderate-income communities, and high housing costs have amplified growing economic inequities. *Id.* Through this Settlement, the Parties are committed to creating a more inclusive housing system and supporting Wells Fargo's customers with homeownership. *Id.* The Borrower Programs will build upon Wells Fargo's other offerings and participation in joint industry initiatives focused on increasing homeownership, and Wells Fargo's continued efforts to help drive economic growth and neighborhood stability. *Id.* Increasing homeownership and driving economic growth benefits all Americans, including low- and moderate-income Americans, and Wells Fargo. *Id.*

By empowering Americans to achieve their dreams, the Borrower Programs will bring prospective mortgage customers to Wells Fargo and strengthen the Company's relationships with its existing customers. *Id.* By expanding and deepening Wells Fargo's presence in the communities benefited by the Borrower Programs, and by strengthening Wells Fargo's reputation and relationships with current and prospective customers in those communities, the Borrower Programs will substantially benefit Wells Fargo's long-term growth and success. *Id.* The entire $100 million in funding will be spent on borrower assistance; there will be no reversion to Wells Fargo or transfer to a *cy pres* recipient. *Id. See also* Preliminary Approval Order at 8 (finding "the Settlement Agreement will benefit Wells Fargo" by "contribut[ing] to Wells Fargo's efforts to create a 'more inclusive housing system' and assist customers in achieving homeownership" and

-14-

that "the mortgage assistance programs will improve Wells Fargo's reputation among prospective customers in the targeted communities").

To further evaluate the benefits of the $100 million Borrower Programs, Lead Plaintiffs retained Professor Jeffrey N. Gordon, the Richard Paul Richman Professor of Law at Columbia University Law School in New York, New York. *See* Gordon Decl. ¶2. Professor Gordon is a respected expert in corporate governance and the regulation of financial institutions. *Id.* ¶¶3-7. Professor Gordon has reviewed the Settlement and related documents, and he has opined that the $100 million Borrower Programs "will produce several important benefits for Wells Fargo," "will have substantial strategic value," and "generate substantial profits for Wells Fargo in its operations." *Id.* ¶1. In that regard, Professor Gordon explains that "[t]he benefits of the Settlement to Wells Fargo fall into several categories." *Id.* ¶12. *First*, "the Settlement is directly framed to support Wells Fargo's 'outstanding' Community Reinvestment Act ('CRA') rating." *Id.*[5] This in turn "will facilitate Wells Fargo's strategic objective of growth through acquisitions of smaller banks and otherwise as it emerges from regulatory restrictions on asset growth." *Id.*

*Second*, "the Settlement will result in additional mortgage origination business for Wells Fargo, which will generate origination fees, servicing fees and an interest rate 'spread' over the life of the mortgage." *Id.* ¶13. Specifically, the Borrower Programs "will generate a mortgage loan that is a large multiple of the subsidy itself" and "[b]ecause of the fees and interest rate 'spread,' the Settlement should earn a substantial profit for Wells Fargo even taking into account the potential default rates among low- and moderate-income borrowers." *Id.*

*Third*, "the Settlement will bring new customers to Wells Fargo — parties who turn to Wells Fargo for a mortgage loan and who thereafter rely on Wells Fargo for other financial

---

[5] The ratings are "Outstanding," "Satisfactory," "Needs to Improve," and "Substantial Noncompliance." *Id.* ¶26.

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT AND MEMORANDUM IN SUPPORT

LEAD CASE NO. 3:22-CV-05173-TLT

products and services, such as checking accounts, credit cards, auto loans, and personal loans." *Id.* ¶14.

*Fourth*, "the Settlement will generate good will for Wells Fargo in the local communities in which this subsidized lending takes place." *Id.* ¶15. Professor Gordon opines that "[t]his is likely to bring in additional customers, both retail and business." *Id.*

*Fifth*, "the Settlement will increase loyalty to Wells Fargo among its depositors." Professor Gordon explains that "[t]his has economic value to Wells Fargo in making its deposits more 'sticky' or 'sleepy' even as higher interest options become available from other banks on-line or through alternatives to bank deposits." *Id.* ¶16.

Professor Gordon estimates that, considering the benefits above separately and then together, the Borrower Programs "the Borrower Programs could lead to mortgage origination of up to $2.5 billion." *Id.* ¶38. "This means full utilization of the Borrower Programs is highly profitable for the bank, generating income streams with approximate present value between $1.1 billion (high) and $550 million (low) against a subsidy amount of $100 million." *Id.* ¶46.

Professor Gordon concludes that "the Borrower Programs in the Settlement will generate many specific benefits for Wells Fargo: satisfying regulatory objectives under the Community Reinvestment Act, bringing additional, profitable mortgage origination business to Wells Fargo, enhancing Wells Fargo's reputation in the communities in which it does business, attracting new customers for Wells Fargo's products and financial services, and enhancing the stability of Wells Fargo through enhancing the 'stickiness' of deposits." *Id.* ¶58.

### 2.    The $10 Million Cash Payment Substantially Benefits Wells Fargo

In addition to the $100 million Borrower Programs, the Settlement provides for a $10 million in monetary consideration to be paid to Wells Fargo by the D&O Insurer on behalf of the Director Defendants will provide immediate and certain recovery, allowing the Company to benefit from this cash payment without the risk, expense, and delay of continued litigation,

-16-

including further discovery, summary judgment, trial, and appeals, or potential litigation between the Director Defendants and their insurers.

### C. The Stage of the Proceedings, Amount of Discovery Completed, and the Vigorous Prosecution of this Action by Lead Plaintiffs and Lead Counsel Supports Final Approval of the Settlement

The "stage of proceedings" and the "extent of discovery completed" is also an important factor that courts consider in determining the fairness, reasonableness, and adequacy of a settlement, because it demonstrates whether the decision to settle is well-informed. *Officers for Justice*, 688 F.2d at 625; *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 616-17 (N.D. Cal. 1979).

Here, even before litigation commenced, Lead Plaintiffs made demands for Board-level minutes and materials under Section 220 of the Delaware General Corporation Law, and received materials that informed Lead Plaintiffs' ability to write a strong initial complaint. After the case was filed and the Court granted in part and denied in part Defendants' motion to dismiss, the parties engaged in extensive formal discovery during the pendency of the case. As noted in the Court's Preliminary Approval Order, Lead Counsel engaged in significant efforts to pursue this litigation. ECF 276 at 10 (citing ECF 269 at 2, 13). The Settlement Agreement occurred after a motion to dismiss, ECF 198, the filing of multiple complaints (*see* ECFs, 1, 37, 147, 177) document production, investigation, and extensive negotiation through private mediation. *Id.* The parties conducted extensive factual and expert discovery, including taking 16 depositions of party and non-party witnesses, and review of more than 313,000 documents (approximately 1.5 million pages) including documents produced from the related *Mortgage Discrimination* and *SEB* actions and documents produced for the first time in this Action. In addition, the parties exchanged six opening expert reports; three for Lead Plaintiffs and three for Defendants. Thus, by the time the Settlement was reached, each side had sufficient information to assess the strengths and weaknesses of its claims. *Cicero v. DirecTV, Inc.*, 2010 WL 2991486, at *3 (C.D. Cal. July 27, 2010) (holding that a settlement is "presumptively fair" where, as here, the parties engage in "meaningful discovery" before settlement).

-17-

Indeed, even in derivative and class actions where little or no formal discovery has been conducted, courts routinely approve settlements. *See, e.g., Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (affirming approval of settlement of securities class action where extensive formal discovery had not been completed and noting "[i]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement"); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, at *8 (N.D. Cal. Apr. 3, 2009) (approving class action settlement where the "the parties engaged in informal discovery prior to reaching a settlement"); *Weaver v. Moen*, 2024 WL 4040355, at *3 (D. Del. Sep. 4, 2024) (approving settlement of derivative action in which "the parties had not engaged in any discovery" and noting "[e]ven settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties."); *In re Healthcare Servs. Grp., Inc. Derivative Litig.*, 2022 WL 2985634, at *10 (E.D. Pa. July 28, 2022) (approving settlement of derivative action in which plaintiffs had conducted only "informal discovery" and noting "formal proceedings and discovery are not required for plaintiffs to assess the merits of their claims and their likelihood of success"); *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 481 (D.N.J. 2012) (approving settlement of derivative action where "formal discovery has not even begun" but "the parties did engage in informal discovery").

Furthermore, Lead Plaintiffs, Pontiac, Plantation, and Isenberg—two of which are sophisticated institutional investors and all of whom are longtime Wells Fargo shareholders—have played a very active role in supervising and participating in the litigation. Lead Plaintiffs regularly conferred with Lead Counsel, reviewed and commented on filings, in the case of Ms. Isenberg sat for deposition, and actively participated in the settlement negotiations. *See* Joint Decl. ¶107.

Moreover, throughout the settlement-approval process, Lead Plaintiffs have represented Wells Fargo and shareholders' interests by, among other things, "diligently complying with the

-18-

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED                         LEAD CASE NO. 3:22-CV-05173-TLT
MOTION FOR FINAL APPROVAL OF PROPOSED
SETTLEMENT AND MEMORANDUM IN SUPPORT

notice plan and other settlement procedures." *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *6 (N.D. Cal. Dec. 18, 2018) ("*Hefler II*").

Accordingly, the advanced posture of this case, that amount of discovery completed, and the vigorous prosecution of this Action by Lead Plaintiffs and Lead Counsel evidence a fully-informed and fair process and further supports final approval of the Settlement.

### D. The Complexity, Expense, Duration, and Risks of Continued Litigation Support Final Approval of the Settlement

Another factor weighing in favor of the Settlement is the complexity, expense, likely duration—and hence, the overall risks—of continued litigation. *Officers for Justice*, 688 F.2d at 625; *Cohn v. Nelson*, 375 F. Supp. 2d 844, 859 (E.D. Mo. 2005). Courts have consistently held that unless the proposed settlement is clearly inadequate, its acceptance and approval are preferable to the continuation of lengthy and expensive litigation with uncertain results. *See TBK Partners, Ltd v. W. Union Corp.*, 675 F.2d 456, 462–63 (2d Cir. 1982).

While Lead Plaintiffs are confident in the strength of their case and would have continued to vigorously prosecute their claims on behalf of Wells Fargo using evidence uncovered in discovery, they also recognized that those efforts may or may not have resonated with a jury given the applicable legal standards under Delaware and federal law.

Indeed, courts have observed that a shareholder derivative action alleged breach of fiduciary duty claims based on directors' "alleged failure adequately to oversee corporate activities [which] is, 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *In re Oracle Corp. Derivative Litig.*, 2011 WL 5444262, at *3 (N.D. Cal. Nov. 9, 2011) (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)). "[A]s other courts have commented, it is generally difficult to prevail in a derivative suit." *In re Oclaro, Inc. Derivative Litig.*, 2014 WL 4684993, at *2 (N.D. Cal. Sept. 19, 2014); *see also In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) ("Because shareholder derivative actions are notoriously difficult and unpredictable . . . settlements are favored."). For these reasons, "the odds of winning [a] derivative lawsuit [are] extremely small"

-19-

and "rarely successful." *In re Pac. Enters. Sec. Litig.*, 47 F.3d at 378.[6]  In fact, counsel have not identified a single *Caremark* claim that has been successfully tried before a finder of fact in a shareholder derivative action.

And even among shareholder derivative actions, this case was relatively complex because it involved causes of action both for breach of fiduciary duty *and* for violations of the federal securities laws, which were premised on Wells Fargo's allegedly discriminatory hiring *and* lending practices. *See* ECF 176 (noting "complaint alleges breaches of fiduciary duty and related causes of action in connection with . . . Wells Fargo's discriminatory lending and discriminatory hiring practices").

Even supposing the case proceeded beyond summary judgment, the Defendants had another opportunity to shut down the case by forming a Special Litigation Committee ("SLC") which could recommend a motion to terminate, and courts have often been receptive to SLC determinations. *See In re Carvana Co. S'holders Litig.*, 2024 WL 1300199, at *1 (Del. Ch. Mar. 27, 2024) (granting SLC motion to terminate).  Surviving that hurdle, damages are uncertain.  Furthermore, whether the Borrower Programs could be achieved in a post-trial judgment is an untested proposition, where the remedy would most likely be damages.  For all these reasons, Lead Plaintiffs weighed the risks of litigation against the benefits of the Settlement and determined that the Settlement was the better option rather than continuing with litigation.

Finally, even victory at trial would not have guaranteed as favorable an outcome.  For example, whether the $100 million Borrower Programs could be achieved through a post-trial judgment is an untested proposition, where the remedy would most likely be damages rather than the remedy that would be required to create such unique programs.  Nor would a jury verdict or a post-trial judgment guarantee that any such verdict or judgment would not be reversed on appeal to the Ninth Circuit.  On balance, all the risks associated with continued litigation weigh in favor of approval

---

[6] *See also Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'") (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)).

-20-

of the proposed Settlement. The Settlement eliminates these and other risks, including the very real risk of no recovery at all after years of litigation, while providing Wells Fargo with substantial benefits now.

**E.    The Settlement Was Negotiated at Arm's-Length by Experienced and Well-Informed Counsel with the Assistance and Oversight of an Independent, Renowned Mediator**

There is a strong presumption of fairness to settlements that are (i) "the result of legitimate arms-length negotiations" by "experience[d]" counsel and (ii) with the assistance of an independent "mediator" such as a "retired . . . [j]udge." *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021, 1029 (9th Cir. 1998); *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *9 (N.D. Cal. Sept. 4, 2018) ("*Hefler I*") ("[I]n light of the fact that the Settlement was reached after the parties engaged in motion practice and participated in multiple days of formal mediation, the Court concludes that the negotiations and agreement were non-collusive."); *In re MRV Commc'ns Derivative Litig.*, 2013 WL 2897874, at *2 (C.D. Cal. June 6, 2013) ("'The involvement of experienced [ ] counsel and the fact that the settlement agreement was reached in arm's-length negotiations, after relevant discovery ha[s] taken place create a presumption that the agreement is fair.'" (citation omitted)); *Hu v. Baker*, 2025 WL 2419265, at *5 (N.D. Cal. Aug. 21, 2025) (finding "arms-length, non-collusive, negotiated resolution" when a mediator supervises "multiple sessions of negotiations"). Here, both factors are amply present.

*First*, the Settlement is the product of vigorous prosecution of the Action by Lead Plaintiffs and Lead Counsel and no conflicts have ever existed in this litigation. Lead Counsel for Lead Plaintiffs, Cotchett, Pitre & McCarthy LLP, Motley Rice LLC, and Bleichmar Fonti & Auld LLP; and counsel for the Defendants, Sullivan & Cromwell LLP, Cleary Gottlieb Steen & Hamilton and Willkie Farr & Gallagher LLP, are each experienced law firms that have extensive experience handling these types of cases. *See* Joint Decl. Exs. F-D, G-D, H-D (Lead Counsel's firm résumés).

*Second*, as the Court found in the Preliminary Approval Order, "the Settlement Agreement was the product of arm's length and informed negotiations with the assistance of an experienced

-21-

mediator, United States District Court Judge Layn R. Phillips." ECF 276 at 11. Judge Phillips has signed a declaration stating his grounds for why this settlement is fair, reasonable, and adequate. *See* Joint Decl. Ex. D (Phillips Decl.). Judge Phillips has mediated many of the largest shareholder derivative, class action, and complex settlements in recent years, including "the Boeing air crash derivative litigation, the United Healthcare derivative litigation, . . . the Fox News and News Corp derivative litigation, the Facebook Cambridge Analytica derivative litigation, the FirstEnergy derivative litigation, the Alphabet derivative litigation, and multiple Wells Fargo derivative and securities class actions — including [the related] securities class action related to the Company's diversity hiring practices . . . and numerous other derivative and securities class actions in the banking and financial sector." *Id.* ¶6.

Judge Phillips attests that "the arguments and positions asserted by Plaintiffs and Defendants during the August 21 mediation session were the product of detailed analysis and hard work, that they were complex, and that, while professional, they were highly adversarial." *Id.* ¶14. "During these discussions, [Judge Phillips] challenged all participants separately to address the weaknesses in each of their positions and arguments." *Id.*

Judge Phillips concludes: "Understanding that every aspect of the final approval of this Settlement is committed to the sound discretion of the trial court, after presiding over the mediation process concerning the matter, it is my professional opinion that the Settlement, as well as the agreed-upon attorneys' fees and expenses for Co-Lead Plaintiffs' counsel, are fair and reasonable and are the product of vigorous and independent advocacy and of arm's-length negotiations conducted in good faith by the Parties." *Id.* ¶23.

In sum, the extensive and arm's-length nature of the settlement negotiations and the involvement of an experienced and respected mediator like Judge Phillips support the conclusion that the Settlement is procedurally fair and was achieved free of collusion. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (stating that "elements [of procedural fairness] are amply satisfied here. The parties, represented by highly

-22-

experienced and capable counsel, engaged in extensive arm's length negotiations, which included multiple sessions mediated by retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases."); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 377 (S.D.N.Y. 2013) (approving settlement where the "parties participated in two full-day mediation sessions" overseen by Judge Phillips).

      **F.**      **After a Robust Court-Approved Notice Program, Wells Fargo Shareholders Overwhelmingly Favor Final Approval of the Settlement**

Pursuant to the terms of the January 13, 2026 Preliminary Approval Order (ECF 276 at 4), Wells Fargo included a copy of the Notice in its Form 8-K with the SEC on January 22, 2026. *See* Joint Decl. ¶61. Notice was also published on Wells Fargo's website and in *Investor's Business Daily*. *Id.* ¶¶62–63. The contents of the Notice were also approved by the Court and contained detailed descriptions of the history of the Action and proposed Settlement, the claims that will be released if the proposed Settlement is approved and the deadline and process for submitting a formal objection. *Id.* ¶65. Notice was also posted on each of Lead Counsel's law firm's websites. *Id.* ¶64. News of the Court's preliminary approval of the Settlement, and the Settlement's key terms, was also published in news articles by *Bloomberg*,[7] *Law360*,[8] and *The Globe and Mail*.[9]

The Notice advised shareholders of the April 14, 2026 deadline to file objections and notices of intention to appear at the final hearing. *Id.* ¶65.[10] To date, Lead Counsel have not received any

---

[7] Martina Barash and Gillian R. Brassil, "Wells Fargo $110 Million Investor Deal Gets First Court Nod," *Bloomberg* (Jan. 14, 2026), https://news.bloomberglaw.com/litigation/wells-fargo-100-million-derivative-pledge-gets-first-court-nod.

[8] Katryna Perera, "Wells Fargo Brass Gets 1st OK For 'Fake' Diversity Suit Deal," *Law360* (Jan. 14, 2026), https://www.law360.com/employment-authority/articles/2430246/wells-fargo-brass-gets-1st-ok-for-fake-diversity-suit-deal.

[9] "Wells Fargo Wins Preliminary Approval of Derivative Settlement," *The Globe and Mail* (Jan. 23, 2026), https://www.theglobeandmail.com/investing/markets/stocks/WFC/pressreleases/37205912/wells-fargo-wins-preliminary-approval-of-derivative-settlement/.

[10] To the extent that any shareholder submits an objection to any aspect of the Settlement, Lead Plaintiffs will address such objection in their reply brief in further support of final approval of the Settlement, which is due to be filed on April 28, 2026.

-23-

objections to the Settlement, or notices of intention to appear at the final hearing. *Id.* ¶66. "[T]he absence of a large number of objections to a . . . settlement raises a strong presumption that the terms of a proposed class settlement action are favorable . . . ." *Hefler II*, 2018 WL 6619983, at *9. Even a small number of objections in the face of overwhelming support is convincing evidence of a proposed settlement's fairness and adequacy—particularly here, where the vast majority of shareholders are sophisticated institutional investors with the resources to object to a settlement if they so chose. *See id.* ("[T]hat not one sophisticated institutional investor objected to the Proposed Settlement is indicia of its fairness."); *In re OSI Sys., Inc. Deriv. Litig.*, 2017 WL 5642304, at *4 (C.D. Cal. May 2, 2017) (approving a derivative settlement in part because "the lack of objection" created a strong presumption that the terms of a proposed settlement were fair).[11]

## V.    CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and enter the Final Approval Order.

Dated:  February 27, 2026

Respectfully submitted,
**COTCHETT, PITRE & MCCARTHY LLP**

*/s/ Mark C. Molumphy*
Mark C. Molumphy (SBN 168009)
Tyson Redenbarger (SBN 294424)
Elle D. Lewis (SBN 238329)
Gia Jung (SBN 340160)
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com

[11] As detailed in the accompanying Motion for Approval of Attorneys' Fees, Expenses, and Service Awards ("Fee Motion"), incorporated by reference herein, Lead Counsel's request for an award of attorney's fees and Lead Plaintiffs' requested Service Awards are fair and reasonable and fully supported by all factors considered by Courts in the Ninth Circuit.

elewis@cpmlegal.com
gjung@cpmlegal.com

**MOTLEY RICE LLC**
Marlon E. Kimpson (*pro hac vice*)
William S. Norton (*pro hac vice*)
Joshua C. Littlejohn (*pro hac vice*)
Vanessa A. Davis (*pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
mkimpson@motleyrice.com
bnorton@motleyrice.com
jlittlejohn@motleyrice.com
vdavis@motleyrice.com

**BLEICHMAR FONTI & AULD LLP**
Nancy A. Kulesa (*pro hac vice*)
300 Park Avenue, Suite 1301
New York, NY 10022
Telephone: (212) 789-1343
nkulesa@bfalaw.com

**BLEICHMAR FONTI & AULD LLP**
Derrick B. Farrell (*pro hac vice*)
3411 Silverside Rd.
Baynard Building, Suite 104
Wilmington, DE 19810
Telephone: (302) 499-2158
dfarrell@bfalaw.com

*Lead Counsel for Lead Plaintiffs*

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne B. Beste (SBN 326881)
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
fbottini@bottinilaw.com
achang@bottinilaw.com
abeste@bottinilaw.com

*Additional Counsel for Lead Plaintiff Amy J. Isenberg*

-25-

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED                LEAD CASE NO. 3:22-CV-05173-TLT
MOTION FOR FINAL APPROVAL OF PROPOSED
SETTLEMENT AND MEMORANDUM IN SUPPORT

**STRANCH, JENNINGS & GARVEY, PLLC**
Lesley Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
Joshua D. Samra (SBN 313050)
1111 Broadway, Suite 300
Oakland, CA 94607
Telephone:  (341) 217-0550
lweaver@stranchlaw.com
adavis@stranchlaw.com
jsamra@stranchlaw.com

*Additional Counsel for Lead Plaintiff City of Plantation Police Officers' Retirement Fund*

LEAD PLAINTIFFS' NOTICE AND UNOPPOSED                LEAD CASE NO. 3:22-CV-05173-TLT
MOTION FOR FINAL APPROVAL OF PROPOSED
SETTLEMENT AND MEMORANDUM IN SUPPORT